# COMPOSITE EXHIBIT "A"

# COMPOSITE EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:25-cv-24611-DPG

MICHAEL SMITH,

Plaintiff,

vs.

CARNIVAL CORPORATION and
NIKHIL MAHARAJ, MD,

Defendants.
_______________________________________/

**PLAINTIFF'S CERTIFICATE OF**
**SERVING FIRST INTERROGATORIES**

The undersigned certifies that Plaintiff's First Set of Interrogatories, along with this certificate, have been served by email on all counsel on the service list below on the date listed in the certificate of service.

Dated: November 24, 2025

**By:/s/ David W. Singer**
David Singer, Esq.
(Florida Bar. No.:306215)
dsingeresq@aol.com
Michael A. Hoffman, Esq.
(Florida Bar No.:89549)
mahoffman@1800askfree.com
**DAVID W. SINGER & ASSOC., P.A.**
1011 South Federal Highway
Hollywood, Florida 33020
Ofc. (954) 920-1571
*Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that a true and correct copy of the following was served by email on November 24, 2025, on all counsel of record on the service list below.

**/s/ David W. Singer**

**<u>SERVICE LIST</u>**

Michael J. Drahos, Esq.
W. Cooper Jarnagin
Ashley Genoese
michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com
ashley.genoese@gray-robinson.com
**GRAY ROBINSON, P.A.**
151 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Ofc. (561) 268-5727
*Attorneys for Defendant(s)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:25-cv-24611-DPG

MICHAEL SMITH,

Plaintiff,

vs.

CARNIVAL CORPORATION and
NIKHIL MAHARAJ, MD,

Defendants.
_______________________________________/

## PLAINTIFF'S FIRST INTERROGATIES TO DEFENDANT

Plaintiff propounds the following interrogatories upon Defendant and requests that they be answered separately, fully, and under oath within thirty days of service pursuant to Federal Rule of Civil Procedure 33 and Local Rule 26.1(e).

### DEFINITIONS

(a) The words "you," "yours" and/or "yourselves" means the Defendant named in this lawsuit, and any directors, officers, employees, agents, representatives, or other persons acting, or purporting to act, on behalf of the Defendant.

(b) The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" means "including without limitation."

(c) "Date" shall mean the exact date, month and year, if ascertainable or, if not, the best approximation of the date (based upon relationship with other events).

(d) The word "document" shall mean any writing, recording, electronically stored information or photograph in your actual or constructive possession, custody, care or control, which pertains directly or indirectly, in whole or in part, either to any of the subjects listed below or to any other

matter relevant to the issues in this action, or which are themselves listed below as specific documents, including, but not limited to: correspondence, memoranda, notes, messages, diaries, minutes, books, reports, charts, ledgers, invoices, computer printouts, microfilms, video tapes, or tape recordings.

(e) "Agent" shall mean: any agent, employee, officer, director, attorney, independent contractor, or any other person acting at the direction of or on behalf of another.

(f) "Person" shall mean any individual, corporation, proprietorship, partnership, trust, association, or any other entity.

(g) The words "pertain to" or "pertaining to" mean: relates to, refers to, contains, concerns, describes, embodies, mentions, constitutes, constituting, supports, corroborates, demonstrates, proves, evidences, shows, refutes, disputes, rebuts, controverts, or contradicts.

(h) The term "third party" or "third parties" refers to individuals or entities that are not a party to this action.

(i) The word "identify," when used in reference to a document (including electronically stored information), means and includes the first and last name and address of the custodian of the document, the location of the document, and a general description of the document, including (1) the type of document (e.g., letter or memorandum) and, if electronically stored information, the software application used to create it (e.g., MS Word or MS Excel Spreadsheet); (2) the general subject matter of the document or electronically stored information; (3) the date of the document or electronically stored information; (4) the author of the document or electronically stored information; (5) the addressee of the document or electronically stored information; and (6) the relationship of the author and addressee to each other.

**INSTRUCTIONS**

If you object to fully identifying a document, electronically stored information, or oral communication because of a privilege, you must nevertheless provide the information required under Local Rule 26.1(e)(2).

You are under a continuous obligation to supplement your answers to these interrogatories under the circumstances specified in Federal Rule of Civil Procedure 26(e).

**PLAINTIFF'S INTERROGATORIES**

***Local Rule 26.1(e)(1) requires that you insert your answers immediately beneath each interrogatory. To facilitate this, Plaintiff's has also served you a copy of these interrogatories in Word format so that you don't have to retype each interrogatory.***

1. Identify all persons with knowledge of any facts relevant to Michael Smith's medical treatment, including but not limited to any diagnosis, treatment, monitoring, non-evacuation decisions, medical staffing, telemedicine consultations, medical equipment, or shoreside communications concerning Michael Smith on October 18–20, 2024. For each, provide name, position, employer, and a summary of their knowledge.

   **Response:**

2. Identify all shipboard medical personnel on duty on the *Carnival Pride* from October 18–20, 2024, including their licenses, certifications (ACLS, BLS, etc.), and job duties.

   **Response:**

3. Identify all officers on duty on the *Carnival Pride* from October 18–20, 2024, including their licenses, certifications, and job duties.

   **Response:**

4. Describe in detail the medical policies and procedures in effect aboard the *Carnival Pride* on October 18–20, 2024 regarding:

   a. evaluation of passengers presenting with stroke-like symptoms;
   b. diagnostic testing available onboard;
   c. telemedicine consultations;
   d. shoreside notification procedures;
   e. evacuation criteria and protocols.

   **Response:**

5. State whether telemedicine was used in connection with Mr. Smith's treatment, and if so, identify the persons involved, the dates, times, and substance of all such communications.

   **Response:**

6. Describe in detail all diagnostic equipment available in the *Carnival Pride* medical facility on October 18–20, 2024, including equipment for neurological assessment, cardiac monitoring, and imaging.

   **Response:**

7. Describe Carnival's practices and policies regarding the hiring, credentialing, training, and supervision of shipboard physicians and nurses, including Dr. Maharaj.

   **Response:**

8. State Carnival's position as to whether Dr. Nikhil Maharaj was acting as Carnival's employee, actual agent, apparent agent, or independent contractor at the time of the incident.

   **Response:**

9. Describe all procedures and decision-making processes on the ship for ordering an emergency disembarkation, diversion, or evacuation and state why such procedures were not initiated earlier for Plaintiff.

   **Response:**

10. Describe all procedures and decision-making processes at Carnival's land-based corporate operations for authorizing an emergency disembarkation, diversion, or evacuation and state why such procedures were not initiated earlier for Plaintiff.

    **Response:**

11. Identify all shoreside medical personnel, including but not limited to Fleet Medical Directors, Medical Superintendents, or Shoreside Physicians, who were assigned to, responsible for, or designated to provide shoreside medical oversight or consultation support for the Carnival Pride during the October 13, 2024 – October 20, 2024 voyage (Cruise ID PR20241013007), regardless of whether they were actually contacted regarding the Plaintiff.

    **Response:**

12. Provide a detailed chronology of Plaintiff's medical encounters, assessments, diagnostic testing, monitoring, treatment, and all Carnival internal communications concerning his condition on October 18–20, 2024.

    **Response:**

13. State whether Carnival contends the medical treatment provided to Plaintiff met the standard of care, and if so, describe specifically how.

    **Response:**

14. Describe all changes in medical policies that have occurred since October 20, 2024 relating to stroke protocols, telemedicine procedures, diagnostic capabilities, or evacuation criteria.

    **Response:**

15. State whether any internal investigation or review was conducted by Carnival regarding Plaintiff's incident and identify all persons involved.

    **Response:**

16. Identify all contracts, agreements, or policies governing the duties, responsibilities, and oversight associated with shipboard physicians, including indemnity agreements with Dr. Maharaj.

    **Response:**

17. State Carnival's contentions regarding the cause of Plaintiff's injuries and identify any other persons or entities Carnival alleges are comparatively at fault.

    **Response:**

18. Describe in detail the protocols, parameters, and evaluation criteria utilized by the Defendant to authorize and approve the promotion of Dr. Maharaj in 2025, including identifying the specific performance metrics considered, the individuals involved in the decision-making process, and whether any safety records or incident reports were reviewed as part of this determination.

    **Response:**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:25-cv-24611-DPG

MICHAEL SMITH,

Plaintiff,

vs.

CARNIVAL CORPORATION and
NIKHIL MAHARAJ, MD,

Defendants.
_______________________________________/

**PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT**

Plaintiff, MICHAEL SMITH requests that Defendant admit the truth of the following matters, pursuant to Rule 36 of the Federal Rules of Civil Procedure.

1. Admit that on October 18, 2024, Shipboard Medical Staff required a $250 deposit before permitting Plaintiff to enter the Medical Center for evaluation or treatment.
2. Admit that the $250 deposit had to be sent from daughter in Pennsylvania.
3. Admit that Shipboard Medical Staff refused to allow Plaintiff to enter the Medical Center, provide a wheelchair, or render any medical assessment or aid until the $250 payment was received and processed.
4. Admit that Shipboard Medical Staff refused to provide a wheelchair, until the $250 payment was received and processed.
5. Admit that Shipboard Medical Staff refused to render any medical assessment or aid until the $250 payment was received and processed.
6. Admit that Plaintiff and his family were required to locate and obtain a wheelchair themselves because medical staff refused to provide one until payment was received.
7. Admit that Plaintiff waited outside the Medical Center, visibly deteriorating, while the family arranged the $250 payment.

8. Admit that the documented entry time of 19:16 ship time on October 18, 2024 reflects only the time Plaintiff was finally admitted entry after the $250 payment cleared.
9. Admit that the handwritten time "7:04" on the Guest Consultation Form is the time Plaintiff's family first received the form to fill out at the Medical Center area.
10. Admit that Carnival Pride was docked in Freeport, Grand Bahama on October 18, 2024 until approximately 5:00 p.m. ship time.
11. Admit that Carnival Pride had departed Freeport and was at sea by 19:16 ship time on October 18, 2024.
12. Admit that Plaintiff first sought entry to the Medical Center prior to 18:00 ship time on October 18, 2024 but was denied until after payment.
13. Admit that Carnival Pride spent the entire day of October 19, 2024 at sea and did not divert to any port or request medevac.
14. Admit that Carnival never requested U.S. Coast Guard assistance or private medevac helicopter for Plaintiff at any time October 18–19, 2024.
15. Admit that Plaintiff reported vomiting more than 10 times and inability to walk without assistance.
16. Admit that Plaintiff's family members reported left-sided facial drooping observed during a video call from the Medical Center on October 18, 2024.
17. Admit that facial drooping is a recognized symptom of acute stroke.
18. Admit that Dr. Nikhil Maharaj diagnosed Plaintiff with hyperglycemia, unspecified on October 18, 2024.
19. Admit that Dr. Nikhil Maharaj diagnosed Plaintiff with tinea pedis on October 18, 2024.
20. Admit that Shipboard Medical Staff documented a "septic left big toe nail."
21. Admit that Dr. Nikhil Maharaj ordered a foot X-ray series for Plaintiff.
22. Admit that Dr. Nikhil Maharaj ordered IV Ceftriaxone primarily for a suspected toe infection.
23. Admit that no CT scan or MRI was performed on Plaintiff aboard the Vessel at any time.
24. Admit that the Medical Center had no capability to perform CT or MRI imaging at any time during the voyage.
25. Admit that Plaintiff was diagnosed with acute hemorrhagic stroke in the right cerebellum at MedStar Harbor Hospital on October 20, 2024.

26. Admit that the time from Plaintiff's symptom onset to first diagnostic CT imaging exceeded 36 hours.

27. Admit that the medical principle "time is brain" is accurate in the treatment of acute stroke.

28. Admit that earlier diversion of the Vessel or medevac could have resulted in earlier imaging and treatment for Plaintiff.

29. Admit that Plaintiff was returned to his cabin after his initial evaluation on October 18, 2024.

30. Admit that Plaintiff returned to the Medical Center multiple times on October 19 and 20, 2024 with worsening symptoms.

31. Admit that the Against Medical Advice form signed by Plaintiff listed only "Hyperglycemia, unspecified" as the diagnosis.

32. Admit that the Against Medical Advice form was not signed by Michael Smith.

33. Admit that the words "cerebrovascular accident" do not appear anywhere on the Against Medical Advice form signed by Plaintiff.

34. Admit that the word "stroke" does not appear anywhere on the Against Medical Advice form signed by Plaintiff.

35. Admit that the acronym "CVA" does not appear anywhere on the Against Medical Advice form signed by Plaintiff.

36. Admit that Carnival security officers were summoned when Stephanie Grimm protested returning Plaintiff to his cabin.

37. Admit that no telemedicine consultation with a neurologist was conducted for Plaintiff at any time prior to disembarkation.

38. Admit that Carnival maintained a written stroke protocol in effect on October 18, 2024.

39. Admit that Carnival's stroke protocol in effect on October 18, 2024 required immediate shoreside medical consultation for passengers presenting with suspected stroke symptoms.

40. Admit that Carnival's stroke protocol in effect on October 18, 2024 required consideration of diversion or medevac when stroke is suspected and imaging is unavailable onboard.

41. Admit that Carnival's stroke protocol in effect on October 18, 2024 required performance of a BE-FAST or equivalent stroke scale assessment.

42. Admit that no BE-FAST or equivalent stroke scale assessment was documented for Plaintiff.

43. Admit that Carnival's stroke protocol in effect on October 18, 2024 required notification to the Captain for possible diversion in neurological emergencies.

44. Admit that the Captain was never notified of a potential stroke in Plaintiff for diversion consideration.

45. Admit that Carnival's stroke protocol in effect on October 18, 2024 was not followed in Plaintiff's case.

46. Admit that Carnival charged $5,594.78 to Plaintiff's Sign & Sail account for medical services rendered October 18–20, 2024.

47. Admit that Carnival, and not Dr. Nikhil Maharaj personally, billed, collected, and retained all or a substantial portion of the $5,594.78.

48. Admit that Carnival billed Plaintiff separately for wheelchair usage.

49. Admit that all medications administered to Plaintiff (including Ceftriaxone, insulin, and IV fluids) were supplied from Carnival's own pharmacy stock.

50. Admit that Dr. Nikhil Maharaj was required to wear a Carnival-issued uniform bearing Carnival logos while working in the Medical Center.

51. Admit that Carnival provided Dr. Nikhil Maharaj with a crew cabin aboard Carnival Pride.

52. Admit that Dr. Nikhil Maharaj was listed as a crew member on the Vessel's crew manifest submitted to U.S. Customs & Border Protection for the October 13–20, 2024 voyage.

53. Admit that Carnival maintained the unilateral right to terminate Dr. Maharaj's assignment or remove him from the Vessel at any port in 2024.

54. Admit that Carnival's 2024 Clinical Practice Guidelines or Medical Operations Manual were mandatory for all shipboard physicians.

55. Admit that Carnival's Shoreside Medical Department possessed authority to override a shipboard physician's clinical decisions in 2024.

56. Admit that the 2024 Carnival Crew Handbook, Medical Staff Manual, or equivalent document classifies shipboard physicians as crew members or officers.

57. Admit that Dr. Nikhil Maharaj was promoted within Carnival during the last 12 months.

58. Admit that Carnival paid Dr. Nikhil Maharaj via salary, stipend, or direct payroll deposit in 2024 rather than as a 1099 independent contractor.

59. Admit that Carnival did not pay Dr. Nikhil Maharaj as a 1099 independent contractor.

60. Admit that Carnival withheld taxes or social security contributions from Dr. Maharaj's 2024 compensation.

61. Admit that the medical invoice issued to Plaintiff is titled "CARNIVAL PRIDE MEDICAL CENTER."

62. Admit that Dr. Nikhil Maharaj is identified as "Treating Physician" on the Carnival invoice issued to Plaintiff.

63. Admit that Carnival's website in 2024 contained statements representing that its vessels have "fully equipped medical centers" staffed by qualified doctors and nurses or words to that effect.

64. Admit that Carnival has, at no time, provided any passenger on the October 13–20, 2024 voyage with written notice that shipboard physicians are independent contractors.

65. Admit that no signage in the Carnival Pride Medical Center in October 2024 stated that shipboard physicians are independent contractors.

66. Admit that Carnival's passenger ticket contract for the October 13–20, 2024 voyage contains no disclaimer stating that shipboard medical staff are not agents or employees of Carnival.

67. Admit that Carnival conducted an internal investigation or review regarding Plaintiff's medical treatment or evacuation decisions.

68. Admit that Carnival has revised or amended its stroke protocols, evacuation criteria, telemedicine procedures, or prepayment policies since October 20, 2024.

69. Admit that nursing staff documented worsening of Plaintiff's condition between October 18 and October 20, 2024.

70. Admit that Plaintiff was billed for 26 hours of "Inpatient – Standard Nursing Care" despite being returned to his cabin.

71. Admit that the foot X-ray series performed on Plaintiff showed no fracture or osseous abnormality.

72. Admit that the Baltimore City Fire Department transported Plaintiff from the Carnival Pride pier to MedStar Harbor Hospital on October 20, 2024.

73. Admit that MedStar Harbor Hospital records describe Plaintiff's presentation as a delayed stroke presentation due to shipboard care.

74. Admit that Plaintiff has permanent neurological deficits as a result of the hemorrhagic stroke.

75. Admit that Carnival's marketing materials for the October 13–20, 2024 sailing described the Medical Center as available 24/7 and staffed by a team of doctors and nurses.

76. Admit that Carnival's pre-cruise communications to booked passengers advertised the Medical Center as a shipboard amenity passengers could rely upon.

77. Admit that Carnival's Shoreside Medical Department was notified of Plaintiff's condition prior to arrival in Baltimore on October 20, 2024.

78. Admit that Carnival does not require its shipboard physicians to be board-certified in emergency medicine.

79. Admit that Carnival has no requirement that shipboard physicians have prior documented experience in hospital emergency departments.

80. Admit that Carnival did not provide Dr. Nikhil Maharaj with specific training in acute stroke recognition and management in the 12 months immediately prior to the October 13–20, 2024 voyage.

81. Admit that Carnival's 2024 training program for shipboard medical staff did not include mandatory annual practical drills on stroke protocol.

82. Admit that Carnival did not adequately train shipboard medical staff on the prepayment policy does not apply or must be waived in life-threatening emergencies.

83. Admit that Carnival failed to train shipboard medical staff to recognize that facial drooping vomiting and sudden weakness as potential stroke symptoms in a diabetic patient.

84. Admit that Carnival did not adequately supervise the Carnival Pride Medical Center to ensure compliance with stroke protocol during the October 13–20 2024 voyage.

85. Admit that Carnival knew or should have known that requiring prepayment before emergency assessment violates accepted standards of care.

86. Admit that Carnival's hiring process for shipboard physicians does not include any practical examination of diagnostic skills for common deadly conditions such as acute stroke.

87. Admit that Carnival's supervision of shipboard physicians is limited to post-incident review only.

88. Admit that Carnival has received prior passenger complaints about shipboard physicians misdiagnosing stroke symptoms as hyperglycemia or infections in the five years preceding October 2024.

89. Admit that Carnival has paid any settlement or judgment in any lawsuit in the past ten years arising out of failure to timely evacuate a passenger experiencing a stroke.

90. Admit that Carnival does not require shipboard physicians to consult with shoreside neurologists for every suspected stroke when imaging is unavailable onboard.

91. Admit that Carnival did not discipline Dr. Nikhil Maharaj for misdiagnosis of Plaintiff's stroke as toe infection.

92. Admit that Carnival's Medical Center prepayment policy directly caused delayed treatment in Plaintiff's case.

93. Admit that the refusal to admit Plaintiff into the Medical Center until $250 was paid fell below the standard of care for a patient presenting with stroke symptoms.

94. Admit that returning Plaintiff to his cabin on October 18 2024 instead of keeping him for observation fell below the standard of care.

95. Admit that billing Plaintiff for 26 hours of inpatient nursing care while confining him to his cabin with no nursing care constitutes willful indifference to patient welfare.

96. Admit that Dr. Nikhil Maharaj had never previously diagnosed an acute stroke while aboard a Carnival vessel prior to October 18 2024.

97. Admit that Carnival provided no continuing medical education credits on current stroke treatment protocols to Dr. Nikhil Maharaj at any time in 2023 or 2024.

98. Admit that Carnival's failure to adequately hire train and supervise its shipboard medical staff proximately caused permanent brain damage to Michael Smith.

99. Admit that Carnival's decision to sail from Freeport Bahamas at approximately 5:00 p.m. on October 18 2024 without first disembarking Plaintiff for hospital evaluation in Freeport Bahamas constituted reckless indifference to human life.

100. Admit that Carnival Pride was within 12 nautical miles of Grand Bahama Island less than one hour prior to Plaintiff presenting at the Medical Center.

101. Admit that Plaintiff lost critical hours of thrombolytic therapy window due to Carnival's misdiagnosis and refusal to treat aboard Carnival Pride.

102. Admit that every single instance of misconduct in this case was carried out by Carnival medical staff for the sole purpose of avoiding offloading Plaintiff ashore in the Bahamas.

103. Admit that Carnival's Shoreside Medical Department was notified of Plaintiff's presentation to the Medical Center on October 18, 2024.

104. Admit that Carnival's Shoreside Medical Department was notified of Plaintiff's symptoms of sudden-onset weakness, repeated vomiting, and inability to walk on October 18, 2024.

105. Admit that Carnival's Shoreside Medical Department was notified that Plaintiff had facial drooping on October 18 or 19, 2024.

106. Admit that Carnival's Shoreside Medical Department was notified that the shipboard physician had diagnosed only hyperglycemia and tinea pedis.

107. Admit that Carnival's Shoreside Medical Department was notified that no diagnostic imaging for stroke was available onboard.

108. Admit that Carnival's Shoreside Medical Department was advised that Plaintiff's condition was worsening while aboard.

109. Admit that Carnival's Shoreside Medical Department never instructed shipboard staff to perform a BE-FAST or equivalent stroke scale assessment.

110. Admit that Carnival's Shoreside Medical Department never instructed shipboard staff to treat Plaintiff as a suspected stroke.

111. Admit that Carnival's Shoreside Medical Department never recommended or ordered telemedicine consultation with a neurologist.

112. Admit that Carnival's Shoreside Medical Department never recommended or ordered diversion of Carnival Pride for Plaintiff's medical emergency.

113. Admit that Carnival's Shoreside Medical Department never recommended or ordered medevac of Plaintiff at any time October 18–19, 2024.

114. Admit that Carnival's Shoreside Medical Department has final authority over whether a vessel diverts for a passenger medical emergency.

115. Admit that Carnival's Shoreside Medical Department has final authority over whether a passenger is medically disembarked or medevac'd in non-port situations.

116. Admit that Carnival's Shoreside Medical Department physicians are direct employees of Carnival Corporation or its wholly-owned subsidiaries.

117. Admit that Carnival's Shoreside Medical Department is responsible for supervising the clinical performance of shipboard physicians.

118. Admit that Carnival's Shoreside Medical Department is responsible for ongoing training and competency assurance of shipboard physicians in high-risk diagnoses including acute stroke.

119. Admit that Carnival's Shoreside Medical Department approved or failed to correct Dr. Maharaj's diagnosis of hyperglycemia/toe infection in a patient presenting with stroke symptoms.

120. Admit that Carnival's Shoreside Medical Department approved or failed to correct the decision to return Plaintiff to his cabin instead of keeping him under observation.

121. Admit that Carnival's Shoreside Medical Department approved or failed to intervene when Plaintiff was required to pay $250 before receiving emergency assessment.

122. Admit that Carnival's Shoreside Medical Department's failure to order immediate evacuation or specialist consultation proximately caused the delay in Plaintiff's stroke treatment.

123. Admit that Carnival's Shoreside Medical Department physicians are paid salaries by Carnival and are not independent contractors.

124. Admit that Carnival's Shoreside Medical Department has received prior complaints or notices of shipboard physicians misdiagnosing strokes in the five years preceding October 2024.

125. Admit that Carnival's Shoreside Medical Department has been named as a defendant or paid settlements in prior lawsuits involving failure to timely evacuate stroke patients.

126. Admit that no member of Carnival's Shoreside Medical Department ever contacted a neurologist regarding Plaintiff's case.

127. Admit that Carnival's Shoreside Medical Department's own written protocols require escalation to a shoreside physician for any suspected stroke when imaging is unavailable.

128. Admit that Carnival's Shoreside Medical Department violated its own escalation protocol in Plaintiff's case.

129. Admit that Carnival's Shoreside Medical Department's inaction in Plaintiff's case fell below the standard of care for reasonable land-based emergency medical oversight.

**By:/s/ David W. Singer**
David Singer, Esq.
(Florida Bar. No.:306215)
dsingeresq@aol.com
Michael A. Hoffman, Esq.

(Florida Bar No.:89549)
mahoffman@1800askfree.com
**DAVID W. SINGER & ASSOC., P.A.**
1011 South Federal Highway
Hollywood, Florida 33020
Ofc. (954) 920-1571
*Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that a true and correct copy of the following was served by email on November 24, 2025, on all counsel of record on the service list below.

**/s/ David W. Singer**

**SERVICE LIST**

Michael J. Drahos, Esq.
W. Cooper Jarnagin
Ashley Genoese
michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com
ashley.genoese@gray-robinson.com
**GRAY ROBINSON, P.A.**
151 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Ofc. (561) 268-5727
*Attorneys for Defendant(s)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:25-cv-24611-DPG

MICHAEL SMITH,

Plaintiff,

vs.

CARNIVAL CORPORATION and
NIKHIL MAHARAJ, MD,

Defendants.
_______________________________________/

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT**

To: Michael J. Drahos,

Plaintiff, MICHAEL SMITH, serves this Request for Production on Defendant, Carnival Corporation, pursuant to Rule 34 of the Federal Rules of Civil Procedure and Rule 26.1 of the Local Rules of the United States District Court for the Southern District of Florida. The Plaintiff requests that the Defendant send Plaintiff's counsel by mail or email, within thirty days, copies of all material described in the numbered paragraphs below. If the Defendant prefers to respond in a different manner allowed by the rules, the Defendant is of course free to do so. The Plaintiff requests that the Defendant comply with the requirements of Rule 34 and Rule 26.1 in responding to this Request for Production.

**Definitions**

(a) The words "you," "yours" and/or "yourselves" means the Defendant named in this lawsuit, and any directors, officers, employees, agents, representatives, or other persons acting, or purporting to act, on behalf of the Defendant.

