# EXHIBIT "B"

**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO.: 25-cv-24611-DPG**

MICHAEL SMITH, )
)
Plaintiff, ) May 6, 2026
)
v. )
) Pages 1 - 79
CARNIVAL CORPORATION, et al, )
)
Defendants. )
_______________________________/

STATUS CONFERENCE HEARING

BEFORE THE HONORABLE JUDGE DETRA SHAW-WILDER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

Counsel on behalf of the Plaintiff:

SHINER LAW GROUP
303 East Yamato Road
Suite 4100,
Boca Raton, FL 33431
BY: MICHAEL A. HOFFMAN, ESQ.

APPEARANCES CONTINUED:

Counsel on behalf of the Defendant:

GRAY ROBINSON, P.A.
515 North Flagler Drive
Suite 650,
West Palm Beach, FL 33401
BY: ASHLEY N. GENOESE, ESQ.
BY: MICHAEL J. DRAHOS, ESQ.

Transcribed By:

BONNIE JOY LEWIS, R.P.R.
7001 SW 13 Street
Pembroke Pines, FL 33023
954-985-8875
caselawrptg@gmail.com

(Thereupon, the following proceeding was held:)

THE COURTROOM DEPUTY: The United States District Court for the Southern District of Florida is now in session with the Honorable Detra Shaw-Wilder presiding.

Calling Case Number 25-cv-24611; Michael Smith versus Carnival Corporation.

Counsel, please announce your appearances for the record starting with the Plaintiff and followed by the Defendants.

MR. HOFFMAN: Michael Hoffman on behalf of the Plaintiff Michael Smith.

THE COURT: Good afternoon, Mr. Hoffman.

MR. HOFFMAN: Thank you, Your Honor.

MS. GENOESE: Ashley Genoese on behalf of the Defendant Carnival Corporation.

THE COURT: Good afternoon, Miss Genoese.

MR. DRAHOS: And good afternoon, Your Honor. Michael Drahos on behalf of the Defendant Carnival.

THE COURT: And say your last name again.

MR. DRAHOS: Drahos.

THE COURT: Drahos?

MR. DRAHOS: Yes.

THE COURT: Good afternoon.

MR. DRAHOS: Good afternoon, Your Honor.

THE COURT: Nice to see you both in person.

MR. DRAHOS: Yes, Your Honor.

THE COURT: Although, I was hoping that we did not have to come here in person. That this would get resolved, but here we are.

So I believe it is your discovery dispute motion, Miss Genoese.

MS. GENOESE: Your Honor, it was actually submitted as a joint statement.

THE COURT: Okay.

MS. GENOESE: The joint statement that was submitted goes through individual topics beginning with Plaintiff's position on the issues.

THE COURT: Okay.

MS. GENOESE: I'm not sure if you would like to go maybe numerically.

THE COURT: I have the joint statement.

And would you all like to provide any general argument or background before we start going one-by-one.

MR. DRAHOS: Well, Your Honor, I actually want to withdraw some of my issues that I have had with their objections. I will let go of some of the discovery issues at hand.

THE COURT: So first --

MR. HOFFMAN: Yes.

THE COURT: If you would like to give they any if you

think it would be helpful in putting these requests in context.

So I will use them up.

MR. DRAHOS: Okay. Thank you, Your Honor.

As I said before, my name is Michael Drahos and we are with the law firm of Gray Robinson. We represent the Defendant.

This is the first time of having the privilege of meeting Your Honor and presenting in your courtroom. So I thought I would do some brief background on our practice itself and then really why we are here from the Defense's perspective.

THE COURT: Excellent.

MR. DRAHOS: Thank you, Your Honor.

So today the lion's share of the discovery disputes will be handled by my colleague, Miss Genoese, since she has had a majority of the 7.1 conferences.

I will be here to chime in, with the Court's permission, on certain issues as they arise particularly as it relates to our corporate representative.

THE COURT: I will tell you on that point, I do not have a rule that it is one attorney to speak. I believe you are able to speak to the dispute on behalf of your client at the appropriate time. So as long as everyone is being professional and not duplicative, feel free to split your argument any way you deem appropriate.

MR. DRAHOS: Thank you, Your Honor.

By way of very brief background, I have a very specialized practice for the last over twenty some odd years now. One hundred percent of my practice has been devoted to defending cruise ship doctors and nurses in medical malpractice claims.

I represent the majority of the largest cruise lines in the world. I have litigated cases all over the country. I have had many different types of claims across pretty much everybody on the water on the planet and I have seen a lot of interesting stuff along the way.

The reason why I bring that up is because some of what Your Honor is going to hear today and see today is really the first of its kind. We have not seen anything like this before.

And we certainly do not make some of the representations that we have made in our motion lightly. We gave this some very detailed thought as to how to handle some of the issues that are going to be brought before the Court particularly due to just the large sheer volume of material.

And I will represent to the Court preemptively here that we will not be perfect on our side. There will be times where there will be objections that Miss Genoese and I will have to discuss and remember why it was that we raised these objections.

And that is because of the volume. We are faced here today with over six hundred various different types of requests

being made of us from various different angles.

And this is a medical malpractice case that is not particularly unique. I have seen this type of case before. The obligations that are being made by the Plaintiff is that his client, Mr. Smith, was on our ship on the Carnival Pride.

And during the course of the voyage he started to develop symptoms. He wasn't feeling well. It was reported to us that he was having these symptoms for two days before he decided to come and see us.

And that timeline has been corroborated by the traveling companion who shared the cabin with Mr. Smith. It is being disputed by Mr. Smith, but we believe both by way of our medical chart as well as the traveling companion's testimony, that this timeline is pretty undisputed or at least largely in favor of the Defense's position.

The reason why that is so material, Your Honor, is because stroke medicine is universally recognized as being time sensitive. We will be the first ones to say that at trial.

And the universal recognition on stroke care is that depending on the type of stroke, there are modalities that are either available or not available.

And in this particular case, we do know by virtue of the fact that Mr. Smith was taken to the hospital after this cruise, exactly what type of stroke he had and in exactly what region of the brain.

And doctors who treat these types of conditions will explain that based upon the location of where that stroke occurred there was only one treatment modality that was available to him. It's a drug called TPA.

And the particular kind of stroke that Mr. Smith had is what we call an ischemic stroke. It is in a very remote area of the brain. We will represent in trial that only three percent of strokes diagnosed in this country are the type and location that Mr. Smith ultimately had.

And so science is going to dictate what type of treatment would have been available to him on the date in question.

Now the reason I took the moment to explain that is because there are rules that doctors need to live by. And one of the principal rules is if you are considering to give a drug called TPA to a patient who has suffered an ischemic stroke.

An ischemic stroke, which is a clog that cuts off the blood flow to the rest of the brain. And then there is a hemorraghic stroke and that is when the artery bursts and the blood cannot get to that region because it does not have a pathway to get there.

So, in this particular case, he had what we call as an ischemic stroke. And so the design of a drug called TPA is it is kind of like Drano. It goes into the body. It circulates across the brain. And the hope is that it gets to the clog in

enough time to dissolve it so that the blood can return to that part of the brain before the tissue dies, but you only have four and-a-half hours to give that medication to a patient who is suffering that kind of stroke.

So what that means is from the onset of symptoms, the moment that you started feeling the signs and symptoms of a stroke the clock starts and you have four and-a-half hours to give that drug.

And if the four and-a-half hours pass you cannot give that drug. There isn't a Neurologist in this country that says you are allowed to give TPA after four and-a-half hours.

So, in this case, Mr. Smith came to us after having these symptoms for two days. And so there was no treatment modality that would be available to him no matter what.

And so we can dispute, in this case all we want, Oas to whether or not the doctors should have recognized these signs and symptoms and we have arguments to address that.

But, at the end of the day, we are going to end up in the same place, which is he did not have the type of -- his symptoms having gone on for so long before he ever came to us that there was not going to be any change in his outcome.

Now after I obtained that testimony I approached Mr. Hoffman and, quite frankly, from my perspective this case was over and I asked him whether or not he was interested in trying to resolve it.

And what we got in response was 112 requests for production, 62 or 63 requests for admissions, a corporate representative deposition with 130 areas of inquiry and 85 document requests and a request for twelve different depositions.

So I believe there is some strategy here on the part of the Plaintiff to just wear us out. And so we have done everything that we can leading up to this moment to respond to all of that discovery.

But the volume, itself, is abusive and that is why we have taken the extraordinary step of filing the motion that we have because we just want to try and get a handle on this case.

And let's focus on the issues that Mr. Hoffman thinks are subject to real dispute, but all this ancillary stuff like casino rewards that the traveling companions were entitled to on the ship have nothing to do with this case and we would like to focus on the issues so that we can get to the finish line.

Thank you, Your Honor.

THE COURT: Miss Genoese, is there anything that you would like to add?

MS. GENOESE: Not from a general topic perspective.

THE COURT: All right. Mr. Hoffman.

MR. HOFFMAN: I just want to speak briefly.

Yes, discovery has been ongoing. It has been a lot. We have had about six rounds of attempting to get records.

As recently as on May 1st we got supplemental answers that should have been responded to from the November request for production. And we have received lots of documents after the amended deadline.

And what Mr. Drahos is saying about my client having been ill for two days prior is not demonstrated based on the records. My client could sign his name when he walked into the infirmary and when he left he couldn't.

So what happened was a twenty-year-old-boy got confused during his deposition as to what was in the timeline of events. And that is actually part of the discovery that we have asked for is people's movement records.

