# EXHIBIT "D"

**Plaintiff's Deposition Transcript**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

\- - -

| | |
|---|---|
| MICHAEL SMITH, | ) |
| | ) CASE NO. |
| | ) 1:25-cv-24611-DPG |
| Plaintiff, | ) |
| | ) DEPOSITION OF |
| | ) MICHAEL SMITH |
| | ) |
| | ) Filed on Behalf of the |
| -vs- | ) Defendants |
| | ) |
| | ) Counsel of Record For |
| | ) This Party: |
| | ) |
| CARNIVAL CORPORATION | ) Michael Drahos, Esq. |
| and NIKHIL MAHARAJ, | ) Gray Robinson, PA |
| M.D., | ) 515 North Flagler Drive |
| | Suite 650 |
| | West Palm Beach, FL |
| Defendants. | 33401 |

\- - -

REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY

DEPOSITION OF MICHAEL SMITH, a Plaintiff herein, called by the Defendants, for examination, taken pursuant to the Federal Rules of Civil Procedure, by and before Michelle L. Goehring, a court reporter and a notary public in and for the Commonwealth of Pennsylvania, at Regus Spaces, One Oxford, 301 Grant Street, Pittsburgh, Pennsylvania, on Thursday, March 19, 2026, at 10:11 a.m.

COUNSEL PRESENT:

For the Plaintiff:

DAVID W. SINGER & ASSOCIATES, PA
by Michael A. Hoffman, Esq.
1011 South Federal Highway
Hollywood, FL 33020
mahoffman@1800askfree.com

For the Defendants:
GRAY ROBINSON, PA
by Michael J. Drahos, Esq.
515 North Flagler Drive
Suite 650
West Palm Beach, FL 33401
michael.drahos@gray-robinson.com



\- - -

I N D E X


| WITNESS | PAGE |
|---|---|
| MICHAEL SMITH | |
| By Attorney Drahos | 4, 250 |
| By Attorney Hoffman | 200 |


E X H I B I T S


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Sign & Sail Account | 72 |
| Exhibit B | Against Medical Advice Form | 132 |
| Exhibit C | Against Medical Advice Form | 135 |
| Exhibit D | Carnival Medical Center Records | 154 |
| Exhibit E | Paramedic Run Report | 168 |
| Exhibit 1 | Payment Agreement and Medical Records Consent Onboard Charges | 202 |
| Exhibit 2 | MedStar Harbor Medical Records | 213 |


*Exhibit 2 was retained by both parties



P R O C E E D I N G S

MICHAEL SMITH, a Plaintiff herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY ATTORNEY DRAHOS:

Q. Good morning. Can you please state your name for the record?

A. Michael Smith.

Q. And, Mr. Smith, my name is Michael Drahos. I'm the attorney in this case who will be taking your deposition. We actually just met a little bit ago.

Now, I would assume you've met with your lawyer and gone over kind of the ground rules. But I want to make that sure we're on the same page, too; okay?

A. Okay.

Q. Have you ever done this before?

A. No.

Q. So as you can see, this is what we call an informal interview of sorts. It's called a deposition. But as much as I try and make it as informal as possible, there are formalities to this that are required.



The first is that, as you can tell, everything is being taken down now by the court reporter for the transcript. So when you and I speak, we cannot speak at the same time. If we do that, it makes it impossible for her to capture who is saying what.

So if you'll let me ask my full question and pause before you answer, this way we know who is saying what on the transcript; okay?

A. Uh-huh.

Q. The second thing is that all of your answers have to be out loud. So if you nod your head, I'm going to know what that means today. But when I go to read the transcript a month from now, I'm not going to remember that.

So I'm going to prompt you if I see you doing that. I'll say, "Is that a yes?" "Is that a no?" I'm not doing that to be obnoxious. I'm doing it so that it's clear on the record; okay?

A. Okay.

Q. If there are times during this deposition where I ask you questions that you don't know the answer to, either because you

don't remember or you never knew the answer, let me know that. I would rather that you not guess.
There may be times where we may talk about, "Hey, why don't you give me your best guess." I want us both to be clear, me and you, that what you're not able to do is guess. Otherwise, if you don't know the answer to a question, let me know that.
A. Yes, sir.
Q. If at any point in time I use legal jargon that you're not familiar with -- I doubt it -- but if I do, or if I mumble or just ask a question that in my head made sense but in yours it didn't, let me know that and I'll rephrase the question.
Otherwise, if you answer my questions, I'm going to assume that you understood what I'm asking you; all right?
A. Yes, sir.
Q. Are you under the effects of any medication today that would affect your ability to testify?
A. No. No, sir.
Q. Lastly, by no means is this intended


to be a torture session. So if at any point you need to take a break for the bathroom or food or a phone call, whatever, let me know and we'll stop.
A. Okay.
Q. I typically go about an hour and then we'll take a break.
So let me start by getting a little bit of background information about you.
You go by Michael Smith. Have you gone by any other names in your lifetime?
A. Michael Smith.
Q. What is the Grimm family relationship to you?
A. It's my stepfamily.
Q. Your stepfamily? Okay. That makes much more sense. Because Mr. Grimm is your father; right?
A. Stepfather.
Q. Okay. What is his first name?
A. John Grimm.
Q. Okay.
A. Senior.
Q. All right. And what's your date of birth, sir?


A. [redacted]
Q. All right. And where do you currently live?
A. McKees Rocks.
Q. Say that again.
A. McKees Rocks.
Q. McKees Rocks?
A. Yeah. [redacted]
Q. [redacted]
A. Yes.
Q. Street? Avenue?
A. [redacted]
Q. Where is McKees Rocks?
A. It's on the Allegheny River.
Q. How far from downtown Pittsburgh where we are today?
A. Probably ten minutes driving.
Q. Okay. And is that an apartment? A single-family home? A townhouse?
A. Apartment.
Q. How many bedrooms?
A. Two.
Q. How many bathrooms?
A. One.
Q. And is that a multi-floor unit?


A. Yeah.
Q. How many stories?
A. Two.
Q. Where is your bedroom? Which floor?
A. Second floor.
Q. And how about the bathroom? Is it also on the second floor?
A. Yeah. Second floor.
Q. How long have you lived there?
A. Approximately four years.
Q. Who do you live there with, if anyone?
A. My cousin, Dave.
Q. What is Dave's last name?
A. Phillips.
Q. Okay. How long has Dave Phillips lived with you at that address?
A. That address, he moved in -- four years since when I moved in.
Q. Has anyone else, other than Dave Phillips, lived in that apartment with you?
A. No one lived there, no.
Q. Do you own or rent?
A. Rent.
Q. Any plans to move any time soon?

A. I hope to be on the first floor somewhere.
Q. Are you actively looking?
A. No.
Q. Is that a "no"?
A. No.
Q. When does your lease expire?
A. I'm not sure.
Q. What is your landlord's name?
A. Paul DeMarco.
Q. How do you spell his last name?
A. I'm not sure.
Q. Where are you from?
A. North Side.
Q. Now, that probably means something here to people in Pittsburgh. I have no context for what that means.
What does the North Side mean?
A. The North Side. Not the South Side. Not the East Side. It's the North Side.
Q. North Side of Pittsburgh?
A. Pittsburgh, yeah.
Q. You were born here?
A. Uh-huh.
Q. Is that a "yes"?


A. Yes, sir.
Q. Have you lived anywhere else besides Pittsburgh for more than a year?
A. No. No, sir.
Q. Are you married?
A. No, sir.
Q. Have you ever been married?
A. No, sir.
Q. Any kids?
A. Two kids. One mine. One stepkid.
Q. What is the -- you said "one mine." I assume you are the father of that --
A. I'm the father of the child, yes.
Q. And what is that --
A. Kayla Windhurst.
Q. Winters?
A. Windhurst. W-I-N-D-H-U-R-S-T.
Q. Oh, Windhurst. Okay.
How old is Kayla?
A. 26.
Q. Where does she live?
A. She lives around the corner from me in McKees Rocks.
Q. And what does Kayla do for a living?
A. She works as Burger King.


Q. And you said there's another stepchild, I believe?
A. Brittany Windhurst.
Q. Windhurst?
A. Yeah.
Q. How old is Brittany?
A. She has to be 30 or 32. She's old.
Q. Where does Brittany live?
A. With Kayla.
Q. What does Brittany do for a living?
A. She was working at Giant Eagle's GetGo gas station around the corner from her house, but now she's on maternity leave. She's having a baby.
Q. Okay. Do you provide any financial support to Kayla Windhurst?
A. No. Just when they need help.
Q. And would the same hold true for Brittany Windhurst?
A. Yes.
Q. Do you have any grandchildren?
A. Yeah. I've got five grandbabies.
Q. Wow.
A. Yes, sir.
Q. Okay. So are those -- who is the


mother of those grandchildren?
A. Brittany. Kayla is the mother of Jordan Minor and Liana Minor.
Q. Jordan, and I didn't get the second name?
A. Liana.
Q. And the last name was Minor?
A. Minor, M-I-N-O-R. Liana, and Kelly. It's her kids.
Q. Okay.
A. Brittany's kids are Amelio Gonzales and Gigi Gonzales. Giovanna Gonzales.
Q. Okay. We're missing one.
A. His name is Tony. That's my oldest stepson, Kenny. His name is Kenny.
Q. And Kenny is the father of Tony?
A. Yeah.
Q. What's Kenny's last name?
A. Windhurst.
Q. Are your parents still alive?
A. No.
Q. When did they pass?
A. My mom passed, like, 8 years ago and my dad passed probably 12 years ago.
Q. Any history of stroke in your

Page 14

family?
A. No. Not that I know, sir.
Q. How about cardiovascular disease?
A. No.
Q. What's the highest level of education that you've obtained?
A. I graduated twelfth grade.
Q. Where did you go to high school?
A. Oliver High School.
Q. Oliver?
A. Oliver.
Q. And where is Oliver High School?
A. Oliver is in Brighton Heights, North Side.
Q. Brandon Heights?
A. Brighton Heights.
Q. What year did you graduate?
A. '94.
Q. And did you attend any schooling beyond high school?
A. No, sir.
Q. Do you hold any licenses or certifications of any sort other than a driver's license?
A. No, sir.

Page 15

Q. Do you have a driver's license?
A. Yes, sir.
Q. Has your driver's license ever been suspended or revoked for any reason?
A. Not that I know of.
Q. Do you have any medical training of any sort?
A. No, sir.
Q. Are you currently employed?
A. No, sir.
Q. When is the last time you held any employment?
A. I would say five years ago.
Q. Was that five years ago?
A. Five years ago.
Q. And what were you doing for a living five years ago?
A. Vending: pop, candy, cigarettes.
Q. Okay. And so when you say "pop," I'm assuming that means soda?
A. Soda. I'm sorry.
Q. That's okay. Everybody calls it something different, it seems.
And then you said candy and cigarettes?

Page 16

A. Yeah. Whatever it took to make a dollar.
Q. So did you own those vending machines?
A. No, sir.
Q. So were you working for a company?
A. I was working for a company.
Q. What was the name of the company?
A. WS Vending.
Q. WS Vending. All right.
Now, is WS vending owned by an individual or a corporation?
A. It's private. An individual.
Q. What was that person's name?
A. Bill Schrim.
Q. Could you spell his last name?
A. I can't, no.
Q. Bill Shrimp?
A. Schrim.
Q. Schrim. Okay. We'll do our best with that one.
Is WS Vending still in business, to your knowledge?
A. To my knowledge, yes.
Q. All right. And how long did you

Page 17

work for that company?
A. I was employed there back in '94. But I went on the books, I don't know, 15 years after that.
Q. We're going to have to unwrap that one a little bit. You said you were employed there in '94?
A. Yeah. I worked under the table in '94 out of high school. The guy took me under his wing.
Q. And then you said you went on the books when?
A. I think I went on the books half way, because of disability. I think I went on the books at, like, 2005-2010, something like that. I can't recall, offhand.
Q. Okay. Let's just say for the sake of discussion it was in 2005.
A. Okay.
Q. Does that mean that you worked continuously for this company from 1994 to 2005?
A. Yes. Off and on.
Q. And that was under the table?
A. Yeah.

Q. And when you say "off and on," what do you mean by that?
A. I cleaned up. I did the weeds around the place. You know, I swept up after the guys after they finished their rounds and stuff like that. I was never out of the building. I was always cleaning machines, painting them, whatever it took to make a dollar.
Q. So does that mean you did, like, miscellaneous work?
A. It's considered miscellaneous, yes.
Q. At the warehouse itself?
A. At the warehouse itself.
Q. Now, when you went "on the books," what does that mean? Did you have a change in title or was it just that you were an official employee?
A. I was officially an employee at that point, I would assume. I was getting -- I was only working so many hours a day and going with my Social Security and disability.
Q. Okay. So you mentioned disability. First of all, is that disability with the United States government?



A. With the United States government.
Q. When did you first apply for disability?
A. My mother did when I was in, I want to say, middle school. It's been years.
Q. And what was the disability that you applied for?
A. Reading and writing.
Q. What was the degree of the disability? Was it dyslexia?
A. Dyslexia, I don't know for sure. But I know I've been it on a long time, due to my mother, and I was in special classes all my life.
Q. Okay. So you had a reading and writing disability that was determined by the U.S. government?
A. Yes. Social Security, SSI.
Q. Has there been any change at all in the disability since that time or does it remain the same disability?
A. It stays the same. I can read a little bit. You know, I like to read to myself.
Q. Okay. But I guess what I'm getting



at here is at any point in time from middle school when you first applied up until the present day, have you ever sought any other additional kinds of disability from the U.S. government?
A. No.
Q. Okay. So today in the eyes of the U.S. government, your disability is dyslexia?
A. Dyslexia. I can't read and write.
Q. Okay. And are you still currently receiving disability?
A. Yes.
Q. What amount do you receive?
A. 884. I'm not sure of the exact number. It is $884 or something like that. it comes on a card every month.
Q. Okay. $884?
A. Per se, yeah.
Q. Per month?
A. Per month.
Q. Has that amount changed at all in the last five years?
A. It changes every year. It goes up a percentage every year. If the cost of living goes up, so does our check.



Q. Okay. Now while you were working at WS Vending, were you still receiving disability compensation?
A. Well, they had to go with time served at the vending company and take money off of my check. So I was -- when I was employed, I would say $384 is what I would receive because I was getting a paycheck and I was getting pay stubs and whatnot.
Q. I see.
A. Kind of -- you know, I don't know how to explain it. But they take money percentage. You know what I mean? If you worked, they take a percentage.
Q. Okay.
A. It's to help you get over, you know, the reading and writing and stuff like that. Yeah.
Q. So you told me that you were last employed five years ago. So does that mean that in 2020 you stopped working at WS Vending?
A. I don't know the exact time. I couldn't tell you.
Q. Somewhere around 2020 to 2021?
A. Something, yeah. It's behind me.

That's all I know.
Q. Why don't we do it this way. Before or after COVID?
A. Oh, after.
Q. Okay. Sometime after COVID?
A. After COVID. Yeah.
Q. And what was the reason for you no longer working there?
A. Well, I hurt my toe and I went to the hospital and they said it was bad. It was a bone infection. So they had to take my left -- my right big toe. They took a portion of it.
Q. Okay. So I did plan to talk about this and we're going to get into it a little bit further.
While we're on the subject, let me just make sure I get it. So there was an incident that occurred at work?
A. No. It happened at home.
Q. Okay. What exactly happened?
A. I think I hit a threshold that went into my bedroom -- I didn't know because of the neuropathy -- but the front of my toe hit a nail coming up from the threshold.



Therefore, it turned into a blister, which turned into soaking it, and being pig headed lead me to my PCP, which led me to the hospital.
Q. Okay. So you are a diabetic?
A. I am a diabetic. Type 2.
Q. And so do you have diabetic neuropathy?
A. Neuropathy. Yeah.
Q. Okay. Let me just finish a couple background things and then we'll get back to that.
So other than this lawsuit, have you filed any other lawsuits?
A. No, sir.
Q. Have you ever had a lawsuit filed against you?
A. No.
Q. Have you ever been arrested?
A. I have been arrested, yes.
Q. How many times?
A. I can't recall. It's all in my childhood.
Q. Okay. More than once?
A. More than -- let's say three times.



Q. Okay. Are you saying more than three times?
A. About three times.
Q. And you said all during your childhood. When was the last time?
A. 2017. Long time ago. It's all behind me.
Q. And what were the circumstances?
A. Driving without a license. Prohibited weapon, homemade brass knuckles. Stupid stuff.
Q. You're going a little bit fast. So we're going to slow down our pace. I'm going to slow down my questions. I'm going to ask you to slow down your answers just a bit to make it a little easier for the court reporter.
So you told me in 2017 you were arrested driving without a license, but I heard you say something about a weapon?
A. It's called a prohibited weapon. That's what they called it. That's what I went down for.
Q. A prohibited weapon?
A. Yeah.
Q. And was that brass knuckles?



A. They said it was brass knuckles. It was a piece of steel that I made in school.
Q. A piece of what?
A. Piece of metal. It was like an I. They called it brass knuckles. It fit in my hand, but it was part of my name. M-I-C-H -- you know what I mean?
Q. It was your name?
A. It was my name. It was a metal that I made in metal shop. It said Michael. But one piece of it looks like a brass knuckle.
So when they raided the house, they took me down for a prohibited weapon because it looked like brass knuckles.
Q. Why were they raiding your house?
A. Because I was visiting someone that got raided for drugs years ago.
Q. Okay. So where --
A. I was an innocent bystander.
Q. Where did that happen?
A. North Side, Concord Street, in Pittsburgh.
Q. Concord Street?
A. Yeah.
Q. Let's see if we can unravel this a

little bit, then. So you're saying in 2017 you were on the North Side on Concord Street in Pittsburgh visiting a friend?
A. Yeah.
Q. You were arrested for driving without a license?
A. Yeah. But that wasn't Concord Street. I drove everywhere without a license. It was a thing we did back in the day.
Q. Okay. And so the home where you were staying was raided?
ATTORNEY HOFFMAN: I'm sorry. I don't want to interrupt, but I think he said it was in middle school and I also understand that he said 2017. So I don't know if there's a clarification needed there.
ATTORNEY DRAHOS: I mean, we all want to walk out of here with a clear understanding.
BY ATTORNEY DRAHOS:
Q. So you said that this happened in 2017?
A. The last time I was arrested was 2017. When I went down to the jail, it was 2017, the last time I was arrested.



Q. And so the last time you were arrested, in 2017, was this the incident that you're telling me about?
A. It was in the time frame. I'm not sure exactly what time.
How many times I got arrested for driving without a license, I know it was a handful of times before I said enough is enough and I stopped driving without a license. But a lot of it was driving without a license.
Q. Why in 2017 did you not have a license?
A. Because I never went for it. Never. Never had guidance, never -- I basically -- I don't know. Never did.
Q. Okay. And so what you're telling me then is that during this time frame, the house where you were visiting was raided and they found brass knuckles that were yours?
A. Yeah.
Q. And they arrested you for that?
A. Yeah. They were on the mantle. They were just sitting there. They said "Who's this?" And I said "Mine." I can't lie. It says Michael. And he said, "Oh, he looks kind



of funny." That's it. That's all it takes.
Q. All right. So that was in 2017. What were the incidents before that?
A. What?
Q. You said you were arrested multiple times. What were the instances?
A. I think it was before that. Because the last time I was arrested was 2017. But I can't tell you how many times I've been arrested for traveling without a license. I know it was several times. At least five -- three or five. I can't tell you exact dates.
Q. And every time that you've been arrested, has it been in the Pittsburgh area?
A. Pittsburgh area.
Q. Have you spent any time in jail?
A. A week, if I can remember correctly.
Q. What were the circumstances that prompted -- why a week in jail?
A. Driving without a license.
Q. Have you ever spent any time in prison?
A. No. No, sir.
Q. Ever filed any workers' compensation claims?



A. No, sir.
Q. Other than disability with the United States government, have you ever sought disability compensation with a private insurance company?
A. No, sir.
Q. So what do you do -- what are your hobbies? What do you do when you're not sitting here with me?
A. I like to go fishing. It's hard. I was a fishing man --
ATTORNEY HOFFMAN: Why don't we take a five-minute break.
(Short recess was taken.)
BY ATTORNEY DRAHOS:
Q. Okay. So, Mr. Smith, when we left off I was asking you what you do in your free time. So you told me about fishing?
A. Yeah. Since the accident, short of taking the fishing rods off, I couldn't fill the room.
I would go every day. I would go every week. Every year on April 15, I used to go on the opening day for trout with a bunch of fellows, a bunch of my brother-in-laws, a bunch

of my brothers. Lately, it's been my bed.
Q. Lately it's been what?
A. My bedroom. The only place I go in my house is my bedroom and my bathroom, since the incident.
Q. We're going to get to that a little bit later in the deposition. For now, I was just interested in what you do in your free time.
A. Yeah. Nothing.
Q. Okay. Do you do anything for exercise?
A. I use rubber bands that the fitness place gave me after the incident. Encompass Health is the name. They gave me rubber bands that I put around my feet, pull it with one arm. I pull it with the other arm. I do both arms. I stand up against the wall and, you know, stand. I mess with my calfs a lot. It's been two years, over two years.
Q. Are you a member of any gyms or fitness clubs?
A. No, sir.
Q. Have you ever been?
A. Yes.


Q. When was the last time you were a member of a gym or a fitness club?
A. Back when I was in the vending company years ago, I went there for swimming and I used to walk around the track.
Back in the day I was heavy. I was over 250 -- over 350. I'm sorry.
Q. What do you weigh now?
A. Somewhere in the 295-300.
Q. All right. So you said back when you were working at the vending company, what gym or fitness club would you go to?
A. I don't think it's there any more. I forget the name of the place. It's North Hills, left-hand side -- I can't -- Club Julian.
Q. Club Julian?
A. It came to me. Club Julian. I wasn't there long. Maybe one term. Maybe a year.
Q. All right. Are you on social media?
A. Once in a while. I cut it out because I didn't want to see -- I don't want to see things. St. Patrick's Day, over the day my buddy sent me pictures. I don't want to see


it.
Q. So what social media pages did you have?
A. Facebook.
Q. And are you not active on there any more?
A. I'm active on it now, but, you know, as active. Enough to see any grandbabies, school pictures, stuff like that.
Q. And are you under the name Michael Smith?
A. Yes.
Q. Is your account private or public?
A. Private. It's only family and friends.
Q. Are there any pictures on your Facebook page regarding the subject cruise?
A. Not that I can recall.
My family, my niece, my sister, they were taking all of the pictures.
Q. Okay. But as you sit here today, you're unaware of any pictures posted on your Facebook page about the cruise?
A. I don't think there's anything on my Facebook.


