# EXHIBIT "H"

**Dr. Gomez's Expert Report**

**MEDICAL EXPERT REPORT**

## I. Introduction

I have been retained by plaintiff's counsel, Michael A. Hoffman, of David W. Singer & Associates, P.A., to provide an independent medical expert review regarding the care and treatment rendered to Michael Smith while a passenger aboard the Carnival Pride during the voyage of October 13 through October 20, 2024.

This review focuses on the events that occurred during the voyage from October 13, 2024, to October 20, 2024. The ship's official, scheduled itinerary for this voyage was as follows (Table 1):

**Table 1. Itinerary Carnival Pride (October 13, 2024, to October 20, 2024)**

| Date | Day | Port | Arrival | Departure |
|---|---|---|---|---|
| Oct 13, 2024 | Sunday | Baltimore, MD | — | 5:00 PM |
| Oct 14, 2024 | Monday | Fun Day at Sea | — | — |
| Oct 15, 2024 | Tuesday | Fun Day at Sea | — | — |
| Oct 16, 2024 | Wednesday | Nassau, Bahamas | 8:00 AM | 5:00 PM |
| Oct 17, 2024 | Thursday | Half Moon Cay, Bahamas | 8:00 AM | 4:00 PM |
| Oct 18, 2024 | Friday | Freeport, Bahamas | 7:00 AM | 1:30 PM |
| Oct 19, 2024 | Saturday | Fun Day at Sea | — | — |
| Oct 20, 2024 | Sunday | Baltimore, MD | 10:00 AM | — |

**Prepared by Victor Gomez, MD, from the produced Carnival Pride voyage records and deck logs.**

I have been asked to render opinions, within a reasonable degree of medical probability, regarding whether the medical care provided by the shipboard medical team met the applicable standard of care and whether any departures from that standard contributed to Mr. Smith's injuries and subsequent clinical outcome.

The applicable standard of care is that level of care, skill, and treatment which would be recognized as acceptable and appropriate by reasonably prudent healthcare providers practicing under similar circumstances. In evaluating the care rendered aboard the Carnival Pride, I have considered the American College of Emergency Physicians (ACEP) Cruise Ship Health Care Guidelines (2023) (1), relevant medical literature and clinical practice guidelines, applicable shipboard medical protocols and procedures, the medical resources available aboard the vessel,

and the circumstances under which care was delivered. These materials inform, but do not independently define, the applicable standard of care.

My review focuses upon the assessment, treatment, monitoring, and disposition decisions made by the shipboard medical team based upon the information available to them at the time care was rendered. My opinions are not based upon hindsight, but rather upon what a reasonably competent cruise ship physician and medical staff should have recognized and done under the same or similar circumstances.

Specifically, my opinions address:

A. The adequacy of the initial medical assessment, diagnostic evaluation, and clinical decision-making for a passenger presenting with poorly controlled diabetes mellitus, persistent nausea and vomiting, dehydration, dizziness, weakness, and abnormal left great-toe findings with concern for infection.

B. The appropriateness and timeliness of the therapeutic interventions provided, including intravenous fluid administration, insulin management, antibiotic therapy, laboratory testing, and other treatments directed toward the patient's presenting condition.

C. The adequacy of patient monitoring, reassessment, documentation, and disposition planning, including the medical team's management of Mr. Smith's refusal of admission to the shipboard medical center and his execution of Against Medical Advice (AMA) documentation.

D. The appropriateness and timing of decisions regarding shoreside referral, emergency medical evacuation, medical disembarkation, and transfer of care, including whether Mr. Smith's clinical condition warranted earlier removal from the vessel for definitive hospital-based evaluation and treatment.

My opinions are based upon my review of the available shipboard medical records, shoreside medical records, emergency medical services records, applicable medical literature and professional guidelines, and my education, training, and experience in maritime medicine, emergency medicine, remote and austere medical care, cruise ship healthcare operations, aeromedical evacuation, and medico-legal review of cruise ship medical cases.

In forming my opinions, I applied a clinical methodology that included review of the shipboard and shoreside medical records, reconstruction of the clinical chronology, assessment of the differential diagnoses reasonably raised by Mr. Smith’s presenting symptoms and subsequent

clinical course, comparison of the care provided with relevant professional guidelines, peer-reviewed medical literature, drug prescribing information, and Carnival's applicable medical protocols and procedures, and consideration of my education, training, and clinical experience in emergency and shipboard medicine. I also considered alternative explanations for Mr. Smith's symptoms and the limitations of the available record.

**II. Materials Reviewed**

I reviewed the materials relevant to my opinions in this matter, including:

- Carnival Pride Medical Center records for Michael Smith from October 18–20, 2024, including the Guest Consultation Form, SeaCare case summary and clinical notes, vital-sign and fluid-balance records, medication administration records, laboratory and point-of-care testing, blood-gas results, urinalysis, ECG, foot radiographs and radiology documentation, discharge documentation, and Against Medical Advice forms.
- Carnival corporate medical and operational materials produced in this matter, including Role Responsibilities for Doctors and Role Responsibilities for Senior Doctors, effective June 26, 2024; MED-3002 First Response and Triage; CCL-MED-3003-A3 First Response Treatment Protocol; MED-3102 Patient Admission and Discharge from the Medical Center; MED-3104-A1 Disembarkation Considerations; MED-3104-A2 Disembarkation/Repatriation Categories; MED-3104-A3 Medico/Medevac Checksheet; MED-3104-A4 U.S. Coast Guard Rescue Coordination Centers Contact Details; MED-3104-A5 Workflow for Disembarkations with Potential Operational Disruptions; and the Carnival Pride Medical Center Equipment Asset Inventory.
- Carnival Pride operational records, including relevant deck logs for the October 13–20, 2024 voyage, medical-disembarkation communications, CareTeam/iCare records, and security documentation concerning Mr. Smith's disembarkation.
- Deposition of Michael Smith, taken March 19, 2026.
- Deposition of Eric Grimm, taken March 19, 2026.
- Eric Watson, USCG Licensed Master, Report WMC-103, dated August 1, 2026, addressing vessel position and the operational feasibility of obtaining shoreside emergency medical care. Mr. Watson expressly limits his opinions to vessel operations, navigation, position reconstruction, and evacuation feasibility rather than medical diagnosis or medical standard of care.

- Baltimore City Fire Department emergency medical services records from October 20, 2024.
- MedStar Harbor Hospital records from October 20–21, 2024.
- MedStar Franklin Square Medical Center records from October 21–26, 2024.
- Encompass Health Rehabilitation Hospital of Sewickley records beginning October 26, 2024.
- Gallagher Home Health Services / Bridges Therapy Associates records concerning post-rehabilitation home health, physical therapy, occupational therapy, and related care.
- Relevant pre-incident UPMC medical records.
- Applicable professional guidelines, drug prescribing information, and peer-reviewed medical literature identified in the References section.

