# EXHIBIT "J"

**Dr. Gomez's Deposition Transcript**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:25-cv-24611-DPG

MICHAEL SMITH,

Plaintiff,

V.

CARNIVAL CORPORATION and
NIKHIL MAHARAJ, M.D.,

Defendants.
________________________________/

DEPOSITION OF
VICTOR GOMEZ, M.D.
Pages 1 through 152

Tuesday, October 6, 2026
Location: Zoom Videoconference
Via all parties
Time: 10:30 A.M.

Stenographically Reported By:
Debra L. Stark
Court Reporter and Notary Public
State of Florida at Large

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

MICHAEL A. HOFFMAN, ESQ.
DAVID W. SINGER & ASSOC., P.A.
1011 South Federal Highway
Hollywood, FL 33020
Tel. (954) 920-1571
Dsingeresq@aol.com
Mahoffman@1800askfree.com

ON BEHALF OF THE DEFENDANT:

GRAYROBINSON, P.A.
MICHAEL J. DRAHOS, ESQ
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5747
Michael.drahos@gray-robinson.com



I N D E X

EXAMINATIONS

VICTOR GOMEZ, M.D.

| | |
|---|---|
| DIRECT EXAMINATION BY MR. DRAHOS | 5 |
| CROSS-EXAMINATION BY MR. HOFFMAN | 105 |
| CERTIFICATE OF OATH | 151 |
| CERTIFICATE | 152 |

INDEX TO EXHIBITS

DEFENDANTS' EXHIBITS

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| A | Re-Notice of Taking Deposition Duces Tecum | 7 |
| B | Report Dated August 14, 2026 | 9 |
| C | Dropbox Link *retained | 29 |
| D.1 | Fee Schedule | 29 |
| D.2 | Invoice Dated June 3, 2026 *retained | 32 |
| E.1 | Testimonial History | 38 |
| E.2 | Updated Testimonial History *retained | 38 |



| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| F | CV | 40 |
| G.1 | Against Medical Advice Form *retained | 87 |
| G.2 | Second Against Medical Advise Form dated October 18, 2021 *retained | 91 |
| H | article | 104 |

PLAINTIFF'S EXHIBITS

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Summary of Records from Carnival | 109 |

NOTE: DEFENDANT EXHIBITS C, D.2, E.2, retained, To be provided by witness
DEFENDANT EXHIBITS G.1, G.2 retained by Mr. Drahos
PLAINTIFF EXHIBIT 1 retained, to be provided by Mr. Hoffman



Deposition taken before DEBRA L. STARK, Florida Professional Reporter and Notary Public in and for the State of Florida at Large.

(Witness presents government-issued Colombia passport and identity verified.)

THE REPORTER: Please raise your right hand.
Do you swear or affirm the testimony you are about to give in this cause is the truth, the whole truth and nothing but the truth?
THE WITNESS: I swear.
THEREUPON:

VICTOR GOMEZ, M.D.

was called as a witness, having been first duly sworn to testify, testified as follows:

MR. DRAHOS: Put your hand down, Doctor. Thank you.
Before we begin, I just want to state on the record that I do not give permission to have my voice recorded or downloaded on any Artificial Intelligence database.

DIRECT EXAMINATION

BY MR. DRAHOS:
Q. Can you please state your name for the

Page 6

record, Dr. Gomez?
A. My name is Victor Gomez.
MR. DRAHOS: We are getting a little echo on your end.
(Discussion was had off the record after which the following proceedings resumed:)
BY MR. DRAHOS:
Q. Why don't we start by stating your name again for the record.
A. My name is Victor Gomez.
Q. Thank you, Dr. Gomez. And are you still in Chicago? I didn't pick that up. I lost sound all together.
A. I am in Chicago, Michael.
Q. And do you have anything there tangible in front of you, any documents or notes of any sort?
A. No, just my computer, my laptop, and that's it.
Q. In advance of the deposition, why don't we just do it this way: I sent you a notice of the deposition which we are going to mark as Defendants' Composite Exhibit A to this deposition. I am going to put it up on the screen.

Page 7

(Defendants' Composite Exhibit A, Re-Notice of Taking Deposition Duces Tecum, was marked for Identification.)
BY MR. DRAHOS:
Q. Can you see it, Doctor?
A. Yes.
Q. What are you using, by the way, to appear today? What device?
A. I am using my MacBook Air.
Q. If at any point you need me to adjust the settings on anything I put on the screen so you can read it easier, please let me know that. I will navigate through this throughout the day today, if you need me to go up, down, reopen, close, whatever. I am going to rely upon you to tell me if you are having any trouble reviewing anything that I am showing you, all right?
A. Can you please zoom in?
Q. Is that better?
A. Better, yes, thank you.
Q. This is what we marked as Defendants' Composite Exhibit A. This is a Re-Notice of Taking Deposition Duces Tecum, for you, Victor Gomez, in the case of Michael Smith versus Carnival Corporation for today's day at 10:30 A.M.

Page 8

Do you see that there?
A. Yes. Correct.
Q. And you agree that you appeared today in response to this notice?
A. Yes.
Q. Did you have an opportunity to review the Schedule A?
A. Not completely.
Q. I have not received any additional materials in response to this Schedule A in advance of the deposition. Do you have items responsive to Schedule A with you today?
A. I believe I would have the invoice, the copy of the report sent to Michael Hoffman, and that's it.
Q. Okay. So you are -- when you say "the invoice," are you referring to your billing in this case?
A. Yes.
Q. And when you say "the report," are you referring to your report that was issued in this case on August 14th?
A. Yes.
Q. You don't have any other materials here with you today?

Page 9

A. No.
MR. DRAHOS: And Mr. Hoffman, before I move on, since there was a miscommunication on this previously, I just want to make sure, I did not receive any share file from your office pertaining to Dr. Gomez, unless you have some contrary record.
MR. HOFFMAN: Let me follow up. I will do that as we go.
MR. DRAHOS: I will keep going for the sake of time. Okay.
BY MR. DRAHOS:
Q. Doctor, I am going to put up on the screen what we will mark as the Defendants' Composite Exhibit B.
(Defendants' Composite Exhibit B, Report Dated August 14, 2026, was marked for Identification.)
BY MR. DRAHOS:
Q. Can you see that there, sir?
A. Yes, can you increase the zoom, please?
Q. Yes. It does not default to the larger size, so you will have to keep reminding me if I forget.
A. Yes.

Q. So, although it says Exhibit A, it is going to be marked to this deposition as Exhibit B.
This is a 25-page report. I am going to scroll all the way down to the bottom so bear with me here. It is actually dated August 14, 2026. Is that your signature there, sir?
A. Yes.
Q. And does Defendants' Composite B accurately reflect the report that you issued in this case?
A. Yes.
Q. Have you made any changes to it since the time you signed this report on August 14th?
A. No.
Q. Are there any other additional versions of this report that exists other than Defendants' Composite Exhibit B?
A. No.
Q. On page 3 of the report, which, by the way, I think you told me you have the report there with you. I would just ask you as a curiosity, please, Dr. Gomez, that if at some point in time today during the deposition you are going to independently review your report in order to


answer one of my questions, and you are putting it on up on your computer screen, to please let me know you are doing that so I know you are referring to something specific as opposed to just stream of consciousness in your mind.
Does that make sense to you?
A. Sure, yes.
Q. So on page 3 of the report, you outline the materials that you have reviewed in this case. Can you see that there on the screen?
A. I can see them, yes.
Q. Those materials, as identified in the report, are the Carnival Pride Medical Center records, Carnival's corporate medical and operational materials produced in the case, Carnival Pride's operational records including the dec logs, the deposition of Michael Smith taken on March 19, 2026, the deposition of Eric Grimm taken on March 19, 2026, the expert report of Derrick Watson dated August 1, 2026, Baltimore City Fire Department Emergency Medical Service records dated October 20, 2024, MedStar Harbor Hospital records from October 20 to October 21, 2024, MedStar Franklin Square Medical Center records from October 21 through the 26th


of 2024, Encompass Health Rehab Hospital beginning October 26, 2024, Gallager Home Health Services.
In addition to that, you also list relevant pre-incident UMPC medical records, which I am going to ask you about in a second, and then applicable professional guidelines, drug prescribing information, and peer-reviewed medical literature which we are also going to discuss.
But for the purposes of my question, have I accurately identified everything that you reviewed in support of your opinions in this case?
A. Yes.
Q. Have you reviewed anything additional to the material that I have just listed here since the time you offered your report in this case?
A. I have reviewed the deposition of one of the nurses, and I have reviewed the deposition of the defense expert, neurological care, and the plaintiff's witness expert about neurology as well. Those three documents.
Q. When you say the nurse, are you talking


about Nurse Debra Dube, RN?
A. Correct, yes.
Q. When did you review that material, that depo?
A. It was like three, four days ago.
Q. When did you -- I think you said the defense expert. Are you referring to Dr. Alexander Merkler?
A. Correct.
Q. And when did you review Dr. Merkler's deposition?
A. Yesterday.
Q. And when you say plaintiff's expert deposition, are you referring to Dr. Raz -- I'll say his name -- Razack?
A. The neurologist, I'm not sure that was his name.
Yes, yesterday.
Q. You reviewed those two depositions yesterday?
A. Yes.
Q. I am curious, was that before or after you were at the cruise ship medical section meeting?
A. After.

Q. Did you tell anybody there at the cruise ship medicine section meeting that you were planning to testify against the cruise line the following day?
A. No.
Q. Anything that you reviewed in any of those three depositions change any of your opinions in this case?
A. Not really.
Q. When you say "not really," what do you mean by that?
A. Well, I have read the deposition from Dr. Merkler, and I would still think that Mr. Smith could have had an option to be medically disembarked on time for further management, but it wouldn't change my opinions themselves and I would reread plaintiff's expert witness depo what could have been better for Mr. Smith.
Q. Did you say it would not change your opinion itself, as it relates to Dr. Merkler's testimony?
A. Yes, correct.
Q. So can we both agree that at the time you authored this report, dated August 14, 2026, up through the present day, you have never heard


from the cruise ship physician who rendered care to Mr. Smith?
A. Correct, I haven't.
Q. In other words, you haven't read any deposition testimony from him and you certainly haven't spoken to him, correct?
A. Correct.
Q. I think I asked you this question before and I won't ask it again.
Explain to me, Dr. Gomez, if you will, please, how are you able to express a standard of care opinion against a physician without ever having heard from the physician himself regarding the medical care?
A. Well, I base my opinion and my analysis objectively by reading the medical report, by reading medical literature related to the medical condition or symptoms that occurred during the medical presentation aboard the ship.
I will base those opinions on my experience on cruise ships, my medical knowledge and my master's in disaster management that somehow encompasses medical evacuations, remote environment -- remote environments, let's put it that way.


Q. I understand the mechanics of how you get from A to Z because you have given me that same answer in the past. But I am asking something a little bit different. What I would like to know is, would you feel more confident in your ability to criticize a doctor, if you have first heard specifically from that doctor relative to what their decision-making was, the methodology that they used, the information that was available to them, than what you have done in this case, which is rendering conclusions about a doctor without ever actually hearing from that doctor?
A. Can you repeat the question, please?
Q. Sure. Do you think your opinions would be stronger if the deposition of Dr. Maharaj, the ship's physician, had already been taken and you would have had the benefit of hearing his analysis, his methodology, his reasoning, the information available to him?
A. Well, I am not sure because he will have his own version of the facts, but I rely on my objectivity on what I am reading, though, what was done during at that time rather subjective opinions from the doctor who would probably say that he did that but he did not document that,


because whatever reasons, so it would be like an assumption and that's why I rely completely on what is written on those reports.
Q. But you have twice said to me that you rely on your objectivity, but we can agree that you are not objective in this case. You have been hired by the plaintiff, correct?
A. Correct.
Q. And you have been hired for the sole purpose of findings criticisms in the medical care that was rendered, agreed?
A. Well, that's what I define by the breach of the standard of care and that's how I can imply that there might have been a better window of opportunity of treatment for Mr. Smith, but because those standard of cares were deviated or breached, that opportunity was closed within the time the patient was on board.
Q. Okay. And so, as you have told me before, I want to confirm for the members of the jury and the Court that this is still your process.
When you are retained by a plaintiff attorney, you view your role as an expert to remove the medical care and point out all of the

Page 18

criticisms that you have in how that care was rendered, correct?
A. Correct.
Q. And has there ever been a situation, up till present day, where you have reviewed a case and you have concluded where the medical care was perfect and you have no criticisms?
A. Well, I will say that in the situation with Mr. Smith, I have agreed that part of the treatment provided to Mr. Smith by the doctor on board was accurate, and I have criticized other processes on board, but as you have read in some situations specifically related to this case, I have agreed with the treatment provided to him.
Q. Okay. That's not necessarily the question that I asked.
Throughout the entirety of the time that you have served as an expert witness, have you ever reviewed a case and told the lawyer who hired you, "I have no criticisms, this medical care was perfect"?
A. No, I have always proceeded and elaborated a report.
Q. As you have told me, you have always found criticisms and it's up to the lawyers to

Page 19

determine whether or not those criticisms are sufficient enough to justify a lawsuit, right?
A. Correct, yes.
So the way it will work, the lawyers will send me some reports, I will read them, I will establish some preliminary opinions, I will discuss with them and they will tell me, "Okay, Doctor, we would like to retain you, please go ahead with your report and we shall expect it by a deadline," and I will proceed accordingly.
Q. So if you view your role or your purpose to find criticisms of the medical care rendered, how do you call yourself objective?
A. Because I am reading material from physicians in a field that I believe I have a lot of expertise and I know how things work there.
Q. How do you define the term "objective?"
A. Well, it's information that could be relied because it is written in a certain matter by a physician and I will be able to interpret it depending on the clinical presentation of the patient.
Q. But when you view records that are written by a physician through the lens of trying to find criticisms, can we both agree that you are

Page 20

not being an objective evaluator, you are being an advocate for the plaintiff?
MR. HOFFMAN: Objection, asked and answered. Go ahead.
THE WITNESS: Well, I have been hired to elaborate the document in which deviations of the standard of care need to be pointed out and that's what I have done.
BY MR. DRAHOS:
Q. So you agree, then, you are an advocate for the plaintiff?
A. Well, I wouldn't say that is the proper term, but in all the situations when I was retained by lawyers, I mean, that's my scope of the mission, you know, find if there is a deviation of the standards of care defined by ACEP.
Q. Okay, find that there is a deviation and throughout the entirety of your time, you have never ultimately concluded that there was no deviation; you have always found some deviation in every case?
A. Every case.
Q. So going back to what we are looking here on the screen, Defendants' Composite

