# EXHIBIT "K"

**Dr. Razack's Deposition Transcript**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 1:25-cv-24611-DPG

MICHAEL SMITH,

Plaintiff,

vs.

CARNIVAL CORPORATION and
NIKHIL MAHARAJ, M.D.,

Defendants.

ZOOM DEPOSITION

OF

NASSER RAZACK, M.D.

Monday - September 28, 2026
10:00 A.M. - 12:00 P.M.
Zoom Video Conference

Stenographically Reported By:

MARSHA C. BRANNON

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

DAVID W.SINGER & ASSOC., P.A.
1011 South Federal Highway
Hollywood, Florida 33020
mahoffman@1800askfree.com
954-920-1571
BY: MICHAEL A. HOFFMAN, ESQ.

ON BEHALF OF THE DEFENDANTS:

GRAY ROBINSON, P.A.
515 North Flagler Drive - Suite 650
West Palm Beach, Florida 33401
michael.drahos@gray-robinson.com
561-268-5727
BY: MICHAEL DRAHOS, ESQ.



INDEX OF PROCEEDINGS


| Deposition of NASSER RAZACK | Page |
|---|---|
| Direct Examination by Mr. Drahos | 4 |
| Cross Examination by Mr. Hoffman | 60 |


EXHIBITS

| DEFENDANT'S | | FOR IDENTIFICATION |
|---|---|---|
| Exhibit A | notice | 5 |
| Exhibit B | material | 6 |
| Exhibit C | report | 16 |
| Exhibit D | 42 pages | 17 |
| Exhibit E | supplement items | 19 |
| Exhibit F1 | fee schedule | 23 |
| Exhibit F2 | 9-24-26 invoice | 23 |
| Exhibit F3 | invoice | 23 |
| Exhibit G | testimonial list | 23 |
| Exhibit H | CV | 30 |
| Exhibit H2 | CV | 31 |

(Defendant's Exhibits B and H2 to be provided separately.)

| PLAINTIFF'S | | FOR IDENTIFICATION |
|---|---|---|
| Exhibit 1 | Power Point | 67 |
| Exhibit 2 | articles | 84 |
| Exhibit 2A | articles | 84 |
| Exhibit 3 | diagram | 84 |



Deposition taken before Marsha C. Brannon, Notary Public in and for the State of Florida at Large in the above cause.

---------

THE COURT REPORTER: Do you swear the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes, I do.
THEREUPON,

NASSER RAZACK, M.D.

having been first duly sworn, was examined and testified as follows:
MR. DRAHOS: Before we formally begin, I just want to state on the record that I do not give consent to have my voice recorded or downloaded into any third party database.
THE REPORTER: I'm not doing that.
MR. DRAHOS: Notice to all parties here on this deposition.

DIRECT EXAMINATION

BY MR. DRAHOS
Q. Doctor, can you, please, state your name for the record?
A. Sure. It's Nasser, N-A-S-S-E-R, Razack, R-A-Z-A-C-K.



Q. Thank you, doctor.
And what's your professional address where you would be able to receive a subpoena, if it's needed for trial?
A. 335 31st Street South, St. Petersburg, Florida 33712.
Q. Thank you.
And what's your current occupation?
A. I'm a neurointerventional surgeon.
Q. All right. And so what I'd like to do, doctor, just to get us started, is I want to do some housekeeping so that we can identify documents here that we're going to be referring to throughout the deposition. What I'll do is I'm going to start with what I'm going to mark as Defendant's Composite Exhibit A.
Can you see that there on the screen?
A. I do.
(The notice was marked as Defendant's Composite Exhibit No. A for identification.)
Q. If at any point in time I'm referring to something on the screen and you're not able to see it or you need me to adjust it in a way that allows for you to read it, please, let me know that.
Okay?

A. Will do.
Q. Do you have anything physically in front of you?
A. I just have a copy of my CV, my fee schedule, my current -- my current invoices and a list of material I reviewed.
Q. Okay. And what we'll do is we're going to go ahead and mark this as Defendant's Composite Exhibit B. We'll just have to figure out after the deposition how we can best put it in the hands of the court reporter.
(The materials the doctor has was marked as Defendant's Composite Exhibit No. B for identification.)
Q. All right. So, in looking here at --
Oh, by the way, doctor, just one other quick ground rule. If at some point in time during the course of the deposition I ask you a question and you want to be able to review something in order to answer that, please, let me know that you're doing that. In this virtual world that we're now living in, I am unable to detect when you might be clicking on something and reading it on your computer screen versus looking me and answering questions.



So, I would just ask for the courtesy, if you're going to do that, you'll going to pull something up on the computer, just let me know what you're pulling up.
Okay?
A. Sure.
Q. All right. Thank you.
A. Let me ask you this. If I wanted to share my screen so you could see what I'm looking?
Q. That would be fine with me as well. All I'm making sure of is that you and I are both on the same page here that, if you're going to do anything like that, then I don't know you're doing that.
All right?
A. So, like I said I'll share my screen if I -- if I do anything so you can see exactly what I'm looking at.
Q. Thank you. Appreciate that.
All right. Now, I'm looking at what's been marked as Defendant's Composite A. This is a notice of taking deposition duce tecum.
Have you seen a copy of this, doctor?
A. I believe so.
Q. All right. And would you agree that you're appearing here today Monday, September 28th



at 10:00 A.M. as an expert retained on behalf of the Plaintiff is the case of Michael Smith versus Carnival Corporation?
A. Yes.
Q. And if you scroll down here to what's the third page, it's called Schedule A.
Can you see it on the screen?
A. Can you magnify that, please?
Q. Sure. It's tiny letters.
Is that any better?
A. Yeah, much better. Thank you.
Q. Okay. So, in looking at Schedule A I'd like to cover a few things here with you about that.
So, number one of Schedule A requests that you bring any and all documents, memoranda, notes, or other tangible evidence or data used to support your testimony as an expert witness in this case. I believe you told me that what you have there in front of you are those paper documents, which are your CV, your fee schedule, your invoices and a list of material that you reviewed.
Do you have anything else it with you today in response to number one here on Schedule A?
A. I sent my attorney a Power Point of images I'd like to review with you and a second Power Point



with two slides on it. It saves us from going back and forth for a lot of not put in order chronologically order records so --
Q. And the Power Point images that you want to review with me, when did you prepare that?
A. I believe it was last week sometime, Wednesday or Thursday. Just so we're clear, that's a draft I've been working on for over a year, but that's just the stuff I thought was relevant to this case.
Q. Okay. When were you retained in the case?
A. I'd say about a year ago.
Q. And who retained you?
A. The Zwidel Law Firm.
THE REPORTER: I'm sorry, doctor. Who did you say?
A. Zwidel, Z-W-I-D-E-L.
Q. All right. And in flipping through here, number two requests any and all bills, invoices, letters of protection or contracts for services rendered with respect to Michael Smith.
Do you have your invoices with you?
A. I sent them to my attorney also.
Q. Those I've not seen yet.
MR. DRAHOS: Mr. Hoffman, where are

Page 10

Dr. Razack's invoices?

MR. HOFFMAN: When did we get those to you? We're taking a look right now to see if we have them. Dr. Razack -- If not, we'll get those to you ASAP.

MR. DRAHOS: I definitely want to see those. So, I'm going to move on for the sake of time here. I want to make sure we get those attached as an exhibit, which I'm going to get to in just a second.

Q. All right. In flipping through ultimately, I'm not looking for your 1099s, doctor, I don't do that as a professional courtesy, but what I would like to know is: Do you have any and all communications that you engaged in either with the Zwidel Law Firm or the Singer Law Firm relating to this case?

A. I'm sure they don't keep that stuff organized. I'm sure they have all my communications. You can ask them for all of that.

Q. All right. But in other words, you don't have that here with you today?

A. No.

Q. All right. I put up on the screen what we're going to mark as Defendant's Composite Exhibit

Page 11

B. This is, as I understand it, to be your expert report dated June 15, 2026; is that correct, doctor?

A. Yes. I -- Since I read this I've changed my opinions so I don't think it's relevant anymore.

Q. Okay. We'll get to that in a second, but let me plug through here because this is what was disclosed to me pursuant to Rule 26 and the scheduling deadline that's been provided by the court.

So, this is page one. It's got a Bates stamp PL37, page two PL38 and then what will be page three PL39 with your signature there.

Do you see that, doctor?

A. Yes.

Q. And when you signed this report on June 15, 2026, were you certifying that they were your opinions in this case?

A. At that time, yes.

Q. All right. Now, when you said this is isn't relevant anymore. Can you explain to me what you mean by that?

A. Yeah. Since I've read this document I've had more time to read this case so I'm sure -- I mean, I have to go through this, this was written awhile ago, to see how it -- how it effects my

Page 12

opinions now.

Q. Okay. So, have you authored any other written opinions other than Defendant's Composite Exhibit B?

A. No.

Q. I think I said opinions. Let me just make sure if I ask the question I intended.

Have you written any other reports in this case other than Defendant's Composite Exhibit B?

