# EXHIBIT "L"

**Captain Watson's Deposition Transcript**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:25-cv-24611-DPG

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION and
NIKHIL MAHARAJ, M.D.,

Defendants.
_______________________________/

DEPOSITION
OF
CAPTAIN ERIC WATSON

September 14, 2026
2:00 p.m. - 5:02 p.m.

U.S. Legal Support, Inc.
Remote Videoconference

Taken before Dorothy Hutchison, Stenographic Reporter and Notary Public, in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed by the Defendant in the above cause.

APPEARANCES:

On behalf of the Plaintiff:

DAVID W. SINGER & ASSOCIATES, P.A.
BY: MICHAEL A. HOFFMAN, ESQUIRE
1011 South Federal Highway
Hollywood, Florida 33020
(954) 920-1571
dsingeresq@aol.com
mahoffman@1800askfree.com

On behalf of the Defendant:
GRAYROBINSON, P.A.
BY: MICHAEL DRAHOS, ESQUIRE
515 North Flagler Drive, Suite 650
West Palm Beach, Florida 33401
(561) 268-5727
michael.drahos@gray-robinson.com
ashley.genoese@gray-robinson.com
Charles.Roussin@gray-robinson.com

I N D E X

| | PAGE: |
|---|---|
| DIRECT EXAMINATION BY MR. DRAHOS | 4 |
| CROSS-EXAMINATION BY MR. HOFFMAN | 90 |



INDEX TO EXHIBITS

CAPTAIN ERIC WATSON
MICHAEL SMITH vs. CARNIVAL CORPORATION
September 14, 2026
DOROTHY HUTCHISON, COURT REPORTER

DEFENDANT'S:

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Deposition notice duces tecum | 117 |
| Exhibit B | Report | 117 |
| Exhibit C | Curriculum vitae | 117 |
| Exhibit D | Testimony history | 117 |
| Exhibit E | Fee schedule | 117 |
| Exhibit F1 | Invoices | 117 |
| Exhibit F2 | Spreadsheet | |
| Exhibit G1 | Ship logs, 27 pages | 117 |
| Exhibit G2 | ICare notes, three pages | 117 |
| Exhibit G3 | Medical records, 55 pages | 117 |
| Exhibit H1 | Port Canaveral Research | 117 |
| Exhibit H2 | Cape Canaveral Research | 117 |
| Exhibit I | Notes | 117 |

(Defendant's Exhibit F2 was retained by the witness.)



P R O C E E D I N G S

Thereupon:

CAPTAIN ERIC WATSON,

being by the undersigned Notary Public first duly sworn, was examined and testified as follows:

THE COURT REPORTER: Would you raise your right hand, please. Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. DRAHOS:

Q Good afternoon. Can you please state your name for the record.
A Eric Watson.
Q And, Mr. Watson, what is your current occupation?
A Captain.
Q Captain for whom?
A American Cruise Lines.
Q Okay. And it's my understanding you've been produced here today to serve as an expert on behalf of the plaintiff in the case of Michael Smith versus Carnival; is that correct?
A That is accurate.



Q Okay. And you are not appearing here today as captain of the American Cruises, correct?
A That's accurate.
Q So what I'd like to do is, we're going to do some housekeeping stuff here just to kind of get going I'm going to identify some documents that we're going to be referring to throughout the deposition. Can you see my screen?
A Yes.
Q Okay. So from time to time I'll obviously be sharing documents on the screen. If at any point in time you can't see those or you need me to navigate up and down on the page, or whatever it may be that I need to do to help you be able to see on the screen, please let me know that, okay? Otherwise, I'm going to assume that you can see everything that I've got on the screen when I'm showing you the screen like that. And I'll check with you every time, okay?
A Understood.
Q All right. So first and foremost, what I have put up on the screen is what we're going to mark as Defendant's Composite Exhibit A. This is what we call a notice of taking deposition duces tecum, and it's for your deposition today, September 14th, at 2:00 p.m. Eastern. Do you see that there?

A Yes, I do.
Q Have you ever seen this document before?
A Yes, I have.
Q So the document, what we're calling Exhibit A, has an attached Schedule A which is a duces tecum, which is a fancy way of saying we ask that you produce certain information here in support of your role as an expert witness. Can you see schedule A up there on the screen?
A Yes, I can.
Q All right. And did you go through Schedule A and produce documents that were responsive to everything that was being requested of you?
A Yes, I did.
Q All right. And let's go through some of that stuff here one by one. Okay. I've put up on the screen what we're going to mark as Defendant's Composite Exhibit B. Can you see that there, Mr. Watson?
A Yes, I can.
Q Defendant's Composite Exhibit B is a 50-page document entitled Expert Report of Captain Eric Watson dated August the 13th of 2026, correct?
A Yes.
Q Okay. And I'm going to scroll all the way down to the last page. Here is that your signature, sir, on Page 50?



A Yes, it is.
Q All right. And it's dated August the 13th of 2026. Does that mean that on August the 13th of 2026 you signed this report certifying that it was accurate and correct?
A Yes, sir.
Q Okay. And then I see down here on the bottom it says WMC matter number, and then it says WMC-103. Do you see that there?
A Yes, I do.
Q What does that stand for, WMC-103?
A That is my internal tracking. So every case that comes in, I assign it a tracking number inside my system so that I have references to it as I'm keeping track of the materials that are being supplied to me and reports, and that way I'm not cross-contaminating any information from one case to another.
Q So does that mean that you have written 103 expert reports?
A No. It started at -- it's not for reports, no, sir. It was each case assigned gets a number and the -- we started at 100. And this was actually my first case that went to a report like this.
Q Okay. So that was my next question. Let me just make sure I got it clear on the record. That would



mean that this is the first time you have ever written a report like the one you've written in the Michael Smith versus Carnival Corporation matter?
A That is accurate.
Q Okay. And since the time of August the 13th of 2026 when you signed this report, did you make any changes to it?
A Since August 13th, no, sir.
Q Okay. And since you qualified it, let me ask you, since the time that you completed the report up until the time that you disclosed it in this case, did you make any change to it?
A No, sir.
Q All right. So at this present moment then the document we've put up on the screen continues to be the most updated and current expert report that you have written in the case, correct?
A That is accurate.
Q Okay. Up on the screen, which we're going to mark Defendant's Composite Exhibit C, is what I understand to be your current curriculum vitae. Is that correct?
A Yes, it is.
Q All right. This is an eight-page document. I'm happy to scroll all the way to the bottom here for



you, but same question as before. Is Defendant's Composite Exhibit C your most up-to-date and current curriculum vitae?
A That is accurate.
Q Okay. Next up on the screen is what we'll mark as Defendant's Exhibit D, and this is what we call a testimonial history. In the one that you've provided in the case you indicated that you have not previously testified. Is that accurate?
A It is accurate.
Q Have you ever testified in court in any capacity?
A Only as a fact witness.
Q How many times?
A Twice.
Q And what were the circumstances?
A One was an alleged injury onboard a supply vessel. A gentleman claimed he was injured moving life jackets. And the second one was a cook who had an infection in his foot that he didn't report and he tried to say that it was the company's fault for the infection going as far as it had gone.
Q Okay. And so in both of those instance then that you have identified for me, were you testifying in your capacity as a captain onboard American Cruises?

A One was. The infection in the foot was for American Cruises, and the other one was a supply boat company, Abdon Callais Offshore, and that was a supply boat servicing the oil fields.
Q I'm sorry. You said that so fast I didn't catch it. What was the name of the offshore matter that involved --
A The name of the company was Abdon, A-b-d-o-n, Callais, C-a-l-l-a-i-s, Offshore. That was the name of the organization.
Q Okay. So in both instances then you were testifying on behalf of the defendant in the matter?
A Correct.
Q Okay. And specifically the one involving the cook who had the infection in the foot, what was the name of that case?
A I don't have the name of the case in front of me. His name was Juan, but I don't have the case in front of me. It was a couple years ago now.
Q Juan was his first name?
A Yes, it was.
Q Okay. But American Cruises was the defendant?
A Yes, they were.
Q And what court was that matter litigated in?
A I'm not sure, sir.


Q Did you testify in a courtroom or in a deposition like what we're doing today?
A Like what we're doing today, and I was onboard the ship.
Q Do you recall the name of the attorney who took your deposition?
A I do not.
Q How about the name of the attorney who represented you, or American Cruises, I should say?
A They were representing American Cruise Lines, and I do not recall their name.
Q All right. You told me you don't recall the court that was litigated in, but how about the state?
A So the corporate headquarters is in Connecticut, but I'm not sure if that's where they were trying it or not.
Q Okay. So those two instances then the one involving the life jacket and the one involving the cook with the infection, those were depositions, correct?
A They were depositions, yes.
Q All right. Have you ever testified in court in a trial?
A No, sir.
Q And other than those two instances we just spoke about, have there been any other instances in


which you've testified in a deposition?
A No, sir.
Q So this company that you formed, Watson Maritime Consulting, when did you form that company?
A January of this year.
Q And are you the sole owner or do you have any partners?
A I'm the sole owner.
Q Do you have any employees that work for the company?
A I do not.
Q All right. Any contractors or people that work on a part-time basis?
A No, sir.
Q So other than in this case, have you been retained to serve as an expert consultant in any other matters involving cruise lines?
A Yes, sir.
Q In any of those instances were you retained by the defendant?
A I signed a retainer for a defendant on Friday, so just a couple days ago. I haven't even got the first materials from them yet, but that just happened on Friday the 13th, or excuse me, Friday the 11th. I apologize.


Q What's the name of the defendant?
A Mr. Santana. Or excuse me. It's the Morgan Law Group. Mr. Santana is the plaintiff.
Q Okay. And you told me that you were retained on behalf of the defendant, correct?
A That is correct. The Morgan Law Group is the defendant.
Q And who is Mr. Santana?
A He was -- charter yacht in Miami.
Q Sorry. Say that again, sir.
A He was the passenger onboard a charter yacht in Miami.
Q And Mr. Santana has filed a claim against the charter yacht?
A He filed a claim against the charter yacht. Yes, sir.
Q All right. What's the name of the charter yacht company?
A I would have to pull that up, if you can give me a minute.
Q Sure.
A That information was just coming in, so I don't have that committed to memory yet. All right. In the supplied materials that I have right now it does not disclose the name of charter company yet. I believe it

was 305 Boat Charters or yacht charters from a phone call we had, but I've have to verify that. The currently supplied documents don't show that.

Q Well, thank you for looking, and let me just circle back now and just confirm that.

Is it an accurate statement that you have not been retained by any, what we'll call commercial cruise line, like Carnival, Royal Caribbean, Norwegian, any cruise lines of that nature?

A Not at this time. I had an inquiry for a defense for a Carnival Cruise Line and the attorney just before a Zoom call called and told me that they weren't going to use me because of the open case on the plaintiff's side of the Carnival Cruise Line. So that was a tender allision with a ship in the Bahamas that I was in -- that they --

Q Hold on. We're losing you, Mr. Watson. We can't hear anything that you're saying.

MR. HOFFMAN: Eric, we can't hear you. It might be easier if you were to call in.

THE WITNESS: I'm not sure what happened here.

MR. DRAHOS: All right, Dottie. Let's go off the record for a second.

(Thereupon, a brief discussion off the record.)



BY MR. DRAHOS:

Q Okay. So, Mr. Watson, after some technical issues, let's see if this will work a little bit better now.

We were talking about your experience serving as an expert consultant, and you made mention of a situation where a lawyer for Carnival called to discuss possibly retaining you. What was the name of that attorney?

A Let me go back and look at that one. I've been getting a lot of inquires, so give me one second.

Q Okay.

A I believe that was -- can you hear me still?

Q Yes.

A I believe that was Nicholas Plymale. He's an attorney with Gerson and Schwartz out of Miami.

Q Yeah. That's a plaintiff attorney, sir. It was Gerson and Schwartz that called?

A Let me double check. Let me make sure I had the right one, because I had two different tender cases there. That's not the right one. That was the plaintiff on that one. Clark was the other one that was plaintiff. He identified Carnival as his client for a tender allision, but he didn't give me the details of it because he said that we were scheduled to have a Zoom



meeting. He called me five minutes before the meeting and said that because I had an open case for the plaintiff against Carnival that he didn't feel comfortable retaining me as an expert for a case defending Carnival.

Q Yeah. And so the question was, what was the name of that lawyer?

A Plymale, sir. And it was Perez versus Carnival, or I believe it was Mr. Perez.

Q And I didn't get the name. I don't know if it's the connection on the phone or what, but it didn't come across clear. Can you say that one more time please?