(b) The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" means "including without limitation."

(c) "Date" shall mean the exact date, month and year, if ascertainable or, if not, the best approximation of the date (based upon relationship with other events).

(d) The word "document" and the word "record" shall mean any writing, recording, electronically stored information or photograph in your actual or constructive possession, custody, care or control, which pertains directly or indirectly, in whole or in part, either to any of the subjects listed below or to any other matter relevant to the issues in this action, or which are themselves listed below as specific documents, including, but not limited to: correspondence, memoranda, notes, messages, diaries, minutes, books, reports, charts, ledgers, invoices, computer printouts, microfilms, video tapes, or tape recordings.

(e) "Agent" shall mean: any agent, employee, officer, director, attorney, independent contractor, or any other person acting at the direction of or on behalf of another.

(f) "Person" shall mean any individual, corporation, proprietorship, partnership, trust, association, or any other entity.

(g) The words "pertain to" or "pertaining to" mean: relates to, refers to, contains, concerns, describes, embodies, mentions, constitutes, constituting, supports, corroborates, demonstrates, proves, evidences, shows, refutes, disputes, rebuts, controverts, or contradicts.

(h) The term "third party" or "third parties" refers to individuals or entities that are not a party to this action.

(i) The word "identify," when used in reference to a document (including electronically stored information), means and includes the name and address of the custodian of the document, the location of the document, and a general description of the document, including (1) the type of document (e.g., letter or memorandum) and, if electronically stored information, the software application used to create it (e.g., MS Word or MS Excel Spreadsheet); (2) the general subject matter of the document or electronically stored information; (3) the date of the document or electronically stored information; (4) the author of the document or electronically stored information; (5) the addressee of the document or electronically stored information; and (6) the relationship of the author and addressee to each other.

(j) The words "this accident" and "the Plaintiff's accident" refer to the Plaintiff's accident described in the Complaint in this action.

**Instructions**

***Local Rule 26.1(e)(5) requires you to identify which numbered request each document you produce pertains to.***

***Please insert your responses immediately beneath each numbered request. To facilitate this, Plaintiff's counsel is sending you this Request for Production in Word format so that you don't have to retype each item.***

***<u>Please provide the following materials</u>:***

1. Produce all medical records, notes, charts, nursing entries, and medication administration records created in the Medical Center that pertain to Plaintiff during the Incident Period.

2. Produce all triage forms or intake forms completed for Plaintiff during the Incident Period.

3. Produce all progress notes or narrative notes documenting Plaintiff's condition or treatment during the Incident Period.

4. Produce all laboratory reports or bloodwork results for Plaintiff generated aboard the Vessel during the Incident Period.

5. Produce all telemedicine records pertaining to Plaintiff during the Incident Period, including any written records of video consults, audio consults, emails, or chat messages.

6. Produce all emails that reference Plaintiff sent between Shipboard Medical Staff and any member of Carnival's Shoreside Medical Department during the Incident Period.

7. Produce all internal messages or communications through any shipboard or corporate messaging system that reference Plaintiff during the Incident Period.

8. Produce the Medical Center logbook entries for the Carnival Pride that reference Plaintiff during the Incident Period.

9. Produce the Vessel's deck log entries that reflect the Vessel's port status and location on October 18, 2024 between 12:00 p.m. and 11:59 p.m.

10. Produce any log, report, or record documenting the call for emergency medical transport of Plaintiff in Baltimore on October 20, 2024, including any record of contact with the Baltimore City Fire Department or other EMS provider.

11. Produce the specific written policy or protocol in effect on the Carnival Pride on October 18, 2024 for evaluation of passengers with suspected stroke.

12. Produce the specific written policy or protocol in effect on the Carnival Pride on October 18, 2024 for emergency medical evacuation or diversion for passenger medical emergencies.

13. Produce the specific written policy or protocol in effect on the Carnival Pride on October 18, 2024 governing use of telemedicine for passenger medical complaints.

14. Produce the specific written policy or protocol in effect on the Carnival Pride on October 18, 2024 governing notification of Carnival's Shoreside Medical Department for passenger medical emergencies.

15. Produce any written policy or protocol in effect on October 18, 2024 that addresses when a passenger should be disembarked in port for urgent medical evaluation.

16. Produce the stroke-related training materials that were provided to the Shipboard Physician for use during his assignment that included the Incident Period, limited to materials in effect between January 1, 2022 and October 20, 2024.

17. Produce the stroke-related training materials that were provided to any nurse who treated Plaintiff during the Incident Period, limited to materials in effect between January 1, 2022 and October 20, 2024.

18. Produce a list or inventory that was in effect on October 18, 2024 identifying diagnostic equipment available in the Medical Center, including imaging, monitoring, and laboratory equipment.

19. Produce maintenance or calibration records for diagnostic equipment used in the Medical Center that pertain to neurological or cardiac assessment and that were in effect during the period January 1, 2024 through October 20, 2024.

20. Produce all CCTV footage showing Plaintiff entering or exiting the Medical Center on October 18, 2024.

21. Produce all CCTV footage showing Plaintiff being transported in a wheelchair on the Carnival Pride on October 18, 2024, limited to the time period 4:00 p.m. to 11:59 p.m.

22. Produce any incident report, occurrence report, or internal form prepared by Shipboard Medical Staff that pertains to Plaintiff during the Incident Period.

23. Produce the contract or agreement in effect between Carnival and the Shipboard Physician that governed his service aboard the Carnival Pride on the voyage that included the Incident Period.

24. Produce any job description in effect on October 18, 2024 for the position held by the Shipboard Physician aboard the Carnival Pride.

25. Produce documents reflecting the method of compensation paid by Carnival to the Shipboard Physician for his service aboard the Carnival Pride during 2024, limited to documents showing whether he was paid salary, stipend, or per diem.

26. Produce performance evaluations of the Shipboard Physician prepared by Carnival's Shoreside Medical Department for the period January 1, 2022 through October 20, 2024.

27. Produce any written warning, corrective action, or disciplinary document issued by Carnival to the Shipboard Physician for the period January 1, 2022 through October 20, 2024.

28. Produce any organizational chart in effect on October 18, 2024 that shows the reporting structure for Shipboard Medical Staff aboard the Carnival Pride.

29. Produce any Carnival policy in effect on October 18, 2024 that describes the authority of the Shoreside Medical Department to direct or supervise Shipboard Medical Staff.

30. Produce the personnel file for each nurse who treated Plaintiff during the Incident Period, limited to licenses, certifications, and position descriptions in effect on October 18, 2024.

31. Produce any document in effect on October 18, 2024 that describes the chain of command for nurses and healthcare assistants working in the Medical Center aboard the Carnival Pride.

32. Produce Plaintiff's complete Sign & Sail or onboard account statement for the voyage that includes the Incident Period.

33. Produce any itemized billing record for medical services rendered to Plaintiff in the Medical Center during the Incident Period.

34. Produce any internal Carnival document that reflects the allocation of medical charges collected from passengers between Carnival and the Shipboard Physician for 2024, limited to documents that apply to the Carnival Pride.

35. Produce any brochure, web page printout, or marketing material in effect between January 1, 2024 and October 20, 2024 that describes onboard medical services on the Carnival Pride or fleetwide.

36. Produce any written material distributed to passengers on the voyage at issue (including in ticket materials or cabin literature) that describes Carnival's onboard medical facilities or medical staff.

37. Produce any written disclaimer provided to passengers on the voyage at issue that states that shipboard physicians are independent contractors.

38. Produce any internal investigation report, root-cause analysis, or case review performed by Carnival that pertains to Plaintiff's medical treatment or evacuation decisions. This request includes documents created in the ordinary course of Carnival's business; to the extent you contend any such document is privileged or protected, you must (a) identify it on a privilege log and (b) produce all non-privileged factual portions in accordance with the Instructions above.

39. Produce any document implemented after October 20, 2024 that amends or revises Carnival's stroke evaluation protocol in the Medical Center, limited to documents that refer to passenger stroke. To the extent any such document contains both factual

information and privileged analysis, you must produce the factual portions and log any redactions as set forth in the Instructions.

40. Produce any document implemented after October 20, 2024 that amends or revises Carnival's policies for emergency disembarkation or evacuation of passengers for medical emergencies. To the extent any such document contains both factual information and privileged analysis, you must produce the factual portions and log any redactions as set forth in the Instructions.

41. Produce all documents, not otherwise requested above, that you intend to rely upon in support of your defenses specifically relating to Plaintiff's medical care, evacuation decisions, and the status of the Shipboard Physician or Shipboard Medical Staff.

42. Produce any organizational chart in effect at any time between January 1, 2022 and October 20, 2024 that shows the structure of the Shoreside Medical Department and its reporting lines to Carnival's corporate management.

43. Produce the written job description in effect during 2024 for the position of Carnival Medical Director (or equivalent title) with responsibility for shipboard medical services.

44. Produce the written job description in effect during 2024 for any shoreside physician position responsible for providing telemedicine or clinical guidance to Shipboard Medical Staff.

45. Produce any written policy or procedure in effect during 2024 that describes the authority of the Shoreside Medical Department to direct, overrule, or approve clinical decisions made by Shipboard Medical Staff.

46. Shoreside involvement in Michael Smith's care

47. Produce all emails that reference Plaintiff sent between any member of the Shoreside Medical Department and Shipboard Medical Staff from October 18, 2024 through October 21, 2024.

48. Produce all written telemedicine records (including consultation notes, summaries, or reports) created by any member of the Shoreside Medical Department that concern Plaintiff during the Incident Period.

49. Produce any call log or contact log maintained by the Shoreside Medical Department that reflects telephone, VoIP, or telemedicine contact regarding Plaintiff from October 18, 2024 through October 21, 2024.

50. Produce any internal Shoreside Medical Department memorandum or note prepared during the Incident Period that discusses Plaintiff's clinical status, differential diagnosis, or evacuation options.

51. Produce any document created by the Shoreside Medical Department on or before October 21, 2024 that summarizes or describes the decision not to medically evacuate Plaintiff before the Vessel returned to Baltimore.

52. Produce the written protocol in effect on October 18, 2024 that governs when Shipboard Medical Staff must contact the Shoreside Medical Department for guidance regarding passenger medical complaints.

53. Produce the written protocol in effect on October 18, 2024 that governs how the Shoreside Medical Department triages calls or telemedicine consultations from Shipboard Medical Staff.

54. Produce the written protocol in effect on October 18, 2024 that describes the role of the Shoreside Medical Department in deciding whether a passenger should be disembarked in port for urgent evaluation.

55. Produce the written protocol in effect on October 18, 2024 that describes the role of the Shoreside Medical Department in deciding whether a vessel should divert or alter course for a passenger medical emergency.

56. Produce the written protocol in effect on October 18, 2024 that addresses suspected or confirmed stroke in passengers, to the extent it identifies any responsibilities of the Shoreside Medical Department.

57. Produce any written guidance, bulletin, or update issued by the Shoreside Medical Department between January 1, 2022 and October 20, 2024 that addresses evaluation or management of suspected stroke aboard ship.

58. Produce all performance evaluations of the Shipboard Physician who treated Plaintiff that were prepared by or submitted to the Shoreside Medical Department between January 1, 2022 and October 20, 2024.

59. Produce a job description for Shipboard Physician who treated Plaintiff and was promoted within Carnival after October 20, 2024.

60. Produce any quality-assurance or peer-review summary prepared by the Shoreside Medical Department that addresses the Shipboard Physician's overall clinical performance between January 1, 2022 and October 20, 2024, limited to documents that mention neurological emergencies or stroke.

61. Produce any credentialing file summary maintained by the Shoreside Medical Department for the Shipboard Physician, limited to documents that show the dates of initial credentialing, re-credentialing, and any conditions or restrictions in effect on October 18, 2024.

62. Produce any training schedule or agenda that lists stroke-related training sessions conducted or coordinated by the Shoreside Medical Department for the Shipboard Physician between January 1, 2022 and October 20, 2024.

63. Produce any email or memorandum from the Shoreside Medical Department to the Shipboard Physician between January 1, 2022 and October 20, 2024 that references his compliance or non-compliance with Carnival medical policies.

64. Produce any internal case review, morbidity and mortality review, or quality-assurance review performed by or for the Shoreside Medical Department that concerns Plaintiff's illness, treatment, or evacuation. This request includes documents created in the ordinary course of Carnival's business; to the extent you contend any such document is privileged or protected, you must (a) identify it on a privilege log and (b) produce all non-privileged factual portions in accordance with the Instructions above.

65. Produce any meeting minutes or notes from any meeting of the Shoreside Medical Department held between October 20, 2024 and December 31, 2024 at which Plaintiff's case was discussed.

66. Produce any written recommendation or action plan generated by the Shoreside Medical Department based on its review of Plaintiff's case.

67. Produce any document that reflects a change in medical policy, protocol, or guidance implemented after October 20, 2024 by the Shoreside Medical Department that was prompted in whole or in part by Plaintiff's case, limited to changes that reference stroke, neurological emergencies, or passenger evacuation. To the extent any such document contains both factual information and privileged analysis, you must produce the factual portions and log any redactions as set forth in the Instructions.

68. Produce any document in effect between January 1, 2022 and October 20, 2024 that describes criteria used by the Shoreside Medical Department to recommend diversion of a vessel for passenger medical emergencies.

69. Produce any document in effect between January 1, 2022 and October 20, 2024 that describes criteria used by the Shoreside Medical Department to recommend immediate disembarkation of a passenger in the embarkation or turnaround port for urgent evaluation.

70. Produce any summary report or spreadsheet created by or for the Shoreside Medical Department between January 1, 2022 and October 20, 2024 that lists passenger medical emergencies aboard the Carnival Pride that resulted in urgent disembarkation or diversion, limited to entries that reference suspected or confirmed stroke.

71. Produce any factual summary, timeline, or case description prepared by the Shoreside Medical Department and provided to any Carnival in-house counsel, risk management personnel, or designated corporate representative concerning Plaintiff's case. To the extent any such document contains both factual information and privileged analysis, you must produce the factual portions and log any redactions as set forth in the Instructions.

72. Produce any written materials prepared by the Shoreside Medical Department to assist any Carnival corporate representative in testifying about Plaintiff's medical care, evacuation decisions, or stroke-related policies. To the extent any such document contains both factual information and privileged analysis, you must produce the factual portions and log any redactions as set forth in the Instructions.

73. Produce any non-privileged document created by the Shoreside Medical Department that Carnival will rely upon to support its contention that the Shipboard Physician was not an employee or agent of Carnival during the Incident Period.

74. Produce all incident reports, occurrence reports, case reviews, or quality assurance documents concerning any other incident within the past five (5) years (preceding the date of this Request) across all Carnival Corporation vessels (including affiliated brands) where a passenger alleged a failure to diagnose a stroke/CVA, or where a stroke/CVA was diagnosed at a shoreside facility within 72 hours of shipboard treatment for non-stroke symptoms.

75. Produce all notes, summaries, or logs related to any prior complaints or claims of "missed stroke" or "failure to diagnose stroke" made against the Shipboard Physician who treated Plaintiff, regardless of which vessel he was assigned to at the time of the alleged incident.

76. Produce all minutes, notes, agendas, summaries, or recordings of any Safety Officer meeting, Deck Officers' meeting, Hotel Officers' meeting, or Captain's meeting held aboard the *Carnival Pride* between October 18, 2024, and October 25, 2024, that reference Plaintiff, Michael Smith, or the specific medical emergency involving Plaintiff.

77. Produce all daily logs, notes, or reports maintained by the *Carnival Pride* Safety Officer for the dates of October 18, 2024 through October 21, 2024.

**By:/s/ David W. Singer**
David Singer, Esq.
(Florida Bar. No.:306215)
dsingeresq@aol.com
Michael A. Hoffman, Esq.
(Florida Bar No.:89549)
mahoffman@1800askfree.com
**DAVID W. SINGER & ASSOC., P.A.**
1011 South Federal Highway
Hollywood, Florida 33020
Ofc. (954) 920-1571
*Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that a true and correct copy of the following was served by email on November 24, 2025, on all counsel of record on the service list below.

**/s/ David W. Singer**

**<u>SERVICE LIST</u>**

Michael J. Drahos, Esq.
W. Cooper Jarnagin
Ashley Genoese
michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com
ashley.genoese@gray-robinson.com
**GRAY ROBINSON, P.A.**
151 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Ofc. (561) 268-5727
*Attorneys for Defendant(s)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:25-CV-24611-DPG

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION d/b/a
CARNIVAL CRUISE LINE, and
NIKHIL MAHARAJ, M.D.,

Defendants.
_______________________________________/

**PLAINTIFF'S NOTICE OF VIDEOTAPED FED. R. CIV. P. 30(b)(6) DEPOSITION OF CORPORATE REPRESENTATIVE DUCES TECUM**

**(CORRECTED)**

**PLEASE TAKE NOTICE** that Plaintiff, MICHAEL SMITH, through undersigned counsel and before a Court Reporter authorized to administer oaths, will take the oral deposition of CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE ("CARNIVAL"), pursuant to Fed. R. Civ. P. 30(b)(6), in accordance with the List of Topics and Request for Production, pursuant to Fed. R. Civ. P. 34, as noted below, and continuing from day to day until completed.

**Deponent:** CORPORATE REPRESENTATIVE CARNIVAL CORPORATION

**Date:** TBD[1]

**Time:** 10:00 A.M.

**Location:** 1011 S. Federal Highway, Hollywood, FL

**Court Reporter:** COGENT (561) 356-0831

CARNIVAL CORPORATION shall designate one or more officers, directors, or managing agents, or other persons, who shall consent to testify on its behalf. CARNIVAL CORPORATION is requested, for each person so designated, to set forth the matters on which he or she will testify. The person(s) designated shall testify as to matters known or reasonably available to CARNIVAL CORPORATION.

[1] May 12, 2026, or such other date as the parties may agree upon in writing, but in no event fewer than fifty (50) days from the date of service of this Notice. The deposition date is proposed to ensure that (a) Defendant's obligation to respond to the document requests set forth in Section B of Schedule "A" is fully due and owing no later than thirty (30) days after service of this Notice pursuant to Fed. R. Civ. P. 34(b)(2)(A), and (b) all responsive documents are produced to Plaintiff's counsel no fewer than fourteen (14) days before the deposition date as required herein. Plaintiff will not agree to any deposition date that compresses either of these windows.

CARNIVAL CORPORATION must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by Plaintiff and to prepare those persons that in order they can answer fully, completely, non-evasively, the questions posed, as to the relevant subject matters. "The duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved." CARNIVAL CORPORATION must prepare its designated representative "to the extent matters are reasonably available, whether from documents, past employees, or other sources. If it becomes obvious that the deposition representative designated by CARNIVAL CORPORATION is deficient, CARNIVAL CORPORATION is obligated to provide a substitute.

**DOCUMENT PRODUCTION DEADLINE:** All documents requested in Section B of Schedule "A" must be produced to Plaintiff's counsel at least fourteen (14) days in advance of the scheduled deposition date. For any document withheld on the basis of attorney-client privilege or work product protection, Defendant shall provide a compliant privilege log pursuant to Fed. R. Civ. P. 26(b)(5)(A) within the same fourteen (14) day deadline, identifying each withheld document by date, author, recipient(s), subject matter, and the specific privilege asserted. Listing a document on a privilege log does not relieve the corporate representative of the obligation to testify regarding the underlying facts, communications, and subject matter of the withheld document; the privilege protects only the document itself, not the facts contained therein. *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383, 395–96 (1981). In the event Carnival produces any responsive document within the fourteen (14) day window but fewer than seventy-two (72) hours before the scheduled deposition, Plaintiff reserves the right to adjourn the deposition as to any topic covered by those late-produced documents and to reconvene at Carnival's expense. Failure to timely produce the requested documents or a compliant privilege log will result in cancellation of the deposition and an immediate motion to compel production, with a request for attorneys' fees and costs pursuant to Fed. R. Civ. P. 37(a)(5).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic mail on March 23, 2026, to all counsel of record as listed in the Service List below.

Respectfully submitted,

/s/ Michael A. Hoffman
MICHAEL A. HOFFMAN
Florida Bar No.: 89549
mahoffman@1800askfree.com
DAVID W. SINGER & ASSOC., P.A.
1011 South Federal Highway
Hollywood, FL 33020
Telephone: (954) 920-1571

Attorneys for Plaintiff

**SERVICE LIST**

Michael J. Drahos, Esq.
W. Cooper Jarnagin, Esq.
Ashley Genoese, Esq.

michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com
ashley.genoese@gray-robinson.com
**GRAY ROBINSON, P.A.**
151 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Ofc. (561) 268-5727
Attorneys for Defendant(s)

## SCHEDULE "A"

## A. LIST OF TOPICS FOR CARNIVAL'S CORPORATE REPRESENTATIVE

**Discovery Responses**

1) Knowledge of Carnival's Answer and Affirmative Defenses in this matter.
2) Knowledge of each and every document provided by Carnival in its Responses to Plaintiff's Request for Productions.
3) Knowledge of all responses by Carnival to Plaintiff's Request for Admissions.
4) Knowledge of all answers by Carnival to Plaintiff's Interrogatories.

**Michael Smith's Personal Injuries**

5) Knowledge of Plaintiff's injuries stemming from the medical negligence aboard the Carnival Pride between October 18–20, 2024.
6) Knowledge of the medical treatment Plaintiff received since October 20, 2024, including emergency hospitalization, neurological treatment, and ongoing rehabilitation.
7) Knowledge of Plaintiff's injuries sustained as a result of the failure to diagnose and treat stroke aboard the Carnival Pride.

**October 18–20, 2024 Incident**

8) Knowledge of Plaintiff's presentation to the Medical Center aboard the Carnival Pride on October 18, 2024, including all presenting complaints, symptoms, vital signs, and examinations performed.
9) Knowledge of all diagnoses made or considered by shipboard medical staff regarding Plaintiff, including hyperglycemia, tinea pedis, and whether stroke, transient ischemic attack, or any acute neurological deficit was considered or ruled out.
10) Knowledge of whether any stroke screening protocol—including BE-FAST, NIH Stroke Scale, Cincinnati Stroke Scale, or any equivalent—was performed or documented for Plaintiff.
11) Knowledge of all diagnostic testing available aboard the Carnival Pride during the Voyage, including laboratory testing, imaging, and point-of-care testing, and whether any such testing was ordered, performed, or withheld for Plaintiff.
12) Knowledge of all treatment decisions and medications ordered for Plaintiff between October 18–20, 2024.
13) Knowledge of the decision to discharge Plaintiff from the Medical Center to his cabin on October 18, 2024, rather than admitting him for observation, including the identity of all persons involved in that decision and the clinical rationale documented or not documented.

14) Knowledge of all communications between shipboard medical staff and Carnival's Health Operations Center (HOC) or Shoreside Medical Department regarding Plaintiff, including whether the HOC was contacted and, if not, why not.

**Escalation, Evacuation, and Disembarkation**

15) Knowledge of whether medical evacuation, vessel diversion, or urgent disembarkation was considered for Plaintiff, and if not, why not.

16) Knowledge of the factors that were or should have been considered in determining whether Plaintiff required disembarkation, including the factors set forth in MED-3104 (Medical Disembarkation) and MED-3104-A1 (Disembarkation Considerations).

17) Knowledge of whether telemedicine consultation was obtained or considered for Plaintiff, and the circumstances requiring such consultation under MED-3105-DI1 (Telemedicine Guidance).

18) Knowledge of the workflow and decision-making process for disembarkations involving potential operational disruption as set forth in MED-3104-A5 (Workflow for Disembarkation with Potential Operational Disruption).

**Payment, Billing, and Access to Care**

19) Knowledge of Carnival's policies regarding payment for shipboard medical services, including whether payment or a guarantee of payment is a condition of admission, continued treatment, or monitoring in the Medical Center.

20) Knowledge of Carnival's policies regarding the rental or use of wheelchairs aboard Carnival vessels, including whether payment is required for wheelchair use, and any records reflecting the provision, rental, or denial of a wheelchair to Plaintiff.

21) Knowledge of whether Plaintiff or Plaintiff's family was required to make payment or provide a guarantee of payment before Plaintiff could be admitted or remain in the Medical Center for observation.

22) Knowledge of whether the inability, refusal, or delay of payment played any role in the decision to discharge Plaintiff to his cabin rather than admit him for observation.

23) Knowledge of whether Plaintiff's family member, Patty Grimm, was contacted by persons aboard the Carnival Pride to request money so that the infirmary would admit Plaintiff, and any records or communications reflecting such a request.

**Family Objections**

24) Knowledge of any objections or protests by Plaintiff's family—including specifically Stephanie Grimm, Alissa Salsbury, Eric Grimm, Austin (AJ) Peterson, and Terry Crowley—regarding sending Plaintiff back to his cabin, failure to evacuate or urgently disembark Plaintiff, or failure to diagnose his condition, and how those objections were handled.

25) Knowledge of Stephanie Grimm's verbal criticism of the medical staff's decision to discharge Plaintiff to his cabin given his medical presentation, rather than keeping him in the Medical Center for care, as identified in Plaintiff's Verified Answers to Interrogatory No. 22.

**Carnival Policies and Procedures**

26) Knowledge of the policies and procedures produced in discovery, including all HESS procedures produced at GR000430 through GR000481.

27) Knowledge of Carnival's policies and procedures for suspected stroke, neurological emergencies, and acute neurological deficit assessment aboard its vessels, including any clinical pathways, screening tools, or decision aids.

28) Knowledge of Carnival's policies and procedures for first response and triage of patients, as set forth in MED-3002 (First Response and Triage)—referenced within Carnival's own production but not produced.

29) Knowledge of Carnival's policies and procedures for patient admission and discharge from the Medical Center, as set forth in MED-3102 (Patient Admission and Discharge)—referenced within Carnival's own production but not produced.

30) Knowledge of Carnival's policies and procedures for patient documentation, as set forth in MED-3701 (Documentation Management)—referenced within Carnival's own production but not produced.

31) Knowledge of Carnival's policies and procedures for reporting and managing patient safety events, as set forth in MED-3802 (Patient Safety Events)—referenced within Carnival's own production but not produced.

32) Knowledge of Carnival's policies and procedures for medicines management, as set forth in MED-4002 (Medicines Management)—referenced within Carnival's own production but not produced.

33) Knowledge of Carnival's policies and procedures for escalation to shoreside medical support, including the role and function of the Health Operations Center (HOC), as described in MED-3105 (Shoreside Information Resources).