Because part of the case is that family members were at the infirmary when he was brought down saying that he is not being taken care of properly.

Security was called on them. These are some of the videos that we are asking for; the body cam footage. There is more to this story, Your Honor, than what the Defendant has just stated.

One of the most interesting things that we received on May 1st was communication that we have been asking for that should have been in the disclosure. There was a senior doctor on the ship and that senior doctor was communicating with Carnival the day after Mr. Smith went to the infirmary saying that we need to disembark him.

And there is no other communication from him anywhere in the initial disclosures and he is not listed. The person who is listed as the senior physician is the young doctor who we cannot depose because he is in South Africa.

And one of the new people that we have asked to depose, they immediately listed upon learning of him in April, is the senior ship doctor.

And I have offered to work with Defense to make it ten and come to you if we need you for anything extra. And I agree that we have cast a wide net, but because of that we are able to -- I had to ask for a motion for leave to amend the complaint. I know that is not at issue on that, but it addresses a lot of facts that were withheld from us.

And there is still big questions that are not being answered and the trickle that has been continuing up until May 1st, which was five days ago, has made this what it is.

So, with that in mind, I am here to try to narrow what it is that we are looking for and what we would be able to discuss at the corporate rep depo.

And this is not a fishing expedition. We are very focused. We think that we know what is going on here, but it is very hard when things are hidden that the Defendant is obligated to have disclosed earlier.

THE COURT: You are referencing, Mr. Hoffman, two things that I want to make sure that I understand.

MR. HOFFMAN: Yes.

THE COURT: You are saying that there was a production on May 1st and then you are saying that things were hidden. What are you referring to?

MR. HOFFMAN: Yes, Your Honor.

The senior ship --

THE COURT: As it relates to the discovery issues before the Court today.

MR. HOFFMAN: Absolutely.

The very last document that we received from the discovery production was on May 1st and it is communication.

May I show it on the screen, Your Honor?

THE COURT: Yes.

MR. HOFFMAN: Okay. Thank you.

So this document we received on May 1st and what I have highlighted here is the language. It's from May 19th at 10:23 a.m. and it comes from -- it says Pride doctor and it is very vague and it says:

"The following guest has been medically disembarked."

And then there is a followup from the shore side saying:

"How did he disembark?"

On October 19th at 3:12, Dr. Rant Leru, somebody that Defendant has continued to represent in the joint statement had nothing to do with anything at all, chimes in and says that he

is still on board.

There is more communication from them going forward, but this was not disclosed until May 1st. This is someone who we have been told has nothing to do with anything.

And it is very relevant because the doctor that -- Dr. Maharaji, the one who diagnosed Mr. Smith with sepsis of the big toe instead of a stroke, he is in South Africa. We cannot serve him. We cannot depose him.

But Dr. Rant Leru, we believe, is available and very relevant and that is one of the deponents that Defendant has objected against.

Does that answer your question, Your Honor?

THE COURT: And Dr. Maharaji is, Defendant, why can't he be deposed?

MR. DRAHOS: Well, I wouldn't entirely agree with what Mr. Hoffman is saying. He is in South Africa.

There was initially at the time that his deposition was requested he was in a hospital. I have been texting back and forth with him while he was in the hospital. He was diagnosed with a pulmonary embolism.

And I explained this to Mr. Hoffman. I said I need to handle this situation delicately. He is in the hospital recovering. I cannot be asking him, hey, when are you going to be available for a deposition?

So I have very sort of delicately communicated with

him. I have monitored his status. Including up to last night I was back and forth on the phone texting with him.

So when he is in a position to where I don't think we are going to be risking his health by letting him answer questions, we certainly will do that.

And so I cannot bring him to the United States, obviously, but if Mr. Hoffman wants to take his deposition, we will make him available. It is just we have some medical limitations that we all need to be reasonable about. That's all.

THE COURT: I recall this now because I believe he discussed it on one of our times together. Miss Genoese, this was an issue that we discussed before?

MS. GENOESE: That is correct. At the status conference, Your Honor.

MR. DRAHOS: And of recently he has taken his fitness for duty test because my understanding is that he is on the map. So I am happy to hear that.

But Dr. Rant Leru can answer, I think, a lot of questions. And had we learned about him earlier we would have been able to amend the complaint properly. We would have asked different discovery questions.

THE COURT: Okay. All right. Thank you both.

That gives me a good overview in addition to what I already know from the hearings that we have had in this case.

So I think the best way to get to this is to first hear from Mr. Hoffman with respect to the request that you are now withdrawing so that I can take those off the list.

MR. HOFFMAN: Yes. So --

THE COURT: And if you would refer to the joint --

MR. HOFFMAN: Yes. Absolutely.

THE COURT: -- statement and tell me the number and the page number so that we can mark those off.

MR. HOFFMAN: So Page 4 is the temporal scope of 30(b)(6) inquiry. I have agreed to reduce that from five years to three years.

I don't think that Defendant particularly objects to it because the basis of their objection is not the temporal scope, but necessarily the substance of those requests.

But I want to say that I have limited all temporal scope requests to three years.

Topic C prior similar incidents, I am not going to pursue that.

D is very important. So we are going to pursue that.

Page 8, E, topic consolidation, I don't think that that is necessary and who is refused by the Defendant. Hopefully we will be able to whittle things down.

What else? I believe that is all; B, C, E, K, yes.

THE COURT: That's it?

MR. HOFFMAN: Yes, Your Honor.

THE COURT: Okay. So let's go with the we will start with Page 3 and let's discuss the privilege log issue.

And maybe if it is easier, if you would like to sit because I know you have to go back and forth, please feel free to sit, but bring the microphone closer to you so that I can hear you.

As you now know the technology is not as -- and it is old courtrooms, but if you prefer to stand, you can stand. If you want to sit, you can sit. Just so that I can be able to hear you.

MR. DRAHOS: Thank you.

MS. GENOESE: Thank you, Your Honor.

Would you like to hear from Defendant first?

THE COURT: Well, let's hear from the Plaintiff since it is the Plaintiff's complaint about the privilege log.

MR. HOFFMAN: We never received a privilege log, Your Honor. That's the main issue.

THE COURT: So there is no privilege log at all or is the privilege log that is not to your satisfaction?

MR. HOFFMAN: No, there is no privilege log at all. There are references to privilege within the request for productions, but I have made multiple requests.

I could not get a privilege log from the Defendant. I did not understand the basis for them refusing such because it is extremely important for us to be able to set depositions and

do our discovery. It is an important tool. I don't know why it has not been provided. My hope is that with these underlying discovery issues resolved, perhaps they will be compelled to do a privilege log in response.

THE COURT: Okay. Miss Genoese.

MS. GENOESE: Yes, Your Honor.

There is no blatant refusal of not producing a privilege log here. I would like to start out, as you see in the joint statement, the first request for production that are listed there 8 through 77 that Plaintiff lists, these responses were served in January; January 23rd to be exact.

We are now very much passed the issue of raising these as well as --

THE COURT: When you are saying passed raising these, do you mean raising the issue of privilege log?

MS. GENOESE: Yes, Your Honor. And I am referring to the local Rule 26 --

THE COURT: So your position is if you do not fulfill your obligation to provide a privilege log and they do not raise it, then you are not required to provide a privilege log?

MS. GENOESE: No, Your Honor. Sorry.

THE COURT: Okay.

MS. GENOESE: More specifically we do have -- and I provided some case law, Your Honor. That is the *Pensacola* case as well as the *U.S. v. Philip Morris* case.

There are objections to these requests for production. Like I said, I do believe that bringing the objections now is untimely as they were served in January.

However, the objections to the *duces tecum* all are similar as well. These requests are so overly broad that we cannot even begin to search for what is on a privilege log.

There is nothing that is being withheld that we have documents that we know are responsive that would be logged. That is not the issue. The issue -- and as it says here in the *Pensacola Firefighter's* case:

"A document must be in the scope of information and otherwise discoverable before any log is required to be produced under Rule 26(b)(5)."

And that is citing to the *United States v. Philip Morris* as well.

And so our position is that the other objections, aside from privilege, should be ruled upon so the scope is at issue. So we know what we need to search for to be logged on a privilege log.

THE COURT: Okay. So you are not saying they waived their right to have issue with your objections and the lack of a privilege log.

What you are saying is, if I recall correctly here and what I have heard, is your obligation under the rules to produce a privilege log is not yet in place because the

requests for production are too broad and would not be practical for you to try to come up with a privilege log because you need to have relevance and scope and all those types of objections ruled upon.

MS. GENOESE: (No audible response.)

THE COURT: Okay. Now in the event -- so are there any request for production that you are able to respond to?

Understanding there is no vague and there is no overbroad to which you can respond to, to which you are withholding documents and have not yet provided a privilege log?

MS. GENOESE: No, Your Honor.

And as we mentioned, there is no incident report. There is nothing like accident report that is being withheld. That is our typical things on a privilege log. Photographs and video as well has been requested. We simply responded none. And Plaintiff takes issue with the fact that there is none, but that is simply the answer.

THE COURT: Okay. So once the objections are addressed by the Court, you would be prepared to do your privilege log. Approximately how much time do you think you would need to prepare the privilege log and also produce documents, if necessary?

MS. GENOESE: Yes, Your Honor.

First the search would have to happen. And then if

anything needs to be on the privilege log, if you could give a month for us to search for the documents after the ruling has been on these objections?

THE COURT: Okay. Mr. Hoffman, any response to that position?

MR. HOFFMAN: Your Honor, I do --

THE COURT: And let me step back for a little bit and tell you that I have a general feeling about discovery.