Q. Are there any pictures on your Facebook page of you in the hospital?
A. Not that I -- not to my knowledge.
Q. Are there any pictures or videos of you during your rehab?
A. My daughter -- not on my phone, no.
Q. No, sir. My question was regarding your Facebook page.
A. No. Not that I can recall.
Q. So let me get back to your medical history that we were talking about a moment ago.
So how long have you had diabetes?
A. I'm going to say ten years, just to throw a number out there. I'm not sure. I can tell you an incident leading up to it, but I can't recall what year it was, no.
Q. What was the name of the doctor who diagnosed you with diabetes?
A. Cedric -- Dr. Cedric is my PCP.
There was a doctor in Mercy Hospital that diagnosed me with diabetes. They thought it was a heart attack and it wasn't. It ended up being a stress attack. But they came back in Mercy Hospital and said -- my girlfriend was

alive at the time -- and went in and they checked everything. They scoped me. Everything was fine. They said, "Oh, you have diabetes. Your levels were high."

Q. So where was this incident in the emergency room?

A. It was at Mercy Hospital in the Hill District. Lower Hill District.

Q. I'm sorry. Where was that?

A. It's called Mercy Hospital. It's on Locust Street.

Q. Locust Street?

A. Yeah. It's in the lower Hill District. If you know where the Hill District is, it's Mercy Hospital.

Q. In Pittsburgh?

A. In Pittsburgh.

Q. When was this?

A. I can't recall. Ten years, let's say. I can't recall the time.

Q. What happened that prompted you to go to the emergency room?

A. Well, we were eating and my front right side was hurting. And I made it to home and me and my girlfriend -- my girlfriend and I



went to Mercy Hospital emergency room. They thought it was a heart attack. They shipped me right in right away.

I went up and I did the treadmill. I did the blood test. I did the stress. And they went up in my main artery and checked all my valves and they said everything was good. But because of my weight, it made it look like I was having a heart attack. But it ended up being a stress attack.

They came back that day and said, "Oh, but, you have diabetes.

Q. All right. Do you have Type 2 diabetes?

A. Type 2.

Q. Are you insulin-dependent?

A. No. I take a pill, metformin, a thousand milligrams a month -- or a day.

And then I take -- I started it about a month ago. I take a shot -- a shot in my stomach every -- before lunch. It's more weight loss. I forget the name of it. It's on my paperwork.

Q. Are you taking Ozempic?

A. I think it's Ozempic. It's for



weight loss.

Q. Okay. So your primary care physician, Dr. Cedric, he's the one that's following you for your diabetes?

A. Yes.

Q. Is he the one who monitors your glucose level?

A. Yes.

Q. And is he the one that's been monitoring your metformin?

A. Yes.

Q. All right. So at the time that this incident occurred where you bumped your foot into your nail --

A. Yeah.

Q. -- at that time, you knew you were a diabetic?

A. Oh, yes.

Q. And did you know that you had diabetic neuropathy?

A. My doctor had been testing me with the feather and the pricking and the poking on my toes. And for a while now he ain't getting any sensation.

You know, I can't feel him with the



feather, the tests -- the feather test, the prick of the needle. I can't feel any of that.

Q. You're speaking in a different tense than I am. You're speaking in present tense so I want to go back and understand what was going on during the time frame that you hurt your toe; okay?

A. Okay.

Q. So at that time, was Dr. Cedric the one that was testing you for diabetic neuropathy?

A. Yes.

Q. And at that time were you having issues feeling feathers and stuff on your toes?

A. Yes.

Q. Were you also seeing a podiatrist?

A. I was at one time, yeah.

Q. What was the name of the podiatrist?

A. I haven't been there in years. But it was in Green Tree. There was a little place on the right-hand side. I was there one time.

Q. Green Tree?

A. Green Tree, Pittsburgh.

Q. Is Green Tree the name of the road?

A. It's a town.

Page 38

Q. Oh, Green Tree is the name of the town?
A. Yeah.
Q. In Pittsburgh?
A. Yeah.
Q. And was this podiatrist a solo practitioner or part of a medical group?
A. I don't know. I was referred to him and work orders and whatnot through my doctor's office that wanted me to go to this guy.
Q. Dr. Cedric sent you to him?
A. Yeah. And all that was just to trim my nails.
Q. Okay. So Dr. Cedric is part of the UPMC community medical group?
A. Yeah.
Q. And is that where you go for all of your primary care needs?
A. Pretty much, yeah.
Q. Well, when you say "pretty much," are there other places that you go to?
A. It depends. Like when I was on -- no. No. If I'm deathly ill, I'll go to the first place I can go to. But everything goes through UPMC.

Page 39

Q. Okay. Have you ever been to see an endocrinologist?
A. I don't know what that is, sir.
Q. Other than this ER visit to Mercy Hospital in the last ten years, have you been to any other emergency rooms for any reason?
A. Not that I can recall, no.
Q. Now this incident that occurred where you hit your toe on the nail, did you go to the emergency room for that?
A. I went to my PCP, which sent me to the hospital.
Q. Okay. So you went to Cedric and then he sent you directly to the hospital?
A. Yes.
Q. Which hospital did he send you to?
A. St. Margaret. It's on Freeport Road and I want to say that's still in the city. I want to say Pittsburgh.
Q. Okay. St. Margaret Hospital in Pittsburgh?
A. Yeah.
Q. Help me. When did that happen exactly?
A. I want to say three or four years

Page 40

ago right after -- or right after I quit WS Vending.
Q. So you quit WS Vending?
A. Yeah.
Q. Did you receive any type of retirement?
A. No.
Q. And that reminds me to go back and check on this.
So other than Social Security, do you have any other sources of income today?
A. Welfare.
Q. How long have you been on welfare?
A. Probably four years.
Q. And is that through the state of Pennsylvania?
A. Yes.
Q. Okay. So what treatment did you receive in St. Margaret Hospital for this injured toe?
A. For the injured toe, they sent me to -- they took the toe through the hospital. After that, they came to me and said that I had a bone infection.
So I went to St. Margaret's for a

Page 41

doctor. I forget his name. He was for a bone infection-type deal. And they had me on antibiotics for that. And they took as much of the toe that they possibly could take.
Q. So when you went to the doctor and he sent you to St. Margaret's, you were admitted to the hospital?
A. Yeah. Yes, sir.
Q. That's when they took a part of the toe?
A. Yes, sir.
Q. And this was your right big toe?
A. Right big toe.
Q. Did you go for medical treatment for your right big toe anywhere else other than St. Margaret Hospital?
A. No, sir.
Q. All right. So other than this admission to St. Margaret and the other hospital that we mentioned a moment ago -- for the sake of clarity, I'm going to repeat it -- so other than the hospital admission at St. Margaret and the hospital admission at Mercy Hospital, have you been admitted to any other hospitals for any other reason before the

Page 42

subject cruise?
A. No, sir.
Q. Was that a "no"?
A. No, sir.
Q. Now, you made a comment moment ago that when you're deathly ill, you'll go to the first place you can find.
Have there been instances in the last seven years where you required the need to go to a medical center or a urgent care center?
A. I used to go to Allegheny General Hospital.
Q. Allegheny?
A. General Hospital. When I was a kid, that's where I was going. That's where I went for a knee surgery years ago. That's where I was. But not until I got older, I went to St. Margaret and then to Cedric.
Q. All right. When was the knee surgery?
A. Years ago. I want to say I was in middle school. It was years ago. I was coming down some steps.
Q. Coming down steps, did you fall or something?

Page 43

A. I fell. I hit the rising of the steps. My knee hit the rising of the step. They called it a football injury.
Q. Which leg was this?
A. The left.
Q. Other than knee surgery on your left leg, have you had surgery on any other part of your body?
A. Growing bone in the left ankle. That was before the knee.
Q. Your left ankle?
A. Yeah.
Q. And what was it?
A. They called it a growth bone. They put two plates in when I was a kid. I was in grade school at that time, I think. I had a leg cast on. Two L brackets that they took out because of -- a number of years ago.
Q. So when did they take the brackets out?
A. A year after I broke my ankle, after everything had healed.
Q. So you were still a kid?
A. Yeah, I was a kid.
Q. So there were two surgeries on your

Page 44

left ankle in total?
A. Yeah.
Q. And those were both at Allegheny General Hospital?
A. Yeah.
Q. Any other surgeries?
A. Not that I can recall, no.
Q. In the last seven years, have you required the need for any type of an orthopedic consultation?
A. Orthopedic? I don't think so, no.
Q. Prior to the subject cruise, had you ever been to see a neurologist for any reason?
A. Not that I can recall. No.
Q. Prior to the subject cruise, had you ever been to see an infectious disease doctor for any reason?
A. Yes. I had a bone infection in my right toe.
Q. Now -- I'm sorry. Remind me again when that bone infection to your right toe was.
A. When I went to the hospital at St. Margaret's.
Q. Okay. At some point in time did your treatment for your right big toe come to a

Page 45

complete end before the cruise?
A. Oh, yeah. Yeah. It was healed. It was fine. I went -- they took the scissors out. It was a year -- I don't know exactly. It's been -- it was a while. It was healed. It was healed.
Q. So in your mind, when was the last medical treatment? What year was the last medical treatment for your right big toe?
A. I'm not -- I can't recall. I've been to so many appointments through my PCP, I couldn't tell you.
Q. So it would have been through your primary care physician?
A. Yeah.
Q. He would have provided the treatment?
A. Yeah.
ATTORNEY HOFFMAN: We have been going for about an hour. Would you like to take a break?
THE WITNESS: I'm fine.
BY ATTORNEY DRAHOS:
Q. Have you ever done any imaging studies done of your brain?

A. Yeah.
Q. Prior to the subject cruise?
A. No.
Q. How about to your head? Have you had any imaging studies to your head prior to the subject cruise?
A. No, sir.
Q. Prior to the subject cruise, have you ever required the need of any type of physical therapy?
A. Yeah. I went through physical therapy to walk after my knee injury.
Q. Okay.
A. I can't remember what I did for my ankle. But for my knee, yeah. Oh, yeah.
Q. What about for your toe? Did you require any physical therapy after that?
A. No. They came to the hospital and a lady -- the occupational therapist came in and she looked and saw that I could go to the bathroom on my own. Another guy came in and said I can walk up the steps and I could walk down the hallway. I was capable of going home alone without no help.
Q. Prior to the subject cruise, have



you ever had any type of speech language therapy?
A. No, sir.
Q. Prior to subject cruise, have you ever been in any type of inpatient rehabilitation program for any reason?
A. No, sir.
Q. Prior to the subject cruise, have you required the need for any type of mental health counseling?
A. Not that I can recall.
Q. So have you ever been to see a psychiatrist or a psychologist?
A. Yes. Through disability.
Q. Which one was it? A psychiatrist or a psychologist?
A. I want to say a psychologist.
Q. When is the last time you saw a psychologist?
A. I can't tell you the exact date, no.
Q. Was it within the last five years?
A. What?
Q. Was it within the last five years?
A. Yeah, it was within the last five years.



Q. Is this the psychologist that's been sent by the U.S. government?
A. It was through disability to see if I was capable of being on disability still, to see where my head was.
Q. All right. How many sessions in total did you have with that particular doctor?
A. One. One day.
Q. Have you ever suffered from any type of drug or alcohol addiction?
A. No.
Q. Do you drink alcohol?
A. Once in a while.
Q. When you do drink alcohol, what do you drink?
A. Mixed drinks.
Q. And what does once in a while mean to you?
A. St. Patrick's day.
Q. This past St. Patrick's day?
A. No. Two years ago.
Q. Why does that stand out to you?
A. Because that's the last -- that's when I was able to go with my buddies.
Q. Where did you guys go?



A. Cherry Hill on the North Side.
Q. To a local pub or something?
A. Yeah. During a local crawl.
ATTORNEY HOFFMAN: What was the name of the pub?
THE WITNESS: Hill Toppers, Dory's, Tammy's. You name it. If there's a bus to one of them, we hopped on it and went. It's a crawl.
ATTORNEY HOFFMAN: Thank you.
BY ATTORNEY DRAHOS:
Q. So before the subject cruise, had you ever suffered from any type of motion sickness?
A. No, sir.
Q. Okay. When you go fishing, do you fish on the shoreline or do you actually go out in the water?
A. Well, opening day, we always were at the creek. My dad and I took a trip to Virginia Beach where we like to go. We haven't been there in two plus years.
We took a tour and we went out and fished for croaker. And I'll tell you, this barge, if you touch your hand out when they

turned left and we were on the right, you could touch water.

This barge, you felt every movement of this barge. Motion sickness? No.

Q. I didn't catch all of that so I'm going to make you go back and we'll go over it.

When you fish here in the Pittsburgh area, are you on the shore or do you --

A. Shore.

Q. Now, you said your father took you to Virginia Beach?

A. We went to Virginia Beach.

Q. How often would you go?

A. Well, once a year. Every July. I drove my mother four times before she passed away and I took my dad four times.

Q. Now, when you went to Virginia Beach, did you rent a boat?

A. No. My boss rented a charter and there was probably about 30 or 40 people on this barge. All you had was a seat, no seat belt. And you fished down for a croaker.

And motion sickness, like the people beside us, this Chinese family, they were on and off of it. I never had motion sickness.



Q. So this barge that you were fishing on, did you go out into saltwater or freshwater?

A. Saltwater. We were in Virginia Beach.

Q. How many times have you fished out on the ocean?

A. Once.

Q. Was it just this one occasion?

A. Yeah.

Q. Now, you're calling it a barge. Is there any better description you can provide for me for this boat?

A. A luxury boat. A big boat. It held a lot of people. It had seating all the way around it. It was like a barge. They served, you know, your pops, your beers. You know, whatever. Hot dogs.

Q. Did it have a crew?

A. It had a crew.

Q. And bathrooms?

A. Yep.

Q. How many bathrooms?

A. I couldn't tell you. I never used them.



Q. How long were you out there for?

A. We were out there probably eight hours.

Q. And so you're saying during this encounter, you didn't feel any seasickness?

A. Nothing.

Q. Is that the only time that you had ever been out on a boat out on the ocean?

A. Out on the ocean, yes.

Q. What was the weather like that day?

A. That day was choppy water. It was sunny out. It was a beautiful day.

Q. Have you ever flown on an airplane?

A. Yes.

Q. How many times?

A. Once -- two times down, two times back, so I'd say four.

Q. Where did you go?

A. We went to Vegas.

Q. When was that?

A. I forget the year. I went down twice with my buddies to play pool. And my dad -- I took my dad down. I can't tell you the years.

Q. All right. So this was, obviously,



while your father was still alive so it has to be within the last --

A. My stepfather, that's Mr. Grimm. It was after my dad had passed away.

Q. Did you have any issues with motion sickness while on the plane?

A. No, sir.

Q. Have you ever been out of the country?

A. No, sir.

Q. Prior to the subject cruise, had you ever sought treatment for vertigo?

A. No, sir.

Q. Couple more, then we'll take a break.

So at the time of the cruise -- so I'm asking you now about the day that you were boarding the ship. All right -- what medications, if any, were you taking?

A. I took my -- I went on the boat, I forget what time. I left the hotel. I took my meds that morning.

Q. I'm going to ask specifics about that later. But right now all I'm asking for is what medications were you taking during that

Page 54

time period.
A. Diabetic medicine, metformin.
Q. Metformin; right?
A. I can't tell you exactly all of them, off the top of my head. They're in my box at home. I can't tell you exactly what meds they are. Trust me. I take a handful.
Q. Let's talk about the ones that you do remember. So you were taking --
A. Metformin, a thousand-milligram.
Q. A thousand-milligram?
A. That's for my diabetes.
Q. How many times a day?
A. Twice a day.
Q. What other medications do you recall?
A. I can't recall. If I -- I don't know, offhand. I know there's a few. There's a diabetic medicine, which is metformin. There's a -- there's six or seven or them. I can't recall them.
All I know is they sit in a box and I read the instructions of what's called for and I take them.
Q. Okay. So other than what the names

Page 55

of the medications are, can you tell me what the medications were for?
A. The metformin is for my diabetes.
Q. Okay.
A. There's another one. It starts with an A. That was for my blood pressure, to keep my blood pressure down. There's was arthritis medicine for my knees that I took.
Q. Okay.
A. That's supposed to suppress the arthritis in my body because I've not bone-on-bone arthritis.
Q. Who diagnosed you with arthritis in your knee?
A. I would say Dr. Cedric. Both legs.
Q. All right. Had you been to any specialist at all to discuss how to handle a bone-on-bone in your knee?
A. Yes. I've been to pain management Mercy Hospital and Dr. Cedric's office. I've been there to get cortisone shorts and talk about pain management.
Q. So Dr. Cedric has been the one that's been monitoring your knees?
A. Yes.

Page 56

Q. And when you went to pain management at Mercy, that was before the cruise?
A. That was well before the cruise.
Q. So we talked about blood pressure medication and we talked about your arthritis. I know you also have high cholesterol. Were you taking medication for that?
A. I think so. I know they took me off because I was doing really well when I went and got my false teeth. I was doing really well with my A1C. They were all happy for me. I can remember that.
Q. Are there any other medications that you can tell me, not by name but by purpose? Meaning what you were taking them for?
A. Metformin, like I said. The blood pressure medicine. The arthritis medicine. The light pain medicine. And I can't think of anything else.
Q. Okay. You made mention of your false teeth.
A. Yes.
Q. You wear dentures?
A. Yes.
Q. On the top and bottom?

Page 57

A. Yes.
Q. When did that first become the case?
A. What do you mean?
Q. So when did you first start wearing dentures for your top teeth?
A. My boss stated that I was his front line. I had some ugly teeth. "You don't smile." He said that he would pay for my teeth. I had to get my A1C down and the whole nine yards.
I did it all. Within two months, I dropped my A1C to be able to have my surgery. The surgery happened at ClearChoice. It was out on McKnight Road, Ross Township. And I can remember the day that I walked out with my teeth.
Q. So you said ClearChoice. That was the name?
A. Yeah.
Q. And when was that?
A. I can't recall the day.
Q. Within the last five years?
A. Yeah, within the last five years.
Q. And so they did both the top and bottom?

Page 58

A. Yes, sir.
Q. Are your dentures permanently installed?
A. I've got two pins on the bottom and no pins on the top, just suction. They're pretty good teeth.
Up top, you're supposed to put glue on. When I wear them, I never wear glue. They stay up.
Q. So the pins on the bottom help keep them in place?
A. Yeah. I've got two.
Q. Do you take them out?
A. I can take them out. I can clean them. I can put them in, whatever.
Q. Okay. But your typical habit, let's say, when you go to bed, do you take them out or do you sleep with them?
A. You're not supposed to. You're supposed to sleep with them.
Q. You're supposed to sleep with them?
A. Yeah. That's what they tell you. The more you wear them, the better they feel.
Q. Since the time that you had this surgery done, have you had any adjustments or

Page 59

changes made to those dentures?
A. No, sir.
Q. Do you go to any dentists or oral surgeons?
A. No, sir.
Q. Where is your pharmacy?
A. My pharmacy is on the North Side. It's Giant Eagle.
Q. Oh, Giant Eagle. Okay.
A. It's on Cedar Avenue. I don't know the address or the phone number.
Q. In Pittsburgh?
A. Pittsburgh.
Q. How long has that been your pharmacy?
A. It's been my pharmacy since I've been a youngin. Years. More than five.
Q. All right. Do you have private health insurance?
A. Just my disability, Highmark. Highmark provides my insurance.
Q. Highmark Insurance?
A. Yeah. They just called me yesterday, Highmark something.
Q. And how long have they been your

Page 60

insurance carrier?
A. Ever since Gateway.
Q. Since Gateway?
A. Yeah. The insurance company called Gateway. My mom had me on Access Gateway.
Q. So how many years have you had Highmark insurance?
A. Within five or six years.
Q. And before that, you were with Gateway Insurance?
A. Gateway Insurance.
Q. All right. Are you on Medicaid?
A. What?
Q. Medicaid?
A. No. No, sir.
Q. What about Medicare?
A. I'm not sure.
Q. Have you ever been on Medicaid insurance?
A. I'm not sure.
ATTORNEY DRAHOS: Okay. This is a good time to take a break. Let's take a break and then we'll come back.
(Short recess was taken.)
BY ATTORNEY DRAHOS:

Page 61

Q. So, Mr. Smith, we're back now on the record, under oath; okay?
A. Yes, sir.
Q. So before the subject cruise -- do you know what I mean when I say "subject cruise"? I mean the one we're here to talk about; okay?
A. Yes, sir.
Q. Before the subject cruise, had you ever been on a cruise before?
A. No, sir.
Q. Before the subject cruise, had you ever traveled anywhere outside of Pittsburgh and needed to seek medical care for any reason?
A. No, sir.
Q. So the subject cruise itself, who booked it?
A. A lady by the name of Terry.
Q. Who is Terry?
A. Crowley. She was like our friend/agent.
Q. Terry Crowley, C-R-O-W-L-E-Y?
A. Something like that.
Q. And is Terry Crowley a travel agent?
A. She's private.

Page 62

Q. A private travel agent?
A. Yeah.
Q. Does she work for a travel agency company?
A. She supposedly works for someone. All I know is I paid through her and that was it.
Q. So who -- as I understand it, there were a number of family members that went on that cruise?
A. Yes.
Q. Who was the person that was the lead of your family in organizing this cruise?
A. Terry Crowley.
Q. Is Terry Crowley a family member?
A. She's a family friend.
Q. Did she go on the cruise, as well?
A. Yes. Yes, sir.
Q. Did Ms. Crowley consult with you at all at any point in time prior to boarding the ship regarding the medical capabilities of the ship?
A. No, sir.
Q. Did you do any research in advance of the cruise?

Page 63

A. No, sir.
Q. Did you speak to anyone from Carnival Cruise Line directly?
A. Yes. There was a lady. I forget her name. She showed me the ambulance, the paramedics the day of leaving.
Q. All right. And I should have been more clear. What I was asking was, prior to the subject cruise, prior to boarding the vessel, did you have any direct communications with anyone at Carnival?
A. No.
Q. Did any member of your family?
A. Only through the website. My nephew, Eric, they had to do everything -- sign us up for the room to get our boarding passes, stuff like that. It all came from Terry and online.
Q. All right. And so why was Eric the one who handled that?
A. He was more knowledgeable of downloading everything.
Q. Do you have a computer at home?
A. No. No, sir.
Q. Does Eric?