**III. Qualifications**

I am a medical doctor with formal postgraduate education in Emergency Medicine & Critical Care Medicine, Emergency & Disaster Management, Occupational Health & Safety, Artificial Intelligence, and Digital Transformation. My academic training integrates clinical medicine, emergency preparedness, mass-casualty response, and medical decision-making in high-risk and resource-limited environments. I earned my medical degree (MD) from Pontificia Universidad Javeriana in 2006, followed by a Master of Science in Emergency Medicine and Critical Care at the University of Barcelona (2009–2011), and a Master of Arts in Disaster Management at Florida International University (2022–2023). I have also pursued advanced training in Artificial Intelligence, Industrial Hygiene, Occupational Health and Safety, and Digital Transformation.

In addition to my formal academic and clinical training, I possess extensive firsthand experience practicing medicine aboard large passenger cruise vessels. My cruise ship medical career extends from 2011 through 2023, during which I served aboard vessels operated by Royal Caribbean International, Celebrity Cruises, MSC Cruises, and Azamara Cruises. In these environments, I was responsible for continuous emergency readiness and the management of high-acuity medical events within large, complex maritime healthcare systems.

From 2011 through 2017, I served as a Medical Officer and subsequently Senior Medical Officer aboard vessels operated by Royal Caribbean International and Celebrity Cruises. In these roles, I held supervisory responsibility for shipboard medical operations and provided direct emergency and inpatient care.

Across my maritime career, which also includes serving as the sole onboard physician and Senior Medical Officer for Azamara Cruises, I routinely evaluated and treated large volumes of passengers, led shipboard emergency response teams, and managed medical emergencies including trauma. I gained direct operational familiarity with cruise ship medical staffing models, onboard diagnostic capabilities, emergency evacuation logistics, and the real-world application of international cruise ship medical standards.

## IV. Case Summary and Clinical Course

### A. Relevant Medical History

Mr. Smith's documented medical history included type 2 diabetes mellitus, hypertension, hyperlipidemia, morbid obesity, and chronic bilateral knee pain. Rehabilitation records also document a history of left knee replacement and prior heel surgery. Before the acute illness, hospital rehabilitation assessments recorded that he was independent with activities of daily living, transfers, gait, and stair negotiation.

### B. Shipboard Medical Events

**October 18, 2024: Initial Presentation and Assessment**

On the evening of October 18, 2024, the ship's medical center was notified regarding a passenger, Mr. Michael Smith, who was reportedly vomiting in his cabin and unable to walk. Debra Dube RN responded to the cabin, finding Mr. Smith conscious and alert but complaining of general body weakness, severe vomiting (>10 episodes), and soft stools over the preceding two days, during which he had been unable to tolerate oral intake. He was transported via wheelchair to the ship's Medical Center.

At initial triage, documented at 19:16 UTC-04:00, Mr. Smith's blood pressure was 132/71 mmHg, heart rate 100 bpm, respiratory rate 17 breaths/min, SpO2 96% on room air, and random blood glucose 369 mg/dL. The separate Guest Consultation Form records the initial assessment at 19:02 UTC-04:00.

Dr. Nikhil Maharaj documented the history of present illness at 19:23 UTC-04:00 and the physical examination at 19:24 UTC-04:00. Physical examination revealed moderate dehydration and abnormal findings involving the left great toenail. Dr. Maharaj documented dystrophic toenails with possible onychomycosis and evidence of tinea pedis, with the left great toenail almost separated from the nail bed. He later noted slight erythema and warmth of the distal left great toe and described the partially separated nail as foul-smelling. He considered the toe a potential source

of infection and obtained radiographs to assess for possible osteomyelitis. Point-of-care laboratory testing was ordered at 19:17 UTC-04:00 and recorded as completed at 19:41 UTC-04:00, demonstrating severe hyperglycemia with a blood glucose level of 404 mg/dL and carbon dioxide of 20 mmol/L. Venous blood gas testing documented pH 7.311, bicarbonate 20.1 mmol/L, base excess −6 mEq/L, an anion gap of 21 mmol/L, and lactate 4.16 mmol/L. The ship medical record shows that a urinalysis was ordered at 20:44 UTC-04:00 on October 18 but was not recorded as completed until October 19 at 21:20 UTC-04:00. When completed, the urinalysis showed large ketones and urine glucose greater than 2,000 mg/dL. An X-ray of the left foot was performed. Dr. Maharaj documented "no osteomyelitis features present," with radiology review pending.

**Therapeutic Interventions and Disposition (Oct 18)**

Medical management was initiated under the direction of Dr. Maharaj, with nursing care provided by RN Mduduzi Madonda and RN Dube. Interventions included:

- Intravenous (IV) Fluid Resuscitation: Normal Saline.
- Antibiotic Therapy: Ceftriaxone 2 g IV.
- Antifungal therapy: Fluconazole 150 mg orally.
- Antiemetic Therapy: Promethazine 25 mg intramuscularly (IM).
- Glycemic Control: 10 Units of Actrapid (short-acting insulin) administered subcutaneously, followed later by an additional 8 Units administered intravenously.

Following the administration of intravenous fluids and 10 units of subcutaneous insulin at 19:46 UTC-04:00, the ship's medical logs reflect that Mr. Smith's blood glucose decreased from an initial triage reading of 369 mg/dL down to 317 mg/dL but remained elevated. At 20:34 UTC-04:00, Dr. Maharaj documented that he advised medical center admission for ongoing monitoring but charted that Mr. Smith preferred to return to his cabin to rest. Mr. Smith and Eric Grimm later disputed aspects of the documented circumstances surrounding the decision to return Mr. Smith to his stateroom; their deposition testimony is addressed separately below. Following the physician's notes, two separate Against Medical Advice (AMA) forms were executed and stamped consecutively at 20:41 UTC-04:00 and 20:42 UTC-04:00. Despite the AMA forms being executed at approximately 20:41–20:42 UTC-04:00, Mr. Smith was not discharged at that time. He remained in the medical center for continued treatment and reassessment for nearly three additional hours. He signed the discharge documentation at 23:28 UTC-04:00 and, at approximately 23:30–

23:32 UTC-04:00, left the medical center assisted by wheelchair, with follow-up planned for the following morning.

**October 19, 2024: Return to Medical Center and Worsening Symptoms**

At the October 19 morning follow-up, Dr. Maharaj documented Mr. Smith's report that he had slept after discharge and began vomiting again at approximately 03:00 UTC-04:00. Eric Grimm later testified that, after returning from dinner, he found Mr. Smith alone in the cabin and witnessed him vomiting. Grimm acknowledged difficulty assigning some events to precise dates, and I therefore do not rely on his testimony to establish the exact timing of the recurrence. Mr. Smith presented back to the medical center at 09:35 UTC-04:00 via wheelchair, complaining of persistent vomiting, nausea, and dizziness, which Dr. Maharaj noted the guest attributed to the ship's motion.