Page 21

Exhibit B, when you make note here of relevant pre-incident UPMC medical records, what specifically are you referring to there?
A. To the baseline documentation prior to Mr. Smith boarding that ship.
Q. But can you give me any more specificity than that?
A. Well, those are medical reports, medical records where they mention what was his status, his baseline, his medical status before boarding that ship.
Q. Okay. But I would like to know specifically what you looked at and considered. Are you able to tell me, with any degree of specificity, what you looked at?
A. If he was able to walk, if he was using a wheelchair, if he had any difficulty to function on the daily activities, if he was having previews and episodes of DKA, for example, or any other complication of diabetes or other complications or any other of his medical conditions.
So, basically, I am trying to determine if what happened on the ship could have ever happened to him in the past.
Q. I appreciate that answer, but it's not

Page 22

exactly what I was asking for.
What I would like to know is specific records did you look at?
A. I will have to check the folder of the production because I don't have it, like, I don't remember it specifically.
Q. So as you sit here today, you can't tell me specifically, nor do you have those records with you?
A. I am having them, because I have the folders that I was shared with by Michael, but I would have to look at specifically which one of them is the one that I read, but all of them are contained in a folder, I can look at it now if you want.
Q. Well, maybe I understood your testimony earlier, Dr. Gomez, because when I asked you what specifically did you have here with you today, you told me that you had an invoice and you had your report.
So are you telling me that you also have a folder of material in the case?
A. Oh, yes.
MR. HOFFMAN: Objection. He is misrepresenting. He said he had a Dropbox in

Page 23

his opening.
MR. DRAHOS: He didn't say anything about a Dropbox at all.
MR. HOFFMAN: A shared folder; I apologize.
MR. DRAHOS: The record will speak for itself.
BY MR. DRAHOS:
Q. Doctor, you identified for me invoices and your report. So let me go back and ask the question again:
What specifically do you have here today with you?
A. Well, I was thinking when you asked me the question before if I was having like something else besides the usual documentation that I will read or assess in order to make a determination but besides the invoice and report, I have all the production sent to me by Michael Hoffman.
Q. All right. Dr. Gomez, I cannot, through any type of telepathy, understand what you mean by that.
So I need you to give me some degree of specificity as to what you have been provided so I can explore what you reviewed.
So tell me specifically what is contained

Page 24

within that file.
MR. HOFFMAN: Michael, I apologize. You had asked about the shared folder. I just found out from my office it had not been sent to you. I am sending it to you now.
THE WITNESS: So, I have here a folder that says Michael Smith's production by Carnival Cruise. There are -- give me a moment to read this. On that folder, there are --
BY MR. DRAHOS:
Q. Why don't you share you screen with me, Dr. Gomez, if you will, please?
A. Okay. Yes.
MR. HOFFMAN: Michael, I sent you the link.
MR. DRAHOS: I was sent a Dropbox link. We have been doing shared file. Are you able to do this in a shared file link instead, Mr. Hoffman?
MR. HOFFMAN: I don't know, I can ask my staff.
THE WITNESS: If Michael shares you the folder, we can go through from your screen.
MR. DRAHOS: I would like to see what you

Page 25

have, Dr. Gomez. So why don't we do this: Let's go off the record, for a second, let's give you an opportunity to do whatever settings you need to do so that you can share your screen, and Mr. Hoffman, if you would be so kind to ask your staff to send in a share file because that's the way we have been doing everything in the case, I would appreciate that. Thank you.
MR. HOFFMAN: Will do.
MR. DRAHOS: We are off the record, Dr. Gomez.
THE REPORTER: We are off.
(A recess was had in the proceedings after which the following proceedings were had:)
MR. DRAHOS: Back on.
THE REPORTER: We are back on.
BY MR. DRAHOS:
Q. Dr. Gomez, we are back on the record.
A. Okay.
Q. So when we left off, you were making adjustments to your computer, so you would be able to show me what is your on screen. Were you able to do that?

Page 26

A. I need to reopen. Sorry about that. It is asking me to exit again and reopen. So if it is okay, I will do that.
(A recess was had in the proceedings after which the following proceedings were had:)
BY MR. DRAHOS:
Q. Back on, thank you.
A. I am sharing my screen. This is the folder I was mentioning.
Q. Okay. Can you go back, please, Dr. Gomez?
What I would like to see is an index of what exactly is in your folder there.
There is a lot of stuff here on the screen.
A. Yes. So this is production I was sent from Michael, and those were the UPMC file and all files and guidances.
Q. Let's go to the part that prompted the question, which is, I would like to know specifically what UPMC pre-incident medical records you have reviewed.
A. I will find it. So it will be this one containing Smith, Michael, for Dr. Gomez,

Page 27

Pettingill, economist.
Q. Can you click on that for me, please?
A. Yes. Can you see it or should I change the --
Q. I can only see a PDF icon.
A. Give me a moment. I will share it.
Here, there, you may see it.
Q. Okay. Tell me what is the first page there. Scroll down to the very bottom of the first page.
It's labeled -- hold on one second. It's is labeled page 2, printed on 1/29/26 at 11:08 A.M. Okay.
And that document is 115 pages in total, Dr. Gomez?
A. I cannot see how many pages there are on my screen.
Q. In the right-hand column there, it says 1 of 115. Do you see that?
A. Yes, I can see it.
Q. So it is 115 pages. Can you go to page 115 for me, please?
A. Yes, one moment, please. To which page? Sorry.
Q. The last page, sir.

Page 28

A. Okay.
Q. That is page 116, printed on the same date, 1/29/26.
All right, thank you, Dr. Gomez. You can close out your screen now.
A. Okay.
Q. That is the entirety of the UPMC pre-incident medical records that you reviewed in this case, correct?
A. Yes, where I compiled the medical history of Mr. Smith.
Q. Turning your attention back to Defendants' Composite Exhibit B, you note here, "Applicable professional guidelines, drug prescribing information, and peer-reviewed medical literature identified in the references section."
Do you see that there, sir?
A. Yes.
Q. If I go to the references section in your report, which is on page 23 and 24, are these the references you are referring to?
A. Correct, yes.
Q. And those would be then the literature that you have reviewed in this case, correct?

Page 29

A. Correct, yes.
MR. DRAHOS: I am going to mark as Defendants' Composite Exhibit C a copy of the Dropbox link provided to me by plaintiff's counsel this morning during the deposition.
(Defendants' Composite Exhibit C, Dropbox Link, was marked for Identification.)
MR. DRAHOS: Madam Court Reporter, we will transmit that to you after the deposition separately.
BY MR. DRAHOS:
Q. Okay, Doctor, continuing on.
As Exhibit D, I am going to put up on the screen Exhibit D, what we will hopefully confirm to be your fee schedule in this case. Does that appear to be your fee schedule for this case, Dr. Gomez?
A. Yes, correct, that's mine.
(Defendants' Exhibit D.1, Fee Schedule, was marked for Identification.)
BY MR. DRAHOS:
Q. That indicates that you request a retainer of $3,200 for your services, correct?
A. Yes.
Q. And is it still the case that that is a

Page 30

flat fee that exists from beginning to end of your services as an expert witness?
A. This year, yes.
Q. So, in other words, does that mean that this is the extent of your billing in this particular case?
A. Repeat again that question.
Q. Sure. Is 3,200 -- well, did you bill plaintiff's counsel 3,200 for your services in this case?
A. Yes. So far, yes.
Q. Does any further billing exist?
A. No, only that one.
Q. When you say "so far," do you have an intention to further bill?
A. Well, if they ask me to do something about whatever happens in the near future, I will bill for it. If not, no.
Q. And you made a reference when I asked you about this earlier. You said you had an invoice with you. What invoice were you speaking of?
A. The invoice that I produced and sent to Michael.
Q. I have not seen that.

Page 31

A. Would you like me to --
Q. Yes, let's go ahead and why don't you share that one with me, Dr. Gomez, so I can see that, sir?
A. Sure, one minute. I will share the screen.
This one (indicating).
Q. I have not had an opportunity to see this yet. If you will scroll slowly so I have a chance to look at it, please.
A. Sure.
Q. Does the invoice have a date on it?
A. Let me check.
Yes, it says here, invoice date, six -- June 3, 2026.
Q. And is that the date that you were retained in this case?
A. Yes. I send my invoices directly from my bank account, and that's the date when I send it.
MR. DRAHOS: All right. I am going to go ahead and mark Dr. Gomez's invoice as Defendants' Exhibit D.2. So the fee schedule will be D.1 and the invoice will be D.2. And, Dr. Gomez, since I have not received

Page 32

that yet, I am going to ask for you to please preserve it, and if you are able to, to forward it to my attention, I would appreciate it. If not, I will request it from plaintiff's counsel.
THE WITNESS: Sure, at the end we can send everything that is pending from my side.
(Defendants' Exhibit D.2, Invoice Dated June 3, 2026, was marked for Identification.)
BY MR. DRAHOS:
Q. How many hours have you spent total in this case as an expert witness, thus far, Dr. Gomez?
A. Well, this time I didn't use as many articles as I would usually use. I only used, like, ten articles or so.
So this took me less time than other reports, but I will say that probably I was retained in June and I sent the report by August. I mean, I wouldn't work every single day on it because I will have other things to do, but technically, I would say that probably this one took me, in hours, I would say -- in days I would say probably seven days. In hours, 24 times seven, something like that, I will tell you, probably

Page 33

150 hours, more or less.
Q. Do you have anything that tracks specifically the amount of time you are spending or are these just ballpark estimates you are giving me?
A. No, I have tried to download an application to quantify the work time that I do, but so far, I haven't found like a nice app, no. So I work at night, in the morning. I have different variables that will affect my performance of each report. It is possible that the reason why it took me less hours than usual is because I have other reports and I have urgent matters to deliver with other cases, so it all depends on what is happening from a deadline perspective with other firms.
Q. What does that mean exactly?
A. Sometimes I have to submit urgent reports from lawyers from other firms. Those would be my priority and I would delay some others when the deadline is not as urgent as the other ones.
Q. So are you telling me then that this case, since you had a period of two and a half months to prepare this report, was not as urgent

Page 34

as others?
A. Well, it was urgent in the sense that there was a deadline, but if I didn't have all the reports to submit, it is possible that I would have delivered this report to Michael by July, possibly.
Q. So tell me, how many hours of the 150 or so that you spent in the case, did you devote to research?
A. Probably half of it, 75 hours.
Q. 75 hours?
A. Yes.
Q. So how much time did you spend actually writing the report itself?
A. Other half.
Q. How much time did you spend actually reviewing the medical records in the case?
A. Well, take into consideration that possibly the records and the production of Carnival that will have taken more time because there were too many documents, but since I am already familiarized with some of the standard procedures of Carnival, well, I wouldn't possibly read all of them again, so possibly added to those 150 hours, I would say that reviewing that

Page 35

specific production could have taken me between 100 and 150 hours, possibly, like six to seven days, more or less.
Q. And this is what you are referring to as your review of the Carnival medical chart and Mr. Smith's medical records?
A. Yes.
Q. So if my math is correct, then that would mean you spent 300 hours?
A. More or less, yes.
And I know you will ask me why I charged ten hours, well, as I told you --
Q. I would appreciate, although I deposed you many times, just let me ask the questions. If I care to get another answer from you, I will ask something I haven't asked previously.
A. Sorry about that.
Q. How much time did you spend in preparation for today's deposition, if any?
A. Possibly four hours.
Q. What did you review in that four hours?
A. I mainly reviewed my report and the three depositions that I was given recently, but I couldn't complete all of them.
Q. Which ones did you not complete?

Page 36

A. Dr. Merkler and the other doctor.
Q. As you sit here today, you don't know the entirety of Dr. Merkler and Dr. Razack's deposition testimony, is that what you are saying?
A. Well, I didn't read it thoroughly but I am relying main issues on several paragraphs.
Q. But my question is: As you sit here today, you have not read through the entirety of Dr. Merkler and Dr. Razack's testimony?
A. Correct.
MR. DRAHOS: I put up on the screen what we will mark as Defendants' Composite E.
BY MR. DRAHOS:
Q. Can you see that, Dr. Gomez?
A. Let me stop sharing.
I can see, yes, Victor Gomez, yes. Yes.
Q. And this has been represented to me as being a summary of instances in which you have been consulted as an expert witness. In looking at this document, is that an accurate estimation of your experience as an expert witness thus far?
A. Can you go down further, please?
That's the bottom? I believe there are other, there's an updated version of it.
Q. I have not seen an updated version. What

Page 37

do you have there?
A. Let me show it to you.
I have an updated version from September of 2026, I will share it.
Q. Okay.
A. You should see it now.
So I am going to go down and the one that I currently have is -- it goes until this one, Dulaney, but since then, I have had these other cases.
Q. Okay. So you have listed the Carlin versus Carnival matter, which that case is over, Dr. Gomez, so you won't be testifying in that case.
Smith V. Carnival, which is today?
A. Yes.
Q. Klijac versus Scenic Cruises, Hewitt versus MSC, Sirendra versus Celebrity, Young versus Carnival, Terrence Young versus NCL, and Branbia versus Princess Cruises. That's the entirety of your --
A. Yes, but I believe this one, the last one, Branbia, I believe, I don't know, I got a message from --
Q. Dr. Gomez, don't speak to Branbia.

Page 38

That is a pending case that I am handling and I do not want to --
A. Sorry.
Q. -- Sculera firm?
MR. DRAHOS: I am going to mark as Defendants' Exhibit E.1, the testimonial history that was provided to me, and E.2 as being the testimonial history you produced here today in response to deposition questioning, and the same instruction as before, Dr. Gomez, please preserve Defendants' Exhibit E2 and either send to it to Mr. Hoffman -- actually, I will ask you to send it to Mr. Hoffman and he will send it on to me so that we can complete the record.
THE WITNESS: Sure.
(Defendants' Exhibit E.1, Testimonial History, was marked for Identification.)
(Defendants' Exhibit E.2, Updated Testimonial History, was marked for Identification.)

BY MR. DRAHOS:
Q. Now, keep that up for just a minute so that you can answer my question, but can we agree

Page 39

that in each and every one of those instances you have been retained as an expert for the plaintiff?
A. Yes.
Q. Up until the present day, you have not been retained by any cruise line, correct?
A. No.
Q. And what I find particularly notable, Dr. Gomez, is a majority of those are my cases and I know I have deposed you maybe five times at this point. But has anyone else taken your deposition other than me?
A. Yes.
Q. Can you go back to the screen, sir, the one you have there as your recent testimonial history?
A. Yes.
So there was one occasion that I was taking the deposition regarding a case that I was assisting with Lipcon, the lawyer was from MSC -- I mean, the firm that was representing MSC.
Q. Which case was that, sir?
A. I believe this one, Beane on August 2025.
Q. Other than the Beane matter, has there been any other cases in which a lawyer has taken your deposition who was not me?