A. Not that I recall, no.

Q. Just briefly so that I understand where we're going in this deposition, can you tell me what it is about Defendant's Composite Exhibit B that has changed for you since the time you wrote this report?

A. Exactly what you said, the time since I wrote the report.

Q. What is it about your opinions that have changed, doctor?

A. I have to read this to answer that question.

Q. Okay.

A. Make it larger, please. Can you go down one paragraph? I'm sorry.

Q. Sure.

Page 13

A. Thank you.

Can you go down one paragraph, please?

Q. Sure.

A. Can you go down one more, please?

Q. Sure.

A. Keep going, please. Thank you. Can you go down further, please? Keep going, please. Keep going further, please. Can you go back up? Keep going back up, please.

So, you see that line that says contrast with Dr. Bennett's examination history?

Q. Yes, sir.

A. Then there is a paragraph that says this examination is incomplete. The last line of the paragraph preceding that one where it says the patient had no complaints, is feeling much better. See that at 8:07 A.M. he noted the patient had no complaints and is feeling much better.

Q. Yes.

A. That's incorrect. That's a nurse's note. That's not him. That's his nurse. So, that should not say he.

Q. Okay.

A. Other than that I agree with everything else that's in there.

Page 14

Q. Okay. So, help me to understand. When I asked you about this report, you said it's no longer relevant. What is it about this report that's no longer relevant then?
A. I didn't have an opportunity to read it. It's not relevant to the time period I'm talking right now for temporal relevance. So, I had to read it to make sure it was contemporaneous with my current opinions.
Q. All right. So, the only change is that the gender of the person who wrote patient had no complaints and is feeling much better should be female not male. That's it?
A. No. It's a different person. It's not a gender issue. It's an identity issue.
Q. So, you're saying rather than attribute that quote to the doctor it should be attributed to the nurse?
A. Correct.
Q. All right. Have you reviewed any additional information since the time of this June 15, 2026 report?
A. No.
Q. All right. Now, the information that you did review is identified here in paragraph one of

Page 15

your report?
A. Yes.
Q. All right. And specifically the Carnival Pride Shipboard Medical Center records. Do you have those records with you?
A. I do.
Q. So, I'd like to know exactly what it is you're referring to as the Carnival Pride Shipboard Medical Center records. How can I get a copy of those, doctor, so that I can see what it is you're looking at?
A. You want me to put them on screen?
Q. Sure.
A. I got to share. Hold on one second. I'm sorry. So, I'm not too good at this. Give me one second.
Can you guys see that?
Q. I see that's the Zoom page.
A. Do you see the records down here?
Q. No.
Now, we do.
A. No?
Q. Yes.
A. Okay.
Q. Can you scroll down, doctor?

Page 16

A. Do you want a specific page or just go through the records?
Q. I'd like to see -- Is there Bates stamps on the lower right hand corner there or not? All right.
A. Just page numbers.
Q. So, that starts with page one of 42.
A. Correct.
Q. What's the last page?
A. Just to confirm it's 42. 42, 42.
Q. And is that the entirety of medical records that you reviewed when you refer to the Carnival Medical Center records for Carnival at least?
A. I believe so. I mean I looked at the whole file over a year ago so --
MR. DRAHOS: So, your expert report is Exhibit B. I'm sorry. The expert report is Exhibit C. Madam court reporter, Exhibit B is the materials that the doctor has in front of him.
(The report was marked as Defendant's Exhibit No. C for identification.)
MR. DRAHOS: So, Exhibit D is going to be the 42 pages of medical records that the doctor has identified as being the ones he's

Page 17

reviewed for this case.
(The 42 pages of medical records was marked as Defendant's Exhibit D. for identification.)
Q. All right. And flipping back to your report, I'm going to take over the screen again, doctor, please.
A. Sure.
Q. It should be back up on the screen there. Can you see that?
A. Oh. I have to stop my sharing. Sorry about that.
Q. I should be back up on the screen. Can you see that?
A. Yes.
Q. I see also hospital records for MedStar Harbor Hospital and Franklin Square Hospital, sir.
A. Correct. Yes.
Q. All right. Then you have imaging and clinical findings.
So, did you review the entirety of those charts from MedStar and Franklin Square?
A. I did.
Q. And in particular did you review the CT images taken at MedStar Hospital on October 20th and

Page 18

October 21st?

A. I did.

Q. And did you review the MRI and angiogram, MRA taken on October 20, 2024 at MedStar Harbor?

A. I don't believe it's a separate angiogram.

Q. So, let me show you --

When you say I don't believe there's a separate angiogram, what do you mean by that?

A. You asked me if I read the angiogram and the MRA. There's a MR angiogram, but there's not a separate angiogram. It's the cerebral (phonetics) angiogram.

Q. Okay. Did you review those imaging studies specifically or did you just refer to the radiology findings made by the interpreting radiologist?

A. I reviewed the imaging specifically. I read the imaging myself.

Q. Okay. And then you indicate that you looked over relevant Carnival policies. What specific Carnival policies did you look at?

A. I provided those to my attorney. I could put them online if you like to see them. If you --

Q. Hold on, doctor, I'm going to help you out.

Page 19

Is this what you're referring to?

A. Yes, sir. I'm sorry. I wanted to do what you asked me to like share what I was looking so that's what I was trying to do. Sorry.

Q. All right. So, I'm going to mark Exhibit E. This is a copy of a supplement I received about 15 minutes ago from the Singer office.

(The supplement items was marked as Defendant's Composite Exhibit No. E for identification.)

Q. When did you review these particular items that are listed here in Defendant's Composite Exhibit E?

A. Sometime in the last year.

Q. Okay. And then lastly it states here medical literature. The medical literature that you reviewed in this case, is that the literature that's identified on page three of your report?

A. Yes. The real issue that pertains to this is the Grace 3 study that -- that's number three here that I provided this morning or I provided on Friday.

Q. But what I'm attempting to lock down here and what I'm calling housekeeping is just simply that I have got everything that I need to know are

Page 20

in support of your opinions. So, when you say that you looked at medical literature in your report, I just want to be sure the reference section is what you're referring to?

A. Correct.

Q. All right. Thank you.

All right. Continuing on. What we'll mark as Exhibit F to the deposition. I have here --

Do you recognize this document?

A. I do. Can you make it larger, please? I'm sorry. I recognize it. It's just hard to read it.

Q. It's a smaller size so I'll try to remember to blow it up for you.

A. Thank you.

Q. All right. So, in looking here on the screen, Exhibit F is a current copy of your fee schedule pertaining to this case?

A. Yes.

MR. DRAHOS: Mr. Hoffman, where are we on those invoices?

MR. HOFFMAN: It looks like they were sent to you on September 25th and I'm going to forward it to you right now.

A. I could read them into the record too, if

Page 21

that helps.

Q. That's okay. I'd like to look at them, doctor. Thank you.

MR. HOFFMAN: Mike, I'm sending it directly to you.

MR. DRAHOS: What time were they sent to me on the 25th?

MR. HOFFMAN: It looks like 8:52.

MR. DRAHOS: A.M. or P.M.?

MR. HOFFMAN: Oh. We need the folder.

MR. DRAHOS: All right. I'm going to go ahead. I see the 8:52 entry. I'm going to pull that out first.

MR. HOFFMAN: Yeah. It looks like that may just be the invoice for today.

MR. DRAHOS: Okay.

Q. Doctor, can you see up on the screen --

A. Can I ask you to enlarge it? It's really small on my side.

Yeah, I can see it.

Q. Okay. Neurointerventional Associates, P.A., that's your company?

A. Yes.

Q. And you would have issued this bill to

Page 22

David Singer & Associates?
A. Yes.
Q. And that was for September 24th; correct?
A. Yes.
Q. All right. And so what does this billing represent, sir?
A. This looks like I reviewed some medical records for two and-a-half hours and more records for another three hours.
Q. And so does that mean you spent about five and-a-half hours preparing for today's deposition?
A. Yes.
Q. And you made mention of the fact there are medical -- I'm sorry -- there are invoices that predate this one?
A. Yes.
Q. All right.
MR. DRAHOS: So, that's what I'm looking for, Mr. Hoffman, is those.
MR. HOFFMAN: I see it. Yeah, I see it and I'm forwarding it to you right now.
MR. DRAHOS: Madam court reporter, again, for recordkeeping purposes Exhibit F is going to be the doctor's fee schedule, Exhibit F1 will be the invoice that I just put up on the screen dated

Page 23

September 24, 2026. Actually we'll make F1 the fee schedule, F2 will be the invoice dated September 24, 2026 and F3 is going to be what Mr. Hoffman sends here any moment.
THE REPORTER: Okay.
(The fee schedule was marked as Defendant's Exhibit No. F1 for identification.)
(The 9-24-2026 invoice was marked as Defendants' Exhibit No. F2 for identification.)
(The invoice was marked as Defendant's Exhibit No. F3 for identification.)
MR. HOFFMAN: I'm still waiting to get it, Michael, so you can continue and I'll get it to you.
MR. DRAHOS: Okay. We'll move on.
Prior to this morning I was also provided with what we're going to mark as Exhibit G to the deposition.
(The testimonial list was marked as Defendant's Exhibit No. G for identification.)
Q. I don't know if I'm able to make this any larger. So, I'll just go through it with you and, if you have something on you end that you can refer to for this, please, do. Actually I can make this larger.