A Mr -- it was Mr. Perez was the last name that I remember.

Q Okay.

A I had Clark against Carnival and Smith against Carnival and then Perez and Carnival. I'm sorry. Perez was -- I apologize. Right. Perez was one for another Carnival seafarer.

Q I'm sorry. Perez was the name of the plaintiff?

A Perez is the name of the plaintiff in that one. That's accurate. My apologies.

Q All right. So is there a case that you --



A The case that I had for Carnival as a defendant was an allision. I don't think I have the gentleman's name, but it was and allision between -- let me try this. It was a case where there was an allision, and the attorney was representing Carnival. It was an allision between the tender and the ship was my understanding.

Q And I'm going to ask it one last time.

A It didn't move forward because of the potential conflict that the attorney --

Q I've heard have you say that.

A -- was worried about.

Q I've heard you say that, but I need to know the name of the lawyer. Are you saying you don't have the name of the lawyer or the name of the case?

A I'll go through these one by one again, sir. Being that we stopped the case early I did not pursue it.

THE COURT REPORTER: I'm sorry. If you could take your hand away. You're coming across a little... The audio is impaired a bit.

BY MR. DRAHOS:

Q Yeah. I'm having trouble with him, too. All right. We need to pick up the pace here, Mr. Watson, because this is taking too long.

Page 18

So the question is: Can you tell me the name of the case or the name of the lawyer who contacted you on behalf of Carnival? Is the answer no?
A Not at this time, no.
Q All right.
MR. HOFFMAN: We'll get you information if it comes up.
BY MR. DRAHOS:
Q So have we discussed then the grand total of your work at the moment as an expert consultant? Are there any other matters in which you've been retained to serve either as a representative for the plaintiff or the defendant in a case involving a commercial cruise line like Carnival or Royal Caribbean or Norwegian or one of that size?
A The other case I was retained in was Clark versus Carnival. That was a tender allision incident that -- in Belize.
Q And who were you retained to serve on behalf of, the plaintiff or --
A The plaintiff. The plaintiff.
Q All right. Thank you. So on my screen is what we're going to mark as Defendant's Exhibit E, Composite Exhibit E. This is what I understand to be your fee schedule. Can you see it there on the screen, sir?

Page 19

A Yes, I can.
Q Okay. And this is a seven-page document. I am just going to flip through it quickly. You charge $500 an hour for your services as an expert consultant?
A Yes, I do.
Q Okay. And is this the fee schedule that was used in support of your services as an expert on behalf of the plaintiff in this case?
A Yes. Yes, it is.
Q Okay. Next up we're going to mark as Composite Exhibit F what I understand to be invoices that have been generated for your services in this case. Can you see my screen, sir?
A Yes, I can.
Q All right. And I want to ask you about what some of this stuff means. So I see here on Page 1 of Composite Exhibit F an invoice for $1500 paid on June the 9th. Do you see that?
A Yes, I do.
Q And it says here under the description initial the case/document review. Do you see that?
A Yes, I do.
Q Okay. How much time did you spend in support of the $1,500 retainer that was paid? Would that be three hours?

Page 20

A That would have been three hours. I actually exceeded that, but I didn't charge anymore for it. I considered it a flat fee, but that's accurate.
Q All right. So you accepted a flat fee of $1,500. And I want to show you Page 2, which is a little bit more of a descriptive invoice for services rendered beginning on June 9th. Do you see that?
A I do.
Q Okay. And this time here along the column under time is the amount of time that's spent for those particular tasks that are described, correct?
A That's fair.
Q All right. And now you said that you exceeded the amount of time. Is that what's represented here under the fee summary, Page 3?
A Yes, it is.
Q Okay. And then there's a Page 4 here, which is a $4,000 payment made on July the 29th. Do you see that?
A Yes, I do.
Q Okay. And that's also described as retainer. So why were there two different retainer payments?
A There weren't two different retainers. The first one was an initial case review. I gave the initial review of the materials that were supplied, and

Page 21

based on our conversations and the case, Mr. Hoffman asked me to do more work. I told him I would need my full retainer to proceed with the case from there.
Q Okay.
A One was the initial -- the first one didn't produce any testimony. There were no reports. It was literally just document review, and as we were moving forward then we went to the full retainer.
Q All right. So I see the full retainer paid on July the 29th, and then there's another payment made on September the 1st of $2,000. Do you see that?
A Yes, I do.
Q All right. And then, of course, there's the $2,000 that was billed to me for your deposition today, correct?
A That is correct.
Q All right.
A Except I only received $1,000. I only received $1,000 from you. I only got 50 percent of that.
Q Okay. And we'll talk about that later, if need be. But for now my question is: If I wanted to know the total amount of time that you have spent in this case to date, where is that information?
A Where is that information?
Q Yes, sir.

Page 22

A I would have to generate it from my time logs here.
Q Do you have time logs?
A I do keep track of all my time on cases, yes.
Q Okay. So I would like to receive a copy of --
A Actually, do you mind scrolling back up, sir?
Q Yeah. Tell me when to stop.
A At the $2,000 billed to Mr. Hoffman.
Q Here?
A Scroll back down. Let me see a little bit further down. A little bit farther. Maybe back up again. I apologize. I was trying to keep up with it as it was going. Scroll up. This is the paid receipt. The top of that. I'm looking for the memo at the top of -- no. That's the $4,000.
Q Yes. The only descriptive I've seen so far is this one here that's dated June 9 through July 24, but I'm imagining there must be more time spent on the case than just what's represented here on Page 2 of Defendant's Composite Exhibit F, correct?
A Correct.
Q So if I wanted to know how much time you spent actually preparing the report in this case, how would we go about getting that information, sir?
A I could generate a report and send it to

Page 23

Mr. Hoffman.
Q Are you saying that as you sit here today that does not exist?
A It is in an Excel spreadsheet at this time. I would have to render it into a report for you and send it over. That's part of the matter numbers that come back over that I was discussing earlier with you, sir.
Q So as we sit here today can you answer the question how much time was spent actually generating your report in this case?
A Let me pull up the spreadsheet real quick and I will answer the question for you.
Q Thank you.
A It's taking its sweet time, that's for sure. Try this another way for you because that's not opening up the way it should.
Q I'm sorry. Mr. Watson, what is it that you're looking at here that it's taking so long for you to answer?
A I'm trying to open the spreadsheet that I tracked this on, but it is only loading about halfway before it stops loading and it's telling me that it is having a loading issue. It will not open for me right now. It keeps failing and the other set I'm trying to go to is also failing on me.

Page 24

Q All right. So what we're going to do is we're going to mark your spreadsheet as Defendant's Composite Exhibit F2, and I'm going to ask for you to please forward that at the conclusion of the deposition. And, Mr. Hoffman, if you'll please forward it on to me in response to the duces tecum. And then, Madam Court Reporter, I will forward it on to you.
MR. HOFFMAN: Okay. I'm going to redact anything that's not related to the case.
MR. DRAHOS: I can't imagine what he would have on his spreadsheet not related to the case, but that's fine.
MR. HOFFMAN: Okay. Thank you.
BY MR. DRAHOS:
Q Okay. Mr. Watson, getting back to the questions then. Up on the screen, which we've previously marked as Defendant's Composite Exhibit B, is your expert report. And I'm referring to Page 13, which, as I understand it, as an inventory of everything that you have reviewed in the case in support of your opinions, correct?
A Yes, sir.
Q Okay. Now, this is all information that was provided to you by plaintiff's counsel?
A With the exception of the website listed at the

Page 25

bottom there and the NOAA buoys.
Q All right. Have you reviewed anything else other than what's identified here in Page 13 and 14 of your report in support of your opinions in this case?
A No, sir.
Q Okay. In other words, you've not reviewed any deposition transcripts, correct?
A No. The depositions, there were two depositions that were provided to me from the plaintiffs over the weekend, but that was -- the report was done well in advance of that.
Q Did you review those deposition transcripts?
A Honestly, I have not had an opportunity to do so. I was busy running the ship here. My apologies.
Q Did you review any expert reports from any of the other experts in this case?
A Yes, I have.
Q What expert reports have you reviewed?
A The defense expert reports.
Q Of who specifically?
A Pardon?
Q Of who specifically?
A I'm having a hard time understanding you, sir.
Q I don't know how much clearer I can ask the question. What specific experts have you reviewed

Page 26

reports from?
A The expert was -- I'll get his name for you in two seconds here. I thought it would take two seconds. I believe his name was Mr. Miller. I'm going to confirm that for you.
Q Captain Miller, Rick Miller?
A Yes.
Q Did you review Captain Miller's report?
A Yes, I did.
Q When?
A It would have been last Friday.
Q Any other reports other than from Captain Miller?
A No, sir.
Q So does that mean that you have not reviewed any expert reports from any medical experts in this case either from the plaintiff or the defendant?
A That is accurate.
Q Have you spoken to any of the other experts who have been retained by the plaintiff in this case?
A I have not.
Q Have you spoken to Mr. Smith, the plaintiff?
A I have not. No, I have not.
Q Have you spoken to anyone else in this case other than Mr. Hoffman?

Page 27

A Only his paralegals in his office.
Q All right. So has the plaintiff's office, meaning Mr. Hoffman's office, provided you with any additional information other than the two depositions and Captain Miller's report since the time that you formulated your report in this case?
A No.
Q Have you asked for any information and not received it?
A Have I asked for any information and not received it?
Q Yes, sir.
A Earlier on I was requesting more detailed logs and weather observations, but there was -- I could look for the missing materials listed I had sent him.
Q Earlier on you asked for more detailed logs and weather information?
A Yeah. And I was supplied with that information eventually, but there was a lot of questions about what time Mr. Smith had presented to the medical center and stuff like that that I didn't have initially which I have received them.
Q Now, when you said there was a lot of questions, questions from whom? You?
A Yes. I was forming my opinion and there were

Page 28

blank spaces that I needed to fill in.
Q What blank spaces were you needing to fill in?
A What time did Mr. Smith present to the medical center? What time had he been seen by a doctor? What were the environmental conditions? Were there any communications with United States Coast Guard? Were there any communications with the bridge from the medical center stating that Mr. Smith was in the medical center and was having medical issues? Communications, basically.
Q And the two depositions that were sent to you, what specific depositions were those?
A Mr. Smith and I believe it was his nephew.
Q When did you ask for this information?
A When did I request it? I didn't request the depositions, but they were provided to me last week.
Q No, sir. I'm sorry. When did you request this additional information that you told me about, the time Mr. Smith reported to the medical center, the time he was seen by the doctor, environmental conditions?
A That would have been about the time that I issued the retainer invoice for $4,000. I can't remember the date that was on that, but that's about the same time that we were moving from the initial materials that were supplied to the extra information there. So

Page 29

I'd have to pull that invoice up again. I tried loading it a few minutes ago, but with my slow internet connection it wasn't working for me.
Q Okay. I'm going to pull up on the screen what we're going to mark as Defendant's Composite Exhibit G. And this is materials that were provided to you by plaintiff's counsel. I want to make sure that I have the same thing that you have seen. So up on the screen, we'll call this G1, is a 27-page document. These are ship logs for the Carnival Pride. Do you see that there, sir?
A Yes, I do.
Q Okay. And have you reviewed any other ship logs other than those that are currently on the screen as Defendant's Composite Exhibit G1?
A No. The -- Mr. Hoffman provided me with the full set of logs, 200-some-odd pages, but I had not reviewed those beyond the date that was in question. These were initially supplied to me and the other ones were supplied last week with the other stuff. I have not reviewed them at this time.
Q Okay. So let me understand what you're saying. You're saying the 27 pages of ship logs that are on the screen as Defendant's Exhibit G1 are the totality of what you reviewed in support of your opinions in this

Page 30

case, correct?
A That is accurate.
Q Okay. And then you said a week ago you were sent an additional 200 pages of ship logs?
A That is accurate.
Q But you have not reviewed those up till presenter day. Is that accurate?
A I have not reviewed those at this time, no.
Q Why not?
A I have been captain on a ship and I haven't had time to read 200 pages of another ship's logs.
Q Okay. Up on the screen and what we're marking as Composite Exhibit G2 is a three-page document which we call ICare notes. Can you see those, sir?
A Yes, I can.
Q Did you review these notes in support of your opinions in the case?
A Yes, I did.
Q And these highlights that are depicted here on the exhibit, were those highlights made by you?
A Yes, they were.
Q And what specifically were you highlighting here? Why highlight these entries in particular?
A I was highlighting the dates of communication and the times of communication. I was trying to

Page 31

determine if there was any communications between the medical center and the bridge at anytime. I was trying to determine, first determine, when Mr. Smith was put ashore versus the time he had presented to the medical center, and I was trying to use that information to help reconstruct where the ship was when Mr. Smith had presented to the medical center. So I was looking for any information that would have corresponded to getting ship's positions and see where we were at.
Q Okay. And finally, I have up on the screen what we'll mark as a Defendant's Composite Exhibit G3, and this is records from the medical center aboard the Carnival Pride, and there are 55 pages in total. Do you see those on the screen, sir?
A Yes, I do.
Q And the 55 pages here on the screen, is this the totality of medical records in the case that you have reviewed?
A No, sir.
Q What additional medical records have you reviewed?
A Well, I'm sorry. Can you keep scrolling? It is looking like there's other information here. All right, so...
Q I would agree. Go ahead. I'll let you answer.