34) Knowledge of Carnival's telemedicine guidance, as set forth in MED-3105-DI1 (Telemedicine Guidance)—referenced within Carnival's own production but not produced.

35) Knowledge of the Medical Response Team procedures, including MED-3003 (Medical Response Team), CCL-MED-3003-A2 (Emergency Medical Response Algorithm), and CCL-MED-3003-A3 (First Response Treatment Guidelines)—all referenced within Carnival's own production but not produced.

36) Knowledge of Carnival's medical staff professional conduct standards, as set forth in CCL-MED-3903-DI2 (Medical Staff Professional Conduct)—referenced within Carnival's own production but not produced.

**Documents Referenced in Production But Not Produced**

37) Knowledge of the existence, content, effective dates, and applicability during the Voyage of each of the following 38 documents, all of which are expressly cross-referenced within Carnival's own production but were not included in Carnival's initial or supplemental production, and the reason each was withheld: MED-3002, MED-3003, MED-3102, MED-3603, MED-3701, MED-3802, MED-4002, MED-4103, MED-3104-A1, MED-3104-A2, MED-3104-A3, MED-3104-A4, MED-3104-A5, MED-3501-A1 through A5, MED-3902-A1 through A5, CCL-MED-3003-A1 through A4, MED-3105-DI1, CCL-MED-3903-DI1-A1, CCL-MED-3903-DI2, ENV-1301, HMP-1100, HMP-1201, PHS-2106, PHS-2110, PHS-2111, PHS-2112, and PHS-2123.

38) Knowledge of whether any of the above-referenced documents have been revised, superseded, destroyed, or withdrawn since the date of the Incident.

**Training and Competency of Shipboard Medical Staff**

39) Knowledge of the training and competency requirements for shipboard physicians aboard Carnival vessels, including MED-3902 (Shipboard Medical Staff Training & Competency) and its appendices MED-3902-A1 through A5—all referenced within Carnival's own production but not produced.

40) Knowledge of the specific training provided to Dr. Nikhil Maharaj prior to and during his assignment aboard the Carnival Pride, including orientation, competency assessments, and continuing professional development.

41) Knowledge of whether Dr. Maharaj received any training in stroke recognition, neurological emergency assessment, BE-FAST or equivalent screening protocols, or the use of clinical scoring aids available in SeaCare.

42) Knowledge of the recruitment, credentialing, and qualification verification process for Dr. Maharaj, as set forth in MED-3904 (Recruitment of Shipboard Medical Staff).

43) Knowledge of any performance reviews, appraisals, or disciplinary actions for Dr. Maharaj.

**Relationship with Dr. Maharaj and Control Over Medical Operations**

44) Knowledge of the contractual relationship between Carnival and Dr. Maharaj, including the terms of the Independent Contractor Agreement and Indemnity Agreement.

45) Knowledge of the degree of control Carnival exercised over Dr. Maharaj's medical practice aboard the Carnival Pride, including mandatory adherence to HESS procedures, use of SeaCare, reporting requirements, and compliance with clinical protocols.

46) Knowledge of Carnival's authority to direct, supervise, discipline, or terminate Dr. Maharaj's service.

47) Knowledge of whether Dr. Maharaj wore a Carnival uniform, held a Carnival crew ID, and was identified to passengers as a Carnival medical provider.

**Dr. Maharaj — Removal from Vessel, Employment Status, and Fitness-for-Duty**

48) Was Dr. Maharaj removed from the vessel prior to the completion of his scheduled contract or assignment? If yes, state the date of his removal and the vessel on which the removal occurred.

49) What was the stated reason or basis for Dr. Maharaj's removal from the vessel?

50) Who first reported to ship's command or shore-side management that Dr. Maharaj was unable to continue performing his duties? State the name, title, and date of that report.

51) Identify every person aboard the vessel or within shore-side operations who was notified that Dr. Maharaj was being removed from the ship, the date each person was notified, and the reason communicated to each.

52) Was Dr. Maharaj's removal from the vessel voluntary, or was it directed by Carnival, ship's command, or a medical authority?

53) Describe the complete sequence of events, in chronological order, from the time it was first determined that Dr. Maharaj could not continue in his role to the time he physically departed the vessel, including the names and titles of all personnel involved.

54) Was Dr. Maharaj transported to any shoreside medical facility at or around the time of his departure from the vessel? If yes, identify the facility, its location, and the date of transport.

55) Was a replacement physician assigned to cover Dr. Maharaj's duties following his departure? If yes, state the name of the replacement, the date he or she assumed coverage, and whether there was any gap in physician coverage aboard the vessel.

56) During any gap in physician coverage resulting from Dr. Maharaj's departure, identify by name and title every person who was designated to handle passenger medical emergencies.

**Dr. Maharaj — Nature of the Medical Event**

57) At the time of Dr. Maharaj's removal, did Carnival have any information indicating that his departure was related to a personal health condition? If yes, describe the nature of that information, when it was received, and by whom.

58) Did Dr. Maharaj personally communicate to anyone at Carnival the reason he was unable to continue his duties? If yes, state who he communicated with, when, and what was conveyed.

59) Did any shipboard officer, crewmember, or medical staff member observe or report any change in Dr. Maharaj's physical condition, behavior, or capacity to perform his medical duties in the days or weeks preceding his removal?

60) Does Carnival maintain any incident report, internal memorandum, or operational log entry documenting the circumstances of Dr. Maharaj's early departure from his assignment? If yes, identify all such records and the persons who created them.

61) Was any report generated—by the vessel, by shore-side operations, or by any crewing agency—describing the reason for Dr. Maharaj's early departure from his assignment?

62) Did Carnival's medical director or any shore-side physician receive any information regarding the nature of Dr. Maharaj's condition at or following the time of his removal from the vessel?

**Dr. Maharaj — Pre-Employment and Ongoing Health Screening**

63) Describe in detail the pre-employment physical examination protocol required of all shipboard physicians prior to beginning service aboard any vessel in the Carnival fleet, including the identity of the examining physician or facility and the frequency of any required renewal.

64) Was Dr. Maharaj required to complete a pre-employment physical before being assigned to the Carnival Pride? If yes, state the date, the examining physician or facility, and the result or outcome.

65) Did Dr. Maharaj's pre-employment physical disclose any existing medical conditions, abnormal laboratory findings, cardiovascular abnormalities, or items requiring follow-up clearance prior to his assignment?

66) Does Carnival require periodic medical recertifications of its shipboard physicians during the course of their employment? If yes, state the required intervals, confirm whether Dr. Maharaj was current on all required certifications at the time of his removal, and identify all certifications on file.

67) Was Dr. Maharaj ever placed on any form of medical monitoring, fitness-for-duty review, or conditional employment status at any point during his tenure with Carnival?

68) Prior to his removal from the vessel, had any officer, crewmember, or Carnival representative ever expressed concern—formally or informally—regarding Dr. Maharaj's physical health, stamina, or fitness to serve in a shipboard medical capacity?

**Dr. Maharaj — Drug and Substance Testing**

69) Does Carnival maintain a drug and alcohol testing policy applicable to shipboard physicians? If yes, produce that policy in its entirety, including the complete list of all substances screened.

70) Was Dr. Maharaj subjected to pre-employment drug screening as a condition of his hire or assignment to any Carnival vessel? If yes, state the date, the testing facility, the substances screened, and the result.

71) Was Dr. Maharaj subject to random drug testing while actively serving aboard any Carnival vessel?

72) Was Dr. Maharaj drug or toxicology tested at any point during the twelve (12) months preceding his removal from the vessel? If yes, state the date of each test, the substances screened, and the results.

73) Does Carnival's drug testing protocol for shipboard physicians include screening for anabolic steroids, synthetic testosterone, human growth hormone, or other performance-enhancing or hormonal substances?

74) If such substances are not included in the standard testing panel, state the basis for that exclusion and identify the person or department that made that determination.

75) Following Dr. Maharaj's departure from the vessel, was any drug, toxicology, or substance screening performed as part of any fitness-for-return-to-duty evaluation or separation protocol?

76) Has Carnival ever received any report, complaint, observation, or concern—from any source—regarding Dr. Maharaj's use of any controlled substance, prescription medication, supplement, or injectable substance?

**Dr. Maharaj — Current Employment Status**

77) Is Dr. Maharaj currently employed by Carnival or by any crewing agency, staffing contractor, or entity through which Carnival sources shipboard physicians?

78) If currently employed, is Dr. Maharaj actively assigned to a vessel, on standby status, or on a leave of absence of any kind? State the current category of his employment status.

79) If Dr. Maharaj is on any form of leave, state the date that leave commenced, the designated category of leave, and whether any return-to-duty date has been established.

80) Has Dr. Maharaj been medically cleared to return to active shipboard duty by any physician, medical director, or regulatory authority? If yes, identify the clearing authority, the date of clearance, and any conditions attached to the clearance.

81) If Dr. Maharaj has not been cleared to return to active duty, state what conditions, evaluations, examinations, or certifications are required before clearance will be issued.

82) Has Carnival made any internal determination as to whether Dr. Maharaj is temporarily or permanently unable to serve in a shipboard physician capacity?

**Dr. Maharaj — Hireability and Internal Records**

83) Does Dr. Maharaj's personnel file, crew record, or any internal Carnival database contain any notation, flag, restriction, or annotation affecting his eligibility for future shipboard assignments? If yes, describe the nature and content of that notation.

84) Has Carnival received any written opinion from any physician, medical director, independent examiner, or third-party evaluator regarding Dr. Maharaj's capacity to return to a shipboard physician role? If yes, identify the author, date, and substance of that opinion.

85) Has the crewing agency or staffing contractor responsible for placing Dr. Maharaj been informed of the circumstances of his early departure from the vessel? If yes, identify the agency and produce all communications on that subject.

86) Has Carnival received any communication from any maritime regulatory body, flag state authority, or medical licensing board regarding Dr. Maharaj's fitness to practice medicine aboard a vessel following his departure? If yes, identify the issuing authority, the date, and the substance of the communication.

**Post-Incident Review and Communications**

87) Knowledge of all internal reviews, investigations, root cause analyses, quality assurance reviews, or peer reviews conducted in connection with Plaintiff's care.

88) Knowledge of all communications between Carnival's shoreside personnel and shipboard medical staff regarding Plaintiff after October 20, 2024.

89) Knowledge of any corrective actions, policy changes, or training modifications implemented as a result of Plaintiff's care.

**Substantially Similar Incidents**

90) Knowledge of all prior incidents in the five years preceding the Voyage in which a passenger aboard any Carnival vessel presented with neurological symptoms suggestive of stroke and was not timely diagnosed, evacuated, or disembarked.

91) Knowledge of all prior claims, lawsuits, or complaints against Carnival in the five years preceding the Voyage alleging failure to diagnose stroke, failure to escalate neurological emergencies, or failure to timely evacuate or disembark a passenger with a medical emergency.

92) Knowledge of any internal audits, quality reviews, or risk assessments conducted in the five years preceding the Voyage regarding the adequacy of shipboard stroke assessment protocols.

**Witnesses/Carnival Personnel**

93) Knowledge of the whereabouts of all Carnival crew members referenced in Rule 26 disclosures, including but not limited to all supplemental responses.

94) Knowledge of all projected contract assignments for all Carnival crew members referenced in Rule 26 disclosures, request for production and answers to interrogatories.

**Video Surveillance and Recordings**

95) Knowledge of all CCTV and video surveillance systems aboard the Carnival Pride, including the location, field of view, and operational status of every closed-circuit television camera during the Voyage, and any cameras that were inoperative, undergoing maintenance, or not recording during the Incident Period.

96) Knowledge of all CCTV and video surveillance footage depicting Plaintiff Michael Smith at any time during the Voyage, from embarkation through disembarkation, including footage from the Medical Center and surrounding corridors, Plaintiff's cabin and cabin corridor, common areas, dining areas, bars and lounges, pool and lido deck areas, casino, elevators, stairwells, gangway, tender platforms, and any other location where Plaintiff was present or through which he was transported.

97) Knowledge of all CCTV and video surveillance footage depicting any member of Plaintiff's Travel Party—specifically Eric Grimm, Stephanie Grimm, Alissa Salsbury, Austin (AJ) Peterson, and Terry Crowley—in or near the Medical Center, the Medical Center corridors, or any area adjacent to the Medical Center during the Incident Period.

98) Knowledge of all CCTV and video surveillance footage depicting Stephanie Grimm at any time during the Incident Period, including footage showing her interactions with shipboard medical staff, security personnel, Guest Services personnel, or any Carnival officer or crew member, and footage showing her presence in or near the Medical Center during any of Plaintiff's medical encounters.

99) Knowledge of all CCTV and video surveillance footage depicting Plaintiff being transported by wheelchair, stretcher, gurney, or any other conveyance at any time during the Voyage, and all footage depicting Plaintiff's disembarkation from the vessel on or about October 20, 2024.

100) Knowledge of Carnival's retention schedule, automatic overwrite cycle, or destruction policy for CCTV footage aboard the Carnival Pride, and whether all responsive footage has been preserved in compliance with Plaintiff's spoliation and preservation demand dated March 10, 2025.

101) Knowledge of all audio recordings of telephone calls, radio communications, or any other recorded communications between any member of the shipboard medical staff and the Health Operations Center (HOC), the bridge, security, any coastguard or medical evacuation service, or any assistance company regarding Plaintiff during the Incident Period.

102) Knowledge of all audio recordings of telephone calls between any person aboard the Carnival Pride and Patty Grimm regarding Plaintiff, including any call requesting payment or a guarantee of payment for Plaintiff's medical treatment.

**<u>Stephanie Grimm — Interactions with Carnival Personnel</u>**

103) Knowledge of all interactions between Stephanie Grimm and any Carnival crew member, officer, security officer, medical staff member, or Guest Services representative during the Incident Period, including the substance of any verbal exchange, complaint, objection, or request made by Stephanie Grimm.

104) Knowledge of any Carnival policy or protocol for handling family objections, complaints, or confrontations in or near the Medical Center, and any training provided to shipboard medical staff or security personnel regarding such situations.

**Written Communications — Travel Party**

105) Knowledge of all written or electronic communications—including emails, memoranda, instant messages, text messages, chat logs, and satellite or ship-to-shore communications—between any Carnival employee or agent and any member of Plaintiff's Travel Party regarding Plaintiff's medical condition, treatment, disposition, payment, or any complaint or objection, during the Incident Period and continuing through the date of this Notice.

106) Knowledge of all written or electronic communications between any Carnival employee or agent and Patty Grimm regarding Plaintiff, including any request for payment or guarantee of payment.

107) Knowledge of all written complaints, grievances, comment cards, or formal objections submitted by any member of Plaintiff's Travel Party to Carnival regarding Plaintiff's medical care, treatment, disposition, or the conduct of shipboard medical staff.

**Logs and Internal Records**

108) Knowledge of all SeaCare system audit logs reflecting user access, entries, modifications, deletions, or exports of Plaintiff's electronic medical record during the Voyage and continuing through the date of this Notice.

109) Knowledge of all End of Voyage reports, End of Voyage document uploads, and voyage summary reports from the Carnival Pride for the October 13–20, 2024 voyage that reference Plaintiff, any medical emergency, any medical disembarkation, or any patient safety event.

110) Knowledge of all port agent communications, reports, or records relating to Plaintiff's disembarkation, including communications with Baltimore-area medical facilities, ambulance services, or ground transportation providers.

**Shipboard Nursing Staff — Debra Dube, RN; Mduduzi Madonda, RN; Alan Anuengo Acebu, RN — Hiring, Credentialing, Training, and Employment Records**

112) For each of Debra Dube, RN; Mduduzi Madonda, RN; and Alan Anuengo Acebu, RN (collectively, 'the Nursing Staff'), identify the entity that employed or contracted each individual for their assignment to the Carnival Pride during the October 13–20, 2024 voyage — whether Carnival directly, a crewing agency, or a staffing contractor — and state the name and contact information of that entity.

113) For each member of the Nursing Staff, state the date each individual first applied for or was considered for a position with Carnival or any entity that placed them aboard a Carnival vessel, and identify all application materials submitted, including employment applications, resumes, curriculum vitae, and cover letters.

114) For each member of the Nursing Staff, describe Carnival's complete pre-employment screening and onboarding process, including background checks, reference verifications,

credential verifications, license checks, and any other vetting steps taken before each individual was approved for shipboard duty.

115) For each member of the Nursing Staff, state the date of each individual's most recent pre-employment physical examination, the examining physician or facility, and the outcome, including any findings, restrictions, or conditions documented.

116) For each member of the Nursing Staff, identify all nursing licenses, professional certifications, and clinical credentials held at the time of the Voyage, including the issuing jurisdiction, license number, and expiration date of each, and state whether Carnival or any placing entity verified each license was active and in good standing before the Voyage.

117) For each member of the Nursing Staff, identify all required certifications for shipboard nursing service — including but not limited to ACLS, BLS, PALS, TNCC, emergency nursing, and any certifications required under MED-3902 or applicable HESS procedures — and confirm whether each individual held each required certification at the time of the Voyage.

118) For each member of the Nursing Staff, describe the full scope of clinical training provided by or required by Carnival prior to and during their assignment to the Carnival Pride, including all onboarding training, orientation programs, shipboard medical training, and on-the-job training checklists completed under CCL-MED-3903-DI1-A1.

119) For each member of the Nursing Staff, state whether each individual received any training — prior to or during the Voyage — in stroke recognition, the BE-FAST protocol, the NIH Stroke Scale, the Cincinnati Stroke Scale, or any other neurological emergency screening tool or clinical decision aid available in SeaCare.

120) For each member of the Nursing Staff, state whether each individual received any training in the escalation of neurological emergencies, including the circumstances under which the Health Operations Center (HOC) must be contacted, under which medical evacuation or disembarkation must be initiated, and under which telemedicine consultation must be obtained.

121) For each member of the Nursing Staff, identify all performance reviews, appraisals, competency assessments, or supervisory evaluations conducted at any time during their employment or engagement, and describe any findings, commendations, concerns, or corrective actions documented in any such review.

122) For each member of the Nursing Staff, state whether any disciplinary action, complaint, adverse finding, or patient safety concern has ever been documented in any personnel file, crew record, Ninth Brain profile, myPerformance record, or any internal Carnival system at any time during their employment or engagement.

123) For each member of the Nursing Staff, identify the crewing or staffing contract — including the independent contractor agreement, service agreement, or similar document — governing each individual's assignment to the Carnival Pride, including the term, scope of

duties, supervision structure, and any provisions relating to compliance with Carnival's HESS procedures.

124) For each member of the Nursing Staff, state the current port assignment, vessel assignment, and projected contract schedule, to the extent known or reasonably available to Carnival, and confirm whether each individual is currently in active shipboard service.

125) For each member of the Nursing Staff, state whether each individual has been interviewed, debriefed, or contacted by Carnival, Carnival's counsel, or any Carnival representative in connection with the Smith matter or this litigation, and if so, state the date, format, and substance of any such contact.

126) For each member of the Nursing Staff, state whether any Carnival policy, HESS procedure, or shipboard protocol in effect during the Voyage required the nursing staff to independently assess or screen a patient presenting with general body weakness, dizziness, vomiting, or neurological symptoms for potential stroke or TIA, separate and apart from any physician evaluation.

127) Knowledge of which member of the Nursing Staff — Dube, Madonda, or Acebu — was the nurse of record on duty at the time Plaintiff was first discharged from the Medical Center on October 18, 2024, and whether any nursing staff member raised any objection, documented any concern, or made any notation regarding the decision to discharge Plaintiff before physician evaluation was complete.

128) Knowledge of whether any member of the Nursing Staff signed, witnessed, prepared, or presented any against-medical-advice form, consent form, discharge instruction, or any other document requiring Plaintiff's signature during either of his Medical Center visits, and the identity of the specific individual who performed each function.

129) For each member of the Nursing Staff, identify all documents in the SeaCare system created, modified, reviewed, or accessed by that individual in connection with Plaintiff's care, including the date and time of each entry, access, or modification.

130) Plaintiff reserves the right to supplement this list.

## B. LIST OF DOCUMENTS TO BE PRODUCED BY CARNIVAL'S CORPORATE REPRESENTATIVE

1) Plaintiff's original and complete medical file and chart, hard-copy or digital format, including but not limited to medical reports, hospital records, diagnostic tests, diagnostic reports, radiological images, films, EKGs, x-rays, laboratory results, and all SeaCare records pertaining to Plaintiff (including but not limited to shipboard medical records).
2) All radiological and diagnostic images in CARNIVAL's possession related to the Plaintiff.
3) All handwritten notes, draft notes, pocket notes, or personal logs created by any member of shipboard medical staff concerning Plaintiff that were not entered into SeaCare.
4) All communications between shipboard medical staff and Carnival's Health Operations Center (HOC) or Shoreside Medical Department regarding Plaintiff, including call logs, telemedicine records, emails, and any other written or electronic communication.
5) All communications between shipboard medical staff and the Captain or any officer regarding Plaintiff.
6) All documents reflecting consideration of medical evacuation, vessel diversion, or urgent disembarkation for Plaintiff.
7) All documents reflecting the decision to send Plaintiff back to his cabin on October 18, 2024.
8) All billing records, charge sheets, payment authorizations, and credit card receipts relating to Plaintiff's shipboard medical care.
9) All documents reflecting any policy or practice requiring payment or guarantee of payment as a condition of admission, continued treatment, or monitoring in the Medical Center.
10) All documents reflecting inability, refusal, or delay of payment in connection with Plaintiff's treatment.
11) All documents, notes, or communications that reference objections or protests by Plaintiff's family—including specifically Stephanie Grimm, Alissa Salsbury, Eric Grimm, Austin (AJ) Peterson, and Terry Crowley—regarding sending Plaintiff back to his cabin, failure to evacuate or urgently disembark Plaintiff, or failure to diagnose his condition.
12) The complete and unredacted version of each of the following HESS procedures, as in effect during the Voyage, all of which are expressly cross-referenced within Carnival's own production (GR000430–GR000481) but were not included in Carnival's production: (a) MED-3002 – First Response and Triage; (b) MED-3003 – Medical Response Team; (c) MED-3102 – Patient Admission and Discharge from the Medical Center; (d) MED-3603 – Vaccination and Disease Screening; (e) MED-3701 – Documentation Management; (f) MED-3802 – Patient Safety Events; (g) MED-4002 – Medicines Management; (h) MED-4103 – Medical Equipment Repair and Maintenance.

13) The complete and unredacted version of each of the following appendices and attachments: (a) MED-3104-A1 – Disembarkation Considerations; (b) MED-3104-A2 – Disembarkation Categories; (c) MED-3104-A3 – USCG Medevac Checklist; (d) MED-3104-A4 – USCG Rescue Coordination Centers Contact Details; (e) MED-3104-A5 – Workflow for Disembarkation with Potential Operational Disruption; (f) MED-3501-A1 through MED-3501-A5; (g) MED-3902-A1 through MED-3902-A5; (h) CCL-MED-3003-A1 – MRT Announcement Procedure; (i) CCL-MED-3003-A2 – Emergency Medical Response Algorithm; (j) CCL-MED-3003-A3 – First Response Treatment Guidelines; (k) CCL-MED-3003-A4 – Medical Response Team Event Log.

14) The complete and unredacted version of each of the following Detailed Instructions: (a) MED-3105-DI1 – Telemedicine Guidance; (b) CCL-MED-3903-DI1-A1 – Medical Staff on the Job Training Checklist; (c) CCL-MED-3903-DI2 – Medical Staff Professional Conduct.

15) The complete and unredacted version of each of the following non-medical HESS procedures: (a) ENV-1301 – Garbage Management; (b) HMP-1100 – Governance of Global HESS Content; (c) HMP-1201 – Risk Assessment; (d) PHS-2106 – Communicable Disease Management Response Levels; (e) PHS-2110 – Management of Acute Respiratory Illness; (f) PHS-2111 – Management of Isolation; (g) PHS-2112 – Disease Reporting; (h) PHS-2123 – Prevention and Control in Guest and Crew Disembarkation Operations.

16) Any and all HESS procedures, clinical pathways, protocols, or guidelines in effect during the Voyage relating to the assessment, diagnosis, or management of suspected stroke, transient ischemic attack, or acute neurological deficit aboard Carnival vessels.

17) All training records, competency assessments, orientation checklists, continuing professional development records, and performance reviews for Dr. Nikhil Maharaj during his employment or engagement with Carnival.

18) All training materials provided to shipboard medical staff during the Voyage regarding stroke recognition, neurological emergencies, clinical scoring aids, or evacuation procedures.

19) Dr. Maharaj's complete personnel file, including the Independent Contractor Agreement, Indemnity Agreement, credentialing documents, and all performance evaluations.

20) All internal reviews, investigations, root cause analyses, quality assurance reviews, or peer reviews conducted in connection with Plaintiff's medical care.

21) All corrective actions, policy changes, or training modifications implemented as a result of Plaintiff's care.

22) All records reflecting passengers or crewmembers who presented with neurological symptoms suggestive of stroke aboard the CARNIVAL PRIDE and aboard CARNIVAL SPIRIT-class vessels and were not timely diagnosed or evacuated for five (5) years prior to the subject incident.

23) All reports, audits, studies, recommendations, either internally or through third-parties received by CARNIVAL since January 2020 which address stroke assessment protocols, neurological emergency response, or the adequacy of shipboard medical screening tools.

24) All CCTV and video surveillance footage from the Carnival Pride depicting Plaintiff at any time during the Voyage, including footage from the Medical Center and surrounding corridors, Plaintiff's cabin corridor, common areas, dining areas, gangway and embarkation/disembarkation areas, and any other location where Plaintiff was present or through which he was transported.

25) All CCTV and video surveillance footage from the Carnival Pride depicting the Medical Center entrance, waiting area, and treatment areas during the period October 18–20, 2024.

26) All audio recordings, including but not limited to recordings of telephone calls between shipboard medical staff and the Health Operations Center (HOC), recordings of radio communications between the bridge and medical staff, and any recorded communications with coastguard, medical evacuation services, or assistance companies regarding Plaintiff.

27) All security logs, incident logs, and security department records from the Carnival Pride relating to Plaintiff, including cabin access logs, passenger movement records, and any security officer reports or notations regarding Plaintiff or his family.