You can sit. I guess we will just kind of inform our work here this afternoon.

You know, it is the cost of doing business in litigation. The parties have to respond to discovery. Lawyers of your caliber you know you have to search. You know you have to do a privilege log. And everyone in this room knows that we have to work within the bounds of the Rules of Civil Procedure and our local rules.

And my overarching position is that I don't like to rule on, you know, waivers, or gotcha, or I am not going to do it because it is too late. If I am forced to invoke the rules, however, I think lawyers of your caliber and us together, I think, we should come up which gets this case on track and gets discovery going.

However, you know, that is first. You should do that and be reasonable. But, however, that does not mean that the rules do not go away. And if the discovery is inappropriate,

harassing, unnecessary, I will enforce the local rules and the civil procedures and to enforce sanctions.

But I think it should be argued as a separate exercise, which is why you probably heard me say you could seek sanctions. Just do that separately.

So any of arguments of like, well, they should have asked for it and didn't ask. Unless it is just the parties haven't been participating in discovery or they sat on their rights for months and months, that is not how I am going to rule on the discovery.

Because you have to do discovery. You have to go to trial. Everybody needs to get the evidence that they need. That is reasonable. That is relevant pursuant to our rule and then move forward and take your depose and go to trial.

So I just say that as kind of an overview, or if you want to bring up, like a technicality, and they didn't raise it in 21 days and it is 22 days, that is not going to be the primary basis of a ruling.

However, it will be something that the Court will consider on an appropriate motion for sanctions, which in this case you have done it as I asked. You have separately filed a motion for sanctions for the Court to consider.

So that is just an overview. And I hope that you understand and if you have any questions feel free to ask. But the idea is today to get on track. What discovery is

admissible? What will be answered and how long it can be answered.

So in terms of responding that is what I am asking for from both sides. And then separately we can deal with the motion for sanctions.

Okay. So does that make sense to everybody? Hopefully that will help you.

MR. HOFFMAN: Yes, Your Honor.

THE COURT: So I am not going to find -- I agree with the Defendant that when objections -- when the request for productions are overbroad or objectionable, and especially when the discovery is as extensive as it is that it is appropriate for them to bring the issue to the Court prior to spending the time, the money, the effort, and resources in producing a privilege log, which in this case could very well be quite voluminous.

So I do not find that the Defendant did anything inappropriate. However, once we come up with the discovery that will be answered, the privilege log will be produced within thirty days.

MR. HOFFMAN: Your Honor, may I speak to this?

THE COURT: Yes.

MR. HOFFMAN: Since January we have been discussing the responses and since January I have been trying to get these answers. And I think that even as we continue to get answers

last week, I think it is demonstrative that this has been an ongoing process since November. There has been no gaps.

THE COURT: Yes.

MS. GENOESE: I would just like to make it clear for the Court that Plaintiff's counsel keeps mentioning we just got materials on Friday.

The discovery was served April 1st. May 1st is the deadline. We did not seek any extensions. We properly supplied the materials.

So to the extent that the discovery requests were propounded very late, Defendant is not holding the ball. Defendant has timely responded to everything and produced 920 pages of materials in this case. I just want to make that clear.

THE COURT: Yes.

MR. HOFFMAN: These are materials that -- the materials that were provided May 1st were requested in the very first request for production.

MS. GENOESE: That is also inaccurate, unfortunately.

MR. HOFFMAN: I do appreciate receiving it on May 1st.

MS. GENOESE: The materials related to traveling companions, we specifically looked for as Plaintiff's counsel mentioned, security reports regarding the traveling companions and other reports. This was not included in the initial request for production that were served in January.

THE COURT: Yes. So counsel has represented to the Court that to the extent they recently produced documents they are responsive to the second request for production.

And I will also say that even if the latest request for production and even if they were responsive to the first, Defendant had not found them after making an effort to do so and they then found them, they have an obligation to produce it.

So absent any type of evidence that they withheld it intentionally that is not anything that is going to impact this Court's decision.

MR. HOFFMAN: Understood.

And one thing I have tried to do, Your Honor, is list the documents specifically that we are looking for because that was one of the issues that counsel had.

If you can name it we can ask for it. So I have done that.

THE COURT: Okay.

MR. HOFFMAN: And hopefully we can work on that.

THE COURT: So anything else that I need to address with respect to the privilege log?

MR. HOFFMAN: No, Your Honor.

THE COURT: And by the way, if you don't understand anything, let's deal with it now so you don't have to come back. So we can get an order that is clear and you all can get

clear direction.

MR. HOFFMAN: Okay.

THE COURT: Are we through with the privilege log issues?

MR. HOFFMAN: Yes, we are.

THE COURT: Defendant, we are good with the privilege log issue? Do you have any other --

MS. GENOESE: Yes, Your Honor.

THE COURT: So we have addressed that.

So the next issue is the temporal scope. Plaintiff has said that they are agreeing to reduce it to three years. So I will hear from Carnival as to whether or not that is acceptable or makes a difference in your response.

MS. GENOESE: Yes, Your Honor.

I mean, we don't have any issue with the narrowing. However, in 130 areas of inquiry simply narrowing the timeframe to three years does not defeat all of the objections. There were additional objections.

So that is the point of Carnival.

THE COURT: Well, when you say does it defeat all of the objections, with respect to timing, to the extent that we're going to get to the issue of the amount of the request. I'm just trying to deal with these overall general things.

So we have the privilege log. Now there is an issue that you object in terms of the scope of the discovery of the

time period. Plaintiff is saying they are limiting it to three years and you are saying that it does not --

MS. GENOESE: That is not really the issue --

THE COURT: Okay.

MS. GENOESE: -- of most of these objection to the corporate representative deposition. And they are not even listed, unfortunately, and I don't believe we ever got a list of specifically which request. If it is all of them, some of them are already limited to the date of the incident or to the subject voyage.

So it is kind of vague as to what the three years is limited to. But I just want to represent to the Court that that alone will not resolve all of the objections to the corporate representative deposition.

THE COURT: But will it resolve any objections with respect to the timing scope?

MS. GENOESE: It is hard to answer because I don't -- there are 130 areas of I am inquiry, but I don't believe that --

THE COURT: All right. So what you are saying is your objection there may be inquiry 115 may be limited to three years, but your objection maybe that particular topic is to three years would be too much for that particular request.

MS. GENOESE: That's exactly right.

THE COURT: Understood.

So, Mr. Hoffman, what do you say to that?

MR. HOFFMAN: I think that there is some disagreement there. I think the language that counsel is using about the date ranges being specific to the subject voyage, I do know that one of the requests made was for any communications, any reports, any followup, any investigation regarding the date range of the 13th to the 20th.

I think that Defendant indicated that we had agreed that we were limiting that just to whatever was produced in that range, but that is not true. It is whatever relates to the 13th to the 20th. That time period.

So just because a document is created after-the-fact does not mean that that is not in the request. But that as wide as the scope is that I am broadening from what the Defendant is saying.

And I do not know if we are at a specific example of that right now, but I note off the top of my head that was something that was relative to the subject voyage and the request for documents related to it.

THE COURT: Okay. So your initial position is that the Defendant has objected to discovery with respect to agreements, as to dates, time, substance, that you have offered to narrow the scope. Carnival has rejected the narrowing of the scope because it does not resolve the relevance objections.

Okay. And I hear what Miss Genoese was saying that

that does not cure, but does it get us anywhere closer that would be helpful for Carnival to the extent that knowing you are only limited to three years for all of the requests without waiving your right to make a specific objection to the extent that the request remains?

MR. HOFFMAN: I will take that one.

THE COURT: Yes.

MR. HOFFMAN: So, Your Honor, thank you.

It is progress. Five years and three years. Three years is better.

THE COURT: Well, would three years cover it?

Because I believe you said -- well, we're talking about a narrow. So each of these cruise. He said two days before he was presenting with symptoms. He came on the cruise. He was there for a few days and then he left.

So in terms of the factual scenario, it happened in the narrow time period. However, for the medical questions is three years within a relevance scope or is that too far in terms of, like, you know, you are saying you guys have narrowed in and this is a certain type of -- there was a certain type of treatment that should or should not have been given.

Is the medical history beyond this factual period relevant? Is three years relevant or is that looking too far? Or I guess it is not just medical treatment. It is treatment of probably Carnival's procedures and the doctor, et cetera.

MR. DRAHOS: Yes. So I do think in some areas limiting from five to three will allow us to prep our witness to answer the questions.

We did just hear this now. We've had five 7.1 conferences with Plaintiff's counsel. He has maintained a five-year scope in all of them.

He just reported to the Court now. So we cannot give you a *carte blanche* answer, but certainly as we get through various topics throughout the day, now that we are looking at it through the lens of three years and not five, we might be able to be more flexible. I just don't know if we can answer this across the board right now.

THE COURT: Okay.

MR. DRAHOS: Certainly it is progress.

THE COURT: So where we are now is that to the extent that you are looking to respond to these topics, you should read it to have a requested scope of three years without waiving your right to object that three years is still too broad for the particular request.

Did you get that, Miss Bradshaw? Okay.

Well, let me step back in terms of the amount of requests. So, Mr. Hoffman, the amount of requests are, I think, just kind of clearly overbroad.

I mean, I have had many cases and litigated many cases and I have never seen in the total case over years of

litigation, this number of request for production.

So I will tell you that you are starting from a place with me that there needs to be an explanation to understand why these number of requests are necessary.

And why it isn't harassing, or, you know, is someone just giving this to an associate and saying draft the request and they want to make sure that they ask every possible question three ways.