Page 64

A. I'm not sure.
Q. All right. So you understand that before you are allowed to board the vessel, you must sign the terms and conditions of what's called a passenger ticket contract?
A. I can't recall if it was done online. I don't know.
Q. If according to Carnival's records your passenger ticket was acknowledged electronically prior to the subject cruise, as you sit here today, do you have any reason to dispute that?
A. No, sir.
Q. Why did you book this cruise?
A. Because I wanted to try something new.
Q. Try something new?
A. Yes, sir.
Q. All right. So let's go slow here and see if we can make this easy.
How many of your family members went on this cruise with you?
A. Patty, my sister.
Q. Let's go one by one.
What is her last name?

Page 65

A. Grimm.
Q. And Patty Grimm is your sister?
A. Yeah.
Q. Biological sister?
A. Same mom, different dad.
Q. Same mom, different dad. Okay.
Patty Grimm. Who else?
A. Stephanie Grimm.
Q. Stephanie Grimm?
A. Sister.
Q. Same thing?
A. Different dad, different mom.
Q. So she would be a stepsister?
A. Yes.
Q. All right. Who else?
A. Patty's daughter, which is Alyssa Salisbury.
Q. And that is Patty's daughter?
A. It's her daughter. Yes.
Q. So that would make her your niece?
A. My niece, yes.
Q. Okay.
A. And there was AJ.
Q. AJ?
A. AJ, which is Stephanie's

Page 66

husband/boyfriend.
Q. What was AJ's last name?
A. I want to say Patterson.
Q. AJ Patterson. Okay. He is Stephanie's boyfriend?
A. Yeah.
Q. Are they still together, those two?
A. Yes.
Q. Who else?
A. Their son, which is Austin.
Q. What's Austin's last name?
A. I want to say it's the same thing as his dad, Patterson.
Q. Okay.
A. There's Eric Grimm.
Q. He is your nephew?
A. My nephew. He was in the state room with me.
Q. Who is his mom?
A. His mom is Stephanie Grimm. It's not the same Stephanie.
Q. A different Stephanie?
A. Yes, sir.
Q. Was that Stephanie Grimm on the cruise, as well?

Page 67

A. No, sir.
Q. Okay.
A. Terry Crowley.
Q. We already talked about her. Anyone else?
A. Terry's sister, Nicole Crowley, which we've never seen. They had a room different than ours.
Q. You never saw Nicole during the cruise?
A. We did, but vaguely here and there. There was another girl there, Megan something. I don't know her name. It was a friend of Nicole's.
Q. All right. Did we get everyone?
A. Pretty much that's it. Eric and I were in a room together. Patty and her daughter were in a room together. AJ, Stephanie, and their son was in a room together. We were in the same hallway. And Terry and her sister had a room at the back of the boat.
Q. So other than Megan and Nicole, everyone else is family?
A. Pretty much. Yeah. Terry's a

Page 68

friend of the family.
Q. Now, during the subject cruise, did any of those individuals need to seek medical care --
A. No, sir.
Q. You have to let me finish this question. I could have said medical center on the rocket ship heading to the moon.
A. We were talking about the ship.
Q. Let me finish the question.
Okay. So all of these individuals that went on the cruise with you, we're going to call them traveling companions; okay?
Did any of the traveling companions need to seek medical care in the ship's medical center during the subject cruise?
A. No, sir.
Q. So who would have been the last health care provider that you saw before this cruise?
A. Dr. Cedric.
Q. And when would that last visit have been?
A. I can't recall the date.
Q. Would it have been within the year?

Page 69

A. It would have been 2024. It would have been in the year.
Q. And --
A. I go, like, twice a month.
Q. You go twice a month?
A. To see him.
Q. Are they regularly-scheduled appointments?
A. Some of them are. Some ain't.
Q. In other words, do you have prearranged plans to see him at least twice a month or is it -- are you telling me that it was your habit to see him twice a month?
A. With diabetes, sir, sometimes if your levels are high, you have to go more often. And he scheduled -- when I go to him -- say I go to him on the 14th. He'll say, "I'll see you on the 23rd," and he'll make the appointment in the office. You know what I mean? They give you a card and I go when that card tells me to go.
Q. Okay. Did you go to see Dr. Cedric at any point in time, prior to the cruise, for the purposes of having him determine whether or not you were fit to sail on the ship?

Page 70

A. No.
Q. Did you go to any doctor for that purpose?
A. No, sir.
Q. So how did you get from the Pittsburgh area to Baltimore?
A. I drove.
Q. Did you physically do the driving?
A. I did the driving, yes, sir.
Q. Whose vehicle?
A. My vehicle, sir.
Q. What kind of car do you have?
A. 2017 Chevy Trax.
Q. Do you own that car?
A. Yes, sir.
Q. And who drove along with you in that vehicle, if anyone?
A. I want to believe it was Eric, my nephew, and Alyssa, my niece.
Q. So if the cruise started on October 13, what day would you have left Pittsburgh?
A. A day ahead of time, sir.
Q. So that would have been a Saturday; correct?

Page 71

A. Supposedly, yes.
Q. Did you stay in the Baltimore area?
A. We stayed in a hotel in the Baltimore area.
Q. And did you and Eric also share a room?
A. Yes.
Q. Anyone else?
A. There was a bunch of us there. My sister, my niece. We only stayed overnight.
Q. Okay. So the entire traveling group stayed in one room or in that same hotel?
A. I think two rooms, sir.
Q. So the other family members, they also drove from Pittsburgh to Baltimore?
A. Yes, sir.
Q. Okay. So from the moment that you got in the car in Pittsburgh until the time that you went to sleep in the hotel room in Baltimore, were you feeling any unusual signs or symptoms?
A. No, sir.
Q. No vomiting or diarrhea?
A. No, sir.
Q. No nausea?

Page 72

A. No, sir.
Q. So the following day was Sunday, October 13. Okay. The ship is scheduled to leave Baltimore that afternoon.
A. Okay.
Q. According to Carnival's records, you would have boarded the ship at 12:31 p.m.; does that sound right to you?
A. Sounds right.
Q. Did your entire traveling group, the traveling companions, all board the ship at the same time?
A. Yes, sir.
(Composite Exhibit A was marked for identification.)
BY ATTORNEY DRAHOS:
Q. I'm going to hand you what we'll mark as Composite Exhibit A to the deposition. For the identification purposes, this is Bates-stamped GR02 through 03.
Mr. Smith, I've handed you what's been marked as Composite Exhibit A to the deposition. This is what we call a Sail & Sign account and it's a summary of all the charges that were levied against your account during

Page 73

the subject cruise.
Have you ever seen this document before?
A. No.
Q. So from time to time, I may be referencing this document, and if I do, I'll prompt you to it.
When you boarded the ship that particular day, October 13, were you feeling in your normal, usual state of health?
A. Yes. Yes, I was.
Q. All right. And do you recall what you did on October the 13th?
A. I can't remember.
Q. Was that "cannot remember"?
A. I cannot remember due to the fact that, you know, we did nothing. You go to dinner -- we went to the captain's dinner, stuff like that. We hung out most of the time.
Q. So I'm going to do my best to try and prompt your memory from time to time. But I want you to do exactly what you did. If you can't remember, you just tell me.
According to the Sail & Sign account, if you look, there's charges that are

Page 74

levied against your account from the Winner's Club; do you see that?
A. Yes.
Q. Do you recall going into the ship's casino?
A. Yes.
Q. Do you gamble at all?
A. No. No, I don't gamble at all. My nephew and I, we were experimenting. We were trying.
Q. Okay. If you look there, the first charge for the Winner's Club is at 2:56 p.m. So do you have a recollection of having gone into the casino that afternoon?
A. I recall going to the casino. I don't know the time.
Q. Regardless of the time, do you recall whether or not you drank any alcohol while you were in the ship's casino that day?
A. No, I didn't drink any alcohol in the casino at all.
Q. Now, if you see there at 3:07 p.m., there's a $5 charge against your account for a chat plan; do you see that?
A. I see that.

Page 75

Q. Did you purchase some sort of plan on the ship that would allow --
A. Not that I know of.
Q. You have to let me finish the question. Did you purchase some sort of plan on the ship that would allow for you to communicate on your cell phone?
A. No, sir.
Q. Okay. Do you know what that charge of $5 for a chat plan is for?
A. No, sir.
Q. Did you, at any point in time during the subject cruise, engage in any text communications?
A. No, sir. Not that I can recall.
Q. All right.
A. I didn't have --
Q. Did you ever use the instant messenger feature on your Facebook page during the subject cruise?
A. I would have to say no.
Q. Did you ever make any phone calls on your cell phone?
A. I couldn't.
Q. You could not?

Page 76

A. I could not.
Q. Did you bring your cell phone on the cruise?
A. Yes, sir.
Q. What kind of cell phone did you have?
A. Samsung Galaxy.
Q. Is that the same one that you've got there?
A. I think so, yes.
Q. Who is your cell phone provider?
A. Metro PC.
Q. Metro PCS?
A. Yeah.
Q. What's your phone number?
A. 413-616-4656.
Q. And then later in the day you'll see there's a charge at 5:31 p.m. I see it's a zero charge, but it indicates that you were in the Sapphire Restaurant; do you see that there?
A. I see that, yes.
Q. Is that the captain's dinner you referred to?
A. I think so, yes.
Q. So other than having been in the

Page 77

casino and the Sapphire Restaurant, is there anything else that you can recall about your experience on the ship on the 13th?
A. Not that I can recall, no.
Q. All right. Now, when you're not on cruise ships on vacation, what time do you typically go to bed at night?
A. Depends. Say 9:00 or 10:00. Something like that.
Q. And what time do you typically wake up?
A. Early.
Q. What's early for you?
A. 6:00. Depends on where I'm at.
Q. Okay. When you're at home?
A. When I'm at home? I sleep all day and stay up all night.
Q. Okay. So tell me then before the subject cruise and you're at home, you tell me you typically go to bed at 9:00 or 10:00, but then you tell me you stay up all night. Which one is it?
A. Are we talking before or after the cruise?
Q. Before the cruise.

Page 78

A. Before the cruise, I would stay up all day -- it was opposite. I would stay up all day and go to bed at 9:00 or 10:00.

Q. All right. And then you're telling me you would typically wake up by 6:00 a.m.?

A. I would typically wake up by 6:00 a.m. and leave my house.

Q. Leave your house and go where?

A. The pizza shop. Anywhere. I was retired at the time. Meaning I didn't have nothing to do but go fishing or, you know, hang out.

Q. Okay. And so what is your time to go to bed now?

A. Now?

Q. Yeah. After the cruise.

A. After the cruise?

Q. Yeah.

A. I sleep all day and I stay up all night. So I wait to hear my grandson at 7:00 before he goes to school, and then I fall asleep.

Q. So you're telling me your grandson at 7:00 a.m. Does he live in your apartment?

A. He lives around the corner.

Page 79

Q. How does he have any role in your daily --

A. My life.

Q. What does he do?

A. He's my life. He goes to school and I like to hear his voice.

Q. So does he come by at 7:00 in the morning?

A. His bus, he catches it at his house. He's 11 years old.

Q. So does he come to your apartment at all during the day?

A. Not during the day. He goes to school. After 3:00 he'll come by.

Q. He comes by at 3:00?

A. Yeah.

Q. So when you say you wait for your grandson's voice, what do you mean by that?

A. I mean, he either calls me at 7:25 or I call him to say have a good day.

Q. Okay. And so is what you're telling me is you typically go to bed sometime around 7:30 in the morning?

A. Yeah.

Q. You wake up at what time?

Page 80

A. I wake up early. And then I go back to -- like I said, I talk to him at 7:00. I go back to sleep. I'll probably wake up for breakfast around 8:30 or 9:00, and then I go back to bed. I sleep all -- that's my routine. I sleep all day.

Q. Okay. And then I assume you must wake up when he comes home at 3:00 p.m.

A. Sometimes he comes over. Sometimes he comes by for money for McDonald's. Whatever the case may be.

Q. Sometimes he does what?

A. He comes over for money.

Q. For money?

A. Yeah.

Q. All right. And if he doesn't come over, what is your typical routine?

A. My routine is to wait for him to call or I bug him. I bug him to the point where he hangs up on me.

He's autistic. He does what he wants to do. If he wants to talk today, he'll talk today. If he don't, he'll hang up.

Q. I see. Remind me what his name is?

A. Jordan Minor.

Page 81

Q. All right. Let's go back to the cruise ship.

So do you recall what time you would have gone to bed that particular night, first night on the ship?

A. First night on the ship, I want to say I was in the state room. I want to say 11:00. Something in that area.

Q. All right. That's a little later than your normal --

A. Well, you're on a cruise.

Q. Sure. Did all of you, meaning all of your traveling companions, all spend each and every moment on the ship or were there times where you would separate?

A. We would separate. There were times where I didn't -- my arthritis, the motion of the ocean, whatever the case may be -- I didn't feel ill. I didn't want to go on any of the excursions.

Q. All right. We'll get to that in a second.

But who among your traveling companions would have been the person that you spent the most amount of time with?

Page 82

A. Eric, my nephew; Patty, my sister; Stephanie, my sister; AJ, my brother-in-law, and the kid.
Q. All right. You basically named your family?
A. Yeah.
Q. So you're saying that you guys spent time together mostly equally?
A. Yeah. We ate together. We sat at Five Guys together. You know, we sat along the pool while Austin swam.
Q. Now, from the time when the ship left port -- typically the ship leaves port around 4:00 -- do you happen to know where you were at the time the ship was leaving?
A. We were looking for the Muster -- we had to go and check out the Muster, talk to them about if something would happen, where to go. You know, the Muster.
Q. Some people like to go up to the top deck and watch the ship sail away.
A. They had a party. We were around the pool. They had a sailing-away party.
Q. So you went to that?
A. We were -- we weren't on the top to

Page 83

watch us leave, but we were in the second level.
Q. All right. So from the time that the ship sailed away until the time you went to bed that night, did you feel any seasickness whatsoever?
A. No, sir. As a matter of fact, we made fun of it.
Q. You made fun of it?
A. Terry said before we left something about motion sickness and whatnot. And she said not to look at the water because it would trigger you to have motion sickness. I tried staring at the water and nothing.
Q. All right. Did you bring any seasickness medication?
A. No.
Q. Do you know what bonine is?
A. No.
Q. How about Dramamine?
A. I know it's a motion sickness pill or something you put behind your ear. I forget. But I know Terry had it.
Q. But you did not bring any pills for seasickness?

Page 84

A. No.
Q. And you didn't bring any kind of bracelets or bands?
A. No.
Q. Nothing behind your ears?
A. Nothing behind my ears.
Q. Did you feel any nausea?
A. No.
Q. So from the time the ship left port until the time you went to bed, any unusual signs or symptoms?
A. No, sir.
Q. Were you feeling like your normal, regular self?
A. Yes, sir.
Q. Any complaints or criticisms at all about your experience at that point?
A. No, sir.
Q. So the next day is Day 2. That's October the 14th of 2024. It's a Monday. The ship is scheduled to be at sea all day long; okay?
A. Okay.
Q. Do you know what time you would have got up? That would have been your first

Page 85

morning on the ship.
A. I know we went to breakfast. It was like 8:00. My nephew and I went down to breakfast and met the family.
We had breakfast. I think I went back to my room. I'm not sure.
Q. Okay. Why did you go back to your room?
A. Because I'm getting older. I'm 55 years of age. The cruise is nice and everything is nice about it, but I like to relax and watch TV.
Q. So your plan was to go back to the room to watch TV?
A. Pretty much, yeah. Catch a movie on the Lido Deck.
Q. Do you recall specifically what you did?
A. Not offhand. No, sir.
Q. So do you know, as you sit here today, whether you went to the room to watch TV or to watch a movie on the Lido Deck?
A. I know that the Lido Deck was on at night. I forget what movie was playing. I sat and watched the whole thing. Eric and my

Page 86

sister and them were, you know, at Guy's Burgers. They were walking around. Whatever the case may be.
But I remember watching the whole movie. I forget what was playing. Transylvania or something stupid. I just was comfortable sitting there watching the movie.
Q. Okay. So we know you were watching a movie that night. And I also know from your Sign & Sail that you were back in the Sapphire Restaurant at 5:47, so we're going to work our way back.
So do you recall being at the Sapphire Restaurant that particular day?
A. The Sapphire, if that was the captain's dinner.
Q. Well, you have that on both days. You're there on the 13th and the 14th.
A. There were two dinners we went to. That's all I can remember signing up for. We all had to be there at a certain time at both dinners.
Q. All right.
A. That's all I can remember.
Q. Now, did you take any pictures on

Page 87

your cell phone during this cruise?
A. I don't think so.
Q. Can you check for me?
A. Not -- I can do what I can do. I am so phone illiterate. It ain't even funny.
Q. Let's see if you can check real quick, and we'll go off the record for the court reporter.
(Short recess was taken.)
BY ATTORNEY DRAHOS:
Q. All right. So, Mr. Smith, you had a chance to look at your phone. What did you find, if anything?
A. A trophy from my nephew. I forget what it -- it was a basketball tournament. It's in my state room.
Q. In your state room?
A. In my room, next to my TV.
Q. So when you say "state room," I'm thinking you're talking about the cruise ship.
A. That's where we were. That's what we're talking about, the cruise ship. We're talking about pictures taken on the cruise ship.
ATTORNEY HOFFMAN: Of

Page 88

basketball?
THE WITNESS: There was some type of tournament they had up on the Lido Deck and Eric had a trophy. Here's the trophy. There's the date stamp.
BY ATTORNEY DRAHOS:
Q. Okay. And that's the only photo from the cruise?
A. That's the cruise. Yeah.
Q. Now, that's your phone. Do you know if anyone in your traveling company took pictures of you during this cruise?
A. I can't recall. I know my sister -- my sister's niece is a picture fanatic. Trust me. There's a picture. There's a photo of us going on the cruise. The final -- like the sail off party or whatever.
It's a mural that they had at the ships port that we walk through. The whole party is in that picture.
Q. That would be Alyssa Salisbury?
A. Yes.
Q. She's the photo fanatic?
A. Yeah.
Q. Was she ever with you the medical

Page 89

center during the time that you were in the medical center?
A. Yes.
Q. Did she take pictures of you?
A. I know there are some pictures floating around of me, you know, half dead. Meaning, yes, they took pictures of me laying in bed.
Q. So there are pictures of you in the ship's medical center?
A. Supposedly.
Q. And other than Alyssa, who else would --
A. It would be Alyssa and my lawyer.
ATTORNEY DRAHOS: Did we get any copies of those photos?
ATTORNEY HOFFMAN: You should have. I'll take a look to see what I've got. I don't have many. I think we did provide what we had, though.
ATTORNEY DRAHOS: Would you mind just checking for me, maybe on a break? I don't remember seeing them but that doesn't mean you didn't sent them to me. I just don't remember.

Page 90

BY ATTORNEY DRAHOS:
Q. So we're talking about Day 2 on this cruise. At any point in time during Day 2 while the ship was at sea, did you have any feelings of seasickness?
A. No.
Q. What was the weather like that day?
A. I forget. I know we had rain, but I don't know what day. It was -- for my first cruise, it was nice.
Q. Okay. So other than being in your cabin watching TV, are there any other specific activities on the ship that you can recall doing? You told me about watching movies on the Lido Deck. Anything else?
A. My nephew and I took a gander of the casino. We went to the captain's dinners.
Q. Okay.
A. Which were crap. We were basically exploring the ship, seeing what everything is. Check the free ice cream out. You know, sit down and watch people at the pool.
Q. You said the captain's dinner was crap. Why was that?
A. It was well proportioned and it

Page 91

wasn't worth my time. I didn't like it.
Q. The food wasn't good?
A. It was good. The guests were nice, but I don't -- I mean, the staff was nice. But the food -- I didn't know anything about it.
Terry never told us what the captain's dinner was. All she said was to dress formally, you know, and dress nice. You're in dress shoes and pants and you go down there. No one has dress pants on. No one had -- you know, so I'm sitting there like a duck. You know, I had a nice shirt on, nice pants, nice shoes.
And the dinner came out and there was nothing there. There was nothing. It's like three shrimp. You know what I mean? What am I going to do with three shrimp.
Q. Okay. So what time do you recall going to bed that particular night?
A. I can't tell you. You know, 11:00, the same time, basically. You know, I spent most of my time in my state room. I did walk around. I did go to Guy's Burgers. I did go to the buffet.
I did everything you're supposed to

Page 92

do on a cruise other than going on any of the excursions.
Q. So throughout the entirety of that day of October the 14th, from the time you woke up until the time you went to bed, were you experiencing any unusual signs or symptoms?
A. No, sir.
Q. Any nausea or vomiting?
A. No, sir.
Q. Any dizziness?
A. No, sir.
Q. So the next day is October the 15th. This is now what we call Day 3 of the cruise and your second day at sea.
A. Okay.
Q. All right. Do you recall what time you woke up that day?
A. I can't recall what -- I don't know. Everything was a blur when I went down to the infirmary. I don't know if it was the third day I went down to the infirmary for being sick.
Q. All right. That is not, according to our records, the day you went down to the medical center.

Page 93

A. Tell me what day I went to the medical center.
Q. So we do not have you in the medical center until October the 18th. So do you have a memory of having gone to the medical center for something prior?
A. No. Never had I went down to medical other than the day you're saying is the 19th. I don't recall the time frame.
You know, what I did the day of -- you know, it's been over two years ago. It was 2024 when I went on that cruise and some things are a blur.
Q. Okay.
A. Not because of alcohol or because of drugs.
Q. We're going to work our way through it and just see what you remember and what you don't. You just keep telling me what you remember and what you don't. That's fine.
On October the 15th, though, there's a charge on your account of the fun shops for $25. Do you recall what it was you were buying?
A. I believe -- I believe it was a

Page 94

bracelet, a friendship bracelet for my daughter. I wanted to take something home. And it was a bracelet. There was a bunch of stuff on the bracelet.
I was with Terry and my sister -- you know, we stood in this line to get this thing. And it was supposed to be pretty. You know, it was a complementary thing of us being on the boat. Some people took advantage of it. Some people didn't.
But I remember standing in line for this bracelet and you had to pay so much for all the charms that went on this bracelet. That's it.
Q. Okay. Did you, at any point in time during this cruise, ever buy any medication?
A. No, sir.
Q. Okay. So throughout the entirety of the day on October the 15th, do you recall experiencing any unusual signs or symptoms?
A. No.
Q. Did you experience any nausea or vomiting?
A. No, sir.
Q. Any dizziness?