Under the care of RN Alan Anuengo Acebu, RN Debra Dube, and Dr. Maharaj, repeat vital signs and laboratory tests were obtained. Management included:

- **Aggressive IV Hydration:** 1 Liter of Normal Saline given as a fast drip, followed shortly after by 1 Liter of Ringer's Lactate as a fast drip, and later a continuous Normal Saline infusion at 175 mL/hr.
- **Antiemetic Therapy:** Repeated administration of intramuscular promethazine and intravenous ondansetron during the day. The medication-administration chronology and documented timing differences are detailed in Table 3.
- **Glycemic Control:** Initiation of a sliding scale protocol. He received an initial 10 Units of Regular Insulin IV at 09:42 UTC-04:00.
- **Antifungal Therapy:** Fluconazole 150 mg capsule administered orally at 17:12 UTC-04:00.

By early afternoon (13:30 - 14:15 UTC-04:00), his blood glucose persisted around 245 mg/dL, requiring additional subcutaneous doses of Actrapid insulin (4 Units, then 6 Units) by RN Dube. At 14:15 UTC-04:00, RN Dube documented approximately 500 mL of greenish gastric emesis and administration of ondansetron 4 mg IV. The structured fluid-balance record separately records the 500 mL emesis at 14:19 UTC-04:00. Later in the evening (20:19), RN Acebu administered Esomeprazole 40 mg IV and an additional 2 Units of Regular Insulin IV. A 12-lead ECG was completed at 18:46 UTC-04:00, which the physician interpreted as showing normal sinus rhythm, left axis deviation (LAD), and a possible right bundle branch block (RBBB), without acute ischemic changes.

**Disposition (Oct 19)**

On October 19 at 10:13 UTC-04:00, Dr. Maharaj documented that Mr. Smith was stable in the medical center and was "for referral to Baltimore Hospital," citing the need for further investigation and optimization of his uncontrolled blood glucose and the abnormal foot findings.

At 10:22 UTC-04:00, Dr. Maharaj sent a medical-disembarkation notification identifying the planned October 20 disembarkation in Baltimore as "Cat 1." The Carnival MED-3104-A2 disembarkation framework defines Category 1 as direct medical disembarkation without escort for a patient who "does not need immediate admission and can travel."

Later that day, at 15:12 UTC-04:00, Senior Ship Physician Dr. L. Rantleru advised CareTeam that Mr. Smith remained aboard and was "admitted to the Medical Center," with disembarkation planned for the following morning upon arrival in Baltimore. The records from October 19 therefore document an evolving disposition plan: an initial Category 1 designation, continued medical-center care, and planned disembarkation in Baltimore the following morning.

**October 20, 2024: Medical Disembarkation**

On the morning of the ship's arrival in Baltimore, Mr. Smith's vital signs at 09:11 UTC-04:00 were blood pressure 145/83 mmHg, heart rate 96 bpm, respiratory rate 18 breaths/min, $SpO_2$ 96% on room air, and blood glucose 201 mg/dL. On October 20, Carnival's iCare documentation recorded that, per the ship physician, Mr. Smith would disembark in the home port by ambulance for further evaluation. He was subsequently medically disembarked and transferred by ambulance to MedStar Harbor Hospital.

**C. Subsequent Hospital and Rehabilitation Course**

Following medical disembarkation in Baltimore on October 20, 2024, Mr. Smith was evaluated at MedStar Harbor Hospital. Neuroimaging demonstrated a right cerebellar infarction. MRI confirmed an acute right superior cerebellar infarct with petechial hemorrhagic transformation. Repeat head CT on October 21 showed increased cerebellar edema and increased mass effect on the fourth ventricle without hydrocephalus. He remained symptomatic with dizziness and incoordination and was transferred for a higher level of neurologic and neurocritical-care monitoring.

On October 21, 2024, Mr. Smith was transferred to MedStar Franklin Square Medical Center for continued neurologic and neurocritical-care management. The hospital course included monitoring of the right cerebellar ischemic infarction with petechial hemorrhagic transformation,

cerebellar edema, and fourth-ventricle mass effect. Neurosurgical intervention was not ultimately required. Physical and occupational therapy documented impaired balance and coordination and a marked decline in functional mobility, and acute inpatient rehabilitation was recommended.

Mr. Smith was admitted to Encompass Health Rehabilitation Hospital of Sewickley on October 26, 2024, for post-stroke rehabilitation. The rehabilitation record identifies post-stroke ataxia following the right cerebellar infarct. He subsequently transitioned to home-health care; Gallagher Home Health began care in November 2024 and continued to document ataxia following cerebral infarction and functional limitations involving ambulation and endurance.

**Table 2: Vital Signs**

| Date and ship time (UTC-04:00) | BP (mmHg), MAP, position | HR (bpm) | RR (rpm) | Glucose (mg/dL) | SpO2 (%) and delivery | GCS | AVPU | Fluid balance: In / Out (mL; ND = not documented) | Vomit (mL) |
|---|---|---|---|---|---|---|---|---|---|
| **2024-10-18 19:16** | 132/71 (91), L | 100 | 17 | 369 | 96%, RA | 15 | A | | |
| **2024-10-18 20:30** | 142/88 (106), S | 102 | 16 | | 96%, RA | 15 | A | | |
| **2024-10-18 21:30** | 147/86 (106), S | 100 | 14 | 317 | 96%, RA | 15 | A | | |
| **2024-10-18 23:10** | 126/82 (96), S | 96 | 14 | 266 | 98%, RA | 15 | A | | |
| **2024-10-18 23:30** | 126/78 (94), L | 102 | 16 | 266 | 95%, RA | | A | | |
| **2024-10-19 09:23** | 145/80 (101), S | 96 | 16 | 341 | 96%, RA | | | | |
| **2024-10-19 10:07** | 127/76 (93), S | 87 | 15 | | 99%, RA | 15 | A | 1000 / ND | |
| **2024-10-19 10:16** | | | | 306 | | | | | |
| **2024-10-19 11:05** | 136/89 (104), L | 99 | 16 | 347 | 96%, RA | 15 | A | | |
| **2024-10-19 11:59** | 136/89 (104), L | 95 | 16 | 261 | 93%, RA | 15 | A | 1000 / ND | |
| **2024-10-19 13:05** | 133/82 (99), L | 94 | 17 | 245 | 94%, RA | 15 | A | 500 / 0 | 0 |
| **2024-10-19 14:19** | 131/73 (92), L | 94 | 16 | 245 | 97%, RA | 15 | A | 500 / 500 | 500 |
| **2024-10-19 15:30** | 126/76 (92), L | 89 | 16 | 234 | 92%, RA | 15 | A | 175 / 120 | 120 |
| **2024-10-19 16:20** | 134/78 (96), L | 89 | 18 | 245 | 92%, RA | 15 | A | 175 / 0 | 0 |
| **2024-10-19 17:27** | 132/83 (99), L | 87 | 17 | 251 | 96%, RA | 15 | A | 175 / 0 | 0 |
| **2024-10-19 18:07** | 107/68 (81), L | 87 | 17 | 241 | 90%, RA | 15 | A | 175 / 0 | 0 |
| **2024-10-19 20:05** | 131/81 (97), S | 91 | 16 | 206 | 94%, RA | 15 | A | | |
| **2024-10-19 21:21** | | | | | | | | ND / 550 | |
| **2024-10-19 21:55** | 130/79 (96), L | 92 | 15 | 193 | 94%, RA | 15 | A | 700 / ND | |
| **2024-10-20 01:03** | 145/85 (105), L | 94 | 15 | 172 | 95%, RA | 15 | A | 525 / ND | |
| **2024-10-20 03:56** | 148/80 (102), L | 93 | 15 | 194 | 93%, RA | 15 | A | 525 / ND | |
| **2024-10-20 05:35** | | | | | | | | ND / 720 | |
| **2024-10-20 06:57** | 160/97 (118), L | 93 | 15 | 190 | 92%, RA | 15 | A | 525 / ND | |
| **2024-10-20 09:11** | 145/83 (103), S | 96 | 18 | 201 | 96%, RA | 15 | A | | |