Page 40

A. No, it's only that case and the rest has been you only.
Q. You can close your screen. Thank you, Doctor.
A. All right.
Q. Let's mark as Exhibit F to the deposition, as I understand it to be your current CV. Can you see it there on the screen? I can enlarge it for you.
(Defendants' Exhibit F, CV, was marked for Identification.)
THE WITNESS: Can you go down to see the medical escort physician.
Yes.
Can you go down, please?
Pretty much, that is it. Yes. That's updated one.
BY MR. DRAHOS:
Q. Now, the last time I took your deposition was in August of this past year, so two months ago, actually two months ago to the day, August 6th, and in that particular case, you testified that you no longer perform any services for Aeromedical & Marine Training & Rescue International. Something changed since August.

Page 41

A. No, no, I am currently still doing it, it was rerun that I haven't worked with them anymore.
Q. When is the last time that you provided any medical escort services for Aeromedical & Marine Training?
A. That could have been possibly three to four months ago, I had a patient taken from Costa Rica to Canada, I believe.
Q. What were the circumstances -- strike that.
What was the condition of the patient?
A. Well, usually those cases involve an unstable patient and --
Q. I am not interested in unstable.
Specifically what was the diagnosis of the patient?
A. I believe he had a traumatic brain injury and he had a contusion, and he was taken to the hospital, he was done a CT scan, observed, and he had to go home because his time in Costa Rica ended.
He was on vacation and they called me to escort him back on a commercial airline to Canada. I don't remember if it was Vancouver or

Page 42

Victoria.
Q. So you accompanied him on a commercial airline?
A. Correct, yes.
Q. Did any other medical support accompany you?
A. No. Myself, that's it.
Q. Did you have to render any medical treatment for him during the transport?
A. No.
I just observed and make sure that he is okay.
Given the case that something will arise, I will take appropriate action, but usually, as I mentioned, these type of patients are absolutely stable, that's the reason why they travel back home commercial airlines, but they will need an escort, usually a nurse, I believe they couldn't get a nurse, and the closest to him was me in Colombia.
Q. So if that particular event took place sometime in June or July, per your previous deposition answer, when would have been the last time, prior to that, that you rendered any medical escort physical services for Aeromedical

Page 43

& Marine Training?
A. I have a folder with that information. Let me retrieve it and I will tell you specifically the dates. So I am mistaken, sorry. The last trip that I did was from Italy to Canada. That was in June/May 2026.
Q. June what?
A. I don't remember specifically the case.
Q. June 2026, and this is the patient you are speaking of, the traumatic brain injury?
A. No, no, this is another one. The traumatic brain injury happened in March of 2026, but this one from Italy to Canada, I don't remember.
I will have to check the WhatsApp and see the report but would you like to know, I mean, I will have to do some search online.
Q. Did you also accompany that patient on a commercial airline?
A. Yes. Oh, I remember. He was a patient who had had -- he went on vacation to Italy and he developed a seizure, and the seizure was caused by a tumor in his brain, and he had to go back home for further treatment so I was called to escort him back to Canada, to Quebec, I think.

Page 44

Q. Did you have to render any medical treatment to that patient?
A. No, nothing.
Q. So we have the March 2026, Costa Rica to Canada, and we have the June 2026, Italy to Canada.
Prior to those two encounters, when was the last time you performed any services for Aeromedical & Marine Training & Rescue International?
A. That would have been February 2026, the patient from California to Vancouver.
Q. And what was the diagnosis of that patient?
A. The patient had an acute myocardial infarction.
Q. And did you accompany that patient on a commercial airline?
A. Correct, yes, commercial airline, Uber, it was a long trip, but yes.
Q. Did you have to render any care to that patient?
A. No. He was very stable and he would have had further basic treatment at home, Northern California.

Page 45

Q. Since we are closing in September of 2026, have there been any further services for that company other than what you told me before?
A. In December of 2025, I remember clearly because it was Christmas Eve. I had to travel in Cali, Colombia, to transfer, to escort a patient from Cali to Valencia in Spain.
The diagnosis initially was not completely clear because the patient had a variety of symptoms, but then eventually -- and I had to actually interrupt the transfer because I was not comfortable transferring that patient so symptomatic, still complaining of issues, her vitals weren't stable, so I decided to cancel it and I requested coronary angiography and they did it and that ruled out coronary issue. I was feeling more comfortable, and I transferred her to Valencia.
We arrived safe and by doing the retrospective assessment, I realized that the patient, she was exposed to toluene, which is a component of the glue that tapestries -- that they use in tapestries.
Q. Did you render medical care to that patient?

Page 46

A. No, but I went to her to the hospital to accompany her to have the coronary angiography.
Q. So when you say you interrupted the trip, were your actually en route from Cali to Valencia, or was this a decision made before the wheels went up?
A. No, no, when I met the patient on the 23rd of December, I went to her house, the take-off history was too complicated and there were many issues, many gaps that I felt were not -- I mean, they would not make me feel confident of transferring that type of patient.
So I called this company and I requested to please ask the insurance, the travel, the insurance, the health insurance from her in Spain, to please arrange the test that I mentioned.
It happened the following day, they cleared her and the following day, that would be the 25th of December, I traveled with her to Valencia.
Q. So what specifically was it about her presentation that led you to believe she was not stable for travel?
A. Well, she was a patient with no medical

Page 47

conditions except obesity, morbid obesity.
Q. Obesity?
A. Yes. And what I met her, when they told me to escort her, sure, they sent me the medical reports and since the tenture (phonetic) ride to Colombia until the moment I was asked to escort her, I mean, probably she went to the ER in Cali, possibly five or more times, complaining of chest pain, shortness of breath, headache, dizziness, restlessness, feeling anxious, a variety of symptoms.
They did x-rays, they did EKGs, they did, I think a CT scan. They did all kind of tests, but what was missing was the coronary angiography to see the patency of the coronary. And when I met her on the 23rd, she was still complaining of chest pain, still complaining of shortness of breath, and I didn't feel -- and her vitals were -- she was hypertensive, she was tachycardic.
That, in conjunction, I mean, will not make me feel safe to transfer her on such a long flight, so I requested for further assessment. That's why I say I interrupted that trip because we were meant to travel on the 24th.

Page 48

Q. The coronary angiography that you requested, did it come back positive for any particular findings?
A. No, no. Came negative, it was normal.
Q. So what was done to stabilize that patient, if anything?
A. Nothing. Now, with that negative test, we will be able to transfer her and -- in a safer position, you know. I mean, I will know that the symptoms are not caused by any cardiac issue, the CT scan of her head was normal. So what it really was could be treated, there would be treatment, you know, but at the end, since the moment we started the trip, she was complaining of anxiety.
But in Colombia, as a physician, I cannot carry controlled medications, so basically I did not have any benzo to calm her down, so I was just talking to her, and by the time we arrived to Valencia, she was feeling much, much better.
Q. Other than the three instances you told me about where you have accompanied passengers on commercial airlines, do you have any other means of income, other than serving as an expert witness

Page 49

for plaintiff attorneys?
A. Yes, I have this other company in Colombia, a shared consultancy called VGMO, but like possibly two weeks ago, the oil platform left the Colombian coast, so that means that we are finished from a contractual agreement. The platform was moved to Guyana, or something like that.
So, basically, what I received from that company that year it is not continuing. I mean, I will close that.
Q. So I have asked you this question before, you know that. You have never told me about any oil platform Colombian post. So what specifically are you referring to?
A. Like a year ago, or so, they contact me from Remote Medical International. Remote Medical International is a global company based in the UK, and they provide medical services to oil platforms.
Noble, for example, is one of them. Noble is an Australian company that they extract or explore potential sources of oil at sea and there was or there is a potential source of oil in the coast --

Page 50

Q. You are going off on a tangent, Dr. Gomez.
Let me just see if I can get a specific answer.
What's the name of the employer that you are speaking of, Remote Medical International?
A. Correct, yes, RMI. Yes.
Q. I do not see them on your CV.
A. No, because I represent them through my VGMO in Colombia and say yes.
Q. So you are saying that Remote Medical International hired you through your company, VGA?
A. VGMO, yes.
Q. VGMO?
A. Yes.
Q. And you are saying that that prior came when? You said a year ago?
A. No, possibly January 2025. Sorry, more or less. Yes, or actually, we started talking January 2025. But we didn't come to an agreement until possibly May 2025.
Q. So, Remote Medical International hired VGMO in May of 2025 to do what exactly?
A. VGMO will provide logistics operations, for example, they will run out of medication, so

Page 51

they will contact me, hey, Victor, could you please outsource these medications?
Sure.
So I will contact the provider in South America, which is a city in Colombia, and I will arrange those medications to be delivered to the trading zone in South America, and from there, they will retrieve it.
And there are occasion, or other occasions, they require maintenance of biomedical equipment. So I hired a contractor to provide that.
On another occasion, they required maintenance and calibration of AEDs, automatic external defibrillators, and -- yes. Stuff like that, you know, nothing clinical, just help logistic services.
Q. So when you say "nothing clinical," you mean no care and treatment rendered to any actual patients?
A. Exactly because they had already a doctor on board.
Q. So if they needed medical supplies, you would order it for them. If they needed somebody to maintain their equipment, you would help

Page 52

facilitate the person or entity who would do that maintenance; is that accurate?
A. Correct.
Q. All right.
A. The patient I was offered to work on a platform in Guyana, that was July, I believe last year, I was -- I signed a contract, I was going to go, but during that time, my mom, she got very sick and she was admitted to the hospital, so I had to cancel and stay with my mom. And since then, they have offered me other positions, but --
Q. What company is that, sir?
A. Sorry?
Q. What company is this that you are speaking of?
A. Remote Medical International.
Q. How much money have you been paid for your services provided to Remote Medical International?
A. Very little. I mean, actually went to losses. Yes, because I will be given the 15 percent commission of whatever transaction, you know, we will do, but the banks in Colombia, they offer transaction -- conversion rate lower than you will normally be, and I didn't know that

Page 53

I could have like, charged, like, a 10 percent to it, and I went to losses, and that's another reason why I am tired by doing that type of service and taking the opportunity that the platform is needing and I don't think I will continue with it.
Q. So we can agree then, you have not actually generated any income or profit through services you rendered to Remote Medical International, correct?
A. Correct. If there is any, it will be possibly less than $500.
Q. Let me go back to my original question then to make sure I have a clear answer.
A. Yes.
Q. Other than income that you generated by virtue of doing the four airplane transfers for Aeromedical & Marine, are there any other sources of income you can identify for me for yourself or your businesses, other than providing expert witness services for plaintiffs?
A. No. Only that.
Q. So I wanted to ask you about your time at Royal Caribbean again. We covered this before, but some issues have come up, Dr. Gomez, that I

Page 54

would like to give you an opportunity to respond to.

We talked about this previously. You agree, there is no dispute, you were terminated from that position, in 2017, correct?

A. Correct.

Q. Were you terminated from that position because a fellowship doctor refused to sail with you after finding that narcotic medications in the ship's medical center were missing?

A. No, that's not true.

Q. So I just want to make sure here that you are testifying under oath, under penalty of perjury, that there is no aspect of your departure from Royal Caribbean, that has anything to do with missing narcotic medication missing from the ship's medical center that you were serving in?

A. I swear, that's not true.

Q. Why do you have Art Diskin as your contact at Royal Caribbean when he was not there at the time you were terminated?

A. He has always been a mentor to me. I still talk to him. He has always supported me. When I did my observership at Jackson, he was the

Page 55

one who arranged it.

Q. All right. You would agree that Ruben Parejo, Dr. Ruben Parejo, the expert for the defense in this case, was your supervisor at Royal Caribbean at the time you were terminated?

A. Yes, for the last year or so that I was in Royal, he was the medical director.

Q. I would like to just hear one last time from you then, what is your take on why you were terminated from Royal Caribbean?

A. When I did my last contract on a ship, on Royal, by the time my father, he was dying, he had a complication of prostate cancer, he had severe pain, he was encephalopathic, he was confined to a bed. He was demented, but still I had to go work and that created or caused me some sort of insomnia and anxiety.

So I came on board, the first few nights I couldn't sleep well so I politely asked Dr. Helen Johnson to prescribe me something to sleep, and we came to an arrangement, to an agreement that Alprazolam would be the best option.

So she prescribed it to me. Okay. I was able to take appropriate sleep, let's put it that way, but during that contract, I noticed

Page 56

that Dr. Johnson, she was not to the standard of care, she was very weak as a health professional.

So we had a situation by the end of the contract in which she was not adequately treating a patient who had cancer and had severe anemia, requiring a transfusion. So I had to take care of that patient and, eventually, when I ended that contract, I reported that situation to Dr. Parejo, and it ended in that Dr. Helen, she retaliated against me and said that I obligated her to prescribe me that medication, and I was fired for that.

Q. So when I asked you if your termination had anything at all to do with narcotic medication, you said no, but in the explanation that you just gave me, you said that Dr. Johnson claimed that she was obligated to provide you medication?

MR. HOFFMAN: Objection. You misphrased the question. You had asked about missing narcotics.

MR. DRAHOS: I don't agree, Mr. Hoffman. You can object to the form.

BY MR. DRAHOS:

Q. But I want to make sure I understood

Page 57

what you just said, Dr. Gomez.

Are you saying that Dr. Johnson's contention was that she was obligated to prescribe you medications?

A. No. I am not saying that, that she retaliated against me. I mean, the explanation that she gave or she probably gave to Dr. Parejo is that I obligated her to give me that medication and I did not. I was just a patient. I was just a person, having an issue, a mental issue, that required medication to be able to sleep and I requested for help, and the help -- the only person that could help me was Dr. Johnson.