Page 24

Can you see that there, doctor?
A. That's better. I can see it. Thank you.
Q. All right. So, Exhibit G has been represented to me as being your testimonial history; is that correct?
A. Yes.
Q. Which would mean these are all the instances in which you've testified as an expert witness?
A. Yes.
Q. All right. And let me just run through some of these so that I can understand what you're referring to here.
So, the first entry dated November 16th of 2020 says U.S. Legal Support. What is that referring to?
A. I don't recall.
Q. Did you testify as an expert against U.S. Legal Support for any reason?
A. I don't know. Maybe this is an error in files. I don't recall what this is so --
Q. Did you generate this document?
A. I think my office manager did.
Q. Okay. Next one July 5, 2023 Green versus Speyerer. Were you retained on behalf of the

Page 25

defendant or the plaintiff in that case?
A. The plaintiff.
Q. And what was the name of the attorney who retained you?
A. I don't recall.
Q. Were you retained for the plaintiff or the defendant?
A. The plaintiff.
Q. Where was that case litigated?
A. It was in Florida. I don't remember the county though.
Q. Florida state court?
A. I believe so.
Q. And what did that case pertain to? What was it regarding?
A. Whether or not to proceed with intervention in a patient.
Q. And when you say intervention, are you referring to tPA or a thrombectomy or both?
A. Yeah. Thrombectomy or carotid. It was a carotid issue that, from what I recall, required thrombectomy as well as carotid intervention. So, more than just thrombectomy.
Q. So, in that case the patient's carotid arteries were occluded?

Page 26

A. I think it was injured or operated on or something. I don't recall. It was awhile ago.
Q. Okay. And did you opine in that case, by virtue of the fact that you were retained by the plaintiff, that a thrombectomy could have or should have been performed?
A. I don't recall the exact details of that case.
Q. Okay. Next one Leone versus Exclusive Global dated May 29, 2025. You were retained on behalf of the defendant in that case?
A. Correct.
Q. And what did that case pertain to?
A. I think it was a traffic accident.
Q. And what was a interventionist retained in a traffic accident case for?
A. I'm also a diagnostic neuroradiologist.
Q. Okay. So, what role did you play in that case?
A. Image interpretation.
Q. All right. Imaging interpretation, do you interpret the brain or are you also interpreting the spine?
A. Both.
Q. Okay. And in that particular case you

Page 27

interpreted the brain images or the spine?
A. I believe the spine.
Q. Okay. Next one is Landry versus Westbank and in that case you were retained on behalf of the plaintiff; is that accurate?
A. That is.
Q. And what did the Landry matter pertain to?
A. Sir, I'd have to reference all these to give you exact answers.
Q. Okay.
A. I can tell you generally I can remember if I represented a plaintiff or a defendant, but these are very detailed cases. If you'd like, we could call a recess, I can look at every case for you, but I'm not going to answer these off the fly because these are very detailed cases.
Q. So, in any of the cases here that you've identified for me did they concern whether or not a patient should have received tPA?
A. I don't believe so, no.
Q. Does that mean that you've never testified in a case as an expert witness either for the plaintiff or defendant wherein the central issue was whether or not tPA could have been administered?
A. I don't believe so, no, meaning I -- I

Page 28

believe I've testified whether or not tPA was administered, was appropriate and appropriate on both sides.
Q. You did not? I'm sorry. I didn't catch that.
A. I believe I have testified whether it was appropriate or not to administer intravenous thrombolytics.
Q. Okay. So, that means you have?
A. Correct.
Q. All right. And in looking at this list can you tell me which involved those specific issues?
A. No.
Q. Flaum versus Wellington. Is that Wellington Regional Medical Center?
A. Correct.
Q. And that case was just, what, two months ago; correct?
A. Correct.
Q. What did that case pertain to?
A. Ischemic stroke.
Q. And I see you were testifying for the defendant in that case?
A. Yes.

Page 29

Q. All right. And so what specific opinions did you render for the defendant in that ischemic stroke case against Wellington Regional?
A. Sir, if you want to take a recess, I'll be happy to review the entire case for you and answer that, but I -- these are very complicated interventional cases, ischemic stroke cases.
Q. So, does that mean you're not prepared to testify here today regarding your testimonial list?
A. Don't -- I'm prepared to testify. I just need a recess to review my records. If you'd like me to do that, I can do so.
Q. How much time do you need?
A. That's a pretty length case so I'd say about eight hours.
Q. So, you're telling me that a case you testified in two months ago you would need eight hours to be able to review and tell me what the issues were?
A. That's exactly what I'm telling you.
Q. Have any of your opinions ever been stricken or limited by any court for any reason?
A. Not to my knowledge.
Q. Was the attorney who took your deposition in the Flaum versus Wellington Regional case from

the Searcy Denney Law Firm?

A. I don't recall.

Q. Have you ever testified as an expert in a case wherein your opinion was that the patient presented to the hospital outside the window for opportunity for tPA to be timely administered?

A. Can you rephrase that question?

Q. Sure.

Have you ever rendered an opinion as an expert witness wherein the opinion was that the patient presented to the hospital outside the window of opportunity for tPA to be administered?

A. I don't believe so, no.

Q. All right. Up on the screen is what we've marked now as Exhibit H to the deposition.

(The CV was marked as Defendant's Exhibit No. H for identification.)

Q. As I understand it, we have a current copy of your CV; is that correct?

A. Can I ask you to enlarge this again?

Q. Yes.

A. Go to the last page, please. That's -- I think there's a more current copy than that actually. Hold on one second. I'm looking at my CV right now. The one I have is updated September 16,



2026. So, that's not current.

Q. So, I'm sorry. The one that I've marked as Exhibit H, which has been disclosed in the case, is not your current CV?

A. Correct. In fact, I think we sent my current CV on Friday so that should have it.

Q. Well, I don't have that, sir. It wasn't provided to me.

So, what I'm going to do is we'll mark H1 as the one that was provided to me and I'm going to ask either your office or Mr. Hoffman's office to send me the current one that was currently sent on Friday and we'll mark that as H2.

(The CV sent on Friday was marked as Defendant's Exhibit No. H2 for identification.)

A. Like I said it's already been sent.

Q. Okay. Well, then I'm going to ask Mr. Hoffman's office to do that.

MR. HOFFMAN: Yeah.

Q. Either way we're going to mark it as H2.

(The CV that was provided was marked as Defendant's Exhibit No. H1 for identification.)

(The to be provided current CV was marked as Defendant's Exhibit No. H2 for identification.)

Q. Okay, doctor, what I am prepared to ask



you about is the one that was disclosed to me, which we have identified as H1. I'm going to go through some of that with you here. You don't need to really review this I wouldn't think to answer questions about your background, but if you need me to, please, let me know.

A. Sure.

Q. All right. So, in reviewing your CV I note here that you graduated from State University of New York at Buffalo in 1994 with a medical degree?

A. Correct.

Q. And you did a fellowship in diagnostic neuroradiology at UVA, which was completed in 2001?

A. I can't see that on my -- Can you just show me where it is on the CV? I'm sorry.

Yes. So, I completed two fellowships there. I did one in diagnostic neuroradiology and one in interventional neuroradiology.

Q. So, I see here on the CV it indicates the fellowship in diagnostic neuroradiology was completed in 2001. When was the fellowship in interventional neuroradiology completed?

A. 2003.

Q. So, when it says there instructor, were



you an instructor or a student?

A. So, I was an instructor for -- So, just let me explain this so you understand this better.

So, our first year we do diagnostic neuroradiology and start taking calls for neurointervention. Our second year we become an instructor for the diagnostic fellowship or the fellows that we were the prior year and the third year is all neurointerventional procedures.

So, it's like a hybrid program that's all three.

Q. Okay. And then when did you obtain your medical license in the state of Florida?

A. Sometime probably in 2000 and -- I'd say 2005.

Q. Okay. So, was there some period of time where -- Strike that.

What medical license were you operating under in 2003 when you were going through this fellowship?

A. University of -- Sorry. Virginia.

Q. Okay. So, you did have a Virginia medical license that has since lapsed?

A. No. No. I had a medical license from the University of Buffalo -- Sorry -- from the state of

Page 34

New York and then, when I went to Virginia, I either obtained a license there or because it's an academic institution, I don't recall if you need one there or not, but I'm pretty sure I obtained my license with my fellowship.
Q. Okay. So, what you're telling me then is that, when you were practicing in this fellowship in neuroradiology, you were either operating under a New Your license or a Virginia license?
A. Either or, yeah.
Q. So, have you ever worked as an emergency room physician?
A. Yes, I have actually.
Q. When?
A. During my internship year and I did an internship year in surgery. We're allowed to work as ED physicians.
Q. And when you say internship, specifically when was that?
A. Can you just go back with my CV? I think it was 19 -- Sorry. Go up a little. I'm sorry. Just go to wherever that -- Go up a little higher. Sorry. Actually let me look at my CV. Let me stick it up here. Sorry. I'm looking at my CV by the way in case you're wondering what I'm looking at.