Page 32

A That is -- yeah. The screen that you're showing right now is the buoy reports that I was using for my report. That was the raw data that I captured from the buoy reports.
Q Okay. So I don't intend on marking that. That's a copy error on my part. So we'll call it Exhibit G3 is a 54-page document. And let me ask the question again.
Is the 54 pages that I have just gone through, and I can go through slower, if need be, but the question is: Is the 54 pages the extent of medical records that you reviewed in the case?
A These are all looking familiar, yes. I'm not recalling anything missing off the top of my head. I knew it was blood work, X-rays, ECGs, the consultation form, payment forms, against medical advice forms.
Q Okay. Did you review any other medical records from any other medical providers other than what was provided to Mr. Smith aboard the Carnival Pride?
A No.
Q Okay. Continuing on, as Defendant's Composite Exhibit H, this is, as I understand it, to be from your expert disclosure, the governing rates, rules and regulations for the Port Canaveral Port Authority, correct, that you referenced in your report?

Page 33

A Yes, it is.
Q And this is a 65-page document. Have you reviewed any other Canaveral Port Authority rules and regulations beyond what's depicted here on the screen as Defendant's Composite Exhibit H1?
A No, sir.
Q Okay. And up on the screen as Defendant's Composite Exhibit H2 is a three-page document that was included in your duces tecum response. What is this, sir?
A That would be the, medical, shoreside medical facility that would have been nearest Port Canaveral had the ship diverted for medical attention for Mr. Smith.
Q Okay. Is this the totality of information that you reviewed in support of your opinions relative to Cape Canaveral Hospital?
A For the hospital, yes, stating that they were a stroke center and that that would be the one that he would have been transferred to, most likely.
Q And lastly, up on the screen what is we'll mark as Defendant's Composite Exhibit I. This is a six-page document that was included within your report. Do you see that there on the screen, sir?
A Yes, I do.
Q All right. What is this six-page document that

I have here on the screen?
A It is a lot of, let's see, it was a summary of stuff I've reviewed and opinions that I was drawing from the materials I reviewed.
Q Okay. So you titled this Smith versus Carnival medical evacuation feasibility notes. These were written by you?
A Yes, they were.
Q And what, are these like stream of consciousness or your arithmetic in support of the opinions? What is the purpose of this document?
A This was my note taking to draft my report that you have.
Q Okay. And so I want to ask you about a couple of things on here. So first of all -- Sorry. Were you going to say something?
A No. I was agreeing with you. I apologize.
Q All right. So on Page 3 of 6 up there on the upper left-hand corner it says Cape Canaveral specific/capabilities: Second busiest cruise port in the world in 2023/2024.
Where did you get that information from?
A That was from the website as they were -- where I was getting the rules and regulations report that you just showed me.


Q All right. So is it your contention then in this case that Port Canaveral in 2024 at the time of this incident was the second busiest cruise port in the world?
A Based off of what I saw, yeah. Just my notes and trying to determine whether Port Canaveral would have been a feasible stop for the ship. So this is just determining if it was possible for the ship to go there.
Q Okay.
A So this is my mental thought process as I was developing my opinions and my report.
Q All right. And then under Number 6 it says confirm Cape Canaveral Hospital. Do you see that there?
A Um. Yes.
Q And then what looks to be like Subsection I, it says distance from Port Canaveral, question mark. Outside scope. What does that mean?
A I was determining how far away it was from the port. And when I was developing my report I determined that shore transportation wasn't really what I was asked for. I was simply asked to get the patient to shore and the feasibility of doing so. Once he was on shore, that would have been up to the other authorities to make those decisions.
Q So are you stating here that it is outside the


scope of your expertise to opine on the length of time that it would be taken to transfer Mr. Smith from the ship to Cape Canaveral Hospital?
A Saying that it was my -- I was retained to determine how long it would take to get him to shore for medical attention.
Q Understood. I understood that from your previous answer, but my question in follow-up to that is: Was it your impression at the time you were formulating your report that it was outside your scope of expertise to opine on how long it would be taken to deliver Mr. Smith from the Carnival Pride to Cape Canaveral Hospital on the date in question?
A Yeah. There's a lot of hypotheticals there. It would be -- there's many variables that would be included there.
Q So then do you agree that you're not an expert in that regard?
A I am an expert on getting the patient to shore. I am not going to talk about how the paramedics would have transported him or how the other modes of transportation of would have caused delay or accelerated that.
Q All right. And you're not going to speak on that subject because you agree you are not an expert in


that regard?
A Yes.
Q I'm sorry? Did you say yes?
A Yes, sir.
Q And then under Number 6, what looks like Bullet Point 1, it says hospital discontinued ambulance acceptance April 2025. What does that mean?
A I was researching the hospital and that was an interesting note that I saw that suggested to me that they were still accepting ambulance acceptance in 2024 during this case, or during this incident. But I didn't include it into the report because that was outside of getting -- I was asked to get the ship to the dock or the patient to shore. So I decided not to use that information even though I was looking at it initially.
Q So when we -- let's switch gears a bit. Since this is the first time you and I are meeting, let me ask a little bit about your background.
So as I understand it in reviewing your CV, which I can put up on the screen for you to review with me if need be, but as I understand it, your license is in what we call a Master Ton 200.
A Right.
Q And so that means that you are licensed to operate ships that reach up to a certain size and

Page 38

tonnage, correct?
A That's accurate.
Q All right. Now, in order for you, or anyone, to operate as a ship's captain aboard the Carnival Pride, that requires a certain degree of license as well, correct?
A Yes, it does.
Q What license is required for someone to serve as a ship captain aboard the Carnival Pride, for example?
A They would refer to it as unlimited.
Q A master unlimited license?
A Master unlimited. Yes, sir.
Q Have you ever held a master unlimited license?
A No, sir.
Q So your Master Ton 200, does that mean then that the maximum ship on which you can serve as a ship's captain is 200 tons?
A That's accurate.
Q And if you read Captain Miller's report in this case, which provided the gross tonnage of the Carnival Pride, would you agree that the Carnival Pride's gross tonnage is 86,071 tons?
A I believe that's accurate.
Q So your service currently today as the captain

Page 39

for American Cruise Lines allows you to serve as a master of their ships, correct?
A That is correct.
Q All right. And the largest ship within the fleet of American Cruise Lines upon which you've served as a ship's captain would be 280 feet, correct?
A That's accurate.
Q And you understand that the Carnival Pride is 963 feet?
A Yes, I do.
Q So would you agree then that the Carnival Pride, the one that we're here to talk about, is more than three-and-a-half times the size of the largest ship vessel you ever served as a ship captain upon?
A Yes, sir.
Q What is the maximum passenger and crew capacity aboard the largest ship you've served on as a ship's captain?
A The largest capacity, the American Constitution, Constellation, those are the 280-foot ships you referenced. They're 180 passenger ships and another 60 crew.
Q Okay. So the maximum capacity ship on which you've served as a ship's captain would be 240 souls?
A Correct. For these overnight trips, yes. I

Page 40

was captain on a ship that was 600 passengers, but that was day trips on Tampa Bay.
Q Okay. And so you also understand, sir, that the maximum capacity of the Carnival Pride would be 3,610 souls?
A Yes, sir.
Q More than six times the largest capacity you've ever served as a ship captain upon, correct?
A Yes, sir.
Q So the American ships that you serve as a captain aboard, do any of them have a medical center?
A No, sir.
Q Do any of them have a ship's doctor?
A No, sir.
Q Do any of them have a ship's nurse?
A No, sir.
Q So in your expert report, which I reviewed, you made reference to an experience you had while serving as captain board the American Constitution in which you told a story about an instance where a passenger was suspected of having suffered a stroke. Do you recall --
A That's correct.
Q -- your expert testimony in your report?
A Yes, I do.
Q When specifically did that occur, what year?

Page 41

A I'm going to say -- we're in 2026 -- I would say that was 2024.
Q When in 2024?
A Probably July or August. I don't have the date in front of me, and that ship is out in Alaska now.
Q Where was that ship sailing at the current time for that situation?
A When that happened we were on Rhode Island Sound in New England sailing from Newport, Rhode Island to Martha's Vineyard.
Q Okay. You were sailing just off the coast, correct?
A Correct.
Q How far from shore were you?
A At that particular time we were roughly five miles.
Q All right. And in that particular instance -- Sorry. Were you going to say --
A No. I was going to say that was our farthest -- that was our nearest point to shore, but it was just a small barrier island, roughly, the Elizabeth Islands.
Q All right. Now, in that particular episode that you spoke about, the situation with the passenger who was suspected of suffering a stroke, you indicated

that as your involvement you called the United States Coast Guard to report the vessel and your current position, correct?
A That's accurate.
Q And you specifically used the words, and I can pull the report up if you need to, but you said following your consultation with the United States Coast Guard you were directed to divert the ship back to shore, correct?
A We were directed to direct the ship back towards Newport, Rhode Island to facilitate the evacuation of that individual.
Q Okay. And as a part of that process did you call the United States Coast Guard Rescue Coordination Center?
A I called the United States Coast Guard and spoke to the nearest station that was within VHF radio range.
Q All right. Did you know who it was that you were speaking to?
A I do not know who it was. It was whatever their dispatcher was on that was on that day, the radio watch. The radio watch.
Q You would have spoken to a dispatcher. Anyone else?



A No. It was the radio watch at the station that was handling the call.
Q I'm sorry. Are you saying radio watch?
A Yep. The person that monitors the VHF radios for people making emergency calls who require an assistance.
Q Okay. Other than that individual, did you speak to anyone else associated with the United States Coast Guard?
A No.
Q In other words, did you speak with any type of a commander or representative who was going to lead the mission on behalf of the Coast Guard?
A No.
Q Did you speak to a flight surgeon?
A No.
Q All right. And if I understand your summation of this particular experience, that medevac was eventually canceled due to a change in circumstances involving the passenger, correct?
A Correct. I made an announcement after turning the ship around and making the initial contact with the Coast Guard requesting anybody with medical background to assist the crew. And we had several individuals step up to assist, and they determined that the individual



was not suffering from a stroke, and that deemed us safe to continue on our voyage, which was accurate.
Q Who was the person who made that decision?
A I made the decision after speaking with the medical passengers that were onboard, the medical field passengers that were onboard.
Q And when you say medical field passengers, who specifically, and I don't need to know name, but what were the qualifications of those individuals?
A There was a doctor and a nurse, I believe were their titles.
Q So if I'm understanding you correctly, what you're saying is that a passenger aboard the ship was a doctor. He assessed the particular passenger, told you that he didn't believe this person was suffering a stroke and you canceled the operation?
A That is accurate.
Q Does American Cruises have a medical operations department shoreside?
A No, no.
Q Do they have a medical director?
A No.
Q So what is the current protocol at American Cruises when you have a medical emergency onboard the ship?