28) The complete SeaCare electronic medical record for Plaintiff, including all encounters, triage entries, vital signs, orders (including the eCenter module), medications, diagnoses, clinical scoring aids, notes, addenda, nursing documentation, risk assessments, disposition records, referral module entries, disembarkation module entries, and all End of Voyage documents uploaded for the October 13–20, 2024 voyage.

29) All Medical Response Team (MRT) Event Logs for the Carnival Pride for the period October 18–20, 2024, including any exercise logs, as required by CCL-MED-3003-DI1.

30) All bridge logs, Captain's Reports, and navigation records from the Carnival Pride for October 18–20, 2024 that reference medical emergencies, consideration of diversion, or communications with medical staff regarding any passenger.

31) All Guest Services records, guest comment cards, guest complaint logs, and guest relations files relating to Plaintiff or Plaintiff's family during the Voyage.

32) All Ninth Brain uploads, myPerformance system records, and Health Services Fleet Resource Site records relating to Dr. Maharaj's handover checklists, signed job descriptions, performance reviews, and training documentation.

33) All satellite communications, ship-to-shore email traffic, and radio communications between the Carnival Pride and any Carnival shoreside personnel, the HOC, or any third party regarding Plaintiff between October 18–20, 2024.

34) All communications with travel insurance providers, assistance companies, or designated healthcare providers regarding Plaintiff, including notifications required by MED-3104.

35) All AMA (Against Medical Advice) forms, payment agreement forms, medical records consent forms, and Guest Consultation Forms relating to Plaintiff—including but not limited to the documents transmitted by Carnival's claims adjuster Maurice Vega on April 15, 2025.

36) Any and all records related to the use, rental, provision, or denial of a wheelchair to Plaintiff aboard the Carnival Pride, including any charges, rental agreements, or policies governing wheelchair availability and cost.

37) Any and all documents presented to Plaintiff Michael Smith or to Austin (AJ) Peterson for signature while in the infirmary or Medical Center aboard the Carnival Pride, including but not limited to consent forms, payment agreements, AMA forms, liability waivers, medical records release forms, and any other document requiring a patient or family member signature.

38) Any and all passenger folio records, onboard account statements, purchase records, and transaction histories for each of the following members of Plaintiff's travel party, individually: (a) Michael Smith; (b) Eric Grimm; (c) Stephanie Grimm; (d) Alissa Salsbury; (e) Austin (AJ) Peterson; (f) Terry Crowley.

39) Any and all records related to cruise booking contracts, ticket contracts, terms and conditions, and passenger agreements for each of the following members of Plaintiff's travel party, individually: (a) Michael Smith; (b) Eric Grimm; (c) Stephanie Grimm; (d) Alissa Salsbury; (e) Austin (AJ) Peterson; (f) Terry Crowley.

40) Any and all casino records, casino rewards program records, players club records, and loyalty program records associated with Michael Smith and/or Eric Grimm, including but not limited to records reflecting Michael Smith's use of Eric Grimm's casino rewards card during the Voyage.

41) All reports by any expert CARNIVAL has retained as an expert witness, advisor or consultant in this action and all records provided to the expert for consideration.

42) All documents relied upon by corporate representatives in formulating testimony to the areas of inquiry noted herein in Section A above ("List of Topics"), other than enumerated documents identified in privilege log withheld pursuant to attorney-client or work product privilege.

43) All CCTV and video surveillance footage from the Carnival Pride depicting any member of Plaintiff's Travel Party—specifically Eric Grimm, Stephanie Grimm, Alissa Salsbury, Austin (AJ) Peterson, and Terry Crowley—in or near the Medical Center, Medical Center corridors, or any area adjacent to the Medical Center during the Incident Period.

44) All CCTV and video surveillance footage from the Carnival Pride depicting Stephanie Grimm at any time during the Incident Period, including footage showing her interactions with shipboard medical staff, security personnel, Guest Services personnel, or any Carnival officer or crew member.

45) All CCTV and video surveillance footage from the Carnival Pride depicting Plaintiff being transported by wheelchair, stretcher, gurney, or any other conveyance at any time during the Voyage, and all footage depicting Plaintiff's disembarkation from the vessel on or about October 20, 2024.

46) A complete CCTV camera map, diagram, or inventory identifying the location, field of view, and operational status of every closed-circuit television camera aboard the Carnival Pride during the Voyage, including identification of any cameras that were inoperative, undergoing maintenance, or not recording during the Incident Period.

47) All documents reflecting the retention schedule, automatic overwrite cycle, or destruction policy for CCTV footage aboard the Carnival Pride, and confirmation of whether all responsive footage has been preserved in compliance with Plaintiff's spoliation and preservation demand dated March 10, 2025.

48) All audio recordings of telephone calls between any person aboard the Carnival Pride and Patty Grimm regarding Plaintiff, including any call requesting payment or a guarantee of payment for Plaintiff's medical treatment.

49) All emails, memoranda, instant messages, text messages, chat logs, and any other written or electronic communications between any Carnival crew member, officer, or department head and any other Carnival employee or agent regarding Plaintiff or any member of Plaintiff's Travel Party during the Incident Period and continuing through the date of this request.

50) All communications between any Carnival employee or agent and any member of Plaintiff's Travel Party—specifically Stephanie Grimm, Eric Grimm, Alissa Salsbury, Austin (AJ) Peterson, and Terry Crowley—regarding Plaintiff's medical condition, treatment, disposition, payment, or any complaint or objection raised by any family member, during the Incident Period and continuing through the date of this request.

51) All communications between any Carnival employee or agent and Patty Grimm regarding Plaintiff, including any request for payment or guarantee of payment, during the Incident Period and continuing through the date of this request.

52) All written complaints, grievances, comment cards, or formal objections submitted by any member of Plaintiff's Travel Party to Carnival—including to Guest Services, the Medical Center, the Captain, any officer, or any shoreside department—regarding Plaintiff's medical care, treatment, disposition, or the conduct of shipboard medical staff.

53) All documents, records, notes, logs, or communications of any kind that reference, mention, or relate to Stephanie Grimm's interactions with shipboard medical staff, including any notation of her verbal criticism of the decision to discharge Plaintiff to his cabin, any complaint she made, any request she made for continued observation or treatment of Plaintiff, and any response by medical staff or any Carnival employee to her objections.

54) All documents reflecting any interaction between Stephanie Grimm and any Carnival security officer, Guest Services representative, officer, or crew member during the Incident Period.

55) All documents reflecting any Carnival policy or protocol for handling family objections, complaints, or confrontations in or near the Medical Center, and any training provided to shipboard medical staff or security personnel regarding such situations.

56) All SeaCare system audit logs reflecting user access, entries, modifications, deletions, or exports of Plaintiff's electronic medical record during the Voyage and continuing through the date of this request.

57) All End of Voyage reports, End of Voyage document uploads, and voyage summary reports from the Carnival Pride for the October 13–20, 2024 voyage that reference Plaintiff, any medical emergency, any medical disembarkation, or any patient safety event.

58) All port agent communications, reports, or records relating to Plaintiff's disembarkation, including communications with Baltimore-area medical facilities, ambulance services, or ground transportation providers.

59) All pre-employment physical examination records for Dr. Nikhil Maharaj, including all laboratory results, cardiovascular evaluations, imaging, and any follow-up or supplemental clearance documentation required before his assignment to any Carnival vessel.

60) All drug and toxicology testing records for Dr. Nikhil Maharaj from the date of his initial hire or engagement through the present, including pre-employment drug screens, random testing records, and any post-incident or post-departure testing.

61) Carnival's complete drug and alcohol testing policy applicable to shipboard physicians, including the full substance panel screened, the testing intervals, and any policy provision addressing performance-enhancing substances, anabolic steroids, synthetic hormones, or injectable medications.

62) All fitness-for-duty evaluations, medical clearance records, return-to-work assessments, and reinstatement determinations made with respect to Dr. Maharaj from the date of his departure from the vessel through the present.

63) All internal communications—including emails, memoranda, instant messages, and inter-departmental correspondence—regarding Dr. Maharaj's departure from the vessel, the reason for his departure, his current employment status, or his eligibility for future shipboard assignments.

64) All communications between Carnival and any crewing agency, staffing contractor, or third-party entity responsible for placing Dr. Maharaj regarding the circumstances of his early departure and any determination as to his future placement or hireability.

65) All written opinions, medical reports, or determinations provided to Carnival by any physician, medical director, independent examiner, or third-party evaluator regarding Dr. Maharaj's fitness to return to active shipboard duty.

66) Any and all communications received by Carnival from any maritime regulatory body, flag state authority, or medical licensing board regarding Dr. Maharaj's fitness to practice medicine aboard a vessel.

67) All incident reports, operational reports, or memoranda generated aboard the Carnival Pride or by shore-side operations documenting the circumstances of Dr. Maharaj's early departure from the vessel, including any gap in physician coverage.

68) All periodic medical recertification records, fitness certificates, and health screening documentation for Dr. Maharaj maintained in his personnel file, crew record, or Ninth Brain or myPerformance system profiles.

69) The complete employment application, resume, curriculum vitae, and all other application materials submitted by Debra Dube, RN in connection with any position with Carnival or any crewing or staffing agency that placed her aboard a Carnival vessel.

70) The complete employment application, resume, curriculum vitae, and all other application materials submitted by Mduduzi Madonda, RN in connection with any position with Carnival or any crewing or staffing agency that placed him aboard a Carnival vessel.

71) The complete employment application, resume, curriculum vitae, and all other application materials submitted by Alan Anuengo Acebu, RN in connection with any position with Carnival or any crewing or staffing agency that placed him aboard a Carnival vessel.

72) All hiring records, onboarding documents, pre-employment screening records, background check reports, and reference verification records for Debra Dube, RN, Mduduzi Madonda, RN, and Alan Anuengo Acebu, RN.

73) All pre-employment physical examination records for each of Debra Dube, RN, Mduduzi Madonda, RN, and Alan Anuengo Acebu, RN, including all laboratory results, cardiovascular evaluations, and any findings, restrictions, or follow-up requirements documented.

74) All nursing licenses, RN registrations, professional certifications, and clinical credential documents for each of Debra Dube, Mduduzi Madonda, and Alan Anuengo Acebu, including the issuing jurisdiction, license number, issuance date, and expiration date of each, and all records confirming Carnival or any placing entity verified each license as active and in good standing prior to each individual's assignment to the Carnival Pride.

75) All records reflecting the clinical certifications held by each of Debra Dube, Mduduzi Madonda, and Alan Anuengo Acebu at the time of the Voyage, including but not limited to ACLS, BLS, PALS, TNCC, emergency nursing, and any certifications required under MED-

3902 or applicable HESS procedures, including any records confirming current certification status and expiration dates.

76) All training records, orientation checklists, on-the-job training logs, competency assessments, and continuing professional development records for each of Debra Dube, Mduduzi Madonda, and Alan Anuengo Acebu, including all documents required under MED-3902, CCL-MED-3903-DI1-A1, and any applicable HESS training procedures.

77) All training materials, course completions, sign-in sheets, attestations, or records of any kind reflecting whether Debra Dube, Mduduzi Madonda, and Alan Anuengo Acebu received training in stroke recognition, BE-FAST, the NIH Stroke Scale, the Cincinnati Stroke Scale, neurological emergency escalation protocols, or any clinical decision aid for neurological assessment available in SeaCare.

78) All contracts, independent contractor agreements, service agreements, or staffing agreements between Carnival and any crewing or staffing agency governing the placement of Debra Dube, Mduduzi Madonda, and Alan Anuengo Acebu aboard the Carnival Pride, including all terms relating to scope of duties, supervision, compliance with HESS procedures, and performance standards.

79) All performance reviews, appraisals, supervisory evaluations, and competency assessments for each of Debra Dube, Mduduzi Madonda, and Alan Anuengo Acebu conducted at any time during their employment or engagement with Carnival or any placing entity.

80) All personnel file contents, crew records, Ninth Brain profiles, myPerformance records, and Health Services Fleet Resource Site records for each of Debra Dube, Mduduzi Madonda, and Alan Anuengo Acebu, including handover checklists, signed job descriptions, and any documents reflecting their qualification status for shipboard nursing duty.

81) All disciplinary records, complaints, adverse findings, patient safety notifications, or corrective action documents relating to Debra Dube, Mduduzi Madonda, or Alan Anuengo Acebu at any point during their employment or engagement with Carnival or any placing entity.

82) All drug and alcohol testing records for each of Debra Dube, Mduduzi Madonda, and Alan Anuengo Acebu from the date of each individual's initial hire or engagement through the present, including pre-employment drug screens, random testing records, and the full substance panel screened.

83) All records reflecting the current port assignment, vessel assignment, and projected contract schedule for each of Debra Dube, Mduduzi Madonda, and Alan Anuengo Acebu, to the extent known or reasonably available to Carnival.

84) All communications between Carnival, Carnival's counsel, or any Carnival representative and Debra Dube, Mduduzi Madonda, or Alan Anuengo Acebu regarding the Smith matter, this litigation, or any aspect of Plaintiff's care aboard the Carnival Pride, including any written statements, summaries of interviews, debriefing notes, or correspondence.

85) All AMA forms, consent forms, discharge instructions, and any other documents signed by, witnessed by, or prepared by any of Debra Dube, Mduduzi Madonda, or Alan Anuengo Acebu in connection with Plaintiff's care, including the identity of the individual who presented such documents to Plaintiff and the circumstances under which Plaintiff's signature was obtained.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:25-cv-24611-DPG**

MICHAEL R. SMITH,
Plaintiff,

v.

CARNIVAL CORPORATION, et al.,
Defendants.

PLAINTIFF'S SECOND REQUEST FOR PRODUCTION TO DEFENDANT, CARNIVAL CORPORATION

To: Michael J. Drahos,

Plaintiff, MICHAEL SMITH, serves this Second Request for Production on Defendant, Carnival Corporation, pursuant to Rule 34 of the Federal Rules of Civil Procedure and Rule 26.1 of the Local Rules of the United States District Court for the Southern District of Florida. The Plaintiff requests that the Defendant send Plaintiff's counsel by mail or email, within thirty days, copies of all material described in the numbered paragraphs below. If the Defendant prefers to respond in a different manner allowed by the rules, the Defendant is of course free to do so. The Plaintiff requests that the Defendant comply with the requirements of Rule 34 and Rule 26.1 in responding to this Request for Production.

Definitions

The definitions and instructions set forth in Plaintiff's First Request for Production are incorporated by reference as though fully set forth herein. Additionally:

(a) "Traveling Companions" means all individuals who sailed on the same voyage as Plaintiff aboard the Carnival Pride (Cruise ID PR20241013007; October 13–20, 2024) whose reservations were booked, linked, associated, cross-referenced, or otherwise grouped with Plaintiff's booking in Defendant's reservation or guest management systems, including but not limited to family members, friends, or members of the same traveling party.

This term includes, without limitation:

i. Eric Grimm

ii. Stephanie Grimm

iii. Alissa Salsbury

iv. Austin (AJ) Peterson (also referenced as Austin Patterson)

v. Terry Crowley

vi. Patty Grimm (identified as a family member contacted during the incident)

(b) “Incident Period” means October 18, 2024 through October 20, 2024.

(c) “Voyage” means the Carnival Pride sailing departing Baltimore, Maryland on October 13, 2024 and returning October 20, 2024 (Cruise ID PR20241013007).

Instructions

Local Rule 26.1(e)(5) requires you to identify which numbered request each document you produce pertains to.

Please insert your responses immediately beneath each numbered request. To facilitate this, Plaintiff’s counsel is sending you this Request for Production in Word format so that you don’t have to retype each item.

Please provide the following materials:

IDENTIFICATION OF TRAVELING COMPANIONS

78. Produce all booking records, reservation records, and confirmation documents for each Traveling Companion on Plaintiff’s booking for the Voyage, including the full name, date of birth, cabin assignment, and booking number for each individual.

79. Produce all documents reflecting the linkage, association, or grouping of any passenger’s booking with Plaintiff’s booking in Carnival’s reservation system for the Voyage, including linked reservations, group bookings, shared payment accounts, and emergency contact designations.

80. Produce boarding and embarkation records for each Traveling Companion, including gangway logs reflecting each embarkation and disembarkation at every port during the Voyage, with timestamps.

81. Produce disembarkation records for each Traveling Companion upon the Vessel's return to Baltimore on October 20, 2024, including the time each Traveling Companion exited the Vessel.

## ONBOARD ACCOUNT AND ACTIVITY RECORDS

82. Produce the complete Sign & Sail or onboard account statement for each Traveling Companion for the Voyage, reflecting all charges, credits, refunds, and transactions.

83. Produce all records of charges to any Traveling Companion's Sign & Sail account that relate to Plaintiff's medical treatment, wheelchair usage, Medical Center fees, or any other charge arising from Plaintiff's medical emergency, including the $250 deposit referenced in Carnival's records.

84. Produce all records reflecting any refund, credit, adjustment, future cruise credit, or goodwill gesture issued to any Traveling Companion in connection with Plaintiff's medical emergency or the Voyage generally.

85. Produce cabin assignment records for each Traveling Companion, including any cabin changes, upgrades, or reassignments during the Voyage.

## COMMUNICATIONS BETWEEN TRAVELING COMPANIONS AND CARNIVAL

86. Produce all written communications between any Traveling Companion and Guest Services, the Medical Center, Security, or any other Carnival department during the Incident Period, including written complaints, requests for assistance, and requests for information regarding Plaintiff's condition.

87. Produce all records of Guest Services interactions, complaints, or requests logged by or on behalf of any Traveling Companion during the Incident Period, including internal notes, case file entries, and follow-up records.

88. Produce all post-voyage written communications between any Traveling Companion and Carnival, including letters, emails, and online submissions referencing Plaintiff's medical emergency, the quality of medical care, or any request for refund, compensation, or investigation.

89. Produce all records of any post-cruise survey or feedback form submitted by any Traveling Companion for the Voyage that references the Medical Center, Plaintiff's medical emergency, medical staff, or any complaint about onboard medical services.

TRAVELING COMPANION INVOLVEMENT IN MEDICAL EVENTS

90. Produce all Medical Center records, intake forms, Guest Consultation Forms, consent forms, payment authorization forms, and Against Medical Advice forms that were completed, signed, or presented to any Traveling Companion in connection with Plaintiff's medical treatment during the Incident Period.

91. Produce all records reflecting that any Traveling Companion was present in or near the Medical Center at any time during the Incident Period, including sign-in logs, visitor logs, and CCTV records.

92. Produce all records reflecting any Traveling Companion's involvement in obtaining or arranging payment for Plaintiff's Medical Center visit, including the $250 deposit and any subsequent charges.

93. Produce all records reflecting communications between any Traveling Companion and Shipboard Medical Staff regarding Plaintiff's diagnosis, treatment, prognosis, discharge, or return to cabin during the Incident Period.

94. Produce all records reflecting communications between any Traveling Companion and any member of Carnival's Shoreside Medical Department regarding Plaintiff's condition at any time from October 18, 2024 through October 31, 2024.

SECURITY INTERACTIONS WITH TRAVELING COMPANIONS

95. Produce all Security Department records, incident reports, logs, and notes reflecting any interaction between Carnival security personnel and any Traveling Companion during the Incident Period, including any interaction arising from a Traveling Companion's protest, objection, or complaint regarding Plaintiff's medical treatment or the decision to return Plaintiff to his cabin.

96. Produce all CCTV footage depicting any interaction between Carnival security personnel and any Traveling Companion during the Incident Period.

97. Produce all records reflecting whether security was called, dispatched, or summoned in connection with any Traveling Companion's objection to Plaintiff's medical treatment, discharge from the Medical Center, or return to his cabin on October 18, 2024.

TRAVELING COMPANION STATEMENTS AND INVESTIGATION RECORDS

98. Produce all written or recorded statements taken from any Traveling Companion by Carnival, its agents, investigators, security personnel, medical staff, or insurers at any time from October 18, 2024 to the present.

99. Produce all internal Carnival notes, memoranda, or file entries that summarize, describe, or reference any oral communication between any Carnival employee and any Traveling Companion regarding Plaintiff's medical emergency during the Incident Period.

100. Produce all documents reflecting any Traveling Companion's request that Plaintiff be disembarked, transferred to a hospital, or evaluated by shoreside medical personnel, and Carnival's response to any such request.

CCTV AND PHOTOGRAPHIC EVIDENCE OF TRAVELING COMPANIONS

101. Produce all CCTV footage depicting any Traveling Companion in or near the Medical Center, or in any corridor, elevator, or public area while accompanying or transporting Plaintiff, during the Incident Period.

102. Produce all CCTV footage depicting any Traveling Companion at the gangway or pier area during the Vessel's port call in Freeport, Grand Bahama on October 18, 2024, limited to the period 3:00 p.m. through departure.

103. Produce all photographs taken by any Carnival department depicting any Traveling Companion during the Incident Period.

KEY CARD AND ACCESS RECORDS

104. Produce all key card swipe records, door access logs, and elevator access logs for each Traveling Companion's cabin key for the Incident Period, reflecting every location accessed by each Traveling Companion's card with timestamps.

105. Produce all key card swipe records reflecting any Traveling Companion's entry to or presence near the Medical Center during the Incident Period.

PRE-CRUISE AND POST-CRUISE RECORDS

106. Produce all pre-cruise communications from any Traveling Companion to Carnival, including special requests, medical equipment requests, accessibility accommodation requests,

dietary restriction notifications, and any disclosure of Plaintiff's pre-existing medical conditions submitted on behalf of Plaintiff or the booking.

107. Produce all pre-cruise health questionnaires or medical screening forms submitted by or on behalf of Plaintiff or any Traveling Companion for the Voyage.

108. Produce all records reflecting any Traveling Companion's purchase of travel insurance or travel protection through Carnival for the Voyage, and any claim submitted thereunder.

109. Produce all records reflecting any post-disembarkation assistance, transportation, or repatriation coordination provided by Carnival or its port agent for any Traveling Companion in connection with Plaintiff's medical emergency on October 20, 2024.

110. Produce all records reflecting any communication between Carnival and any Traveling Companion's emergency contact designated in the booking system.

SHORE EXCURSION AND ACTIVITY RECORDS

111. Produce all shore excursion booking records, attendance records, and departure/return times for each Traveling Companion for the Freeport, Grand Bahama port call on October 18, 2024.

112. Produce all records reflecting the time each Traveling Companion returned to the Vessel on October 17, 2024 and October 18, 2024, including gangway logs and key card swipe records.

Dated: April 01, 2026

Respectfully submitted,

/s/Michael A. Hoffman

Michael A. Hoffman, Esq. (Fla. Bar No. 89549)
mahoffman@1800askfree.com
David W. Singer, Esq. (Fla. Bar No. 306215)
dsingeresq@aol.com
ndvorak@1800askfree.com
gestevez1800askfree.com
DAVID W. SINGER & ASSOCIATES PA
1011 South Federal Highway
Hollywood, FL 33020

T: 954-920-1571
*Attorneys for Plaintiff*

Certificate of Service

I hereby certify that a true and correct copy of the following was served by email on April 01, 2026, on all counsel of record on the service list below.

/s/ Michael A. Hoffman

<u>Service List</u>

Michael J. Drahos, Esq.
W. Cooper Jarnagin
Ashley Genoese
michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com
ashley.genoese@gray-robinson.com
GRAY ROBINSON, P.A.
151 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Ofc. (561) 268-5727
*Attorneys for Defendant(s)*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:25-cv-24611-DPG**

MICHAEL R. SMITH,
Plaintiff,

v.

CARNIVAL CORPORATION, et al.,
Defendants.

**PLAINTIFF'S SECOND REQUEST FOR ADMISSIONS TO DEFENDANT, CARNIVAL CORPORATION**

Plaintiff, MICHAEL R. SMITH, pursuant to Fed. R. Civ. P. 36, requests that Defendant Carnival Corporation admit or deny each of the following. Each matter is deemed admitted unless specifically denied or objected to within thirty (30) days.

**1.** Admit that Carnival produced four pages comprising two distinct versions of the Against Medical Advice ("AMA") form for Plaintiff, Bates-stamped GR000627 through GR000630.

**2.** Admit that GR000627 and GR000628 comprise one version of the AMA form, with GR000627 as the substantive page and GR000628 as the signature page.

**3.** Admit that GR000629 and GR000630 comprise a second version of the AMA form, with GR000629 as the substantive page and GR000630 as the signature page.

**4.** Admit that the "MEDICAL ADVICE GIVEN" field on GR000627 states "Admission to medical center for monitoring."

**5.** Admit that the "MEDICAL ADVICE GIVEN" field on GR000629 states "Referral to Baltimore hospital."

**6.** Admit that both GR000627 and GR000629 list only "Hyperglycaemia, unspecified" as the diagnosis.

**7.** Admit that neither GR000627 nor GR000629 lists stroke, cerebrovascular accident, CVA, or any neurological condition as a diagnosis.

**8.** Admit that GR000630—the signature page paired with the “Referral to Baltimore hospital” version—bears a patient signature timestamp of October 18, 2024 at 20:41 UTC-04:00.

**9.** Admit that GR000628—the signature page paired with the “Admission to medical center for monitoring” version—bears a patient signature timestamp of October 18, 2024 at 20:42 UTC-04:00.

**10.** Admit that the “Referral to Baltimore hospital” version (GR000629/630) was electronically timestamped one minute before the “Admission to medical center for monitoring” version (GR000627/628).

**11.** Admit that all four signatures on GR000630—patient, accompanying passenger, senior doctor, and medical staff member—bear the identical timestamp of October 18, 2024 at 20:41 UTC-04:00.

**12.** Admit that all four signatures on GR000628—patient, accompanying passenger, senior doctor, and medical staff member—bear the identical timestamp of October 18, 2024 at 20:42 UTC-04:00.

**13.** Admit that the electronic health record system used aboard the Carnival Pride assigns timestamps automatically when a signature is captured.

**14.** Admit that the electronic health record system used aboard the Carnival Pride maintains an audit trail that records the date, time, and user associated with the creation or modification of each document, including each AMA form.

**15.** Admit that Carnival has not produced the audit trail for GR000627, GR000628, GR000629, or GR000630.

**16.** Admit that Dr. Maharaj’s clinical note timestamped October 18, 2024 at 20:34 UTC-04:00 is the first entry in the Case Summary that references advising Plaintiff on admission to the Medical Center for monitoring or referral to a hospital.

**17.** Admit that the 20:34 note states Dr. Maharaj “advised admission in MC for monitoring however he would prefer to go back to his cabin” and separately that Dr. Maharaj “advised guest on referral to hospital for further care however he would prefer to go to his own hospital back home.”