Because I have read the complaint. I have read the answer. I do not see how the issues in this case need that number of topics for request for production.

MR. HOFFMAN: I have offered to consolidate because I think a lot of them were broken up.

A lot of the requests were done after meet and confers where we said, well, perhaps this would be best as a topic. That was an ongoing conversation. The temporal scope was offered for three years earlier, but --

THE COURT: But if you start with -- and I apologize if I am being murky because I am merging all of these things in my mind; the various requests for production, the topics.

But if we just start with the request for production, I believe there is 112 requests for production in a medical malpractice case that deals with a very narrow time period. A known medical issue and one or two doctors visits.

Help me understand why 112 just requests for

production would be appropriate. And because 112 requests for production if they are duplicative, or unnecessary could have been well better written because that puts a burden on any Defendant or any recipient to have to go through and read them. Come up with objections to them. Meet and confer with you over 112 if there could have been fifty or thirty.

So I need to hear from you why 112 is acceptable and I can tell you that it is an uphill battle because I cannot imagine why it would be necessary or appropriate in this case.

MR. HOFFMAN: At this point, Your Honor, we have cast a wide net. We have gotten information back that allows us to narrow those requests. The requests that I am here to discuss are specific.

And that is only because we have been getting responses over the past four weeks that are the loudest to understand, but a lot of these things were requested months ago. They were part of original discovery requests.

And when those discovery requests were not responded to, well, then it became an issue for the corporate rep deposition.

But, again, more information has been provided as recently as mid-April that allows me to greatly whittle where we are going.

So this has been part of the process. It has been dragged out for several months, but I am hear to narrow that

list down.

THE COURT: Well, I could imagine that every time you meet and confer, you are meeting and conferring over in just one type of discovery 112 requests for production.

Unless they are grouped together, I do not see how the Defendant has to deal with them one-by-one and, you know, get to 120 and remember, oh, well, that is duplicative of number two and go back and look at number two.

MR. HOFFMAN: I agree.

THE COURT: It is a lot of wasted time.

MR. HOFFMAN: I understand.

And I do believe that the requests are in blocks specific to the subject that I was trying to be aware of that; cognizant of it.

THE COURT: Okay.

MR. HOFFMAN: But a lot of the break-down comes to when we are not specific enough or we are not on point enough that there is no response.

So it becomes almost answering a request from the Defendant, but as far as naming the specific documents we are there.

THE COURT: Okay. Do you want to be heard on that?

MR. DRAHOS: Very briefly, Your Honor.

So I do want to address the elephant in the room because this is the first time that I have ever filed a motion

for sanctions against an opposing lawyer. I think a lot of these requests are AI generated.

And so we have some case law on this that that is not an appropriate way to litigate. We are litigating against Mr. Singer's office and Mr. Hoffman and not Chat GPT, but that is really the only explanation that I can think of for how you can even generate the volume that we are seeing.

And to the extent Plaintiff's counsel is trying to represent to this Court that he is having to chase us down for information, these were discovery responses is that we provided in January.

If he thought at that time that we were hiding the ball, or not answering completely, then he should have brought it to the Court's attention in February. That is what the rules are designed to do so that we are not in the position where he can recycle requests over and over and over again.

And then come before Your Honor and say, well, you know, I've been trying to get this stuff and they are not giving it to me. We feel like we are chasing our tail. And so that is why --

THE COURT: When you say recycle the request, explain that to me.

MR. DRAHOS: Yes. So, for example, we had requests for production and interrogatories that we had to respond to and provide answers to in January, which we did.

There were 7.1 conferences. I think we have had five in total. One that was over three hours long. And then, we get a corporate representative notice that has the same exact areas of incident inquiries that we had previously addressed in the requests for production and interrogatories months ago.

And so that created an obligation on our part. Like Your Honor was saying, when we had to go through each one of those areas of inquiry and identify whether this was something that had already been addressed, provide an objection to do again and, then, have another 7.1 conference with him about issues that we already talked about.

So, by all means, it is our goal here today to just tell us exactly what you need. If it is reasonable we will give it to you. But what we don't want is to have these long extended discussions with discovery requests over and over and over again with really no light at the end of the tunnel, which is the way we feel right now.

THE COURT: Understood.

So we are going to get moving so that we can make sure that, at least as of today, all the pending issues have been resolved. We have a set of requests for production that will be still pending and the answers given and then move forward.

So, with respect to the time issue, we have addressed that. Mr. Hoffman is removing his, I guess, motion to compel with respect to topic 22.

Is there anything that you would like to be heard with that to put that to rest this removal?

MR. HOFFMAN: If he is withdrawing, Your Honor, we're good to move on. Thank you.

THE COURT: He is withdrawing it.

And that would be withdrawing however that topic appears in any form of discovery. Just to be clear.

MR. HOFFMAN: Understood.

THE COURT: Topic 22s and RFAs and interrogatories that you are removing that topic.

MR. HOFFMAN: And same with the corporate rep depo, Your Honor. That won't be addressed, Your Honor.

THE COURT: I just want to make sure so we don't have to come back and fight over that.

MR. HOFFMAN: Yes.

THE COURT: So if you are preserving it in any form now is your time to say it.

MR. HOFFMAN: I am not.

THE COURT: Okay. All right. So the next issue is the HESS procedures.

MR. HOFFMAN: Yes, Your Honor. And this is very important and very specific. The documents that we are looking for have been identified by name and title.

They actually come from the documents that we are actually providing as part of discovery, but they are missing

important appendices. Specifically, when it comes to the emergency medical response algorithm and the first response --

THE COURT: Before you get to that --

MR. HOFFMAN: Yes.

THE COURT: Carnival has said they received your request. They understand it and they produced it. They are not withholding anything.

So am I speaking out of turn?

MS. GENOESE: No, Your Honor. It is pretty much that I did want to just clarify.

THE COURT: Okay.

MS. GENOESE: So I think to summarize what the issues is, is we produced all of the procedures and policies based on the requests for production. These were produced again back in January.

Within the policies there are reference to other policies that may or may not have anything to do with this case.

For example, there is communicable disease management. There is garbage management reference. And so Plaintiff has just unilaterally said I want every single policy that is even quoted or listed within the policies that were produced that may or may not have to do with this case.

We have reached an agreement that there are some that I have already seen in past cases that I know would be

responsive and we have already agreed to produce them when we get them.

But as far as the blatant or just the overarching request of anything possibly referenced, it is not a formal discovery request. And I will have to review them, which I did agree to do to determine if we are going to produced them or not.

THE COURT: Okay. So the request for production of documents you reviewed it. You responded. You gave what you believed to be responsive documents.

MS. GENOESE: In January, yes.

THE COURT: And the Plaintiff reviewed them and saying, well, seeing something referenced in here, I think that is also responsive.

MS. GENOESE: Yes. We had two 7.1 conferences in February. It wasn't brought up until March 26th.

THE COURT: Okay. So when you had that conference, Mr. Hoffman pointed out what he thought should be additional documents produced and you have agreed to produce those documents.

MS. GENOESE: Some of them, but some of them I do still -- I haven't even heard honestly of --

THE COURT: I'm sorry. Say that again.

MS. GENOESE: I have candidly not even heard of some of these documents. So I will have to review them.

For example, like something that just blatantly says governance of global HESS content. I don't know what that policy is. So I do have to review them first to see if it is, one, relevant to the request that he made. And two, to see if it is relevant.

THE COURT: Okay. So, Mr. Hoffman has identified followup discovery -- I will put it like that -- that he would like.

And you are saying that you are willing to voluntarily look for it and, then, if you find it, then you will make an independent determination if it is relevant and/or responsive to the prior requests.

MS. GENOESE: That is in good faith. Yes, we did agree to that.

THE COURT: Okay. Perhaps a better way to do that is to have another request for production done for those specific documents.

Give you time to respond and object so that we avoid trying to trace back which conferral is related to, and which hearing this related to. I believe you do have time before your discovery deadline in order to do that.

So what I am going to do is deny that motion to compel those documents without prejudice to you, Mr. Hoffman, following another request for production to the extent you think there are additional documents that should be produced.

That count against the hundreds that have already been served.

Okay. So anything that you would like to be heard on that, Mr. Hoffman?

MR. HOFFMAN: No, Your Honor. I think that is a very just request. Thank you.

THE COURT: Okay. So with respect to item D on Page 6 of your joint statement, the HESS procedures, the Court is going to deny the motion to compel to Plaintiffs serving a very narrow specific target request for production only to the additional documents that you have already identified that you are looking for in response.

MR. HOFFMAN: Yes, Your Honor.

THE COURT: Okay.

MR. HOFFMAN: Thank you.

THE COURT: Okay. So now we are on topic E. That has been withdrawn. Again, my understanding, Mr. Hoffman, is that copies are withdrawn across all types of pending discovery.

MR. HOFFMAN: Yes, Your Honor.

THE COURT: Topic F, travel time meet and Stephanie Grimm topics. So this is the deposition topics. I will hear from you, Mr. Hoffman.

MR. HOFFMAN: Yes. I'm sorry. I need to look at the topics.

THE COURT: And please go to the substance. You don't have to make any arguments about meet and confer. I have heard

from you all. I see the parties have been trying to meet and confer. So please only respond as to the substance.

MR. HOFFMAN: Okay. This is specific to the family protesting that their family member was not being taken care of properly.

And security, being called to remove them from the infirmary, to the point that the only person left with Mr. Smith to sign against medical advice is because Mr. Smith was incapacitated, was a non family member. A non family member that was not objecting to the poor care that he was receiving.