Page 95

A. No, sir.
Q. Do you recall what time you went to bed that night?
A. I can't recall.
Q. Okay. All right. Now, the next day is Day 4. It's October the 16th. That's a Wednesday. And the ship is scheduled to be in Nassau. So it would have been the first stop in the port of call; all right?
A. Okay.
Q. Now, according to our records, you did not get off the ship?
A. No, sir.
Q. Why not?
A. Because I didn't feel like it. I wanted to stay on the ship where everything was free. You could go to the buffet. You didn't have to pay for a bus to take you somewhere for an excursion. You didn't have to do any of that. Plus, everybody walks faster than me. So my sister went her way and I stayed on the boat.
Q. Why is it that people walked faster than you?
A. I was 350 pounds.

Page 96

Q. Did you require any type of assistive device?
A. No, sir.
Q. So back during this time frame you would have had that surgery on your toe already; right?
A. I already had the surgery, yeah.
Q. Did you have any type of device to help you walk?
A. No, sir.
Q. No cane or anything?
A. No, sir.
Q. So how was the weather that particular day; do you recall?
A. Not that I can recall. I spent about a week in the hospital. That's all I know.
Q. So while the ship was in Nassau, it doesn't appear that Eric got off the ship either?
A. I don't know.
Q. But what you're telling me is that you had no interest in getting off and visiting Nassau?
A. No, sir.

Page 97

Q. Did you have a passport at the time?
A. No, sir.
Q. So do you know if you were legally allowed to get off the ship?
A. We were legally allowed to get off the ship. We didn't need no passport. All we needed was our state IDs and our birth certificates, whatever the case may be.
Q. So on that particular day, did you experience any unusual signs or symptoms?
A. No, sir.
Q. Were you feeling any nausea?
A. No. Not that I can recall.
Q. Any dizziness?
A. Not that I can recall.
Q. Any seasickness?
A. Not that I can recall.
Q. Did you vomit?
A. No.
Q. How sure are you, as you sit here today, that you were not experiencing any nausea or vomiting or dizziness on October the 16th?
A. I don't recall. I don't think I did. I'm going to tell you honestly, no, not

Page 98

until I went to bed and woke up sick. I went to bed feeling some type of way.
If you say it was the 19th, okay. I'll take your word for it.
Q. I want to make sure I leave here today with the clearest understanding of what happened on the ship.
So I'm going to be as transparent with you as I possibly can so that we both can be clear on what happened; all right?
A. Yes, sir.
Q. Did you ever tell anyone at any point in time, prior to you going to the medical center on October 18, that you had been experiencing nausea and dizziness and seasickness for the past two days?
ATTORNEY HOFFMAN: Objection, asked and answered.
THE WITNESS: No, sir.
BY ATTORNEY DRAHOS:
Q. And you're 100 percent sure of that?
A. Yes, sir.
Q. Did you complain to anyone in your traveling party on October the 16th that you were not feeling well?

Page 99

A. No, sir. Not that I can recall, no.
Q. And so it's your testimony here today, under oath, that you went to bed on the night of October 16 feeling your normal, usual state of health?
A. Yes.
Q. You want to say yes or the answer is yes?
A. The answer is yes. I didn't speak to anybody.
Q. So the following day is Day 5 of the cruise. It's October the 17th. And the ship is scheduled to be in Half Moon Cay; okay?
Now, according to Carnival's records, Mr. Grimm did get off the ship that day but you did not?
A. I did not.
Q. Why didn't you get off the ship?
A. I didn't want to.
Q. And is it for the same reason that you're telling me, that you didn't -- everything was free on the ship and you didn't have to deal with the Bahamas?
A. I didn't feel the concern to go to the islands. I didn't want to. I'm a grown

Page 100

man. No one makes my decisions for me.
Q. That's fine. What I want to be clear on, though, is you didn't get off the ship because you didn't want to, not because you weren't feeling well enough?
A. No. I never said that. I didn't feel like going off the ship.
Q. I want to be clear. What you're telling me is you didn't want to, not that you weren't feeling well enough; right?
A. No. I was not -- I was feeling normal. Normal enough to walk down to the buffet. Normal to walk on the ship by myself.
Q. So are you telling me that on October the 17th, you did not experience any nausea?
A. Not that I can recall, no.
Q. No dizziness?
ATTORNEY HOFFMAN: Objection, asked and answered.
BY ATTORNEY DRAHOS:
Q. No dizziness?
A. No.
Q. No vomiting?
A. No.

Page 101

Q. Is that a "no"?
A. No.
Q. Did you complain to anyone in your traveling party that you were not feeling well on October 17?
A. No.
Q. And so according to your testimony then or what you're telling me today, you went to bed on October the 17th, 2024 in your normal, usual state of health?
A. Yes.
Q. Were you feeling any seasickness at all on October the 17th?
A. No, sir.
Q. Do you know what time you went to bed that night?
A. No, sir.
Q. Was there any particular time during this cruise when you went to bed later than 11:00 p.m.?
A. I'm not sure, sir.
Q. The following day is October the 18th, and the ship is scheduled to be in Freeport, the Bahamas. It's a Friday.
Do you recall what time you got up

that day?
A. No.
Q. According to -- strike that.
What did you do during the day on October the 18th while the ship was in Freeport?
A. I can't recall.
Q. So I'm going to represent to you that this is the day that you went to the medical center for the first time, according to Carnival's records; okay?
And according to Carnival's records, you would have called approximately 7:15 for medical care.
A. 7:15 p.m.?
Q. Yes, sir.
A. Okay.
Q. So putting that time frame into perspective, do you recall what you were doing during the day in the events leading up to calling at 7:15?
A. Well, not offhand. I recall being -- going to bed feeling sick. I can remember that. And supposedly they wouldn't come up to get me. They wouldn't, nothing,


unless someone paid $50 for a wheelchair.
And then I went to the infirmary -- you said the 19th? I don't know. That morning I had my nephew call. I said, "I'm not feeling good." And my sister and everyone came over because they were in the same hallway as us.
Q. So let's go back. According to Carnival's records, your first time in the ship's medical center was October 18 at 7:15 p.m.
A. Okay.
Q. All right?
A. Yes, sir.
Q. So you're telling me that you went to bed the night before feeling sick; is that correct?
A. I went to bed -- I want to say now it's the 18th. I went to bed and I told my nephew, "I don't feel good. I don't feel good. I don't feel good." I couldn't walk. I was throwing up. I was pissing in a bucket. I couldn't walk to the bathroom in the state room.
All I remember is going to the infirmary and them sending me back saying I was


fine. And they kept saying, "Oh, you're going back to your state room." And my family is like, "No. You keep him here." They wanted more money and they wanted this.
It's 2024 when this happened. After I went in the infirmary, I don't know.
Q. All right. So it's not clear to me yet and so I need to go back and ask you again. If you went to the Carnival medical center on October the 18th at 7:15 p.m., did you go to bed at night on October the 17th feeling sick?
A. No. No. That all happened -- I want to believe it happened the 18th and 19th.
Q. Okay.
A. Because they kept having me back and forth.
Q. So what you're telling me is that on October the 17th, you went to bed feeling fine?
ATTORNEY HOFFMAN: Objection, asked and answered.
BY ATTORNEY DRAHOS:
Q. Right?
A. Yes.
Q. All right. So when you woke up on October the 18th, were you also feeling fine?


A. On what day?
Q. October the 18th.
A. I can't recall. I know supposedly they took me down. I was out of it. Medically, I was out of it.
Q. All right. So you do not recall, when you woke up on the morning of October 18, how you were feeling?
A. I was feeling like -- the 18th, I think I woke up throwing up, pissing, shitting. And I told my nephew to call my sisters. "Call them. Something is wrong."
Q. Okay. Your nephew was in Freeport from 8:54 a.m. until 9:39 a.m. What were you doing during the time he was in Freeport?
A. Sick.
Q. In your cabin?
A. In my cabin.
Q. And when you say "sick," what were your symptoms?
A. Throwing up, shitting, pissing, and couldn't walk.
Q. Why didn't you call for medical assistance?
A. I couldn't move.

Page 106

Q. Are you saying you felt that way before your nephew went off the ship or after?
A. It was -- I think it was -- he said "Do you feel okay?" I said, "I'll feel all right, Son." Yeah. He's like a son to me. And I said, "Go enjoy yourself. Don't worry about me."
When he came back in I was like, "Call someone now." And he called my sisters that were in the same hallway, the same floor, same everything.
My sisters came in and said, "You're going downstairs. We're calling." That's when they discovered it was going to cost money to go down.
Q. So your nephew asked you before he got off the ship if you were feeling okay and you told him he could go?
A. Yes.
Q. But you weren't feeling okay?
A. I wasn't feeling okay. If the day was the 18th -- whatever -- the 18th or 19th, they sent me up to my state room. I didn't know my name. I was messed up. Worse I ever felt in my life.

Page 107

Q. So why did you tell your nephew that he can go and enjoy himself then?
A. Because it was his first time on the cruise.
Q. In hindsight, should you have called the medical center then?
A. Yes. Yes.
Q. So if according to Carnival's records your nephew came back on to the ship at 9:39 a.m., when was the next time you saw him?
A. He wouldn't leave my side.
Q. So he remained in the cabin with you?
A. Pretty much. As much as I can recall. He was pretty broken up.
Q. If he was in the cabin with you starting at 9:30 a.m., some short period of time thereafter, why did you all wait until 7:15 to call the ship's medical center?
A. I don't recall. I don't recall. I know my sisters were asking me what I was doing, how I was doing. And I -- I -- they said I changed colors. I don't know anything.
Q. Who else do you recall coming in and seeing you in the cabin in that condition

Page 108

before calling the medical center?
A. Patty, my sister; Stephanie, my other sister; AJ, my brother-in-law.
Q. Now, were they encouraging you to call the medical center?
A. My sisters weren't playing any games. My sisters both said and brother-in-law said, "Call down there now." And I don't know how long it took them to come and get me. I can't recall.
Q. How many times did they come in to visit you in the cabin that particular day?
A. That day?
Q. Yes.
A. I want to say two. They were out doing their own thing. They didn't know until the day of me getting sick. They didn't know. They only one who knew was Eric.
Q. Okay. So when did Patty first learn that you were not feeling well?
A. I want to say -- you say the 18th. I'm going to say the 18th when I got sick. They sent me down. They came up with a wheelchair and then they -- I was fine enough to go to my room.

Page 109

Q. All right. So let's go slow here. Did Patty know that you were not feeling well on October the 18th before or after she visited Freeport?
A. I want to say after. They all came in my room after they went on the excursion, I would say.
Q. So is that the same for Stephanie?
A. Same for Stephanie, AJ. They were all together.
Q. Okay. So what you're saying is that when Patty, Stephanie, and AJ got off the ship to visit Freeport, they did not know at that time that you were not feeling well?
A. I did not believe so.
Q. But Eric did?
A. Eric did. He was in my state room.
Q. And so when Patty, Stephanie, and AJ went back on the ship, do you recall when they first saw you?
A. Eric left the state room. If I can recall correctly, he went and got Patty and Stephanie, said that there's something wrong with Uncle Mike.
Q. Okay. And then Patty and Stephanie

and AJ came into the cabin?
A. Yes, sir.
Q. How many times had you vomited on October the 18th --
A. I couldn't tell you.
Q. Let me finish the question. On October the 18th, how many times had you vomited at this point in time when Patty and Stephanie came in?
A. I couldn't tell you.
Q. Does that mean it was so many times you can't recall?
A. Yes, sir.
Q. All right. Now, you said that Patty and Stephanie were "not playing around." So did they tell you to go to the medical center?
A. Yes.
Q. Did you go?
A. Yes.
Q. All right. So if according to Carnival's records the very first phone call was made at 7:15 p.m., are you telling me that Patty and Stephanie came to see you at approximately 7:15 p.m.?
A. I can't recall the times, the dates.


ATTORNEY HOFFMAN: Objection. Did you say the 7:15 p.m. is when he went to the clinic or when the first call was made?
ATTORNEY DRAHOS: It's when the first call was made.
ATTORNEY HOFFMAN: And that's on a log. Do you know the Bates stamp?
ATTORNEY DRAHOS: GR5.
BY ATTORNEY DRAHOS:
Q. So who was it that called the medical center?
A. I'm not sure.
Q. It was not you?
A. It was definitely not me.
Q. Tell me what your exact symptoms were at that moment in time when the first phone call was made to the medical center on your behalf.
A. I was shitting out, meaning my stool was liquid. I was throwing up in anything I can, ice bucket, garbage can. Peeing in the ice bucket. Sitting on the couch. And that was it. I was weak. Weak. I couldn't -- I kept saying, "My right arm."
Q. What do you mean by your right arm?


A. I couldn't lift my right arm. I couldn't feel my legs.
Q. So you could not lift your right arm?
A. Yes.
Q. And what did you say about your right leg?
A. I couldn't feel my legs, period.
Q. Both legs?
A. Both legs.
Q. So when did you start to feel this sensation that you couldn't lift your right arm?
A. I'm going by your dates. I want to say the 18th.
Q. When you woke up that morning?
A. When I woke up that morning, it started getting worse.
Q. So when you woke up that morning, are you telling me that you couldn't lift your right arm?
A. I could lift my arm enough to hold on to the wall and to be able to go into the bathroom and sit back down where I was.
Q. All right. So when did -- did it


get any worse than that at any point?
A. I remember when I first went down to the infirmary, they were doing everything. They were sticking me in my stomach, first of all, whatever the case may be. And they said, "What's your symptoms?" And I said, "I can't lift my arm. I can't lift my arm."
They kept saying, "You're going back to your state room." "No. I'm staying here." And they took my money.
Q. Okay. So when you woke up that morning, you were capable of lifting your right arm to a point where you could put it on a wall?
A. Yeah. Door handle, above my waist.
Q. All right. When did it get worse than that? Before or after you went in to the medical center?
A. I would say while -- you know, when it started happening in my state room, they took me down in the wheelchair. The first thing I said was, "I can't walk and my arm feels weird."
Q. Okay. Were you capable of lifting it?

Page 114

A. Enough to hit the trim of the room. Enough to hit the door handle, the desk, whatever, just to get to the bathroom.
Q. At the time you were transported down to the ship's medical center, your arm was capable of going how high?
A. I would say my waist. As high as like the wall trim, the door trim. To get it high even now, I've got to help it.
Q. All right. So at the time you were transferred to the medical center, you could lift your arm as high as a door handle?
A. Enough to put pressure on it so I couldn't fall.
Q. Okay. And at the time you were transferred to the medical center, were both of your legs numb?
A. They wheelchaired me out of the room. I could put my weight on them, but to make a step, no way.
Q. So when did you start to feel that sensation in your legs?
A. After -- they were taking me down in the wheelchair. I couldn't walk.
Q. Are you saying throughout the

Page 115

entirety of the day while you were in your cabin, you were capable of feeling your legs?
A. No. Say whenever they came up with the wheelchair, whatever time that may have been after 7:00 p.m., whenever they felt like they could come up and get me with this wheelchair, I had help from the couch to the wheelchair. I had help from there to the bed.
They kept trying, "Oh, you can walk." No, I couldn't.
Q. So earlier you were telling me that you were urinating into a bucket?
A. Yes.
Q. Was that during the day?
A. That was -- yeah. Throughout the day.
Q. Why were you doing that?
A. Because I couldn't make it to the bathroom.
Q. Why not?
A. My legs hurt.
Q. So your legs were --
A. I was weak.
Q. All right. Do you know what the person who called the medical center said on

Page 116

your behalf?
A. I don't recall what they said. They said that I was sick and weak. I was throwing up.
Q. You said something about how you found out there was going to be a charge for it or something. What to you remember about that?
A. Whoever called, I remember AJ, Austin saying that they wanted $50 for a wheelchair to get me down in the infirmary. I remember being in the infirmary. For me to stay in the infirmary, they wanted 200 something dollars.
Q. We're going to get to that in a minute. Right now what I'm trying to get at is what was communicated while you were in the cabin.
So what you're saying is AJ or Austin told you that Carnival wanted $50 for a wheelchair?
A. Yes, sir.
Q. Was there any other discussion about how much it was going to cost at that point in time?
A. No, sir.

Page 117

Q. All right. But do you agree that a ship's nurse came to the cabin to see you?
A. Someone came to see me.
Q. Do you know who that person was?
A. No. Not off hand. They came and saw me and they called -- like I said, they called for the wheelchair or whatever. I don't know the time frame.
Q. Do you recall this person by name who came to see you in the cabin?
A. No, sir.
Q. Can you describe this person by appearance?
A. No, sir.
Q. Can you describe what they were wearing?
A. No, sir.
Q. Did this person identify their role on the ship to you?
A. Not to my knowledge, no.
Q. All right. So I'm going to represent to you that in the medical chart that's been generated of the care that was rendered to you on the ship, there's a note entered by that individual who came into your

Page 118

cabin to see you. And this person indicates that when she came into the cabin, she found you sitting on a chair; is that correct?
A. No.
Q. What's inaccurate about that?
A. It was a couch.
Q. You were sitting on the couch?
A. The couch. That pulled out into a bed. It was a couch/bed.
Q. Now, this individual also indicates in her note that when she found you, you were fully conscious; is that correct?
A. I was half out of it.
Q. Were you conscious?
A. No.
Q. Were you unconscious?
A. In and out. In and out. Okay. I was weak.
Q. Okay. You were weak. But what I'm wanting to know is at the time were your eyes open and were you --
A. Yes, sir. Yes, sir.
Q. Now, this person also indicates that you were alert and communicating; is that accurate or inaccurate?

Page 119

A. Yes.
Q. All right. In other words, you were able to tell her how you were feeling?
A. Yes.
Q. All right. Now, she indicates in her note that you complained of general body weakness, vomiting, and soft stool since two days ago. Are you saying that she got that wrong?
A. She got that wrong.
Q. It's your testimony here, under oath, that you never told this individual, who came to evaluate you in the cabin, that you had been experiencing body weakness, vomiting, and diarrhea since October 16?
A. No, sir.
Q. Did you tell this individual that you had vomited more than ten times?
A. Possibly, yes.
Q. And did you tell this individual that you had not eaten anything?
A. I couldn't keep anything down.
Q. When was the last time you can recall eating anything?
A. The day before.

Page 120

Q. What was it that you ate?
A. Breakfast. The buffet. With my diabetes, I've got to be careful with what I eat.
Q. So is it your testimony that the last thing you had eaten was breakfast on October 17?
A. Something like that, yeah.
Q. Well, when you say "something like that," is that your answer?
A. I want to say so. I don't know -- like, what are you talking about?
Q. So I'm asking you what you ate -- what the last thing you recall eating. You told me you recall eating breakfast on October 17?
A. I want to believe so.
Q. Okay.
ATTORNEY HOFFMAN: He also said buffet.
THE WITNESS: You had to indulge in the buffet.
BY ATTORNEY DRAHOS:
Q. The breakfast buffet?
A. Yeah, breakfast buffet.

Page 121

Q. Did you also -- were you asked whether or not you were experiencing any shortness of breath?
A. I can't recall.
Q. If this individual wrote that you denied feeling any shortness of breath; is that accurate or inaccurate?
A. Inaccurate. I can't recall. I don't know -- there was -- I know there was like three or four people that came to see me.
Q. Okay. Did you deny experiencing any chest pain when this person came into the cabin initially to see you?
ATTORNEY HOFFMAN: Objection, asked and answered.
THE WITNESS: I don't recall.
BY ATTORNEY DRAHOS:
Q. All right. Now, it's your recollection that you were brought down to the medical center in a wheelchair?
A. Yes, sir.
Q. So you told me about issues that you had with your right big toe. Were you experiencing any medical conditions with your left big toe at the time?

A. No. No, sir.
Q. Had you ever sought treatment from anyone for medical care for your left big toe?
A. No. That happened while I was on the ship.
Q. Tell me about that. When did you first notice anything with your left big toe?
A. I don't know. I just noticed that the toenail somehow came off in my new shoes. I was wearing new shoes. I don't know, but it was coming off.
That dead -- when I was on the ship, you know, just walking around the ship -- I'm a big guy. I don't know.
Q. What day was that?
A. I can't recall. Can't recall when. But I just know I wrapped it and was hoping I didn't lose a toenail. That was it. The toe was not a problem.
Q. All right. So what day did you wrap it?
A. I forget. Second or third day on the ship. I don't know.
Q. What did you notice about your left big toe on the second or third day of the cruise?



A. That it was coming off somehow or some way. I don't know.
Q. Had that ever happened to you before?
A. No, sir.
Q. Is there anything in particular that you can point to as being the cause for that?
A. No, sir.
Q. Meaning you didn't bump it into anything?
A. Not that I can recall.
Q. All right. So when you entered the medical center for the first time, tell me what you remember about that experience.
A. Going down to the infirmary in a wheelchair. They had a bed set up for me. They put me in the bed. I forget his name. It was their head doctor.
He came over to me and said, "What's wrong?" I said, "I can't feel my arm and my legs. I never felt this before."
And then they didn't say much of anything, other than they talked about my diabetes and they talked about my toe. I can remember some of that.



Q. Okay. So you don't recall the name of the doctor?
A. No.
Q. Can you describe his appearance for me?
A. A cleaned-up gentleman. I want to say Hawaiian or something. He was something.
Q. Hawaiian?
A. He was something. He was clean-cut. Black hair. He had a Johnny Bravo haircut.
Q. A what?
A. His hair came up in the front. Other than that, no, I was pretty much, you know, in and out. They said I slept a lot. I don't know.
Q. Did he identify himself and his role on the ship?
A. He said he was the head doctor.
Q. Did he say anything else?
A. He said, "I'm going to be here to take care of you."
Q. Do you recall what he was wearing?
A. I don't know. This white-gray color. He looked the part of the ship. He looked like everybody else walking around the ship. Clean-cut, you know, clean shirt. He was clean-shaved.



Q. Okay. Anything else about his appearance that you recall?
A. No. Not at all. I've seen several people.
Q. So according to the ship's doctor, when he first evaluated you, his notes indicate that you reported to him that you had been experiencing vomiting, diarrhea, and lethargy, meaning tiredness, for the past two days.
A. False.
Q. You're saying he got that wrong also?
A. False.
ATTORNEY HOFFMAN: What page are you on?
ATTORNEY DRAHOS: 15 of the medical chart.
BY ATTORNEY DRAHOS:
Q. The doctor also indicates in his note that you reported to him that you had experienced multiple episodes of vomiting more than ten times; is that accurate?