**Note: MAP = mean arterial pressure; HR = heart rate; RR = respiratory rate; SpO2 = peripheral oxygen saturation; GCS = Glasgow Coma Scale; AVPU = Alert/Voice/Pain/Unresponsive; RA = room air; ND = not documented; L = lying; S = sitting. Prepared by Victor Gomez, MD, from the produced Carnival Pride medical records.**

**V. Expert Analysis and Breaches of the Standard of Care**

It is my opinion, within a reasonable degree of medical probability, that the care provided to Mr. Michael Smith by the medical staff aboard the Carnival Pride fell below the applicable standard of care. The standard of care requires that cruise ship medical providers possess the clinical skills and judgment to adequately evaluate, diagnose, monitor, and appropriately triage patients presenting with complex or high-risk symptoms. My opinions regarding these departures are outlined below.

**A. The adequacy of the Initial Assessment and Diagnostic Workup**

Based on the medical records, Mr. Smith presented to the shipboard medical team on October 18, 2024, with triage documented at 19:16 UTC-04:00. He reported severe recurrent vomiting, described as more than ten episodes over the preceding two days, and was reported unable to walk. He reported soft stools described as "not watery" and denied abdominal pain. At triage, his random blood glucose was 369 mg/dL, later measured at 404 mg/dL by point-of-care testing; Dr. Maharaj documented moderate dehydration.

The metabolic evaluation also remained relevant to ongoing reassessment. Initial testing documented glucose 404 mg/dL, carbon dioxide 20 mmol/L, an anion gap of 21 mmol/L (a calculated value used to help assess for the presence of unmeasured acids in metabolic acidosis), a venous pH 7.311, bicarbonate 20.1 mmol/L, base excess −6 mEq/L, and lactate 4.16 mmol/L, findings consistent with an acid-base disturbance characterized by reduced bicarbonate and base excess together with elevated lactate. Dr. Maharaj documented that the elevated lactate and mild acidosis were possibly secondary to dehydration. The abnormal left great toe was separately considered a possible source of infection. The available shipboard record does not establish the specific cause of the lactate elevation. Although the formal laboratory result lists an anion gap of 21 mmol/L, Dr. Maharaj's October 18 at 20:34 UTC-04:00 note records an anion gap of 14; the available record does not explain that discrepancy. A urinalysis ordered on October 18 at 20:44 UTC-04:00 was not recorded as completed until October 19 at 21:20 UTC-04:00, at which time it showed large ketones and urine glucose greater than 2,000 mg/dL. These findings do not, by themselves, establish diabetic ketoacidosis, and I do not diagnose DKA from the available record. They do, however, demonstrate that the metabolic abnormalities required continued clinical and laboratory reassessment rather than being considered fully resolved based on improvement in serum glucose alone. The available record does not establish whether the interval between the

urinalysis order and its recorded completion reflects delayed specimen collection, testing, or documentation.

While the medical team correctly identified and initiated treatment for his severe hyperglycemia and dehydration, they failed to adequately evaluate the neurologic significance of his presentation. Severe recurrent vomiting together with an inability to ambulate was not adequately explained by the working diagnoses and required consideration of alternative causes, including a central neurologic process (2,3). In the setting of dizziness or disequilibrium, severe gait impairment or inability to walk is an important finding in distinguishing a central neurologic cause, including posterior circulation stroke (3).

A Glasgow Coma Scale (GCS) score of 15 and relatively stable vital signs do not exclude an acute ischemic stroke. Patients with posterior circulation or cerebellar ischemia may remain alert and hemodynamically stable despite clinically significant neurologic dysfunction, including dizziness, recurrent vomiting, gait impairment, and incoordination (3). A decline in level of consciousness may occur later in the course of a cerebellar infarction as edema and posterior fossa mass effect develop (4).

The physician documented a neurologic examination indicating intact cranial nerves, symmetric strength, normal reflexes, a “steady gait,” and a “negative Romberg” test. The medical records contain the same neurologic examination language on four separate occasions: October 18 at 19:23 UTC-04:00, October 19 at 09:36 UTC-04:00, October 19 at 17:26 UTC-04:00, and October 20 at 08:04 UTC-04:00, with each entry stating that Mr. Smith had a “steady gait” and a “negative Romberg” test. Although gait and functional ability can fluctuate during an acute illness, the available record does not document an observed period of normal independent ambulation that reconciles those entries with the triage notation that Mr. Smith was “unable to walk,” his presentation by wheelchair, and his continued need for wheelchair transport during the clinical course.

This inconsistency is clinically significant because posterior circulation ischemia and cerebellar infarction frequently present with nonspecific symptoms, including dizziness, nausea, severe vomiting, and unsteady gait, and an accurate diagnosis depends heavily on the careful assessment of coordination, truncal stability, gait, and eye movements (2). The medical record does not adequately reconcile how a patient initially unable to walk was later deemed to have a steady gait. It is my opinion, within a reasonable degree of medical probability, that the failure to

objectively reassess and accurately document the patient's gait, coordination, and truncal stability in the face of these red flags constitutes a departure from the standard of care.