There is no other doctor on board who would have been able to provide me with something to sleep, and I have tried other medications, like, I don't know, Benadryl or whatever, antihistamines, and it hasn't worked in the past, during that time, and I knew that more likely than not, the alprazolam would be a better option. That is why we say, okay, listen, let's go to something that really works, because on ships, most of the doctors they would prefer to prescribe antihistamines, rather than that type of medication, which is benzodiazapines because they

are afraid of prescribing a real medication for a real problem. They tried to mask the treatment with medication that actually it will cause the sedation as a side effect, but it is not empirically for his main therapy for an insomnia.
Q. So when you say Dr. Johnson told Royal Caribbean that you obligated her to prescribe new medication, what is your understanding of what Dr. Johnson was saying?
When you use the term "obligated," I am not sure what that means?
A. That information came from Dr. Parejo, actually. He was the one who informed me, listen, Dr Johnson has told me that you obligated her, you push her, you -- I don't know another synonym for that word. But basically I obligated her, and that's not true. I went as a patient. I am sure that the medical record is still on that ship and you can find the consultation. If no consultation was done, it will be a negligent act from that doctor.
I am sure that since it was a medical controlled medication, there is a record of that consultation on that ship.
Q. So when you use the word "obligated,"



are you saying that Dr. Johnson was saying you were pressuring her? Is that what you are saying?
A. I guess, because when I reported her, I think that was her defense to -- yes, to, I don't know how to say it. To affect me, to make me fired, whatever you call it. I didn't obligate her at all.
Q. And when you were working for VIKAND, you were doing so aboard MSC ships?
A. No, MSC is not part of the VIKAND fleet.
Q. But you did serve for a brief period of time on MSC ships, correct?
A. Three months, yes.
Q. And did your departure from MSC have anything to do with narcotic pain medication?
A. No.
Q. You were fired from that position as well, correct?
A. No.
Q. What is your understanding of what led to your departure from MSC?
A. I resigned.
Q. Why?
A. I didn't like the way that they were dealing with crew members who got sick on board.



For example, Royal Caribbean, a crew member will get sick and the company will take care of the treatment back home, right, but by the time MSC, whoever will get sick, will get a ticket back home, and that's it. Deal with it.
So there was no followup or compensation and the doctors they were hiring on board, I mean, also -- I mean, I didn't ever see them up to the standards of care, not all of them, because I actually met a really great doctor there, Dr. Georgio. He was actually begging me not to leave the company because we were really good --
Q. I don't need to know about --
A. Thank you. I resigned because I didn't like it.
Q. You resigned before completing your contract, correct?
A. Correct, yes. I preferred to go a medical mission in Guatemala rather than continue working with them.
Q. Were you fired from VIKAND?
A. Yes.
Q. What is your understanding of the circumstances that prompted your termination from VIKAND?



A. Well, when I first joined Royal Caribbean in 2011 on Majesty of the Seas, I had a senior doctor, pa Colombian senior doctor named Jenny Garcia. She was a very abusive doctor in some sort of way. She used to tell me to work whenever it was convenient to her, and the staff captain, whoever was in charge, they told me, listen, Dr. Jenny is being investigated for other issues, so whatever thing you see, say something. There was one time that I had a retreated to go down in Nassau in the Bahamas, but she made a mistake in that she also went ashore, so basically the ship was left without a single doctor on board, and I took that opportunity to report her, and she was fired. Eventually, she went to work in Disney.
Eventually, she went be to work in VIKAND and in the meantime while I was working with Royal, and then I went to durable medicine and then by the time I came back to ship life, to ships, I went to VIKAND, and she had already by that time had a higher position, they hired her management position, and there was one time that I went on vacation, that was in July 2023, I was supposed to go back to that ship on September,

Page 62

October 2023, I think.
And during my vacation, she decided to do an audit, an internal audit, and it was my understanding, from what I was told actually by VIKAND, that they found out that the nurse, he forgot to enter the separation expiration dates of the medications on SeaCare, and they decided to fire me for that.
I believe, it is my perception, that this woman, Jenny Garcia, she took revenge and she told or said or whatever to VIKAND management that I am not an asset, a good asset to the company and they fire me, because I don't see any reasonable explanation of why they will fire me for that minor issue. I mean, it could easily be fixed, some training, but no, I was fired.
Q. So, Dr. Gomez, I want to give you an opportunity to answer under oath.
Did your termination at VIKAND have anything to do with allegations that there was missing narcotic pain medication in the ship's medical center?
A. No.
Q. So as you sit here, what you are

Page 63

telling the members of the jury and the Court, under oath, is that no ship physician affiliated with VIKAND ever complained that they refused to sail with you because there was missing narcotic pain medication in the ship's medical center that you were responsible for?
A. Correct.
MR. DRAHOS: So let's -- we have been going an hour and a half, let's take a quick five-minute break, we are going to come back and start talking about some of your findings.
THE WITNESS: Okay. When shall we meet?
MR. HOFFMAN: Can we do 12:10?
MR. DRAHOS: 12:10 is fine.
(A recess was had in the proceedings after which the following proceedings were had:)
MR. DRAHOS: Dr. Gomez, we are back on the record.
BY MR. DRAHOS:
Q. When do you contend was Mr. Smith's last known well time?
A. I believe that he came on October 18th,

Page 64

during the evening, and he reported that he had symptoms for the past two days.
So I would say that the 16th possibly he was better than on the 18th.
Q. So is it your testimony in the case then that Mr. Smith's last known well time was October the 16th?
A. I presume from what the nurse wrote on the triage.
Q. In looking at -- give me a minute.
In looking at Defendants' Composite Exhibit B of your expert report, specifically page 21, is it your opinion in this case that the available record does not permit you, within a reasonable degree of medical probability, to determine when Mr. Smith would have been eligible for or would have received a particular reperfusion, endovascular or surgical intervention had shore-side transfer occurred earlier?
A. Correct.
Q. And when you say reperfusion, what you are referring to there is either TPA or TKA, right, thrombolytic medication?
A. Yes.

Page 65

Q. And you would agree that thrombolytic medication would need to be administered to a suspected stroke patient within three hours of their last known well time or, in some instances, up to four and a half hours from last known well time, correct?
A. Yes.
Q. Can we both agree then that by the time Mr. Smith presented to the ship's medical center, he was outside any window of opportunity for reperfusion therapy?
A. I would not agree on that. Because by the time he came to the medical facility, there was no neurological diagnosis by then. So...
Q. Dr. Gomez, let's retrace our steps. It's a rather straightforward situation?
A. Okay.
Q. If Ms. Smith's last known well time was October 16th and TPA or TKA or thrombolytic medication must be administered within three hours or, in some instances, up to four and a half hours from last known well time, can we agree that by the time he presented to the ship's medical center on October the 18th, at approximately 7:15 P.M., he was outside the window of opportunity for that

Page 66

medication?
A. Sure, yes, I agree.
Q. And when you say in your opinion that you can't state whether he was eligible for endovascular or surgical intervention, you are speaking specifically of mechanical thrombectomy, correct?
A. Correct, yes.
Q. And can we both agree that in order for a patient to be eligible for a mechanical thrombectomy their clot needs to be in a large vessel?
A. Correct. Yes.
Q. And in this particular case there is no evidence that Mr. Smith ever had a clot in a large vessel that would have qualified him for a mechanical thrombectomy?
A. By looking retrospectively the reports from shore-side medical assessment, yes, correct.
Q. So can we both agree by the time Mr. Smith presented to the ship's medical center on October the 18th, we know that he was never going to be a candidate for a mechanical thrombectomy?
A. Well, I believe he will need a

Page 67

neurological consultation in order to make that decision. I will not be the person, the most detailed person to make that call, but, yes, I agree in the sense that if he would have had been presumably diagnosed with a neurological condition, well, he would be during a window, within a narrow window in which possibly those specific treatments will not be physical to be done.
Q. All right. Maybe I should ask it a different way to make sure I get a clear answer from you.
Is there any evidence you can point to in this case that would indicate that Mr. Smith was a candidate for a mechanical thrombectomy when he presented to the ship's medical center on October the 18th?
A. I don't know because I am not a neurosurgeon and it would be up to the neurosurgeon or interventional radiology to make that call, but from a pragmatic perspective of a ship doctor, he could have had a window, no matter what window of unspecified time, but he would have had a window if I, as a ship physician in this case, I will have taken the proper measures to

Page 68

make the call for an urgent Medevac.
Q. That's not necessarily my question.
So let me ask it a third time this way:
Is there any evidence you can point to in this case that indicates that Mr. Smith was a candidate for mechanical thrombectomy at any point in time?
A. No.
Q. When is the last time, if ever, you've treated a patient who had been diagnosed with a posterior circulation stroke?
A. I'm not sure if I had ever seen personally a patient with a posterior stroke. I don't remember.
Q. All right. Can we both agree that posterior circulation strokes are much more rare than anterior circulation strokes?
A. Well, as per the medical literature, they represented 20 percent of all ischemic strokes.
Q. Same question, Doctor.
Can we agree that posterior circulation strokes are more rare than anterior circulation strokes?
A. Well, they are not rare, just less

Page 69

common.
Q. Less common, that's fine. I will accept that term.
A. I agree, less common.
Q. And you are indicating that they account for 20 percent or all strokes diagnosed?
A. As per UpToDate, yes.
Q. Do you agree that posterior circulation strokes are more difficult to diagnose than anterior circulation strokes absent diagnostic imaging?
A. I am not sure difficult would be the operative word in this context. I will say -- I will reply to that question that they will require a more complete and thorough physical examination in order to prove the differential diagnosis, and in that way, be able to be tested accordingly.
Q. And using your terms, the reason why a posterior circulation stroke requires a more thorough examination than an anterior circulation stroke is that a posterior circulation stroke does not present with classical symptoms like right-sided weakness or slurring of speech or right arm drift, for example?
A. Correct.

Page 70

Q. So posterior circulation strokes, you would agree, present with much more vague or nonspecific symptoms?
A. Well, yes, I agree that they -- they present with not vague symptoms, but like atypical symptoms for the normal characteristics of a stroke.
Q. You said atypical?
A. Yes.
Q. Atypical. And so do you also agree that both the FAST testing that is sort of taught to lay people and the NIH stroke scale is less sensitive for posterior circulation stroke than anterior circulation stroke?
A. Yes, correct.
Q. And that's because posterior circulation stroke symptoms can fluctuate over time?
A. No, because there are many FAST weak symptoms that could be confounded with other medical conditions.
Q. Other medical conditions, one of which being seasickness?
A. Seasickness, correct. Another one could be acute gastroenteritis. Yes, other medical conditions, other than specific neurological

Page 71

disorders, and for that reason, more thorough neurological examination would be needed.
Q. So, for example, some of the hallmark signs and symptoms of posterior circulation stroke would be dizziness and vertigo, nausea and vomiting, and even GI symptoms?
A. Well, GI symptoms specifically related to vomit, yes. Nausea and vomit, yes.
Q. Okay.
A. But diarrhea itself, no. Unless there will be a coincidental situation in which the patient developed gastroenteritis and, at the same time, a posterior circulation stroke.
BY MR. DRAHOS:
Q. So, Dr. Gomez, do you agree in the time you served as a cruise ship doctor, that the most common presentation seen in a cruise ship medical center would be seasickness?
A. Not really.
Q. Would you at least put it in the top three most frequent conditions that are seen in a cruise ship medical center?
A. From a guest perspective?
Q. Yes, sir.
A. It is my opinion that the most common

Page 72

medical condition that a guest will present when visiting the medical facility, it will be a respiratory issue, a bronchitis, a cold, COVID, influenza, depending on the time of the year.
Q. Got it.
A. The most common cause for a visit, sorry, in the medical facility from a guest perspective.
Q. Would you agree that seasickness would be among the three most common conditions presented to a cruise ship medical center?
A. I don't agree with that. Seasickness rarely presents on board cruise ships. I have seen patients/guests with seasickness, but it wouldn't say it would be the top three medical conditions that I would ever see or have ever saw.
Q. Let me make sure I heard you correctly.
Are you have saying that seasickness rarely presents?
A. Yes.
Q. Seasickness rarely presents to the ship's medical center?
A. Correct. Rarely, yes.
Q. All right. How about gastrointestinal --
A. Let me clarify one thing.

Page 73

Q. Yes.
A. There will be situations in which seasickness I could present, obviously, but it would be considered as mild. In that situation, the nurse would be the first person to address that. You know, "Hey, nurse, I have sickness, could you please help me?
"Sure, take some meclizine, try to take some ginger drinks, whatever, to keep hydrated, don't drink alcohol, don't drink sweet beverages, you know, look to the horizon, don't stay in your cabin," stuff like that, but there will be instances in which more severe sicknesses will require the medical, the doctor's opinion, attention.
So from a doctor's perspective, I will say that the doctor will not have to see as many seasickness as you said compared to the nurse, probably. If ever a doctor will see a seasickness, it is because the patient is significantly symptomatic.
Q. What about gastrointestinal illness?
A. It's very common.
Q. Would you put it in the top three?
A. Yes.

Page 74

Q. Okay.
A. But also, in the same sense, it would be the acute gastroenteritis, the typical symptoms, nausea, vomit, diarrhea, fever, no fever, feeling weak, in which those cases, the nurse will deal with it.
I mean, if the patient has no other medical conditions that will require IV hydration, but in the case that the patient, for example, is an elderly woman or man having a history of heart failure, a history of bowel disease, that are not COVID, diverticulitis, COVID, IBS, call it whatever, and on top of that, she is probably not able to walk, in those situations, the doctor would be required to intervene in order to treat accordingly that specific situation, just because of the risk of further complications if no action is taken, from an IV perspective, it is different to hydrate the person orally as to hydrate the person intravenously.
Q. So I just had a thought and I wanted to ask you.
You told me that you had reviewed Dr. Merkler's deposition. Did you ever review

Page 75

Dr. Merkler's report in this case?
A. The report, I mean, different from the deposition?
Q. Yes, sir.
A. No.
Q. Did you ever review Dr. Ruben Parejo's report?
A. I don't remember, to be honest. Let me check my folder. To be honest, probably, yes.
Q. You don't have it here today; is that what you are telling me?
A. All the names of those files, I mean, they are not specific like Parejo's report, you know what I mean, there are large documents with many documents inside, so I don't remember specifically, which one is the one that has the expert witness.
Q. All right. I would rather not waste any more time with that, so let's move on.
Can we agree that prior to ever appearing at the Carnival Medical Center, can we agree that Mr. Smith was an unhealthy individual?
A. Agree.
Q. He was morbidly obese, right, and he suffered from uncontrolled diabetes well before

Page 76

he ever set foot in a cruise ship medical center, right?
A. Agree.
Q. And he also had preexisting diabetic neuropathy?
A. Agree.
Q. So on page 11 of your report, I will pull it up for you -- well, I will just pull it up.
Doctor, having gone through this medical chart, and you reviewed it objectively, like you said, are you of the opinion in this case that the medical team correctly identified and initiated treatment for severe hyperglycemia and dehydration?
A. Correct.
Q. And are you also of the opinion in your report, that the medical team appropriately initiated IV fluid resuscitation and insulin therapy to address Mr. Smith's metabolic derangement as well as providing ceftriaxone for his foot infection?
A. Correct.
Q. Do you have an opinion as to what the cause of that foot injection was?