Page 35

That would be 1994, '96, maybe '96. I'm not positive on '96.
Q. Where specifically were you in 1994, 1995 and possible 1996?
A. North Shore Hospital, Manhasset, New York.
Q. Okay. I see that North Shore University Hospital, NYU School of Medicine, Department of Surgery; correct?
A. Yes.
Q. And you're telling me that during that particular time period you were working as an emergency room doctor?
A. I believe so.
Q. Was that --
A. I -- Sorry. I worked shifts. I didn't work as a dedicated ED physician cause that was my internship and residency. I don't think it's on my CV, but I worked with the Bronx VA during that time also.
Q. All right. And so does that then mean -- I mean, can I safely conclude that you have not worked as an emergency room doctor since 1996?
A. Yes.
Q. All right. And this capacity in which you were working as an ER doctor was -- you said shifts.

Page 36

Were you working some sort of locum tenes type of relationship?
A. Well, at -- at the Bronx VA, it was -- I think it was a salary position. So long ago I barely remember it, but --
Q. So, this Bronx VA salaried position, was it a full time? Meaning, in other words --
A. No. I think it was a night shift deal, something like that so --
Q. So, I mean, how many shifts are we talking about?
A. I don't recall. So long ago.
Let me ask you to clarify a question thought. When you say -- cause you just asked me something, is it safe to say so since 1996 you've not worked as a ED physician, are you talking about as a dedicated ED physician? Because I do work in an emergency department. I just evaluated a patient there on Friday, for example, for a procedure I did.
Q. Yeah.
Well, to answer your question, so that we know what I'm asking, even in the current contest you're referring to, meaning this past Friday, you're seeing those patients as a interventionist; right?

Page 37

A. I have -- I have three hats when I see them. My field consist of neurology, neuro-imaging and neurointervention. So, when I see them I evaluate them neurologically on imaging and whether or not I determine their a candidate for neurointervention.
Q. I mean, let me say this, doctor: One of my closest friends is an interventional radiologist, same training as you. Is -- Well, I don't even want to talk about that.
Let's just see if we can agree to this parameter. Would you agree that by the time a patient reaches you, even if in the emergency room, there's another doctor that's already evaluated that patient and already determined that this is a patient that needs to see a specialist like you based upon constellation of symptoms?
A. Yes.
Q. All right. Meaning you're not the first line of treatment?
A. Correct.
Q. Okay. So, your role would be to interpret neuro-imaging and perform neuro and vascular procedures if you find them clinically appropriate to do so?

A. Correct.
Q. All right. Can we agree that you've never worked as a cruise doctor?
A. Yes, I could agree.
Q. Have you ever been in a cruise ship medical center?
A. I'm never been on a cruise ship.
Q. Never been on a cruise ship period?
A. No.
Q. All right.
A. I though I'd save you some questions there.
Q. Thanks. Thanks.
So, can we then also agree that you've never performed any type of an evaluation or assessment of a patient at sea?
A. Yes.
Q. And you've never been involved in deciding whether or not a passenger should be medially evacuated while at sea?
A. Correct.
Q. All right. So, a couple more questions about your background and then we can move on. I'm just fascinated by this. I see that you went to Stetson Law School from 2011 to 2014?



A. Yes.
Q. All right. Now, if I read your CV correctly, that would mean that while you were serving as a director of neurointerventional radiology at Palms of Pasadena Hospital, North Side Hospital and Sarasota Memorial you were also in law school?
A. Yes.
Q. Did you sit for the bar exam?
A. I did.
Q. You passed?
A. Yes.
Q. You hold a law license?
A. I'm sorry? Say that again?
Q. Sure.
Do you have a license to practice law in the state of Florida?
A. I do.
Q. Do you actively practice law?
A. I had one client last year -- not actively. I intend to in the near future.
Q. You had one client last year?
A. Yes.
Q. What kind of matter was that?
A. It was a neurointerventional case and I



defended him.
Q. All right. I saw you got a master of law in child advocacy at Temple. Is that an online program?
A. It was a hybrid program.
Q. Hybrid meaning what?
A. All our trial experience was in-person. All the didactic stuff was online.
Q. So, does that mean you had to go out to Temple Law School and, what, sit through some mock trials or something?
A. Yes.
Q. How often did you do that?
A. I believe it was approximately one week a month.
Q. Okay.
A. Sorry. The -- the -- the live trial portion was about one week or a weekend a month for the trial portion and the didactic portion was like weekly lectures. They're online the weekly lectures.
Q. Okay. Do you know Nure Khry (phonetics)?
A. Say that again?
Q. N-U-R-E K-H --
A. It sounds familiar. I can't say no, but



that name sounds familiar to me like I've heard it before.
Q. Okay. He's up in the Tampa area now doing neurointerventional work. I just wondered if maybe you guys crossed paths.
All right. So, you understand then, obviously having passed the bar exam and been a doctor yourself, that the question of whether or not the standard of care was breached is different than a question of whether or not a diagnosis was ultimately correctly rendered?
A. Yes.
Q. Okay. And so the standard of care we can agree would be determined by whether the doctor acted reasonably based upon the information that was available to him or her at the time?
A. In his field of practice, yes.
Q. Okay. A couple of other quick checklists to make sure I checked off.
Have you ever published addressing the standard of care for doctors practicing medicine at sea?
A. No.
Q. Have you ever taken a course on cruise ship medicine before?

A. No.
Q. Have you ever written any clinical guidelines that govern cruise ship medical care?
A. No.
Q. Have you ever developed any cruise line medical protocols?
A. No.
Q. And have you ever trained a cruise ship doctor?
A. No.
Q. Have you actually ever talked or even seen one before?
A. I've seen one.
Q. Okay. When you say you've seen one, what do you mean? On TV?
A. I've seen them in Miami and stuff like that. Look, I've never sailed on one. When I worked in Melbourne there would be a lot of cruise ships there too, but I never, you know --
Q. You never what?
A. I've never gone on a cruise or gone on a cruise ship.
Q. So, in other words, you've never like conferred with a cruise ship doctor while they were rendering care to a patient at sea?



A. No.
Q. All right. So, your -- your training, your particular speciality in neurovascular medicine allows you to explain what you see on MR or CT images; right?
A. I don't think I understand your question.
Q. Yeah.
So, in other words, your training in neuroradiology will allow for you to look at an MR or CT image, explain what the anatomy shows and talk about whether or not that anatomy is favorable for neurovascular treatment or not?
A. I will say that's a very small part of my training.
Q. Okay. So, any part of your training at all concerns the stand of care applicable to a cruise ship doctor?
A. No.
Q. So, I don't know. I mean, I'm getting a vibe that maybe we're going to get this deposition done a lot quicker than I thought, hopefully so for us both, but let's just see where this goes.
So, you have reviewed, you said, the head CT image that was taken at MedStar Hospital on October 20th at 11:34 A.M.; right?



A. Correct.
Q. Okay. And do you agree with the interpreting radiologist's impression that it showed a hypo-density within the right superior cerebellum consistent with an infarct in the right SCA (inaudible)?
A. I agree with that portion of it, yes.
Q. And do you agree that this was a posterior circulation ischemic stroke?
A. Yes.
Q. Okay. Do you also agree that Mr. Smith was not a candidate for mechanical thrombectomy?
A. Not at that time.
Q. Okay. Have you seen any evidence that would indicate that Mr. Smith was a candidate at any time for mechanical thrombectomy?
A. Well, that's a it depends question because we don't know what stroke Mr. Smith had when he had his infarct on the 18th.
Q. So, doctor, I would like to ask you the question and have you answer specifically the question that I asked. So, let me ask it again.
Have you seen any evidence in this case that would allow for you to testify that Mr. Smith was a candidate for mechanical thrombectomy at any



point in time?
A. Well, no, I haven't, but that's because all the appropriate studies that should have been done weren't done on this patient.
Q. Okay. I understand that that's your opinion, but as we sit here today you agree that you can't testify within a reasonable degree of medical probability that Mr. Smith at any particular point in time was a candidate for mechanical thrombectomy. Agreed?
A. You just changed the question. He may have been on the 18th. That's my answer.
Q. But there isn't any particular image study or evidence that you can point to that specifically says that to be the case; correct?
A. There's no imaging or particular study that would indicate that because it was not appropriately ordered when it should have been.
Q. So, you believe that a study should have been ordered on the 18th?
A. Yes.
Q. The study that you have seen, the head CT image showing a posterior circulation stroke, you would agree that a posterior circulation stroke is not one that can be treated with a mechanical