A We utilize local resources: 911, Coast Guard, whatever the case may be.
Q When is the last time you had a medical emergency onboard?
A About 12:45 this afternoon.
Q What were the circumstances?
A I can't claim it as an emergency, but they sounded the emergency medical alarm in their room, so we had to respond. It was uncontrollable bleeding nose is what it was. He refused medical transportation for that.
Q Uncontrollable bleeding?
A Bleeding nose, yeah. He was bleeding from his nose. He had quite a mess on his shirt, but it was -- we offered him medical transportation to be evaluated and he refused.
Q Who was it that offered the medical transportation?
A I did.
Q What specifically did you offer?
A I asked him if he wanted to be evaluated by a doctor or transportation to the hospital.
Q And when you say evaluation by a doctor, who were you contemplating?
A His choice. We would have provided

transportation to an urgent care or to an emergency room, depending on what he felt his needs were.
Q The ship was at sea at the time or in port?
A We were in port at the time.
Q And this gentleman ultimately declined your offer?
A He did decline, yes.
Q Do you believe that your actions were appropriate in that regard?
A Yes, I do.
Q Why?
A I offered him medical attention. He had a bleeding nose. He requested assistance. We provided bandages and applied pressure to help stop the bleeding and offered him further medical evaluation which he declined.
Q How do you know that that gentleman was capable of making that decision?
A I can't force him to take medical transportation.
Q So is it --
A If I feel his life is -- if I feel his life is in jeopardy I could try to force it, but for a bleeding nose I can't force him to take medical transportation.
Q All right. So in that particular circumstance



then do you believe that the appropriate action on your part would be to make the offer and allow that person to make the decision on their own?
A In this case, yes.
Q Was there anybody on the ship who had any degree of medical experience capable of providing that person with various options beyond transfer or no transfer off the ship?
A We were just doing basic first aid is all we're trained for.
Q Do you know what the cause of his bloody nose was?
A Not at this time.
Q What port are you currently in?
A New Bedford, Massachusetts.
Q Is that the home port or are you in a port of call?
A We're in a port of call.
Q Where do you sail to next?
A We're headed to Martha's Vineyard.
Q And that gentleman will be sailing on your ship to Martha's Vineyard with you?
A He's scheduled to now, but after this call I'll be following up with him.
Q So you also made reference to a circumstance



where you were serving as the master aboard the ACO Jessica Moore.
A That's accurate.
Q What is the ACO Jessica Moore?
A It is a supply boat, offshore supply vessel.
Q And that circumstance that you've made reference to was involving a medical air transport that came to where you all were located?
A Yes, sir.
Q All right. In other words, you were not required to divert the vessel for that operation?
A We were 200 miles off the coast for that case, and it would have been 20 hours steam time back to the dock to get the individual shoreside evaluations, and it was deemed that the helicopter was a better route.
Q Okay. But my question was, ultimately in order to effectuate that operation you did not need to divert the vessel, correct?
A We did not need to divert the vessel, no.
Q All right. And also, in support of that operation, you did not call the United States Coast Guard, correct?
A No. We did not call the United States Coast Guard for that.
Q All right. You had no involvement in the



actual planning of that air ambulance operation, correct?
A I just requested it.
Q Okay. Beyond requesting it though, you were not the one who worked out the logistics of when the plane was going to take off, where it was going to land, where the person was going to be transported to, correct?
A No, sir. That was handled by shoreside staff.
Q And you had no involvement in any type of a helicopter evacuation involving that particular circumstance, correct?
A Can you repeat the question please?
Q Sure. You had no personal involvement in any type of coordination of a helicopter evacuation involving that operation, correct?
A The only involvement I had was making sure that the vessel was alongside the drilling rig that we were servicing, and they brought the flight crew down in a basket to the ship to evaluate the individual before transporting him up. And once they decided that he needed transportation, then they were able to bring him up and transport him to shore. But my involvement was making sure we were in a position where the flight crew could get down and do a proper evaluation before

bringing him up.
Q Did you have to navigate the ship in any way, shape or form in support of that operation?
A Yes, I did. We were -- when we're not actively working with the rig we have to remain 500 meters outside their safety zone. And when the medical evacuation or when the medical emergency started to occur, I contacted the bridge and we started making the plans. And when the decision was made that they were going to fly a helicopter out, I had to go through the procedures of maneuvering alongside the rig and getting in position to facilitate the transfer by crane between the ship and the rig.
Q The helicopter that was involved was a private helicopter?
A Yes. It was contracted.
Q In other words, it was not a United States Coast Guard helicopter.
A It was not United States Coast Guard. That's accurate.
Q And you made mention of the fact that you have done drills involving helicopter hoist maneuvers from vessels, correct?
A That is accurate.
Q And you made mention of the fact that that was



when you were -- who was your employer at the time?
A Abdon Callais Offshore.
Q And it was -- you called it Shell -- Shell Oil's helicopter?
A Shell. Yes. Shell Oil Company maintained their own search and rescue helicopter on -- as part of their fleet, I guess you would say, the helicopter fleet. So we would coordinate with them occasionally to do these drills that they wanted to do.
Q So in other words, those drills did not involve the United States Coast Guard, correct?
A They did not, no.
Q And those drills did not actually involve a hoist maneuver with an actual patient in the basket?
A Not with an actual patient. We did transfer people, but not a patient.
Q How many times in total did you do these drills?
A The drills, I'd say it was two times and then there was two to four evolutions each time.
Q And how many years ago was that that you did this?
A That would have been -- trying to think here. About 12 years ago.
Q All right. So let me ask one of the most



obvious and easiest questions you're going to get today.
Would you agree that you have no personal experience coordinating medical evacuations from any Carnival vessels?
A That's accurate.
Q All right. And would you also agree that you have no experience coordinating medical evacuations from what we'll call commercial cruise lines, so Royal Caribbean, Norwegian, Virgin, MSC, ships of that size? You have no personal experience in that regard either, correct?
A That's accurate.
Q Have you ever experienced a helicopter medical evacuation from, I'm going to call it a commercial cruise line? Do you know what I'm referring to when I say that?
A Can you say it again then?
Q Sure. I want to make sure that we have the parameters in place. So I'm going to group in cruise lines like Carnival, Royal Caribbean, Norwegian, Disney, MSC as commercial cruise lines, okay?
A Okay.
Q So that I'm not repeatedly saying the same names over and over again. What I want to be sure is of do you have any personal experience of any nature in



witnessing helicopter evacuations aboard any commercial cruise lines?
A No.
Q Do you have any personal experience of any nature regarding any small vessels transfers from a commercial cruise line to a small boat for purposes of medical evacuation?
A No.
Q Do you have any experience of any nature regarding diverting commercial cruise vessels from their current course to an alternate course for purposes of medical evacuation?
A I consider American Cruise Lines a commercial cruise line, so yes, but not on the scale of what you're saying or tonnage of what you're saying.
Q So what you're saying is to the extent you have any experience in that regard at all, it would be exclusively your experience on American Cruises?
A Correct.
Q Okay. Do you agree that you did no research in this case as it relates to the policies and procedures at Carnival Corporation for medical evacuation?
A That's accurate.
Q And would you also agree that you did no research regarding what the United States Coast Guard's

policies and procedures are for medical evacuation of passengers?
A That's accurate.
Q Have you ever interacted with a cruise ship doctor for any reason?
A No.
Q Have you ever been aboard the Carnival Pride?
A No.
Q Have you ever been aboard any Carnival vessel?
A No.
Q Other than American Cruises, what other cruise lines have you sailed on for any reason?
A Norwegian as a passenger. Dolphin back when they were in --
Q When?
A That would have been nine years ago.
Q And I'm sorry. What was the name of that ship?
A That was the Norwegian Getaway.
Q And that was what, for a vacation, a personal vacation?
A Yes, sir. I take my family.
Q Did you go up to the ship's bridge?
A No.
Q Did --
A I asked. They wouldn't let me.



Q Okay. Did you go in the ship's medical center?
A No, I did not.
Q All right. So again, using my same parameter, have you ever been inside the ship's bridge of a commercial cruise vessel other than, of course, American Cruises?
A Correct. So, and to finish answering your previous question, I also sailed as a guest on Royal Caribbean as a teenager and then Dolphin Cruise Lines back when they were in business. That was when I was a teenager, and I was on the bridge of the ship. The Vasco da Gama, the Dolphin Cruise ship, were the two bridges that I visited as a guest onboard.
Q So I heard you say you've been on the ship's bridge of the Dolphin when you were a teenager, right? But I thought I heard you say another name. What was the other ship's bridge that you had been on?
A The Vasco da Gama, V-a-s-c-o, d-e, G-a-m-a, Vasco da Gama.
Q How long ago was that, sir?
A I was also a teenager then as well.
Q And sorry. I don't know how old you are. How old are you?
A I'm 49.
Q Forty-nine. Okay. So we're talking over 30



years ago?
A Yes.
Q All right. So another easy question, hopefully. You are not a medical director, or not a medical doctor. You have no medical training or experience whatsoever, correct?
A Basic first aid, CPR.
Q All right. So on Page 4 of your report you indicate, and I'll read it so that we can just be totally clear on this, I am not a physician and offer no opinion concerning medical diagnosis, treatment, prognosis, causation, medical standard of care, whether Mr. Smith's symptoms should have been recognized as a stroke or whether medical evacuation was clinically indicated. My opinions are limited to vessel operations, navigation, position reconstruction and the operational feasibility of obtaining shoreside medical care.
Does that continue to be the scope of your expertise in this case?
A Yes, sir.
Q All right. In other words, then we can both move on understanding that you will offer no medical opinions in this case, correct?
A That is accurate.



Q So on Page 5 of your report, and why don't we do this, I'm going to pull it up. Okay. I've put up on the screen what we've previously marked as Defendant's Composite Exhibit B, and I'm turning to Page 5. Can you see it there on the screen?
A Yes, I do.
Q Now Page 5 delineates what you understand to be the scope of your assignment in this case, correct?
A Correct.
Q Have there been any changes at all made to the scope of the assignment since the time of this report?
A No.
Q All right. Now, I want to ask you particularly about -- let's see what bullet point is this -- the fifth bullet point down. See that there? It says determine the approximate distance and true bearing from the reconstructed 19:45 position.
A Yes. Yes.
Q Why this particular date? Why this particular time?
A 19:45 was the time that I noted in the medical records that the medical center had documented that Mr. Smith had been seen and evaluated by the ship's doctor.
Q So I appreciate that answer, but why are your

Page 58

opinions in this case based upon that particular moment in time?
A Because that is at the time when it appears that the doctor made a determination with Mr. Smith's condition.
Q Okay. I think we both can agree to that. But why is that the time that you were asked to construct your opinions in this case?
A There's no other time, so what's going on after that, that would have made any more sense.
Q Were you asked to focus on 19:45 on October the 18th, 2024 specifically by plaintiff's counsel?
A No, I was not. That information came out of the documents that were provided by plaintiff's counsel. There were ongoing reports after that, but once the doc had seen the individual, that was the time that I went with for determining whether the ship could have diverted or not.
Q So why is it that no other date or no other time in Mr. Smith's medical care would make sense to you to start your analysis from?
A I was -- at the time I was only provided with the 24-hour day's notes for the ship's position, the ship's log. And I was asked to determine the distance and -- to shore to determine if medical evacuation would

Page 59

have been feasible. Once the individual had been seen by a doctor, that was the timestamp that I used from their documents to rebuild everything for my opinion.
Q Okay. Let me make sure I understand what you're saying. You said that at the time of your expert retention when you were asked to review the case, the only ship logs that you had received were for October the 18th, 2024?
A That is accurate. Yes, sir.
Q All right. And so what you're telling me then is you reviewed the ship logs and you reviewed the medical chart, and you independently made the decision to start your analysis at 19:45. Is that what you're saying?
A That's accurate.
Q All right. Now, specifically as it relates to what you found at 19:45, you did review the ship's logs?
A I did review the ship's logs, yes.
Q All right. Now, we can go to any information that you need to refer to for my question. It doesn't matter to me. But what I want to ask you is: Do you agree that according to the ship's logs, at or about 19:45 the wind knots were 37.8 knots?
A That sounds pretty close to accurate. That would be from the 20:00 observations.

Page 60

Q Whichever marker you'd like to use. If there's one closer in time to 19:45 than 20:00, please feel free to refer to that. But can we both agree then, that at least according to the ship logs, the wind speed was measured at 37.8 knots at the time?
A Yes.
Q All right. And would you also agree based upon your review of the ship logs that the seas were described as rough?
A Yes.
Q All right. Now, you did some wind calculations in your report that I want to ask you how you came to certain conclusions. Specifically, did you convert the winds to -- from apparent to true wind?
A Yes.
Q All right. In other words, did you assume in this particular case that the ship logs that we've just spoken about which report wind speeds at 37.8 knots are apparent winds?
A Yes.
Q Did you do anything in this case to verify whether the shipboard operations had already corrected for vessel motion?
A That was in -- I did reference it against the weather data buoys that were in the vicinity.

Page 61

Q Yeah. We're going to talk about the buoys in a minute, but I'm speaking specifically about the ship bridge and the capabilities of the ship bridge on October the 18th of 2024. So if I'm understanding you correctly, you assumed that the ship logs were apparent wind, correct, not true wind?
A Correct.
Q Do you know the bridge system that's used by the Carnival Pride to record wind values?
A I do not.
Q Do you know what the NACOS system is, N-A-C-O-S?
A Can you repeat it for me, please? It broke up.
Q Sure. Do you know what the NACOS system is, N-A-C-O-S? NACOS system.
A No.
Q If I were to represent to you, sir, that the ship logs actually report the true wind speed, do you have any information here today that you can use to refute my representation?
A No.
Q Specifically as it relates to the sea conditions we have talked about the fact that they were rough, but I want to ask some more questions about the details of what that means, okay?