**18.** Admit that only seven minutes elapsed between the 20:34 clinical note and the first AMA signature timestamp at 20:41.

**19.** Admit that only eight minutes elapsed between the 20:34 clinical note and the second AMA signature timestamp at 20:42.

**20.** Admit that a foot X-ray was ordered by Dr. Maharaj at 20:18 UTC-04:00 on October 18, 2024 and was not completed until approximately 21:00 UTC-04:00, after both AMA forms were signed.

**21.** Admit that Nurse Madonda's note timestamped 21:00 UTC-04:00 on October 18, 2024 documents that the X-ray of the left foot was performed, images were shown to the physician, and findings were explained to the patient—all after both AMA forms were signed.

**22.** Admit that Dr. Maharaj documented wound care to Plaintiff's left foot at 21:14 UTC-04:00 on October 18, 2024—after both AMA forms were signed.

**23.** Admit that Dr. Maharaj administered 8 units of short-acting insulin to Plaintiff at 21:38 UTC-04:00 on October 18, 2024—after both AMA forms were signed.

**24.** Admit that Dr. Maharaj's note timestamped 22:42 UTC-04:00 on October 18, 2024 states the patient is "feeling much better," is "no longer dizzy," is "tolerating oral intake of water," and is "clinically well hydrated"—approximately two hours after both AMA forms were signed.

**25.** Admit that Plaintiff was not discharged from the Medical Center until approximately 23:30 UTC-04:00 on October 18, 2024—approximately two hours and forty-nine minutes after the first AMA form was signed.

**26.** Admit that Nurse Madonda's note at 23:30 UTC-04:00 on October 18, 2024 documents: "Patient reviewed by Dr. Nikhil. Patient states he feels much better. Discharged out of medical center left assisted on wheelchair conditional satisfactory."

**27.** Admit that the Disposition section of the Case Summary documents the disposition as "Discharge from clinic, follow up required"—not as a departure against medical advice.

**28.** Admit that the Disposition section was documented by Dr. Maharaj at 21:18 UTC-04:00 on October 18, 2024—after both AMA forms were signed.

**29.** Admit that the Disposition section designates Plaintiff for "Cat 1 – Medical disembarkation (direct) without escort" to the port of Baltimore on October 20, 2024 at 10:00 UTC-04:00.

**30.** Admit that the Carnival Pride had departed Freeport, Grand Bahama and was at sea at 20:41 UTC-04:00 on October 18, 2024, when the “Referral to Baltimore hospital” AMA was signed.

**31.** Admit that the Carnival Pride did not arrive in Baltimore until October 20, 2024.

**32.** Admit that approximately 37 hours elapsed between the 20:41 timestamp on the “Referral to Baltimore hospital” AMA and the Carnival Pride’s arrival in Baltimore.

**33.** Admit that a “Referral to Baltimore hospital” was not actionable medical advice on October 18, 2024 at 20:41 because the ship was at sea and Baltimore was approximately 37 hours away.

**34.** Admit that there was no mechanism by which Plaintiff could have accepted a “Referral to Baltimore hospital” and been transported to a Baltimore hospital on October 18, 2024 at 20:41, short of diversion or medevac.

**35.** Admit that no diversion or medevac was ordered, requested, or considered in connection with the “Referral to Baltimore hospital” documented on GR000629.

**36.** Admit that Mr. Smith’s hometown hospital is not in Baltimore, MD.

**37.** Admit that Plaintiff’s signature appears only on the signature pages (GR000628 and GR000630) and not on the substantive pages (GR000627 and GR000629).

**38.** Admit that the substantive page of the AMA form (containing the diagnosis and medical advice given) is a separate page from the signature page.

**39.** Admit that the substantive page of the AMA form can be replaced or substituted without altering the signature page.

**40.** Admit that Carnival’s electronic health record system permits an authorized user to modify the “MEDICAL ADVICE GIVEN” field on the substantive page of the AMA form after the patient’s signature has been captured on the signature page.

**41.** Admit that the audit trail for GR000627 through GR000630 will show that GR000629 was not created or last modified on October 18, 2024.

**42.** Admit that Plaintiff signed a Guest Consultation Form when he first presented to the Medical Center, and that the Case Summary records his first presentation at 19:16 UTC-04:00 on October 18, 2024.

**43.** Admit that Plaintiff's signature on the Guest Consultation Form is legible and recognizable as a signature.

**44.** Admit that Plaintiff's signature on the AMA signature page(s), signed approximately 85 minutes later at 20:41–20:42 UTC-04:00, is not legible and does not resemble a recognizable signature.

**45.** Admit that Plaintiff's signature visibly deteriorated between the time he signed the Guest Consultation Form and the time he signed the AMA form.

**46.** Admit that deterioration in a patient's handwriting or signature can be a clinical indicator of neurological impairment.

**47.** Admit that no member of the medical staff documented any observation or concern about the change in Plaintiff's signature between the Guest Consultation Form and the AMA form.

**48.** Admit that Carnival security officers were called to the Medical Center in connection with Plaintiff's travel companions' objections to Plaintiff's treatment or proposed discharge on October 18, 2024.

**49.** Admit that the security response occurred after the presentation of the AMA form to Plaintiff for signature.

**50.** Admit that the security response occurred before the presentation of the AMA form to Plaintiff for signature.

**51.** Admit that Plaintiff's travel companions left on their own volition because they were told they would be removed from the Medical Center area by security.

**52.** Admit that Carnival's comparative negligence defense, as stated in its Answer to Interrogatory No. 17, relies on Plaintiff's "failure to follow medical advice" and "signing the Against Medical Advice form."

**53.** Admit that the version of the AMA form that states "Referral to Baltimore hospital" (GR000629) is the version Carnival relies upon to support its comparative negligence defense.

**54.** Admit that Carnival does not contend that Plaintiff refused "Admission to medical center for monitoring"—the medical advice stated on GR000627.

**55.** Admit that the Disposition section of the Case Summary, which designates Plaintiff for medical disembarkation in Baltimore, is inconsistent with Carnival's contention that Plaintiff left against medical advice.

**56.** Admit that the three hours of continued treatment documented in the Case Summary between 20:41 and 23:30 on October 18, 2024 are inconsistent with a patient who left against medical advice at 20:41.

**57.** Admit that Plaintiff had no stroke-related disability before he boarded the Carnival Pride on October 13, 2024.

**58.** Admit that Plaintiff had no difficulty walking, speaking, or caring for himself before he boarded the Carnival Pride on October 13, 2024.

**59.** Admit that Plaintiff walked onto the Carnival Pride without assistance on October 13, 2024.

**60.** Admit that Plaintiff was able to legibly sign his own name when he first presented to the Medical Center on October 18, 2024.

**61.** Admit that Plaintiff was transported off the Carnival Pride by the Baltimore City Fire Department on October 20, 2024.

**62.** Admit that it is Carnival's position that Plaintiff's condition is attributable in whole or in part to pre-existing medical conditions.

**63.** Admit that no pre-existing medical condition prevented Plaintiff from walking, speaking, or signing his name before he boarded the Carnival Pride.

Dated: April 01, 2026

Respectfully submitted,

/s/Michael A. Hoffman

Michael A. Hoffman, Esq. (Fla. Bar No. 89549)
mahoffman@1800askfree.com
David W. Singer, Esq. (Fla. Bar No. 306215)
dsingeresq@aol.com
ndvorak@1800askfree.com
gestevez1800askfree.com
DAVID W. SINGER & ASSOCIATES PA
1011 South Federal Highway
Hollywood, FL 33020
T: 954-920-1571
*Attorneys for Plaintiff*

Certificate of Service

I hereby certify that a true and correct copy of the following was served by email on April 01, 2026, on all counsel of record on the service list below.

/s/ Michael A. Hoffman

Service List

Michael J. Drahos, Esq.
W. Cooper Jarnagin
Ashley Genoese
michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com
ashley.genoese@gray-robinson.com
GRAY ROBINSON, P.A.
151 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Ofc. (561) 268-5727
*Attorneys for Defendant(s)*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.: 1:25-cv-24611-DPG

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION d/b/a
CARNIVAL CRUISE LINE, and
NIKHIL MAHARAJ, M.D.,

Defendants.
_______________________________________/

**PLAINTIFF'S THIRD REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT CARNIVAL CORPORATION**

Plaintiff, MICHAEL SMITH, by and through undersigned counsel and pursuant to Federal Rules of Civil Procedure 26 and 34, hereby propounds this Third Request for Production of Documents to Defendant CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINE ("Carnival"), and requests that Carnival produce the documents identified below for inspection and copying at the offices of David W. Singer & Associates, P.A., 1011 South Federal Highway, Hollywood, Florida 33020, within thirty (30) days of service.

These Requests are propounded consistent with the directives of United States Magistrate Judge Detra Shaw-Wilder at the May 6, 2026 status conference

These Requests are also propounded in light of new factual disclosures contained in Carnival's May 1, 2026 supplemental discovery responses, including communications dated October 19, 2024, reflecting that the Senior Ship Physician of the *M/V Carnival Pride* participated in the medical-disembarkation decision regarding Plaintiff. See Tr. 13:6–14:11; 60:20–61:25.

**DEFINITIONS**

1. **"Plaintiff" or "Mr. Smith"** means Michael Smith.

2. **"Carnival"** means Defendant Carnival Corporation d/b/a Carnival Cruise Line, and any of its parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, attorneys, and representatives.

3. **"Vessel"** means the M/V Carnival Pride.

4. **"Voyage"** means the cruise aboard the Vessel that departed on or about October 13, 2024, and concluded on or about October 20, 2024.

5. **"Incident Period"** means October 18, 2024, through October 20, 2024, inclusive.

6. **"Plaintiff's Travel Party"** means Eric Grimm, Stephanie Grimm, Alissa Salsbury, Austin (AJ) Peterson, and Terry Crowley.

7. **"Patty Grimm"** means Plaintiff's sister, who was not aboard the Vessel during the Voyage.

8. **"Senior Ship Physician" or "Dr. Rantleru"** means the Senior Doctor assigned to the Vessel during the Voyage, identified in Carnival's May 1, 2026 supplemental production as Dr. L. Rantleru.

9. **"Master"** means the master, captain, or staff captain of the Vessel during the Voyage.

10. **"Medical Center"** means the shipboard infirmary, examination room, treatment room, and observation space of the Vessel.

11. **"HOC"** means Carnival's Health Operations Center, including all shoreside medical-support personnel, on-call physicians, telemedicine providers, and assistance-company personnel coordinating with the Vessel's medical staff.

12. **"SeaCare"** means the electronic medical record system used by Carnival to document the care of Vessel guests, including Plaintiff.

13. **"HESS"** means Carnival's Health, Environment, Safety, and Security management system, including all procedures, appendices, attachments, detailed instructions, and supporting documents promulgated under that system.

14. **"Document"** has the broadest meaning permitted under Federal Rule of Civil Procedure 34(a)(1)(A) and includes all writings, recordings, photographs, electronically stored information, metadata, audit trails, log entries, and tangible things, in any form or medium.

15. **"Communication"** means any transmission of information, in any form, between two or more persons, including without limitation e-mails, text messages, instant messages, voicemails, telephone calls, radio communications, satellite communications, ship-to-shore communications, application or ticketing entries, and chat messages.

## INSTRUCTIONS

1. **Form of Production.** Produce all documents in native digital format with all metadata preserved. Electronic mail shall be produced in MSG or EML format with all headers and attachments. Spreadsheets shall be produced in native format. Image files shall be produced in original resolution. PDFs shall be produced in searchable, OCR'd form. No compression, alteration, or processing that affects content or metadata shall be permitted.

2. **Temporal Scope.** Unless a specific Request specifies otherwise, the temporal scope of each Request is the Voyage. To the extent any Request reaches beyond the Voyage, the

maximum temporal scope is three (3) years, consistent with the Court's ruling at the May 6, 2026 status conference.

3. **Privilege Log.** For any document withheld in whole or in part on the basis of attorney-client privilege, work-product protection, or any other claim of privilege or protection, Carnival shall serve a privilege log identifying each withheld document by date, author, recipient(s), copy recipient(s), subject matter, document type, and the specific basis of the asserted privilege or protection. Carnival shall serve its privilege log within thirty (30) days of the Court's written order on the matters taken under advisement at the May 6, 2026 status conference, consistent with the Court's directive.

4. **Identification by Request Number.** Pursuant to S.D. Fla. Local Rule 26.1(e)(5), Carnival shall identify each responsive document by the specific Request number to which it is responsive.

5. **Continuing Duty.** These Requests are continuing in nature. Carnival shall supplement its responses pursuant to Federal Rule of Civil Procedure 26(e) upon discovery of any additional responsive documents.

6. **No Waiver.** Compliance with these Requests does not waive, limit, or supersede any pending motion, prior request, or any right to seek additional discovery.

## REQUESTS FOR PRODUCTION

### Section I — Audio Recordings and Telephone Communications

**113.** All audio recordings, voicemails, transcripts, and call summaries of telephone, radio, satellite, or VOIP communications between any member of the Vessel's medical staff (including the Senior Ship Physician and the ship's physician) and HOC during the Incident Period, including any communication concerning Plaintiff or Plaintiff's medical disembarkation.

**114.** All audio recordings, voicemails, transcripts, and call summaries of bridge-to-medical, medical-to-bridge, security-to-medical, and medical-to-security radio or telephone communications aboard the Vessel during the Incident Period, including any communication concerning Plaintiff, Plaintiff's Travel Party, the response to the Medical Center, or the medical disembarkation.

**115.** All audio recordings, voicemails, transcripts, and call summaries of ship-to-shore communications between any member of the Vessel's crew, officers, or medical staff and the United States Coast Guard, any Rescue Coordination Center, any port agent, any assistance company, any telemedicine provider, or any emergency-response coordinator during the Incident Period, including any communication concerning Plaintiff's medical disembarkation.

**116.** All audio recordings, voicemails, transcripts, and call summaries of telephone or radio communications between any member of Plaintiff's Travel Party and any officer,

crewmember, security staff, medical staff, or Guest Services representative of the Vessel during the Voyage.

**117.** All call logs, switchboard records, PBX records, telephone-billing records, and call-detail records reflecting incoming and outgoing telephone activity during the Incident Period for: (a) the Medical Center; (b) the Bridge; (c) Guest Services; (d) the Security office or station; (e) Cabin 4136; and (f) each cabin assigned to a member of Plaintiff's Travel Party.

**Section II — Written Communications Concerning Plaintiff and Travel Party**

**118.** All written communications — including e-mails, text messages, MS Teams or Slack messages, ticketing entries, application-log entries, and chat messages — between any member of the Vessel's medical staff (including the Senior Ship Physician and the ship's physician) and HOC concerning Plaintiff, Plaintiff's medical condition, Plaintiff's treatment, or Plaintiff's medical disembarkation, from October 18, 2024 through November 30, 2024.

**119.** All internal Carnival written communications referencing Plaintiff, Plaintiff's Travel Party, or the medical disembarkation, including communications by and between the Senior Ship Physician, the ship's physician, the Master, the Staff Captain, the Hotel Director, Guest Services, Security, and the HOC, from October 18, 2024 through November 30, 2024.

**120.** All satellite, VSAT, or other ship-to-shore e-mail traffic and messaging traffic concerning Plaintiff or Plaintiff's medical disembarkation during the Incident Period and the seven (7) days thereafter, including the Senior Ship Physician's October 19, 2024 communication regarding Plaintiff's medical disembarkation as referenced in Carnival's May 1, 2026 supplemental production.

**121.** All written communications between any officer, crewmember, security staff, medical staff, or Guest Services representative of the Vessel and any member of Plaintiff's Travel Party, from October 13, 2024 through the present.

**122.** All written communications between Carnival and Patty Grimm, from October 13, 2024 through the present, including any communication concerning payment, guarantee of payment, or financial responsibility for Plaintiff's medical treatment.

**123.** All complaints, grievances, comment cards, post-cruise surveys, Care Team communications, customer-service tickets, and follow-up correspondence submitted by, or made on behalf of, any member of Plaintiff's Travel Party, from October 13, 2024 through the present.

**Section III — Logs, Reports, and Internal Records**

**124.** All Medical Response Team (MRT) Event Logs and MRT exercise or drill logs maintained by the Vessel during the Voyage.

**125.** All bridge logs, deck logs, Captain's logs, and Master's logs of the Vessel for the Incident Period, including all entries by the Master, the Staff Captain, or any officer of the watch

referencing Plaintiff, the medical disembarkation, any medical emergency, any diversion or change of routing considered or undertaken, and any port-agent coordination concerning Plaintiff.

**126.** All Security dispatch logs, Security incident reports, Security activity logs, and Security investigation reports for the Incident Period, including any record of Security being summoned to, dispatched to, or responding to the Medical Center, Cabin 4136, or any cabin assigned to a member of Plaintiff's Travel Party.

**127.** The Daily Security Summary Watch Reports, or equivalent daily security-activity report, for October 18, 19, and 20, 2024.

**128.** All Guest Services records, Guest Services notes, Guest Services tickets, and Guest Services logs referencing Plaintiff, any member of Plaintiff's Travel Party, or Plaintiff's medical disembarkation.

**129.** All SeaCare system audit logs and audit trails for Plaintiff's electronic medical record (Patient ID W1Q3M9-4, Bates GR000001–GR000046), including user-access entries, record entries, modifications, edits, deletions, addendums, electronic-signature events, and exports, from October 18, 2024 through the present.

**130.** All End of Voyage Reports, End of Cruise Reports, voyage summaries, and operational-debrief documents for the Voyage that reference Plaintiff, any medical emergency, any medical disembarkation, or any patient-safety event.

**131.** All communications with the port agent, ISS Shipping, Trenton Davis, or any other shoreside coordinator concerning the disembarkation of Plaintiff in Baltimore, Maryland, on or about October 20, 2024.

**<u>Section IV — Travel Party and Family Interaction Records</u>**

**132.** All records reflecting Stephanie Grimm's interactions with any member of the Vessel's medical staff, security staff, or Guest Services regarding Plaintiff's care, treatment, or discharge, including any verbal criticism of the Medical Center's decision to discharge Plaintiff, any objection, complaint, or request for Plaintiff to be observed in the Medical Center, and any response by Vessel personnel.

**133.** All records reflecting interactions between any member of Plaintiff's Travel Party and any officer, crewmember, security staff, medical staff, or Guest Services representative of the Vessel concerning Plaintiff's care, treatment, or medical disembarkation.

**134.** All records of Security's response to any alleged family disturbance, objection, escalation, or removal in or near the Medical Center on October 18, 19, or 20, 2024, including any dispatch record, incident report, body-worn-camera download record, witness statement, supervisor briefing, post-incident review, or follow-up communication.

**135.** All policies, procedures, post orders, training materials, and operational guidance governing Carnival's handling of family or visitor objections in or near the Medical Center,

including the protocol for summoning, dispatching, or escorting family or visitors away from the Medical Center.

**136.** All statements, recorded or written, taken from any member of Plaintiff's Travel Party by Carnival or any agent, investigator, security officer, medical staff member, insurer, or third-party representative of Carnival, from October 18, 2024 through the present.

**Section V — Payment, Folio, and Documents Signed in the Medical Center**

**137.** The complete shipboard folio, sail-and-sign account, and onboard purchase history for each member of Plaintiff's Travel Party for the Voyage, produced individually for each Travel Party member.

**138.** All records of charges, debits, credits, holds, pre-authorizations, or guarantee-of-payment entries associated with Plaintiff's medical treatment during the Voyage, including charges posted to Plaintiff's folio and charges posted to any other passenger's folio on Plaintiff's behalf.

**139.** All records of wheelchair charges, wheelchair-rental fees, and wheelchair-equipment loan agreements applied to Plaintiff or any member of Plaintiff's Travel Party during the Voyage.

**140.** All casino-rewards, Players Club, and onboard-loyalty records for Plaintiff and Eric Grimm associated with the Voyage, including all records reflecting Plaintiff's use of Eric Grimm's casino-rewards card or account.

**141.** The booking contract, cruise ticket contract, and reservation record for each member of Plaintiff's Travel Party for the Voyage.

**142.** All Against Medical Advice (AMA) forms, refusal-of-treatment forms, consent forms, discharge instructions, billing-acknowledgment forms, financial-responsibility forms, and any other document presented to Plaintiff or to Austin (AJ) Peterson for signature in the Medical Center during the Incident Period, including all drafts, signed and unsigned versions, signature audit trails, and any version reviewed, signed off, or approved shoreside.

**143.** All policies, procedures, post orders, training materials, and operational guidance governing Carnival's collection of payment, pre-authorization of payment, or guarantee of payment as a condition precedent to admission, treatment, observation, or continuation of care in the shipboard Medical Center.

**Section VI — HESS Procedures and Appendices Referenced But Not Produced**

**144.** The complete and unredacted version of each of the following appendices to MED-3104 — Medical Disembarkation, in effect during the Voyage, each of which is cross-referenced within Carnival's HESS production (Bates GR000430–GR000481) but was not produced: (a) MED-3104-A1 — Disembarkation Considerations; (b) MED-3104-A2 — Disembarkation Categories; (c) MED-3104-A3 — USCG Medevac Checklist; (d) MED-

3104-A4 — USCG Rescue Coordination Centers Contact Details; (e) MED-3104-A5 — Workflow for Disembarkation with Potential Operational Disruption.

**145.** The complete and unredacted version of MED-3003 — Medical Response Team, and each of the following appendices thereto, in effect during the Voyage, each of which is cross-referenced within Carnival's HESS production (Bates GR000430–GR000481) but was not produced: (a) CCL-MED-3003-A1 — MRT Announcement Procedure; (b) CCL-MED-3003-A2 — Emergency Medical Response Algorithm; (c) CCL-MED-3003-A3 — First Response Treatment Guidelines; (d) CCL-MED-3003-A4 — Medical Response Team Event Log.

**146.** The complete and unredacted version, in effect during the Voyage, of each of the following HESS procedures cross-referenced within Carnival's HESS production (Bates GR000430–GR000481) but not produced: (a) MED-3002 — First Response and Triage; (b) MED-3102 — Patient Admission and Discharge from the Medical Center.

**147.** The complete and unredacted version, in effect during the Voyage, of MED-3105 — Shoreside Information Resources, and its detailed instruction MED-3105-DI1 — Telemedicine Guidance, each of which is cross-referenced within Carnival's HESS production (Bates GR000430–GR000481) but was not produced.

**148.** The complete and unredacted version, in effect during the Voyage, of each of the following HESS procedures cross-referenced within Carnival's HESS production (Bates GR000430–GR000481) but not produced: (a) MED-3802 — Patient Safety Events; (b) MED-3701 — Documentation Management.

**149.** The complete and unredacted version, in effect during the Voyage, of MED-3902 — Shipboard Medical Staff Training & Competency, and each of the following appendices and detailed instructions thereto, each of which is cross-referenced within Carnival's HESS production (Bates GR000430–GR000481) but was not produced: (a) MED-3902-A1 through MED-3902-A5; (b) CCL-MED-3903-DI1-A1 — Medical Staff on the Job Training Checklist; (c) CCL-MED-3903-DI2 — Medical Staff Professional Conduct.

**<u>Section VII — Senior Ship Physician Employment and Credentialing Records</u>**

**150.** The complete personnel file of Dr. L. Rantleru maintained by Carnival or any of its parents, subsidiaries, affiliates, or agents, including all human-resources records, employment records, performance records, contract records, training records, and corrective-action records.

**151.** All employment contracts, contract addenda, contract extensions, letters of appointment, and shipboard assignment orders between Carnival and Dr. L. Rantleru, including all records reflecting his assignment to the Vessel during the Voyage and all prior shipboard assignments aboard any Carnival vessel during the three (3) years preceding the Voyage through the present.

**152.** All employment applications, curricula vitae, professional references, letters of recommendation, pre-employment screening records, and background-check results for

Dr. L. Rantleru, including all records reflecting Carnival's verification of professional history, prior employment, and prior maritime medical practice.

**153.** All medical licensure, board certifications, ACLS, BLS, ATLS, and other clinical-skills certifications, continuing medical education records, professional liability insurance records, and credentialing records for Dr. L. Rantleru, including all renewals and verifications during the three (3) years preceding the Voyage through the present.

**154.** All training records, orientation checklists, on-the-job training documentation under CCL-MED-3903 (Medical Staff Handover) and CCL-MED-3903-DI1-A1 (Medical Staff on the Job Training Checklist), competency assessments, and continuing professional development records for Dr. L. Rantleru during the three (3) years preceding the Voyage through the present.

**155.** All performance evaluations, peer reviews, supervisor reviews, patient complaints, family complaints, crew complaints, grievances, incident reports, internal investigations, root-cause analyses, peer-review actions, disciplinary records, and corrective-action documentation concerning Dr. L. Rantleru during the three (3) years preceding the Voyage through the present.

Dated: May 27, 2026.

Respectfully submitted,
By: /s/ Michael A. Hoffman
Michael A. Hoffman, Esq.
Florida Bar No. 89549
**DAVID W. SINGER & ASSOCIATES, P.A.**
1011 South Federal Highway
Hollywood, Florida 33020
Telephone: (954) 920-1571
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of November 2026, a true and correct copy of the foregoing was served via electronic mail upon all counsel of record on the Service List below.

/s/ Michael A. Hoffman
Michael A. Hoffman, Esq.

**SERVICE LIST**

Michael J. Drahos, Esq.
W. Cooper Jarnagin, Esq.
Ashley N. Genoese, Esq.
Charles J. Roussin, Esq.
**GRAY ROBINSON, P.A.**
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Telephone: (561) 268-5727
michael.drahos@gray-robinson.com
cooper.jarnagin@gray-robinson.com
ashley.genoese@gray-robinson.com
charles.roussin@gray-robinson.com
Attorneys for Defendant Carnival Corporation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-cv-24611-GAYLES/SHAW-WILDER

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION,
NIKHIL MAHARAJ, M.D., and
LETLHOGILE RANTLERU, M.D.,

Defendants.
_______________________________________/

**PLAINTIFF'S THIRD REQUEST FOR ADMISSIONS TO DEFENDANT CARNIVAL CORPORATION**

Plaintiff, MICHAEL SMITH, pursuant to Federal Rule of Civil Procedure 36 and S.D. Fla. Local Rule 26.1, requests that Defendant, CARNIVAL CORPORATION, admit, within thirty (30) days of service, the truth of each of the following matters. Each Request is admitted unless a written answer or objection is served within that period. Fed. R. Civ. P. 36(a)(3). An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless it states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny. Fed. R. Civ. P. 36(a)(4).