And also, the family had left the infirmary for fear of being removed by security. So these are topics that I have asked for the corporate representative to be knowledgeable of.

And that will be done by speaking with the nurses, the doctors, the people who were present, the security.

THE COURT: So you want to -- well, let me go to the request and make it easier.

This is the deposition; third party deposition notice or travel party deposition.

MR. HOFFMAN: And the Defendants' initial disclosure is also listed as fact witnesses.

THE COURT: Knowledge of whether Plaintiff's family member Patty Grimm was contacted by person's aboard the Pride to request monies so that the infirmary would admit Plaintiff and any records or communications reflecting such a request.

MR. HOFFMAN: This is in regard, Your Honor, to the infirmary requiring payment from my client prior to being seen.

And the family had to leave the infirmary and go back to their rooms and call their family members that they had to get $250 back from the landlord from rent to send to the boat so that Mr. Smith could be seen. So that is what that is in relation to.

THE COURT: And you want the corporate rep to be knowledgeable of what you just said happened? Are you looking to any records or communications reflecting --

MR. HOFFMAN: Yes, Your Honor.

So when security is called there is generally a log. So we are asking for information --

THE COURT: Is this a request for production or a corporate rep notice?

MR. HOFFMAN: I believe this is in the corporate rep notice. Was it part of the request for production? I believe so, Your Honor.

THE COURT: You said it was a part of the request for production?

MR. HOFFMAN: All communications related to any of the travel party and anything related to the infirmary, yes, those were part of the initial requests.

THE COURT: And were those documents produced?

MR. HOFFMAN: We received nothing.

I mean, we received very little. I mean, we received nothing from security about being called and removing the people.

We have asked for a body cam footage. We have asked for the summary security watch report. We have asked for any internal communications from the infirmary to security to remove the folks. Nothing.

THE COURT: And then, what is the relevance of this to the claim or defense in the case?

MR. HOFFMAN: They are saying that our clients took their time to get to the infirmary. They got to the infirmary as soon as they knew something was wrong.

And it undercuts this comparative negligence defense that our client was at fault for anything. He could sign his name when he got to the infirmary. Hours later he could not because he was suffering that stroke when he got to the infirmary. It was not two days before. If it was two days before, he wouldn't have been able to sign his name.

And the protest of the family for him to be seen without getting $250 payment and then for them to protest the fact that they were diagnosing him with sepsis of the big toe rather than recognizing the fact that he couldn't walk or speak and was suffering a stroke.

So, yeah, trying to get a better picture of everything because that is what came out during the deposition of the

traveling companion.

THE COURT: And how would a corporate rep -- how would you propose this corporate rep prepare to testify on a topic as you have raised it here?

MR. HOFFMAN: I would --

THE COURT: How would they know how the Plaintiffs felt and what they did? What they did when they left the infirmary? I'm on 23, 24, 25.

MR. HOFFMAN: Got you.

Knowledge of Stephanie Grimm's verbal criticism of the medical staff's decision to discharge.

I would think that if security was called, it was called by somebody. That would be in a log. That would be somebody that the corporate rep would speak to. I would hope that they would speak to the nurses that were responsible for the intake.

Those are the people who would be the most knowledgeable about what took place. I have asked to depose those people as well, but I am not able to get dates yet, but we were trying to get this resolved first before I send the depositions.

THE COURT: I will hear from the Defendant.

MR. DRAHOS: Thanks, Your Honor.

So I do think there is some point of clarification that is necessary. Your Honor is not hearing the whole story.

So when Mr. Smith came to the medical center -- and again, this is the testimony of the traveling companion that he had been sick well over a day possibly too.

He came into the medical center and he was evaluated by the ship's doctor. And the ship's doctor made the recommendation to him that he should stay in the medical center for observation.

And that, ultimately, at the conclusion of the cruise, he should seek medical care ashore. He did not agree with either one of those recommendations. He wanted to go back to his cabin. So he signed an Against Medical Advice form.

So this argument being made to the Court that he couldn't sign his name, we actually have him signing a document at the time of this interaction with the ship's doctor that was co-signed by a family member.

It has been represented by the Plaintiff that they have a plan to have some of these traveling companion family members testify that they were not in agreement.

That they came back from the medical center and that there might have been some sort of verbal altercation that went on between these family members and the ship's doctor. We don't have any record of that.

We have represented to the Plaintiff that we don't have any record of that. And if it is the Plaintiff's intention to put that testimony on and those witnesses can

testify to what they believe occurred, but asking Carnival to recreate an incident that the Plaintiff claims happened that we say didn't happen, I just feel like we are get really far afield of what --

THE COURT: I guess on the question of topics for a corporate rep depo, I think I just heard you just articulate how it is an issue in the case.

So with respect to the corporate rep depo, it is not that the corporate rep has to recreate or even agree that it did happen. The corporate rep just has to find out Carnival's position with respect to that and perhaps as you just articulated.

We do not know anything about that. There was a waiver. Nobody came in. You know, so to testify on the topics that necessarily agree or affirm the Plaintiff's position.

MR. HOFFMAN: Agreed, Your Honor.

Our corporate rep will eventually disclose what our position is at the deposition regarding the interaction between the patient and our doctor and the witness who signed it.

But once we started getting into, well, Stephanie Grimm was not happy and she said this, that, and the other thing to some crew member, we think they are getting too far afield there.

THE COURT: Meaning, it would be too much to find out did she come back to the infirmary. I am trying to understand

what your objection is. The objection is, hey, it's not possible for our corporate rep to even prepare on this topic because it is too far afield or you are saying -- help me understand your position with respect to that.

MR. HOFFMAN: So we don't know anything about Stephanie Grimm, I think her name is, and her criticisms of the decision-making on the ship. There is no record of that. I do believe that we ran a search on Stephanie Grimm and we did produce -- is it an e-mail after the cruise that she wrote?

MS. GENOESE: Yes.

MS. GENOESE: So our understanding is that she wrote an e-mail to what we call Our Eye Care to report her displeasure of what went on during the cruise.

There is a way for us to run that search. We did and we found something and we disclosed it.

To the extent Mr. Hoffman has a question that he wants to ask about that, the corporate rep would literally read what the document says.

I think where our concerns lie is that the purpose of this case is to investigate the medical care and whether or not it met the standard of care.

Once we are being asked to investigate, to the extent other guests were critical, it just becomes a separate investigation. We want to stay focused on the medical care and what went on in our medical center.

If the Grimms plan to testify about, you know, their issues I will take Mrs. Grimm's deposition and we will hear from her. We just do not want to have to focus our resources on investigating some side issue that --

THE COURT: So, first the question is relevant to the claim or defense. That is the first question.

I think I heard you both articulate that whether it is a good defense or not, or whether it is a win or not, there is a position of the Plaintiff that either the medical form was not properly signed, or didn't want to sign it, or didn't sign it for the right reasons, and that there are people that they intend to come to testify about that.

If that is the fact, then it is relevant to a claim or a defense, then we have to get to the next question. Is it overly broad? Is it burdensome? Is it harassing?

So with respect to relevance, are you saying that it is not relevant or it is? Because I think you said they may come and testify and say he didn't waive. He didn't want to stay, or he left, or that it is an issue in the case.

MS. DRAHOS: Yes.

THE COURT: Maybe not a strong issue. Maybe it won't win and maybe it will get kicked out on summary judgment, but right now it seems to be issue in the case.

MR. DRAHOS: So, to clarify, Miss Grimm was not in the medical center at the time the AMA forms were signed. It was

Mr. --

THE COURT: Well, on that point, isn't that a point that it is relevant that they are entitled to evidence on it.

So you are saying that this didn't happen and this happened, but that is not evidence that can be presented or even tested.

He cannot follow up with you. He cannot cross-examine you and he cannot put a document in front of you, but he can to your corporate rep.

And so if your corporate rep comes to you and says I recently got myself prepared to talk about what happened in the infirmary around that time. Who was there. Who came. Who went. If that is the best that you can do that is all you have to do.

And then, they will be subject to cross-examination. Then, perhaps that brings up the issue, then you want to go and talk to the person, then you get to cross-examine that person if it is a relevant issue.

So it sounds to me like it may be a relevant issue that would be appropriate for discovery and for them to know what Carnival has on it, evidence wise, and what their position is. That can be subject to cross-examination.

MR. DRAHOS: I do not disagree with anything that Your Honor said.

THE COURT: Feel free. This is the time that --

MR. DRAHOS: I agree --

THE COURT: Respectfully.

MR. DRAHOS: I agree with Your Honor that what went on in the medical center and the circumstances surrounding the AMA are definitely material to the case and I believe we have produced everything responsive to that.

Where we start to get into the gray area is when we are asked -- like, for example area of inquiry number 24, knowledge of any objections or protests by the family. Including -- and then there are one, two, three, four, five of them.

If there isn't a written document that would summarize this, then arguably it creates an obligation on our part to speak to the Guest Services Manager who was at the front desk. Hey, did anybody come in here and complain about Mr. Smith?

Like, I'm taking to extremes to try to --

THE COURT: I guess that taking it to an extreme is not going to help us here because you are not obligated to do that to produce a knowledgeable corporate rep.

But the corporate rep has to say is, okay, I have knowledge of our company. I have knowledge of the way we document things. I have knowledge of, look at this, and say I know how this information makes its way through the company. I went and I made a phone call and I asked a question and it came back and said there is nothing, or there is one line in the

page and, you know, whatever it is. That is all the corporate rep is obligated to do.