A. Yeah.
Q. And soft stools for the past two days. Did he get that wrong also?
A. He got that wrong.
Q. With loss of appetite; correct?
A. I couldn't keep nothing down.
Q. So he's got every part of that right except for the fact that you were not experiencing that for two days; is that what you're telling me?
A. Yes.
Q. All right. And he also indicates here that you specifically denied feeling a headache at the time; is that accurate?
A. I don't recall. I was in and out of headaches and dizziness and vomiting and bathroom breaks.
Q. So if the doctor represents that he asked you and you told him you were not feeling a headache at the time, are you in a position here today to say whether or not he's right or wrong?
A. I can't recall. There was so much going on.
Q. Now, the doctor's notes also


indicate that he performed an examination on you; is that accurate or inaccurate?
A. Say that again.
Q. Did the doctor perform an examination on you?
A. Supposedly, yes. That's what they say they did.
Q. Are you saying that he did not?
A. What do you consider an examination?
Q. A physical examination.
A. What do you mean? Walking?
Q. Well, what do you recall him doing, if anything?
A. Shooting me in my stomach with something. I don't know much of anything other than a lot of tests they had taken. A lot of blood work. They kept coming in and pricking my finger for diabetes.
Q. Let me ask you some specifics. So the doctor's notes indicate that it was his impression that you were awake, alert, and oriented at the time of his exam; is that accurate or inaccurate?
A. Inaccurate.
Q. What is inaccurate about it?


A. Because I was -- most of the time I was -- I wasn't talking to anybody. I was sleeping most of the time because they kept pumping me with stuff that I don't know what was going on. And most of time I was sleeping. I was out of it.
Q. When you first came into the medical center, you were awake; correct?
A. Yeah, I was awake.
Q. And you were awake when you first encountered the doctor; correct?
A. Briefly. Yes.
Q. Are you saying that you lost consciousness at some point in time while you were in the medical center --
A. Maybe --
Q. Wait. Let me finish, please.
Are you saying that you lost consciousness at some point in time while you were in the medical center on October the 18th?
A. I don't know.
Q. The doctor, his notes indicate that he did a physical exam on you and specifically measured your strength in your arms and legs. Are you saying that's accurate or inaccurate?


A. False.
Q. And so if the doctor wrote in his notes you had full strength in your arm and legs, are you saying that's wrong?
A. False.
Q. What's false about that?
A. Because I couldn't lift my right arm. The only one that ever did any stress test on me was my doctor, my PCP.
Q. Okay. So you're telling me that at no point in time on October the 18th did the doctor --
A. No.
Q. You have to let me finish.
You're saying on October the 18th at no point in time did the doctor do any type of a measurement of your strength or sensation in either your arms or legs?
A. Not that I can recall.
Q. So does that mean that the doctor could have done an examination of the strength and sensation in your arms and legs and you just don't remember?
A. No one had ever done any test like that in that medical center. I was laying down

the whole time.
Q. You gave me two different answers. You're saying it didn't happen and you're saying I don't recall.
A. All I can remember is laying in a bed. How do you -- how did he test my arms and my legs laying in a bed? How? That's not how it's done.
You know, my PCP, you've got to stand up and shake your legs off, close your eyes, whatever the case may be, and take a pressure test. My doctor had me sit there and push down on my arms.
Q. I did not ask about that doctor right now.
A. No.
Q. So let's just be clear so that both of our positions are transparent; okay?
If the doctor testifies in this case that he did an examination of your arms and legs on the evening of October the 18th and they were normal, are you saying that's wrong?
A. That's wrong.
Q. And are you saying that he never tested that?



A. No. No, sir.
Q. Okay. How long were you in the medical center for that evening?
A. I can't recall. I know it was -- they wanted me to go to my state room. That's all I can remember. I don't know how long I was down there.
Q. They wanted you or you wanted to?
A. They wanted me to.
Q. Let's talk about that. So did you tell the doctor on October the 18th that you were feeling better in the medical center?
A. No, sir.
Q. Did you tell him that you weren't feeling any nausea or diarrhea while in the medical center?
A. No, sir.
Q. Did you tell the doctor on October the 18th that your dizziness started when the ship started rocking?
A. No, sir.
Q. You never said anything like that at all?
A. No, sir.
Q. Did the doctor tell you on the



evening on October the 18th that it was his advice that you should stay in the medical center for monitoring, but that you wanted to go back to the cabin?
A. No, sir.
Q. That did not happen?
A. I did not want to go back to my state room, no.
Q. And did the doctor tell you on October the 18th that it was his recommendation that you go to the hospital when the ship reaches Baltimore, but you told him no, you'd prefer to go back home in Pennsylvania?
A. I didn't have much waiting for me. I never stated anything about a Pittsburgh doctor or nothing.
(Composite Exhibit B was marked for identification.)
BY ATTORNEY DRAHOS:
Q. So I'm going to hand you what we'll mark as composite Exhibit B to the deposition.
Mr. Smith, I've handed you what we've marked as Exhibit B to the deposition. It has a Bates stamp of GR627 through GR628; do you see that there in front of you?



A. Yes.
Q. This is what we call an Against Medical Advice Form.
A. Yes.
Q. And this was completed, at least according to the records, on October the 18th at 8:42 p.m.
Can you turn to Page 2, which would be 628?
A. Yes.
Q. Do you see in the upper left-hand corner there's a squiggly mark in the patient box Michael Smith?
A. Yes.
Q. Is that your signature?
A. Maybe.
Q. What does that mean, "maybe"?
A. It looks like it.
Q. Do you have any reason to believe that's not your signature?
A. Yes.
Q. Who is Austin Patterson?
A. That's my brother-in-law.
Q. And do you know what his signature looks like?

Page 134

A. No.
Q. If according to Carnival's records Austin Patterson would have signed this document on October the 18th at 8:42 p.m.; do you have any reason to dispute that?
A. I have no reason to dispute that. No.
Q. Was Austin with you on October the 18th in the medical center?
A. I recall, yes.
Q. Now, this Against Medical Advice Form indicates that the doctor specifically suggested that you stay in the medical center for monitoring. But you signed this form saying that you did not agree with that advice; do you see that?
A. I see that.
Q. What is your explanation for why you signed this document?
A. I can't remember. Like I said, I was in and out of it.
Q. So earlier you told me that you wanted to stay in the medical center and the ship's medical staff told you, "No. You can go back to your cabin." This document indicates

Page 135

otherwise. So what is your explanation for that?
A. They can put whatever they want on the paper is what it sounds like. No way did I ever sign a paper saying that I was leaving. I couldn't walk.
Q. Okay. So you're saying that this document has been fabricated?
A. I don't know. Something -- something ain't right about it.
Q. Is your memory, perhaps, not right?
A. Possibly.
(Composite Exhibit C was marked for identification.)
BY ATTORNEY DRAHOS:
Q. I'm going to hand you what we'll mark as Composite Exhibit C marked for the deposition.
A. Yep.
Q. So that is also an Against Medical Advice Form dated October 18, 2024. Can you turn to the second page which is Bates-stamped GR630?
And if you look at the upper left-hand corner, do you see that there's a box

Page 136

that says Michael Smith?
A. Yes.
Q. Does that also appear to be your signature?
A. Yes.
Q. And then the box next to it, do you agree that that also appears to be Austin Patterson's signature?
A. That's what it says, yes.
Q. Now, this is a form indicating that the doctor has recommended that you be referred to a hospital in Baltimore.
Did you disagree with that advice on October the 18th, 2024?
A. I'm not sure. There's a lot of stuff going on.
Q. Do you agree, Mr. Smith, as you sit here today, that if you do not follow the advice of your doctor, that you're responsible for the consequences?
A. Can you repeat that question?
Q. Do you agree that if you do not follow the advice of a doctor, you are responsible for the consequences?
A. You should speak to your doctor.

Page 137

You should listen to your doctor every time, yes.
Q. So is it still your testimony here today that you were sent back to your cabin against your will?
A. Yes, sir.
Q. So the medical note written by the doctor indicates that on the evening of October the 18th, you advised him that you were feeling more energetic; is that true or not true?
A. What day, sir?
Q. October the 18th, that evening while you were in the medical center.
A. I couldn't agree to anything. My speech was messed up. I couldn't talk.
Q. Okay. Did you tell him that you were being made to feel dizzy -- or that your dizziness was worsening as the motion of the ship was increasing?
A. No. I never said anything like that, no.
Q. Did you tell the doctor on the evening on October the 18th that your dizziness went away?
A. No. Never.

Page 138

Q. Did you tell him that you were no longer feeling nauseous?
A. Never.
Q. So if the doctor wrote that in his note, are you saying that the doctor fabricated that?
A. I can't say. I don't know.
Q. Okay. What other explanation would you have other than that the doctor fabricated it if it indicates in his notes that you told him you were feeling more energetic, that you weren't feeling dizzy, and you weren't feeling nauseous?
A. I don't know. I can't recall what the doctor wrote down and I can't -- I don't know what was going on. I know there was a bunch of arguing and there was a bunch of stuff that went on that day, that I can't recall.
Q. There's also a separate note entry written by a nurse who indicates that you told her that you were feeling much better, as well.
Are you saying that the nurse got it wrong?
A. Yes.
Q. So both the doctor and nurse have

Page 139

inaccurately reported your symptoms and your condition on the evening on October the 18th?
A. Yes.
Q. And you said there was arguing and a bunch of stuff going on. What are you talking about?
A. Because my sister wanted me to say -- my sisters and AJ would sign on the releases for -- they wanted me to stay in the infirmary. They wanted me to stay with the doctors because there was nothing for me to do in the state room.
Q. Who else was in the medical center with you on October the 18th?
A. I can't recall. I know my niece, Alyssa; my sister, Patty; my sister, Stephanie; Austin, and AJ. That, I can remember. And Eric.
Q. And Eric?
A. Eric.
Q. And so it's your testimony that the medical staff discharged you from the medical center on the evening of October 18 against your wishes, as well as the wishes of Alyssa, Patty, Stephanie, Austin, AJ, and Eric?

Page 140

A. Yes, sir.
Q. And are you saying that you were not feeling any better after receiving treatment at the medical center on October 18?
A. I can't recall.
Q. What did you do after you were discharged from the medical center that night?
A. From the medical center that night, I went back to my room and went right back down.
Q. Can you go back to Exhibit A?
Sir, if you look at Exhibit A, on October the 18th at 9:31 p.m. there's a charge for $14.16 at the casino bar.
Did you go to the casino after being discharged from the medical center?
A. No, sir.
Q. Do you have an explanation for why there's a charge at the casino bar?
A. State room. Eric, my nephew, somehow, some way, he became the primary person in charge of my state room because he did -- I guess he did everything online to get our boarding pass and everything. Eric is the one that did all of that.

Page 141

Q. You're saying that Eric went into the casino bar and charged against your account?
A. It was the room's account.
Q. Well the service charge is in the casino bar at 9:31 p.m. Are you saying it was Eric that was in the casino bar for that charge?
A. I wouldn't say. It wasn't me. I was definitely ill. I went right back down to the infirmary.
Q. Well, you went to your cabin is what you're telling me?
A. I went to the cabin. I couldn't stand it anymore. So they called and said, "He ain't getting better. He wants to come back down." And either the first or second time, they wanted more money. Money.
ATTORNEY DRAHOS: All right. Let's take a break.
(Short recess was taken.)
BY ATTORNEY DRAHOS:
Q. We're back on the record. So you told me that -- when we left off, you told me that you had gone back to your cabin and you

Page 142

went to sleep; is that correct?
A. I don't remember going to sleep.
Q. All right. So what did you do in the cabin after you were discharged from the medical center?
A. Tried to tough it out.
Q. Tried to what?
A. Tried to tough it out. Someone called down and said, "You need to come up and get him."
Q. All right. So when you went back to the cabin, do you know what time that was?
A. I can't recall.
Q. And was Eric in the cabin with you?
A. Yes, sir, that I can recall.
Q. Anyone else in the cabin with you?
A. No.
Q. All right. So who would have been the person to call the medical center back?
A. I'm not sure. I think it was my sister or AJ. I don't know.
Q. Do you know when they called?
A. They called, it was minutes after they dropped me off. I didn't recall saying I wanted to go back to my state room, to begin

Page 143

with.
Q. So you're saying when you left the medical center to go to your cabin, was your sister and AJ in the cabin with you?
A. I want to say so.
Q. Were they in the medical center with you, as well?
A. Yeah. They were at the medical center until I told them to go, go and enjoy yourself.
Q. Let me go back. So I know that Austin was in the medical center with you because he signed documents; right?
A. Supposedly.
Q. Who else from your family was in the medical center with you throughout the entirety of the time you were in there?
A. Everybody but Terry, her sister, and Megan.
Q. Give me names, if you will, please.
A. Terry Crowley, Nicole Crowley, and Megan something.
Q. They were not in the medical center?
A. Not that I can recall.
Q. But your family was?

Page 144

A. Yes.
Q. And they were with you throughout the entirety of the time?
A. No.
Q. Who did you release from the medical center?
A. My nephew came in and said that he was going to be somewhere. I said go enjoy yourself is what I said.
Q. Eric; right?
A. Yeah.
Q. So when you were in the medical center on the night of October 18, Eric was in there but you told him to leave?
A. They came to see me: my niece, my sisters, my brother-in-law, everybody.
Q. That part I got. But what I'm wondering is who left before you did?
A. All of them. I was stuck in the room.
ATTORNEY HOFFMAN: Listen to the question.
BY ATTORNEY DRAHOS:
Q. Let me go back because it sounded, from your lawyer, that you didn't answer the

Page 145

question the way it was anticipated.
I am -- my understanding is that your entire family, who was traveling on the cruise with you, was in the medical center on the night of October the 18th with you; right?
A. Yes.
Q. Were they all with you when you left or did some of leave earlier than you?
A. What's the question? I don't understand.
Q. Okay. All of your family was in the medical center on the night of October the 18th with you; right?
A. Yes.
Q. Were they all still with you when you left or did some of them leave earlier?
A. I think some of them left earlier due to an argument, yes.
Q. Due to an argument?
A. Yeah.
Q. Who were the people that left due to an argument?
A. Stephanie Grimm and my sister, because they threatened to call, I guess, the boat police or something. They wanted me to go

Page 146

to my state room and my sister said no.
Q. So Stephanie and who was the other one?
A. Patty, I would say.
Q. Stephanie and Patty?
A. And Alyssa had been right behind them.
Q. And Alyssa?
A. Yeah.
Q. Okay. So Stephanie, Patty, and Alyssa were arguing with who?
A. The doctor. Stephanie was talking with the doctor, as much as I could hear. They threatened her with calling the police of the boat or whatever to come get her.
ATTORNEY HOFFMAN: I just want to be clear. Objection, testifying to facts not in evidence. It was only Stephanie, I believe, he testified that was arguing.
THE WITNESS: Yeah.
ATTORNEY DRAHOS: I mean, I think it's been clear the way it's been asked.
BY ATTORNEY DRAHOS:
Q. So you said Stephanie and Patty and Alyssa left because of the argument; right?

Page 147

A. Pretty much, yeah.
Q. What time was that?
A. I can't recall.
Q. Where did they go?
A. I don't know. Back to their state room. I don't know.
Q. And they were arguing with the same doctor, the clean-cut guy that was treating you?
A. The clean-cut guy, yep. I would say so, yes.
Q. What were they arguing about?
A. About me being released to my state room.
Q. They didn't agree, is what you're saying?
A. They did not agree.
Q. And what was the doctor saying?
A. The doctor was saying that there was nothing more they could do. They wanted money.
Q. Who wanted money?
A. I heard something about 200 and some dollars to be sent to my sisters for me to be seen in the doctor's room. There was no room for me, supposedly.

Page 148

Q. They wanted $200 for what?
A. To see me. For me to stay down in there.
Q. To stay there?
A. To stay there.
Q. Okay. Did you get in any arguments with the doctor?
A. No. I couldn't move. I couldn't speak. I couldn't tell him. I couldn't do anything.
Q. So what is your understanding for why the doctor threatened to call the boat police?
A. Because of Stephanie's mouth.
Q. What was she saying?
A. I can't recall everything. All I can recall was "You effing," you know, and foul language. "You keep my brother down here or else."
Q. So she was using vulgarity?
A. Oh, yeah. I would say so. Knowing her, yeah. Like I said, I was laying in the bed.
Q. Is Stephanie out there?
A. No.

Page 149

Q. Has she been here today?
A. No.
Q. So did Stephanie leave the medical center voluntarily or was she escorted?
A. Voluntarily.
Q. All right. So when you left the medical center, who from your family was with you?
A. The first or second time?
Q. The first time.
A. Everybody. Whoever was there, Stephanie, Patty, AJ. I mean, they came --
Q. Either we're speaking past each other or we're not talking about the same circumstance.
So you told me that on October the 18th that Stephanie and Patty and Alyssa left the medical center; right?
A. Yeah.
Q. So that would mean that when you left the medical center on October the 18th, Stephanie, Patty, and Alyssa were not with you?
A. They had all their information. When I left the infirmary, I could remember all of them being there. When they -- they came

back for my release to go back to my state room, they helped me back to my state room.
Q. All right. So what you're saying is they left and then came back to help you?
A. Yes. They were releasing me.
Q. So everybody in your family was with you when you left the medical center?
A. Pretty much.
Q. Well, were they or were they not?
A. Were a tight family, yes.
Q. When you say "pretty much," it makes me clarify. I have to find out what you mean by that.
A. Okay.
Q. So to be clear, the whole family was with you when you left the medical center?
A. Yes.
Q. And did the whole family go with you back to your cabin?
A. Probably not. They probably went back to their cabin. It's in the same hallway.
Q. So who do you specifically remember --
A. Eric.
Q. Let me finish the question. Who do


you specifically remember going back to the cabin with you, other than Eric?
A. Eric.
Q. Okay. Now, earlier you told me that within minutes after dropping you off, somebody called back to the medical center?
A. Supposedly, yes.
Q. Well, did they or didn't they?
A. Yes.
Q. Who was it that called?
A. I don't know. One of my sisters, supposedly. There was nothing they could do for me up here.
Q. How is it that you know that?
A. What do you mean? How is it that I know that I was in the infirmary?
Q. Well, when you left the medical center and you went back to your cabin, your sisters were not physically with you.
A. They were in the same hallway. They came to visit me, yes.
Q. Where were they when they made that phone call?
A. I don't know. In my cabin or in their cabin. I don't know.


Q. All right.
A. I can't recall.
Q. So how is it that, as you sit here today, you have an understanding that somebody called the medical center within minutes of you returning to your cabin?
A. Do you expect them to come up and get me? No. My sisters called and said, "He is not feeling good."
Q. How is it that you have that understanding? Did somebody tell you that?
A. I was awake. I can hear.
Q. So you're saying you overheard?
A. I said to my nephew, "I'm not feeling good." I don't know who he went to. My sister, Stephanie, was next door or Patty. I don't know who or how or whatever phone call was made. I went back down.
Q. That evening?
A. That evening.
Q. How did you get from your cabin back to the --
A. The wheelchair.
Q. You've got to let me finish the question.


So you're saying that you went back to the medical center by wheelchair on the night of October the 18th?
A. Yes.
Q. And when you went back to the medical center via the wheelchair, who was in the medical center?
A. I want to say the staff. I don't know. I don't know any names.
Q. Was the doctor still there?
A. From what I recall, yes. He was there -- or someone was there. Someone reevaluated me. They were shooting me in my stomach. I don't know. I don't know who was there.
Q. So when you returned to the medical center for a second time on October the 18th, did the doctor who treated you previously treat you again?
ATTORNEY HOFFMAN: Objection, asked and answered.
THE WITNESS: Maybe.
BY ATTORNEY DRAHOS:
Q. You don't know?
A. I'm lucky I know what shoe size I

had that day.
Q. All right. And so what do you remember about what took place in the medical center when you returned on the night of October the 18th?
A. They stated that there was going to be an ambulance at port waiting for me and to be comfortable. So I laid in the bed and laid in the bed and they kept -- they put me in this room and monitored me.
Q. They did what?
A. They put me in the room and monitored me. They made sure I was okay until we ported in Baltimore. And there was an ambulance, a paramedic that was taking me to one of the hospitals in Baltimore.
Q. So have you seen the medical charts in this case?
A. I can't recall.
(Composite Exhibit D was marked for identification.)
BY ATTORNEY DRAHOS:
Q. Let's go ahead and attach this as an exhibit. So I'm going to hand you what we'll mark as Composite Exhibit D to this deposition.



It's Bates-stamped GR5 through GR46.
Do you know what time it was that you would have returned to the medical center on the night of October the 18th?
A. No, sir.
Q. And is it your testimony that you remained in the medical center throughout the entirety of the evening?
A. I want to say yes, sir.
Q. But that's different than what's reflected in the medical records. So in the medical records, it's indicated -- if you look at Page 38 of the chart, Bates stamp 42. It's indicated here by the nurse that you came back to the medical center at 9:35, as advised, for follow-up.
Are you saying that that's wrong?
A. That's wrong.
Q. Now, the doctor's notes written on that same page, Page 38, at 9:48 a.m. indicated that, "The guest presented to the medical center in a wheelchair for follow-up. Slept well upon discharge from medical center, but then vomiting at 3:00 in the morning, multiple episodes. The medical center was not made



aware."
Are you saying that that didn't happen?
A. When I went down the second time, they put me in the same bed. They rolled me into a room. I sat in that room I don't know how many hours. All they kept saying was, "Rest. We're going to port." And they ported in Baltimore and the paramedics were there to get me.
Q. That's not what I asked.
A. I can't remember.
Q. The timeline that's indicated in the medical chart written by the medical staff is that you were sent back to your cabin, that you remained there, and that you vomited at 3:00 in the morning but did not come back in until 9:35 a.m.
Are you saying that timeline is not correct?
ATTORNEY HOFFMAN: Objection, asked and answered. He just said he doesn't remember.
ATTORNEY DRAHOS: Well, he hasn't made it clear.