**B. The Appropriateness and Timeliness of Therapeutic Interventions**

The shipboard medical team appropriately initiated intravenous fluid resuscitation and insulin therapy to address Mr. Smith's metabolic derangements, as well as ceftriaxone for a suspected diabetic foot infection. Promethazine is relevant to my assessment because of its recognized central nervous system effects, rather than because its use as an antiemetic was itself necessarily inappropriate. The shipboard record documents repeated administration of intramuscular promethazine together with multiple doses of intravenous ondansetron during the period of observation (Table 3). Promethazine is a phenothiazine derivative with antihistaminic and sedative properties. Its recognized central nervous system effects include drowsiness, sedation, dizziness, confusion, disorientation, and incoordination (5). These effects overlap clinically with important manifestations of posterior circulation neurologic disease, including dizziness, gait instability, altered alertness, and impaired coordination (2). Medical literature available at the time of the incident also recognized that nausea and vomiting may result from neurologic disease and that associated findings such as altered mental status or a focal neurologic deficit are alarm features requiring further evaluation (6).

For adult nausea and vomiting, the prescribing information recommended a usual dose of 12.5–25 mg, not to be repeated more frequently than every four hours (5). I do not offer a separate standard-of-care opinion based solely on the recorded promethazine dosing intervals. I do not opine that promethazine itself caused Mr. Smith's stroke or subsequent lethargy. Rather, repeated administration of a medication capable of producing sedation, dizziness, and impaired coordination increased the importance of serial, objective neurologic reassessment in a patient whose presenting abnormalities already included reported inability to walk, wheelchair dependence, recurrent vomiting, and dizziness.

On October 19 at 18:10 UTC-04:00, Dr. Maharaj documented that Mr. Smith was "too lethargic to stand." That finding was clinically significant regardless of its cause. In the context of the earlier report that he had been unable to walk and his continued impaired mobility, it warranted focused reassessment of gait, coordination, truncal stability, mental status, and other neurologic findings, together with reconsideration of a central neurologic cause. My standard-of-care criticism

therefore concerns the adequacy of the neurologic reassessment and diagnostic reconsideration, not the mere administration of promethazine.

This clinical course reflects decision-making consistent with diagnostic anchoring bias, a well-documented phenomenon in which a physician focuses on a single, often initial, piece of information when making clinical decisions without sufficiently adjusting to later conflicting data (7). The documented clinical course is consistent with continued emphasis on severe hyperglycemia, dehydration, a presumed gastrointestinal illness, the abnormal great toe, and later motion sickness despite subsequent findings that were not fully explained by those diagnoses. The clinical significance of possible diagnostic anchoring is that subsequent discordant findings did not result in a sufficiently documented reconsideration of the working diagnosis, particularly the persistent mobility abnormality and the later finding that Mr. Smith was too lethargic to stand. Although vomiting decreased during portions of the clinical course, symptomatic improvement did not establish diagnostic resolution. It is my opinion, within a reasonable degree of medical probability, that improvement in vomiting should not have been interpreted as resolution of the underlying illness without objective reassessment of Mr. Smith's gait and mobility, coordination, truncal stability, mental status, and ocular findings.

The ship medical record contains differences between certain bedside/nursing narrative times and the medication administration/completion times recorded in the medication record. Table 3 therefore reports the SeaCare medication administration/completion times where available; where a later dose is documented differently in the nursing narrative and medication order, both times are identified.

**Table 3. Documented Anti-Vomiting Medication Administration During Shipboard Medical Center Course**

| Date | Time (UTC-04:00) | Medication | Dose / Route | Interval from prior same medication | Clinical context / record note |
|---|---|---|---|---|---|
| **Oct 18, 2024** | 20:33 | Promethazine | 25 mg IM | — | Administered/completed after initial presentation with recurrent vomiting and reported inability to walk |
| **Oct 19, 2024** | 09:54 | Ondansetron | 4 mg IV | — | Administered/completed during return evaluation for recurrent vomiting, nausea, and dizziness |
| **Oct 19, 2024** | 10:16 | Promethazine | 25 mg IM | 13 hr 43 min | Administered/completed during morning treatment |
| **Oct 19, 2024** | 15:12 | Promethazine | 25 mg IM | 4 hr 56 min | Administered/completed after recurrent vomiting during continued observation |
| **Oct 19, 2024** | 15:54 | Ondansetron | 4 mg IV | 6 hr | Administered/completed during continued nausea/vomiting treatment |
| **Oct 19, 2024** | 17:22 | Ondansetron | 4 mg IV | 1 hr 28 min | Administered/completed during continued nausea/vomiting treatment |

| | | | | | |
|---|---|---|---|---|---|
| **Oct 19, 2024** | 18:12 | Ondansetron | 4 mg IV | 50 min | Administered/completed during continued nausea/vomiting treatment |
| **Oct 19, 2024** | 18:13 | Promethazine | 25 mg IM | 3 hr 1 min | Administered/completed; this entry follows Dr. Maharaj's 18:10 notation that Mr. Smith was "too lethargic to stand" |
| **Oct 19, 2024** | 21:57 nursing note / 22:00 medication order | Promethazine | 25 mg IM | approx. 3 hr 44–47 min | Nursing documentation records administration at 21:57; SeaCare medication-order section lists the dose as starting at 22:00 |

**Prepared by Victor Gomez, MD, based on information from the Carnival medical records provided for review.**

### C. Informed Refusal, Monitoring, and Disposition

On October 18, 2024, Dr. Maharaj documented that he recommended continued medical-center observation and subsequent hospital evaluation. Two Against Medical Advice (AMA) forms were executed at approximately 20:41 and 20:42 UTC-04:00. The forms bear signatures attributed to Mr. Smith and Austin Patterson, his brother-in-law. My concern regarding the AMA process is not simply that Mr. Smith elected to decline recommended care. Rather, it is whether the refusal was adequately informed in the context of an incomplete diagnostic assessment of his presenting symptoms.

Medical and ethical literature, including the American Academy of Neurology position statement regarding consent in acute ischemic stroke, describes informed consent or refusal as requiring disclosure of relevant information, a recommendation regarding the proposed course of care, and the patient's voluntary authorization or refusal. Decisional capacity is commonly assessed through the patient's ability to understand the relevant information, appreciate how it applies to his circumstances, reason among the available options, and communicate a choice (8).

Carnival's own physician role responsibilities in effect at the time are consistent with these principles. They required ship physicians to obtain complete and accurate patient histories, perform appropriate physical examinations, develop appropriate assessments, differential diagnoses, treatment plans, referrals, and follow-up plans, ensure that patients were aware of alternative treatment options, include family and caregivers in shared decision-making, communicate clinical reasoning and decision options to patients and caregivers, and maintain accurate, concise, timely, and complete medical records. These requirements are consistent with the clinical obligations applicable to informed decision-making and provide relevant company-specific context for the standard of care aboard the Carnival Pride.