Page 77

A. Well, diabetic patients they tend to have more prevalence or incidence of infections, specifically in their toes, because of the neuropathy and because the diabetes itself tends to damage the vessels in the periphery of the body, and being the toes, those extremities that are more prone to changes of temperature, you know, and they are exposed to dirt, you know, it would be more probable, sorry, that they would develop what is called diabetic foot infection.
Q. All right. So you characterized his hyperglycemia as severe in your report, correct?
A. Correct, yes.
Q. Why did you characterize it as severe?
A. There are guidelines that they define values that are considered as above normal, being one of them, above 180, and if it is above 200, it will be considered as markedly elevated and severe.
Depending on the value of that glucose and the presence or not of other symptoms or signs or labs, you would be able to characterize that complication within a narrow number of complications, being one of them DKA or being another one hyperosmolar coma, another one that

Page 78

is euglycemic, EDKA. So there are so many complications that would be characterized depending on the presence or not of symptom, signs and labs, one of them as being hyperglycemia which was significantly elevated, that is the reason why I characterized it as severe.

Q. So, do you agree that if Mr. Smith's severe hyperglycemia was not addressed, it could be potentially fatal?

A. Yes, correct.

Q. As you sit here today, do you attribute any responsibility to Mr. Smith for his overall poor health, particularly his markedly elevated blood sugar and what we have characterized as severe hyperglycemia?

A. You are asking me if I can attribute the reason for the hyperglycemia?

Q. Do you attribute any responsibility to Mr. Smith for allowing him to get to that particular illness?

MR. HOFFMAN: Objection to form.

THE WITNESS: Could you please define "responsibility"?

BY MR. DRAHOS:

Page 79

Q. Sure. Is Mr. Smith responsible for the fact that he presented to a cruise ship medical center with blood sugar in excess of what we would characterize as markedly elevated blood sugar?

A. No, I wouldn't call it that he was responsible. I mean, he had the unfortunate event in which possibly, more likely than not, he developed an acute gastroenteritis.

No. I would say no to that, he was not responsible.

Q. So you did review his pre-cruise medical records, right?

A. Yes.

Q. And did you take notice of what measures, if any, Mr. Smith was taking to control his blood sugar prior to this cruise?

A. He was taking insulin.

Q. Was he compliant?

A. I don't know. Probably, yes, probably not. I don't have that information.

Q. All right. So, in other words, in this particular case, you have attributed -- well, you have been critical of the ship's medical staff for their handling of Mr. Smith's condition, and

Page 80

what I would like to know is, in this same case, are you attributing any fault to Mr. Smith for his overall poor health?

MR. HOFFMAN: Objection, form.

BY MR. DRAHOS:

Q. The answer was no, Dr. Gomez?

A. No.

Q. So if the records in this case were to indicate that Mr. Smith's primary care physician was pleading with him to take medications and to get better control over his blood sugar and he failed to do so, are you telling members of the jury that Mr. Smith was not responsible for the consequences for that?

MR. HOFFMAN: Objection to form.

THE WITNESS: It's very difficult to answer that question because, at this stage in Mr. Smith was, he was already with many medical conditions that could have easily been precipitated, just because of the obesity, I mean, it would be very difficult to me to say, yes, you are at fault, you are guilty of your own pleasures, it would be very difficult for me to answer that.

BY MR. DRAHOS:

Page 81

Q. So we have talked earlier about the fact that Mr. Smith began having symptoms on October the 16th, yet he did not notify the ship's medical center until October the 18th.

Do you hold him responsible for any potential delays in care?

A. No, and I --

MR. HOFFMAN: Objection, form. Go ahead.

THE WITNESS: And actually, that gives me reassurance that the fact that he didn't know how to perform, how to act, what to do, reveals possibly that he never experienced such similar symptoms in the past, even if he was a very sick man.

Even if he had the opportunity, or I wouldn't say the opportunity, the misfortune of having experienced diabetic complications or any other medical condition just because of his unhealthy situation, it could be possible that he will be able to know that he needed urgent care, for example.

BY MR. DRAHOS:

Q. Well, let me ask for clarity on what you are saying, Dr. Gomez.

If Mr. Smith was vomiting on October 16th

--
A. Yes.
Q. -- when was it his obligation to notify anybody on the ship of that?
A. Well, from a public health perspective, immediately.
From his own personal medical background, immediately.
From another perspective, immediately.
Q. All right.
A. That will always depend on two things:
From a public health perspective, well, you know, on cruise ships they will tell you if you have any symptoms, vomit, nauseous, diarrhea, fever, no fever, whatever, you should call the medical facility.
But it is understood as well that if you are a person who has medical, several medical conditions, you should actually look for help in a situation that you are having abnormal symptoms.
So depending on which perspective you approach it, you still have to report -- well, I wouldn't say immediately but within the next couple of hours, especially if you are diabetic,



I am sure that his primary care physician when he first diagnosed him of diabetes, he told him, listen, you know, be very careful of this and that, you have to be adequately hydrated, you have to do the medication in a compliant way, you know, those instructions are usually given to patients.
I am not sure if he failed to be compliant because, in my opinion, if he have ever had, he would have gone for medical attention as soon as possible, but he didn't, he waited two days.
Q. Do you believe, as you sit here today, that he holds any responsibility for delaying his medical care by waiting those two days to tell anybody?
MR. HOFFMAN: Object to form.
THE WITNESS: Yes, I agree, he should have asked for help before.
BY MR. DRAHOS:
Q. All right, thank you.
A. I don't remember if this was his first cruise or not, but it is my theory that the longer that you have traveled on cruise ships, the longer you know how the drill works, and, for



example, if you will ever experience gastrointestinal illness, you will know how it works and you will carry your own medication and you will obviously avoid being treated by the medical because isolation will happen. They know that. Cruisers, they know that.
Q. Does a competent adult patient have the right to make their own medical decisions?
A. Competent, yes.
Q. A competent adult patient has the right to accept or reject a physician's recommendation?
A. Sure.
Q. And you can agree, can you not, that you can't force a competent patient to accept treatment?
A. Correct. You cannot force it.
Q. And you most certainly cannot transport a competent patient, or you cannot insist upon or force a competent patient to be transported to a hospital against their wishes?
A. Depends on the clinical situation. If there is something urgent or severe, I think that you need to explore other alternatives to make that person understand what the situation could be and what other better ways are to approach



that.
Q. So are you saying that you can forcibly remove somebody from a cruise ship?
A. Not forcibly. I mean, I wouldn't consider forcibly remove. I will call it Medevac. I don't know.
Q. Are you telling me that you can forcibly Medevac a patient?
A. I believe that if you provide a better understanding, a context to that person, if you explain the illness, you could have this condition or this one or that, we have no capabilities to treat it on board, I will strongly recommend you need to go ashore for further treatment.
Q. So you are familiar with Against Medical Advice forms?
A. Yes.
Q. Have you used them as a doctor?
A. Yes.
Q. And you would agree that the purpose of an Against Medical Advice form is to document that a patient understands that their doctor disagrees with the decision that they are making?
A. Say again, please.
Q. Sure. The purpose of an Against

Page 86

Medical Advice form is to document that the patient is making a decision contrary to what the physician has recommended?
A. Yes.
Q. All right. And that declining that recommendation from the doctor could ultimately expose that patient to risk. That form is designed to memorialize that that agreement has been reached?
A. Yes, I agree, but, obviously, there will be some things that will need to be exposed or be cleared within that context.
Me, as a physician, if you ever decide not to follow my instructions, I will have to write on that AMA that Mr. Michael is refusing treatment to a probable diagnosis of stroke, that needs further treatment. I will have to detail the context.
Q. I am going to put up on the screen what which we will mark as Defendants' Composite Exhibit F, starting with an Against Medical Advice form signed on October 18, 2024 at 20:42.
Can you see that there? It was previously marked as Exhibit B in Mr. Smith's deposition.

Page 87

THE REPORTER: What was the CV marked as?
MR. DRAHOS: Let me go back and check.
THE REPORTER: I think that was F. You had an E1 and 2.
MR. DRAHOS: You are right, Madam Court Reporter. Thank you.
Exhibit F is the CV. Exhibit G is the Against Medical Advice form.
(Defendants' Exhibit G.1, Against Medical Advice Form, was marked for Identification.)
BY MR. DRAHOS:
Q. Doctor, you had an opportunity to review that, right, Exhibit G?
A. Yes.
Q. And you have reviewed this in advance of offering your opinions in this case, correct?
A. Yes.
Q. And can we agree in looking at Defendants' Composite Exhibit G, we will say this is G1, that specifically the advice that was given to Mr. Smith, on October 18, 2024, at 2042, was that he should be admitted to the medical center for monitoring.
Do you see that there?

Page 88

A. I can see it, yes.
Q. And can we both agree here that Mr. Smith and his traveling companion signed this document on October 18, 2024, at 2042?
A. Correct.
Q. Are you aware of any evidence that Mr. Smith was either forced or coerced to sign this document?
A. Well, I recall from the deposition of Mr. Eric Green that he states that he was not -- how it happened.
So I wouldn't be able to say what were the circumstances in which this AMA was signed. But if you go up, please, on this document --
Q. Let me ask it a different way, Dr. Gomez:
Are you aware of any evidence that Mr. Smith was forced or coerced into signing this document?
A. Well, I don't think so. But I am not sure.
Q. As you have stated in your report, I can pull it up if need be or, hopefully, we can agree, you know of no evidence in this case to indicate that Mr. Smith did not have the decisional capacity to sign this form, correct?

Page 89

A. Correct.
Q. Now, if we look at this form, does it indicate to you, sir, that Mr. Smith knowingly exposed himself to the risk of failure to remain in the medical center?
A. Say again, please.
Q. Sure.
Can we agree, by virtue of his signature on this AMA form, Mr. Smith knowingly exposed himself of the risks of his failure to remain in the medical center?
A. Yes, but within the context of hyperglycemia, as written there in the diagnosis.
Q. Now, those risks as they were indicated here specifically on this form were that his condition could worse, he could respond poorly to the treatment that had been rendered to him, his infection could progress, he can't be monitored in his cabin and he could actually suffer more morbidity or mortality, correct?
A. I agree that is what is written, but I don't agree on why the AMA was decided to be filled, to be done, signed within this context of hyperglycemia because actually the treatment provided for this condition, which was the IV

Page 90

fluids, the insulin was a correct treatment. So I don't know why it went from treating well a patient for a specific medical condition which, in this case, is the hyperglycemia, why the doctor proceeded to go into an AMA, or, I mean, that is what doesn't fit within this case because he was correctly treated from a metabolic perspective, you know, the high glucose, but I don't agree that in the situation where there was no properly followup, or reconciliation on the fact that Mr. Smith was wheelchair dependent, he couldn't walk. He was persistently symptomatic with vomit by four or five --

Q. Dr. Gomez, I am going to let you rattle off all that stuff a little bit later. It really is unrelated to what we are talking about here. So, specifically as it relates to this AMA, do you agree this document states that not every possible risk can be provided on the form?

A. Agreed.

Q. How do you understand or explain that one of those possible risks are further morbidity or mortality?

What does that mean to your, Dr. Gomez?

A. Complications.

Page 91

Q. What specifically does the word morbidity or mortality mean to you?

A. Morbidity is illness, is being further sick or ill.

Q. How about mortality?

A. Mortality is to die from it.

Q. So he was specifically warned that the condition he was being treated for in the medical center could ultimately lead to his death if he decided against recommendations of remaining in the ship's medical center.

Can we agree to that?

A. Yes.

Q. Continuing on which we will mark and identify on the record as G.2, this is the second medical advice form that was completed by Mr. Smith on October 18, 2021.

Can you see that there, sir?

(Defendants' Exhibit G.2, Second Against Medical Advise Form dated October 18, 2021, was marked for Identification.)

THE WITNESS: Yes.

BY MR. DRAHOS:

Q. Can we agree that this particular AMA form lists medical advice that he should be

Page 92

referred to a Baltimore hospital for his condition?

A. Yes.

Q. And by virtue of Mr. Smith having signed this form, this would indicate he did not agree with that recommendation, correct?

A. Yes.

Q. So now, Mr. Smith has signed two Against Medical Advice forms that we have discussed. One being advice that he should remain in the ship's medical center, and the other that he should seek medical care in Baltimore at the conclusion of the cruise?

A. Uh-huh.

Q. As you sit here today, do you attribute any responsibility to Mr. Smith for either one of those decisions, for the consequence? Let me rephrase that.

As you sit here today, do you attribute any responsibility for the consequences of those decisions made by Mr. Smith?

A. Partially.

Q. In what sense, sir?

A. I believe that the doctor should have further proved the explanation of the context for

Page 93

which Mr. Smith would have had any potential risk of further morbidity and/or mortality.

Q. So what more you do you believe the doctor should say to the patient, other than, "If you don't stay in the ship's medical center or if you don't follow my advice to go seek medical care in Baltimore at the conclusion of this trip, you could die"?

What more should the doctor have to tell the patient to convince them otherwise?

A. Well, I believe that in this case, this situation, the doctor, first of all, should have done a more thorough neurological examination and possibly by doing so he could have possibly noted that there is or there are some neurological signs suggesting a potential neurological condition that would further require imaging and/or neurological monitoring in a stroke or better specialized medical institution.

Q. What evidence do you have in this case to indicated that that, in any way, would have changed Mr. Smith's decisionmaking?

A. Can you rephrase that question, please?

Q. Sure. What evidence, or can you indicate that there is any -- can you point to

Page 94

any evidence in this case to support your contention that those specific warnings would have, in any way, changed Mr. Smith's decision?
A. Sure. I mean, Mr. Smith was highly symptomatic from a neurological perspective. He was not able to walk by himself. He was dependent on a wheelchair. He was persistently vomiting.
He -- he -- retrospectively -- well, I wouldn't say -- well, I think retrospectively that it was further revealed that he had an issue with his arm.
On top of that, the doctor, despite that Mr. Smith was, as I mentioned, wheelchair-dependent, vomiting, he couldn't walk, the doctors wrote several times during that consultation that his gait was steady and that was not the case.
Q. So according to your own summary in your report on the evening of October 18, 2024, the ship's medical center was notified regarding a passenger, Mr. Michael Smith, who was reportedly vomiting in his cabin and unable to walk.
Do you see that there, sir?