Page 46

thrombectomy?
A. I don't agree that a posterior circulation stroke cannot be treated my mechanical thrombectomy. They often are.
Q. In this particular case, based upon the anatomy that was shown on the head CT taken at MedStar Hospital on October 20th at 11:34 A.M., was anything in that image evidence that Mr. Smith was a candidate for mechanical thrombectomy?
A. On the 20th this person had a completed stroke. So, he would not be an candidate for mechanical thrombectomy. What I was saying earlier is, if imaging was obtained appropriately when it was supposed to be, this might be a different conversation.
Q. Okay. But based upon the image that you've seen, actually all the images that you've seen, that would not be a patient based upon that anatomy shown on those films that would qualify for mechanical thrombectomy?
A. Based on the images I've seen that occurred after the stroke was committed -- completed when appropriate studies were not obtained when they should have been on the 18th, those post stroke completed images would not be a candidate for

Page 47

thrombectomy.
Q. Okay. What type of posterior circulation stroke are you testifying to here as an expert on being one in 2024 that would be candidate for a mechanical thrombectomy?
A. Vertebral artery occlusion, basilar artery occlusion or certain types of posterior cerebral artery occlusions.
THE REPORTER: I'm sorry. What type of artery, doctor?
A. Vertebral artery occlusion, basilar artery occlusion or certain types of posterior cerebral artery occlusions.
THE REPORTER: Thank you, doctor.
Q. And are those all large vessel occlusions?
A. No.
Q. So, the vertebral artery occlusion, did you see any evidence of that pertaining to Mr. Smith?
A. After the fact, no, but it's -- it's not really relevant looking at this case days after the infarct occurred. It's relevant to look at this case contemporaneously as the infarct is occurring on October 18th. Everything that's done after that doesn't really help anyone.

Page 48

Q. All right. I want to make sure that I get my questions answered here today though, doctor, so although I appreciate you want to determine what's relevant and what's not, I'm still going to ask the questions.
So, did you see any evidence of a basilar artery occlusion on any of the imaging studies you reviewed?
A. No.
Q. And did you see any evidence of a posterior artery occlusion on any of the images that you reviewed?
A. No.
Q. When was Mr. Smith's last known well time?
A. I believe it was October 18th at 19:15 UTC hours.
Q. 19:15 UTC?
A. Yes.
Q. Did you render that opinion anywhere in your report?
A. I don't believe so.
Q. Why not?
A. You just asked me that.
Q. That's not something that you figured was relevant to the case?

Page 49

A. Well, there's a lot of things relevant to this case. I'd love -- I'm happy to tell you -- answer that, if you want me to. I'm happy to tell you what's relevant to this case.
Q. So, let's go off of what you just provided for me. Can we agree that in October of 2024 AHAA state guidelines dictate that a patient cannot receive tPA after four and-a-half hours from symptom onset?
A. Typically not.
Q. Okay. And actually, I mean, when it starts within 2024 the standard actually was three hours from symptom onset and in some cases patients up to four and-a-half could receive tPA from symptom onset?
A. Yes.
Q. All right. So, in this particular case, was there any anatomic findings that would allow for you to state within a reasonable degree of medical probability that Mr. Smith's condition was such that he could have qualified for tPA up to four and-a-half hours from symptom onset?
A. He -- if he was eligible for tPA, he could have received it up to four and-a-half hours after symptom onset.

Page 50

Q. Okay. That part I understand, sir. Was there anything on his particular anatomy that would allow for you to say, look, based upon these collaterals or based upon, I don't know, the condition of the infarcts, he could have been a candidate, possibly could have gone past three hours and into four and-a-half hours?
A. That has nothing to do with the decision to order tPA.
Q. So, what is the criteria that you used, doctor, to determine whether or not a patient can receive tPA after three and-a-half hours and up to four and-a-half hours from symptom onset?
A. If he has a disabling stroke and he's eligible for tPA and no hemorrhage on CT, I would give him tP after four and-a-half hours.
Q. So, it has to be a disabling stroke meaning that the NIA Stroke scale has to be what?
A. That has nothing to do with it. That scale has nothing to do with something being disabling or not.
Q. What do you qualify as a disabling stroke then?
A. Anything that interferes with the quality of life. For example, having dis-coordination of

Page 51

your limbs, having dysarthria, having an inability to walk properly. Those are all salient symptoms all of which Mr. Smith had.
Q. Okay. So, disabling symptoms. I think I heard you say no evidence of hemorrhage; right?
A. Correct.
Q. And was there any other criteria? You said it so fast I didn't write it down.
A. Sorry. So, disabling symptoms.
Q. Got it.
A. No hemorrhage on CT.
Q. Okay.
A. I can't remember what I said the first, but -- I'm sorry -- any -- and if he's eligible, meaning if he's within the initial timeframe, he was within four and-a-half hours and other things that wouldn't prevent tPA, giving tPA like prior surgery with three months, prior stroke between -- before three months, prior bleed before three months, not on anti-coagulation except for Coumadin, those types of things.
You just have to make sure that they're eligible for tPA also.
Q. Okay. So, doing some quick math. If according to your expert opinion Mr. Smith's last

Page 52

known well time would have been 19:15 UTC, does that then mean that even under the most favorable conditions we can possibly allow for, that he would have needed to receive tPA by 23:45?
A. If that's four and-a-half hours later, yeah.
Q. Okay. Do you know what the average door to needle time was at Cape Canaveral Hospital on October 18, 2024?
A. No.
Q. Do you know what the average door to needle time was for comprehensive stroke centers back in October of 2024?
A. I know what our average door to needle time is in the hospital I work at.
Q. Okay. But let's start first with my question, then I'm going to ask you about yours.
A. How would I know other hospitals comprehensive door to needle times? How would I possible know that?
Q. Okay. So --
A. Ask realistic questions maybe.
Q. Well, listen, I'm not going to insult you because you're an expert witness here today. I would ask that you give me the same courtesy and,

Page 53

when this deposition is --
A. I'm not -- sir, I'm not trying to insult you.
Q. Well --
A. Ask me -- ask me questions I could actually answer.
Q. Okay. And you're going to answer the questions that I ask and, if you can't, then tell me you can't and we'll move on. All right? But you can go ahead and look up my cases and see there's a Daubert opinion on this exact question.
So, you're telling me then you cannot testify here today to what the average door to needle time was back in October, 2024 at a comprehensive stroke center; correct?
A. No, I can't tell you the average door to needle time at a comprehensive stroke center I don't work at.
Q. Thank you.
Just for the sake of curiosity, when you say our hospital, which hospitals are you referring to that you could provide door to needle average time?
A. Physicians Regional and Naples Community Hospital.

Page 54

Q. Physicians Regional and Naples Community Hospital?
A. Correct.
Q. And were you working there as a neurointerventionist back in October of 2024?
A. Yes.
Q. What was your average door to needle time then?
A. He strive to be under an hour. We have like a 90 percent goal for that.
Q. And to explain to the members of the jury and to the courts specifically what you and I are speaking of, door to needle is the reference that is used in your stroke community to time the period upon which a patient presents to the hospital, is imaged, those images are interpreted and they're able to receive tPA.
Did I accurately describe what door to needle means?
A. Well, we usually use TNK now, not tPA.
Q. Okay. I mean, what do you want to call it so that we're speaking of the same thing?
A. IV thrombolytics.
Q. IV thrombolytics?
A. Correct.

Page 55

Q. Okay. So that would mean then, as I've stated, let me just refer to your language so that we're both speaking the same language, door to needle time means the amount of time that hospitals track as it relates to when the patient presents to the hospital, is imaged, those images are interpreted and they ultimately receive IV thrombolytics; correct?
A. Correct.
Q. So, your hospital back in October of 2024 strives to try and do that in under one hour?
A. Correct.
Q. Which would mean, if Mr. Smith came to your hospital in October of 2024 under the most favorable conditions we can possibly imagine, in order for him to have been able to receive tPA he would have had to have presented to your hospital by 22:45; correct?
A. If that's three and-a-half hours from 19:15 hours, yes.
Q. Okay. We've been going about an hour, doctor. Let me just pause for a minute and review my notes and then we'll get back at it. Let's just take a five minute break if that's good for everyone.