A Okay.
Q Rolling and pitching are two particular descriptions that you all use in your maritime world to describe sea conditions, correct?
A That is accurate.
Q All right. And do you agree in your experience as a ship's captain and a mariner out at sea that when a ship is rolling and pitching it can cause sensory conflicts to passengers?
A Sure.
Q Particularly to the vestibular system?
A Yes, it can.
Q All right. And would you agree that when a ship is rolling, that produces an alternating side-to-side angular motion and associated lateral and vertical accelerations?
A Yes.
Q And when a ship is pitching, that produces both fore and aft angular motion, correct?
A Correct.
Q All right. And so a ship log which reports rough seas with both rolling and pitching conditions, would that be consistent with seasickness? In other words, can those conditions cause a passenger to become seasick?



A Based on the individual, yes.
Q All right. Do you know anything at all about Mr. Smith's sea legs, for lack of a better description?
A No.
Q In other words, do you know anything about his sensitivity to sea conditions?
A No.
Q All right. In this particular instance or this particular encounter at 19:45, would you agree that the ship was both rolling and pitching?
A I was not onboard, but that's what the logs indicate for 20:00.
Q Just as a mariner, sir, I'm not asking you to make a medical opinion, but is a mariner, would it be unreasonable for someone to suspect that a guest who comes into the medical center reporting nausea during conditions which the seas are described as rough with rolling and pitching, would it be unreasonable for someone to suggest that that individual is experiencing seasickness?
MR. HOFFMAN: Objection. Asking for a medical opinion. Answer if you can.
THE WITNESS: Yeah. I would say that that would be outside my scope, sir.



BY MR. DRAHOS:
Q All right.
A I was not there. I was not there. So I see seasick people, but to determine what the ship's motions were at that particular time, I could not, sir.
Q Well, let me ask it in the reverse then. Have you seen any information in this case based upon your review of the ship logs which would indicate to you that the sea conditions were not such that a passenger could suffer seasickness?
MR. HOFFMAN: Objection. Asking to speculate. Go ahead.
THE WITNESS: Can you repeat it one more time for me?
BY MR. DRAHOS:
Q Sure. What I'd like to know is did you see any evidence in this case which would indicate that the conditions were not consistent with potential seasickness?
A That would be hard to determine with just a -- rough would be a subjective term. So I would prefer to know how many degrees the ship was rolling or how many degrees the ship was pitching to try to determine how much motion was going on, but that was not disclosed.
Q So you did have an opportunity to review



Captain Miller's report, correct?
A Yes.
Q All right. And so Captain Miller provides analysis in his report about those sea conditions and about how those conditions would be consistent with causing seasickness. And what I'd like to know before I move on is: Do you have any opinions to rebut Captain Miller's opinions to say he's wrong and here's why?
A Not at this time. I don't have any information on that.
Q All right. Now, you did make mention of the fact that you reviewed buoys in support of your opinions in this case, correct?
A I reviewed buoys, yes.
Q And the two buoys in particular that you identified in your report would be Buoy 41009 and 41113, correct?
A That is accurate.
Q And do you agree, sir, that Buoy 41009 was 20 nautical miles east of Cape Canaveral during the time period in question? Sorry. Was that a yes?
A Yes. Yes, sir. Sorry.
Q That would also mean that Buoy 41009 during the time period in question was in 138 feet of water, correct?

A Roughly. I didn't check the buoy depth, no.
Q All right. Well, would you agree with me that during the time period in question that we're here to talk about, this 19:45 to 20:00, the Pride was 30 nautical miles away from Buoy 41009?
A Okay. Yes.
Q All right. Now, you also referenced Buoy 41113. And would you agree that that buoy was 30 -- I'm sorry -- Buoy 41113 was three nautical miles east of Cape Canaveral during the time period in question?
A I would have to do the measurements there. I know it was adjacent to the ship channel, the entrance channel, but I --
THE COURT REPORTER: I'm sorry. Please repeat this answer, please repeat.
THE WITNESS: Yes. I was saying that I don't know the distance of the buoy from Cape Canaveral. I just know that it was adjacent to the ship channel.
BY MR. DRAHOS:
Q Okay. Well, if it was adjacent to the ship channel, that would mean that it's even further away from the Carnival Pride than Buoy 41009, correct?
A Correct.
Q Do you agree that it was approximately 48



nautical miles away during the time period in question?
A That would be approximate, yes.
Q All right. And it was in 32 feet of water, correct?
A Yes.
Q And Buoy 41113 did not measure any wind speed, correct?
A That's accurate.
Q Both those buoys, Buoy 41009 and 41113, were behind the western wall of the gulf stream during the time period in question, correct?
A Roughly, yes. 41009 would be close to it, but yes.
Q All right. Based upon those markers that we've just identified and agreed upon, can you agree with me that the weather conditions that the Carnival Pride was facing versus those two buoys were vastly different during the time period in question?
A There's a potential for difference, yes.
Q All right. Let me ask about your evacuation option opinions, and let's just sort of see where this goes. Specifically you identified three different potential scenarios: one by small boat, one by helicopter and one where the vessel diverts, correct?
A Correct.



Q And in this particular case is not your opinion that you do not have sufficient amount of information to conclude that a small boat transfer could have been safely completed in this case?
A The small boat transfer was based on the ship diverting but not making, not actually proceeding through the channel into the berth. It was diversion to the pilot boarding area and doing the transfer there, which is why the buoy adjacent to the ship channel was relevant for the three- to four-foot seas, and a vessel of the size of Carnival Pride would have been safely capable of transferring the passenger from the ship to a responding vessel.
Q So let's do it this way then. Okay. On the screen what is we're previously marked as Defendant's Composite 3, and I'm on Page 23. Do you see that there?
A Yes, I do.
Q So if we look at what would be the last paragraph on Page 23, was it not your opinion in this report, I do not have sufficient information to conclude that a surface transfer could easily have been completed at a particular time on October the 18th, 2024?
A Yes.
Q Okay. So in this particular case will you be opining that a small boat transfer could be completed



for Mr. Smith?
A Say it again please.
Q Sure. In this particular case will you be opining at trial, will you be offering the opinion at trial that a small boat transfer could have been accomplished for Mr. Smith during the time period in question?
A Had the ship reached out to the Coast Guard or other authorities and requested medical transportation, I believe that that would have been an option, had the ship proceeded to an area where it was calm enough for them to do so.
Q Have you provided any analysis, any hypothetical analysis that would provide a scenario in which that could have been safely accomplished?
A Other than saying the at-sea transfer, I'm not saying that that would have happened 47 miles off the coast. I would have imagined, similar to my American Constitution scenario where the ship would have diverted to meet the responding boat, and it would have eliminated a couple hours of ship maneuvering inside tight quarters.
Q So let me ask the question again, sir. I'm going to move to strike as nonresponsive.
In your expert report in this case have

you provided any hypothetical scenario in which Mr. Smith would have been delivered by small boat transfer to shore?
A No.
Q Same question for helicopter evacuation. I'll turn to the next page. Do you see that there, Page 24?
A Yes.
Q All right. And is it not your opinion according to your expert report, last paragraph, the available information is sufficient to identify helicopter evacuation as an operational pathway that vessel command could have requested for evaluation? It is not sufficient for me to conclude that a Coast Guard helicopter would necessarily have been available, launched, or able to complete the hoist at a specific location and time?
A That's accurate.
Q All right. And so would you agree then that you have provided no hypothetical scenario in this case in which Mr. Smith could have been delivered by helicopter?
A I'm just saying that it was feasibly offered -- option.
Q All right. But my question, sir, is: Would you agree that in this case you've not provided any


hypothetical scenario that would involve Mr. Smith being transferred by helicopter?
A Okay.
Q Do you agree?
A Yes.
Q All right. The only hypothetical scenario that you have offered is a ship diversion to shore, correct, the cruise ship, the Pride?
A Yes.
Q All right. Now, let's talk about some specifics there so that I understand your opinions before we leave today. I'm looking at Page 25. Section 6.6 of your report, do you see that there, sir?
A Yes, I do.
Q Now, your calculations indicated that the Pride was 47.4 nautical miles away from shore at 19:45?
A That's accurate.
Q All right. And you've opined in this case, if we look at the -- under the estimated time components, you've opined in this case that it would take two hours and 11 minutes for the Carnival Pride to reach the port entry at Port Canaveral, correct?
A To reach the sea buoy or pilot boarding area.
Q Okay. Pilot boarding area. And what that means, sir, is that the Carnival Pride could not be, it


could not be docked in the Port of Canaveral by the ship's captain. There would need to be a third party. A pilot would need to come onboard to do so, correct?
A That is accurate.
Q All right. And what you've provided for here in your analysis is that that process would require additional time to effectuate, correct?
A What process would?
Q The process of the pilot coming onboard and actually steering the ship into port.
A Right. So during the two hours and 11 minutes that the ship was transiting from PR02 to the sea buoy/pilot boarding area, I think it would be reasonable for a medical emergency for a pilot to be available out there as that ship was approaching.
Q Right. And so what you've indicated here though is that the two hours and 11 minutes is what it would take for it to get to the port entry, and then it would take an additional 75 to 105 minutes for the pilot to board the vessel and actually steer it into port; is that correct?
A That is accurate.
Q All right. Now, you also provided here an opinion relative to the amount of time that it would take for emergency personnel to board the ship and then


to transfer Mr. Smith to Cape Canaveral Hospital. You see that there?
A Yes.
Q Earlier you've told me that you're not an expert in that regard though.
A Correct.
Q So in this scenario, regardless of your lack of experience and expertise relative to ground transfer and transfer to shore, what you've indicated here is that even if the Carnival Pride would have navigated to Port Canaveral as you've suggested, the time frame upon which that could have been completed would vary anywhere from three hours and 51 minutes to four hours and 46 minutes, correct?
A Correct.
Q All right. And so does that then mean, sir, to be abundantly clear for the court, that if this ship diverted beginning at 17:45, the fastest possible time that you have hypothesized here in your expert opinion would be 21:36? And you can check my math if you'd like.
A Well, yeah, you stated 17:45, but we're talking 19:45. So that's a two-hour difference right there.
Q Oh, you're right, sir. I'm sorry. Let me ask the question again to be clear. So let me check my

math. Okay. Let's do that again, okay? This time I'm going to say the right time.
A Okay.
Q All right. So for clarity for the court, you've indicated that in this hypothetical scenario if the ship would have diverted to Port Canaveral beginning at 19:45, the earliest possible scenario in which Mr. Smith could have been delivered to Cape Canaveral Hospital would be 23:36, correct?
A That seems accurate.
Q I'm sorry. Did you say that seems accurate?
A Yes. Do it off the top of my head, but on the screen it says 23:35. I think we've got a one minute difference there.
Q All right. So if I understand your opinion correctly, the basis for your opinion that the ship could have started its diversion to Port Canaveral at 19:45 is because you believe that's when the ship doctor would have completed his evaluation of the patient?
A It's when the ship's doctor stated in his documents that he had seen the patient.
Q Okay. So if Mr. Smith would have presented to the ship's medical center at 19:00, what you're saying that is within 45 minutes the ship's doctor would have completed his analysis and concluded that Mr. Smith


needed to be delivered to shore? Is that what you're saying in this hypothetical scenario?
A Yeah, that --
MR. HOFFMAN: Objection. Asking to speculate.
THE WITNESS: Yeah. Yeah. Sorry, sir.
BY MR. DRAHOS:
Q There was an objection. So let me just make sure that you understood my question and that you have answered it.
So under this hypothetical scenario that you have comprised, what you're saying is that if Mr. Smith would have presented to the ship's medical center at 19:00, the ship's doctor would have concluded by 19:45 that he required medical care ashore on an emergent basis?
A Yeah. I don't have an opinion on that. That's outside my scope and expertise.
Q I'm not asking whether or not that opinion was correct or should have been made. What I'm asking is: Your analysis in this particular case begins with Mr. Smith presenting to the medical center at 19:00 and the doctor making the decision at 19:45, correct?
A Correct. 19:45 is the timestamp that I saw that the doctor had evaluated Mr. Smith.
Q Okay. So if 19:45 would have been the moment


in time that the ship's doctor would have made that medical decision, how much time are you allotting for him to speak to the shoreside department at Carnival in discussion about diverting the vessel?
A I'm not allowing for any time at this time, sir.
Q So what you're saying is that the doctor and the doctor alone can command the ship's master to divert the vessel based upon his medical judgment?
A I'm saying that the ship's doctor, if it was diagnosed as a major medical event, should have communicated with the ship's master, and that they would have made their decisions on how to proceed from there. I'm not saying that he can command the master to deviate. I don't know how long it would take him to do these things. But I know that from the time that he had been evaluated to the time to shore, that was the calculations that I provided.
Q All right. But your hypothetical scenario that you've provided for here would require that to occur, right? You have the doctor making that decision at 19:45, and you also have the ship diverting course at 19:45, correct?
A Yeah. For hypothetical reasons, yes.
Q All right. So that would mean then that if it


required 15 minutes of communication between the doctor and the ship's bridge or the doctor and shoreside operations or the doctor, shoreside operations and the ship's bridge, your timeline would be added an additional 15 minutes, correct?
A 15 minutes, yes.
Q All right. And so in this particular case, can we agree that taking 15 minutes for the ship's doctor and the ship's bridge and the shoreside operations to talk about Mr. Smith's scenario would be a reasonable period of time before deciding to divert the vessel?
MR. HOFFMAN: Objection. Asking him to speculate.
THE WITNESS: Reasonable?
BY MR. DRAHOS:
Q Yes, sir.
A Can you repeat it?
Q I'm going to ask it in a different way.
A Okay.
Q How much time do you believe, Mr. Watson, would be required for a ship doctor, a ship's captain and shoreside operations to speak about diverting a vessel due to a medical emergency?
MR. HOFFMAN: Objection.