As used herein, "Plaintiff's shipboard medical chart" means the SeaCare Medical Center case file for Plaintiff produced at GR000005–GR000046; "the Vessel," "the Voyage," and "the Medical Center" have the meanings set forth in Plaintiff's Fourth Request for Production; and all quoted language is reproduced verbatim from the cited Bates-numbered document.

**REQUESTS FOR ADMISSION**

1. Admit that Plaintiff's shipboard medical chart (GR000005–GR000046) contains no documentation of a "last known well" time for Plaintiff.

RESPONSE:

2. Admit that Plaintiff's shipboard medical chart contains no documentation that any stroke-screening instrument — including BE-FAST, the Cincinnati Prehospital Stroke Scale, or the National Institutes of Health Stroke Scale — was administered to Plaintiff at any time aboard the Vessel.

RESPONSE:

3. Admit that Plaintiff's shipboard medical chart contains no documentation of finger-to-nose testing of Plaintiff.

RESPONSE:

4. Admit that Plaintiff's shipboard medical chart contains no documentation of heel-to-shin testing of Plaintiff.

RESPONSE:

5. Admit that Plaintiff's shipboard medical chart contains no documentation of any assessment of Plaintiff for nystagmus.

RESPONSE:

6. Admit that the words "cerebellar," "ataxia," and "dysmetria" do not appear anywhere in Plaintiff's shipboard medical chart.

RESPONSE:

7. Admit that the only appearance of the word "stroke" in Plaintiff's shipboard medical chart is in the October 18, 2024 history notation "No history or DKA, HHS, MI, stroke" (GR000019).

RESPONSE:

8. Admit that physician examination entries in Plaintiff's shipboard medical chart dated October 18, 2024 at 19:24 (GR000022); October 19, 2024 at 09:36 (GR000021); October 19, 2024 at 17:26 (GR000021); and October 20, 2024 at 08:04 (GR000020) each contain the identical text: "Oriented to person, place, and date. CN II-XII intact. Strength and sensation

symmetric and intact throughout. Patellar, Brachial, and brachioradialis reflexes 2+ bilaterally. Steady gait, negative Romberg test."

RESPONSE:

9. Admit that Dr. Maharaj's clinical note of October 19, 2024 at 18:10 (GR000039) states: "Guest is however too lethargic to stand."

RESPONSE:

10. Admit that Plaintiff's shipboard medication record documents Promethazine 25 mg administered to Plaintiff intramuscularly, completed at 18:13 on October 19, 2024 (GR000034).

RESPONSE:

11. Admit that Plaintiff's SeaCare referral documentation (GR000045) records a Risk Priority of "Yellow," a Risk Priority Reason of "Requires hospitalization most likely," and a Referral Priority of "Urgent."

RESPONSE:

12. Admit that the "SEAEVENT REPORT NUMBER" field of Plaintiff's SeaCare referral documentation (GR000045) is blank.

RESPONSE:

13. Admit that the deck-log printouts produced by Carnival for the Voyage bear the disclaimer "Possible entry versions are hidden in this print." (See, e.g., GR000850.)

RESPONSE:

14. Admit that the hourly-observation entries in the Vessel's deck log for October 19, 2024 at 01:00 (GR000850) and at 18:00 (GR000863) each record the Vessel's stabilizer fins as "In" and the sea state as "Rough."

RESPONSE:

15. Admit that Carnival maintained an Acute Gastroenteritis surveillance log for the Voyage pursuant to the CDC Vessel Sanitation Program.

RESPONSE:

Dated: August 24, 2026

Respectfully submitted,

/s/ **Michael A. Hoffman**
Michael A. Hoffman, Esq.
Florida Bar No. 89549
mahoffman@1800askfree.com
David W. Singer, Esq.
Florida Bar No. 306215
dsingeresq@aol.com
DAVID W. SINGER & ASSOC., P.A.
1011 South Federal Highway
Hollywood, Florida 33020
Tel: (954) 920-1571
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 24, 2026, a true and correct copy of the foregoing Plaintiff's Third Request for Admissions to Defendant Carnival Corporation was served by e-mail upon all counsel of record identified on the Service List below.

/s/ Michael A. Hoffman

**SERVICE LIST**

Michael J. Drahos, Esq.
W. Cooper Jarnagin, Esq.
Ashley N. Genoese, Esq.
Charles J. Roussin, Esq.
Michael.Drahos@Gray-Robinson.com
Cooper.Jarnagin@Gray-Robinson.com
Charles.Roussin@gray-robinson.com
Ashley.Genoese@Gray-Robinson.com
**GRAYROBINSON, P.A.**
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-cv-24611-GAYLES/SHAW-WILDER

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION,
NIKHIL MAHARAJ, M.D., and
LETLHOGILE RANTLERU, M.D.,

Defendants.

_______________________________________/

**PLAINTIFF'S FOURTH REQUEST FOR PRODUCTION TO DEFENDANT CARNIVAL CORPORATION (NOS. 156–192)**

Plaintiff, MICHAEL SMITH, pursuant to Federal Rules of Civil Procedure 26 and 34 and S.D. Fla. Local Rule 26.1, requests that Defendant, CARNIVAL CORPORATION, produce the documents and electronically stored information described below within thirty (30) days of service. Numbering continues from Plaintiff's Third Request for Production, which ended at Request No. 155.

**DEFINITIONS**

1. "Plaintiff" or "Mr. Smith" means Michael Smith.

2. "Carnival" means Defendant Carnival Corporation d/b/a Carnival Cruise Line, together with its officers, directors, employees, agents, departments, and anyone acting on its behalf, including its shoreside Fleet Medical Department, Health Operations Center, CareTeam, and Fleet Operations Center.

3. "Vessel" means the M/V Carnival Pride (IMO 9223954).

4. "Voyage" means the cruise aboard the Vessel that departed Baltimore, Maryland on or about October 13, 2024 and returned to Baltimore on October 20, 2024 (Cruise ID PR20241013007).

5. "Incident Period" means October 18, 2024 through October 20, 2024, inclusive.

6. "Medical Center" means the shipboard infirmary, examination, and treatment spaces aboard the Vessel.

7. "SeaCare" means the electronic medical record system used by Carnival aboard the Vessel.

8. "NAPA Logbook" means the electronic logbook system (NAPA Logbook version 2.251.1 or otherwise) used to create, maintain, and print the Vessel's deck logs, including all entry versions, revision histories, and metadata.

9. "Testifying Expert" means each expert witness identified in Carnival's Expert Witness Disclosure served August 17, 2026: Joseph Fernandez, M.D.; Victor H. Barredo, M.D.; Alexander Merkler, M.D.; Ruben Parejo, M.D.; and Captain Richard M. Miller (Pharos Mission Critical Solutions, LLC).

10. "Document" and "Communication" have the broadest meanings permitted under Federal Rules of Civil Procedure 26 and 34, and include electronically stored information in native format with metadata intact.

11. The definitions set forth in Plaintiff's Third Request for Production served May 27, 2026 are incorporated by reference.

**INSTRUCTIONS**

1. Form of Production. Produce all documents as they are kept in the usual course of business or organized and labeled to correspond to the categories in each Request. Produce electronically stored information — including VDR, AIS, ECDIS, GPS, NAPA Logbook, stabilizer-system, and SeaCare data — in native digital format with all metadata intact. Fed. R. Civ. P. 34(b)(2)(E).

2. Identification by Request Number. Pursuant to S.D. Fla. Local Rule 26.1(e)(5), identify the Bates range produced in response to each numbered Request.

3. Privilege Log. For any document withheld in whole or in part, provide the information required by Fed. R. Civ. P. 26(b)(5)(A) and S.D. Fla. Local Rule 26.1(e)(2).

4. Temporal Scope. Unless a Request states otherwise, the temporal scope is October 13, 2024 through October 20, 2024.

5. Continuing Duty. These Requests are continuing in nature under Fed. R. Civ. P. 26(e).

6. Preservation. To the extent any category of electronic data responsive to Requests 156 through 159 or 167 through 168 has been overwritten, deleted, or not preserved, produce

all documents concerning the preservation, download, retention, overwriting, or destruction of that data, including any litigation-hold notice applicable to it.

7. No Duplication of Pending Matters. These Requests do not seek the documents that are the subject of Plaintiff's pending Motion to Compel Better Responses to Plaintiff's Third Request for Production (Nos. 114, 127, 129, 130, 133, 137, 142, 143, 146, 148, 149, and 150–155), and no Request herein duplicates any Request numbered 1 through 155.

**REQUESTS FOR PRODUCTION**

**I. VESSEL ELECTRONIC NAVIGATION AND OPERATIONAL DATA**

156. All voyage data recorder (VDR or S-VDR) data for the Vessel for October 18 through October 20, 2024, including any download, extraction, backup, or preserved data set, and all documents concerning the preservation, retention, or overwriting of such data.

RESPONSE:

157. All Automatic Identification System (AIS) transmission data, logs, or records for the Vessel for October 13 through October 20, 2024 in Carnival's possession, custody, or control, including any AIS data obtained from any vendor or service.

RESPONSE:

158. All ECDIS voyage, track, route, and playback data; GPS track history; and all other contemporaneous electronic position recordings for the Vessel for October 13 through October 20, 2024.

RESPONSE:

159. The complete native electronic export of the Vessel's NAPA Logbook for October 13 through October 20, 2024 — all log types — including all entry versions, revision histories, edit logs, and metadata. This Request expressly encompasses the entry versions that the produced deck-log printouts state are "hidden in this print" (see, e.g., GR000850).

RESPONSE:

160. The complete berth-to-berth passage plan for the Voyage, including all appraisals, waypoints, amendments, and approvals.

RESPONSE:

161. The Vessel's bell book, maneuvering book, and engine telegraph or engine-movement records for October 18 through October 20, 2024.

RESPONSE:

162. The Vessel's engine-room logs and all machinery-status, defect, or limitation records for October 13 through October 20, 2024 reflecting the availability or any limitation of propulsion, steering, generators, or thrusters.

RESPONSE:

163. The Master's night orders and the Master's standing orders in effect during the Voyage, including the night orders acknowledged in the October 19, 2024 deck log.

RESPONSE:

164. All noon reports, position reports, and voyage-progress reports transmitted from the Vessel to any shoreside department during the Voyage.

RESPONSE:

**II. WEATHER INFORMATION RECEIVED AND SHIP-MOTION DATA**

165. All weather forecasts, weather-routing reports, sea-state advisories, heavy-weather warnings, and route-optimization products received by the Vessel or by any Carnival shoreside department concerning the Vessel's route for October 13 through October 20, 2024, together with documents sufficient to identify each provider of such products and any contract with that provider.

RESPONSE:

166. All documents concerning any decision, discussion, or recommendation regarding the Vessel's course, speed, or routing in response to weather or sea conditions on October 18 or October 19, 2024.

RESPONSE:

167. All records of the deployment or retraction of the Vessel's stabilizer fins for October 13 through October 20, 2024 — including stabilizer control-system logs and alarm data — and all policies, procedures, or guidance in effect during the Voyage governing when stabilizer fins are to be deployed or retracted.

RESPONSE:

168. All motion-monitoring, hull-stress-monitoring, accelerometer, seakeeping, or ride-comfort data recorded aboard the Vessel for October 18 through October 19, 2024, and documents sufficient to identify each such system installed aboard the Vessel.

RESPONSE:

## III. PASSENGER-ILLNESS SURVEILLANCE FOR THE VOYAGE

169. The Acute Gastroenteritis (AGE) surveillance log maintained for the Voyage pursuant to the CDC Vessel Sanitation Program, and each AGE report (including any 24-hour or 4-hour report) submitted to the CDC for the Voyage.

RESPONSE:

170. Documents sufficient to show, for the Voyage, the number of passengers and the number of crew who presented to the Medical Center with, or were treated for, (a) gastroenteritis or gastrointestinal symptoms and (b) motion sickness or seasickness. Patient-identifying information other than Plaintiff's may be redacted.

RESPONSE:

171. All records of the distribution, dispensing, or sale of motion-sickness or seasickness medication aboard the Vessel during the Voyage, including Guest Services distribution logs and point-of-sale records for meclizine, dimenhydrinate, or comparable products.

RESPONSE:

172. All guest complaints, comment cards, Guest Services entries, or post-cruise survey responses for the Voyage concerning ship motion, rough seas, or seasickness.

RESPONSE:

173. Each daily "Fun Times" or equivalent daily program distributed to passengers during the Voyage, and each notice, announcement, or communication provided to passengers during the Voyage instructing them to report gastrointestinal symptoms to the Medical Center.

RESPONSE:

174. Plaintiff's pre-boarding health questionnaire, health-screening form, or health acknowledgment for the Voyage, in whatever form completed or accepted.

RESPONSE:

175. The Outbreak Prevention and Response Plan (or equivalently titled plan) in effect for the Vessel during the Voyage.

RESPONSE:

**IV. HIRING, TRAINING, COMPLIANCE, AND FINANCIAL-MOTIVE DOCUMENTS (SECOND AMENDED COMPLAINT, COUNTS V, VII–X AND ¶¶ 36–45)**

176. The complete Doctor Clinical Performance Interview administered to Defendant Maharaj on or about October 25, 2022, including the complete question set, Defendant Maharaj's answers, all scoring sheets, scoring keys or guides, interviewer notes, and the identity of each interviewer.

RESPONSE:

177. All communications with, and the complete file of, any third-party recruiting agent or agency concerning the recruitment, referral, screening, or placement of Defendant Maharaj.

RESPONSE:

178. All documents concerning any remediation plan, corrective action, restriction, enhanced supervision, coaching, or follow-up considered, proposed, or implemented for

Defendant Maharaj in response to his 2024 performance evaluations, or, if none exists, a written statement to that effect pursuant to Fed. R. Civ. P. 34(b)(2).

RESPONSE:

179. All internal audits, gap analyses, assessments, compliance reviews, or certifications performed between January 1, 2022 and October 20, 2024 concerning whether Carnival's shipboard medical operations meet or exceed the standards established by the Cruise Lines International Association (CLIA) or the American College of Emergency Physicians (ACEP) Health Care Guidelines.

RESPONSE:

180. Each version, in effect at any time between January 1, 2024 and October 20, 2024, of Carnival's guest-facing "Medical Staffing and Equipment" and "Medical Emergencies" statements, including Carnival Help Center Article ID 1194 and the web pages quoted at paragraph 8 of the Second Amended Complaint.

RESPONSE:

181. Documents sufficient to show the revenue, budget, and profit-and-loss performance of the Vessel's Medical Center for fiscal years 2023 and 2024, and all periodic fleet-wide medical-department revenue reporting for the same period.

RESPONSE:

182. All documents concerning any "cost savings and revenue-enhancing initiatives" (GR000681) suggested, proposed, or implemented by the Vessel's medical staff during 2023 or 2024, and all documents identifying any revenue, cost, or financial metric used in the evaluation or compensation of shipboard physicians during that period.

RESPONSE:

183. Documents sufficient to show Carnival Corporation's current financial condition and net worth, including its most recent audited financial statements. This Request is directed to Plaintiff's claim for punitive damages under the general maritime law (Second Amended Complaint ¶¶ 36–45).

RESPONSE:

## V. TESTIFYING-EXPERT MATERIALS

184. All facts or data that Carnival or its counsel provided to each Testifying Expert and that the expert considered in forming the opinions to be expressed. Fed. R. Civ. P. 26(b)(4)(C)(ii).

RESPONSE:

185. All communications between Carnival or its counsel and each Testifying Expert that (a) relate to compensation for the expert's study or testimony or (b) identify assumptions that counsel provided and that the expert relied upon. Fed. R. Civ. P. 26(b)(4)(C)(i), (iii).

RESPONSE:

186. The complete file of each Testifying Expert for this matter, including all notes, chronologies, calculations, measurements, chart plots, OpenCPN route or measurement files, Google Earth project files, imaging reviewed, test forms administered (including the St. Louis University Mental Status examination form scored by Dr. Barredo), literature relied upon, and drafts of any demonstrative exhibit.

RESPONSE:

187. All invoices, statements, and payment records for each Testifying Expert in connection with this matter through the date of production.

RESPONSE:

188. The retention or engagement agreement between Carnival or its counsel and each Testifying Expert for this matter.

RESPONSE:

189. Documents sufficient to identify each matter in which Carnival or GrayRobinson, P.A. has retained each Testifying Expert from January 1, 2021 to the present, and the total amounts paid to each Testifying Expert or that expert's firm in connection with all such matters.

RESPONSE:

190. The complete data set of Vessel deck-log information provided to Captain Richard M. Miller or Pharos Mission Critical Solutions, LLC, including the NAPA Logbook export downloaded and printed on or about March 26, 2026 that is identified in the information-sources annex to the Pharos report.

RESPONSE:

191. All diagnostic imaging obtained during the compulsory medical examinations of Plaintiff on May 21, 2026 and May 22, 2026, in native DICOM format, and all raw notes, intake forms, test instruments, and measurements generated during those examinations.

RESPONSE:

## VI. BALTIMORE ARRIVAL AND TRANSFER TIMING

192. All records showing, for the Vessel's October 20, 2024 arrival at Baltimore: the time of first line ashore; the time all fast; the time the gangway was rigged; and the time the gangway was opened for disembarkation, including pilot records, mooring logs, port logs, and terminal or security records reflecting those times.

RESPONSE:

Dated: August 24, 2026

Respectfully submitted,

/s/ Michael A. Hoffman
Michael A. Hoffman, Esq.
Florida Bar No. 89549
mahoffman@1800askfree.com
David W. Singer, Esq.
Florida Bar No. 306215
dsingeresq@aol.com
DAVID W. SINGER & ASSOC., P.A.
1011 South Federal Highway
Hollywood, Florida 33020
Tel: (954) 920-1571
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2026, a true and correct copy of the foregoing Plaintiff's Fourth Request for Production to Defendant Carnival Corporation (Nos. 156–192) was served by e-mail upon all counsel of record identified on the Service List below.

/s/ Michael A. Hoffman

**SERVICE LIST**

Michael J. Drahos, Esq.
W. Cooper Jarnagin, Esq.
Ashley N. Genoese, Esq.
Charles J. Roussin, Esq.
Michael.Drahos@Gray-Robinson.com
Cooper.Jarnagin@Gray-Robinson.com
Charles.Roussin@gray-robinson.com
Ashley.Genoese@Gray-Robinson.com
GRAYROBINSON, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-cv-24611-GAYLES/SHAW-WILDER

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION,
NIKHIL MAHARAJ, M.D., and
LETLHOGILE RANTLERU, M.D.,

Defendants.

_______________________________________/

**PLAINTIFF'S SECOND SET OF INTERROGATORIES TO DEFENDANT CARNIVAL CORPORATION (NOS. 19–25)**

Plaintiff, MICHAEL SMITH, pursuant to Federal Rule of Civil Procedure 33 and S.D. Fla. Local Rule 26.1(e), propounds the following interrogatories upon Defendant, CARNIVAL CORPORATION, to be answered separately, fully, and under oath within thirty (30) days of service. The definitions set forth in Plaintiff's First Set of Interrogatories and in Plaintiff's Fourth Request for Production are incorporated by reference. Numbering continues from Plaintiff's First Set of Interrogatories, which ended at Interrogatory No. 18; with the seven interrogatories below, Plaintiff has propounded twenty-five interrogatories in total, within the limit of Fed. R. Civ. P. 33(a)(1).

Local Rule 26.1(e)(1) requires that Carnival insert its answer immediately beneath each interrogatory. To facilitate compliance, Plaintiff is contemporaneously serving these interrogatories in Word format.

**INTERROGATORIES**

19. For each expert witness identified in Carnival's Expert Witness Disclosure served August 17, 2026 (Joseph Fernandez, M.D.; Victor H. Barredo, M.D.; Alexander Merkler, M.D.; Ruben Parejo, M.D.; and Captain Richard M. Miller), state the number of separate matters in which that person or his firm has been retained by Carnival or by GrayRobinson, P.A. from January 1, 2021 to the present, and the total amount paid to that person or his firm by or on behalf of Carnival in connection with all such matters.

ANSWER:

20. Identify each weather forecast, weather-routing report, sea-state advisory, or heavy-weather warning received by the Vessel or by any Carnival shoreside department concerning the Vessel's route for the period October 13 through October 20, 2024, including the provider, date, and time of each; and state whether the wind observations recorded in the Vessel's deck logs for October 18–19, 2024 were recorded as true wind or as apparent (relative) wind.

ANSWER:

21. State whether the Vessel was equipped on October 18–19, 2024 with any motion-monitoring, hull-stress-monitoring, accelerometer, or ride-comfort recording system, identifying each such system; identify each period during October 18–19, 2024 during which the Vessel's stabilizer fins were deployed and each period during which they were retracted; and identify each person who made or directed each deployment or retraction decision.

ANSWER:

22. State separately for the Voyage: (a) the total number of passengers and the total number of crew recorded in the Vessel's Acute Gastroenteritis surveillance log maintained pursuant to the CDC Vessel Sanitation Program; and (b) the total number of passengers and crew who presented to the Medical Center with, or were treated for, motion sickness or seasickness.

ANSWER:

23. State why the urinalysis ordered for Plaintiff on October 18, 2024 at 20:44 was not recorded as completed until October 19, 2024 at 21:20, identifying when the specimen was collected and when it was tested; and state the basis for the difference between the anion gap of 21 mmol/L reported in Plaintiff's October 18, 2024 laboratory results and the anion gap of 14 recorded in Dr. Maharaj's clinical note of October 18, 2024 at 20:34.

ANSWER:

24. State the date and time at which (a) Defendant Maharaj first notified Defendant Rantleru of Plaintiff's presentation or condition; (b) the Master or any bridge officer of the Vessel was first informed of Plaintiff's condition or planned medical disembarkation; and (c) each shoreside person, department, or mailbox — including the Health Operations Center, CareTeam Services, and the Fleet Operations Center — first received notice of Plaintiff's condition; and for each such notice identify the person giving it, the person receiving it, and the means of communication.

ANSWER:

25. Identify each claim, lawsuit, or written complaint asserted against Carnival from January 1, 2020 to the present alleging a failure to diagnose or a delayed diagnosis of stroke aboard any Carnival vessel, or a failure to timely evacuate, divert, or medically disembark a passenger requiring shoreside care, stating for each the claimant's name, the vessel, the date of the incident, the forum and case number if suit was filed, and the disposition.

ANSWER:

Dated: August 24, 2026

Respectfully submitted,

**/s/ Michael A. Hoffman**

Michael A. Hoffman, Esq. (Florida Bar No. 89549)
mahoffman@1800askfree.com
David W. Singer, Esq.(Florida Bar No. 306215)
dsingeresq@aol.com
DAVID W. SINGER & ASSOC., P.A.
1011 South Federal Highway
Hollywood, Florida 33020
Tel: (954) 920-1571
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 24, 2026, a true and correct copy of the foregoing Plaintiff's Second Set of Interrogatories to Defendant Carnival Corporation (Nos. 19–25) was served by e-mail upon all counsel of record identified on the Service List below.

/s/ Michael A. Hoffman

**SERVICE LIST**

Michael J. Drahos, Esq.
W. Cooper Jarnagin, Esq.
Ashley N. Genoese, Esq.
Charles J. Roussin, Esq.
Michael.Drahos@Gray-Robinson.com
Cooper.Jarnagin@Gray-Robinson.com
Charles.Roussin@gray-robinson.com
Ashley.Genoese@Gray-Robinson.com
GRAYROBINSON, P.A.
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:25-cv-24611-GAYLES/SHAW-WILDER

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION,
NIKHIL MAHARAJ, M.D., and
LETLHOGILE RANTLERU, M.D.,

Defendants.
_______________________________________/

**PLAINTIFF'S FOURTH REQUEST FOR PRODUCTION TO DEFENDANT CARNIVAL CORPORATION**

Plaintiff, Michael Smith, pursuant to Federal Rules of Civil Procedure 26 and 34 and Local Rule 26.1, requests that Defendant Carnival Corporation produce the documents described below within thirty (30) days of service, at the offices of David W. Singer & Associates, P.A., 1011 S. Federal Highway, Hollywood, Florida 33020, or by secure electronic transfer. Numbering continues from Plaintiff's Third Request for Production (Nos. 113–155). Each request is directed to allegations of the Second Amended Complaint [ECF No. 69] and, where indicated, to the testimony of Carnival's nurse Debra Dube, R.N., given August 5, 2026.[1]

[1] Carnival's general objection to the Second Request for Production counted the document requests then served. The twenty-six requests below are each tied to a paragraph of the Second Amended Complaint filed August 14, 2026 [ECF No. 69] or to testimony given by Carnival's own nurse on August 5, 2026 — neither of which existed when Carnival responded to the earlier sets — and Instruction No. 2 removes any duplication objection by permitting a Bates reference for anything already produced. The footnotes state, for counsel's benefit, why each request is relevant and why the objections Carnival raised to the earlier sets do not carry over.

## I. Definitions

1. "Carnival," "You," and "Your" mean Defendant Carnival Corporation, including its Fleet Medical Department, Medical Director, shoreside Health Operation Center ("HOC"), Care Team Services, Fleet Operations Center, Guest Services, Loss Prevention unit, and its officers, employees, agents, contractors, and attorneys, and any parent, subsidiary, or affiliate acting on its behalf.

2. "Plaintiff" means Michael Smith. "Travel Party" means the persons who traveled with Plaintiff on the Voyage, including Eric Grimm and Stephanie Grimm.

3. "Vessel" means the Carnival Pride. "Voyage" means the Carnival Pride sailing of October 13 through October 20, 2024 (Voyage PR20241013007 per GR000001). "Incident Period" means 12:00 a.m. on October 18, 2024 through Plaintiff's disembarkation on October 20, 2024, unless a request states otherwise.

4. "Medical Center" means the shipboard medical facility aboard the Vessel. "SeaCare" means the electronic medical-record system in which Plaintiff's shipboard chart (GR000005–GR000046) was created, and any associated audit, logging, template, or reporting module.