I do not think it requires a complete and separate investigation. Unless that is your normal policy and procedure to do. Do you understand what I am saying?

MR. DRAHOS: I do and I think that as this hearing continues, you will see that there are some extremes that are being asked.

We are being asked to produce the casino rewards for traveling companions. Like, why would we need that for --

THE COURT: Well, we are going to address that.

MR. DRAHOS: Yeah.

THE COURT: We are going to get there. I wish I could generally get you guys in the right direction and just not do this, but you seem to have done it yourself and got to a funnel of these issues.

So I am going to say with respect to -- well, I am going to -- let me not try to rule on each one of these and I will hear from you and then I will issue an order.

MR. DRAHOS: Okay.

THE COURT: So we can move through. I do not want to leave time -- I mean, I do not want to run out of time.

MR. DRAHOS: Okay.

THE COURT: Okay. So is anything else that you would like to be heard on those topics?

MR. DRAHOS: No, Your Honor, thank you.

THE COURT: Okay. All right. Let me get back to the writing.

MR. HOFFMAN: Your Honor, I just want to speak to something that Defense had said.

The issue with the AMA and the family being removed is the family was protesting him signing the AMA and being discharged.

And I believe that you will get testimony when they find out from the person who also signed it was that security showed up because they were there to remove the Grimm family.

But they had already left under threat, which is why that AMA got signed by a non family member and Mr. Smith who was incapacitated. I just wanted to put that on the record. Sorry. Thank you.

THE COURT: Okay. So now we are on F or G?

MS. GENOESE: G.

THE COURT: Dr. Maharaji's departure and fitness topics. Topic 50. Let's see. Okay. I have it in front of me.

Okay. Mr. Hoffman.

MR. HOFFMAN: One of our arguments is that this was a negligent hire. He was negligently retained and negligently assumed.

And Dr. Maharaji is very physically fit and we believe

that he had developed a pulmonary embolism from drug abuse and we were inquiring as to what kind of background checks were done.

Why was he removed? What type of inventory are they taking of the medication? We do not understand his decision-making. We do not understand when he was removed from the boat due to this pulmonary embolism.

There is a lot of mystery, but this is older. I think that the focus is more on the decision-making of the doctors, the senior doctor on board, as well as the other doctor on board.

So that was the reason for why this was the focus because he thought he was the senior ship doctor. We thought he was the only doctor, but he wasn't.

THE COURT: Are you withdrawing this?

MR. HOFFMAN: Regarding the -- not completely because I would like some basic information of when he was not able to perform his duties and when that was.

THE COURT: And this happened after --

MR. HOFFMAN: We don't know.

THE COURT: Well, after --

MR. HOFFMAN: It happened after. We don't know exactly how far after.

Okay. Mr. Drahos.

MR. DRAHOS: Thank you, Your Honor.

So, as I represented to the Court at the beginning of this hearing, I was texting back and forth with Dr. Maharaji while he was in the hospital.

He most definitely couldn't stop his contract. There was never any determination that he wasn't fit to serve on the ship. We have not objected to counsel's right to at least ask the question as to when did this event occur.

And I can represent to the Court now confidently that the pulmonary embolism happened when he was back home in South Africa and that he has been medically limited and cannot return and that is why he is not currently serving on a ship.

But what was represented by Plaintiff's counsel in court, an officer of this Court, just represented that he believes the reason why Dr. Maharaji had a pulmonary embolism is because of drug abuse.

MR. HOFFMAN: I have no idea that he was removed after-the-fact. So that changes everything. It changes everything the fact that he was removed after his contract ended.

THE COURT: Mr. Hoffman, let me let him finish.

MR. HOFFMAN: I'm sorry, but that wasn't a fact that was disclosed.

THE COURT: He didn't interrupt you.

MR. HOFFMAN: Yes, Your Honor. I'm sorry.

THE COURT: Let me focus on what he is saying.

MR. HOFFMAN: Please.

THE COURT: Let him finish.

MS. GENOESE: Mr. Hoffman knew well when that pulmonary embolism was happening because I told him.

We were working on a deposition date for the doctor and I said he is currently in a hospital. He has had a pulmonary embolism.

So I can't tell you exactly what date that was, but that was most definitely within the last couple of months. It did not happen on the ship.

MR. HOFFMAN: Then I would --

MS. GENOESE: There 23 of our objections to this deposition notice that we had to prepare for that concerned questions that Plaintiff's counsel wants to ask him about whether or not our doctor was drug tested. Whether or not he was taking anabolic steroids.

THE COURT: Tell me which ones those are so that would help us move along.

MR. DRAHOS: Okay.

THE COURT: Direct me to the ones that have to do with Dr. Maharaji's medical condition and any alleged drug use.

MR. HOFFMAN: Dr. Maharaji's departure after his contract changes everything.

I understand that this is not relevant to the scope of what I am looking into because of that new fact that I did not

know before, Your Honor. I was told he was removed from the ship because he had a pulmonary embolism, period.

MR. DRAHOS: We cannot do anything other than represent as officers of this Court that Mr. Hoffman knew very well when that pulmonary embolism was and that it was recent.

And there has been performance evaluations that have been turned in that show that he was working on the ship.

And to answer Your Honor's question --

THE COURT: Hold on one second.

Mr. Hoffman, what you are saying to the Court is you asked for all this discovery because you thought that you did not know when Dr. Maharaji was removed from the ship and you thought it was closer to the time than the incident.

MR. HOFFMAN: Yes.

THE COURT: And that the basis of your request is because of the basis of that belief?

MR. HOFFMAN: Yes, Your Honor.

THE COURT: And what you are saying is that he knew this prior to today and prior to propounding the discovery?

MS. GENOESE: I, myself, have told him in 7.1 conferences that he was not removed from the contract. This happened in October of 2024. And to our understanding, the pulmonary embolism happened in March of 2026.

He already had the contract for Dr. Maharaji, which would have been completed by the time it was produced in

discovery.

MR. DRAHOS: I have to check, Your Honor, that there may very well be an e-mail that I might have written to Mr. Hoffman explaining that we have just learned that he is in the emergency room.

I do not know how detailed I was to be able to support the representation that we are making that it was very clear that this pulmonary embolism was an emergency situation that had just recently happened.

And so the representation that is being made to the Court that I do not know this and I thought it happened on the ship, I do not know how you can reasonably take that position when we repeatedly told him over and over again that this was an emergency situation.

And what we were getting back from him was, well, I believe he was on steroids and that is what caused his pulmonary embolism which is so inflammatory.

There was a reason why we did things like filing a sanctions motion because we feel like it is just so inappropriate.

THE COURT: Okay. So I understand.

Direct me to the request for production that are based on Dr. Maharaji's removal, or condition, or medical condition.

MR. DRAHOS: I'll defer to my colleague.

THE COURT: And if you are not able to do it right

now, you can file a supplement. And when we get to them, you can identify those for me if that is going to be easier.

MR. DRAHOS: It is in the corporate rep's deposition notice. Specifically area of inquiry number 69:

Carnival maintained a drug and alcohol testing policy. Was Dr. Maharaji subject to pre-employment drug screening? Was Dr. Maharaji subject to random drug testing? Was Dr. Maharaji drug or toxicology tested? Does Carnival's drug testing protocol for ship doctors --

THE COURT: Okay. I see 69 through 76.

MR. HOFFMAN: Which I withdraw, Your Honor.

THE COURT: 77 through 82.

MR. DRAHOS: We do not object to those.

THE COURT: Okay.

MR. DRAHOS: They are asking for his employment which we will provide that to him.

THE COURT: Okay. 82 through 86.

MR. DRAHOS: 84 asks for any written opinion from any doctor or third party evaluator for his capacity to return. And then they want the actual report, the date, and the substance of the opinion. That is a HIPPA violation if we were to turn that over.

Is any crew, agency, or staffing contractor responsible for him? Have they been informed of the circumstances? It is so highly relevant especially since this

is something that happened recently.

THE COURT: That is 85. What about 86?

MR. DRAHOS: Carnival has any communication from any Maritime regulatory body for medical license board regarding his business to practice medicine. Again --

THE COURT: Okay. What else? Tell me the other -- I am sorry I interrupted you.

MR. DRAHOS: Okay.

THE COURT: I understand.

Are there any others that go to questions about Dr. Maharaji after his reasonable role, or any incident, such as drug abuse, or steroid use that you want to bring to my attention?

MS. GENOESE: There are just additional topics starting at 55 that go to the removal and health conditions and change of, I think, appearance and change of health conditions.

MR. HOFFMAN: It will be 53 to 76 that I will drop.

THE COURT: 53 through 76 you are withdrawing?

MR. HOFFMAN: Yes, Your Honor.

THE COURT: Okay.

MR. HOFFMAN: Thank you.

THE COURT: Anything further before we get continued to going on?

MR. DRAHOS: No, Your Honor.

THE COURT: I understand your position.

Okay. So let's see if we can make some progress here. So that is G with re-dress. I know what your position is.

Number 8, upper class number 7. So what I would like to do is for you all to provide any additional context or argument that you would like the Court to know and then I am going to return a written order addressing these topics.

So, Mr. Hoffman, if there is anything that you would like to withdraw, now is the time to do it. Otherwise, it is going to be the subject of my order. And I will tell you that now I become like the Defendants are saying that they were forced to do the work.

MR. HOFFMAN: I'm sorry, Your Honor.

THE COURT: On requests that may be duplicative or not necessary. So I want you to be mindful of that. So if there is anything that you deem withdrawable, please let me know.