BY ATTORNEY DRAHOS:
Q. So what is your -- what is your position in the case? That you stayed in the medical center throughout the night of October 18 or you went back to the cabin, stayed there, slept, got up at 3:00 in the morning and started vomiting?
ATTORNEY HOFFMAN: As he just stated, he doesn't remember.
ATTORNEY DRAHOS: I would appreciate not to instruct the witness on how to answer questions. If you want to object to the form, that's fine.
ATTORNEY HOFFMAN: Okay.
THE WITNESS: So I went to the infirmary. They sent me upstairs. You got signatures I don't know where.
They sent me to my room within, I want to say, minutes, if not less than that. Somehow, some way, one of my sisters called and said, "You've got to come get him."
They came and got me and took me down there. And I want to say it was the 19th that I stayed put in that infirmary because they wouldn't -- like I said, they wanted money

Page 158

for me to stay there.
They then put me in a room. I had a little port window. I can remember looking out that window. I remember being in that room. Not until they came and got me at port, and that was the end of it. That's all.
BY ATTORNEY DRAHOS:
Q. Okay. So yes or no, did you go back to your cabin on the night of October the 18th, go back to sleep, and wake up at 3:00 in the morning and vomit?
A. I don't know. There was a lot of vomit. I don't know anything about sleep. How can you sleep? You're in pain.
Q. Did you vomit in your cabin on October the 19th at --
A. I don't know.
Q. You've got to let me finish.
Did you vomit in your cabin at 3:00 in the morning on October the 19th?
A. I can't recall.
Q. Okay. Did you tell the doctor on the morning of October the 19th that you were a first-time cruiser and that your dizziness may be attributable to motion sickness?

Page 159

A. No.
Q. Did the doctor talk to you about your blood sugar levels?
A. They mentioned -- yes.
Q. And did he ask you whether or not the lab results that they were getting on the ship for your blood sugar was within normal range for you?
A. No. I don't know. I don't recall.
Q. So do you know what your normal range is for your blood sugar?
A. My normal range is, like, 300. This morning it was 300. Before breakfast, it was 300. My doctor states it needs to be 170, 160 or 170.
Q. Did the doctor tell you -- the ship's doctor tell you at any point in time what he thought was causing your symptoms?
A. No. No, sir.
Q. During your time in the medical center on October the 19th, did you, at any point in time, begin to feel better?
A. No, sir.
Q. Did you get worse?
A. I stayed the same. They had me in

Page 160

the bed and I spent like a day in the bed. That's all I can think of. And they're coming in and testing me for my blood sugar, shooting me in my stomach, shooting me with insulin, whatever the case may be, and they kept examining that toe on the left side, which was irrelevant.
Yes, there was a lot of stuff that was brought up in that medical center that maybe I don't recall.
Q. Okay. Do you know how many times, if at all, you vomited in the medical center on October the 19th?
A. Not that I recall, no.
Q. If it's reported in the ship's medical center you vomited at 2:15 and then at 3:30?
A. If they say so.
Q. Do you have a memory of vomiting any more than that?
A. I can't recall.
Q. Now, according to the ship's records, when you entered the medical center at approximately 9:30 on October the 19th, you remained there until 5:15 p.m.; is that

Page 161

accurate with your recollection?
A. If you say so, sir.
Q. Now, did you have a particular conversation with the ship's doctor at approximately 5:00 to discuss whether or not you should stay in the medical center or return back to your cabin?
A. They kept trying to send me back in my state cabin. I said no.
Q. According to the ship doctor's note, at 5:00 p.m. on October the 19th, you were sleeping peacefully in the bed; is that accurate or inaccurate?
A. There was nothing else to do, sir.
Q. Were you sleeping in the bed?
A. Maybe.
Q. So according to the ship's doctor, at 5:16 p.m., he explained to you that your vital signs were stable, that you had been well hydrated and that your blood sugar had been under control for more than four hours.
And then in his observation, you were stable enough to return to the cabin. And he indicates in his note that you understood and agreed with that plan.

Page 162

A. So you say.
Q. Is that accurate or inaccurate?
A. No. Never once did I want to go back to my state room.
Q. Let's talk about October the 19th, the entire day. It's a sea day. The ship is sailing back to Baltimore.
Who was in the medical center with you from your family?
A. I can't recall. I don't recall.
ATTORNEY HOFFMAN: Objection, asked and answered.
October 18, you asked?
ATTORNEY DRAHOS: No. I said October 19.
BY ATTORNEY DRAHOS:
Q. Did you tell the doctor at that time, at approximately 5:16 p.m., that you were feeling tired and dizzy as the ship was rocking?
A. I can't recall.
Q. Do you recall what the weather was like that particular day?
A. Like I said, I was in the infirmary looking out the infirmary window. I can't

Page 163

recall.
Q. All right. Now, there's another note entry about almost an hour later at 6:10 p.m., where it says that you were too lethargic to stand; do you have a memory of that?
A. I know leaving my state room each time, they came in with a wheelchair. I could not stand on my legs.
Q. Okay. So according to the ship's record, you never left the medical center on the 19th. You stayed there; is that accurate?
A. Pretty much, yeah. I was waiting for them to port.
Q. And they did tell you that there were plans to have you medically transferred to a hospital in Baltimore by that time; right?
A. Yes.
Q. So did you have any issues at all throughout the night -- this last day, this last evening on October the 19th?
Did you have any issues at all while you were in the medical center?
A. Not that I recall. I couldn't stand. I know I had a vomit bag. I don't know

Page 164

how many times I vomited. I don't know.
Q. Well, on Page 34 of the note -- and this is the last note written by the doctor on the morning of October the 20th. The ship is scheduled to arrive at Baltimore. He indicates that you were sleeping peacefully in the bed.
Agree or disagree with that?
A. Agree.
Q. Okay. And he writes that you did not have any issues reported throughout the entire evening; is that accurate or inaccurate?
A. I'm not sure.
Q. Okay. He says that you're tolerating oral sips of apple juice with no further vomiting episodes reported?
A. I can't recall. I can't recall putting anything in my body.
Q. Okay.
A. Other than the shots they were giving me.
Q. And then the plan was for the ambulance to arrive at 10:00 that morning?
A. Supposedly, yes.
Q. And did you tell the doctor on the morning of October the 20th that you had no

Page 165

other complaints and you were feeling much better?
A. What hospital are we talking about? The first hospital or the second hospital?
Q. This is the morning of October the 20th.
A. I would have been in one of the hospitals in Baltimore -- no. I was in an emergency room the whole time.
Q. Let's just make sure that you answer the question that I'm asking.
On October the 20th, at 8:00 in the morning, did you tell the ship's doctor that you had no complaints and you were feeling much better?
A. No. I never said anything to the ship's doctor.
Q. Who, if anyone from your family, was in the medical center with you at the time the -- you were transferred off of the ship?
A. When I went to one of the hospitals, I don't know which one it was at first, my sister, Patty --
Q. No. I don't mean to interrupt you but you're not answering the question that I

Page 166

asked. I don't want to waste energy having you answer something --
A. I understand.
Q. When you were in the medical center being transferred off of the ship into an ambulance, was there anyone from your family there with you at that time?
A. Not that I can recall, no. They were getting off of the ship on their own.
Q. Who was the last family member that you recall encountering in the ship's medical center?
A. I don't know. I don't know that answer.
Q. All right. So were you conscious at the time the paramedics arrived on to the ship?
A. Yes.
Q. Do you recall having a conversation with them?
A. I remember -- they asked me if I was okay for transport. Yes. That's about it. I was laying down and they were doing all ambulance things.
They were checking my vitals, doing everything they're supposed to do as

Page 167

paramedics. I don't remember.
The only conversation I had with them was about the Baltimore Ravens and the Steelers.
Q. The Ravens and the Steelers?
A. Something in that area. They were just making light of the situation.
Q. So if the paramedics who transferred you from the cruise ship to the hospital indicate in their run report that you made no complaints to them other than that you were feeling tired, did they get that right or wrong?
A. Wrong, I'd say. I don't remember talking to them at all about my medical.
Q. You're saying they didn't ask any questions about your symptoms?
A. Why would they? No. Their job is to transport me.
Q. So, sir, I'm going to ask you what is Page 7 of 9 pages of the run report that was generated by the paramedics.
ATTORNEY HOFFMAN: Do you have a copy of it?
ATTORNEY DRAHOS: No. I have

Page 168

it electronically. So I'm going to show it electronically and we're going to attach it as an exhibit.
(Composite Exhibit E was marked for identification.)
BY ATTORNEY DRAHOS:
Q. Is that your signature?
A. Maybe. Maybe not.
Q. Do you know, one way or another?
A. I would have to say yeah. I don't know.
Q. Do you have any reason to believe, in looking at that, that that's not your signature?
A. The fact that I can't use my right arm and that's how I sign things, I don't know.
Q. Other than that, do you have a specific recollection, as you sit here today, as to whether you signed or did not sign what's been marked Exhibit E?
A. I'm not sure. I don't know. No answer.
ATTORNEY DRAHOS: So what I'll do is I'm going to mark the entire run report. It's a nine-page document. It is Composite

Page 169

Exhibit E.
BY ATTORNEY DRAHOS:
Q. Okay. I'm going to read for you what is directly written by the paramedic that picked you up --
ATTORNEY HOFFMAN: Could you send it to me?
ATTORNEY DRAHOS: Let me see if I can send it to you. Bear with me for just one second.
ATTORNEY HOFFMAN: Thank you.
BY ATTORNEY DRAHOS:
Q. So, Mr. Smith, I'm going to read to you from Page 5 of the run report from the paramedics. If you see there, there's a section that says Subjective.
A. Okay.
Q. I'm going to go into the third sentence. It says, "Patient was found on scene with weakness and vomiting for the past three days. Patient was found on a cruise ship. Patient had been feeling weak and vomiting. Staff at ship clinic found patient to have inconsistent glucose. Patient stated that he was still feeling lethargy. Patient denies

chest pain and shortness of breath. Patient stated no other injuries or illnesses at this time."
Do you see that there?
A. I see that.
Q. Do you agree or disagree with that entry written by the paramedics?
A. I agree.
Q. And if according to Carnival's records you were taken off of the ship at 10:40 a.m., do you have any reason to dispute the accuracy of that?
A. No.
Q. And you were taken directly to MedStar Harbor Hospital ER; correct?
A. Yes.
Q. According to their records, you arrived at 11:08 a.m.; any reason to dispute that?
A. No.
Q. Now, were you fully oriented both to person, place, and time when you arrived to MedStar Harbor Hospital ER?
A. I'm not sure. All I know is I sat in the bed and did testing.



Q. So did you know who you were at the time?
A. Yeah.
Q. Did you know where you were?
A. Pretty much, yeah.
Q. And did you know the date?
A. No. I couldn't tell you any dates. I can't remember.
Q. All right. So you knew who you were, where you were, but you didn't know what day it was?
A. I can't recall.
Q. According to the MedStar Harbor ER records, you would have been assessed by an emergency room physician at 11:57 a.m.; would that be accurate to you?
A. Yeah. If you say so.
Q. Now, according to the assessment of that doctor, your speech was normal at that time; accurate or inaccurate?
A. Accurate -- or inaccurate.
Q. I'm sorry. Did you say --
A. They were talking about my speech the minute I hit the ER.
Q. Okay.



A. They didn't know -- until they ran further testing and found out that I had a stroke.
Q. Okay. Were you slurring your words on October 20, 2024?
A. I believe so.
Q. And so if it was the doctor -- the ER doctor's note that that person specifically spoke to your family and was told that your speech was normal, are you agreeing or disagreeing with that entry by the doctor?
A. Disagreeing.
Q. So you're saying you were slurring your words?
A. Yeah.
Q. Now, that ER doctor also wrote that they did an examination of your upper extremity and lower extremities; do you have a memory of that?
A. I can't remember.
Q. And if according to the ER doctor you had full strength and sensation both in your upper extremities, meaning your left and right arm, and your lower extremities, meaning your left leg and right leg; is that accurate



or inaccurate?
A. Inaccurate.
Q. What deficits were you demonstrating on October the 20th when you were at the MedStar Harbor Hospital?
A. I was very weak. I couldn't feel my right arm. I couldn't feel my legs. And my sister, Patty, and Eric was there until I sent them home.
Q. Until you sent them home?
A. Yes.
Q. So you're telling me that the ER doctor also got it wrong, that the ER doctor indicated that your strength in your right arm was normal and your sensation was normal, but you're saying that's not the case?
A. I don't recall the whole facts because I was there -- I don't know how long I was there before I was shipped to another hospital due to the -- fuck, what do you call it -- the stroke. The hospital that can better take me. I went to the ICU.
Q. All right. So was your right arm in the same condition at MedStar Harbor Hospital as it was on the cruise ship?

Page 174

A. Pretty much.
Q. Pretty much or it was?
A. It was.
Q. Okay. Were your legs in the same condition at the MedStar Harbor Hospital as they were on the cruise ship?
A. Yes.
Q. According to the ER physician at MedStar Harbor Hospital, you reported a pain score of zero; is that accurate or inaccurate?
A. Inaccurate.
Q. What was your pain score on a scale of 0 to 10?
A. I can't recall, but it wasn't zero. Like, I had pain. I couldn't feel my legs or my arm. I couldn't keep up.
I kept complaining until they ran further tests and they find out that I had the stroke.
Q. So according to the ER doctor at MedStar Harbor Hospital on October the 20th, the only complaint you made was that you were feeling dizzy and off balance.
Are you saying that you specifically complained of right arm issues?

Page 175

A. Yes.
Q. Do you know what an NIH Stroke Score is?
A. No.
Q. Has anyone ever told you what that is?
A. No.
Q. So as you sit here today, if it was the ER doctor's assessment that your NIH Stroke Score was zero on October the 20th of 2024, you would have no idea about that?
A. All I know is they shipped me to another hospital due to the stroke. I was in two different hospitals in Baltimore, Baltimore Regional and Baltimore where they discovered there was bleeding in my brain and I was in the ICU.
Q. So did they talk to you about specifically what those findings were on the imaging studies?
A. They said it was a right cerebellum and it controlled the whole right hand. If it was a left cerebellum, it controls my whole left side.
Q. All right. Do you know what a micro

Page 176

hemorrhage is?
A. I've heard of it. Something -- I had a bleed in my brain that they said was there, but it wasn't enough significance to go in for surgery.
Q. Did they quantify the degree of bleeding that they found on exam?
A. Not to my knowledge, no.
Q. So if it's the representation of the doctors who wrote the notes in this case that you had minimal bleeding, is this the first time you're hearing that today by the defense lawyer?
A. By the defense lawyer? No. It's in all of my doctor's papers at home.
Q. So did some doctor at some point in time explain to you the degree of bleeding that was found in your brain?
A. Yeah. They said it was minimal. That's at Baltimore while I was in the ICU.
Q. Do you agree or disagree -- strike that.
When you spoke to the doctors, did they tell you that, at the time your brain was imaged, that it was not actively bleeding?

Page 177

A. It was actively bleeding at that time.
Q. They said it was?
A. Yeah. But it wasn't bleeding enough to go in for surgery.
Q. Did they tell you there was no evidence of swelling in your brain?
A. I'm not sure.
Q. But you do have a memory of the doctors telling you that the injury was not significant enough for surgical treatment?
ATTORNEY HOFFMAN: Objection, facts not in evidence.
THE WITNESS: Supposedly.
BY ATTORNEY DRAHOS:
Q. When you say supposedly, how did you come to learn that?
A. I come to learn that through research, through reading my papers more when I got home. My daughter was reading them.
I had a brain bleed that they couldn't go in because it was a big bleed. They stated that if I would have been sooner with the stroke, it was a time issue situation.
Q. So who told you that?

Page 178

A. The doctors.
Q. Which one?
A. Everyone.
Q. Every one of the doctors?
A. At the emergency room. I recall them sending me to Baltimore Regional, and they wouldn't let me go by private means. I had to go by ambulance. And they took me there and I was in the ICU. They kept saying it was a timely issue. If the boat would have life flighted me off or took a boat off or something off, they kept -- I had a stroke in the left cerebellum.
Q. So who specifically told you that you should have been Life Flighted off of the ship?
A. The emergency room in the Baltimore hospital.
Q. The ER doctor?
A. The ER doctor stated, "Why were you left in the room?" All they did was monitor me. Why didn't I leave the room?
Q. Okay. So the ER doctor. Who else do you recall?
A. When I went to the ICU.

Page 179

Q. The ICU doctor?
A. The ICU doctor. They asked me where I was and they laughed.
Q. But did they say to you that you should have been taken off of the ship?
A. Yeah. Oh, yeah. Yes, sir.
Q. What treatments did either the ER doctor or the ICU doctor tell you you would have received if you had come sooner?
A. I don't know. I don't know the answer to that. All they said was that there was a time issue stamp on it. Meaning I shouldn't have sat in the room for a day.
Q. So you're saying they said you should not have sat in the room for a day but you're telling me they didn't tell you that there was some treatment that they could have provided that they didn't?
A. It was before -- it was beyond that. It was past that. My whole side is numb to this day. I can't walk long distance.
Q. We're going to get to that in a second.
A. Sure.
Q. So you were discharged from Franklin

Page 180

Hospital on October the 26th; correct?
A. Yes.
Q. Six days later?
A. Yes.
Q. And do you agree or disagree that at the time of your discharge, you reported pain on a scale of 0 out of 10?
A. I can't recall. Can't recall.
Q. And during the time that you were in MedStar Hospital, whether it was the Harbor Hospital or Franklin, did your symptoms in your right arm ever improve?
A. No.
Q. And during the time that you were at MedStar Hospital, either Harbor or Franklin, did your symptoms in your lower legs ever improve?
A. No.
Q. So you're saying you were discharged from those facilities without any improvement in either your right arm or your lower legs?
A. Yes. I went to therapy.
Q. Did the doctors tell you what it was that they believed caused your stroke?
A. No.

Page 181

Q. Do you know what PFO is?
A. No. No, sir.
Q. Have you ever heard of the fact that you were born with a congenital defect in your heart?
A. No, sir.
Q. So what you're saying is that at no point in time did any doctor come to you and say, "We want you to be monitored for two months. And then afterwards if you don't have any symptoms, you may be a candidate to have a surgery on your heart"?
A. No one ever said anything about my heart.
Q. You never heard anything like that at all?
A. No. Never.
Q. How do you get from Baltimore back to Pennsylvania?
A. My stepdad, John Grimm.
Q. He drove you back?
A. He drove me back.
Q. So you would have been discharged on October the 26th and admitted to Encompass Health that same day?

Page 182

A. Yes, sir.
Q. How long is the drive from Baltimore to Pittsburgh?
A. I forget. Seven hours. I don't know. I can't recall.
Q. All right. According to the records, you would have been at Encompass Health for 13 days?
A. 14 days. Yep.
Q. During the time that you were at Encompass Health, did your symptoms in your right arm ever get any better?
A. They were working on it.
Q. I'm sorry?
A. No. They were working on it.
Q. So you left Encompass Health with the same condition in your right arm as it was when you were on the ship?
A. I met their criteria. I learned how to walk all over again. And I can't walk by myself. I need a cart.
Q. I don't think I asked anything about that.
So I'm focusing strictly on your right arm. Are you telling me that when you

Page 183

were discharged from Encompass Health, you left that facility with your right arm being in the same condition as it was when you were on the ship?
A. Pretty much, yes.
Q. Pretty much or yes?
A. Yes.
Q. And when you left Encompass Health, were your symptoms in your lower legs the same as they were when you were on the ship?
A. No. They felt a lot better.
Q. In what way?
A. And I was able to stand on them enough to walk with my walker, which I left there with a walker.
Q. Is that the first time you've ever had a walker?
A. Yes.
Q. Is that the first time you've ever had any type of assistive device to walk?
A. No. I had crutches when I had my knee.
Q. And the walker that you left with, is that the same one that you have in this room?

Page 184

A. No, sir.
Q. Is that a no?
A. No, sir.
Q. What happened to the first walker?
A. It's in my bedroom.
Q. Where did you get the walker from that's in this room?
A. My cousin got it for me. It's got a seat on it. It's got brakes. It's aluminium and it wasn't worth the money -- my insurance wouldn't have paid for it. It's not worth anything. It doesn't got brakes. It doesn't got a seat. It's not as nice as that one.
Q. The one that you got from Encompass Health?
A. Yeah.
Q. So when did you get this one that's in the room?
A. Months later.
Q. Months later?
A. Months later.
Q. And did you say your cousin got it for you?
A. Yeah.
Q. Which one?

Page 185

A. David Harrover.
Q. David. What was his last name?
A. Harrover.
Q. Harbor?
A. Harrover.
Q. Can you spell that for me?
A. No.
Q. Okay. Why did your cousin David get you a new walker?
A. Because he had seen how the other one worked.
Q. He saw?
A. Yeah. He knew I needed something different.
Q. Okay. And so has that been the walker you've used since then?
A. Yes, sir.
Q. So did you ever have any further treatment on your left toe?
A. No, sir.
Q. Have you been to see anyone about your knees?
A. I've been -- my PCP gives me arthritis medicine all the time. When I run out I call down to Giant Eagle and they say

Page 186

okay. It's a nonalcoholic medicine. It's for arthritis only.
Q. So after you left Encompass Health, have you been to any specialist for any conditions related to the stroke?
A. No, sir.
Q. Have you been to any further rehab?
A. No, sir.
Q. So is the only doctor you've seen since leaving Encompass Health Dr. Cedric?
A. Yes. Yes, sir.
Q. Do you have any pending appointments with any doctors?
A. No, sir.
Q. Do you have any pending appointments with any health care providers?
A. No, sir.
Q. So you have not had any consultations with any cardiologists?
A. No.
Q. So tell me what physical limitations you're experiencing today that you were not experiencing before the cruise.
A. Walking. Going to the bathroom on my own. Sitting for long times. Walking long

Page 187

distance. Using my right hand. It's my dominant hand. I have to have another -- somebody wipe my butt.
Q. I want to go through some of those a little more specifically. So let's talk first about the use of your right hand.
Are you capable of holding a glass in your right hand?
A. Yeah and no. Sometimes there's like -- it has a mind of its own. I can hold stuff. But it wants to fall. You know, it's not normal.
Q. So you're holding that glass with your right hand right now. Can you put that up to your mouth?
A. (Witness uses his right hand to pick up a glass cup.)
Q. Do you agree that you were capable of doing that?
A. No. Barely, yes.
ATTORNEY HOFFMAN: I would like to note there's no water in the glass.
ATTORNEY DRAHOS: Right. There's no water in the glass. I just wanted him to demonstrate.