The documented clinical assessment remained focused principally on hyperglycemia, dehydration, and possible infection. At the same time, the ship medical record documented that Mr. Smith had been reported unable to walk, required wheelchair transport to the medical center,

and complained of generalized weakness; the physician examination nevertheless documented a "steady gait" and negative Romberg test. The records do not document that this discrepancy was reconciled before the AMA discussion, or that Mr. Smith was counseled that his impaired ambulation, vomiting, weakness, and subsequent dizziness could represent a serious central neurologic disorder requiring urgent hospital evaluation. Accordingly, I have not identified documentation that the informed-refusal discussion addressed the possible neurologic significance of these findings or the material risks associated with declining further hospital evaluation for an unresolved neurologic condition.

The October 18 ship medical record does not establish that Mr. Smith lacked decisional capacity when the AMA forms were executed, and I do not offer that opinion. My concern is instead whether the refusal was adequately informed. A patient may possess decisional capacity and nevertheless make a decision without having been adequately informed of a clinically material risk. In my opinion, the adequacy of the informed-refusal process must be assessed based on what the shipboard medical team recognized and communicated to Mr. Smith at the time, as reflected in the medical record.

Mr. Smith's later deposition testimony differs from the shipboard documentation concerning the circumstances in which the AMA forms were signed. He testified that he did not want to return to his stateroom and denied stating that he preferred evaluation by a physician in Pittsburgh. When shown the first AMA form, he initially stated that the signature "maybe" was his and that it "looks like" his signature, although he could not recall why he had signed the document and acknowledged that his memory of the events could be inaccurate. When shown the second AMA form, he agreed that the signature appeared to be his. He later testified, however, that he had no independent recollection of being told that he was signing a document reflecting a decision to leave against medical advice and maintained that he wanted to remain in the medical center. He also questioned whether the signature on the AMA documentation resembled his signature on another medical-center document from that period.

I do not rely on this later testimony to conclude that the AMA forms were fabricated or that Mr. Smith lacked decisional capacity. The circumstances surrounding the signing of the forms are factually disputed, and I do not attempt to resolve that dispute. My standard-of-care opinion does not depend on resolving that issue. It rests instead on the adequacy of the clinical assessment performed at the time and on whether the possible neurologic significance of Mr. Smith's

symptoms, and the clinically significant risks associated with declining further evaluation, were recognized and communicated as part of the refusal discussion.

Because the ship medical record does not document that the possible neurologic significance of Mr. Smith's symptoms and the risks of declining further evaluation were explained to him, the medical record alone does not establish whether he would have made the same decision had those risks been fully communicated. Mr. Smith later testified, however, that he did not want to return to his stateroom and wanted to remain in the medical center. That testimony is consistent with the possibility that a more complete explanation of the unresolved neurologic concerns and the risks of declining further evaluation could have affected his decision. The deficiency in the informed-refusal process is that the record does not demonstrate that he was provided the information necessary to make that decision on a fully informed basis.

The actual discharge presents a separate issue regarding safe patient disposition. Although the AMA forms were executed at approximately 20:41 and 20:42 UTC-04:00, Mr. Smith remained in the medical center for continued treatment and reassessment. He signed the discharge documentation at 23:28 UTC-04:00, and at 23:30–23:32 UTC-04:00 the nursing and physician notes document that he left the medical center assisted by wheelchair. The nearly three-hour interval between execution of the AMA forms and his actual departure therefore provided an additional period during which his clinical condition and unresolved mobility impairment could be reassessed before discharge. The shipboard record also documents clinical improvement before discharge: at 22:42 UTC-04:00 Dr. Maharaj recorded that Mr. Smith felt much better, was no longer dizzy or nauseated, was tolerating water, and was clinically well hydrated; at 23:30 UTC-04:00 RN Madonda recorded that Mr. Smith stated that he felt much better and described his condition as satisfactory.

Carnival's MED-3102 procedure governing patient admission and discharge from the medical center provides additional company-specific context regarding safe discharge planning. The procedure identifies support or assistance required outside the medical center, ongoing treatment and follow-up, medications or other aids required after discharge, and other special needs as matters to be considered during discharge planning. It further provides that the patient and any travel companion should be involved in discharge planning and that patients should be discharged only after identified support or assistance needs have been put into place. The procedure assigns ultimate responsibility for discharge to the treating physician, including explanation of required

follow-up care. Although Mr. Smith had declined formal admission to the medical center, these provisions are consistent with the clinical principles applicable to safe disposition after several hours of active medical treatment. I have considered these shipboard requirements together with the applicable medical standard of care in evaluating the adequacy of Mr. Smith's discharge planning.

Despite that documented symptomatic and metabolic improvement, Mr. Smith still required wheelchair assistance when he left the medical center. I have not identified documentation that his previously reported inability to walk was objectively reassessed before discharge, nor does the ship medical record document who, if anyone, accompanied him from the medical center, what assistance he would have available after discharge, or who was expected to provide that assistance and monitoring. This is clinically relevant because his impaired mobility had been one of the significant features of his original presentation and remained unresolved in the documentation.

Eric Grimm subsequently testified that he believed no family member was present when Mr. Smith was discharged because the family was at dinner. He testified that when he later returned to the cabin, he was surprised to find Mr. Smith there alone and witnessed him vomiting, and that the family did not understand why Mr. Smith had been returned to the cabin without their knowledge. Grimm's recollection of the precise sequence and timing of events was not consistent in all respects, and I therefore do not rely on his testimony to establish the exact circumstances of the discharge. His testimony is nevertheless consistent with the absence of documentation in the ship medical record showing that a travel companion participated in the final discharge planning or identifying what assistance and monitoring had been arranged for Mr. Smith after he left the medical center.

In my opinion, within a reasonable degree of medical probability, the discharge planning was inadequate because the record does not demonstrate an objective reassessment of Mr. Smith's ability to ambulate safely or a documented plan establishing that the assistance and monitoring required after discharge had been identified and put into place. This concern is consistent with Carnival's discharge procedure, which required consideration of support and assistance outside the medical center and provided that identified assistance needs should be in place before discharge. My opinion does not depend upon establishing that Mr. Smith was actively vomiting at the precise moment of discharge, that he was entirely alone when he left the medical center, or that the AMA documentation was ineffective.

### D. Shoreside Referral, Medical Disembarkation, and Transfer of Care

Mr. Smith was medically disembarked upon the ship's scheduled arrival in Baltimore on October 20, 2024, where shoreside neuroimaging identified a right cerebellar infarction. Repeat head CT on October 21 documented increased cerebellar edema and increased mass effect on the fourth ventricle.

The ACEP Cruise Ship Health Care Guidelines require that ships have plans for timely shoreside referral when a patient's condition exceeds onboard capabilities (1). It is my opinion, within a reasonable degree of medical probability, that Mr. Smith's presentation of recurrent dizziness, inability to walk, severe recurrent vomiting, and later documented lethargy warranted urgent escalation for shoreside hospital evaluation well before the vessel's scheduled arrival in Baltimore, including activation of Carnival's medical-disembarkation process so that available evacuation, diversion, or transfer options could be evaluated.