Page 95

A. Yes, correct.
Q. So from the moment that purportedly notified the medical staff of his medical condition, he was unable to walk. So what about his gait or inability to walk do you believe would have changed his decision-making, had the doctor told him this was related to the stroke and not severe hyperglycemia that could lead to your death?
A. I believe if the doctor had properly or in a timely manner informed to the patient, Mr. Smith, that he could have been with the stroke presentation, I believe possibly he would not have signed or incurred into the process of an AMA.
Q. What evidence do you have to support that belief?
A. Well, just my experience as a physician and, I mean, both by professional and personal experience in dealing with medical situations in which, if I was a ship doctor and I had a situation in which I will highly recommend a patient to that further treatment needed ashore, I would look at the options, I would look for a better approach to talk not only to the patient

Page 96

but to the family and make them understand that there is more to do and the ship will not be the better location for that.
Q. Did you know Mr. Smith prior to this cruise?
A. Never.
Q. Have you ever spoken to him?
A. No.
Q. Have you ever examined him?
A. No, never.
Q. So you have opined in this case, that earlier recognition and shore-side transfer, more likely than not, would have resulted in a better neurological outcome, that is the opinion you rendered in this case?
A. Yes.
Q. All right. You specifically stated here in the report, which I can pull up, that the available evidence in the case does not permit your to quantify the extent to which earlier recognition and transfer would have reduced the final infarct volume, correct?
A. Yes.
Q. You are unable to quantify the degree of which earlier recognition and transfer would have

Page 97

reduced the cerebral edema?
A. Yes, correct.
Q. You are unable to qualify the extent upon which earlier recognition and transfer would have reduced the mass effect?
A. Correct.
Q. And you are specifically unable to quantify the extent to which earlier recognition and transfer would have reduced the long-term neurologic deficits to Mr. Smith, correct?
A. Yes, correct.
Q. So what that means, to sort of break it down into smaller terms is that you can't tell us how much smaller the infarct would have been, if smaller at all, had he been transferred to a shore-side center sooner?
A. Correct.
Q. You can't quantify how much cerebral edema, if any, would have been avoided with earlier transfer and treatment at a shore-side center?
A. Correct.
Q. And you can't quantify how much mass effect, if any, would have been avoided with if an earlier transfer to shore?

Page 98

MR. HOFFMAN: Objection. He is not here to testify to that.
BY MR. DRAHOS:
Q. Correct, Dr. Gomez?
MR. HOFFMAN: It's outside the scope. Go ahead.
THE WITNESS: Correct.
BY MR. DRAHOS:
Q. And ultimately, you cannot quantify the reduction in long-term neurologic deficits, correct?
A. Yes.
Q. And can you also -- would you also agree that you can't identify any specific treatment that would have changed his outcome?
A. At that specific movement on the ship, I will not be able to define what specific treatment would have been required, correct.
Q. So, in your report, you opine that the failure to recognize and escalate his condition deprived him of a materially better opportunity. Those were your words, correct?
A. Yes, correct.
Q. All right. And you specifically chose the word "opportunity," did you not?

Page 99

A. Yes, I chose it, yes.
Q. In other words, this is your report that you wrote, right?
A. Yes, it is.
Q. It was not generated by Artificial Intelligence, was it?
A. No.
Q. Can we both agree that opportunity for a better outcome is not the same as a better outcome?
A. Absolutely agree.
Q. And opportunity for treatment does not establish that treatment would have been actually administered?
A. Correct.
Q. And opportunity for treatment does not establish that treatment would have been successful?
A. Correct.
Q. So basically, what you are saying is that the delay caused a loss of chance for treatment, right?
A. Yes.
Q. One of the examples you provided in your report is that earlier recognition would have

Page 100

provided hospital-based neuroimaging to Mr. Smith, correct?
A. Correct, yes.
Q. But we can agree that neuroimaging does not reverse an ischemic stroke?
A. Yes, correct.
Q. Meaning CT and MRI does not restore blood flow?
A. Correct.
Q. So the only citation that I see here in your report to support your conclusion that he would have had a better neurological outcome is this study that was done in, I think it was 2018, correct?
A. Can you show it to me, please?
Q. Yes, sir.
A. I believe it's the guidelines from Dr. Powers.
Q. I will disagree with your characterization of it as guidelines. I have up on the screen what is the article that you cite to in your report for evidence of a better neurological outcome.
Do you see that there, sir?
A. Yes.

Page 101

Q. And this is the report that you would have specifically cited to in your report?
A. Correct.
Q. All right. Now, are you aware or did you consider the fact that this particular study makes mention of eight other conflicting studies that had different results than what this one ultimately concluded?
A. Rephrase that again, please.
Q. Sure. How closely did you read this?
A. I read the abstracts and if I decide to go with this article, I will further look for specific words and read specific paragraphs, conclusions, but I will not go within the methodology because it would be highly technical that at the end it will make me lose more time than anything, so I will go to the conclusions themselves or outcomes.
Q. So you did not consider the methodology that this particular author used to reach the outcome, is what you are saying?
A. Yes, correct.
Q. When you said you read the abstract, did you read from this from first word to last word or just --

Page 102

A. The conclusion, like background, purpose and conclusions usually is what I will do.
Q. So if this article specifically cited to eight other studies with conflicting results, are you telling me that you did not read the other eight studies to find out why they were conflicting?
A. Correct, yes.
Q. Now, this particular study is what we call a population level data report, right?
A. Yes.
Q. It describes outcomes among groups of patients, agree?
A. Yes.
Q. It does not tell us what would have happened to Mr. Smith, specifically?
A. Correct.
Q. It discusses an association between delayed arrival and functional outcome, right?
A. Yes.
Q. But can we agree that association and causation are not the same?
A. Yes.
Q. All right. And so an observational association, standing alone, does not establish

Page 103

that delayed arrival would actually cause a worse outcome in each and every single patient?
A. Correct.
Q. So this particular article that you have pointed to, obviously does not study Mr. Smith. He is not in this observational data, right?
A. Well, if we go retrospectively, we know for a fact that Mr. Smith, he eventually did not require surgery because of the hydrocephalia and order increased mass effect from it. So basically, he would be excluded, for example, from this type of article -- of research.
Q. In other words, this study would not pertain to Mr. Smith?
A. Well, more likely than not, he would be concluded in those eight situations or patients that were excluded from the -- from the report.
Q. So, in other words, if these authors were preparing this same observational data study today, they would exclude Mr. Smith from the analysis?
A. Yes, because, in this case, the patient took many hours to arrive to stroke center and, more likely than not, he will not have been

Page 104

considered to reperfusion therapy, and his only viable option, if a complication will occur, specifically the hydrocephalia and the mass effect, would be often brain surgery.
Q. I just want to make sure because you answered it so quickly and I want to make sure the answer is correct.
If the author of this report was generating it literally today, Mr. Smith would be excluded from the report, correct?
A. Yes.
Q. Thank you, sir. Those are all the questions I have.
THE WITNESS: Thank you.
(The above-referred to document was marked as Defendant's Exhibit H, article for identification.)
MR. HOFFMAN: Can I get about ten minutes to get my thoughts together?
MR. DRAHOS: Okay.
MR. HOFFMAN: Thank you.
(A recess was had in the proceedings after which the following proceedings were had:)
THE REPORTER: Back on.

Page 105

CROSS-EXAMINATION

BY MR. HOFFMAN:
Q. Good afternoon, Dr. Gomez. My name is Michael Hoffman. I am the plaintiff's attorney for Michael Smith. I want to ask, counsel was asking you before about the Against Medical Advice. My question is kind of basic. So when someone signs an Against Medical Advice, that's a sign that they want to leave the infirmary, correct?
A. Correct.
Q. Now if they stay in the infirmary, is that a sign that they reconsidered the Against Medical Advice form?
MR. DRAHOS: Object to the form.
THE WITNESS: Possibly. It is very strange to sign an AMA and still decide to be in the medical.
BY MR. HOFFMAN:
Q. Have you ever been there when a patient signs an Against Medical Advice and then stays in the infirmity for maybe a couple, two hours at least?
A. In my memory, I don't ever recall that situation.

Q. How many patients would you say you have seen in the ship infirmary?
A. In the course of my career?
Q. In the course of your career.
A. Thousands.
Q. And so in all those times, when someone has signed Against Medical Advice, does care stop at that moment or is it an ongoing process?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, usually, if the patient is AMA, he or she would not like to continue treatment or recommendations, they usually would leave the medical facility at that moment.
BY MR. HOFFMAN:
Q. Have you ever seen where a patient signed an Against Medical Advice form, before the care resumes, is there a cancellation of Against Medical Advice form?
A. If the patient would like to reconsider, they would like to restart or continue with the treatment, yes, I mean, that form will typically be abolished and treatment will continue, and the patient will have to be done on the report.
Q. My question was, Doctor, is there a


form that says, I want to cancel the against medical advice form, or do you just need to stay in the infirmary to resume treatment?
MR. DRAHOS: Object to form.
THE WITNESS: There is no such form.
BY MR. HOFFMAN:
Q. So it's clear to say that if a patient signs an Against Medical Advice form and then stays in the infirmary to sign that they have reconsidered that advice and they are staying in the infirmary, correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Correct, yes.
BY MR. HOFFMAN:
Q. So it's been alleged that this form was signed by Mr. Smith in his alleged capacity but also alleged that his stroke occurred days earlier. My question is, if someone is in the second or third day after having a stroke of this nature, do they have the capacity to sign an Against Medical Advice form?
MR. DRAHOS: Object to form.
THE WITNESS: Well, it depends to what extent of the stroke has occurred.
In the specific reconciliated stroke


diagnosis, we know that it was posterior cerebellar stroke, where the typical signs will involve for the balance and the -- and the gait, you know, like coordination issues.
But the cognition itself, it could -- it would depend to what extent the effect of the territory of the injured brain tissue will be affected. But typically, in this type of posterior strokes, the cognition itself will be somehow normal. I mean, the patient will pretty much act normal in the sense that he will be able to answer questions, you know, but if you will ask him to get up, to walk, I mean, that will possibly be affected, but, for example, to sign a document, it will be difficult because he will not be able to coordinate the handwriting, you know. But mentally, like generally, mentally speaking, like thinking, like producing a word, understanding a word, technically he will still be able to do so.
BY MR. HOFFMAN:
Q. Understood.
I want to go to -- Dr. Gomez, I want to show you my screen. I will mark this as


Plaintiff's Exhibit 1, this is the summary of records from Carnival.
(Plaintiff's Exhibit 1, Summary of Records from Carnival, was marked for Identification.)
BY MR. HOFFMAN:
Q. Are you able to see my screen okay?
A. Can you zoom in?
Q. Yes.
A. It's better, thank you. I can see it. I can see.
Q. So, at this stage, so I am on page 1 of the medical records, and it is dated October 18th, and it has a timestamp of 1916.
I ask you, from this point on, is there a -- any sort of neurological examination in the records?
MR. DRAHOS: Object to the form.
THE WITNESS: Sorry, Michael, could you repeat it?
BY MR. HOFFMAN:
Q. Looking at page 1 of the report, I want you to tell me where in the document does it start to document any sort of neurological exam that was conducted on Mr. Smith?

Page 110

A. The words "unable to walk" raise an alarm on me.
Q. But I am talking about in this document that we are looking at, where does it begin a neurological exam in the infirmary?
A. If you go down, please, down, down, further down, further down, further down, down, down, down.
Okay, stop a little bit down, one more page, I believe. Yes, where it says "physical examination."
It says there October 20th, so that was not the date. If you go further down, you will see October 19th, and if you go further down, you will see -- you should see further down, October 19th, still.
There.
October 18, 2024, at 1924 performed by Dr. Maharaj. He did the general examination, no distress, morbid obesity, mental status, awake and alert. Oriented, cooperative, general dehydration, moderate. He exposed the foot issue.
If you go further down, the eyes -- well, the word, that's normal, the ear, nose,

Page 111

mouth and throat, normal. CV normal. Respiratory, normal. Abdomen, normal. And then you go to neurological and it says, "Oriented to person, place and date. Cranial nerves 2 and 12 intact, strength and sensation symmetric and intact, throughout. Patellar, brachial and brachioradialis reflexes two pluses bilaterally. Steady gait. Negative Romberg test."
Q. Okay, Doctor, that is what I actually wanted to ask you about.
So if this exam is accurate, is -- hold on.
If the exam is accurate, then based on the findings, Mr. Smith has not suffered a stroke at this point, correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Exactly. If those findings re-perform and objectivized by Dr. Maharaj, were true, the patient will not exhibit the difficult to walk, for example.
BY MR. HOFFMAN:
Q. Okay.
A. Basically, what the doctor is stating here is that the cranial nerves from 1 to 12 will be completely normal, but one of those nerves,

Page 112

for example, are the ones in charge of what is called nystagmus.
Nystagmus is the horizontal or vertical appearance of the eyes, of the ocular globe whenever some specific tests are done.
Another test that will be compliant to the cranial nerve examination, it is what we have mentioned before, which is the coordination tests.
So it is my opinion that if those tests would really have been done, more likely than not, they would have been abnormal, but in this case, they are reflected as normal, which does not match the clinical presentation of this patient.
Q. So if Dr. Parejo writes that Mr. Smith was already outside any therapeutic window when he presented on October 18th, can Carnival hold that position and maintain that its examination from October 18th at 1924 was accurate?
MR. DRAHOS: Object to the form.
THE WITNESS: I believe it was not accurate.
BY MR. HOFFMAN:
Q. So, if the exam was not accurate --

Page 113

sorry, scratch that.
But if the exam was accurate, it would be stating -- showing that the therapeutic window hadn't opened yet, correct?
MR. DRAHOS: Object to the form.
THE WITNESS: Correct.
I mean, if the proper thorough neurological examination would have been performed at this time at 1924, on October 18, 2024, more likely than not, the doctor, Dr. Maharaj would have recognized the potential of am development of a stroke, posterior stroke, and more likely than not will have initiated an escalation process in order to notify his senior doctor on Carnival headquarters in order to look for options to deviate or to refer that patient in a prompt manner, rather than waiting until October 20th, when he was disembarked in the normal process through ambulance, to Baltimore Clinic.
BY MR. HOFFMAN:
Q. So we have October 18th at 1924, where it seems to state that neurologically Mr. Smith is okay, but I want to go to the timestamp on the

Against Medical Advice form.
A. Perfect.
Q. Are you still able to see my screen or is it still on the other?
A. I can see still the medical report.
Q. Thank you.
So we were just talking about the timestamp of 8:08, 2008, it says, "Additional note: Cycli -- or myatosis and warm distal aspect of big toe on left foot, NVI with normal range of motion of toe, not tender."
What does that mean, Doctor?
A. That specific writing of physical examination is specifically related to the foot issue, the left great toe that apparently revealed sense of infection.
Q. And then --
A. And then --
Q. -- I want to go to the other form here.
The Against -- so that was at 2008. Then it looks like we have the Against Medical Advice form signed, let's see.
The Against Medical Advice form which was signed at, it looks like, 2042, so about 40 minutes after that note about big toe.