Page 56

A. Sure.
THE REPORTER: Thank you.
(Thereupon, a short recess was taken.)
Q. All right, doctor. We're back on the record.
So, let me ask you, the posterior circulation stroke. I'm just going to call it PCS for ease of reference.
Does the PCS, does that typically manifest symptoms of nausea, vomiting, dizziness or vertigo?
A. Well, just to be specific, yes, those are posterior circulation strokes, but those are specifically the cerebellum, which is supplied by the posterior circulation by three specific arteries.
Q. Okay. And so in other words, PCS, posterior circulation strokes, can manifest the same type of symptoms that would be also consistent with seasickness?
A. Not really, no. That's -- that's why we do a comprehensive neurological exam and had Mr. Smith performed the comprehensive neurologic exam and checked for cerebella functioning you would have known it wasn't seasickness, but because he did not, he pretty much diagnosed Mr. Smith had seasickness

Page 57

and not a cerebral stroke.
Q. All right. So, would you agree that nausea, vomiting and dizziness is consistent with seasickness?
A. I'm not an expert in seasickness.
Q. Okay. Well, have you ever been on a boat before?
A. A long time ago.
Q. All right. So, I mean, are you telling me that you're generally unfamiliar with the fact that when a person is suffering seasickness, they're nauseous, they may vomit and you're dizzy?
A. I have no opinion on that.
Q. Well, how about as it relates to frequency, would you agree with me that PCS, posterior circulation strokes, are very rare?
A. No, I would not agree with that at all.
Q. Have you read studies published by the American Heart Association and American Stroke Association that says that of all stroke cases, PCS strokes are somewhere between one to three percent of all strokes diagnosed?
A. That's not correct.
Q. Okay. So, you tell me what percentage of strokes that you see in your hospital are PCS versus

Page 58

ACS strokes?
A. I'd say between 10 and 20 percent. That's not rare.
Q. So, let me -- let me make sure I understand what you're qualifying as rare and not rare. So, if you're saying PCS strokes or posterior circulation strokes, account for anywhere between 10 to 20 percent of all strokes that you diagnose, does that mean that ACS, anterior circulation strokes, are the remaining 80 to 90 percent?
A. Correct.
Q. Okay. So, what specifically are you relying upon for the opinion that Mr. Smith's last known well time was 19:15 on October 18th?
A. The records from the cruise line.
Q. Okay. And what was it about those entries in those records that led you to believe that 19:15 was the last known well time?
A. That's when he started having weakness and I think a nurse first contacted him described him as being weak and unable to stand.
Q. All right. So, you -- Well, actually have you read the deposition testimony of Michael Smith?
A. I don't believe so, no.
Q. Have you read the deposition testimony of

Page 59

Eric Grimm?
A. I don't believe so, no. I may have. It was over a year ago so I may have.
Q. Well, I need to know today whether or not you have. So, as you sit here today are you relying in part or at all on the deposition testimony of either Michael Smith or Eric Grimm?
A. So, I don't recall if I read them, but I'm not relying on their deposition to answer this question.
Q. All right. So, other than the description provided in the medical chart aboard the Carnival Pride, do you have knowledge of any other information regarding Michael Smith's medical history prior to presenting to the ship's medical center?
A. No.
Q. You've not reviewed the deposition testimony of the ship's doctor either?
A. I don't recall if I did. I don't believe so.
Q. Any depositions at all that you reviewed in this case?
A. Like I said, it was over a year ago. I may have. I just don't recall what they were at

Page 60

this point.
Q. There's nothing specific in any deposition that you're pointing to as support of your opinions in this case though?
A. No. I'm deriving my opinions from the medical records.
MR. DRAHOS: I don't have any further questions for you, doctor. Thank you.
A. Thank you.
MR. HOFFMAN: Can I get some time? I just need about five minutes, come back 11:20?
MR. DRAHOS: Sure.
(Thereupon, a short recess was taken.)

CROSS EXAMINATION

BY MR. HOFFMAN
Q. Dr. Razack, thank you.
I wanted to ask you some questions about the Power Point that defense had marked as --
MR. HOFFMAN: What was the exhibit number?
MR. DRAHOS: I didn't mark the Power Point and I object to any use of it, but go ahead.
MR. HOFFMAN: Well, I'll have it marked to help the jury understand where Dr. Razack is going over here.

Page 61

Q. So, Dr. Razack, could you explain the first slide here on the first page?
A. Sure. So, what we're looking here is the time course from Friday, October 18, 2024 to Sunday, October 20, 202 from when Mr. Smith first became symptomatic to when he was discharged from the ship and went to the hospital.
So, these are the notes by the physician, the ship's physician, Dr. Maharaj. I apologize if I mispronounce his name.
So, basically at 19:23 hours, it's UTC, the time, he noted that Mr. Smith had lethargy and wrote in his review of systems, review of symptoms negative for dizziness and weakness. He also wrote he had a steady gait, but interestingly he didn't record any symptoms of right arm incoordination, falling to the right or the family noticing dysarthria, and I'll show you the next slide why that's relevant, but more importantly he did not perform any specific cerebella functioning.
Now, the reason this is important, and I sent you an exhibit that shows Carnival Cruise Lines own policy says that they provide the level of care as the emergency -- sorry -- the American College of Emergency Physicians, they provide that same level

Page 62

of care and that level of care says performs a comprehensive neurologic exam, which was not done here because no cerebella function was performed or no cerebella exam was performed. We'll get how that's relevant in the next slide.

Then he reevaluates Mr. Smith at 20:34 hours where now he complains of dizziness. This is like almost an hour later where the entry was like no dizziness, now he has dizziness, but again he doesn't assess cerebella function.

At 21:40 hours, and these are the pages from the records, he's still dizzy, but again no cerebella function was performed here. Again, a comprehensive neurologic exam, which Carnival Cruise Lines say is their policy, was not performed.

Then at 22:42 no longer dizzy or nauseous, but no cerebella function test performed and then at 23:32 he left on a wheelchair.

Now, it's interesting this wheelchair thing because this is telling me he can't ambulate, which is -- could be a form of ataxia, but again no cerebella function tests were performed.

Then the following day at 9:48 he says that Mr. Smith is nauseous and dizzy and presents in a wheelchair again. Highly concerning for ataxia,

Page 63

but no cerebella testing was done. Then at 18:10 he notes the guest is too lethargic to stand and left in wheelchair. Again, very concerning for ataxia, but no cerebella function -- no cerebella testing was performed.

Then at 8:04 he says that Mr. Smith has a steady gait. This is the same day he received the CT where we're going to review more detail. This CT, the same day shows a completed infarct in the cerebellum on the right consistent with the right superior cerebellum artery infarct.

This gait, more likely than not, could not have been steady. He, more likely than not, had ataxia and abnormal gait because, not only is the right superior cerebellum involved, the vermis is involved too. When you have an infarct to the right superior cerebellum, you're involving a nucleus called the dentate nucleus that communicates to the mid brain via the right superior cerebellum peduncles, which is also infarcted here.

It has motor fibers that go from the dentate nucleus to the thalamus and to the red nucleus in the mid brain. Those are effected by the stroke, which would cause limb ataxia plus he has the vermin infarct. This would cause truncal

Page 64

ataxia.

So, both of those infarcts tell me more likely than not he would not have had a steady gait. So, really all of these tell me that cerebella functioning was really never assessed. Had it been assessed, it's my opinion that Mr. Smith would have been diagnosed with a stroke when he presented for the first time on October 18th.

If you go to the next slide, that would be great. It's the next one down. Yeah.

So, this is when he comes to Nestor Harbor Hospital and Dr. Bennett evaluates Mr. Smith at 16:54 hours and he says he presented to the emergency department after having two days of balance difficulty, dizziness, nausea and vomiting, which would put him on the 18th.

His symptoms began on Friday 10-18-24. Here we go. He noted that his right arm was not working right and was falling to the right. People notice that his speech is slurred, but he feels that he's speaking at his normal level just without dentures.

So, he told Bennett that his arm wasn't working properly and he was falling to the right on the 18th. Maharaj did not listen to his history

Page 65

cause he did not perform a comprehensive neurologic test of history. When people noticed his speech was abnormal, that was his daughter.

So, you can get something called ataxic dysarthria when you have a cerebellum stroke, which means the patient may not notice that his speech is abnormal because, when we hear things, we hear through bone conduction, but other people can hear it being abnormal. That's why when you listen to yourself on a tape recorder recording yourself, it never sounds right because we hear -- we perceive our speech on ourselves differently.

More importantly when Bennett performed his cerebella functioning, the finger to nose test was markedly abnormal on the right, poor heal to shin on the right. This is what we call dysmetria. This has to be positive because he has this big cerebella infarct. This is a acute cerebella infarct, by the way.

This was on -- Mr. Smith has this when he left the ship on the 20th. He likely started developing this by even the 18th based on the imaging. So, there's no way he could have had a normal gait or I should say it's more likely than not he had normal gait when he left that ship.

Page 66

Even the ED nurse notes, when they came to the hospital, that he was all extremities equally, but, again, this is Mr. Smith stating this, his right arm felt funny or heavy on Friday.

So, really all his symptoms started on the 24th. Mr. Smith, himself, said his arm wasn't working right, he was falling to the right. When you fall to the right, that's a cerebella issue too. We call that lateral pulsion, meaning when you have dis-coordination on one side you fall to that side.

Mr. Smith had limb ataxia and truncal ataxia based on the distribution of the stroke. His speech was also in ataxia dysarthria.