BY MR. DRAHOS:
Q -- anytime for that process?
MR. HOFFMAN: Objection. Asked --
THE WITNESS: -- Hoffman?
BY MR. DRAHOS:
Q Sorry. What was your answer, sir?
A My answer. I was just asking -- I apologized to Mr. Hoffman for stepping on him. That was all I said.
Q All right. Well, let me ask the question again because we need to get an answer.
How much time do you believe, Mr. Watson, is reasonable for a ship doctor, a ship captain and a cruise line's shoreside operations to confer regarding whether or not to divert the vessel for a medical emergency?
MR. HOFFMAN: Objection. Asking for speculation and outside the scope.
MR. DRAHOS: I'll take a form objection. That's all I need. If I need you to qualify it, I'll ask for it.
MR. HOFFMAN: Answer if you can.
THE WITNESS: From personal experience when I had the suspected stroke onboard, from the time that it was reported to me to the time that I was



turning the ship around was just a few minutes after contact with the Coast Guard.
BY MR. DRAHOS:
Q All right. So from your personal experience it takes a few minutes to take a commercial cruise line and divert its itinerary to an alternative port for a medical emergency. That's what you're saying?
A When I had my personal experience I diverted the cruise ship without conferring with our shoreside staff because the captain is ultimately responsible for the health and safety of every person onboard. The rest of it I would follow-up with as the ship was transiting towards the help that the individual needed.
Q So in this particular scenario what you're saying then is if the ship's doctor called the ship's captain of the Carnival Pride and said I have a medical emergency, I need to divert the ship to shore, he is to turn the wheel immediately. Is that what you're saying?
A He needs to be going through the motions pretty quickly to do so in my opinion.
Q Well, what's pretty quickly in your opinion?
A Within a few minutes. Checking the -- guess he would have to plot a quick position if it was a straight shot from where the ship was, but a new course, check for hazards and start diverting that way while



continuing radio communications with shoreside authorities and shoreside communications with their home office.
Q All right. So how much time have you allotted for the ship's captain of the Carnival Pride on the date in question to calculate the, quote, straight shot and check for any -- what did you put here -- hazards?
A It's matter of a few minutes, sir. It does not take much time to do those calculations.
Q And, Mr. Watson, I'm just going to ask more because this is going to get put on a transcript and read to a lot of attorneys here locally in town, and it sounds to me like you want to be an expert.
So what you're saying is that in the case of a medical evacuation involving a ship that has 6,000 lives on it, if the doctor calls the ship's captain and says I need to divert to shore 50 nautical miles away, he should spend a few minutes checking for hazards and calculating the quote-unquote straight shot? That's what you're saying?
A To a reasonable extent, yes. Diverting the ship when it's mile -- a ship that's 50 miles at sea doesn't have many hazards around it other than some traffic.
Q Okay. So --



THE COURT REPORTER: I'm sorry. I need a repeat on that. Doesn't have many hazards around it, and then what did you say, sir?
THE WITNESS: Other than traffic. If there was traffic in the area that would have been a hazard for the ship altering course. That would have been an immediate concern.
BY MR. DRAHOS:
Q Do you know anything about the traffic in the area on the night in question?
A I do not.
Q All right. Port Canaveral is the second busiest port in the world according to your analysis. What you're saying is that the captain could have figured out the navigating around all that traffic in a few minutes?
A Fifty miles at sea it's pretty spread out, but the -- it would be pretty easy to determine. I'm sure they have AIS, automatic identification system, and most of the other commercial traffic out there does as well.
THE COURT REPORTER: I'm sorry.
THE WITNESS: The systems do a lot of the calculations.
THE COURT REPORTER: I'm sure they have AI and...

THE WITNESS: AIS, automatic identification systems. And the other commercial traffic in the area would have those systems as well. And those systems help determine a lot of the calculations to how close the ships will be on a specific heading.
BY MR. DRAHOS:
Q And so just to be clear on this, and then we'll move on, you're saying the captain is to make that decision without conferring with shoreside operations or the United States Coast Guard?
A No. I would definitely be on the radio with the United States Coast Guard, but I would be trying to get the ship as close to a port as possible --
Q No, but I --
A -- to get the medical help that was necessary.
Q I'm asking you before the captain commits to actually turning the wheel of the ship towards Port Canaveral, are you saying he's to do that before conferring with shoreside operations or the United States Coast Guard?
A I would say let's get the Coast Guard involved as we're trying to determine where we would go. The Coast Guard would be within a couple of minutes. I'm talking VHF Channel 16. We have a medical emergency, and the Coast Guard would say please divert to this


approximate location. We'll start dispatching stuff hypothetical. That was my experience when I had my situation.
THE COURT REPORTER: I'm sorry, sir. You're not coming through clear for me. The Coast Guard would say...
THE WITNESS: I apologize. What was the last thing you got?
THE COURT REPORTER: Coast Guard would say please divert to this approximate...
THE WITNESS: Location. And they would, if it was going to be a small boat transfer, then they could help facilitate launching the assets out to them. In my personal case I made a 180-degree turn after clearing some traffic.
BY MR. DRAHOS:
Q So you're allowing the captain a couple of minutes to calculate for any hazards in direction and a couple of minutes to confer with the Coast Guard, correct?
MR. HOFFMAN: Objection. Misstating his testimony.
BY MR. DRAHOS:
Q Sir, before the ship captain turns the wheel, and I'm sort of being -- well, it doesn't matter.


Before the ship captain turns the wheel, sir, what you're saying is he has a couple of minutes to calculate his course and determine if there's any hazards, and he has a couple of minutes to confer with the Coast Guard. That's what you're telling us?
A Yes, sir.
Q All right. So how much total time, when you say couple of minutes, how much time are you allowing for that?
A Coast Guard call would probably take two to three minutes, and with the -- if he states I have a medical emergency, my doctor has a stroke onboard, it's not going to take the Coast Guard long to say that they want to try to get him off. That's my personal experience.
The electronic charting systems they have onboard would be pretty easy to get an approximate heading and have the ship turning in the right direction with a couple of clicks of a mouse. It's -- if I were to go up to the bridge of my ship right now and I was out in open water, I could you give you a range and bearing from one point to another point within about 30 seconds.
Q So in this particular case how much time are you giving specifically the ship's bridge to do that


calculation?
A I'd give them ten minutes. That far exceeds anything that I would need over here on my ship.
Q All right. How long does it take the Carnival Pride to turn 180 degrees?
A I don't have the handling characteristics of that ship, sir.
Q How long does it take the Carnival Pride to turn 90 degrees?
A I do not have the handling characteristics of that ship.
Q So when you calculated two hours and 11 minutes, you're just saying as the crow flies?
A It's a straight shot from the 19:45 using the average speed that was recorded in the ship's log.
Q All right. But did you account for any time that would be required to turn the ship's direction at all?
A No, sir. It was a direct shot from 19:45. I was using known locations based on the ship's log and the medical center records. I wasn't making up my own points.
Q All right. So does that mean then that at 19:45 whens the ship's captain decided that he was going to need to divert to Port Canaveral that he would not be

required to turn the direction of the ship?
A He would need to turn it at some point, yes, within that ten minutes that we're discussing.
Q So you have him turning the ship within this ten-minute period that he's also calculating hazards?
A Immediately it would have been traffic.
Q Right. But you have within the ten-minute period of time he's turning the ship and calculating hazards at the same time, correct?
A His bridge team would be doing so, yes.
Q All right. So I got to ask you, Mr. Watson, because it will be an issue in the case, why the urgency? Why making those decisions so quickly like that?
A If a person is having a stroke onboard is time not a concern for getting him the medical care needed?
Q Sorry? Is that a medical opinion, sir?
A No, sir. It's a operational opinion. You're asking me why the urgency. I'm explaining that the urgency would be based on the medical event that's occurring.
Q What about the specifics of this case?
A The specifics of this case?
Q Yes. Were you asked to just figure out the fastest possible way that you could get him to shore



without considering any of the other circumstances?
A I was asked to evaluate the feasibility of medical evacuation given three different scenarios. Well, not three different scenarios. I came up with my three different scenarios.
Q All right. Well, you did read the medical chart, right?
A Yes.
Q All right. And so that would mean then that you definitely read what's on Page 40 of the medical chart where it's written by the doctor at 20:34 that he specifically recommended that Mr. Smith remain in the ship's medical center, but Mr. Smith wanted to go back to his cabin. You saw that part, right?
A I did.
Q And you also must have then seen the part where specifically Mr. Smith was advised that he could be referred to a hospital when they reach Baltimore, but he preferred to go to a hospital in his own home where he was more comfortable. You saw that part too, right?
A I did read that, yes.
Q All right. And then you also then must have seen this against medical advice form that was signed by Mr. Smith at 20:42 indicating that he did not want to --
A Yes, I did.



Q -- medical center?
A Yes.
Q And so what you're telling the members of the jury and, by extension, the court, is that you believe this ship's captain should have turned that ship and sailed back to shore, giving him ten minutes to do so, in a circumstance where at the same time that all of this was supposed to be happening, Mr. Smith wanted to go back to his cabin. That's what you're telling us?
MR. HOFFMAN: Objection.
THE WITNESS: I'm sorry, Mr. Hoffman.
MR. HOFFMAN: No. Go ahead.
THE WITNESS: So repeat your question, sir. I'm sorry.
BY MR. DRAHOS:
Q Yes. So what you're indicating here to the members of the jury and to the court is that you're giving this ship's captain ten minutes to turn the ship and calculate any hazards to get back to shore while Mr. Smith is signing against medical advice forms stating that he wants to go back to his cabin?
MR. HOFFMAN: Objection. That's not --
MR. DRAHOS: Form is fine, Mr. Hoffman.
THE WITNESS: I would say that that's outside my expertise, sir. What I was asked to determine



is if it was feasibly optional to divert the ship, not whether -- not what happened inside the medical center.
BY MR. DRAHOS:
Q How is Mr. Smith's circumstance, the one that I've just read to you here where he specifically declined staying in the ship's medical center and specifically declined seeking shoreside medical care from the guy with the nose bleed that's currently on your ship right now? How are those two circumstances different?
A How are they different, sir?
Q Yes.
A They're not too different.
MR. DRAHOS: All right. Those are all the questions I have. Thank you very much.
MR. HOFFMAN: Can I get ten minutes and be right back?
MR. DRAHOS: How about five minutes, you know?
MR. HOFFMAN: I'll do my best. Okay.
MR. DRAHOS: All right.
MR. HOFFMAN: Thank you.
(Thereupon, a brief recess was taken.)