5. "Dr. Maharaj" means Defendant Nikhil Maharaj, M.D. "Dr. Rantleru" means Defendant Letlhogile Rantleru, M.D. "Medical Staff" means every physician, nurse, and healthcare assistant assigned to the Medical Center during the Voyage, including Dr. Rantleru, Dr. Maharaj, Alan Acebu, R.N., Debra Dube, R.N., Mduduzi Madonda, R.N., and Anele Njikelana, HCA.

6. "SAC" means the Second Amended Complaint [ECF No. 69]. "Answer" means Carnival's Answer and Affirmative Defenses [ECF No. 49]. "Dube Deposition" or "Dube Dep."

means the August 5, 2026 videotaped deposition of Debra Dube, R.N., in this action, cited by page and line.

7. "Stroke Protocol" means the written stroke protocol, and the stroke checklist forming part of it, that Nurse Dube testified Carnival maintains and to which she has access (Dube Dep. 74:13–75:5). "SeaCare Stroke Assessment" means the stroke-specific assessment within SeaCare's assessment module in which a FAST or other stroke screen is recorded (Dube Dep. 28:8–25). "Medico Medevac Check Sheet" means MED-3104-A3 (GR000924–GR000925). "MED-3002" means First Response and Triage (GR000930–GR000933).

8. "Document" and "Communication" have the full meaning permitted by Rule 34(a)(1)(A), and include electronically stored information ("ESI") in native form with metadata, e-mail, text and instant messages (including WhatsApp, Microsoft Teams, and similar platforms), voicemail, telephone call-detail records, system logs, audit trails, database entries, and drafts.

9. "Credential" means any physical or electronic token issued to, worn by, or carried by any person that can be read, scanned, sensed, or logged by any system You operate or contract for, including without limitation Sail & Sign cards, stateroom key cards, crew and staff identification badges, proximity or smart cards, timeclock credentials, and mobile-application credentials. "Read Event" means any record generated when a reader, lock, terminal, timeclock, or scanner detects or logs a Credential, including the credential identifier, reader identifier and location, date and time, result, and associated person or account.

10. "Relating to" means concerning, referring to, describing, evidencing, or constituting, in whole or in part.

## II. Instructions

1. Respond separately to each request. Under Rule 34(b)(2)(B)–(C), each objection must state with specificity its grounds, state whether any responsive materials are being withheld on the basis of the objection, and permit inspection of the remainder. General or boilerplate objections are not responses.

2. These requests do not seek documents already produced. If a responsive document has already been produced in this action, You may respond by identifying it by Bates number; a response that a request is "duplicative" without that identification is not a response under Rule 34(b)(2).

3. Where a request asks for documents "sufficient to show" a fact, You may produce a subset of documents that fully establishes the fact rather than every responsive document.

4. Produce ESI in native format with all metadata intact where the request concerns audit trails, logs, timestamps, call-detail records, or Read Events, together with a data dictionary or field legend sufficient to interpret each field. Otherwise produce in searchable PDF with Bates numbers.

5. If any document is withheld under a claim of privilege or work-product protection, serve a privilege log that complies with Rule 26(b)(5)(A) and Local Rule 26.1(e)(2)(C) with Your written response.

6. If no responsive documents exist after a reasonable inquiry, state so unequivocally and identify the custodians and systems searched. Where a request cites testimony from the Dube Deposition describing a document, system, or practice, a response that no such document exists must state the basis for that response in light of the cited testimony.

7. Unless a request states otherwise, the period covered is the Incident Period. These requests are continuing to the extent provided by Rule 26(e), and Carnival is reminded of its duty under Rule 26(e)(1) and Rule 36 to correct any prior response rendered incomplete or incorrect by the documents produced in response hereto.

## III. Requests for production

### A. Stroke protocol, stroke screening, and training of the Medical Staff (Counts V and IX; SAC ¶¶ 23, 39, 89–90)

156. The Stroke Protocol, including the stroke checklist, in every version that has existed, with each version's document number, author, approval and effective dates, and fleet-distribution records; Documents sufficient to show whether any version was in effect aboard the Vessel from October 18 through October 20, 2024 and when each member of the Medical Staff first received or acknowledged it; and, if the Stroke Protocol was first adopted after October 20, 2024, the Documents reflecting the decision to adopt it.[2]

157. Documents sufficient to show the SeaCare Stroke Assessment as configured aboard the Vessel in October 2024 — the template or screen, its fields, its user instructions, and the date it was added to SeaCare — together with the SeaCare audit records showing whether the SeaCare

[2] Nurse Dube testified that Carnival maintains a written stroke protocol with a stroke checklist, that she has electronic access to it, and — when asked to open it — that counsel would not permit her to do so. Dube Dep. 74:13–75:5. Carnival responded to Initial RFP Nos. 11 and 56 (the stroke protocol) with "None other than what may be contained within" its general medical policies (GR000417–GR000441), denied Initial RFA No. 38 ("Carnival maintained a written stroke protocol in effect on October 18, 2024"), and refused to answer Interrogatory No. 14 and Initial RFP Nos. 39 and 67 (post-incident revisions). Those positions cannot all be reconciled with the testimony. If the protocol was in effect on October 18, 2024, it is the standard Carnival set for itself under Counts I, II, V, and IX (SAC ¶¶ 23, 39, 89–90), and the earlier responses must be corrected under Rules 26(e)(1) and 36(b). If it was adopted afterward, the request is still proper: Rule 407 governs admissibility, not discoverability, and the document bears on feasibility and on the accuracy of Carnival's sworn discovery responses. Proprietary content is addressed by a confidentiality designation, not by withholding.

Stroke Assessment was opened, started, saved, or completed for Plaintiff at any time during the Incident Period, and by whom.[3]

158. All FAST or BE-FAST stroke-recognition training materials, and the completion, attendance, or acknowledgement records for each member of the Medical Staff for the contract period that included the Voyage; the stroke-related content of the ACLS renewal training completed by Dr. Maharaj and Dr. Rantleru before the Voyage; the schedule, topics, attendance records, and materials for each continuing-education session conducted by the Senior Doctor aboard the Vessel from January 1 through October 31, 2024; and the Vessel's medical-drill schedule and drill log for 2024 identifying the scenario drilled on each date.[4]

159. The completed CCL-MED-3903-DI1-A1 Medical Staff On-the-Job Training Checklist (GR000940) signed by each member of the Medical Staff for the contract period that included the Voyage, and the "EMR – Emergency Response Procedures for Medical" materials referenced at item 2 of that checklist as in effect during the Voyage. To the extent produced in response to Request No. 154, identify by Bates number.[5]

---

[3] Dube Dep. 28:8–25: SeaCare's assessment module contains a stroke-specific assessment; a FAST screen, if performed, would be recorded there; there is "no reason" it would not be. Carnival objected to Initial RFA No. 42 (no BE-FAST or equivalent stroke scale documented) as vague as to "BE-FAST or equivalent stroke scale assessment"; its nurse uses the same vocabulary (28:2–7). Carnival objected to Second RFA Nos. 14–15 (SeaCare audit trail) as "wholly irrelevant"; the Court has since compelled the AMA signature date-and-time records (ECF No. 73, Request No. 129), and the SAC pleads the integrity of the chart at ¶¶ 41–42. Whether the assessment was ever opened for Plaintiff is a fact that only the audit log can supply, and it goes to Counts I, II, and IX.

[4] Count IX (SAC ¶¶ 89–91) was pleaded after Carnival objected to Initial RFP Nos. 16, 17, and 62 (stroke training materials and schedules) as irrelevant and "not adequately linked" to the incident, and to Initial RFA Nos. 80, 81, and 97 as vague. Those objections assumed there was no training claim; there is one now, and the Court has ordered production of Dr. Rantleru's training records (ECF No. 73, Request No. 154). Nurse Dube testified that Carnival trains FAST/BE-FAST (28:2–7); that her stroke training otherwise comes only through biennial ACLS renewal (25:2–11); that the Senior Doctor gives continuing education twice a month but she cannot recall a stroke session aboard the Vessel (30:6–31:7); and that medical drills covered unconscious, trauma, mass-casualty, and fire scenarios but never a stroke (21:23–24:18). The request is confined to the Medical Staff, the Vessel, and 2024.

[5] Carnival produced the blank checklist (GR000940). Nurse Dube testified that she signed one for the Vessel, that signing represents she was trained on the listed items — including "HESS Procedures" and "EMR – Emergency Response Procedures for Medical" — and that she could not say whether any manual accompanies those items. Dube Dep. 15:19–19:10. The completed checklists show what each provider acknowledged before treating passengers (SAC

160. Carnival's written procedure, if any, in effect in 2024 by which a shipboard nurse may escalate a disagreement with, or concern about, a physician's assessment or diagnosis — including any chain-of-command, speak-up, patient-safety, or ethics-hotline procedure applicable to shipboard medical staff — together with the training records on that procedure for the Medical Staff, and Documents sufficient to show whether any hotline report, patient-safety report, or escalation concerning Plaintiff's care was received.[6]

**B. Hiring and retention of Dr. Maharaj (Counts VII and VIII; SAC ¶¶ 78–86)**

161. All agreements, candidate submissions, curriculum vitae transmittals, and Communications between Carnival and the third-party recruiting agent or agency through which Dr. Maharaj was recruited, Relating to Dr. Maharaj, from first contact through his first sign-on aboard a Carnival vessel.[7]

162. The Doctor Clinical Performance Interview administered to Dr. Maharaj on or about October 25, 2022, including the completed instrument, scoring sheet, pass/fail threshold, interviewer notes, and any recording; the blank template, scenario bank, and revision history for every version of that instrument in use from January 1, 2022 through October 20, 2024; and Documents sufficient to show whether any stroke, transient ischemic attack, or adult neurological

---

¶¶ 89–91). The personnel-file privacy objection Carnival raised to Initial RFP Nos. 26–27, 30, 58, and 60–61 is met by the redaction of personal identifiers the Court approved for Request No. 150 (ECF No. 73).

[6] Dube Dep. 35:14–40:16; 73:1–16: a nurse would not raise a missed diagnosis with either physician ("out of my scope of practice"), would not raise it with the Lead Nurse, would fear for her job if she did, and knows of no hotline; the Senior Doctor contributes to nurses' evaluations. Whether Carnival gave its nurses any channel to escalate a physician's error is a training-and-supervision fact under Count IX (SAC ¶¶ 89–91) and bears on the conscious-disregard allegations at ¶¶ 36–45. Carnival objected to Initial RFP Nos. 28 and 31 (reporting structure; chain of command) as "vague" and a "fishing expedition." The nurse's testimony supplies the connection those objections said was missing.

[7] Count VII, SAC ¶¶ 78–81. Carnival answered Interrogatory No. 7 (hiring, credentialing, training, and supervision practices) by pointing to general policies (GR000464–GR000481) and produced credentialing documents for Dr. Maharaj (GR000497–GR000566), but nothing reflecting how he was sourced or what the recruiter told Carnival about him. A recruiter's file is not a personnel file; it is the record of what Carnival knew, and asked, before it put Dr. Maharaj aboard.

emergency scenario was included in, considered for, or removed from that instrument during that period.[8]

163. Carnival's written physician credentialing and vetting procedure in effect at Dr. Maharaj's hire and during the Voyage, including any crosswalk to the American College of Emergency Physicians cruise-ship-medicine guidelines pleaded in Affirmative Defense E of the Answer, together with the completed credentialing file or checklist for Dr. Maharaj at hire: primary-source verification of licensure, ACLS, BLS, and ATLS certifications, reference checks, malpractice-history inquiry, and background check.[9]

164. All Documents reflecting any remediation plan, performance-improvement plan, coaching, restriction, enhanced supervision, reassignment, or follow-up implemented or considered for Dr. Maharaj in response to the "Needs Improvement" ratings in his April 2024 and June 2024 performance evaluations (GR000909–GR000912), including the direction that he read HESS procedures daily, and Documents sufficient to show the decision to assign him to the Vessel for the Voyage and any condition placed on that assignment.[10]

165. All Communications among Carnival's senior physicians, Fleet Medical Department, and shoreside personnel Relating to the review, approval, or discussion of Dr. Maharaj's 2024 performance evaluations (GR000907–GR000912), including the approval-

---

[8] The interview instrument is Carnival's own document (SAC ¶ 79). Carnival objected to Initial RFA No. 86 (no practical examination for common deadly conditions such as stroke) as vague; the completed instrument and the scenario bank answer the question directly and are limited to 2022–2024. Count VII, SAC ¶¶ 79–80.

[9] Carnival pleaded ACEP compliance as Affirmative Defense E (ECF No. 49) and answered Interrogatory No. 6 by invoking CLIA and ACEP standards. The credentialing procedure and the completed file are the only means of testing that defense. Carnival's response to Initial RFP No. 61 produced GR000497–GR000566 under a "vague" objection; this request names the specific verification steps, so a Bates reference suffices for anything already produced.

[10] In January 2026 Carnival answered "none" to Initial RFP Nos. 26–27 and 58 (evaluations; corrective action; evaluations submitted to shoreside). The three 2024 evaluations were produced later (GR000907–GR000912); two rate Dr. Maharaj "Needs Improvement" in CCL Compliance in the months before the Voyage. Count VIII (SAC ¶¶ 83–86) turns on what Carnival did with that knowledge. If the answer is that nothing was done, Rule 34(b)(2)(B) requires Carnival to say so.

workflow records identifying each reviewer and approver and the date of each action; and Documents sufficient to show the input of the Vessel's Lead Nurse into those evaluations.[11]

166. The complete file for the October 11 – November 10, 2024 evaluation of Dr. Maharaj (GR000907–GR000908), including drafts, the appraiser's supporting materials, the shoreside reviewer's approval, and any reference in that file to the care of Plaintiff or to the complaint of Stephanie Grimm (GR000913–GR000919); and Documents sufficient to show any promotion, re-engagement, change of title, or change of compensation of Dr. Maharaj after October 20, 2024.[12]

**C. Triage, escalation, and evacuation (Counts II, VI, and X; SAC ¶¶ 31–32, 36–39, 93–96)**

167. The complete SeaCare triage history for Plaintiff, including every triage-classification entry and every reassessment entry required by MED-3002 § 2.2 from his October 18, 2024 presentation through disembarkation, with the author and timestamp of each, and any audit record showing whether the "Urgent" classification was ever changed, or a change was attempted, by any user.[13]

---

[11] SAC ¶¶ 44, 84. Nurse Dube testified that the Senior Doctor gives input on nurses' evaluations and that the Lead Nurse contributes to the physicians' evaluations (40:17–41:9). Carnival objected to Initial RFP No. 63 (communications concerning Dr. Maharaj's compliance or non-compliance with medical policies) as a fishing expedition; the "Needs Improvement — CCL Compliance" ratings are precisely such communications and are now in the record. A routine evaluation-approval workflow created in the ordinary course of business, months before suit, is not work product.

[12] SAC ¶¶ 44, 85: a shoreside reviewer approved an "Exceptional" rating in Assessment Diagnosis & Treatment Planning after Carnival had received the family's written complaint (GR000919). Carnival objected to Initial RFP No. 59, Initial RFA No. 57, and Interrogatory No. 18 (Dr. Maharaj's post-incident promotion) as post-incident and irrelevant. Negligent retention is judged by what the employer did once it knew (Count VIII); the post-incident rating, retention, and promotion decisions are the claim, not collateral to it.

[13] Dube Dep. 79:2–80:8: a suspected stroke is "emergent" under MED-3002 (GR000931); amending the triage category is the nurse's job; Plaintiff's "Urgent" classification was never changed. MED-3002 § 2.2 requires reassessment of urgent patients at least every thirty minutes. The reassessment entries, or their absence, and any attempt to change the category exist only in SeaCare's triage module and audit log, which the printed chart (GR000005–GR000046) does not display. Counts I, II, and V.

168. The complete HOC, Care Team Services, and Fleet Operations Center case record for Plaintiff, including case-management-system entries, call logs, ticketing records, telemedicine-consultation logs, and internal messaging, Relating to the October 19, 2024 10:23 a.m. disembark notification, Dr. Rantleru's October 19, 2024 3:12 p.m. Communication (GR000913), and any action taken or not taken in response; and Documents sufficient to show whether the Senior Doctor or any member of the Medical Staff contacted the HOC concerning Plaintiff on October 18 or 19, 2024. To the extent produced in response to Request No. 114, identify by Bates number.[14]

169. Documents sufficient to identify the shoreside personnel on duty or on call for the HOC, the Fleet Medical Department, and Care Team Services from October 18 through October 20, 2024, their positions, the on-call or watch schedule, and the written escalation protocol governing physician review of shipboard disembark notifications; the Fleet Medical Department organizational chart and the Medical Director's role description in effect in October 2024; and any HOC or Fleet Medical Department procedure for reconciling a "Category 1" disembarkation designation against a patient's admission status.[15]

170. Any Medico Medevac Check Sheet (MED-3104-A3) completed for Plaintiff; Documents sufficient to show the number of Medico Medevac Check Sheets completed aboard

---

[14] Count X (SAC ¶¶ 93–97) did not exist when Carnival objected to Initial RFP Nos. 47–49 and answered "upon information and belief, none" to shoreside e-mails, telemedicine records, and call logs for October 18–21, 2024. It has since produced the October 19 10:23 a.m. notification to the HOC (GR000636) and Dr. Rantleru's 3:12 p.m. e-mail (GR000913) — the very category those requests described. Nurse Dube testified that the Senior Doctor is the liaison to the HOC when a case worsens, that a nurse cannot initiate HOC contact, and that she does not know whether shoreside was contacted about Plaintiff (43:5–8; 47:12–14; 50:9–12). The Court ordered Request No. 114 produced except as to Travel Party matters (ECF No. 73); this request reaches the case-management and telephony records behind those communications.

[15] Carnival objected to Initial RFP Nos. 28, 42, 43, 44, and 45 and to Interrogatory No. 11 (shoreside organization; Medical Director; shoreside physicians responsible for the Vessel) as "wholly irrelevant." Count X now names the Medical Director and the HOC personnel who received the Category 1 notification (SAC ¶¶ 10, 93–96). Carnival denied Initial RFA Nos. 117–118 (shoreside responsibility for supervision and training of shipboard physicians), yet its nurse describes the HOC as the source of "guidelines on how to take care of the patients" (42:22–43:8). The roster and escalation protocol identify the shoreside witnesses and the standard they were bound to apply; the request is limited to three days and one department.

the Vessel from October 1, 2023 through October 31, 2024 and the disposition of each (patient identifiers may be redacted); and all Documents reflecting any consideration by the Medical Staff, the Master, or shoreside personnel of medical evacuation, diversion, or United States Coast Guard assistance for Plaintiff.[16]

171. All records of Communication or conferral between the Master, Staff Captain, or bridge and the Medical Staff Relating to Plaintiff, including bridge log entries, the Master's night orders and standing orders concerning medical emergencies and medical disembarkation in effect during the Voyage, and any evaluation of a change of course or speed, United States Coast Guard contact, or earlier or higher-category disembarkation. Deck logs already produced at GR000690–GR000906 need not be reproduced.[17]

172. Vessel position, course, and speed data (voyage data recorder extract, ECDIS log, or voyage abstract) from 8:00 p.m. on October 18, 2024 through arrival at Baltimore on October 20, 2024, and the passage plan for that leg, sufficient to show the Vessel's track and its distance from the nearest ports and from helicopter-evacuation range.[18]

---

[16] Carnival's answer to Interrogatory Nos. 9–10 states that "the determination for medical evacuation of a passenger is made by the ship physician and Captain," and Carnival could not admit or deny whether diversion or medevac was considered for Plaintiff (Second RFA No. 35). Nurse Dube had never seen the Medico Medevac Check Sheet, testified that the attending physician completes it, and did not know whether one was done for Plaintiff (44:5–47:11; 50:13–20). Either the sheet exists for Plaintiff or it does not; the count of sheets completed aboard the Vessel in the preceding year shows whether the form is used at all. Count VI, SAC ¶¶ 31–32, 37–38.

[17] SAC ¶ 32 (Count VI) alleges the Master was never consulted. Carnival's own interrogatory answer places the Captain in the evacuation decision (Nos. 9–10); the October 19 notification was addressed to the "Pride Captain" (GR000636); and Nurse Dube testified that either physician may call the Coast Guard (82:9–23). Carnival objected to Initial RFP Nos. 76–77 (officers' meetings; Safety Officer logs) as a fishing expedition and pointed to its privilege log. Bridge logs, night orders, and standing orders are operational records kept in the ordinary course; they are not work product, and the request is confined to Plaintiff and to three days.

[18] Carnival produced deck logs in response to Initial RFP No. 9 but no electronic track. The VDR or ECDIS extract is the primary navigational record; it is limited to the thirty-eight hours at issue and bears on the diversion and evacuation analysis under Count VI (SAC ¶¶ 31–32), including the Vessel's proximity to Florida ports on the night of October 18, 2024.

**D. Guest Services report, payment, and overnight follow-up (SAC ¶¶ 24–31, 40)**

173. The Guest Services log, call record, or ticket for the October 18, 2024 report that a guest in stateroom 4136 was vomiting and unable to walk (GR000005), the wheelchair request and dispatch record identifying the responding crew member and the time of each transport, and the ship's telephone (PBX) call-detail records for calls among stateroom 4136, Guest Services, the Medical Center, and Dr. Maharaj's extension or cabin from 6:00 p.m. on October 18 through 10:00 a.m. on October 19, 2024.[19]

174. All folio postings, point-of-sale transactions, card authorizations or pre-authorization holds, and reversals for Medical Center and wheelchair charges to Plaintiff's or any Travel Party member's account from October 18 through October 20, 2024, with system timestamps and the terminal or user that entered each; and the written policy in effect during the Voyage governing when Medical Center charges are discussed with and collected from a guest, including the MED-3002 direction that discussion of charges be deferred until after assessment and emergency treatment (GR000932). To the extent produced at GR000642–GR000659, identify by Bates number.[20]

---

[19] The chart opens with "Guest services reported a guest vomiting in his cabin and unable to walk" (GR000005; Dube Dep. 85:5–7), and Nurse Dube was called to stateroom 4136 (82:24–83:6). She also testified that a physician's overnight check on a discharged patient is made by telephone and would be charted, and that none appears (88:23–89:14). The Guest Services ticket fixes when the complaint began; the PBX records show whether anyone called the stateroom that night. Carnival objected to Initial RFP No. 7 (internal messaging) as burdensome and answered "None" to key-card records for the Travel Party (Second RFP Nos. 104–105) without saying whether the systems exist; Interrogatory No. 7 of the accompanying set is directed to that gap. This request is confined to one stateroom, four extensions, and sixteen hours.

[20] Carnival objected to Second RFP Nos. 83 and 92 (the deposit and payment arrangements) on the express ground that there were "no allegations concerning issues with payment or deposits." The SAC now pleads them at ¶¶ 24 and 40. Carnival denied Initial RFA Nos. 1, 7, and 48 (deposit before entry; separate wheelchair billing); Nurse Dube testified that for critical patients charges are discussed after treatment and that she never saw pre-payment required (83:7–85:3), while Plaintiff's family testifies otherwise. Folio, point-of-sale, and authorization timestamps resolve that conflict, and the deferral direction is Carnival's own standard (GR000932). Plaintiff does not re-serve Request No. 143 (ECF No. 73); this request is directed to transaction-system records and the written charging policy. [ATTORNEY NOTE — REQUIRED — CONFIRM before service: compare the text of Request No. 143 and narrow if any overlap remains.]

**E. Chart integrity, refusal-of-care forms, complaint handling, and financial incentives (SAC ¶¶ 36–45)**

175. The SeaCare audit trail and metadata for Plaintiff's chart (GR000005–GR000046), produced natively or as system audit reports, showing for each entry the authoring user, creation timestamp, every modification with user and timestamp, and any template, default-value, or copy-forward indicator — including the "neurological examination" entries dated October 18, 19, and 20, 2024, the "steady gait" entry of October 20, 2024, and the disembarkation-category entry of October 18, 2024 at 21:18 — together with the SeaCare user login and session records for the Medical Center during the Incident Period.[21]

177. All Documents Relating to any case debriefing with a shoreside physician, interview of any member of the Medical Staff, clinical review, peer review, patient-safety-event report, SeaEvent report, or root-cause analysis concerning Plaintiff's care, and Documents sufficient to show whether any occurred; and all Documents Relating to the handling of Stephanie Grimm's October 20 – November 1, 2024 complaints (GR000913–GR000919), including the Loss Prevention file and its routing and closure decisions.[22]

[21] SAC ¶¶ 41–42: three identical "neurological examination" entries, and a "steady gait" entry on the morning the patient left the ship on a stretcher. Nurse Dube testified that a nurse would not chart a steady gait without seeing the patient walk and that nothing in the chart records that Plaintiff walked (88:8–22; 96:1–97:4). Carnival objected to Second RFA Nos. 14–15 (SeaCare audit trail) as "wholly irrelevant"; the Court has since compelled the AMA signature date-and-time records (ECF No. 73, Request No. 129). This request applies the same principle to the rest of the chart. Native production is required because the audit trail does not exist in the printed record.

[22] Carnival answered Interrogatory No. 15 that no incident or accident report was prepared, and "upon information and belief, none" to Initial RFP Nos. 38 and 64–66 (root-cause analysis, case review, meeting minutes, action plan). Nurse Dube confirms it: no debriefing, no interview, no internal review that she knows of (74:6–12), although debriefings with a shoreside physician are routine for emergent cases (47:15–48:12). SAC ¶ 44 pleads that Carnival routed the family's complaint to Loss Prevention and opened no clinical review. If the answer is still "none," Rule 34(b)(2) requires Carnival to say so; if a review exists, the work-product objection Carnival raised to Initial RFP No. 22 calls for a privilege log, not silence, and never reaches the underlying facts. The Court sustained Carnival's objection to producing the MED-3802 procedure (ECF No. 73, Request No. 148); this request seeks the case file for this patient, not the procedure.

178. Documents reflecting medical-center revenue targets, key performance indicators, budgets, or incentive or bonus criteria applicable to the Medical Staff or to Dr. Maharaj or Dr. Rantleru for 2024, and all Communications to shipboard physicians during 2024 concerning "responsible financial practices," "cost savings," or "revenue-enhancing initiatives" as those terms are used in the Role Responsibilities documents (GR000482–GR000486).[23]

180. Documents sufficient to show, for the period October 1, 2021 through the present, each contract period during which Dr. Maharaj or Dr. Rantleru served aboard a Carnival vessel, each Carnival training, conference, or orientation he attended.