MR. HOFFMAN: Yes, Your Honor. I am all for withdrawing as much as I can because I do want to narrow it.

THE COURT: And now we are on number 8.

MR. HOFFMAN: Yes, Your Honor.

And the context of this is that I would like to know about communications and dialogue between the senior ship doctor and the ship doctor and the master regarding Mr. Smith because all three of these people should have been involved given that there was communications on October the 19th about a medical disembarkation.

Up until we recently received those documents on May 1st, we were only of the awareness that Dr. Maharaji was the only person in this equation that may have been communicating with the ship's captain or the master, but now we have the senior ship position.

So we are asking what communications there were between Carnival shore-side, the doctors, the captain about Mr. Smith and the fact that he had to be medically disembarked.

What was that conversation on the morning of October 19th or the evening of October 18th? Was there internal acknowledgment that he had suffered a stroke? I think that these are things that are relevant.

THE COURT: From the Defendant, anything you would like to add to your submission?

MS. GENOESE: Not adding to the submission, but just to point out that we did agree to have a corporate representative testify to the conditions based on Plaintiff's injuries, which are the topic that is an H that are contained in the medical records and the documents produced in discovery.

MR. HOFFMAN: And that is why I asked for it to be broader because if the senior ship physician was involved, there is more to it than just these medical records.

Especially if a medical disembarkation was decided that was a category one, which, Your Honor, is one of those appendices that we are missing from HESS which explains what

the medical disembarkation categories are in the procedures for that to take place.

These are all intertwined, Your Honor.

THE COURT: Okay. Anything further, Miss Genoese?

MS. GENOESE: Just that the issue really was for internal information that the Plaintiff has, which, again, aside from the medical records and all the things that were produced and which communications were produced, I am not sure how else a corporate representative would be able to testify as to Plaintiff's injuries. That is the dispute is the internal information part.

THE COURT: Understood.

All right. So number I, CCTV retention and preservation. Mr. Hoffman.

MR. HOFFMAN: Yes. It has been represented that there is no CCTV in the infirmary. We are aware that there is body cam footage worn by security. We have made that request.

We know that there is video of the disembarkation. We do not know what was preserved. But most specifically, Your Honor, at this stage given the representation that there is no CCTV footage in the infirmary, which would show much of what is at issue, this is limited solely to any body cam security footage that came to be from security going to the infirmary to remove the Grimm family.

MS. GENOESE: And we have already represented in the

supplemental responses on May 1st that there are none.

I know Plaintiff has an issue with that, but we did agree in this topic to provide the corporate representative testimony as to knowledge of Carnival's retention schedule, overwrite cycle, destruction policy for CCTV footage on the Pride, whether all responsive footage has been preserved based on the preservation demand letter.

So these are not things that we are hiding. There are simply none. I know Plaintiff's position is that must be impossible. However, that was our response and that is our position on the topic.

MR. HOFFMAN: If they were to include that there is no body cam footage from security, then, of course, I would say okay, but that was not represented and that is the issue here, Your Honor.

MS. GENOESE: I do candidly, off the top of my head, but I do believe that until the responses on May 1st there was a request for production about that, which we did respond none. It is my remembrance at least.

THE COURT: Okay. So I am a little confused, Mr. Hoffman. How do you get from a request for CCTV to a demand that it is body cam?

I understand that there is a separate body cam RFP, but with respect to the CCTV request, you have requested. They responded and they made a position. What more -- how do we get

to, well, you have responded about CCTV. You say you have nothing. Okay. But now give me the body cam representations about that.

MR. HOFFMAN: Yes. In the meet and confer it was discussed that there was no CCTV footage in the infirmary. Based on my knowledge of how Carnival operates, I moved to any footage that was on the body cam of the security.

So I am looking for --

THE COURT: And they have responded.

MR. HOFFMAN: On May 1st. So five days ago. So, yes, I understand.

THE COURT: So the issue with respect to CCTV is resolved.

MR. HOFFMAN: It seems that way, yes.

THE COURT: There is no issue before this Court with respect to the body cam because you have asked for an RFP and they have responded.

MR. HOFFMAN: Five days ago. Yes, Your Honor.

THE COURT: Is there anything that I am missing on that?

MR. DRAHOS: We agree, Your Honor.

MR. HOFFMAN: Okay.

MR. DRAHOS: We agree with the Court.

MR. HOFFMAN: Yes, I agree with the Court.

THE COURT: Okay. Certification of completeness for

*duces tecum* requests. Duplicative of require request for production.

MR. HOFFMAN: So, Your Honor, this is where I created the list of documents specific to what it was that I was asking for because the issue that we discussed in the meet and confer was that it was too wide, it was too broad, and that that was the reason why there was overlap and that was my confusion.

So with that in mind, I said, all right, I will do my best to create a list if a list is what you need. So based on my knowledge of Carnival and its internal operations, and the records that we have already received, I created as much of a list as I could that specifically identifies the documents that we were referring to.

And that is on the following page on Page 14 of the joint statement.

THE COURT: So there is request for production or documents and you duplicated those requests and *duces tecum*. And then they responded to your request for production. And then responded to the *duces tecum* saying that we have produced the documents and now you want --

MR. HOFFMAN: We're still -- I mean, they said that, but we are still getting documents on May 1st. So we have made the representation multiple times have we gotten everything.

And a lot of these things that we have, but a lot of the things have questions, Your Honor.

THE COURT: But if we go back to the document production, additional documents May 1st is because there was a second request for production of documents. And that they are now responding to.

So is it your position that everything you asked for in the second request for production was already asked for in the first request?

MR. HOFFMAN: It was done in an effort to narrow things down and it was done after the meet and confer. It was done for the purpose of trying to make things more narrow.

And if that was a fail that was a fail, but I think that the responses that we have received May 1st, which, again, Your Honor, responses to the November request for production it's the same request. We only got responses in April on May 1st when we asked for it in November.

It would have been made a huge difference in this case had that document that I originally showed you was provided, or if that doctor was listed in the initial disclosure of the Defendant, it would have made a drastic difference in the way that this discovery has gone forward.

THE COURT: Okay. So staying focused on this, there is duplicative requests for a *duces tecum*. They have responded. They said that they produced it .

What more do you believe they are obligated to do?

MR. HOFFMAN: I have asked for daily security summary

watch reports.

THE COURT: Okay. So that's a different issue. You are saying that you have looked at the documents that have been produced and you believe that there are specifically responsive documents that you believe exist that have not been produced.

MR. HOFFMAN: Yes. And that was done as a result of the meet and confer where I was told that I am not being specific enough. So I created the list.

THE COURT: But the Plaintiff's position is you are saying that you do not want to take their word for it. You want them to re-respond and to each specific *duces tecum* and cross reference to the request for production.

MR. HOFFMAN: No.

THE COURT: And identify the Bates stamp.

MR. HOFFMAN: To resolve it I have said that that would not be necessary. That I would provide a list of the documents that we are looking for and what --

THE COURT: But that list has not been provided.

MR. HOFFMAN: It's in the joint stip.

THE COURT: I don't see that.

MR. HOFFMAN: It's Page 14.

THE COURT: Page 14. Well, this is not a list. This is another request --

MR. HOFFMAN: They are.

THE COURT: A whole other broad request for production

of documents.

MR. HOFFMAN: These are specific detailed documents that are what was asked for in the *duces tecum*.

The request from counsel was for specific documents to be requested and that is what I had done. I have asked for an audit trail for the medical chart. I have asked for shore-side review or sign-off of the Against Medical Advice form. If they do not exist, they don't exist.

THE COURT: Carnival, with respect to these requests, what has been indicated to you is specific documents, what is your position to that? If he is moving away from answering them again, cross reference, tell me produce, he is now saying, well, answer these particular questions. What is your response?

MS. GENOESE: I am seeing a lot of this for the first time in the joint statement. To the extent I am not going to through each one --

THE COURT: That's right.

MS. GENOESE: But the Against Medical Advice form, that was produced January with initial documents.

THE COURT: Okay.

MS. GENOESE: A lot of these do have objections that were previously --

THE COURT: I will.

MS. GENOESE: Okay.

THE COURT: So what I am going to do with respect to -- I am going to look at it carefully, but I have given you my thought process. I think earlier I had said what you are requesting to me seems to be an additional request for production.

I think this is the same with a specific list that they could just go through and find them, but I think they have the right to look at them and make any appropriate objections.

So to the extent you are looking to narrow, then you should do another request for production and they can respond.

MR. HOFFMAN: Yes, Your Honor.

THE COURT: And object if they deem it appropriate.

MR. HOFFMAN: Thank you.

THE COURT: Anything further on that?

MS. GENOESE: The only other thing, Your Honor, is kind of the whole point of this topic is what I understood it, a lot of these were already addressed in prior answers to interrogatories and prior requests for production and prior responses to the *duces tecum* requests.

We objected to many of them. So that is why in a lot of our objections it does say refer to our 7.1 conference agreement notes, which are all written in communications very detailed.

These are things that Plaintiff has now said we agree to and now it is, just kidding, we want more. So they are not

abiding by the agreements that we had, but they are instead following up with additional ones.

So to the extent that these are going to be duplicative and another set of discovery requests to us, that's the only thing I want to make aware to the Court.

THE COURT: Meaning, what you are saying is you may have to point back and say we already agreed or we --

MS. GENOESE: Yes, which we did several times in the objections to the 30(b)(6) corporate representative notice. I put that directly in the objection because these are topics that were discussed, agreed to, not moved upon, and things like that. But, again, it keeps getting duplicative and repetitive.