Page 188

BY ATTORNEY DRAHOS:
Q. Are you able to turn a doorknob with your right hand?
A. No. I can lean on it. That's about it. There's no -- trust me. This hand can smack you and not know it.
Q. Are you able to make a fist?
A. I can make a fist.
Q. Okay. So you're making a fist now?
A. Yeah.
Q. Why are you holding your wrist?
A. Because I -- it has a mind of its own. It goes.
When I eat, I try my best to eat with this hand -- eat with this hand, but it's -- I've got to learn different things. One thing was wiping my butt.
Q. So are you able to eat with your right hand?
A. No. I use my left hand.
Q. So if you had a sandwich, could you eat a sandwich with your right hand?
A. I don't try any more. It's messy.
Q. Can you brush your teeth with your right hand?

Page 189

A. No. I don't have to.
Q. Okay. Can you comb your hair with your right hand?
A. No.
Q. I see that you have a beard.
A. Yeah.
Q. You don't shave?
A. I used to.
Q. When was the last time you shaved?
A. The day -- going on the cruise.
Q. So you were clean shaven on the cruise?
A. Pretty much. I think so. I think I had a short haircut. You know, you're going on a cruise. You dress up nice. I don't know. It's a different experience.
I did spend -- I've been to a barber shop once.
Q. Okay. It wasn't clear the way you answered that.
So did you have a beard on the cruise?
A. I don't think so.
Q. All right. Can you use your phone with your right hand?

Page 190

A. No. All I can do is set it in there. But I'll throw it. Pretty much, no.
Q. Do you send text messages?
A. No. If I do, it's this hand with the phone sitting down.
Q. Your left hand?
A. Left hand. Yeah.
Q. Could you throw a ball with your right hand?
A. No. No, sir.
Q. So are you able to dress yourself?
A. Barely.
Q. But you can?
A. Tying my shoes is a challenge. I try.
Q. What kind of shoes are you wearing today?
A. Just flats.
Q. What are those?
A. No. They're like a Skechers. They're generic.
Q. But they've got laces?
A. They've got laces, yes.
Q. Did you tie those laces?
A. No.

Page 191

Q. Who did?
A. My cousin, Dave. I try, but I can't get the bow right with both hands.
Q. Do you eat steak?
A. No. Unless it's cut up.
Q. Can you cut your food?
A. No. I haven't put a knife in my hand.
Q. So can you hold things in your right hand?
A. For a period of time I can hold something. Like a pen -- you know, I use my hand to do -- in physical therapy, stuff like that. But it's always laying flat.
Q. So are you able to write your name with your right hand?
A. No. Absolutely not. I tried.
Q. Okay.
A. I tried my initials. No.
Q. So you're doing all your writing with your left hand now?
A. No. My daughters do my writing.
Q. Were you capable of doing writing before that?
A. A little bit. I was able to spell

Page 192

my name. Spelling is a little, you know, rough and reading is a little rough.
Q. So like if you were going to write a greeting card, happy birthday to you, before the cruise would you be capable of writing that?
A. Yes.
Q. And are you saying now after the cruise you can't write that?
A. Yes.
Q. So let's talk about standing. You said that you're not able to stand for long times?
A. Yes.
Q. So tell me how long are you capable of standing?
A. I've never timed it. I've never timed it, sir.
Q. Have you been to any sporting events?
A. No. No, sir.
Q. Do you go to concerts?
A. I used to.
Q. Have you been to a concert since the cruise?

Page 193

A. No, sir.
Q. Do you go to church?
A. No, sir.
Q. Have you ever gone to church?
A. No, sir.
Q. I'm sorry to be -- have you been to any funerals since the cruise?
A. No. I didn't make it to any funerals.
Q. Have you been to any events where you have to stand in a crowd?
A. No. Never.
Q. So this is an example of what we talked about earlier. I want you to guess. Tell me how long do you think you're capable of standing independently.
A. Independent, about 40 seconds.
Q. So sitting there in that chair, are you able to get up without putting your hands on the table?
A. No.
Q. You have to put your hands on the table to get up?
A. With help. I've been sitting here for too long.

Page 194

Q. So you also told me your walking is limited. How far are you capable of walking, in your estimation?
A. I walk from my bedroom to my bathroom with the walker, with some type of assistance. Sometimes it's rougher than others. I think it's about three foot.
Q. How did you get up here today?
A. With a walker with help.
Q. All right. So did you drive here?
A. No. My daughter did.
Q. Okay. So when your daughter drove up to the building, did you get out there on the main street on 4th Street?
A. No.
Q. Where did you get out?
A. There's a parking lot. She pulled over and they helped me out of the car. I walked over and caught an elevator up to the second floor.
Q. So you went from a parking lot up into the building?
A. Main street. Underneath the building.
Q. Parking lot underneath the building on main street?
A. It was Cherry Way.
Q. Okay. So you went from Cherry Way into the building?
A. Probably ten feet, if that. Five feet. With the walker.
Q. You took the elevator up?
A. Yes.
Q. And then you got off the elevator and went down the hallway?
A. A long hallway.
Q. Into this room?
A. And sat down. That's why I haven't gotten up yet.
Q. So what is the longest distance you think you're capable of walking?
A. I push myself. I try. But five feet, ten feet with an apparatus meaning a walker -- one of my walkers or someone holding my hand.
Q. All right. You also mentioned issues with what we'll call toiletry. So are you able to urinate independently?
A. Yes.
Q. And are you able to defecate independently?
A. Yes. If no one is home, I take a shower to clean myself off.
Q. Can you shower independently?
A. No. There's always someone in the bathroom with me. I have a shower chair.
Q. You do have a shower chair?
A. Yes, I do.
Q. All right. But you indicated on a break -- and I'm just going to put it on the record in fairness to us both -- that you need assistance with wiping?
A. Yes.
Q. Who is the person that does that for you?
A. My nephew. Whoever is at my house. Mainly, my cousin, Dave.
Q. Cousin Dave is the one that you live with?
A. Yeah. Like I said, I'd rather jump in the shower than a grown man wipe my butt.
Q. Okay. Do you cook?
A. No.
Q. So what is your source of meals?
A. My cousin cooks for me.
Q. Your cousin, Dave?
A. Dave.
Q. Do you ever order from Uber Eats?
A. Not me. My daughters will once in a while.
Q. What about Door Dash?
A. No.
Q. Do you do any of that online food order?
A. No. We do online orders at Dominos once in a while, stuff like that.
Q. Are you claiming any changes in your cognition as a result of this incident?
A. What do you mean?
Q. So your ability to think, has it been affected?
A. I don't believe so. I get accused of calling my grandson different names, dates, stuff like that.
Q. But from your observation, there has been no change in your memory, for example?
A. No.
Q. What about your ability to follow along with a program that you're watching on TV?

Page 198

A. Sometimes I just shut it off. I see things, I'd sit and watch and --
Q. So you're a sports fan; right?
A. No.
Q. So the Ravens and Steelers thing?
A. That was a joke.
Q. You don't appreciate the rivalry between those two teams?
A. I don't care about it, one way or the other.
Q. You don't watch football on Sunday?
A. I do if it's on. I don't sit there and bing watch games, no.
Q. But when you watch a game, can you follow along?
A. Somewhat. I'll watch a few players. You know, I'll watch a lot of commercials. I like the commercials on sports games.
The conversation about the Baltimore thing came up with them. They said it because I was from Pittsburgh.
Q. Yeah.
A. That's how it started.
Q. Do you have any plans to go on vacation anywhere?

Page 199

A. I would. I would if it -- if my legs --
Q. Okay. All right. So this being the last time that you and I get a chance to talk to each other, I always turn over the last question to the witness. So I'm going to give you that courtesy.
Is there anything being that -- we're talking here and I'm a direct messenger to Carnival Cruise Line -- is anything that you want to share with me that you think would be important for me to know that I haven't talked to you about?
Maybe a question I should have asked that is on the top of your mind? Anything else that you want the share while you have the floor.
A. No. I enjoyed the cruise. I've been told of my sickness. Other than that, no.
ATTORNEY DRAHOS: All right. Those are all the questions I have.
ATTORNEY HOFFMAN: I have questions. Can we take a break, though?
ATTORNEY DRAHOS: Sure.
(Short recess was taken.)

Page 200

EXAMINATION
BY ATTORNEY HOFFMAN:
Q. I would like to ask you some questions on redirect. I want to go back to some of the documents that counsel showed you, specifically the Against Advice Medical Forms, Exhibits B and C.
You were shown those documents and asked whether you signed them; do you recall that?
A. Yes.
Q. Do you have any independent recollection of being told, while you were in Carnival's medical center, that you were signing a document that said you wanted to leave against the advice of the doctor?
A. No, sir.
Q. At any point that night did you say to any member of the medical staff, the doctor, a nurse, anyone, "I want to go back to my room"?
A. No, sir.
Q. What were you actually saying to the medical staff about what you wanted?
A. I wanted to stay. My whole family

Page 201

wanted me to stay. I was deathly ill.
Q. Were you asking them for help?
A. Yes.
Q. Were you scared?
A. Yes.
Q. The document defense counsel showed you says the reason for your discharge was that you preferred to return to your cabin; is that true?
A. No.
Q. So at the -- were these documents -- do you recall these documents ever being placed in front of you?
A. No, sir.
Q. If they had been placed in front of you at the time on October 18 when you first went to the clinic, would you have been in a condition to understand what you were signing?
ATTORNEY DRAHOS: Object to form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. You testified you could not lift your right arm, you were vomiting, you couldn't feel your limbs. In that condition, were you

Page 202

in any state to be reviewing and knowingly sign a legal document?
A. No, sir.
Q. Defense counsel showed you two against medical advice documents both bearing your signature one minute apart.
Did anyone explain to you why you were asked to sign two separate documents from the clinic within one minute of each other?
A. No, sir.
Q. I want to show you another document from when you first went into the infirmary.
I am going to show you what is -- the titled Payment Agreement and Medical Records Consent. I'll have this marked as Defense Exhibit A.
ATTORNEY DRAHOS: You mean Plaintiff Exhibit A?
ATTORNEY HOFFMAN: Yeah. Plaintiff. Actually, we'll mark it as 1 since you already did letters.
(Plaintiff's Exhibit 1 was marked for identification.)
BY ATTORNEY HOFFMAN:
Q. Do you recall seeing this document,

Page 203

sir?
A. Not to my knowledge.
Q. Now, did you see -- is that your signature there?
A. Yes.
Q. Is that your signature when you went in to the clinic?
A. When I first went in to the clinic? Yeah. I would say so.
Q. Would you say that it is the same as the signature that's on the against medical advice document?
A. Absolutely not.
Q. What's different about it?
A. It's different. I may have or I may not have, but that looks more like my signature before, you know, the infirmary, the doctors.
Q. Okay.
A. They say I signed that. I don't know.
Q. But you're saying that the document on October 18 at 2024, it does not look like the document that you -- the signature you signed when you first came into the medical center?

Page 204

A. No, sir.
Q. So, Mr. Smith, those against medical advice documents, the ones that say you prefer to return to your cabin, do you recall the words that are on these documents?
A. No, sir.
Q. Okay. The language in those documents, "preferred to return to cabin," did you use those words to any doctor?
A. No.
Q. To any nurse?
A. No.
Q. To your family members?
A. No, sir. Absolutely no.
Q. Were you ever given a copy of those documents while you were still on the ship so you could review what was written?
A. No, sir.
Q. Did anyone from the ship's medical staff offer to read those documents to you?
A. No, sir.
Q. Given your reading disability, if a document was placed in front of you on that ship and no one read it to you, would you have known what it said?

Page 205

A. No, sir.
Q. The ship's medical chart was written entirely by the medical staff. Did you have any ability to review anything in that chart while you were on the ship?
A. No, sir.
Q. So you had no way of knowing what Dr. Maharaj was writing in that chart?
A. No, sir.
Q. And any of your family members, who were present and watching what was happening to you, provide a statement that was in the medical chart?
A. Not that I recall.
Q. I want to talk about what was actually happening in the infirmary.
So was your sister, Stephanie, with you while you were in the medical center?
A. Yes.
Q. What was Stephanie doing on your behalf while you were in that room?
A. Pleading.
Q. Pleading what?
A. Pleading to leave me in there.
Q. Was she telling the medical staff to

Page 206

send you back to your room?
A. Yes.
Q. Was she telling the medical staff to send you back to your room?
A. No.
Q. Was she telling them the opposite?
A. Yes. She was telling them to let me stay there. She was voicing her opinion.
Q. What did the medical staff do in response?
A. Report her to the police on the boat.
Q. So they called security?
A. They called security -- or rather, they didn't come, but it came out of his mouth that he was going to call security. She wanted me to stay there.
Q. So Stephanie, the person who was demanding that you stay in the clinic, was intimidated and left?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: She left due to -- she didn't want no trouble.
BY ATTORNEY HOFFMAN:

Page 207

Q. After Stephanie was removed, who was left there with you?
A. I don't know if anybody was there, to be honest with you.
Q. Do you recall Austin Patterson's voice that evening?
A. I recall him stating that there was no effing way they were taking me to the state room. No way in hell. He wanted me to stay there.
Q. Okay. Did they send you back to your room, anyway?
A. Yeah. I think so.
Q. Were you capable of walking back to your state room?
A. No, sir.
Q. And how did you get from the infirmary back to the state room?
A. I guess the wheelchair.
Q. When you say you guess, because you don't really recall?
A. Yeah. It was definitely a wheelchair.
Q. After you were sent back upstairs, how long were you in your state room before

Page 208

your family called the infirmary again?
A. I want to say minutes.
Q. If you had voluntarily chosen to leave the clinic because you felt better, why would your family have called back within minutes to demand that you be brought back down?
A. Because I was deathly ill.
Q. That night were you brought back down to the infirmary?
A. By the wheelchair.
Q. Okay. And each time you were there, were you telling the staff you wanted the leave or were you asking them to help you?
A. No. To find out what's wrong with me.
Q. What's that?
A. Find out what's wrong with me.
Q. Okay. Were you charged for that wheelchair that brought you to the infirmary?
A. Yes. I believe because they said 50 a pop. $50 up, $50 down, $50 up, $50 down.
Q. Do you know whether Austin Patterson signed anything in connection with that wheelchair?

Page 209

A. I'm not sure who did, but I know he was upset that they had to pay $50 for a wheelchair.
Q. Did Austin sign any against medical advice documents?
A. Not to my knowledge, no.
Q. Do you know if he signed anything related to renting a wheelchair?
A. I'm not sure who did what. All I know is I heard the story.
Q. While you were in the infirmary, what did the doctor tell you was wrong with you?
A. They didn't know. They kept saying septic of my toe, motion sickness. They were poking around basically to find out what's wrong with me. They tried using my diabetes. They tried using my thing. Even the hospital didn't know what was wrong with me.
Q. Did they mention your blood sugar?
A. Yeah, they mentioned my blood sugar.
Q. Did he say anything to you about a stroke?
A. No. Never.
Q. Did he tell you that your symptoms,

Page 210

the weakness on one side was consistent with a stroke?
A. Never.
Q. Did he tell you that the inability to lift your arm was consistent with a stroke?
A. No.
Q. Did he tell you that the symptom of slurred speech was consistent with a stroke?
A. No.
Q. Did he say anything to you about the cost of staying in the infirmary?
A. Yes.
Q. Did he tell you that if you stayed, it was going to cost more?
A. Yes.
Q. When you guys -- when the infirmary was first called, did you have to pay before you were seen?
A. No.
Q. Were you -- do you know how that payment was made to the clinic?
A. I don't think it was paid to the clinic. I think it was part of the argument. I know the money was sent over to somebody and I don't know if they ever paid it or what.

Page 211

There was so much arguing going on. I'm not sure.
Q. Did you ever tell Dr. Maharaj that you thought your symptoms were from motion sickness?
A. No.
Q. Did the doctor ever tell you that he believed your symptoms were from motion sickness?
A. They said a few things, yes.
Q. Did the doctors at MedStar Harbor Hospital in Baltimore, after reviewing your CAT scans of your brain, did they tell you that motion sickness caused your symptoms?
A. No, sir.
Q. Did any doctor at any point tell you that motion sickness causes one-sided weakness?
A. No, sir.
Q. Did any doctor tell you motion sickness causes your dominant arm to stop functioning?
A. No, sir.
Q. To your understanding, does motion sickness cause the kind of neurological symptoms that you experienced?

Page 212

ATTORNEY DRAHOS: Object to form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. Defense counsel spoke about your blood sugar levels on the ship. Did any doctor at MedStar Hospital tell you that your stroke was caused by high blood sugar?
A. No, sir.
Q. Did anyone at Franklin Square Hospital or Encompass Health tell you your stroke was caused by your blood sugar?
A. No, sir.
Q. To your understanding, does elevated blood sugar cause blood clots to form in the cerebellum?
ATTORNEY DRAHOS: Object to form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. The ship's medical staff was monitoring and treating your blood sugar. With all of that, did they ever identify the actual cause of your symptoms?
A. No.

Page 213

Q. The ship closed your cases with the diagnosis of hyperglycemic, unspecified, no mention of a stroke.
When you arrived at Harbor Hospital in Baltimore, what did those doctors tell you had actually happened?
A. That I suffered a stroke.
ATTORNEY DRAHOS: Object to form.
BY ATTORNEY HOFFMAN:
Q. How long did it take the doctors at Harbor Hospital to identify that you had suffered a stroke?
A. After multiple scans, multiple machines, they admitted me to another hospital that would better diagnose with a stroke.
Q. Was it the same day that you were admitted to the Harbor Hospital that you learned that you had suffered a stroke?
A. Yes, sir.
(Plaintiff's Exhibit No. 2 was marked for identification.)
BY ATTORNEY HOFFMAN:
Q. On October 20 at 11:57 --
ATTORNEY HOFFMAN: And I would

Page 214

actually like to have the Harbor Hospital notes as Exhibit 2. And that's -- it's a long document. That's the 589-page document.

ATTORNEY DRAHOS: Exhibit 2 is going to be the entire 589 pages?

ATTORNEY HOFFMAN: Yeah. A composite exhibit.

BY ATTORNEY HOFFMAN:

Q. So in the notes, October 20 at 11:57 it states that you were slurring. Would that be -- would that be what you recall?

ATTORNEY DRAHOS: Object to the form.

THE WITNESS: Yes.

BY ATTORNEY HOFFMAN:

Q. And the note says "speech sounds slurred." Would you say that's an accurate note?

ATTORNEY DRAHOS: Object to form.

THE WITNESS: Accurate.

BY ATTORNEY HOFFMAN:

Q. On October 21, Page 133, it's stated that the assessment showed strength and mobility deficits. Do you recall them testing

Page 215

your strength?

ATTORNEY DRAHOS: Object to form.

THE WITNESS: Not that I can recall.

BY ATTORNEY HOFFMAN:

Q. Was Stephanie making a scene at the infirmary because they weren't helping you?

A. Yes.

Q. And when you were eventually taken off of the ship and transported to the hospital, is that what you had been asking for all along?

ATTORNEY DRAHOS: Object to form.

THE WITNESS: Yes.

BY ATTORNEY HOFFMAN:

Q. The doctors in Baltimore told you that it was a time issue. Do you understand what that meant?

A. After further conversations, yes.

Q. When the doctors said you had a stroke in the cerebellum and that timing was a problem, did they explain there's a window during which doctors can administer

Page 216

clot-busting medication?

ATTORNEY DRAHOS: Object to the form.

THE WITNESS: Yes, sir.

BY ATTORNEY HOFFMAN:

Q. And did they tell you the reason you couldn't receive that medication is because too much time had passed by the time you reached the hospital?

ATTORNEY DRAHOS: Object to the form.

THE WITNESS: Yes.

BY ATTORNEY HOFFMAN:

Q. Did they tell you that if you had been removed from the ship sooner, the window might still have been open?

ATTORNEY DRAHOS: Object to the form.

THE WITNESS: Yes.

BY ATTORNEY HOFFMAN:

Q. Every doctor who evaluated you after you left the ship, did any of them tell you it was solely caused by your diabetes?

A. No, sir.

Q. Did any of them tell you your

Page 217

condition was caused by your diabetes?

A. No.

Q. Did any of them tell you that your conditions were caused by the motion of the sea?

A. No, sir.

Q. On the morning of October 20 -- actually, on October 18 when you first went into the infirmary, you had stated that you got up on the bed. Were you able to do that by yourself?

A. No, sir.

Q. How did the clinic staff handle that?

A. They pulled the wheelchair -- as far as I can remember, they pulled the wheelchair, locked it, and two or three guys grabbed me and set me and spin me to the bed. That's where I -- yeah. That's where I was.

Q. On the morning of October 20 before you were taken off the ship, were you able to walk to the ambulance on your own?

A. No.

Q. Were you physically transported out of the medical center and off the ship?

A. Yes, sir.
Q. The medical records contain an addendum from the nurse stating that you were left in a trolly, meaning a gurney, when the paramedics took you; is that what you recall?
A. I was in a bed, yeah.
Q. And when the ambulance arrived, your vital signs were documented as blood pressure 154 over 87 and oxygen saturation at 94 percent. Were you feeling healthy at that point?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. Carnival's official case diagnosis that was reported in the records that Carnival closed your case with was hyperglycemia unspecified. That's high blood sugar.
Did anyone from Carnival ever make mention of a stroke?
A. No. Never.
Q. When you arrived at Harbor Hospital in Baltimore, what did the doctors tell you about what happened?



ATTORNEY DRAHOS: Object to form. Asked and answered.
THE WITNESS: After further tests, they said I had a stroke in my right cerebellum. The left cerebellum, which controls the right side of my body.
BY ATTORNEY HOFFMAN:
Q. Do you know how quickly after arriving at Harbor Hospital they identified that you had suffered a stroke?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: I'm not sure. It was ER time.
BY ATTORNEY HOFFMAN:
Q. While you were still on the ship across two days and multiple infirmary visits, did anyone -- Dr. Maharaj or any nurse ever suggest that your symptoms could be neurological?
A. Never.
Q. They discharged you from that ship with a diagnosis of hyperglycemia and sent you by ambulance. Not to the nearest hospital by emergency diversion, but off the ship at the



scheduled port in Baltimore; correct?
A. Yes.
Q. The discharge plan records say, "CAT 1 medical disembarkation direct without escort." They sent you off that ship alone.
Was any member of your family permitted to ride with you in the ambulance?
ATTORNEY DRAHOS: Object to form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. Dr. Maharaj documented in the physical exam notes on multiple occasions that on October 18, the 19th, and 20th that your "neurological exam showed strength and sensation symmetric and intact throughout and steady gait."
I want to ask you directly about that. When you arrived at the infirmary each of those times, were you walking in on your own two feet?
A. No, sir.
Q. Were you walking at all when you were in the infirmary?
A. No, sir.