Carnival's own disembarkation framework is relevant to this assessment. On October 19 at 10:22 UTC-04:00, Dr. Maharaj transmitted a planned Category 1 medical-disembarkation notification for Mr. Smith in Baltimore. Carnival's MED-3104-A2 defines Category 1 as direct medical disembarkation without escort for a patient who "does not need immediate admission and can travel." The same framework separately identifies Category 3 for medical disembarkation to a local healthcare facility and Category 5 for medical disembarkation involving operational disruption, including direct helicopter or boat transfer, ship diversion, delay in port arrival, or an increase in ship speed. Carnival's procedure further states that when more than one disposition category applies, the higher category should be selected in SeaCare. The Category 1 designation is therefore clinically relevant because it reflects the shipboard team's assessment of the urgency and level of shoreside care required; I do not base my opinion on the category designation alone. Rather, my opinion is based on Mr. Smith's documented clinical condition and whether that condition warranted escalation beyond routine disembarkation at the scheduled home port.

Carnival's MED-3104-A3 Medico/Medevac Check sheet further illustrates the clinical information and decision-making factors relevant to an emergency medical transfer. The form specifically calls for documentation of whether the patient is ambulatory and whether the patient is vomiting. It then identifies seven questions that are to be addressed: what condition the patient has; what the patient needs; where that care can be obtained; how soon it is needed; what care can be provided aboard the vessel; what care can be provided during transit; and whether the available

transfer plan can meet the relevant window of opportunity. These factors were directly pertinent to Mr. Smith's presentation because his shipboard record repeatedly documented vomiting, wheelchair dependence or inability to walk, and a clinical condition requiring care beyond the diagnostic capabilities available aboard the vessel.

Carnival also maintained a specific workflow for patients who might require urgent medical disembarkation involving operational disruption. MED-3104-A5 directed the Senior Doctor or designate to contact the Health Operations Center with the clinical information, review disembarkation options with the captain, and consider logistics including the ship's current position, distance and time to the next port, and available operational options. The workflow contemplated circumstances requiring a helicopter or another vessel, a delay exceeding one hour, or alteration of the vessel's passage plan, speed, or course. Accordingly, recognition of a medically urgent condition did not require the treating physician personally to determine the ultimate maritime transfer method; Carnival had an established process through which the medical need could be escalated and operational alternatives evaluated by the Senior Doctor, Health Operations Center, and vessel command.

Carnival's role-responsibility documents identify specific escalation responsibilities for the shipboard physicians. The treating Doctor was required to develop appropriate assessments, differential diagnoses, treatment plans, referrals, and follow-up plans; to notify the Senior Doctor in a timely manner of significant clinical cases and cases that could affect ship operations; and to escalate as needed. The Senior Doctor maintained overall responsibility for the medical response to emergencies and was required to notify shipboard senior management and the shoreside Health Operations Center in a timely manner of clinical cases that could affect vessel operations, and to escalate cases as needed.

In my opinion, within a reasonable degree of medical probability, once Mr. Smith's clinical course demonstrated recurrent vomiting, inability to ambulate or continued wheelchair dependence, recurrent dizziness, and later documented lethargy, the applicable standard of care required the treating physician to recognize that the clinical picture warranted escalation beyond routine shipboard management and to timely involve the Senior Doctor. The Senior Doctor, in turn, was responsible for escalating the case to shipboard senior management and the Health Operations Center when the clinical circumstances implicated the need for shoreside care and possible operational intervention. The failure to initiate that escalation and to activate Carnival's

MED-3104-A5 workflow for evaluation of urgent medical disembarkation, diversion, or other available transfer options constituted a departure from the applicable standard of care.

Separate from my medical opinion regarding the need for urgent shoreside evaluation, I reviewed the maritime operational analysis of Eric Watson, a USCG Licensed Master. Watson reconstructed the Carnival Pride's position at approximately 19:45 UTC-04:00 on October 18, 2024, and calculated that the Port Canaveral approach sea buoy was approximately 47.4 nautical miles away on a bearing of approximately 275° true. Using the vessel's average recorded evening speed of approximately 21.72 knots, he estimated a theoretical open-water transit time of approximately 2 hours 11 minutes to the Port Canaveral approach sea buoy, with additional time required for coordination, port entry, docking, or patient transfer. Watson identified diversion toward Port Canaveral, coordination for a surface-vessel transfer, and requesting United States Coast Guard evaluation of helicopter evacuation as operational options that could have been evaluated if an urgent need for shoreside medical care had been identified and communicated to vessel command. He does not opine that any particular method was guaranteed, immediately available, required, or medically indicated. I rely on his analysis only for vessel position, transit calculations, and operational feasibility. My opinion that Mr. Smith required urgent shoreside medical evaluation is based on the clinical evidence and is independent of Watson's maritime opinions.

More likely than not, the medical team's failure to recognize and act upon red flags for posterior circulation stroke delayed definitive shoreside neurologic evaluation and neuroimaging. The administration of promethazine, a medication capable of producing sedation, dizziness, and impaired coordination, increased the importance of serial, objective neurologic reassessment (5). My criticism is not that promethazine caused the stroke or that its administration itself required medical disembarkation; rather, the failure to adequately reassess Mr. Smith's neurologic findings contributed to the delay in recognizing the need for urgent shoreside neurologic evaluation.

**VI. Causation**

It is my opinion, within a reasonable degree of medical probability, that the shipboard medical team's failures to recognize and appropriately reassess Mr. Smith's neurologic red flags and to initiate timely shoreside escalation delayed the diagnosis of his right cerebellar stroke and delayed his access to neuroimaging, specialist neurologic assessment, and hospital-level monitoring and management. The administration of medications capable of affecting alertness, dizziness, and

coordination increased the importance of serial neurologic reassessment but was not itself a separate causative breach.

The subsequent hospital course demonstrates the clinical significance of that delay. Following medical disembarkation, neuroimaging identified a right cerebellar infarction and repeat head CT on October 21 documented increased cerebellar edema and increased mass effect on the fourth ventricle. Mr. Smith subsequently required transfer for neurocritical-care monitoring. Earlier recognition and shoreside transfer would have provided access to hospital-based neuroimaging, neurologic assessment, and monitoring at an earlier point in his clinical course. Population-level data demonstrate that delayed hospital arrival in posterior circulation stroke is associated with worse functional outcome, supporting the clinical importance of timely recognition and hospital evaluation (9).