And my question, Doctor, is: What was indicated in the medical records that you saw that would indicate that Mr. Smith was at risk of morbidity if he were to resume to his room at 2042 when this document was allegedly signed?
A. Okay. Well, from the physical examination notes, we can see that there was stable neurological patient without any neurological affection. From the treatment perspective, we can note that the patient was already receiving large amounts of fluids, you know, which is okay for the hyperglycemia. He was given insulin.
So I believe that, from a practical perspective, I mean, it seemed that the patient was quite stable from the hemodynamic metabolic and neurological status, but clearly, that does not represent the reality from the neurological status because we know for a fact, that one of the main reasons he came to consult was that he was unable to walk, and he was with persistent vomiting.
That, in my opinion, should ring an alarm to the doctor, that, okay, he is not able to stand up by himself, he always preferred to be


seated or laying down on the bed. On top of that, he is vomiting, a lot, requiring four or five doses, or four doses promethazine and a couple of doses of ondansetron, which is for vomit.
That is a little bit for simple motion sickness condition, you know, so I believe something was missing during the assessment.
Q. Doctor, what is supposed to take place as far as the process of Carnival in regard to -- when an Against Medical Advice form like this is signed, is there any policy or procedure for what the doctor on duty is supposed to do?
A. I believe when -- no, when there is an AMA signed, the chief doctor would intervene in order to assess the situation and probably provide a second opinion to that patient in order to -- to approach better whatever is needed, and so, in that way, the patient will be able to make a better decision on what will be the best for him or her. Okay?
If -- and it would be like a standard of care, like a normal empirical practice, if the senior doctor will still have the patient that is still denying to continue the treatment or


whatever recommendation, if it was me the ship doctor, I will contact my office and tell them, guys, I have this patient vomiting a lot. I will make it, I will escalate it so further responsibility could be achieved from the management shore-side and, in that way, I could have better support and I will not be the only one making decisions.
Q. Now, in Mr. Smith's circumstances, there were indeed two doctors on board, correct?
A. Yes, sir.
Q. So what is the chain of command on board when there is a junior doctor and a ship doctor, as per the roles and responsibilities for Carnival's doctors?
MR. DRAHOS: Object to the form. Mischaracterizes the titles on the ship.
THE WITNESS: Usually the junior doctor will still be considered one of the doctors, but the junior doctor will not have enough experience or the capabilities to make decisions regarding Medevacs or escalation processes, he could, but he will not be following the policies, and in this case, for the proper conductancy of the process will

Page 118

have been to contact the senior doctor, so the senior doctor will have assess the patient, would have been involved in the AMA situation, and further he will have escalated that situation to the HOC of Carnival, and possibly having all of that been done, the captain or the staff captain will have been involved and options of Medevac will have happened --
BY MR. HOFFMAN:
Q. Um --
A. -- for the patient of the ship.
Q. What is the master of the ship's responsibility for the passengers on board?
MR. DRAHOS: Object to the form.
THE WITNESS: He is responsible for the safety of crew and guests as well as supervising all operations happening on board.
BY MR. HOFFMAN:
Q. And if he is responsible for the safety of the crew and guests, if there is a patient that comes to the infirmary and one of the possible risks of his outcome is morbidity, but he is refusing care and wants to go back to his room, what -- is that something that should be

Page 119

conveyed to the master?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, yes and no. Yes in the sense that he needs to be informed of a possible risk or possible bad outcome to one of the guests.
But also, the HIPAA would not allow me to share that information to the medical or other person unless authorized by the patient, so I will have to obviously check that circumstances but, ultimately, I would do that through the HOC, you know, from the Carnival headquarters of Health Operation Center, and I will notify them, listen, I have this guest, he is sick, he is not following recommendations, there is a perspective idea of disembarking, so they will help me to make further decisions and they will probably tell me, listen, you have to tell the captain, the staff captain, tell them everything, tell the medical team the information, so all of them -- well, the master staff captain and HOC and marine department will be able to provide an option of disembarkation, deviation, or calling the

Page 120

helicopter or speed boat, or anything.
BY MR. HOFFMAN:
Q. At what point does the senior doctor get notified of Mr. Smith's position on board?
A. I believe there is a note that the senior doctor, he was called when the junior doctor wrote too lethargic to walk. I think just after that he wrote a note doctor, the senior doctor, whatever it was, I don't remember the name, he was consulted, he was -- he was participating on the evaluation of the patient.
Q. And when did the senior doctor first communicate to HOC?
A. I can't remember that information.
Q. I am going to pull up, we don't have the email but we have a communication. Hold on one second.
Are you able to see my screen?
A. Yes.
Q. So on the very, very bottom of the first comment section here, it says, from Pride doctor, sent Saturday, October 19, 2024, 10:23 A.M. to Care Team Services, FOC Mailbox, Health Operations Center, Miami, Pride assistant chief security officer, Pride assistant guest services

Page 121

manager, Pride captain, Pride chief security, Pride guest services.
Pride guest services manager, Pride hotel director, Pride port papers, Pride staff captain, Scott Joseph from Carnival Corp., Issbaltimore@issshipping.com, trentondavis@iss-shipping, with cc to the Pride senior doctor, the Pride lead nurse, Pride medical center, Pride healthcare system, and the subject was, "Secure, confidential. Guest disembark, Michael Smith, Cabin 4136. Good day. The following guest has been medically disembarked. It says ship name, Carnival --
MR. DRAHOS: I'm going to object to the form. Mr. Hoffman, is there going to be a question here, not to be mention --
MR. HOFFMAN: Yes.
MR. DRAHOS: So it's a brand new opinion, even if you are trying to express something out of this long recitation of an email.
BY MR. HOFFMAN:
Q. I was about to ask.
So when it says on October 19, '24, 10:23 A.M., The following guest has been medically

Page 122

disembarked, is that a true statement?
MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MR. HOFFMAN:
Q. I'm sorry?
A. No, that's not true. He went back to Baltimore on the 20th.
Q. Then it says, "Ship name, Carnival Pride, disembarkation category, Cat 1.
What is a Category 1 for disembarkation?
A. Well, Carnival has five categories, and the lowest number one, it will be for those patients that will not require -- that they will be able to --
Q. Is there a policy, Doctor?
A. Yes.
I mean, the lower is the better.
I mean in the sense that he is a stable patient. You know, the higher you go is because the patient requires an emergent medical disembarkation, for example.
Category 5, that would have a patient with he is unconscious, he is not breathing, intubated, like a serious situation.
Category 1 will be something that is not

Page 123

considered as urgent, as severe, you know, and that actually mischaracterizes the real situation of Mr. Smith, had the doctor really further examined that patient, probably, at the end of the day, will not have been a Cat 1, disembarkation, but another one would have been two, three, four, but there is a guideline, there is an SOP for that, standard operation procedure, of Carnival for that purpose to define what category of disembark has been the patient assigned.
Q. I would like to share my screen with you.
I believe this is the form that you are referring to.
So I have here what has been provided to us by the defense, and it says, "Medical Medevac check sheet."
Is this the checklist that you are referring to?
MR. DRAHOS: Object to the form.
THE WITNESS: This is a check sheet but there is a policy, separate policy in one of the documents produced by Carnival.
BY MR. HOFFMAN:

Page 124

Q. So 3104.
A. Actually, there is a process flow which is with colors yellow and green and red. Yes, there is something more like depicted like as a diagram. This is like a checklist, you know.
Can you go down?
Q. Yes, give me one second.
A. So what I can see, I mean, this is clearly, you know, it's a checklist, you know how the patient is. But it is depending on this checklist that the doctors on board will eventually characterize the category of the disembarkation.
Q. So who would complete this form?
A. Either the junior doctor or the senior doctor.
Q. Did you see this form completed for Mr. Smith?
A. No.
Q. Okay.
A. And I believe usually this form completed will be provided to HOC and in that way, HOC will have a better perspective of the situation on board, and that way they will be able to make better decisions with the captains,

Page 125

that captain in order to delay the ship or call a helicopter, or speed boat, anything.
Q. I believe I found the form you were referring to.
So it's a -- stop share. Share.
So what I have up on the screen is Bates stamped 928.
It is Form 3104-A5, and it says, "Workflow disembarkation operational disruptions."
Can you tell me what I am looking at, Doctor?
A. Yes, I misspell -- I mischaracterize it as process flow, but it is a workflow. It shows the flow that should occur given the medical situation that will require a debark option, but there is another document that specifically characterizes each category.
Q. Let me pull up one more form.
A. That is also part of the process that the doctor should follow.
Q. Okay.
A. For example, you see senior doctor and captain agreed on a debark option. Senior doctor calls HOC to notify of agreed debark plan. So there are three managers making a decision, the

Page 126

senior doctor, the captain and the HOC team in Miami.
Q. So at the top of the screen -- sorry, give me one second.
After the Against Medical Advice forms that were shown to you on you October 18th, was there any other Against Medical Advice forms signed by Mr. Smith?
A. No.
Q. And once it was communicated by the senior doctor about Mr. Smith being disembarked, during the 24 hours that is followed, prior to him getting to Baltimore, did the medical team make any effort to get him to a hospital?
MR. DRAHOS: Object to the form.
THE WITNESS: Other than Baltimore, no.
I have found the document of categories.
BY MR. HOFFMAN:
Q. Okay, what?
A. There is a MED 3104-A2.
Q. Okay, one second, I will share the screen.
Doctor, I have up on the screen MED 3104-A2, disembarkation repatriation categories, Bates stamped 922.

Page 127

Can you tell me what I am looking at here, Doctor?
A. So that's the classification or categorization of the different -- the classification of categories depending on the medical or clinical status of the patient.
For example, this patient, Mr. Smith, he was categorized as -- classified as Category 1 in which a medical disembarkation will occur without escort and it specifically defines the context in which a patient does not need immediate admission and can travel.
For example, they are known to have renal capula (ph) which needs treatment, but are not causing an acute problem. And there are two subcategories, which is to country of residence or outside of residence or to country outside of residence, and the guidance would say that, for example, for the country of residence subcategory, this will include crew or people who work on board that can travel home in order to continue care, which does not apply to this case.
And the other subcategory 1B, to country outside of residence. This would include crew who come to work on board who don't need

Page 128

immediate admission to port, but the care they need is not available in their home country and they need to travel to a different country for treatment.
Q. So, Doctor, Category 1 where it say -- that's the category that Mr. Smith was categorized under, correct?
A. Yes.
Q. It says, "Patient does not need immediate admission," but the Against Medical Advice form indicated that he should be at a hospital. Is that -- are those two things consistent?
MR. DRAHOS: Object to the form.
THE WITNESS: No. I mean, clearly, Mr. Smith could not walk, was depending on a wheelchair, he was symptomatic, he had gait and coordination issues, that is clearly not a Category 1.
BY MR. HOFFMAN:
Q. So, Mr. Smith's condition when the time -- when the boat arrived at Baltimore, he did not fit under Category 1 in that he needed to be immediately admitted, correct?
A. Exactly.
Q. He could not travel on his own, correct?

Page 129

A. He should have been at least, from this table you are showing, either a Category 3 or a 4, at least.
Q. Let's talk about Category 3 and Category 4.
Why do you say Category 3?
A. Because it says medical disembarkation to a local healthcare facility, it would typically be the most local facility to port and the subcategories would be direct admission for care or admitted and awaiting onward transfer. That onward transfer could be considered like a regional or a highly better medical facility with further capabilities, but at least I would have classified this patient as a Category 3. Even from the moment that email was sent to all management at shore-side, I would have stated this patient is Category 3, will require urgent disembarkation, and I am not talking about Baltimore as the unique location of possible disembarkation, I would have looked into other option, with HOC and the captain and see what are the options.
Q. Was that done by the senior doctor on board?

A. No. I didn't characterize anything implying that analysis from them.
Q. What was done for Mr. Smith, once they acknowledged that he needed to be disembarked to HOC?
A. He continued treatment on board.
Q. What do you mean by treatment?
A. He was given the IV fluids, he was given constant promethazine, he was given ondansetron, which are symptomatic medications to treat symptoms like nausea, vomit, the hyperglycemia. Yeah, like the standard treatment of what is considered okay for metabolic issue, like in this case, the hyperglycemia.
Q. Did you see any post stroke care?
A. No.
Q. Is there anything else on this document that you think is relevant, Doctor?
MR. DRAHOS: Object to form.
THE WITNESS: If you go to Category 5 --
BY MR. HOFFMAN:
Q. Yes.
A. -- that would be like also showing -- I mean, that would be the case, for example, a


proper analysis of the situation have led to get the senior doctor involved and the senior doctor correctly would have identified the seriousness of the situation and that he would have contacted HOC and that he will have contacted the staff captain and in conjunction, all of them will have decided, okay, we have a serious patient that requires urgent neuroimaging or neuromonitoring, and in that situation, if they will have a category that the patient needed to be medically disembarked urgently would have led to Category 5, in which you see the two categories show directly -- I mean, medical disembarkation involving operation disruption, directly off the ship by helicopter, directly off the ship by boat transfer, by ship diversion, delaying sailing.
So you see this type of category will involve literally what it says there, involving operational disruption, that the boat, the ship will not continue the normal speed or flow or direction pursuant to a contingent plan.
Q. Would a disembarkation like this delay the boat from reaching it's port?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, depending on the


decision to be made. I mean, if it was a helicopter, if it was a decision the ship would have to be, like, without -- I mean, no speed, he will have to be -- the ship will have to be still in the water so that would mean time lost to reach the following destination.
If a boat transfer will have been called, also the ship would have to slow down the speed so they will be next to each other.
If there was a diversion, obviously that will also affect the normal itinerary of the ship.
So whatever option will have been decided, with within Category 5, it will have immediately affected timely arrival to the next destination, which will have possibly be compensated by increasing the speed, or literally like a real delay of arrival to the next port.
BY MR. HOFFMAN:
Q. I understand.
The Against Medical Advice, did Mr. Smith have the opportunity to assess the neurologic risk that he was facing?