So, all these -- this history places all three of these findings as within the cerebella -- cerebellum, but specifically the right superior cerebellum artery. So, essentially, if we go back one slide Mr. Smith, he had all of these findings, but they were not elicited by Maharaj's H&P nor was the cerebella functioning tested. If he had a cerebella testing -- tested, because of this imaging right here, more likely than not he would have seen he had this metric, just like Mr. Bennett found out, and more likely than not, if he had elicited a proper history, he would have diagnosed this as

Page 67

being a right cerebella stroke and more likely than not would had initiated their own protocol to evacuate Mr. Smith to get a high level of care.

I could go to imaging two. There's another that has all imaging on it, if you would like.

Q. Give me one second.

MR. HOFFMAN: I'd like to have this marked as Plaintiff's Exhibit 1.

THE REPORTER: The one that's on the screen now, Michael?

MR. HOFFMAN: Yes, ma'am.

MR. DRAHOS: The Defendant objects for the same reasons as provided before.

(The Power Point was marked as Plaintiff's Exhibit No. 1 for identification.)

Q. Doctor, is there imaging that you have on your screen you referenced that you're referring to?

A. Yeah. I just -- It's the -- the exhibit I sent you on Friday, the Power Point exhibit. I could try to pull it up too, if that helps.

Q. Please.

A. Okay. Let me try that. I'm not good at this stuff. Let me try -- let me try again. Give me one second. I'm sorry.

Page 68

Can you guys see that?

Q. Yes.

A. Okay. So --

MR. DRAHOS: Hold on a second, doctor.

First of all, I don't think there's a question pending. So, I need to object to the form. Second, I've never seen this. It's never been provided to me. So, is it -- its slide 1 of 126?

A. I send this along Friday.

MR. DRAHOS: Unfortunately, doctor, I didn't get it. So, we'll have to deal with that with the court.

Mr. Hoffman?

MR. HOFFMAN: Yeah. It looks like these are the imaging. I -- I'm asking my office now. I don't see it in our file.

These are all medical records that were taken that we've all discussed that are part of the exhibits that you had entered in; correct?

Q. These are all just spliced together, doctor?

A. Yeah. I just thought it would be easier because, whenever I look at these images, the computer crashes all the time.

Page 69

Q. So, it -- Has this been put together for the purpose of I guess explaining clearly to the jury what it is that you're --

A. Yeah.

Q. -- your testimony?

A. Yes.

Q. Okay.

MR. HOFFMAN: Michael, I can have this sent to you, but this is all imaging that was in the medical records that I believe that you have admitted as an exhibit to your --

MR. DRAHOS: Well, Mike, we can talk off the record -- Actually, no, let's talk on the record because I think is where you and I go sideways a lot, we don't seem to be playing by the same rules. I mean, you're setting stuff in emails to me, burdening my staff, taking over citations and testimonial history of my experts.

Again all of these experts have been testifying in this case without providing information to me and now this is something that I've not had an opportunity to authenticate to determine whether or not it actually is the films that are coming from MedStar that I would have been able to do had this been properly disclosed.

Page 70

So, I'm just going to go ahead and assert a standing objection so that we're not wasting time and you can go ahead and proceed.

A. All right. So --

Q. Yes, doctor, if you could explain what the imaging shows in relation to Mr. Smith and when the stoke occurred?

A. Sure. So, this is the first CTs (phonetics) Mr. Smith received at MedStar Harbor Hospital October 20, 2024 at 11:34 hours and these are not brain CTs. There are the coronal CTs. I'm showing these first cause it shows the superior aspect --

MR. DRAHOS: Doctor, I'm sorry. I need to interrupt just a minute. I've had an emergency call come in. So, if you give me two seconds to take this and find out what they want. I'll be right back.

A. Sure.

(Discussion off the record.)

MR. DRAHOS: Thank you everyone. My college daughter who's a little more dramatic than need be. So, thank you.

A. I'm going to proceed. Is that okay?

MR. DRAHOS: Yes. Thank you, doctor.

Page 71

A. Okay. So, these are coronal images. They're not conscious brain CTs. You can see that this infarct, the regional lower density is in the right superior cerebellum. It's in one of the mid line, the vermis two. So, really what this does will produce a right side limb ataxia and a truncal ataxia. It's also kind of pushing the fourth ventricle, pushing in this little circular structure here.

Notably though, if you look at the density, while it's not as dense as the surrounding brain tissue, it's not -- it's not as dark as like the fluid and ventricle for example. I say that because you'll see why in a second, you could see this -- this reduced density where the cerebella infarct is, you see on multiple views.

Now, this a view again showing this is superior cerebella artery infarct. Now, we're going to see axial views showing that same infarct. You can see that this area is darker pushing on the ventricle going into the mid line.

Q. Doctor (inaudible) --

A. I'm sorry --

THE REPORTER: I haven't heard, Michael, what you said.

Page 72

Q. I just asked what slide number he was on.

A. I'll read -- I'll read them out loud, madam court reporter. I'm sorry. That's my fault.

So, if we go to slide 14, we can still see this hypo density. The reason I talk about how the hypo the density is we define strokes one way in terms of chronicity. So, a hypo acute stroke is less than 24 hours. Okay? An acute stroke occurs from one day, more than 24 hours, to seven days. You could see that these different chronicities have different imaging. So, an acute stroke is less density than the brain tissue, but it's not as hypo dense as spinal fluid.

So, based on the imaging pattern of this stroke and its consistency and density, it's more likely than not that this stroke occurred on the 18th, the evening of the 18th because this to me looks like it's an acute stroke that's probably one to two days old based on the density of the brain tissue here.

We'll see that consistently throughout all these different slides. We're on slide 16. Slide 17 shows the hypo density too. I think I've made my point with that. So, I'm going to the next study actually.

Page 73

The next study is the brain MRA performed at Sain (phonetics) Institution, MedStar Harbor on October 20, 2024 at 13:32 hours.

The first images we're looking at, this is slide number 23. This is Sagittal T1. I'll go to slide 24 that shows this decreased signal, which is, again, significant for a right superior cerebella artery stroke. This is seen on slide 25. It's seen on slide 26 as well.

Then we go to slide 27. This is the MRA. We're going to skip this cause this a source image. I'm just skipping for the source images. I print them for a reason.

This is slide 34. Slide 34 is a MRA of the posterior circulation. The (inaudible) artery (inaudible), the basilar artery is (inaudible). There's a dominate right anterior inferior cerebella artery. You see both superior cerebella arteries. So, at this point all the vessels here are open, but, again, this is two days after the fact that Mr. Smith had a stroke.

Now, interestingly are these time of flight (phonetics) images, which is on image 35, you actually see both the two arteries here. You see that dominate right anterior inferior cerebella

Page 74

artery. You see an entire left superior cerebella artery, but there is a little stringy right superior cerebella artery. This may represent the occlusion. It's hard to say on one image because on this image it looks like it's open to me. This is slide 34. So, it's really hard to tell if that's an occlusion or not.

But what we can say for certainty is on slide 36, these are T2 images now, we see that there's definitely a right superior cerebella artery stroke. It involves and compresses the right superior cerebella artery peduncle. You can see it being moved from the mid line. It compressed the fourth ventricle and it definitely involves the vermis.

The reason this is so important is the right superior cerebella artery will cause limb ataxia, that distribution within the cerebellum. Within the vermis that causes a truncal ataxia and, again, that's why it's more likely than not Mr. Smith would have had a steady gait based on this imaging.

I'm going to go forward. There's -- I'm going to go forward to the susceptiblity images. So, starting with slide 47. These are the

Page 75

susceptibility images showing this dark region of metallic susceptibility. This is blood within the infarcts.

I'm going to go forward in the interest of time. We're just seeing the same thing.

Then on slide 76 we're looking at the MRA and just showing the images -- the major vessels are painted (phonetics) again.

I'm going to go forward to the next CT. The next CT was on October 21, 2024 at 8:36 hours and this just shows that right superior cerebella artery. It's becoming more less dense. You can see it's getting more similar to CSF (phonetics). So, every day that goes by we're going to get this infarct less and less dense. It's the same distribution now. This is on slide 94 we're looking at.

I think that's really it for the images, but, Michael, I had made reference to the -- to the policy of Carnival Cruise Lines when I did the last slide. I wanted to -- you to show that exhibit so I could reference the slide I showed earlier to that one, if that's possible.

Q. Yes. You're referring to the Carnival's website?

Page 76

A. Yes.

Q. Okay. I'm going to share my screen here.

A. Let me stop my sharing. Sorry.

Q. Okay. Is everyone able to see that on the screen?

A. I can see it, yeah. If you can just blow it up a little.

Q. Okay. Are these the policies that you're referring to?

A. Yeah. These are the two policies I was --

MR. DRAHOS: Just object to the form, doctor. Go ahead.

A. Okay. These are the two policies I was referring to when I was going through the timeline slide I showed you earlier. The reason it's so important is Dr. Maharaj, he never performed a comprehensive neurologic exam on Mr. Smith because there's no record of cerebo testing ever performed.