CROSS-EXAMINATION
BY MR. HOFFMAN:
Q Captain Watson, I wanted to go to Page 26 of your report, 25 and 26 of your report, which I'll bring up on the screen. Can you see my screen okay?
A Yes.
Q Yes?
A Yes.
Q I wanted to ask you where it says Page 25 to 26 and it says pilot boarding, speed reduction, and then it goes on to say at the very end that this would be approximately 75 to 105 minutes. And my question to you regarding this issue, this is about the -- what it would take for the pilots to go out to the ship to get -- in order to take a transfer of the passenger?
A That would be what it would take to get the ship to the berth, alongside the berth in Port Canaveral from the sea buoy or the pilot boarding area.
Q The 75 to 105?
A Yes.
Q That would be from the transport back from the buoy to the seaport?
A Correct. That's the two hours and 11 minutes previously stated was the open water transit. That 75 to 105 minutes was the transit from the pilot boarding



area/sea buoy into the approximate berth in, that we don't know which berth it would be. It was to the west turning basin and then allowing some time for maneuvering once in there.
Q Understood. Thank you. I appreciate that clarification. I want to start by asking about the nose bleed that you had today. The passenger with the nose bleed today, where was your vessel, you said?
A We're docked in New Bedford, Massachusetts.
Q And how did you learn of the incident?
A The guest utilized the medical emergency alarm from their room, which alerted me on the pilot house, and that's how I learned of what was happening. The room number was displayed on the alarm, and we made a call on the radio for crew to respond for the emergency.
Q And who made the offer of having care ashore?
A I did.
Q So --
A The first three people there was myself, my mate, the second in charge and the hotel manager.
Q Understood. So on your vessel today when you were notified, you personally put shoreside care in front of the passenger while the ship sat at the pier, correct?
A That is accurate.



Q Okay. Now, the Carnival Pride on October 18th, where was the ship at 19:45?
A Where was the ship? It was transiting northbound off the coast of Florida 40 -- I'd have to look, but I think it's 49 miles off the coast or 45 miles off the coast, somewhere in that range.
Q And of every record provided to you, does any one record that the master or the bridge of the Carnival Pride, does it indicate that on October 18th that they were notified Mr. Smith was in the medical center with a suspected neurological event?
A Negative. I have not seen any indication in the records supplied to me that the bridge was notified.
Q Does any record show a call to the Coast Guard?
A No.
Q October 18th?
A None at all.
Q Does any record show a call to Port Canaveral on October 18th?
A No, sir.
Q Does any record show a call to any shoreside authority on October 18th?
A No, sir.
Q Okay. And counsel read you the note that Mr. Smith was told he could be referred to a hospital



when he reached Baltimore. From the records, when do you understand the ship reached Baltimore?
A I believe it was October 20th.
Q So under your analysis, when could Mr. Smith have been at a hospital had the ship diverted at 19:45?
A Approximately?
Q Yes.
A Close to midnight, middle of the night on October 18th or the very, very early morning hours of October 19th.
Q So operationally then, not medically, what's the difference between what you did for your passenger today and what the records showed for Mr. Smith on October 18th?
MR. DRAHOS: Object to form.
THE WITNESS: Operationally?
BY MR. HOFFMAN:
Q Yes.
A So the records didn't show any offer of shoreside medical attention immediately.
Q And how does that differ from what took place on your boat with the nose bleed?
MR. DRAHOS: Object to the form.
THE WITNESS: Even though -- pardon me?

BY MR. HOFFMAN:
Q You can answer.
A Okay. From where I'm sitting here, the -- I'm sorry. Can you repeat it again? I got sidetracked. My radio just went off with some of the crew talking over here.
Q No worries. So the question was, operationally what was done differently on October 18th on your boat -- or what was done operationally different on your boat for the nose bleed versus what took place on October 18th for Mr. Smith?
MR. DRAHOS: Object to the form.
THE WITNESS: Operationally I would say the bridge was notified immediately of a potential emergency onboard and emergency care was -- or emergency care was offered immediately for the person to make their own decision.
BY MR. HOFFMAN:
Q Understood. And earlier counsel had showed you the against medical advice form. Do you recall seeing that form?
A Yes, I do.
Q Do you recall the timestamp?
A I do not.
Q If I were to tell you that it was 20:42, would



you have any reason to contest that?
A No. I would not have any reason to, no.
Q And your assumed decision point, what time did you use as a marker?
A What time did I use as a marker for what? You broke up.
Q As a marker for when Mr. Smith was seen by the doctor.
A 19:45 I saw in some of the medical records where the doctor had noted that Mr. Smith had been evaluated.
Q Now, I've read the conclusions of your report and I just want to be clear. Does your report state the vessel command should have ordered a diversion at 19:45?
A No.
Q Okay. Thank you. Let's see. Regarding the buoys I wanted to ask what was the primary source for the conditions on the ship that you had reviewed?
A The ship's logs.
Q Okay. And the buoys that you used, what were the buoys used for?
A What were they used for?
Q Yes.
A To determine -- to determine what the weather events were at sea level. One thing that should be



noted in our discussions here is that Carnival Pride is a very tall ship and they may experience higher winds on the top of that ship versus a few feet above sea level. So that's another important factor that should be considered there, but the -- a diversion of the ship for either entering port, medical evacuation by vessel at-sea transfer or a helicopter transfer. So I was trying to see what those options were and whether it would have been possible for the -- for those operations to have occurred.
Q Okay. And I think Buoy 41113 was discussed, and that sits adjacent to the Port Canaveral ship channel?
A Yes, it does.
Q And why was that location relevant to your analysis?
A Had the ship diverted towards Port Canaveral for medical evacuation of Mr. Smith, if the conditions were significant, it might have prevented the ship from being able to enter the port. So I wanted to see if that was going to be a factor in the feasibility of the evacuation. And if the ship wasn't to enter port, I also wanted to see what the seas were in the area for vessel-to-vessel transfer so that the ship could have proceeded on its voyage while still getting medical care



for Mr. Smith.
Q Okay. Sorry. I was pulling up a document. So Conclusion 7 states, the diversion of the Carnival Pride toward Port Canaveral was operationally feasible based upon the vessel's reconstructed position, reported speed, navigational access and apparent operating condition. I identified no navigational propulsion, steering or weather condition in the records reviewed that established that such a diversion was operationally precluded.
And my question is: Conclusion 7, is that based on the buoys or the deck log?
A A little bit of both. So I was, at the time I was looking at it as apparent winds. And then a ship of that size operates in lis texa (sic) conditions, I'm not going to say frequently, but fairly often, and being able to turn the ship and run towards the coast was -- in my -- I was in four-foot seas on the way to New Bedford yesterday with a ship a third of the size of the Carnival Pride. So seeing three- to four-foot seas at the sea buoy for a vessel three times the size of mine was not concerning.
THE COURT REPORTER: I'm sorry. What conditions did you say? I didn't hear the word before conditions. Operates in...

THE WITNESS: I said, my vessel operated in four-foot seas yesterday on the way here.
THE COURT REPORTER: No, no, no. I'm sorry. The Pride. A ship of that size operates in some kind of conditions.
THE WITNESS: Operating in three- to four-foot conditions would not be a concern being that my vessel was a third of the size and was able to do so yesterday.
THE COURT REPORTER: Thank you.
BY MR. HOFFMAN:
Q Thank you, Captain Watson. I want to ask, earlier Mr. Drahos asked about whether a 200-ton license limits you to 200-ton ships, and you stated that that is not true. Is that accurate?
MR. DRAHOS: Object to the form.
THE WITNESS: No, it does. It does limit me to 200-ton ships, 200 tons domestic tonnage.
MR. HOFFMAN: Okay.
THE WITNESS: For comparison purposes, the international tonnage of this ship, which is what the Carnival Pride uses, is over 3,000 tons, over 3,000 tons. So it's still not a big difference for the ship, but it's -- if we're looking at it for international tonnage, the Coast Guard has a very



funny way of working their tonnage. So my license is 200 tons domestic tonnage, whereas international tonnage shows the ships to be larger.
BY MR. HOFFMAN:
Q Understood. I'm looking at Conclusion 3, Page 32 of your report. Let me share it real quick. Can you see the screen okay?
A I was trying to. There it goes. It's up now.
Q So Conclusion 3 states, at approximately 19:45 the Port Canaveral approach sea buoy was approximately 47.4 nautical miles from the vessel's reconstructed position on an initial bearing of approximately 275. Is that gross tons? No. It's 275 degrees.
A Degrees, true. That would be the course that the ship would have to steer to get to port and...
Q And then Number 4 says, using the vessel's average recorded evening speed of approximately 21.72 knots, the theoretical open water transit to the Port Canaveral approach was approximately two hours and 11 minutes. Additional time would have been required for pilotage, channel transit, maneuvering, patient transfer and ground transportation.
And my question is: Does the size, tonnage or passenger count of the vessel change how 47.4 nautical miles at 21.72 knots is calculated?



A No, sir.
Q And where did the speed come from that you used?
A Once the ship left Freeport, Bahamas I used what appeared to be their cruising speed for the evening, and I believe Mr. Drahos has the timestamps and the notes that I had there, that I used those, and then I did an average of those speeds.
Q Does cruising speed mean maximum speed?
A No, sir.
Q So if this was the cruising speed, would it be fair to conclude that the boat was able to go faster than the speed that you used for your calculations?
MR. DRAHOS: Object to the form.
THE WITNESS: That would be my understanding.
BY MR. HOFFMAN:
Q Okay. And how long have you had a Coast Guard master's license?
A For just about 25 years, sir.
Q And approximately how many nautical miles underway?
A Over 300,000.
Q And could you tell me what are the types of vessels you have commanded and in what waters?
A I have commanded tall ships, sailing ships,



offshore supply vessels, private yachts, charter boats and these small cruise ships upon the coastal waters between Maine and Key West, Florida, the gulf coast between Key West and coast of Texas, Puget Sound and yacht work throughout the Bahamas and Caribbean.
Q Okay. And as a master what decisions have you been responsible for?
MR. DRAHOS: Object to the form.
THE WITNESS: All decisions, sir.
BY MR. HOFFMAN:
Q Could you give a little bit more detail for the court as to what all decisions means as far as your position as a master?
A It's up to me to, first of all, be responsible for the health and safety of everybody onboard. If there is an emergency, I make the decisions to contact the authorities and what speed I would set to facilitate that. I would be responsible for adjusting the ship's speed depending on weather or postponing ship's sailing schedules based on weather, understanding the mechanical systems onboard the ship and whether they're functioning and whether delay should be implemented to help promote or to provide repairs, if necessary. All operations of the ship fall on my shoulders.
Q And how does that bear on reconstructing a

vessel's position from a deck log?

A How does that bear on -- are you asking about me reconstructing the position?

Q As a master are you able to reconstruct a vessel's position from a deck log?

A With known timestamps, which I got from the medical records, yes. I was able to take the closest known position and speed and course and then determine how far the ship would have traveled in the given time between the time in question and the known position. Plotting that back onto the electronic charts would give me the position, approximately, based on the recorded speeds and courses.

Q So how does this bear on your opinion that a diversion towards Port Canaveral was operationally feasible?

A Forty-seven miles on a ship that does 20-plus knots, it seems very feasible to be able to do that. There was no reason that anywhere in there that shouldn't have been an operational feasible occurrence.

Q And this is based on your skills as a master for assessing position, speed, operating condition and port access?

A Yes, sir.

Q When you were told on the bridge that a



passenger might be having a stroke, what was the first thing you did?

A First thing I did was -- the mate was not the first one on scene. So I had the mate on scene within a minute or two, and he confirmed the initial report, and at that point I picked up the microphone and then I recorded it -- reported it to the Coast Guard.

Q And what do you report when you contacted the Coast Guard?

A Told them the ship's position, course and speed, that there was reported medical emergency on board, the symptoms of the medical emergency and requesting guidance on evacuation of the individual so that we could get them the care necessary.

Q So after you were told that a passenger might have a stroke, the first thing you did was contact the Coast Guard. What was the second thing you did?

A Continued my communications with the Coast Guard. And when the Coast Guard said that they wanted the ship to rendezvous with a small boat that they were going to dispatch, I was -- I turned the ship around and was headed back to -- towards Newport to facilitate that.

Q And how much the time passed --

A And I -- go ahead.



Q No, please.

A I was going to say there was traffic in the area. I did a quick evaluation of the traffic. That took maybe a minute, and I was turning the ship around. And I had probably a half dozen vessels or more that were within maybe a mile, mile and a half of me. So that was requiring some attention for a minute, but we were -- we were on a reciprocal course relatively quick.

Q And how much time passed between the report reaching you and the ship turning?

MR. DRAHOS: Objection.

THE WITNESS: Not more than five minutes. Less than five minutes, sir.

BY MR. HOFFMAN:

Q Okay. And the medical evaluation counsel asked about regarding the passenger physician, did that happen before or after the ship was already turned around and the Coast Guard notified?

A When the doctor evaluated him?

Q Yes.

A So that happened after the ship was turned around and the Coast Guard was notified.

Q Okay. And who made the decision to cancel the rendezvous with the Coast Guard?

A Ultimately that was my decision based on the



information available to me from the medical individual, the medical professional that had onboard.