181. For the Incident Period, in native format with a data dictionary: (a) all crew Credential Read Events, door or access-control records, and timeclock or time-and-attendance records for the Medical Center and its adjacent spaces and for each member of the Medical Staff, together with the watch schedule or roster set by the Lead Nurse showing who was assigned against who actually recorded presence; (b) all Read Events for Plaintiff's Credentials and the stateroom door-lock records for stateroom 4136 and the staterooms of his Travel Party, to the extent not produced at GR000002–GR000004; and (c) the retention schedule, auto-purge interval, and any litigation-hold notice applicable to each system that generated the foregoing data, to SeaCare, and to the PBX call-detail records sought in Request No. 173, with Documents sufficient to show whether any such data for the Incident Period has been purged or overwritten.[24]

[23] The quoted phrases are Carnival's own, from the Role Responsibilities documents it produced in response to Initial RFP No. 24 (GR000482–GR000486). SAC ¶ 43 pleads them as the financial pressure behind a Category 1 designation and itemized wheelchair charges. Carnival objected to Initial RFP No. 34 (allocation of medical charges) as a fishing expedition and to Initial RFA Nos. 58–60 (compensation structure) as "proprietary." Proprietary material is produced under a confidentiality designation; it is not withheld. The request is limited to 2024 and to the Medical Staff.

[24] Carnival answered "None" to key-card and door-access requests for the Travel Party (Second RFP Nos. 104–105) without stating whether such systems exist, what they record, or whether the data was purged. Nurse Dube testified that the Lead Nurse set the nursing schedule and assigned her to Plaintiff (34:5–11); the credential and timeclock records show who was actually present in the Medical Center, against that schedule, when the identical neurological examinations were charted (SAC ¶ 42). Subsection (c) is directed to retention and hold facts: if data was overwritten after Plaintiff's March 10, 2025 preservation demand, that is a Rule 37(e) fact Plaintiff is entitled to learn now.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 4, 2026, a true and correct copy of the foregoing was served by electronic mail upon: Michael J. Drahos, Esq. (michael.drahos@gray-robinson.com), W. Cooper Jarnagin, Esq. (cooper.jarnagin@gray-robinson.com), Ashley N. Genoese, Esq. (ashley.genoese@gray-robinson.com), and Charles J. Roussin, Esq. (charles.roussin@gray-robinson.com), GrayRobinson, P.A., 515 North Flagler Drive, Suite 650, West Palm Beach, Florida 33401, Telephone (561) 268-5727, Counsel for Defendants Carnival Corporation and Nikhil Maharaj, M.D.

Respectfully submitted,

/s/ Michael A. Hoffman
Michael A. Hoffman
Florida Bar Number: 89549
MAHoffman@1800AskFree.com
David W. Singer & Associates, P.A.
1011 S. Federal Highway
Hollywood, Florida 33020
Telephone: (954) 920-1571
Cell: (954) 665-5290
*Attorneys for Plaintiff Michael Smith*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:25-cv-24611-GAYLES/SHAW-WILDER

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION,
NIKHIL MAHARAJ, M.D., and
LETLHOGILE RANTLERU, M.D.,

Defendants.
_______________________________________/

**PLAINTIFF'S SECOND SET OF INTERROGATORIES TO DEFENDANT CARNIVAL CORPORATION**

Plaintiff, Michael Smith, pursuant to Federal Rules of Civil Procedure 26 and 33 and Local Rule 26.1, requests that Defendant Carnival Corporation answer the following interrogatories separately and fully, in writing and under oath, within thirty (30) days of service. Carnival answered eighteen interrogatories in Plaintiff's Initial Interrogatories (served January 23, 2026); the seven interrogatories below bring the total to twenty-five under Rule 33(a)(1). The definitions in Plaintiff's Fourth Request for Production are incorporated by reference.

## I. Instructions

1. Answer each interrogatory on the basis of all information known or reasonably available to Carnival, including information held by its shoreside departments, affiliates, and the Medical Staff. Under Rule 33(b)(4), any ground for objection not stated with specificity is waived.

2. If You elect to answer by reference to business records under Rule 33(d), identify the records by Bates number in sufficient detail to permit Plaintiff to locate the answer as readily as You could.

3. "Identify," as to a person, means to state the person's full name, position, employer, and last known business address; as to a Document, its date, author, recipients, and Bates number.

## II. Interrogatories

1. Identify the third-party recruiting agent or agency through which Dr. Maharaj was recruited; identify each person who conducted or scored his Doctor Clinical Performance Interview on or about October 25, 2022; and state the score he received, the passing threshold, and each clinical scenario or topic on which he was assessed.

**RESPONSE:**

2. Identify the Stroke Protocol and stroke checklist by title, document number, author, approval date, and each effective date; state whether any version was in effect aboard the Vessel from October 18 through October 20, 2024, and if it was first adopted after October 20, 2024, state the adoption date and the reason for adoption; state whether SeaCare as configured aboard the Vessel in October 2024 contained the SeaCare Stroke Assessment and identify its fields; state whether that assessment was opened, started, or completed for Plaintiff, by whom, and if not, why not; and reconcile these answers with Carnival's denial of Plaintiff's Initial Request for Admission No. 38, served January 23, 2026.

**RESPONSE:**

3. For Plaintiff's shipboard chart (GR000005–GR000046): identify each triage classification and each MED-3002 reassessment of Plaintiff, with author and time, and state why his "Urgent" classification was never amended; identify each person who created, entered, edited, or electronically signed the "neurological examination" entries of October 18, 19, and 20, 2024 and the "steady gait" entry of October 20, 2024, with the time of each entry and whether it was generated by template, default value, or copy-forward; and identify each member of the Medical Staff who observed Plaintiff walk unassisted at any time during the Incident Period, stating when.

**RESPONSE:**

4. Identify every person at the HOC, the Fleet Medical Department, Care Team Services, and the Fleet Operations Center who received, opened, reviewed, or acted upon the October 19, 2024 10:23 a.m. disembark notification or Dr. Rantleru's 3:12 p.m. Communication (GR000913), and describe what each did; state whether any member of the Medical Staff contacted the HOC concerning Plaintiff on October 18 or 19, 2024 and, if so, who, when, and with what result (Dube Dep. 43:5–8); state whether a Medico Medevac Check Sheet was completed for Plaintiff and, if not, why not; and state whether the Master or any bridge officer was consulted regarding a change of course or speed, United States Coast Guard contact, or an earlier or higher-category medical disembarkation for Plaintiff, identifying each person involved and the outcome, or state why no such consultation occurred.

**RESPONSE:**

5. State the time Guest Services received the October 18, 2024 report that Plaintiff was vomiting and unable to walk, the time a wheelchair was dispatched and by whom, and the time Nurse Dube arrived at stateroom 4136; state the time and amount of each Medical Center or wheelchair charge or authorization hold placed on Plaintiff's or any Travel Party member's account on October 18, 2024, and identify each person who requested payment or card information from Plaintiff or the Travel Party before or during his October 18 assessment; and state whether any member of the Medical Staff contacted or checked on Plaintiff between his October 18 discharge and his return at 9:35 a.m. on October 19, identifying who, when, and by what means, or state that no contact occurred.

**RESPONSE:**

6. Identify each system in use aboard the Vessel or shoreside during the Incident Period that generated or stored (a) SeaCare audit-trail, template, or user-session data, (b) crew Credential Read Events or Medical Center access-control records, (c) crew timeclock or time-and-attendance data, (d) stateroom door-lock records, or (e) shipboard telephone (PBX) call-detail records, stating for each its name, vendor or host, custodian, retention period and auto-purge interval, whether a litigation hold was applied and when, and whether any Incident Period data has been deleted or overwritten.

**RESPONSE:**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 4, 2026, a true and correct copy of the foregoing was served by electronic mail upon: Michael J. Drahos, Esq. (michael.drahos@gray-robinson.com), W. Cooper Jarnagin, Esq. (cooper.jarnagin@gray-robinson.com), Ashley N. Genoese, Esq. (ashley.genoese@gray-robinson.com), and Charles J. Roussin, Esq. (charles.roussin@gray-robinson.com), GrayRobinson, P.A., 515 North Flagler Drive, Suite 650, West Palm Beach, Florida 33401, Telephone (561) 268-5727, Counsel for Defendants Carnival Corporation and Nikhil Maharaj, M.D.

Respectfully submitted,

/s/ Michael A. Hoffman
Michael A. Hoffman
Florida Bar Number: 89549
MAHoffman@1800AskFree.com
David W. Singer & Associates, P.A.
1011 S. Federal Highway
Hollywood, Florida 33020
Telephone: (954) 920-1571
Cell: (954) 665-5290
*Attorneys for Plaintiff Michael Smith*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:25-cv-24611-GAYLES/SHAW-WILDER

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION,
NIKHIL MAHARAJ, M.D., and
LETLHOGILE RANTLERU, M.D.,

Defendants.
_______________________________________/

**PLAINTIFF'S THIRD REQUESTS FOR ADMISSION**
**TO DEFENDANT CARNIVAL CORPORATION**

Plaintiff, Michael Smith, pursuant to Federal Rules of Civil Procedure 26 and 36 and Local Rule 26.1, requests that Defendant Carnival Corporation admit the truth of each of the following matters within thirty (30) days of service. Under Rule 36(a)(4), a denial must fairly respond to the substance of the matter, and a lack of knowledge may be asserted only after reasonable inquiry. Each matter not timely answered is admitted. The definitions in Plaintiff's Fourth Request for Production are incorporated by reference.[1]

[1] Carnival's responses to Plaintiff's first two sets of requests for admission opened with general objections to their number. These forty-six requests each state a single fact; each is drawn from a document Carnival produced, an interrogatory answer Carnival gave, or the sworn testimony of Carnival's nurse; and each supplies the date or time frame Carnival previously said was missing. Rule 36 sets no numerical limit and reaches "facts, the application of law to fact, or opinions about either." Under Rule 36(a)(4), a statement that Carnival "cannot reasonably admit or deny" must be preceded by reasonable inquiry, and a request drawn from Carnival's own chart, its own personnel records, or its own physicians' knowledge does not admit of that response. The footnotes identify the source of each request and the prior response it bears on.

**A. Hiring, retention, and roles**

1. Admit that Carnival recruited Dr. Maharaj through a third-party recruiting agent or agency.[2]

2. Admit that the Doctor Clinical Performance Interview administered to Dr. Maharaj on or about October 25, 2022 did not include any clinical scenario concerning an adult neurological emergency or stroke.[3]

3. Admit that Dr. Maharaj's April 2024 performance evaluation (GR000911–GR000912) rated him "Needs Improvement" in CCL Compliance.[4]

4. Admit that Dr. Maharaj's June 2024 performance evaluation (GR000909–GR000910) rated him "Needs Improvement" in CCL Compliance.

5. Admit that no written remediation plan, restriction, or enhanced-supervision plan was implemented for Dr. Maharaj between June 28, 2024 and October 18, 2024.[5]

6. Admit that Carnival assigned Dr. Maharaj to the Vessel for the Voyage without any restriction on his clinical duties.

7. Admit that Dr. Rantleru was the Senior Ship Physician aboard the Vessel throughout the Voyage.[6]

8. Admit that during the Voyage Dr. Maharaj was the junior physician aboard the Vessel and reported to Dr. Rantleru.

---

[2] Count VII, SAC ¶ 79.

[3] Carnival objected to Initial RFA No. 86 as vague. This request names Carnival's own instrument (SAC ¶ 79) and the date it was administered; the completed form is in Carnival's possession.

[4] GR000911–GR000912, produced by Carnival. Requests 3 through 6 concern documents Carnival answered "none" to in response to Initial RFP Nos. 26–27 and 58 in January 2026 and produced later; each states a single fact from the face of the document or from Carnival's own records.

[5] Count VIII, SAC ¶¶ 83–86. A response of lack of knowledge is unavailable: the fact is within Carnival's own personnel records and requires only the inquiry Rule 36(a)(4) presupposes.

[6] Dube Dep. 12:19–22 (Dr. Rantleru "was the senior physician"; Dr. Maharaj "was the junior physician"); 32:5–19 (reporting structure). Requests 7 through 9 establish the roles Counts II, III, IV, and VIII depend on.

9. Admit that the Role Responsibilities for Senior Doctors (GR000484–GR000486) applied to Dr. Rantleru, and the Role Responsibilities for Doctors (GR000482–GR000483) applied to Dr. Maharaj, during the Voyage.[7]

10. Admit that Carnival required every member of the Medical Staff to complete the Medical Staff On-the-Job Training Checklist, CCL-MED-3903-DI1-A1 (GR000940), before his or her first shift aboard the Vessel.[8]

11. Admit that Carnival maintained a written stroke protocol applicable to its shipboard medical centers on October 18, 2024.[9]

12. Admit that Carnival's shipboard nurses have electronic access to a written stroke protocol that includes a stroke checklist.

13. Admit that SeaCare, as configured aboard the Vessel in October 2024, contained a stroke-specific assessment form.[10]

14. Admit that no SeaCare stroke assessment was opened or completed for Plaintiff at any time during the Incident Period.

---

[7] Carnival produced these documents as the physicians' job descriptions in response to Initial RFP No. 24 and cited them in its answer to Interrogatory No. 2.

[8] GR000940 (Carnival's production). Dube Dep. 15:19–19:10 (completed one aboard the Vista and the Pride; signing represents training on the listed items).

[9] Carnival denied Initial RFA No. 38 on January 23, 2026. On August 5, 2026 its nurse testified that Carnival has a written stroke protocol with a stroke checklist to which she has access (Dube Dep. 74:13–75:5). Rule 36(b) and Rule 26(e)(1) require Carnival to correct the earlier response if it was incorrect when made or is no longer true; Requests 11 and 12 give Carnival the occasion to state, under the obligations of Rule 36, whether the protocol existed on the date of the incident or was adopted afterward.

[10] Dube Dep. 28:8–25 (SeaCare's assessment module contains a stroke-specific assessment; a FAST screen, if performed, is recorded there; there is "no reason" it would not be). Carnival objected to Second RFA Nos. 14–15 (SeaCare audit trail) as "wholly irrelevant"; the Court has since compelled SeaCare date-and-time records for the AMA forms (ECF No. 73, Request No. 129).

15. Admit that no stroke-scale assessment (FAST, BE-FAST, Cincinnati Prehospital Stroke Scale, NIHSS, or equivalent) is documented in Plaintiff's shipboard chart (GR000005–GR000046).[11]

16. Admit that no focal neurological sign assessment is documented in Plaintiff's shipboard chart.[12]

17. Admit that Carnival trains its shipboard medical staff to use the FAST or BE-FAST stroke-recognition screen.[13]

18. Admit that no medical drill conducted aboard the Vessel in 2024 involved a stroke or neurological-emergency scenario.[14]

19. Admit that Carnival provided no written procedure to its shipboard nurses in 2024 for escalating a concern that a physician had missed a diagnosis.[15]

20. Admit that Plaintiff was classified "Urgent" on triage on October 18, 2024 and that his triage classification was never amended to "Emergent."[16]

21. Admit that a shipboard nurse is not authorized to initiate contact with the HOC.[17]

---

[11] Carnival objected to Initial RFA No. 42 as vague as to "BE-FAST or equivalent stroke scale assessment." Its nurse uses the term (Dube Dep. 28:2–7), and the request now lists the scales by name. The chart is Carnival's own document.

[12] Dube Dep. 75:6–76:8 (reviewed the chart; saw no focal-sign assessment). MED-3003-A3 directs assessment of "AVPU, pupils, seizure and focal signs" (GR000929).

[13] Dube Dep. 28:2–7. Carnival objected to Initial RFA No. 80 as vague as to "specific training"; this request names the screen.

[14] Dube Dep. 21:23–24:18 (drills for unconscious, trauma, mass-casualty, and fire scenarios; "Do you ever do a drill for a stroke?" "No."). Carnival objected to Initial RFA No. 81 as vague; this request is limited to one vessel and one year. Count IX, SAC ¶¶ 89–91.

[15] Dube Dep. 35:14–40:16; 73:1–16 (would not raise a missed diagnosis with either physician or the Lead Nurse; feared for her job; knows of no hotline). Count IX, SAC ¶¶ 89–91; ¶¶ 36–45.

[16] Dube Dep. 79:2–80:8 (suspected stroke is "emergent" under MED-3002; amending the category is the nurse's job; the classification was never changed). MED-3002 § 2.2 (GR000931). Counts I, II, and V.

[17] Dube Dep. 47:12–14. Requests 21 and 22 concern the escalation path Count X depends on (SAC ¶¶ 93–96). Carnival objected to Initial RFA Nos. 103–108, 116, and 123 (shoreside notification and shoreside staffing) as "irrelevant to any of Plaintiff's alleged claims"; that objection predates Count X and does not survive it.

22. Admit that no member of the Medical Staff contacted the HOC concerning Plaintiff on October 18, 2024.[18]

23. Admit that no Medico Medevac Check Sheet (MED-3104-A3) was completed for Plaintiff.[19]

24. Admit that either shipboard physician was authorized to contact the United States Coast Guard Rescue Coordination Center without prior shoreside approval.[20]

25. Admit that Plaintiff's medical disembarkation was designated "Cat 1 – Medical disembarkation (direct) without escort" on October 18, 2024 and that under MED-3104-A2 (GR000922–GR000923) Category 1 applies to a patient who does not need immediate admission and can travel.[21]

26. Admit that Plaintiff was admitted to the Medical Center on October 19, 2024.[22]

27. Admit that the October 19, 2024 10:23 a.m. disembark notification concerning Plaintiff was received by the HOC in Miami, Florida, identified no receiving hospital, and identified no assistance company.[23]

---

[18] Dube Dep. 43:5–8 (the Senior Doctor liaises with the HOC when a case is complicated or worsening); 50:9–12. Carnival's answer to Interrogatory No. 5 (no telemedicine was used) and its admissions to Initial RFA Nos. 109–113 are consistent with this fact.

[19] Carnival stated it could not admit or deny whether diversion or medevac was considered for Plaintiff (Second RFA No. 35). Nurse Dube testified the attending physician completes the check sheet (50:16–20). Inquiry of the attending physician — Carnival's co-defendant, represented by the same counsel — resolves the request; lack of knowledge is not available.

[20] Dube Dep. 82:9–23. Carnival's answer to Interrogatory Nos. 9–10 ("the determination for medical evacuation of a passenger is made by the ship physician and Captain") is to the same effect. Count VI.

[21] Carnival admitted the designation in response to Second RFA No. 29. MED-3104-A2 is Carnival's document. SAC ¶¶ 28, 95.

[22] GR000005–GR000046; GR000913 (Dr. Rantleru: "This guest ... is now admitted in the medical center").

[23] GR000636 (Carnival's production). SAC ¶¶ 94–95. Requests 27 through 29 state facts from the face of Carnival's own documents; Carnival's earlier "irrelevant" objections to shoreside-notification requests (Initial RFA Nos. 103–108) are foreclosed by Count X.

28. Admit that no shoreside physician reviewed Plaintiff's clinical information before his disembarkation on October 20, 2024.[24]

29. Admit that no shoreside personnel directed any change to Plaintiff's Category 1 designation after receipt of Dr. Rantleru's October 19, 2024 3:12 p.m. Communication (GR000913).

30. Admit that no decision rationale agreed between the two onboard physicians, as contemplated by MED-3104, is documented for Plaintiff's disembarkation.[25]

31. Admit that the Master of the Vessel was not consulted regarding a change of course or speed for Plaintiff's disembarkation.[26]

32. Admit that the "neurological examination" entries dated October 18, 19, and 20, 2024 in Plaintiff's shipboard chart contain identical text.[27]

33. Admit that no entry in Plaintiff's shipboard chart records that any member of the Medical Staff observed Plaintiff walk unassisted between his October 18, 2024 presentation and his disembarkation.[28]

---

[24] Carnival admitted that its shoreside medical department never instructed a stroke-scale assessment, never treated Plaintiff as a suspected stroke, never recommended a neurology consultation, and never recommended diversion or medevac (Initial RFA Nos. 109–113). This request asks the antecedent fact. SAC ¶ 96.

[25] MED-3104 (GR000921–GR000928). SAC ¶¶ 36–38.

[26] Carnival objected to Initial RFA No. 44 as compound; this request states one fact. Carnival's own answer to Interrogatory Nos. 9–10 places the Captain in the evacuation decision, and the October 19 notification was addressed to the "Pride Captain" (GR000636). SAC ¶ 32 (Count VI).

[27] GR000005–GR000046. SAC ¶ 42. Nurse Dube conceded that the Glasgow Coma Scale does not test gait, balance, standing, unilateral strength, drift, coordination, slurring, or facial symmetry, and that a patient can score 15 and be unable to stand (68:6–70:4).

[28] Dube Dep. 88:8–22 (nothing in the notes indicates Plaintiff was able to walk); 96:15–97:4 (a nurse would not chart a steady gait without seeing the patient walk). The chart records a "steady gait" at 8:04 a.m. on October 20, 2024 and a stretcher transfer to an ambulance the same morning.

34. Admit that a troponin and a 12-lead EKG were ordered for Plaintiff on October 19, 2024, and that no neurological imaging and no stroke-scale assessment was ordered for him at any time during the Incident Period.[29]

35. Admit that Plaintiff's shipboard chart documents no contact with Plaintiff by any member of the Medical Staff between his discharge to his stateroom on October 18, 2024 and his return to the Medical Center at approximately 9:35 a.m. on October 19, 2024.[30]

36. Admit that Carnival's procedure requires the Senior Doctor to be contacted when a guest declines recommended admission to the Medical Center or recommended referral to a shoreside hospital.[31]

37. Admit that Dr. Rantleru was not contacted before either Against Medical Advice form for Plaintiff (GR000627–GR000630) was generated on October 18, 2024.[32]

38. Admit that the "Witness: Senior Doctor" signature line on the Against Medical Advice forms for Plaintiff was signed by Dr. Maharaj and not by Dr. Rantleru.

39. Admit that no shoreside case debriefing concerning Plaintiff's care was conducted with the Medical Staff after the Voyage.[33]

---

[29] Dube Dep. 55:16–56:15 (troponin and 12-lead EKG ordered at 18:26 on October 19). Carnival admitted no CT or MRI was performed (Initial RFA Nos. 23–24) and that no telemedicine was used (Interrogatory No. 5). Carnival objected to Initial RFA No. 37 (no neurology consultation) for lack of knowledge; the fact is in its own chart.

[30] Dube Dep. 88:23–89:14 (a physician's overnight check on a discharged patient is made by telephone and would be charted; none appears). Carnival admitted the 23:30 discharge (Second RFA Nos. 25–26). SAC ¶¶ 25–26.

[31] Dube Dep. 97:16–98:7 (the Senior Doctor "is supposed to be contacted"; the attending junior doctor makes the call). MED-3102 (GR000934–GR000939).

[32] Dube Dep. 93:5–14 (does not know why Dr. Rantleru was not consulted). Carnival admitted that every signature on each form carries the same timestamp (Second RFA Nos. 11–12). Requests 37 and 38 ask facts Carnival can establish by inquiry of its own physicians. SAC ¶ 41.

[33] Carnival answered Interrogatory No. 15 that no incident or accident report was prepared and "upon information and belief, none" to Initial RFP Nos. 38 and 64–66. Nurse Dube testified that debriefings with a shoreside physician are routine for emergent cases (47:15–48:12) and that none occurred here, that she was never interviewed, and that she knows of no internal review (74:6–12). Requests 39 and 40 ask Carnival to admit what its discovery responses already say. SAC ¶ 44.

40. Admit that no member of the Medical Staff was interviewed by Carnival after the Voyage regarding whether Plaintiff had suffered a stroke aboard the Vessel.

41. Admit that the October 11 – November 10, 2024 evaluation rating Dr. Maharaj "Exceptional" in Assessment Diagnosis & Treatment Planning (GR000907) was approved by a shoreside reviewer after Carnival received Stephanie Grimm's October 20, 2024 complaint (GR000919).[34]

42. Admit that Carnival routed Stephanie Grimm's complaint concerning Plaintiff's care to its Loss Prevention unit and opened no patient-safety-event report, SeaEvent report, root-cause analysis, or peer review concerning the care of Plaintiff.[35]

43. Admit that Carnival is funding the defense of Dr. Maharaj in this action.[36]

44. Admit that Carnival is funding the defense of Dr. Rantleru in this action.

45. Admit that Carnival's agreement with Dr. Rantleru in effect during the Voyage requires him to indemnify Carnival for claims arising from his medical care of passengers.

46. Admit that Carnival processed and paid Dr. Rantleru's compensation for the Voyage from Florida.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 4, 2026, a true and correct copy of the foregoing was served by electronic mail upon: Michael J. Drahos, Esq. (michael.drahos@gray-

---

[34] Both documents are Carnival's (GR000907; GR000919). SAC ¶¶ 44, 85 (Count VIII; ratification).

[35] GR000913–GR000919; Interrogatory No. 15. Carnival objected to Initial RFA No. 67 (internal investigation or review) as vague as to "internal investigation or review"; this request names each form of review by Carnival's own nomenclature. SAC ¶ 44.

[36] Requests 43 through 46 concern the agency and jurisdictional facts pleaded at SAC ¶¶ 12–19 and put in issue by Affirmative Defense G (ECF No. 49) and Carnival's answer to Interrogatory No. 8. Carnival objected to Initial RFA Nos. 58–60 (compensation structure) as "proprietary"; whether Carnival funds a co-defendant's defense, or holds an indemnity from him, is a fact, not a privileged communication, and its bearing on agency is settled by Carnival's own reliance on the contract.

robinson.com), W. Cooper Jarnagin, Esq. (cooper.jarnagin@gray-robinson.com), Ashley N. Genoese, Esq. (ashley.genoese@gray-robinson.com), and Charles J. Roussin, Esq. (charles.roussin@gray-robinson.com), GrayRobinson, P.A., 515 North Flagler Drive, Suite 650, West Palm Beach, Florida 33401, Telephone (561) 268-5727, Counsel for Defendants Carnival Corporation and Nikhil Maharaj, M.D.

Respectfully submitted,

/s/ Michael A. Hoffman
Michael A. Hoffman
Florida Bar Number: 89549
MAHoffman@1800AskFree.com
David W. Singer & Associates, P.A.
1011 S. Federal Highway
Hollywood, Florida 33020
Telephone: (954) 920-1571
Cell: (954) 665-5290
*Attorneys for Plaintiff Michael Smith*