THE COURT: Well, where it can get an issue, a different issue with respect to whether or not these are duplicative, appropriate, harassing, oppressive, that's a separate issue in your motion for sanctions.

And just to be clear, just trying to get these responses and get these narrowed does not mean that that second inquiry won't be made.

So to the extent, Mr. Hoffman, I don't view this as just the kind of list --

MR. HOFFMAN: Yes, Your Honor.

THE COURT: You can ask another request for production and they can respond.

And I want to say this to you. If you reach an

agreement in a meet and confer, I do not enforce that. So to come in and say, oh, I didn't do that because we agreed.

If you want an agreement to be enforced it needs to be in an agreed order. That's the best way to do it because that avoids I don't want to have to go back and read letters and e-mails and see who said what and who agreed to what.

I would hope that as officers of the Court and as professionals and attorneys that you can stand by your agreement, but unfortunately that does not always happen.

So my practice is if you want it enforced, turn it into an agreed order, send it to my chambers and we can go and sign it and get it entered, review it, and if appropriate, sign it and get it entered. Okay. So I understand that issue.

Let's see. We are now location of corporate rep deposition?

MR. HOFFMAN: Miami-Dade County is fine. It does not have to be at the corporate office of Carnival.

THE COURT: Well, what is the debate here?

MR. HOFFMAN: I had to ask if they wanted Palm Beach.

MR. DRAHOS: No.

MR. HOFFMAN: Sorry. What was it?

MR. DRAHOS: We offered to host the deposition in our office in Miami. It is convenient for the witness. It is convenient for the attorneys. That was not convenient to counsel.

MR. HOFFMAN: I agree. I withdraw. I withdraw it and I apologize.

THE COURT: Okay. So the deposition of the corporate rep will take place at Defendants' counsel's office, correct?

MR. DRAHOS: Yes, Your Honor. Thank you.

THE COURT: All right.

MR. HOFFMAN: In person. Thank you.

THE COURT: Did you want to say something?

MR. HOFFMAN: I just confirmed in person.

THE COURT: Deposition of the master of the Carnival Pride. Anybody want to be heard in addition to what is in the statement? No. Okay. Everybody is standing on their positions?

MR. DRAHOS: I mean, Your Honor, I can file a motion to go beyond ten if --

THE COURT: I'm sorry. Speak into the microphone.

MR. DRAHOS: Sorry. I could file a motion to go beyond ten if that is what is necessary upon, you know, reconsideration, but I guess that is a question.

Is the corporate rep included in those ten depositions, Your Honor?

THE COURT: Well, did you review the rules of civil procedure to --

MR. HOFFMAN: I believe I have, Your Honor.

THE COURT: I'm sorry?

MR. HOFFMAN: I believe it is.
THE COURT: You believe they are.
MR. HOFFMAN: Yes.
THE COURT: Okay.
MR. HOFFMAN: Yes.
THE COURT: So you should follow the appropriate motion with to justify why you would need to go beyond ten?
MR. HOFFMAN: Yes, Your Honor.
THE COURT: And you know, ten.
I try to wrap my mind around why this case seems to may have discovery seems to have ballooned beyond what seems to be the very narrow issues that both parties agree that needs to be resolved in this case.
MR. HOFFMAN: The majority of the depositions are the medical staff that were part of the decision-making involved as well as the officers on the ship.
Also part of our claim is negligent retention and some of the doctors that evaluated the doctor's performance which would include this incident.
THE COURT: Are you going to have experts in this case?
MR. HOFFMAN: Yes, Your Honor.
THE COURT: So why do you need a bunch of other doctors who evaluated when you are going to have an expert to testify whether this doctor met the required duty of care?

MR. HOFFMAN: It goes --

THE COURT: What do they add?

MR. HOFFMAN: It would be to address the negligent retention, but I understand your position, Your Honor.

THE COURT: Okay. I am going to have the benefit of my concern and you can determine if you are going to seek more depositions.

MR. HOFFMAN: Yes.

THE COURT: Okay. Motion for protective order. We are going to get to that.

Okay. All right. Okay. You have your motion for leave that you are going to file --

MR. HOFFMAN: Yes.

THE COURT: -- with Judge Gayles?

MR. HOFFMAN: Yes, Your Honor.

THE COURT: Okay. All right. So with respect to the motion for sanctions, I would like to have a good handle on what has happened in this case and the scope of discovery, but I will give you an opportunity if you would like to say anything further with respect to the motion for sanctions, or if you have a presentation that you would like to give. And then, I will hear from you, Mr. Hoffman.

MR. DRAHOS: Thank you, Your Honor.

I will be brief because I do think the message has been delivered during the close of discussion. I would only

just like to point out that there were concessions being made throughout this hearing.

At the beginning there were several concessions and there were concessions being made as Your Honor was asking questions. These were similar types of questions that we were having.

The Defendant should not have to come into court and take up the time of Your Honor, as well as all of our resources, to finally get Plaintiff to concede to certain points that we feel are obvious and straightforward.

So to the extent some of this was limited today by Plaintiff's counsel backing down on positions and we don't think he deserves to get points for that.

We think, if anything, that should what we would ask that that be considered by the Court because we did have to come in here to get some of these things finally relented to and we think that is an abuse of the process as well.

THE COURT: Do you want to address anything in Mr. Hoffman's response, the issues that he raised in response to your motion for sanctions? I believe he said that -- well, I will give you an opportunity to respond.

Mr. Hoffman, if you want to be heard?

MR. HOFFMAN: Yes, Your Honor.

The concessions that were made in good faith in response to Your Honor, as well as the defense, as well as

re-evaluation of the case as May 1st discovery has come in.

I mean, we are responding and reacting to what we got, but as far as trying to be transparent and trying to not back down on, or have confusion of the meet and confers because we have had that conversation. I said let's record it so we do not have confusion and we have a record. That was rejected.

So I have done everything that we can to try to make things as transparent and as smooth as it could, because I am not looking to make a conflict and I am not looking to make this overburdensome.

I am looking to try to see what happened to my client and why and how bad it was. And a lot of the records that we he know exist they are still trickling out.

So none of this is meant to harass. When things have been noted as overburdensome, I have recognized and said that we are not going to -- the recertification is over the top. You are right. I am not going to require that.

So I did not want to be here either. I think that opposing counsel and I work together well for the most part, but these are issues that I think are most important to both our clients.

THE COURT: Now with respect to the issue of use of AI and use of duplicative -- I believe the Defendants would say oppressive requests for deposition and documents on topics and request for production.

MR. HOFFMAN: I mean, do I use that as tool?

Yes. Is it the sole manner into which these things are created? Absolutely not.

I have co-counsel who has litigated these cases for thirty years. A lot of info was received from Miss Swidell (phonetic), but it is a tool that I use.

It does not mean that it is meant to -- I don't use it for the purpose of abuse of showing it to try to be diligent and try to address the concerns that have arisen as a result of the conflicts that we have had and our meet and confers that have asked for more specific requests.

But as far as AI being a tool, yes, I am not going to argue that I don't use it, but it is not doing the work. It is the tool. The same way that I --

THE COURT: Have you reviewed the requests to yourself, weed out ones that were duplicative, or too broad for the scope of the claims and defenses in this case?

MR. HOFFMAN: I don't think that -- I mean, I think that they were drafted with those things in mind.

THE COURT: Drafted by you?

MR. HOFFMAN: Yes, by me along with tools, but it is a scope and I work within the scope.

THE COURT: Okay. Anything further?

MR. DRAHOS: Yes. So I do want to say that we have had to devote a lot of resources to handling these issues. We

have never seen scope quite to this volume.

Miss Genoese has dedicated almost entirely all of her efforts on this case, which has been quite taxing on my team and her, quite frankly.

And yes, we were asked early on whether or not we would consent to having our conversations recorded and we talked about that as a team and we strongly suspect that AI has been used heavily throughout this process.

We did not turn into Your Honor the volume of e-mails that we have been dealing from Mr. Hoffman as well. And just by how lengthy those e-mails are and how quickly he is able to turn them, I strongly suspect he is using AI for that as well.

And so we decided we don't want to have our voices recorded because we think we are talking to Chat GPT or whatever tool he is using.

THE COURT: I do not believe as attorneys, members of the Bar, you have to justify to me not wanting to be recorded by opposing counsel and you should not have to be recorded to fulfill your obligations to meet and confer.

So I don't believe that needs any justification. If it is no, it is no.

MR. DRAHOS: Thank you, Your Honor.

THE COURT: And I don't read anything into that to be that you have done anything inappropriate or untowards. So that will help you.

MR. DRAHOS: Thank you, Your Honor.

THE COURT: Okay. Is there anything further? Okay.

I am going to take this under advisement and issue a written order. Is there a deadline? Is there a deposition of a date set in terms of timing of moving forward?

MR. DRAHOS: Not at the moment. We have discovery deadlines but not --

THE COURT: I am going to get that. I just wanted to make sure. You know, sometimes people come and the depos are next week and I wanted to make sure.

MR. DRAHOS: No, we have them scheduled.

THE COURT: All right. Thank you very much.

MS. GENOESE: Thank you, Your Honor.

THE COURTROOM DEPUTY: All rise.

(Thereupon, the proceedings concluded.)

CERTIFICATE

I hereby certify that the foregoing transcript is an accurate transcript of the audiotape recorded proceedings in the above-entitled matter.

05/23/26

Bonnie Joy Lewis,
Registered Professional Reporter
CASE LAW REPORTING, INC.
7001 Southwest 13 Street,
Pembroke Pines, Florida 33023
954-985-8875