Q. On October 19 at 6:00 in the evening Dr. Maharaj wrote in his clinical note that you were too lethargic to stand.
Did anyone ask you to walk across that room to demonstrate your gait that night?
A. They asked me to walk, and I said no.
Q. And why did you say no?
A. Because I couldn't stand.
Q. The nurse's risk assessment on October 19 recorded your gait as steady and your mobility as full.
You arrived in a wheelchair and based on your condition that morning, was your gait steady and your mobility full?
A. Not to my knowledge.
Q. Your right arm, your dominant arm, was it functioning normally during those infirmary visits?
A. No, sir.
Q. Did you feel the condition of your right arm worsen while you were in the infirmary?
A. Yes, sir.
Q. So if a neurological exam was

Page 222

conducted that found your strength and sensation to be symmetric and intact and your gait steady but you were arriving by wheelchair, could not walk from your cabin, and your right arm was not functioning, what does that tell you about whether that exam was actually performed on you?

ATTORNEY DRAHOS: Object to form.

THE WITNESS: Not that I can remember. I don't remember anything other than laying in the bed.

BY ATTORNEY HOFFMAN:

Q. Okay. Did you ever tell the ship's doctor you were a first-time cruiser?

A. Yes.

Q. The ship's medical charts says the doctor -- you told the doctor that your dizziness may be attributable to motion sickness; did you ever say that?

A. False.

Q. The chart says your speech was normal at various points in your treatment and you testified you were slurring.

Were any of your members, who were

Page 223

watching you, concerned about your speech?

A. Not really. We were worried about my health.

Q. Okay. Does the ship's chart reflect anywhere where your family members were telling the doctors about your condition as it was deteriorating?

A. Yes. My sister Stephanie is very boisterous.

Q. We went through the notes. To your knowledge, does anywhere in the chart say what your family members were saying about your condition?

ATTORNEY DRAHOS: Object to form.

THE WITNESS: No.

BY ATTORNEY HOFFMAN:

Q. So there were three separate neurological exams, one on each day, the 18th, the 19th, and the 20th, and all contain the same exact language, "CN II-XII intact. Strength and sensation symmetric and intact throughout. Patellar, Brachial, and brachioradialis reflexes two plus bilaterally. Steady gait, negative Romberg test."

Page 224

Does that language read to you like three separate exams were performed on you?

ATTORNEY DRAHOS: Object to the form.

THE WITNESS: No, sir.

BY ATTORNEY HOFFMAN:

Q. Do the records indicate that you had three separate exams?

ATTORNEY DRAHOS: Object to the form.

THE WITNESS: No, sir.

BY ATTORNEY HOFFMAN:

Q. Do you recall ever receiving any of the exams that were noted in the medical records?

A. No, sir.

Q. Were you attached to an IV the night of October 18?

A. I'm not sure.

Q. The note says you were no longer dizzy and not nauseous on the night of October 18; did you ever say that?

A. I'm not sure.

Q. Okay. Did you ever say that your arm was working?

Page 225

A. No. I kept complaining about the weight of my arm. Like, my arm never -- it kept falling.

Q. And you left the infirmary that first time in a wheelchair; correct?

A. Yes.

Q. And every time you went back to the infirmary, you had to be in a wheelchair?

A. Yes, sir.

Q. By that point -- so you -- on October 18, the first night, I believe it was established that you spent the night in your room; correct?

A. Supposedly, yeah. I can't recall.

Q. When -- on October 19 when you returned, did Dr. Maharaj ever tell you that your vital signs were stable and your blood sugar was under control?

A. I don't recall hearing that, no.

Q. Do you ever recall him telling you that you were stable and to return to your cabin?

A. No. I can't recall.

Q. Did he ever tell you that your neurological symptoms were resolved?

Page 226

A. No, sir.
Q. Did he ever talk to you at all about your neurological symptoms?
A. I don't believe so.
Q. Did he tell you -- did he ever talk to you about the right-sided weakness?
A. Never.
Q. Did he ever talk to you about your ability to walk?
A. Never. Other than I couldn't.
Q. When defense counsel told you that your NIH score at MedStar Hospital was a zero on October 20, do you know what that number means?
A. No, sir.
Q. Did anyone ever explain to you what an NIH Stroke Score is?
A. No, sir.
Q. And regardless of that score, you were admitted to the ICU at MedStar Harbor Hospital?
A. The hospital I was in the ICU, yes.
Q. Were you admitted to the ICU because the doctors thought nothing was wrong you?
A. No.

Page 227

Q. Were they concerned that something catastrophic was about to happen to you?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: They didn't know.
BY ATTORNEY HOFFMAN:
Q. The attending physician at MedStar Harbor wrote that you were at very high risk of developing hydrocephalus. To your understanding -- do you know what hydrocephalus is?
A. No. No, sir.
Q. So you're not aware as to whether or not it's a life-threatening condition?
A. No, sir.
Q. The same doctor who wrote that, said that he also spent 60 minutes with you providing critical care services and documented you as critically ill.
Does that language describe someone with a minor injury?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: No, sir.

Page 228

BY ATTORNEY HOFFMAN:
Q. The chart shows two different NIH scores recorded within one minute of each other, a 0 and a 2. Do you know if you were given an exam twice in one minute?
A. I'm not sure.
Q. Okay. You were ultimately transferred from MedStar Hospital to a neuro ICU at another facility because MedStar couldn't handle the level of monitoring required; is that right?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: Yes.
BY ATTORNEY HOFFMAN:
Q. Your right arm, the arm the ER doctor was said to have had full strength, can you lift that arm normally today?
A. No, sir.
Q. Was it ever explained to you -- so on October 21 the repeat scan at MedStar showed worsening vasogenic edema and increased mass effect on the fourth ventricle.
Did anyone ever explain to you why your imaging got worse from the 20th to the

Page 229

21st?
A. No, sir.
Q. Do you know if neurosurgery was consulted about surgical intervention?
A. I know they wanted to go in, but supposedly it wasn't significant enough to go in. They chose not to.
Q. Is it -- were they saying that the damage caused wasn't significant or was it that they would not be able to make a significant --
ATTORNEY DRAHOS: Object to form.
THE WITNESS: Significant damage for blood loss in my head. But they said it was a lot of exercise at this point. It was a lot of, you know, trying. Move my arm, move my legs. That's why they sent me to Encompass Health.
BY ATTORNEY HOFFMAN:
Q. So they said they couldn't do anything surgically but they said it was up to you?
A. Yeah.
Q. Before you got on the Carnival Pride, did you need a walker to get around?

Page 230

A. No, sir.
Q. Before that cruise, did you need anyone's assistance to walk around?
A. No, sir.
Q. Could you climb stairs on your own?
A. Yes, sir.
Q. After you were discharged from the hospital following this stroke, did any of that change?
A. Yes, sir.
Q. When you came home from the hospital, what kind of services did you need?
A. Physical therapy, speech therapy.
Q. Did you receive home health care?
A. I refused it.
Q. Okay. Did you have other people to fill that need?
A. Yes. I have a family.
Q. So who helped you with your home health care needs?
A. My daughter came over and cooked for me. My nephew, my cousin. I get three square meals a day. And then I use my gum bands throughout the day. There's a lot of exercise.
Q. Do you have a walk-in bathroom, a walk-in bathtub?

Page 231

A. No.
Q. Your primary diagnosis at the time you started home health services was ataxia following cerebral infarction. In plain terms, what does that mean for how you move?
A. I don't move.
Q. What do you mean you don't move?
A. I move enough to go to the bathroom. Let's say I've got to get to the door. I have to get my walker and walk to the front door to unlock it. You know, other than that, it's my bed, my TV, the bathroom.
Q. When you were in the hospital after the stroke and the doctor started explaining what happened to you, do you remember the moment that it became real that this wasn't something that was going to wear off?
A. Yeah.
Q. What did you understand at that point about what your life was going to look like going forward?
A. Painful.
Q. Was there a specific moment, something a doctor said, something you tried to do and couldn't when you realized things had permanently changed?

Page 232

A. Yeah. Wiping my own butt. Seeing my grandkids in school.
Q. Do you recall crying when you were in the hospital?
A. Yeah. You go from not walking to not walking -- walking to not walking. It was -- you know, you do what they ask of you. When you went to therapy, you did what they told you to do.
Q. Was anyone with you when the doctors told you that you had had the stroke?
A. My dad showed up. My cousin showed up. You know, I had some support.
Q. Before October 18, 2024, if you wanted to go somewhere, what did you do?
A. I got in my car and I went. Up until, you know, the cruise. Everything changed.
Q. But back before October 18, you could just get up and go?
A. Yes.
Q. What has to happen now before you can go anywhere?

Page 233

A. I've got to prepare. I have to know ahead of time. It takes a long time to get dressed.
Q. Do you need someone to take you?
A. Yeah. No one ever told me I wasn't allowed to go out. I just stopped. I don't feel comfortable.
Q. Would you feel safe driving?
A. No. No, sir.
Q. Would you be able to drive with your right arm?
A. No.
Q. Would you be able to use the gas pedal?
A. No. I tried. It's not worth my life or no one else's.
Q. If you want to go somewhere and no one is available to take you, what do you do?
A. I can only go when my family comes and gets me. When my daughter is off of work. I've got to depend on everybody else.
Q. And how often does it happen when you want to go somewhere and you just can't?
A. I think it's a mental thing. I think -- I didn't want to come today. After

Page 234

getting into my kitchen getting up from my kitchen chair to go back to my bed, I slept like a baby.
I mean, all it was was to the kitchen and sitting in a chair to sitting in bed. Skip dinner. Skip everything. You just go to bed.
Q. Understood.
Before the stroke, who did you spend time with regularly?
A. My grandkids.
Q. Did you spend time with friends?
A. My friends, yeah. You know, St. Patrick's day and fishing. You know, my brother-in-law calls me and says, "Hey, let's go fishing."
Q. Of the people that you used to hang out with, how many do you still see regularly?
A. None.
Q. What happened to those relationships?
A. I got handicapped.
Q. Did people stop coming around after the stroke?
A. Yeah.

Page 235

Q. Did you stop being able to go with them, too?
A. Yeah. Sure.
Q. Is there anyone from that part of your life, someone you used to see all the time that you have not seen since you got home from the hospital?
A. Yes, sir.
Q. And what happens when you've tried to reach out to people?
A. They give me the cold shoulder.
Q. Do you feel like the same person those people knew before October 2024?
A. No.
Q. Do you think they feel the same way?
A. Yeah.
Q. Before the stroke, did you like to cook?
A. Yeah. I cooked for my family every holiday.
Q. During the week, how many times would you cook?
A. At least four to five times a week. Every holiday. Everybody came to my house. They would come to my house.

Page 236

Q. Were you the holiday cook for the family?
A. Yes, sir.
Q. Who does it now?
A. My cousin Dave and my daughters Kayla and Brittany.
Q. Does Dave work?
A. No. He works with me. He makes sure -- he's my caretaker.
Q. Do you know if he's paid by the state as your home health care?
A. He has nothing. No.
We're trying it now, actually, but, no.
Q. After you got home from the hospital in those early weeks, who was there with you?
A. My stepdad and my stepmom. My sister, Stephanie. My niece, Alyssa. They took the trip back from Baltimore.
Other than that, you know, I get visitors like my sister-in-law, my daughters, my grandkids. That's all.
Q. What do you do when things are quiet?
A. Turn the TV off and go to sleep.

Page 237

Q. Do you think about what your life was like before the cruise?
A. Oh, yeah. Yeah. I think about it every day.
Q. Do you think about what it might have looked like if the doctors had recognized what was happening to you?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: Yes, sir.
BY ATTORNEY HOFFMAN:
Q. Is there something that you still look forward to, something that gave you something to plan for or think about that's no longer part of your life?
A. I want to say the ability to be able to do whatever I want to do. I don't -- I can't defend myself really and I was a big defender. I don't care.
But nowadays, you've got to watch what you do. You get called out of your house. You've got to know -- like, I don't get to see my grandkids.
Q. What do you miss the most?
A. My grandkids. Going to their

school. Going to their plays. Going to their graduations.
Q. This is -- I want to ask you something really directly. In the months since you came home from the hospital, have there been times where you felt completely alone with all of this? Not just physically alone, but alone in a way that was harder than the physical part?
A. Yes.
Q. What do you mean?
A. I sit at home and I shut my phone off. Like today, I shut it off because we're here today. But I don't want no phone calls. I don't want no help.
Q. When the ambulance came to take you off of Carnival Pride, we established no family member rode with you. When they put you into the ambulance, were you scared?
A. Yeah.
Q. Did you know where you were going?
A. I know I was going to a hospital.
Q. Did you have your phone?
A. I don't know. I don't recall. I would say no.



Q. Do you know how long you were at Harbor Hospital before a family member arrived?
A. It was a car ride, parking and whatnot. Eric, my nephew, and my sister Patty were the only ones at the hospital when I was in Harbor.
I sent them home because there was nothing to do but sit in an emergency room. Would you want people to visit you in the emergency room? No. I wanted to get better.
And with Stephanie -- you know, it was better they went home.
Q. You had stated that the -- you would be given medication and then you would be sleepy?
A. Yeah.
Q. Did the doctor ever tell you in advance when he was going to give you a drug that was going to make you sleepy?
A. No. Never. Never.
Q. So when he gave you promethazine on October 19 that evening, did he tell you that it was going to help you sleep through the night?
A. I don't know. I can't recall.



Q. Before plaintiff -- defence counsel asked you about Carnival Cruise's ticket contract that governed your cruise. Had you ever seen that document?
A. Not to my knowledge. It was all done on the computer, supposedly. All I know is I handed her money and that day she was the one in charge, so she gave us our boarding passes and our room numbers and all of that.
Q. Given your dyslexia, if someone handed you a multi-page ticket contract and left you alone with it, what would happen?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: I would have to take off my glasses because I'm not nearsighted or whatever. I can read better. But I need peace and quiet.
BY ATTORNEY HOFFMAN:
Q. Would you be able to get through the document?
A. Probably not.
Q. And did anyone from Carnival ever read the document to you before you boarded the ship?



A. No, sir.
Q. Did anyone from Carnival ever sit and explain what the document said or its language?
A. No, sir.
Q. When you received anything from Carnival before the cruise, confirmation e-mails, booking documents, did anyone tell you that you had the right to request the contract in a format that you could actually use?
A. No, sir.
Q. Carnival Cruise Lines has a formal policy called its special needs policy; are you aware of that policy?
A. No, sir.
Q. Did anyone from Carnival tell you before the cruise that they had a special needs policy?
A. No, sir.
Q. So did anyone from Carnival ever tell you that you can request to get the contract in large print?
A. No, sir.
Q. Did you ever know that a department within Carnival existed to assist people with

people who have special needs?
A. No, sir.
Q. Did anyone at any point ask you if you had read the ticket contract?
A. No, sir.
Q. Did anyone ever ask you at any point if you have a reading disability?
A. No, sir.
Q. Did anyone at Carnival ask you whether you needed any help understanding the documents you were asked to sign?
A. Never.
Q. If someone called you from Carnival before the cruise and said, "Mr. Smith, we can send you the ticket contract in large print or we can arrange for someone to read it to you," which one of those would have worked for you?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: Reading it to me.
BY ATTORNEY HOFFMAN:
Q. Did anyone ever call you to make that offer?
A. No, sir.


Q. Before the cruise, did you or anyone helping you go on Carnival's website?
A. No, sir. No.
Q. Do you know if anything on Carnival's website had anything on there about a tool or a feature that would change the way the text in the contract looked so it would be easier for someone with dyslexia to read?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. Did Carnival's website have a feature that would read the ticket contract to you out loud automatically?
ATTORNEY DRAHOS: Object to form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. Did Carnival's website have any tool that adjusted the spacing between letters or words to make reading easier?
ATTORNEY DRAHOS: Object to form.
THE WITNESS: No, sir.


BY ATTORNEY HOFFMAN:
Q. Did Carnival's website have any tool that changed the font of the ticket contract to one that is easier for dyslexic readers?
ATTORNEY DRAHOS: Object to form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. Do you own a screen reader program on your phone or computer?
A. No, sir.
Q. Do you know what a screen reader program is?
A. No, sir.
Q. So Carnival's website is built to be compatible to be with third party screen readers, meaning that programs that passengers already own or already know how to use could assist them. Did anyone from Carnival ever tell you that before the cruise?
ATTORNEY DRAHOS: Object to the form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. So when you went -- have you ever


been to Carnival's website?
A. No, sir.
Q. Carnival has a formal system, a guest access department specifically for passengers who need accommodations because of a disability. So, yes or no, did anyone from Carnival ever connect you with that department?
ATTORNEY DRAHOS: Object to form.
THE WITNESS: No, sir.
BY ATTORNEY HOFFMAN:
Q. Did anyone from Carnival ever tell you that that department existed?
A. No, sir.
Q. Did anyone from Carnival ever offer you a large-print version of the ticket contract?
A. No, sir.
Q. Did anyone from Carnival ever offer you a large-print version of the against medical advice document?
A. No, sir.
Q. Do you recall anyone from Carnival ever offering you the against medical advice document?

A. No, sir.
Q. Do you recall if you told the doctor that you had a disability for reading?
A. I can't remember.
Q. Why did you never -- do you have to -- is reading part of the driving test?
A. It is.
Q. Was that intimidating to you?
A. No. I sat down and took my time.
Q. Earlier we were talking about -- I believe when you said you had a -- you had gone to the hospital for a heart issue. When you were diagnosed with diabetes, you touched your left side but you said that the pain was on the right side.
A. It was on my left at that time.
Q. It was or was not?
A. It was on the left. Because my dad always said the left was a heart attack.
Q. Understood.
When you were asked about what hospital you would go to, you had stated you will go anywhere when deathly ill. Was that just a rhetorical statement or was that a literal statement.



A. I found out the ambulance will only take you where they're capable of taking you. At that time -- like, if it happened on the North Side, they would take you to AGH.
Q. So you're just saying if you were deathly ill, you would go anywhere for help?
A. I want help.
Q. When you were fishing for croakers, is that deep-sea fishing?
A. That's deep-sea fishing.
Q. What's deep-sea fishing like?
A. It's wonderful.
Q. Are there a lot of waves?
A. Yeah. First time for everything.
Q. How big were the waves?
A. They were big.
ATTORNEY DRAHOS: Just object to the form.
BY ATTORNEY HOFFMAN:
Q. But you did not get motion sickness?
A. No, sir.
Q. Were you able to speak clearly when you had dentures?
A. To my knowledge, I don't know. Yes or no.



Q. Were people able to understand you more before the cruise?
A. Yes.
Q. Okay.
You were asked earlier how long you could stand for and I believe you said 40 seconds. I wanted to ask. Is that -- would you feel confident standing 40 seconds all by yourself?
A. No, sir.
Q. What would it take in order for you to feel safe to stand?
A. To lean on something. To lean against the wall. You know, use my walker.
Q. When you say standing for 40 seconds, you're talking about with assistance?
A. With assistance, yeah. Like, if I left my bedroom and walked to the bathroom with my walker and stood there for a couple of seconds. Mess with my cousin, you know, just to communicate with him. I have a hard time getting back to the bedroom.
Q. Can you access your toilet with your walker?
A. No.



Q. Has -- did the home health care nurse ever come into your home?
A. Yes.
Q. And did they make any comments about your living situation?
A. Yes, sir.
Q. What did they tell you?
A. She called me about my kitchen not having kitchen tiles, my bathroom being too small. And every time I went anywhere -- I know it's her job, but at times she held on to my pants to help me from falling.
Q. On October 18 it states in your notes -- in his notes, "He feels more energetic than when he presented. However, he's still dizzy, made worse by the motion of the ship."
At that point were you ever told that he wanted you to go to a hospital?
A. No, sir.
Q. And if your records indicate that you're feeling more energetic -- actually, October 18, 2242, "Guest explained he was feeling much better. He is no longer dizzy and he is not nauseous. He is tolerating oral intake of water. He is clinically well

hydrated."

My question is if he is saying that you're feeling much better, you're no longer dizzy, why is he -- do you know why he would tell you that he wanted to admit you to the medical center for monitoring?

ATTORNEY DRAHOS: Object to the form.

THE WITNESS: No.

BY ATTORNEY HOFFMAN:

Q. And if you were feeling much better and no longer dizzy and not nauseous, do you know why he would tell you to go to the hospital?

A. No.

ATTORNEY HOFFMAN: I don't have any further questions.

ATTORNEY DRAHOS: I have one quick follow-up.

EXAMINATION

BY ATTORNEY DRAHOS:

Q. The 2017 Chevy Trax that you told us you owned, do you still own it?

A. It's safe in my driveway.

Q. And have you had any maintenance on



that car done since 2024?

A. No.

Q. When was the last time --

A. Everything gets done -- the whole front and a new belt since it's been sitting where it's been sitting.

Q. Who does the maintenance on that car?

A. My cousin Dave.

Q. Have you taken it anywhere to have any work on it?

A. Never. Oil changes are done at home.

Q. Oil changes are done at home?

A. Yeah. I took it in for a recall on a wiring at Chevy classic in Bellevue. I took it in for a recall.

Q. For recalls. So you took it into the Chevy dealership?

A. Yeah.

Q. And what was the name of that Chevy dealer?

A. Classic Chevrolet.

Q. And where is that located?

A. Bellevue, PA.



Q. Thank you.

ATTORNEY DRAHOS: All right. Read or waive?

ATTORNEY HOFFMAN: Read.

(The deposition was concluded at 3:00 p.m. and signature was not waived.)



C E R T I F I C A T E

\- - -

I, MICHAEL SMITH, do hereby certify that I have read the foregoing transcript and it is a true and correct copy of my deposition, except for the changes, if any, made by me on the attached Deposition Correction Sheet.

_________________________

_________________________

Date

ERRATA SHEET

| PAGE | LINE | REASON FOR CHANGE/CORRECTION |
|---|---|---|
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |
| _____ | _____ | ________________________ |



COMMONWEALTH OF PENNSYLVANIA )
) SS
COUNTY OF ALLEGHENY )

CERTIFICATE

I, Michelle L. Goehring, a notary public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, MICHAEL SMITH, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness.

I further certify that I am not a relative, employee or attorney of any of the parties, or a relative or employee of either counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 31st day of March 2026.

/S/Michelle L. Goehring, Notary Public
Court Reporter
My Commission Expires: July 12, 2029
Commission No. 1317058