The available record does not permit me, within the same degree of medical certainty, to determine whether Mr. Smith would have been eligible for or would have received a particular reperfusion, endovascular, or surgical intervention had shoreside transfer occurred earlier. Nor does the available evidence permit me to quantify the extent to which earlier recognition and transfer would have reduced the final infarct volume, cerebral edema, mass effect, or long-term neurologic deficit. My causation opinion is that the departures from the standard of care caused a clinically significant delay in diagnosis and in access to hospital-level stroke evaluation, monitoring, and management.

Although I cannot quantify the precise degree to which earlier recognition and shoreside transfer would have altered Mr. Smith's final infarct volume or ultimate deficit, it is my opinion, within a reasonable degree of medical probability, that the shipboard team's failure to recognize and escalate his neurologic red flags more likely than not deprived him of a materially better opportunity for timely diagnosis, hospital-level neurologic monitoring, and definitive stroke care. More likely than not, that opportunity would have resulted in a better neurologic outcome than he ultimately experienced. This opinion is consistent with the population-level data, cited above, demonstrating that delayed hospital arrival in posterior-circulation stroke is associated with worse functional outcome (9). The precise magnitude of that benefit cannot be quantified from the available evidence; however, that limitation does not alter my opinion, within a reasonable degree of medical probability, that earlier recognition and shoreside transfer more likely than not would have resulted in a better neurologic outcome.

**Alternative explanations considered:** In reaching these opinions I considered alternative explanations for Mr. Smith's clinical course. His cerebellar infarction may have arisen from a spontaneous thromboembolic or atherosclerotic process independent of any shipboard act or omission; his nausea, vomiting, and dizziness could be attributed in part to his severe hyperglycemia, dehydration, presumed gastrointestinal illness, and reported motion sickness; and the promethazine could have contributed to some degree of sedation and incoordination. I do not contend that the shipboard team caused Mr. Smith's stroke. Having considered and accounted for these alternatives, it remains my opinion, within a reasonable degree of medical probability, that the constellation of recurrent vomiting, inability to ambulate, dizziness, and later lethargy was not adequately explained by those alternative processes alone and required objective neurologic reassessment and timely escalation that did not occur. The relevant departure from the standard of care was the failure to perform that reassessment and escalation, not the underlying etiology of the stroke, and the resulting delay in diagnosis and access to hospital-level stroke care forms the basis of my causation opinion.

**VII. Conclusions**

It is my professional opinion, within a reasonable degree of medical probability, that the medical care provided to Mr. Michael Smith by the shipboard medical staff aboard the Carnival Pride fell below the applicable standard of care.

The shipboard management was inadequate by the medical team's failure to recognize and objectively evaluate persistent neurologic red flags, including recurrent vomiting, dizziness, inability to walk, and later lethargy. The use of medications capable of producing sedation, dizziness, and impaired coordination increased the importance of serial, objective neurologic reassessment; my criticism is not the administration of those medications themselves, but the failure to adequately reassess neurologic findings that remained unexplained. The informed-refusal process also did not adequately address the possible neurologic significance of Mr. Smith's symptoms or the clinically significant risks associated with declining further evaluation. The October 18 discharge planning was also inadequate because the record does not demonstrate objective reassessment of Mr. Smith's ability to ambulate safely or a documented plan establishing that the assistance and monitoring required after discharge had been identified and put into place.

Taken together, these departures from the standard of care included the treating physician's failure to recognize and appropriately reassess Mr. Smith's neurologic red flags, and the treating

physician's and Senior Doctor's failure to initiate timely shoreside escalation and activate Carnival's MED-3104-A5 urgent medical-disembarkation workflow.

Consequently, it is my opinion, within a reasonable degree of medical probability, that the shipboard medical team's departures from the standard of care delayed Mr. Smith's definitive hospital-based stroke diagnosis and delayed his access to neuroimaging, specialist neurologic assessment, monitoring, and hospital-level management. More likely than not, that delay adversely affected his neurologic outcome.

The opinions expressed in this report are based on the materials available to me as of the date of this report. I understand that additional discovery remains outstanding. I will review any additional materials provided to me and, if warranted, supplement or amend my opinions in accordance with Federal Rule of Civil Procedure 26(e) and any applicable court orders.

## VIII. References

1. American College of Emergency Physicians (ACEP), Cruise Ship and Maritime Medicine Section. Cruise Ship Health Care Guidelines Policy Resource and Education Paper (PREP) [Internet]. 2023 Oct [cited 2026 May 4]. Available from: https://www.acep.org/cruise/resources
2. Edlow JA, Newman-Toker DE, Savitz SI. Diagnosis and initial management of cerebellar infarction. Lancet Neurol. 2008 Oct;7(10):951–64. doi:10.1016/S1474-4422(08)70216-3 PubMed PMID: 18848314.
3. Edlow JA, Carpenter C, Akhter M, Khoujah D, Marcolini E, Meurer WJ, et al. Guidelines for reasonable and appropriate care in the emergency department 3 (GRACE-3): Acute dizziness and vertigo in the emergency department. Academic Emergency Medicine. 2023 May 1;30(5):442–86. doi:10.1111/acem.14728 PubMed PMID: 37166022.
4. Wijdicks EFM, Sheth KN, Carter BS, Greer DM, Kasner SE, Kimberly WT, et al. Recommendations for the management of cerebral and cerebellar infarction with swelling: A statement for healthcare professionals from the American Heart Association/American Stroke Association. Stroke. 2014;45(4):1222–38. doi:10.1161/01.str.0000441965.15164.d6 PubMed PMID: 24481970.
5. Promethazine Hydrochloride Injection, USP. Berkeley Heights, NJ; 2023 Dec.

6. Johns T, Lawrence E. Evaluation and Treatment of Nausea and Vomiting in Adults. Am Fam Physician [Internet]. 2024 [cited 2026 Jun 4];109(5):417–25. Available from: https://www.aafp.org/afp/2024/0500/nausea-vomiting-adults

7. Ly DP, Shekelle PG, Song Z. Evidence for Anchoring Bias during Physician Decision-Making. JAMA Intern Med. 2023;183(8):818–23. doi:10.1001/jamainternmed.2023.2366 PubMed PMID: 37358843.

8. Sattin JA, Chiong W, Bonnie RJ, Kirschen MP, Russell JA. Consent Issues in the Management of Acute Ischemic Stroke AAN Position Statement. Neurology. 2022 Jan 11;98(2):73–9. doi:10.1212/WNL.0000000000013040 PubMed PMID: 35312627.

9. Sommer P, Posekany A, Serles W, Marko M, Scharer S, Fertl E, et al. Is functional outcome different in posterior and anterior circulation stroke? Stroke. 2018;49(11):2728–32. doi:10.1161/STROKEAHA.118.021785 PubMed PMID: 30355215.

Victor Gomez, MD, MSc, MA, MBA
Shipboard Medical Care - Expert Witness
August 14, 2026