MR. DRAHOS: Object to the form.
THE WITNESS: Well, I believe that taking into consideration that Mr. Smith was somehow conscious, he was able to speak, he was able to --
BY MR. HOFFMAN:
Q. But does the form identify any risks related to the neurologic issue or just the hyperglycemia?
MR. DRAHOS: Object to the form. You are cutting off your own witness and you don't need him to read the form, Mr. Hoffman. It is a waste of our time.
Can we just move along here with this, please?
THE WITNESS: The image is clearly hyperglycemia. There was or this is not or there was not an objective neurological condition being addressed on that AMA, on those AMAs.
BY MR. HOFFMAN:
Q. Doctor, you had received the role and responsibilities of the doctor and the senior doctor, and my question is, what does Carnival require the ship's doctor with respect to the

Page 134

senior doctor?
MR. DRAHOS: Object to the form.
BY MR. HOFFMAN:
Q. And I can pull the forms.
A. Sure.
Q. Let me share my screen here.
So there are two documents, one is Bates stamped 482, Bates stamp 483, which is roles and responsibilities for doctors.
The next document is role and responsibilities for senior doctors. That is Bates stamped 484 and 485? The question was: What is the junior doctor's responsibility to the senior doctor?
MR. DRAHOS: Object to form.
THE WITNESS: He reports to him.
BY MR. HOFFMAN:
Q. And when there is a matter such as getting in touch with HOC, is that for the junior doctor to do or the senior doctor?
MR. DRAHOS: Object to the form.
THE WITNESS: Senior doctor.
I mean, the junior doctor could initiate it. But at the end of the day, this new doctor who is in charge of the medical

Page 135

department and should be the one focussing on that.
BY MR. HOFFMAN:
Q. And would someone suffering a stroke be deemed a medical emergency?
MR. DRAHOS: Object to the form.
THE WITNESS: Can you repeat, please?
BY MR. HOFFMAN:
Q. Would someone having a stroke be deemed a medical emergency?
MR. DRAHOS: Form.
THE WITNESS: Yes.
BY MR. HOFFMAN:
Q. And the next -- on the bottom here it says, "Professional responsibilities," and it says, "Notifies the senior doctor in a timely manner of any significant clinical cases, cases that may affect the operation of the ship and cases with potential clinical and reasonable risks."
My question to you is: Did Mr. Smith present as a significant clinical case?
A. Yes, definitely.
Q. So is a 13-hour gap in the senior doctor being told of Mr. Smith's condition

Page 136

appropriate?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, it was a delay, there was a delay, yes.
BY MR. HOFFMAN:
Q. So is that type of delay appropriate or is it something when you have a significant clinical case, like Mr. Smith, that the senior doctor -- you have been a senior doctor, would you want be to be notified right away of a case like Mr. Smith?
MR. DRAHOS: Object to the form.
THE WITNESS: Absolutely, I have been a junior and a senior and as a junior, I would always report it to my senior, and as a senior I would like to be informed about any clinical situation that would require, not only the escalation process itself, but also help my colleague, you know, in order to -- to make decisions and have the second opinion and to treat in a different way. So that is teamwork.
BY MR. HOFFMAN:
Q. So given that Mr. Smith was documented at risk of death, over 13 hours to meet with a

Page 137

senior doctor really does not qualify under in a timely, as per the professional responsibilities; would you agree?
MR. DRAHOS: Object to the form.
THE WITNESS: I mean, taking into account, the time in which the AMA was signed, I mean, it is my opinions that at that time I will have involved the senior doctor.
BY MR. HOFFMAN:
Q. At the time of -- at what time would you have consulted with the senior doctor?
A. When the decision of signing an AMA was decided by the junior doctor, I will have junior doctor inform the senior doctor, listen, I have a situation, I need your expertise, I need your opinion, help me with this, and they will have talked to the patient, provided other opinions.
Q. So what did the standard of care require the treating physician and the senior doctor once that Against Medical Advice assessment was made?
MR. DRAHOS: Object to the form. Asked and answered.
THE WITNESS: Well, I believe there is

a policy in which -- and the job description of the senior and junior doctor, the leader of the medical operation on board would be the senior doctor and the communication and coordination and whatever logistics needs to be informed to him or to her, to the senior doctor.
BY MR. HOFFMAN:
Q. Sorry, Doctor, I think this is what you were referring to earlier as far as 3104-A5.
Per this policy, what was the standard of care that should have taken place?
A. With Mr. Smith?
Q. Yes.
MR. DRAHOS: Object to the form.
THE WITNESS: So if I were the junior doctor, I would have seen this patient early in the evening, the nighttime of October 18th. I would have of obviously treated in the way the junior doctor did it, in providing large amounts of fluids, IV insulin, but also I would continue monitoring, I will have done serial labs to assess persistent feed, his metabolic status, you know, I will have the antibiotic, yes,


possibly it will delay further complications from an infected perspective on a diabetic patient.
But at the same time, I will have question myself why this patient is vomiting so much. It is not normal to vomit that much.
Clearly, this patient was not having diarrhea, that will be congruent with the typical acute gastroenteritis, you know, the typical symptoms are, in this case. The patient said that he had no abdominal pain and that his stool was soft. So that wouldn't match my clinical evaluation and I would have further examined this patient from a neurologic perspective, and I have done it correctly, I would have asked the patient, hey, listen, Doctor -- Mr. Smith, try to stand up from your wheelchair. He would not have been able to do that.
I would have tell him to follow my finger, in order to do the finger-nose test or the heel-shin -- the heel-knee test, and those tests are specific for coordination and gait.


And I believe that was not done and that's possibly the reason why there was no expeditive (ph) decision on the Medevac on the 18th.
MR. HOFFMAN: I appreciate it. I don't have any additional questions. One of the other attorneys may have some follow-up.
BY MR. HOFFMAN:
Q. Doctor, in the discovery you were provided with three evaluations of Dr. Maharaj, and he was the doctor on board when Mr. Smith went to the infirmary, and the evaluations, they are of his three contracts, I believe three tours, yet he was on two contracts. And let me show you --
MR. DRAHOS: Mr. Hoffman, before you put those up on the screen, can you identify anywhere here in Dr. Gomez's expert report where he comments or opines on any evaluations of Dr. Maharaj?
MR. HOFFMAN: I think these were provided after the report was created.
MR. DRAHOS: Okay. Well, the purpose of an expert deposition is to explore the opinions as provided in the expert report.


It is not so that the plaintiff can ask any questions they feel like asking and render all new opinions. So...
MR. HOFFMAN: You are right, I think we should -- I understand what you are saying.
BY MR. HOFFMAN:
Q. Doctor, are the opinions you have given today held to a reasonable degree of medical probability?
A. Yes.
Q. If upon reviewing the records that have been received by plaintiff from defendant in discovery, and it should change your opinion in any way, would you supplement your report?
A. Yes.
Q. Did you review Carnival's evaluation of Dr. Maharaj's training?
MR. DRAHOS: Object to the form.
THE WITNESS: I can't remember clearly, it's possible but I don't remember.
BY MR. HOFFMAN:
Q. In your opinion, did Carnival fail to escalate Mr. Smith's medical emergency?
A. Yes.
Q. What would have been done differently

had Carnival elevated Mr. Smith's medical emergency to a stroke?
MR. DRAHOS: Object to the form.
THE WITNESS: Clearly, the HOC, the Health Operation Center, would have been informed about the current situation aboard the ship, and they will have helped and assisted the doctors on board to make further decisions in regards to a medical disembarkation.
BY MR. HOFFMAN:
Q. And as a senior ship doctor, is it your responsibility -- in your role as a senior ship doctor, has it been your responsibility to look back at perhaps an error that may have been made that could have affected a patient's outcome?
MR. DRAHOS: Object to the form.
THE WITNESS: Yes, I remember that whenever we would have an adverse situation from any perspective, we would have meetings, you know, like two boxes or we have had meetings which we possibly would have reviewed the situation and what could have been done better.
BY MR. HOFFMAN:


Q. If an incident like this had occurred while you were the senior ship doctor, would there have been a post incident review?
A. Yes.
MR. DRAHOS: Object to the form.
BY MR. HOFFMAN:
Q. And what would the purpose of that be?
MR. DRAHOS: Object to the form.
Again, this is a brand new opinion.
THE WITNESS: Well, I believe this patient was significantly ill. He was not well, characterize the differential -- there was no differential diagnosis, other than ketoacidosis which is a complication of diabetes. Another differential diagnosis that was done was acute gastroenteritis and dehydration.
(Off the record.)
THE WITNESS: So what I am trying to say is that this patient was not properly categorized. He was, among the differential diagnosis, he was given the acute gastroenteritis diagnosis, he was given the dehydration diagnosis, and he was given the hyperglycemia diagnosis, and he was given


like possible early diabetic ketoacidosis diagnosis, and as you can see, all of them are related and point to one direction, which is a metabolic issue, but it's missing completely the neurological issue.
So the doctor, the junior doctor was anchored in the fact that he could have had acute gastroenteritis, that he was vomiting a lot, that he was volume depleted, and that was the reason why the glucose went up, and he characterized it in that way, but he totally missed the neurological symptom that could have been related.
BY MR. HOFFMAN:
Q. And, Dr. Gomez, my question is whether the metabolic issue, would it -- what would be the proper standard of care to determine if there was an underlying neurological issue?
MR. DRAHOS: Object to the form. Asked and answered.
THE WITNESS: A better neurological examination.
BY MR. HOFFMAN:
Q. And were there symptoms that present as a stroke that can be confused for a metabolic


disorder, like slurring of the speech or inability to move an arm?
A. Specifically for posterior cerebellar circulation stroke. I mean, the symptoms would overlap with typical symptoms of motion sickness, dizziness, vertigo, possibly nausea from gastritis, so those symptoms would definitely overlap.
That is what actually requires the high index of suspicion of a physician, you know, to really distinguish if it this is or that, and I believe that was the primary issue that caused the delay and failure to recognize that this patient was with an ongoing neurological issue, not only about.
Q. The CT scan in Baltimore, that was the first time that there was any sort of diagnostic equipment used to determine what was going on with Mr. Smith's brain, if it had determined that the stroke had occurred in the evening of the 18th, do you have any reason to dispute that?
MR. DRAHOS: Object to form. What opinion? Come on, Mr. Hoffman.
THE WITNESS: I mean, I believe that in some sort of way the patient was experiencing

some sort of symptom that could have been or not attributed to a neurological cause. I'm not sure because the fact that he was not able to walk who had either corresponded to weakness, because of so much vomit and feeling weak, you know, or is it possible that he could have had already developed a neurological issue, call it stroke. I wouldn't know at that moment on the evening of October 18th. But what I know is that the persistence of symptoms could have raised an alarm on the doctor and maybe he could have escalated it.

BY MR. HOFFMAN:

Q. But it should have been escalated when it was determined that further morbidity and mortality could have been an issue?

MR. DRAHOS: Object to the form.

THE WITNESS: The moment the AMA was signed or inferred to the patient to be signed, that should have been a moment in which the senior doctor should have been involved and better assessment or better directions or recommendations or assessment from the senior doctor would have occurred, and in that way, a different direction, the



whole situation would have taken place.

BY MR. HOFFMAN:

Q. Is there anything in the medical records when the Against Medical Advice form was signed that would indicate that his metabolic situation was such that it could result in morbidity and mortality?

A. Well, I believe that the treatment of the metabolic issue was properly approached. I mean, the patient was given with the standard of care that is required in the situation, which is fluid, IV fluids, insulin and repeat of the glucose, which was done by the doctor and the nurse, right.

Q. Right, but the question was, Doctor, was there anything in his metabolic condition prior to the Against Medical Advice being signed that would indicate that he was at risk for death if he were to leave the infirmary?

A. No.

MR. HOFFMAN: Thank you, Doctor. I have no further questions.

MR. DRAHOS: Read or waive, Dr. Gomez?

THE WITNESS: Sorry?

MR. HOFFMAN: Read.



MR. DRAHOS: Read or waive?

THE WITNESS: I don't understand, sorry.

MR. DRAHOS: You have the right to read the transcript to make sure it was taken down accurately or you can waive the right. It's up to you.

THE WITNESS: I will waive, I think.

MR. HOFFMAN: Read.

MR. DRAHOS: You are not his lawyer, Mr. Hoffman. He needs to make the decision.

THE WITNESS: Because I am not hearing well.

MR. DRAHOS: Dr. Gomez, you have done this many times, so all I am offering you is the opportunity to read the transcript to make sure the court reporter took down your comments accurately or you can waive the right.

THE WITNESS: I waive the right.

MR. DRAHOS: Madam Court Reporter, I am going to order.

Dr. Gomez, I want to remind you that there are two exhibits we are waiting on from you, if you can please send them on to Mr.



Hoffman.

MR. HOFFMAN: The invoice, and what was the second?

MR. DRAHOS: The invoice and the updated testimonial history.

THE WITNESS: Okay, yes. I will send to counsel and he will send it to you.

THE REPORTER: Do you want a copy, Mr. Hoffman?

MR. HOFFMAN: I do, please. Yes.

MR. DRAHOS: Ms. Stark, I would like to -- you know what, I will get your e-mail. Can I expedite the transcript, please?

THE REPORTER: Yes, for when?

MR. DRAHOS: Friday.

(Thereupon, a discussion was had off the record after which the proceedings resumed.)

\- - - - - - - - - - - - -

(Reading and signing of the deposition was waived by the witness and all of the parties.)

(Thereupon, the above proceedings were concluded at 2:30 P.M.)

----------



CERTIFICATE OF OATH

STATE OF FLORIDA:
COUNTY OF BROWARD:

I, DEBRA L. STARK, Court Reporter and Notary Public, in and for the State of Florida at Large, do hereby certify that VICTOR GOMEZ, M.D. remotely appeared before me by audio and visual means on October 6, 2026, and was duly sworn.

Signed and sealed heretofore on this day of October 9, 2026.

[signature]
------------------------------
DEBRA L. STARK, Court Reporter
And Notary Public, State of
Florida at Large

MY COMMISSION EXPIRES:
March 28, 2029



C E R T I F I C A T E

STATE OF FLORIDA:
COUNTY OF BROWARD:

I, DEBRA L. STARK, certify that I was authorized to and did stenographically remotely report by audio and visual means the deposition of VICTOR GOMEZ, M.D. ; duly sworn by me; pages 1 to and including 152; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Signed and sealed on this date of October 9, 2026.

[signature]
------------------------------
DEBRA L. STARK, Court Reporter
and NOTARY PUBLIC, State of
Florida at Large

MY COMMISSION EXPIRES:
MARCH 28, 2029