So, really if you look at the first of these articles, which is ID'd as 1194, this is Carnival Cruise Lines that states this, they say: In order to maintain a safe and comfortable environment for our guests, our medical centers meet or exceed the standards established by the Cruise Lines International Association, CLIA, and the

Page 77

American College of Emergency Physician, ACEP.

Well, Mr. -- sorry -- Dr. Maharaj failed the standard because he never performed a comprehensive neurologic exam, which is specified in one of the articles I reference in the ACEP article and it's also specified in the Grace 3 article, which is another article I reference.

So, he never met Carnival Cruise Lines own standards because he never performed a comprehensive neurologic exam cause it did not include cerebo testing.

Then this next article, which is under the Shipboard Medical Services FAQs, article ID 1134. The question is: What happens if we have a serious medical emergency like a heart attack or a stroke? It's very current to what happened to Mr. Smith.

The answer: Medical staff are certified in Advanced Cardias Life Support (ACLS) and resuscitation which includes training for emergencies such as heart attack and stroke. Guests presenting symptoms of a stroke may require shoreside specialized imaging and specialist review to assess their specific situation and determine the most appropriate treatment option. Serious medical emergencies may require us to transfer care needs to

Page 78

a shoreside facility.

Well, Mr. Smith has a serious medical emergency. When we look at the imaging we just looked at, more likely than not he suffered a stroke the evening of October 18th. Had Dr. Maharaj followed Carnival Cruise Lines policies and adhered to the standards of the American College of Emergency Physicians, ACEP, and performed a comprehensive neurologic exam including cerebella testing, Mr. Smith would have been more likely than not diagnosed with an ischemic stroke of the right cerebellum the evening of October 18th.

Q. Thank you, doctor.

And the -- I believe we discussed earlier the hour -- the window of time as to when the I guess medication could be administered to break through the stroke of the client, but my question is: Once somebody is outside of that window, what's the standard of care? Are they -- Does it -- Is the standard of care, is there still urgency to getting him into a stroke facility or to having --

A. Well --

MR. DRAHOS: Wait, doctor.

Object to the form.

Go ahead.

Page 79

A. So, the standard of care is to continue to medically manage the stroke. There's different ways we can do that. We could put him on dual anti-platelets, other medical management because in this stroke (inaudible) there was a concern of mass effect. That's why he was sent to Franklin Square Hospital to manage that in case he needed to have what's called a craniectomy.

So, by not treating the stroke, it's getting -- it's progressing there are still other things you could do to treat the stroke, had it been diagnosed earlier. Had it been diagnosed earlier, a lot of these things would have -- could have been prevented. Like that transfer could have been prevented, the subsequent transfer to Franklin Square Medical Hospital and he's still --

You know, once the diagnosis is made, there's other things we can do to medically manage these patients in addition to IV thrombolytics. Like I said, for example, dual anti-platelets and other medical management.

Q. So, was the gap of when Mr. Smith first went to the infirmary and when he was supposedly disembarked 33 hours later, did that -- was that proper standard of care for someone in his

Page 80

situation?

A. No. Mr. Smith should have been diagnosed with an ischemic stroke on the evening of October 18th when Dr. Maharaj first evaluated him. Dr. Maharaj did not perform a comprehensive neurologic exam on Mr. Smith. He didn't elicit a proper history.

I mean, the history Dr. Bennett elicited from Mr. Smith on the 20th showed he had right ipsilateral arm dis-coordination. He had -- he was falling to the right and he had a dysarthria. None of those three things were elicited by Dr. Maharaj's H&P on the 18th.

In addition, he did not perform proper cerebella function testing. He did not test for dysmetria like Dr. Bennett did. When Dr. Bennett tested Mr. Smith, he had markedly abnormal. His word in the chart was markedly abnormal finger to nose pointing, which is an indication of dysmetria, and heel to shin testing, which is also an indication of dysmetria. Again -- Sorry.

Q. Where are those -- So, you just mentioned the finger to nose, heel to shin. Are those part of like a standard neurological examination?

A. It's part of testing for cerebella

Page 81

function, which is part of a standard neurologic examination, which is endorsed by the ACEP, the American College of Emergency Physicians, which is the standard Carnival Cruise Lines adheres by.

Q. What equipment does that examination require?

A. Nothing.

Q. How long does it take?

A. 10 seconds.

Q. Does performing defer depending on whether the physician's in a hospital emergency department or a ship's medical center?

A. No.

Q. And when is it neurological -- basic neurologic -- initial neurological exam, when is that first taught to a doctor?

A. I think we first learned it the first year of med school.

Q. Okay. Thank you.

In the medical records that you reviewed from Carnival, did you see any testing of Mr. Smith's limb coordination?

A. No.

Q. When you were reviewing the -- the imaging, you had stated that it was indicative that

he would not have had a steady gait?
A. Yes. Because -- I say this because Dr. Maharaj put a note at 8:04 A.M. when he disembarked the ship that his gait was steady. It's more likely than not it could not have been steady because that distribution of a stroke. On the imaging, the right superior cerebellum was involved, which would lead to right limb ataxia and the vermis was involved, which would lead to truncal ataxia.
So, you have two forms of ataxia, which would have involved -- that involve gait. So, it was highly improbably that Mr. Smith had a steady gait when he left the ship that day.
Q. Is there anything in the medical records from Carnival that indicates that Mr. Smith had a stroke?
A. I think his symptoms indicate he had a stroke and the fact that, not so much those records, but the records at -- at the subsequent hospital when they went on shore, the daughter and the sister talk about his dysarthria. So, Mr. Smith, himself, complained of limb ataxia and falling to the right where the daughters describe his dysarthria.
So, at the time they're on the ship with him. So, they saw those contemporaneously. The



real issue was why didn't Dr. Maharaj elicit those symptoms such as H&P on the 18th in real time. I mean, Bennett elicited those symptoms in his history two days later. So, those should have been elicited on the 18th, but those were not recorded in the records anywhere I could see.
Q. And, doctor, when you say Dr. Bennett, I believe it's Dr. Bennett Miller is his last name.
A. Oh. Sorry. Yeah. Yeah. I'm sorry.
Q. And, doctor, does any opinion in your report depend on Mr. Smith having been a candidate for a mechanical thrombectomy?
A. No.
Q. No?
A. No.
Q. Did Carnival fall short of the standards that they had indicated that they would meet when a person suffers a stroke onboard their boat?
MR. DRAHOS: Object to form.
A. Yes. They specifically state on their own website that they adhere to the same standards, if not higher, than the American College of Emergency Physicians. They failed those standards because Dr. Maharaj did not perform a comprehensive neurologic exam because he did not test for



cerebella functioning.
Q. Okay.
(The images were marked as Plaintiff's Exhibit Nos. 2 and 2A for identification.)
(The diagnosis was marked as Plaintiff's Exhibit No. 3 for identification.)
MR. HOFFMAN: Thank you, doctor. I have no further questions.
A. Thank you.
MR. DRAHOS: Read or waive, doctor?
A. I'd like to read, please.
THE REPORTER: Mike, transcribed or let me know later?
MR. DRAHOS: I'll order, yes.
THE REPORTER: Okay. Thanks.
A copy, Michael?
MR. HOFFMAN: Yes.
THE REPORTER: Thank you, guys.
(Thereupon, the deposition was concluded at 12:00 P.M.)



CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF BROWARD

I, Marsha C. Brannon, Notary Public, State of Florida, certify that Nasser Razack personally appeared before me on September 28, 2026 and duly sworn.

Signed this 1st day of October, 2026.

Marsha C. Brannon, FPR
Notary Public, State of Florida
Commission No.: FF 698529
Commission Expires: 11-13-2029

CERTIFICATE

THE STATE OF FLORIDA
COUNTY OF BROWARD

I, MARSHA C. BRANNON, certify that I was authorized to and did stenographically report the deposition of Nasser Razack; pages 1 to and including 86; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I hereby certify that I am not a relative, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 1st day of October, 2026.



Marsha C. Brannon, FPR
Court Reporter, State of Florida



WITNESS NOTIFICATION LETTER

October 1, 2026

Nasser Razack, M.D.
335 31st Street
St. Petersburg, Florida 33712

In Re: Smith v. Carnival
Deposition taken on September 28, 2026
U.S. Legal Support Job No. 7222862-001

The transcript of the above proceeding is now available for your review.

Please call 954-463-2933 schedule an appointment between the hours of 9:00 A.M. and 4:00 P.M. Monday through Friday at a U.S. Legal Support office located nearest you.

Please complete your review within 30 days.

Sincerely,
Marsha C. Brannon
U.S. Legal Support, Inc.
700 East Dania Beach Blvd -- 1st Floor
Dania Beach, Florida 33004

CC via transcript
Michael Drahos, Esq.
Michael Hoffman, Esq.



ERRATA SHEET

DEPOSITION OF: NASSER RAZACK DATE 9-28-2026
JOB NUMBER: 7222862-001

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS PAGE

___________________________________________________

| Page No. | Line No. | Change | Reason |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

____________________ ________________________
Date Nasser Razack