Q Okay. On the Carnival Pride on October 18th was there a physician onboard?

A To the best of my knowledge, yes.

Q And of the records -- I'm sorry?

A The records indicate that.

Q And of the records provided, is there any entry that the ship's doctor's evaluation reached the bridge?

MR. DRAHOS: Object to the form. It's been asked.

THE WITNESS: No.

BY MR. HOFFMAN:

Q You said no?

A I said no.

Q Mr. Drahos had gone through Section 6.6 which had four time components.

A Hm-hm.

Q And I think the last two, patient transfer to EMS was 15 to 30 minutes and ground transport was ten to 20. Does your opinion that the Carnival Pride could have reached the Port Canaveral berth depend on either of those last two components?

A No, sir.

Q Okay. When did Mr. Smith actually reach

Page 106

shoreside care?
A I don't know what time. I believe the records indicated he was transported ashore for medical care by ambulance on October 20th, but I don't know what time.
Q Okay. And the two hours and 11 minutes that you used for the calculation of the open water transit, counsel called it as the crows flies. And I want to ask, where did you measure to get two hours and 11 minutes?
A The distance from DR02 and 19:45 estimated waypoint and the -- between that waypoint and the sea buoy, and then I used the ship's average speed to calculate a reasonable time.
Q Did you use a program in order to come up with this calculation?
A No, sir.
Q And bringing you back to Section 6.6, is any number in Section 6.6 not derived from the deck log or a chart measurement or the ship's own free port channel speed?
MR. DRAHOS: Object to form.
THE WITNESS: Say it again please.
BY MR. HOFFMAN:
Q Is any number in Section 6.6 not derived from the deck log, a chart measurement, the ship's own free

Page 107

port channel speed or published port or hospital source?
MR. DRAHOS: Object to the form.
THE WITNESS: So the 7.5 was from the ship's log, and I allowed for a little bit less time for the maneuvering inside the wet basin there.
BY MR. HOFFMAN:
Q Okay. Thank you for that. I want to ask, counsel had you agree that you offered no hypothetical scenario for a small boat transfer or helicopter, correct?
A Correct.
Q And I believe Conclusion 8 on Page 33 says, at-sea surface transfer and Coast Guard helicopter evacuation were additional operational pathways that could have been requested and evaluated. Their actual execution would have depended upon environmental conditions, responder availability, asset capability, and determinations made by the responding authorities. Is that still your opinion today?
A Yes, it is.
Q And what's the difference between a pathway that could have been requested and evaluated and one that would have occurred?
MR. DRAHOS: Object to the form.
THE WITNESS: Well, the -- uh, my understanding

Page 108

of Mr. Drahos' question was that I was not offering an opinion of those pathways. But the pathways remained operational had they been requested and would have been determined not by my evaluation sitting here at a computer, but by the master of the vessel and the responding authorities in determining which one would have been feasible or available to them.
BY MR. HOFFMAN:
Q And who decides whether a Coast Guard asset launches once they're contacted by the master?
A The Coast Guard makes the final decision on which is the best path.
Q Okay. So at 6.4 you state, I do not have sufficient information to conclude that a surface transfer could safely have been completed at a particular time on October 18th, 2024. Is that still your conclusion?
A Yes, sir.
Q And that's in your report, correct?
A Yes, it is.
Q Do you withdraw, narrow or soften any of your conclusions today?
MR. DRAHOS: Object to the form.
THE WITNESS: No.

Page 109

BY MR. HOFFMAN:
Q The 27 pages of deck log you reviewed, what date do they cover?
A October 18th, 2024.
Q Is the 19:45 position, the 20:00 hour position in every speed you used on those pages?
A The 19:45 position is a estimate position based off of the 20:00 hour position. I plotted the 20:00 hour position with the ship's speed at 20:00 hours and backed it up 15 minutes with the 19:45 position using a reverse course.
Q Okay. And that was derived from the 27 pages of deck log you reviewed?
A Yes, it was.
Q Okay. Who signed the deck log?
A I believe it was the master of the vessel. I don't have his name.
Q Okay. And counsel asked about Exhibit 1, your working notes. Are those notes your report?
A They are not my report.
Q Okay. And the second busiest cruise port line, is that in your report?
A It is not.
Q Okay. Does any conclusion rest on it?
A No.

Q The April 2025 ambulance line, is that in your report?
A No.
Q And does any conclusion rest on it?
A No.
Q Did you research Carnival's evacuation procedures or Coast Guard policy?
A No.
Q You had stated earlier that you had participated in a medical evacuation where Shell had sent out their own helicopter; is that correct?
A Yes, it is.
MR. DRAHOS: Form.
BY MR. HOFFMAN:
Q Was the helicopter that was used by Shell, was that in lieu of reaching out to the Coast Guard for help?
A Yes, it was.
Q Do you know if there's anything that prevents a commercial cruise line from having a helicopter for evacuation purposes?
MR. DRAHOS: Object to the form.
THE WITNESS: There is none that I'm aware of.
BY MR. HOFFMAN:
Q Okay. To what standard are the opinions in



your report held?
A To what standards?
Q Are your opinions held to a reasonable degree of professional certainty within the maritime vessel operations?
A Yes, they are.
Q I want to take us to Exhibit L of your report. I'm going to share the screen here. Are you able to see the screen okay?
A Yes, I can.
Q Okay. Could you tell me what this document is? It seems to be titled Operational Medical Evacuation Pathways.
A Correct.
Q Okay.
A It's essentially a flow ch -- go ahead.
Q No, please.
A Yeah. It's essentially a flow chart showing -- plus the medical determinations made that the notification to the master or the bridge should be made and then the operational coordination. Depending on where the ship is and what assets are available, we have basically three choices to choose from to try to facilitate emergency evacuation for an individual.
Q So whose job is it to act first in this



situation?
MR. DRAHOS: Object to the form.
THE WITNESS: I would say the person making the medical determination.
BY MR. HOFFMAN:
Q So that would be the physician or the medical department?
A In this situation, yes.
Q Okay. And who acts second after that first determination is made?
A I'd say the medical determination, once that's made, needs to be relayed to the bridge or the captain, depending on where he's at or what's going on.
Q And what do the records show about whether the second box was reached on October 18th?
MR. DRAHOS: Object to the form. How many times you going to ask this, Mr. Hoffman?
THE WITNESS: The records do not show that that happened.
BY MR. HOFFMAN:
Q And has anything that you were asked or shown today changed any conclusion or any position, distance bearing, speed or elapse time figure in your report?
A No, sir.
Q Okay. Counsel was asking you earlier about the



wind and rolling and the 37.8 knots language at 19:45. And I want to ask what was the wind speed at 20:00 hours?
MR. DRAHOS: Object to the form.
THE WITNESS: 20:00 hours, sir?
BY MR. HOFFMAN:
Q Yes, sir.
A That would be the 37 knots that they recorded on the bridge logs.
Q Okay. And where in the October 18th log does 37.8 appear?
A It's the -- I would have to look at them, but if you look at the 20:00 hour hourly observations, that would say -- it would show wind speed.
Q Okay. So if you can take a look at the October 18th log, I can pull it up if you need me to.
A Yes, please do.
Q Okay. One second please. Sorry. I'm just going to open up this log real quick. Okay. Go back to sharing my screen here.
And so the question was, the 37.8 knots that was referenced -- I'm looking here. It seems that -- let's see. Page 846.
A You passed it.
Q I passed it?

Page 114

A Yep.
Q Where was it?
A Should be at the 20:00 hours in the left lane, in the left column. There we go. It should show hourly observations.
Q Okay.
A Let me see here. Ship's speed.
Q The question was, where does it say 37.8 knots?
A It shows 32.7 actually, on this one.
Q I believe Mr. Drahos made a reference to 37.8 knots, and I'm asking if you see that.
A Not for the 20:00 observations.
Q Okay.
A 37.8 was at 18:00 hours. That would be an hour before. That would be an hour before the time in question.
Q It was a full hour and 45 minutes before the decision point, correct?
A Before the decision point, yes, sir. An hour and two minutes before the records show he presented to the medical center.
Q Okay. And then at the 21:00 hour it says that it was pitching gently and not rolling. What does that mean for the stability of the boat?
MR. DRAHOS: Object to the form.

Page 115

THE WITNESS: Pitching gently means that the vessel is experiencing some motion, but based on my opinion it wouldn't have been excessive.
BY MR. HOFFMAN:
Q And what does not rolling mean?
A Not going side to side. The ship was going fore and aft or bow down, bow up, but not rolling port to starboard.
Q On the commercial vessel that you're captain of now, does it have technology that mitigates pitching and rolling?
A The one I'm on today does not. It's one of three on this coast that don't. Most of them do.
Q And what is it that, what technology are you referring to?
A Stabilizers. Our particular vessels are utilizing fins that extended out from the center of the ship approximately 12 feet. They're active stabilizers. So they rotate down 25 degrees, up 25 degrees. There's a vertical reference system that's in the system there and it anticipates the roll of the ship to help reduce the roll of the ship.
Q Thank you. Counsel represented that the log reports true wind. And what does your report say about that possibility?

Page 116

MR. DRAHOS: Object to the form.
THE WITNESS: It doesn't specify whether it's true or apparent. Most vessels I've experienced are usually reporting apparent.
BY MR. HOFFMAN:
Q And if the value is already true wind does a correction apply?
A No. If it's already true wind then the correction would not be necessary.
Q And does any position, distance, bearing, speed or elapsed time figure in your report depend on whether the wind is true or apparent?
A No. The wind speed, if it was apparent wind, would be less because the wind was coming from the bow and the ship was moving ahead. So the true wind speed would be less than recorded if it was apparent directions that they were providing.
Q Okay. And what did you identify in the records that established that a diversion towards Port Canaveral was precluded by weather or a sea state?
A Precluded?
Q Yeah.
A Can you say it again please?
Q If there was, was there anything in the records that established that a diversion towards Port Canaveral

Page 117

was precluded by weather or sea state?
A No, sir.
MR. HOFFMAN: Captain Watson, I don't have any further questions. Thank you.
MR. DRAHOS: You can read or waive the transcript. That means you can read to it make sure the court reporter took down everything accurately, or you can waive that right. It's up to you, but you got to let her know.
MR. HOFFMAN: We'll read.
MR. DRAHOS: That's everything for today. Mr. Watson, thank you very much for your time.
THE COURT REPORTER: Are there any orders?
MR. DRAHOS: Yes. I'll be ordering.
MR. HOFFMAN: Yeah. I'll be ordering as well.
MR. DRAHOS: And, Mr. Watson, I just want to remind you to please send the spreadsheet that we've marked as an exhibit so we can get that attached to the transcript.
THE WITNESS: I will do so immediately, sir.
(Thereupon, at 5:02 p.m. the deposition was concluded, after which Defendant's Exhibits A through F1 and G through I were marked for identification.)

CERTIFICATE OF OATH

State of Florida )
)
County of Broward )

I, the undersigned authority, certify that CAPTAIN ERIC WATSON personally appeared before me via videoteleconference and was duly sworn.

WITNESS my hand and official seal this 27th day of September, 2026.

Dorothy L. Hutchison,
Notary Public, State of Florida
My Commission No. HH 671939
Expires: August 29, 2029

Personally Known___ Or Produced Identification: X
Type of Identification Produced. Driver's license



State of Florida )
)
County of Broward )

I, Dorothy Hutchison, Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were remotely taken before me at the time and place therein set forth and were taken down by me stenographically and thereafter transcribed into text under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: September 27, 2026.

Dorothy L. Hutchison
Shorthand Reporter



WITNESS NOTIFICATION LETTER

September 27, 2026

Capt. Eric Watson
C/O MICHAEL A. HOFFMAN, ESQUIRE
1011 South Federal Highway
Hollywood, Florida 33020

In Re: MICHAEL SMITH vs. CARNIVAL CORPORATION
Deposition taken on 9/14/26
US Legal Support Job No. 7226341-001

The transcript of the above proceeding is now available for your review.

Please call to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a US Legal Support office located nearest you.

Please complete your review within 30 days from the date of this letter.

Sincerely,

Dorothy Hutchison, Court Reporter
US Legal Support, Inc.
100 Northeast Third Ave. Suite 470
Fort Lauderdale, FL 33301
(954) 463-2933

CC: via transcript:



ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE
IN RE: MICHAEL SMITH vs. CARNIVAL CORPORATION
CAPTAIN ERIC WATSON
9/14/26
US Legal Support Job No. 7226341-001

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

__________ ______________________________
Date CAPTAIN ERIC WATSON

**Please forward original signed errata sheet to US Legal so copies may be distributed to all parties.