Smith v. Carnival Corp., et al., No. 1:25-cv-24611-GAYLES/SHAW-WILDER (S.D. Fla.)

# EXHIBIT A

Deposition of Nikhil Maharaj, M.D. (Oct. 8, 2026)

*Plaintiff?s Motion for Leave to Take the Deposition of Defendant Letlhogile Rantleru, M.D., After the Discovery Cutoff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-cv-24611-DPG

MICHAEL SMITH,

Plaintiff,

-vs-

CARNIVAL CORPORATION and
NIKHIL MAHARAJ, MD,

Defendants.
_______________________________________/

Via Zoom Videoconference

Thursday, October 8, 2026
9:12 a.m. to 3:14 p.m.

VIDEOTAPED DEPOSITION OF

NIKHIL MAHARAJ, M.D.

Taken before Kimberly Cherena, Court Reporter, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition Duces Tecum filed in the above-styled cause.

APPEARANCES:

On Behalf of the Plaintiff:
DAVID W. SINGER & ASSOCIATES, P.A.
1011 South Federal Highway
Hollywood, Florida 33020
954-920-1571
mahoffman@1800askfree.com
BY: MICHAEL A. HOFFMAN, ESQ.

On Behalf of the Defendants:
GRAYROBINSON, P.A.
151 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
561-268-5727
michael.drahos@gray-robinson.com
BY: MICHAEL J. DRAHOS, ESQ.

Also Present:
Ron Hoffman, Videographer

INDEX

TESTIMONY OF NIKHIL MAHARAJ, M.D.


| | PAGE |
|---|---|
| Direct Examination by Mr. Hoffman | 7 |
| Cross-Examination by Mr. Drahos | 216 |
| Certificate of Oath | 238 |
| Certificate of Reporter | 239 |


INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS MARKED


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Taking Deposition Duces Tecum | 11 |
| Exhibit 2 | Dr. Maharaj's CV | 22 |
| Exhibit 3 | Carnival Interview | 28 |
| Exhibit 4 | Review from Dr. Raju | 31 |
| Exhibit 5 | Review from Dr. Ashok | 31 |
| Exhibit 6 | Conditional Offer of Employment | 38 |
| Exhibit 7 | Medical Team On-the-Job Training | 48 |
| Exhibit 8 | Medico/Medevac Check Sheet | 68 |

INDEX OF EXHIBITS (CONT.)

PLAINTIFF'S EXHIBITS MARKED


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Roles and Responsibilities for Doctors | 69 |
| Exhibit 10 | Itemized Bill | 77 |
| Exhibit 11 | Policy - Med 3104A2 | 80 |
| Exhibit 12 | Policy - Med 3104A5 | 81 |
| Exhibit 13 | Roles and Responsibilities for Senior Doctors | 89 |
| Exhibit 14 | Against Medical Advice Forms | 92 |
| Exhibit 15 | SeaCare Case File | 107 |
| Exhibit 16 | Guest Disembark Email | 112 |
| Exhibit 17 | iCare Comment Log | 113 |
| Exhibit 18 | Independent Contractor Agreement | 118 |
| Exhibit 19 | Answer and Affirmative Defenses to Plaintiff's Amended Complaint | 123 |
| Exhibit 20 | Policy - Med 3102 | 165 |
| Exhibit 21 | Carnival Triage Policy | 180 |
| Exhibit 22 | Security Log | 182 |
| Exhibit 23 | Affidavit | 183 |
| Exhibit 24 | Letter from Sister | 197 |

INDEX OF EXHIBITS (CONT.)

PLAINTIFF'S EXHIBITS MARKED


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 25 | Reply from Carnival | 197 |
| Exhibit 26 | Performance Evaluation | 200 |


(Exhibits were retained by Mr. Hoffman.)

DEFENDANTS' EXHIBITS MARKED


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Against Medical Advice Form | 220 |
| Exhibit B | Against Medical Advice Form | 222 |
| Exhibit C | Medical Chart | 226 |
| Exhibit D | Affidavit | 236 |


(Exhibits were retained by Mr. Drahos.)

THEREUPON:

THE VIDEOGRAPHER: Okay. Good day, everyone. Today's date is October 8, 2026. The time is now 9:12 a.m. This is the video deposition of Dr. Nikhil Maharaj in the matter of Smith v. Carnival Corporation, et al. Our court reporter is Kimberly Bherena (sic) of Cogent Legal Services, and the videographer is Ron Hoffman of Cogent Legal Services.

Will counsel please announce their appearance for record, and Madam Court Reporter, you may swear in the witness.

MR. HOFFMAN: Attorney Michael Hoffman for the plaintiff, Michael Smith.

MR. DRAHOS: And this is Michael Drahos from the law firm of GrayRobinson, on behalf of the defendant, Carnival Corporation, and Dr. Nikhil Maharaj.

Before the witness is sworn in, I have a brief statement to make for the record. Dr. Maharaj is appearing here today voluntarily, without the need for subpoena, by stipulation of the parties. His appearance is not to be construed as a waiver of his pending personal jurisdiction challenge.

Also, both myself and Dr. Maharaj want to

state on the record that we do not give our consent to have our voices recorded by anyone other than Ron Hoffman, the videographer. We particularly do not give permission to have our voices recorded by any AI third-party database. Thank you.

THE REPORTER: Thank you very much. The witness presented identification before the record began.

Sir, can you please raise up your right hand?

NIKHIL MAHARAJ, M.D.,

having first been duly sworn, testified as follows:

THE REPORTER: Thank you very much.

You guys may begin.

THE WITNESS: Thank you.

DIRECT EXAMINATION

BY MR. HOFFMAN:

Q. Okay. Dr. Maharaj, good afternoon, right? You're -- 3:00 your time?

A. Yes, that's correct, sir. Good afternoon.

Q. Good afternoon. So my name is Michael Hoffman. I represent Michael Smith. Before my first question, two things. Earlier in the case, I had asked for discovery that touched on your health. When I learned the timing of everything, I withdrew those requests on the records, and I will not ask you about

your health today. I only wish you good health and to be well, okay?

Second, most of my questions today are about -- are about what Carnival gave you to work with on the Pride, the training, the protocols, the support, and what it did not, okay? So if a question is unclear, tell me and I'll fix it.

Have you ever been deposed before?

A. No, sir.

Q. Okay. So just a couple, I guess, ground rules. While I was speaking, you were nodding your head, acknowledging that you understand what I said, but in order -- when we do the deposition, it's very natural for us to do those things, but I do need you to verbalize your answers for the purpose of the court reporter taking down your words.

If I ask a question, again, you don't understand, let me know. I'll rephrase it. If your attorney objects, give them a moment to finish their objection, and then go on to answer the question, unless your attorney advises you not to. And if you need a break, let me know. I just ask that we finish whatever section we're in and then, you know, take a break. So if you give me a little bit of a heads-up that -- if you need a break coming up, but we should break regularly.

Do you have any questions or is everything clear?

A. Yes. Everything's clear. I understand.

Q. All right. Thank you. Could you tell me where you are right now?

A. Currently in Durban, South Africa.

Q. Okay. And is there anyone else in the room with you?

A. No. No one's in this room.

Q. Okay. And do you have any documents in front of you?

A. Documentation as in?

Q. Just any documents or screens or phones or anything in front of you at this moment.

A. Yeah. I have my cell phone next to me, a few reading books next to me. It's just part of my desk setup.

Q. Okay. Okay. Nothing related to the case in front of you? No documents related to why we're here today?

A. I -- no. So I do have the case notes. Am I allowed to have that next to me?

Q. Yes, sir. You are. And I'm -- I'm going to share those with you as well. You're referring to the 42 pages of the medical summary?

A. Yes, sir.
Q. Thank you. Could you tell me what you did today -- what you read today to prepare?
A. Briefly overview of the case notes, the 42 pages that you just mentioned.
Q. Okay. And did you have an opportunity to read Nurse Dube's (phonetic) deposition?
A. Nurse Dube? No, I did not read her deposition.
Q. Okay. And did you see any reports from Dr. Parejo or Dr. Gomez?
A. I did, and I did manage to read those, skimmed through it.
Q. Okay. And Dr. Merkler's (phonetic) report?
A. I'm not sure exactly whose report, but I did skim through a few doctor's reports that were included in the notes.
Q. Okay. And when you say the doctor's notes, you mean the expert reports that were provided to you by Counsel?
A. Yes, that's correct.
Q. Okay. Thank you. Other than lawyers, and I don't want to know any conversations that you've had with your lawyers, have you talked to anyone about Mr. Smith since October 20th, 2024?

A. No, sir.
Q. Okay. You never spoke with Dr. Rotlaru (phonetic) after Mr. Smith's departure, about him --
A. No.
Q. Okay. And did you ever talk to anyone in Carnival's shoreside medical department after Mr. Smith's departure?
A. No.
Q. Okay. I'm going to share my screen. I'm going to show you -- did you -- in order for you to appear today, I had given your attorney, it's called a Notice of Taking Videotaped Deposition Duces Tecum. Did you -- I'm going to share the document on my screen.
MR. HOFFMAN: I'd like to have this marked as Exhibit A.
(Exhibit 1 was marked for identification.)
THE WITNESS: Sure.
BY MR. HOFFMAN:
Q. Are you able to see my screen okay?
A. Yes, I can.
Q. Okay. Have you seen this document?
A. I'm not too sure. Are you able to scroll down a little bit so I can familiarize myself?
Q. Absolutely. Yes. Yes. So this is just the time and the date and the -- some of the logistics. And

then here, it's the scope of the examination of what we'll be discussing.

A. I can't recall if I've seen this or not. I apologize.

Q. Understood. Okay. So the scope of the examination will be talking about the Plaintiff's presentation symptoms, all diagnosis made or considered, any stroke assessments, diagnostic testing, treatment decisions, communications with shipboard nurses and Carnival's shoreside medical. Is this the first time you've seen this document?

A. I think it might be.

Q. Okay. That's fair. So on Page 4 of the document, there's a list of documents that are requested. Would it be fair to say that you've never seen this list either?

A. Yes, that's fair.

Q. Okay. Do you have any handwritten notes or personal logs that you created that -- from your time when -- between October 18th and October 20th, 2024?

MR. DRAHOS: Object to the form.

THE WITNESS: Are you referring to -- sorry for disturbing, but specifically with regards to this case?

BY MR. HOFFMAN:

Q. Yes, concerning the plaintiff.
A. No. No.
Q. Okay. All right. Do you recall Mr. Smith being on the boat?
A. Yes, I do.
Q. Okay. Thank you. All right. I want to ask, in October 2024, did you have your personal cell phone on the boat?
A. Yes, I did.
Q. Okay. Is it the telephone that you use today?
A. October 2024, no.
Q. Okay. Did you have -- when you purchased your new phone, did you upload all the information from the old phone?
A. Majority.
Q. Okay.
A. Yes.

Ex. D
13:18-14:9

Q. Understood. Did you have WhatsApp or another messaging application on it in October 2024?
A. Yeah, I use WhatsApp.
Q. Okay. Was there any group chat with the medical team on the Carnival Pride?
A. Yes, we did have group chat.
Q. Okay. And do you still have that group chat?
A. Not from Pride, no.

Ex. D 13:18-14:9

Q. Okay. What happened to it?
A. Usually when you exit, you're exited off the group by the lead nurse or the doctor. That's it.
Q. Okay. Was it a chat that was established by Carnival or by Dr. Rotlaru, or do you know?
A. Yes. It's usually as part of the handover, the senior doctor will hand over admin to the next senior doctor, and then they'll be in charge of recruiting people in the chat.
Q. Could -- I'm sorry, could you hold on one second? I apologize.
A. Okay.
MR. HOFFMAN: Can you go off record? I'm sorry.
THE VIDEOGRAPHER: Okay. The time is 9:21. We're going off record.
(A recess was taken.)
THE VIDEOGRAPHER: Okay. The time is 9:24. We're back on record.
BY MR. HOFFMAN:
Q. Okay. So Dr. Maharaj, when we were just talking, I was asking you about WhatsApp, and you had said that there was a -- a WhatsApp group that was established by Carnival, that the admin would turn over to the next crew, or -- could -- could you please

Ex. D 15:3-9

continue what you were saying?

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah, sure. So I'm not exactly sure who established it, if I'm being 100 percent accurate, but usually the lead nurse or the senior doctor would be admins, and then they pass it over once they complete their contracts, and they're responsible for pretty much kicking people off the group once they leave the -- or debark the vessel.

BY MR. HOFFMAN:

Q. Okay. And did you have any chats separate from the group with Dr. Rotlaru?

A. WhatsApp chats? I honestly can't recall.

Q. Okay. Did you have any other messaging app where you would communicate with Dr. Rotlaru directly?

A. Directly, yes. We -- I stayed in contact by -- just in a friendly relationship, maybe calling him once or twice after the crew, after the -- after I debarked.

Q. Okay. And did you ever have any text messages or messaging with him while on the boat?

MR. DRAHOS: Object to the form.

THE WITNESS: Honestly, I -- I can't remember.

BY MR. HOFFMAN:

Q. Okay. Would you still have that chat in your

WhatsApp if you did have conversation with him?
MR. DRAHOS: Object to the form.
THE WITNESS: Most likely, if -- if it's been restored.
BY MR. HOFFMAN:
Q. Okay. Well, if you do have that, could you please preserve it, please?
MR. DRAHOS: We object to that.
THE WITNESS: Okay.
BY MR. HOFFMAN:
Q. Thank you. And did you ever discuss Mr. Smith with Dr. Rotlaru outside of the time period of October 18th to October 20th, 2024?
MR. DRAHOS: Object to the form. It's been asked and answered.
BY MR. HOFFMAN:
Q. Okay. Did you have a Carnival email address in your own name?
A. Not in my own name. It was in the doctor's name.
Q. It was in the Pride doctor name? Or what was the name of the email?
A. Yeah. Yeah. So whenever you board a vessel as the doctor, you get the doctor's email address. So if you're on Pride, you have the Pride doctor's email

address during that time. And when you move on, you get another doctor's email address.

Q. Okay. Was there any differentiation between you and Dr. Rotlaru, who was the senior ship doctor?

A. We had different email addresses.

Q. Okay. What was your email address?

A. If I remember correctly, it was prdoctor@carnival.com.

Q. Okay. And do you remember Dr. Rotlaru's email?

A. It's usually srprdoctor@carnival.com.

Q. Thank you. Do you have anywhere in -- on paper or on a laptop, any of the training materials provided to you by Carnival?

MR. DRAHOS: Object to the form.

THE WITNESS: Not currently, no.

BY MR. HOFFMAN:

Ex. D 17:18-18:3

Q. Okay. Does Carnival keep a record of the training each doctor has completed?

A. Yes, they do.

Q. Okay. Do you know the name of the system?

A. It's usually stored on a central system called NinthBrain, where certificates are uploaded.

Q. Okay. And what could -- what is NinthBrain?

A. It's pretty much a storage for certifications,

Ex. D 17:18-18:3

accreditations.

Q. Is it also a training --

A. It's an online platform, basically.

Q. Okay. Thank you. Is there also training available on it?

A. I think -- I don't think it's clinical-based, but I -- I think there are some trainings, if I recall correctly.

Q. Okay. When you say not clinically based, what else would it -- what would it be?

A. General maritime trainings, shipboard trainings, basically.

Q. Okay. Is there a health services fleet resource site?

A. There is.

Q. Okay. Could you tell me what's kept inside of it?

A. It's communications, HOC communications. It has -- so it's been a while since I accessed the site, but it also has fleet resource datas. It has the monthly meetings with the previous meeting recordings. Yeah, that's the main thing. Mostly used for coordinations and communication.

Q. Okay. Would there be training materials regarding evacuation procedures?

MR. DRAHOS: Object to the form.

THE WITNESS: If I recall correctly, I think it might have the HESS documents linked to it or on it. I can't -- I can't recall 100 percent.

BY MR. HOFFMAN:

Q. Understood. Did NinthBrain have the training sessions included?

A. Are -- are you referring to HESS?

Q. Sorry. Yes. So -- I'm sorry. I jumped. So a moment ago, I was asking about the health services fleet resource site, but I'm going back to NinthBrain. Does NinthBrain also include training modules?

A. I don't think NinthBrain has HESS on.

Q. Okay. Only -- what does have the HESS document?

A. So directly the -- directly, the -- the HESS site is where you can access it. And from previously what I mentioned, I think it might be on the fleet resource site.

Q. I'm sorry. The -- the fleet resource site. Thank you. And also, is there another system called My Performance?

A. There is.

Q. Okay. Could you tell me what is kept in My Performance?

A. Previous performance reviews, the availability to escalate disciplinary action. There will be availability by the senior doctor and lead nurse to do performance reviews. Yeah, it's pretty much all the accessibility and storage of that.

Q. Okay. Thank you. Do you recall -- are -- are you -- sorry. Are you involved with the -- the payment portion when a passenger comes to the infirmary?

A. Can you please elaborate with regards to the payment portion?

Q. Yes. So concerning payment, my -- my question is: Is there -- do you have any involvement as the doctor regarding collecting payment prior to the person coming into the infirmary?

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah. No, there's -- there's no payment that's collected prior to them presenting to the infirmary.

BY MR. HOFFMAN:

Q. Okay. So if someone comes to the infirmary, they don't need to address cost at that moment?

MR. DRAHOS: Object to the form.

THE WITNESS: If it's an emergency, definitely not.

BY MR. HOFFMAN:

Q. Okay. And what would constitute emergency that does not require payment at that moment?

A. A variety of factors that has to be clinically addressed.

Q. Fair enough. We'll get more into that. Do you recall Mr. Smith's family being with him at the infirmary?

MR. DRAHOS: Object to the form. Time frame?

THE WITNESS: I -- sorry?

MR. HOFFMAN: On October 18th. The -- when -- the first day that --

THE WITNESS: I --

MR. HOFFMAN: -- Mr. Smith presented.

THE WITNESS: Yes. I do recall his family, but I honestly don't recall on which instances I saw them or who I saw. But I do know that there were families with him from time to time.

BY MR. HOFFMAN:

Q. Okay. Do you recall --

A. Family or friends.

Q. Okay. And did you recall any conflict with them on that day?

MR. DRAHOS: Object to the form.

THE WITNESS: No. I -- I didn't personally have any conflict with anyone.

BY MR. HOFFMAN:

Q. Okay. But did you speak with anyone -- anyone from the family on that day?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm sure I did speak to the family at some stage, but I can't recall specifically who I spoke to.

BY MR. HOFFMAN:

Ex. D 22:9-16

Q. Understood. Okay. On the Pride, how would you contact Dr. Rotlaru if it was after hours?

A. So if it was an emergency and the entire team needed to be activated, we had a radio, a two-way radio, in which the team was on a specific channel. If it was anything else, we'd have our Cisco phones in which I'd have my number, he'd have his number, and we'd contact each other on that.

Q. Okay. I want to ask you about your background. I see that you -- well, I'll pull up your resume.

MR. HOFFMAN: Mark this as Exhibit A -- or Exhibit B.

(Exhibit 2 was marked for identification.)

BY MR. HOFFMAN:

Q. Are you able to see my screen okay?

A. Yes, sir.

Q. All right. So graduated with an MBChB at -- from Nelson R. Mandela School of Medicine. What does MBChB stand for?
A. It's Latin for Bachelor of Medicine, Bachelor of Surgery.
Q. Okay. And you received a dean's commendation in 2016 and again in 2019?
A. Yes, sir.
Q. And it says you finished high school with seven distinctions and a 94 percent aggregate?
A. Yes, sir.
Q. What does the seven distinctions mean?
A. It's basically just a title, like, I'm assuming in the U.S. you call it an A+ or something like that.
Q. Ah, okay. Got it. And I see you speak English, Afrikaans, and isiZulu?
A. Yes.
Q. Okay. Are there any other languages you speak?
A. No.
Q. It's two more than I speak, sir. Have you ever studied at Bond University in Australia?
A. Sorry, what?
Q. Bond University in Australia?

A. Bond? No.

Q. Okay. All right. So -- and then you had a two-year internship from January 2020 to December 2021. It looks at the Gauteng Department of Health, Charlotte Maxeke, Chris Hani Baragwanath, and Helen -- Helen Joseph. Are those different institutions or --

A. Yeah. So my main hospital for the first year of internship, because it comprised over two years, was Charlotte Maxeke and then we pretty much rotate in the next year. It's -- it's basically equivalent to the U.S. residency in a way, if you want to think of it like that.

Q. Okay. So your first-year rotations included internal medicine with, like, cardiology and oncology?

A. Yes, correct. And renal.

Q. Renal. Yeah, thank you. Did any rotation include neurology?

A. Do you mean during my internship?

Q. Yes.

A. I didn't rotate during neurology in internship.

Q. Okay. Did any rotation include a stroke unit?

A. Not during internship.

Q. Okay. Could you tell me how many stroke patients you've personally managed before you joined

Carnival?

MR. DRAHOS: Object to the form.

THE WITNESS: I cannot give you an exact number.

BY MR. HOFFMAN:

Q. Would be -- can you give me a -- a range, more than ten?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes.

BY MR. HOFFMAN:

Q. More than 20?

MR. DRAHOS: Object to the form.

THE WITNESS: Most likely.

BY MR. HOFFMAN:

Q. If I say more than 30, am I pushing it?

MR. DRAHOS: Object to the form.

THE WITNESS: Honestly, I can't give you an exact number.

BY MR. HOFFMAN:

Q. Okay.

A. But yeah.

Q. Okay. So more than 20, but you're not sure about much more beyond?

A. Sure.

MR. DRAHOS: Object to the form.

BY MR. HOFFMAN:

Q. Thank you. In 2022, you spent the full year in the emergency department at Helen Joseph Hospital?

A. That's correct.

Q. Okay. And it says here that you learned to deal with an overcrowded resuscitation unit and to accommodate severely ill patients with limited resources and time?

A. That's correct.

Q. And then from January 2023, you held a senior position there overseeing junior staff; is that correct?

A. That's correct.

Q. And when you say junior staff, was that doctors underneath you or was that nurses and other staff?

A. Yeah. So it's basically the community service and intern doctors.

Q. Okay. And Carnival's -- I see in Carnival's interview, it described Helen Joseph as a busy consultant-led emergency department. Would you say that's an accurate description?

A. Yeah, that's -- that's fair.

Q. So -- and consultant-led means a specialist emergency physician was available to you every shift?

MR. DRAHOS: Object to the form.

THE WITNESS: That's correct.

BY MR. HOFFMAN:

Q. And at Helen Joseph, if you were worried about a patient's brain, you could get a -- a CT scan, correct?

A. That's correct.

Q. You could get a -- a specialist opinion?

A. Yes.

Q. How quickly would you be able to get a specialist opinion if you were worried about a patient's brain?

MR. DRAHOS: Object to the form.

THE WITNESS: It'd be immediate.

BY MR. HOFFMAN:

Q. Okay. You received your diploma in primary emergency care from the Colleges of Medicine of South Africa. What year --

A. Yes, sir.

Q. -- what year is that?

A. That was 2022.

Q. 2022. Got it. And it says here ATLS, ACLS, PALS, BLS, and the AIMEA -- AIME airway course. These are all certifications that you acquired prior to going into Carnival Pride?

A. Yes, that's correct.

Q. Okay. What's point of care ultrasound training?

A. It's pretty much emergency ultrasound skills.

Q. Okay. And from April 2023 to January 2024, I see you also worked as a flight physician for NetCare?

A. Yes.

Q. Okay. And in that job, you're responsible for making sure patients were appropriately stable -- stabilized prior to transportation, correct?

A. Yes, that's correct.

Q. Okay. So before you've ever boarded a Carnival ship, you've personally moved critically ill patients by air, correct?

A. Yes, that's correct.

Q. And you know what it takes to arrange a medical transport, correct?

A. Yes.

Q. And you know that for some conditions, time matters, correct?

A. That's correct.

MR. HOFFMAN: Okay. I'm going to share with you what I'd like to have marked as Exhibit 3.

(Exhibit 3 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is the -- the interview from

Carnival. Share my screen again. And have you seen this document before?

A. I have not.

Q. Okay. So do you recall meeting Carolyn Lewis?

A. Yes, I did. I do. Sorry.

Q. Okay. So she wrote here that you're a highly competent and keen emergency medicine doctor. Do you -- you seen that down here?

A. Yes.

Q. Okay. And she wrote you have a great systematic approach to all the clinical scenarios that you guys covered in your interview and that you exceeded expectations to most of the answers. Do you recall the interview that you had with her?

A. I do. Some parts, yes.

Q. Okay. Let me go to third page here, Bates stamp 517. There's a -- a trauma scenario and in that you told her you would assess the pupils and look for localizing signs. Can you tell me what a -- what is a localizing sign?

MR. DRAHOS: Object to the form.

THE WITNESS: It points to a neurological deficit. For example, unequal pupils can be a localizing sign, deviation of one pupil from the other, abnormal cranial nerve responses.

BY MR. HOFFMAN:

Q. So in October 2022 -- in October 2022, you knew to look for focal neurological signs in an emergency patient, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: That's correct.

BY MR. HOFFMAN:

Q. And then another scenario, Bates stamp 516, the heart attack scenario, you listed previous thrombotic CVA in the preceding 3 over 12 as a contraindication to clot-busting drugs. CVA means stroke, correct?

A. Yeah.

Q. Stop sharing that. Your -- the first boat that you were on with Carnival was the Carnival Splendor, correct?

A. That's correct.

Q. Okay. And do you recall the name of the senior doctor?

A. There were two that I worked with. The first one was Dr. Raju (phonetic), and the second one was Dr. -- Dr. Ashok (phonetic), I think.

Q. Okay. Okay. So I'm going to share with you -- we have --

MR. HOFFMAN: We'll mark this as Exhibit 4.

(Exhibit 4 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is your evaluation?

THE REPORTER: I'm sorry.

MR. HOFFMAN: I'm sorry?

THE REPORTER: You had A -- A, B, and then you changed it to 3, and now you want 4. Would you like it to all be 1 through 4 or A through D?

MR. HOFFMAN: Let's stick with numbers. I apologize.

THE REPORTER: Thank you very much.

MR. HOFFMAN: Thank you. Please correct me if I deviate again. I apologize.

BY MR. HOFFMAN:

Q. So are you able to see my screen where it has your -- the review from --

A. Yes.

Q. Okay. Dr. Rama Raju. And it says here that you're a good clinician with good clinical skills. And did you have a -- how was your relationship with Dr. Rama Raju?

A. I'd say a good professional relationship.

MR. HOFFMAN: Okay. And then I'm going to share with you what's Exhibit 5.

(Exhibit 5 was marked for identification.)

BY MR. HOFFMAN:
Q. And this is your -- another review from June 2024. Looks like it's by Dr. Ashok. And he writes that, "A good doctor by profession in displaying his professional skills. He's in the process of learning CCL guidelines and HESS procedures." How was your relationship with Dr. Ashok?
A. Same. We had a very good professional relationship.
Q. Okay. It says you're confident, clinically sharp, and seems to be professionally driven. So you had a good working relationship with Dr. Ashok?
A. Yes.
Q. Okay. And that was the end of your first contract?
A. That's correct.
Q. Okay. You applied through a recruitment agent called AMR, correct?
A. Yes, that's correct.
Q. And do you know if this is part of Carnival?
A. I don't think they have -- I think it's just a referring agency to Carnival, recruitment agency to Carnival.
Q. Okay. You think they also work for other cruise lines as well?

A. I would assume so.

Q. Okay.

A. I'm not 100 percent sure on that.

Q. Understood. When you met with Carolyn Lewis, what was -- did you -- is Ms. Lewis a physician?

A. I think she's an emergency physician.

Q. Okay. Do you know if she's ever worked on a boat?

A. I'm not sure.

Q. Okay. So I want to go back to this -- this document, Bates stamp 515. The form lists eight scenarios, acute myocardial infarction, trauma, chest pain, respiratory failure, pediatric seizure, anaphylaxis, hemorrhagic shock, atrial fibrillation. Is that all of them that you discussed?

A. Yes.

Q. None of the eight concern a stroke, correct?

A. I don't recall a stroke being discussed.

Q. Was dizziness and vomiting and seasickness addressed?

A. Other than those, I can't remember.

Q. Okay. At any stage of Carnival's hiring process, the interview, the questionnaire, any reference call, do you recall anyone asking a single question about recognizing a stroke?

MR. DRAHOS: Object to form.
THE WITNESS: I don't recall.
BY MR. HOFFMAN:
Q. Okay. Do you recall if anyone asked you how many stroke patients you had managed?
A. I think maybe on the form.
Q. Okay. Who would --
A. But verbally, I don't recall.
Q. Okay. Who did you speak with on the phone?
A. No, I'm saying on the form that you fill in.
Q. Oh, on the form? Okay. Thank you. You mean your application for AMR?
A. Application form.
Q. Okay. In part of -- in your interview, did anyone ask you to demonstrate a neurological examination?
A. Are you talking about the interview with Carolyn?
Q. Just the interview with Carolyn up and -- through the hiring process.
A. I don't recall anyone.
Q. Okay. We'll go to question 3. So question 3 is about a -- a 60-year-old with chest pain who wants to go and play bingo, and Carnival asked if you would admit him for further observation or discharge. Do you

remember that one?

A. I can, if I can read it. I might be able to recall a little bit more.

Q. Yes. Are you able to see that okay or --

A. Yeah, yeah, that's good. Thank you. Okay.

Q. Okay. Does that refresh your recollection or --

A. I don't recall the exact question, but I mean, clinically, I can answer it.

Q. Okay. If you could.

MR. DRAHOS: Object to the form.

THE WITNESS: It's -- it's, obviously, very patient-specific. And according to the clinical situation at the time, a differential diagnosis would, obviously, point towards something cardiovascular.

BY MR. HOFFMAN:

Q. And your -- your answer was that you would risk stratify him with the heart score before deciding, correct?

A. Yes, correct.

Q. Okay. And that would help you guide your decision as to whether to admit or discharge, right?

A. That's correct.

Q. Okay. So Carnival tested whether you would --

you would use a validated score before letting a -- a chest pain patient walk out. Did Carnival ever test whether you would use a validated score before letting a dizzy, vomiting patient, who could not walk, go back to his cabin?

MR. DRAHOS: Object to the form. You keep calling it Carnival. I don't know if you're doing that as a mistake or you're doing it intentionally, but --

MR. HOFFMAN: Oh, no. Sorry. When I -- when I refer to the interviewing process, I am asking -- well, I -- I am specifically asking about Carnival.

MR. DRAHOS: Okay. Well, I object to the form.

BY MR. HOFFMAN:

Q. Okay. So specifically, did Carnival ever test whether you would use a validated score before letting a dizzy, vomiting patient, who could not walk, go back to his cabin?

MR. DRAHOS: Object to the form.

THE WITNESS: I -- I don't understand because we -- we were never tested by Carnival.

BY MR. HOFFMAN:

Q. Okay. So AMR tested whether you would use a validated score before letting a chest pain patient walk

out, correct?

A. Yeah, that's correct.

Q. Okay. So did AMR ever test whether you would use a validated score before letting a dizzy, vomiting patient, who could not walk, go back to his cabin?

MR. DRAHOS: Object to the form. It's argumentative.

BY MR. HOFFMAN:

Q. If you could answer, please.

MR. DRAHOS: Do you understand the question?

THE WITNESS: As -- as far as I understand, it was only what was present here that was asked. Nothing else.

BY MR. HOFFMAN:

Q. Okay. So the answer would be no?

A. I would assume so, yes.

Q. Okay. Question 7 on Page 5 of this document, Bates stamp 519, a patient is brought to the medical center in a wheelchair and asked you to discuss your management of the case, assuming the ship is at sea. Did the interviewer ever ask you anything about when a patient at sea must be evacuated?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't recall.

MR. HOFFMAN: I want to show you -- have

marked as Exhibit 6.

(Exhibit 6 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is the conditional offer of employment from Carnival. And the offer is dated December 6th, 2023, and this is 13 months after your original interview with Ms. Lewis. And my question was: Were you interviewed again in between that time period?

A. No.

Q. Okay. Were you tested again in that time period?

A. Tested in terms of?

Q. Like, those evaluations, those questions, those scenarios.

A. By AMR?

Q. Correct.

A. No.

Q. Okay. Did you have any testing by Carnival prior to the conditional offer being presented?

A. No.

Q. Okay. And it says the letter is -- the letter is conditional offer of employment. It says, "Carnival has approved your application for employment with Carnival Cruise Lines as shipboard doctor." Was it your understanding that you were an employee of Carnival

Cruise Lines?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm an independent contractor of Carnival.

BY MR. HOFFMAN:

Q. Okay. It says here, number 6, "Diseases and immunity screenings. As a medical employee, you must document serologic testing for HIV and hepatitis." And so the language of a contractor, is that in this document that we are looking at?

MR. DRAHOS: Object to the form.

THE WITNESS: If we scrutinize the document, because I -- I don't know it offhand.

BY MR. HOFFMAN:

Q. Okay. I just pulled back up the first page.

A. Yeah. So as far as my knowledge is concerned, we are independent contractors of Carnival.

Q. Okay. And this offer was made from Carnival's Medical Talent Acquisition Group in Miami?

A. I would assume so, yes.

Q. It says, on the second page, and it's Bates stamped 546, "Employment is subject to a satisfactory internal review of, at least, three professional references, which we'll obtain if unavailable at the time of writing this offer." And it required an ACLS

certificate, advanced life support, or advanced cardiac life certificate, when you joined a vessel. And was there ever any condition about neurological emergencies?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't understand the question.

BY MR. HOFFMAN:

Q. Yeah. Was Carnival -- so Carnival was concerned that you -- they wanted to make sure you had certification in advanced life support or advanced cardiac life support. And my question was: Was there ever any concern about your training regarded -- regarding neurological issues?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm still not understanding the question, sir. Are -- are you asking if we -- what -- I don't understand the question.

BY MR. HOFFMAN:

Q. Right. So the -- the question is -- is whether or not there was any sort of understanding that you had that you needed to present certification or training regarding your handling of neurological emergencies upon accepting of this offer of employment, or was it only regulated to advanced cardiac life support and advanced life support?

MR. DRAHOS: Object to the form.

THE WITNESS: Advanced cardiac life support includes neurological emergencies.
BY MR. HOFFMAN:
Q. It does? Could you tell me more about the advanced cardiac life support training and how --
A. It's a --
Q. -- neurological emergencies?
A. Yeah, sure. It's usually a different duration of the course depending on which institution you do it with. It has to be accredited. I did mine with the American Heart Association, which has an international standard. And they cover various emergency topics, one of it is neurological emergencies.
Q. Okay. Is part of that training identifying neurological emergencies when there's other medical events taking place?
MR. DRAHOS: Object to the form.
THE WITNESS: Other medical events in terms of?
BY MR. HOFFMAN:
Q. Dizziness and vomiting.
MR. DRAHOS: Object to the form.
THE WITNESS: I'm not sure if they specifically included dizziness and vomiting in the training.

BY MR. HOFFMAN:

Q. Okay. But are there measures that can be taken under ACLS to identify if a person is having an underlying neurological emergency when it can be masked by another condition?

MR. DRAHOS: Object to the form.

THE WITNESS: I think what you're asking is, will the patient not need imaging to be done?

MR. DRAHOS: Well, Doctor, you don't need to help him try and explain his question to you. If you don't understand it, ask him to rephrase it, but I don't want you to subjectively try and interpret what he's trying to get at here, okay?

THE WITNESS: Okay, sir.

BY MR. HOFFMAN:

Q. So yes, I -- I was asking about the imaging. If you could please expand.

MR. DRAHOS: Object to the form.

THE WITNESS: So I'm still not understanding the question, sir. What would you like me to explain in the imaging?

BY MR. HOFFMAN:

Q. Yeah. So if you suspect -- so under ACLS, the training addresses neurological emergencies, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: That is a part, correct.
BY MR. HOFFMAN:
Q. And my question is: Is part of that training identifying a neurological emergency when there are other conditions that are presenting that could mask a neurological emergency?
MR. DRAHOS: Object to the form.
THE WITNESS: I honestly am not sure.
BY MR. HOFFMAN:
Q. Okay. Thank you. Did you have any training on maritime medicine prior to accepting this conditional offer of employment?
A. Not maritime medicine.
Q. Okay. I want to ask you about your time, I guess, before you went on your first assignment on the Carnival Splendor. Before that day, had you ever worked on a ship?
A. I have never worked on a ship before that.
Q. Okay. And where did Carnival train you before you boarded?
A. Please repeat?
Q. Where did Carnival train you before you boarded the Splendor?
A. What do you mean by training?
MR. DRAHOS: Object to the form.

BY MR. HOFFMAN:
Q. I mean, did you -- prior to being placed on the boat, did Carnival give you any training in Miami or online or -- or not at all?
MR. DRAHOS: Object to the --
THE WITNESS: No.
BY MR. HOFFMAN:
Q. There was no training prior to you going on board?
A. Not by Carnival.
Q. Okay. Did you receive training from AMR?
A. Not by AMR.
Q. Who did you receive training for before you went on board the boat?
MR. DRAHOS: Object to the form. Are -- are you --
THE WITNESS: The various courses that I attended.
BY MR. HOFFMAN:
Q. I'm sorry?
A. The courses that I attended.
Q. The courses you attended. Okay. And when you say the courses you attended, you mean in the course of your -- your regular maintenance of your license and being a doctor?

MR. DRAHOS: Object to the form.
THE WITNESS: They were medical courses.
BY MR. HOFFMAN:
Q. Okay. Medical courses specific to your time that was coming up on the Carnival Splendor?
MR. DRAHOS: Object to the form.
BY MR. HOFFMAN:
Q. Correct?
A. I'm not understanding the question.
Q. Right. So you -- I was asking about any training that you had received before you boarded. And my understanding is you did not receive any training from Carnival before you boarded, correct?
A. That's correct.
Q. And you did not receive any training before AMR -- AMR before you boarded, correct?
MR. DRAHOS: Object to the form.
THE WITNESS: That's correct.
BY MR. HOFFMAN:
Q. Okay. So you had said that you attended courses. And my question is: When are these -- when were these courses that you attended prior to boarding the Carnival Splendor?
MR. DRAHOS: Object to the form.
THE WITNESS: If you can pull up my CV --

MR. DRAHOS: Are you referring to his medical school or -- I'm sorry, but like --

MR. HOFFMAN: If it's that broad of an answer, then that's okay. I'm --

MR. DRAHOS: But the question is ridiculously vague. I mean, when you're asking, what training did you go through prior to joining the ship --

MR. HOFFMAN: In anticipation of going on the boat.

MR. DRAHOS: I mean, all right.

MR. HOFFMAN: Sorry. So I'll be more -- I'll be more clear. I apologize.

BY MR. HOFFMAN:

Q. So upon accepting the conditional offer of employment, what training did you take -- what courses did you take prior to going onboard the Carnival Splendor?

MR. DRAHOS: Objection to form. Same basis.

THE WITNESS: Can you mention a time period?

BY MR. HOFFMAN:

Q. Yes. It looks like December 6th, 2023, was when the conditional offer of employment was made. And it looks like you went on the boat end of February 2024, correct?

A. That's correct.

Q. So I -- I guess I'm asking, between December 6th, 2023, and February 28th, 2024, did you take any courses in preparation of going on the Carnival Splendor?

A. During that time period, I don't recall if I took any courses.

Q. Okay. Thank you. When you first went on the Carnival Splendor, did you shadow another doctor?

A. What does shadow mean?

Q. I'm sorry. When you went on the Carnival Splendor, were you -- when you were first on call, were you alone or did you work along with another doctor?

MR. DRAHOS: Object to the form.

THE WITNESS: When I was first on call?

BY MR. HOFFMAN:

Q. Do -- I guess my --

A. Can you please elaborate?

Q. Yeah. No. I guess my question is: When you first went on the Carnival Splendor, what type of orientation did you have to the medical department and your -- your job?

A. Sure. So it was an introduction with the other doctor that was on board who did an in-person handover with me, the senior doctor at the time and the lead nurse that guided me.

Q. Okay. And how many days was that orientation?
A. There's no fixed point or formalized orientation program. It's pretty much just guidance and getting through as much as possible in a quick a time as possible.
MR. HOFFMAN: Okay. I'd like to show you what I'm going to mark as Exhibit 7, which is Bates stamped 940.
(Exhibit 7 was marked for identification.)
BY MR. HOFFMAN:
Q. And this is titled Medical Team On-the-Job Training. Are you familiar with this document?
A. Yes.
Q. Okay. Do you recall if you signed one on the Splendor?
A. Yes.
Q. Do you recall if you signed one on the Pride?
A. I'm sure I did.
Q. Okay. And it says, review -- "All signing on medical team members, review and sign off on the below prior to first shift on duty. To be completed in addition to handover checklists." So when you were -- when you first came onto the Carnival Splendor, did you complete this checklist, the on-the-job training checklist, before your first shift on duty?

A. Yes.

Q. Okay. And I'd like to just go down the list real quick. It covers HESS procedures: EMR, emergency response procedures for medical, handling of calls to the medical emergency line, initial response to a medical emergency call, medical emergency response, and triage in a mass-casualty incident. When you went through the checklist, did you receive documents or any sort of policies or procedures relating -- relating to the issues that are addressed here on the on-the-job training checklist?

MR. DRAHOS: Object to the form.

THE WITNESS: What issues?

BY MR. HOFFMAN:

Q. So, like, the HESS procedures. Overall occupational safety and environmental policies, chemical storage, sharps container, garbage handling, expired medication handling. Did you review those HESS procedures when you were going through the checklist?

A. Yeah, I would assume so.

Q. Okay. And -- well, I don't want you to assume. So I -- I -- I'm trying to ask about the process of the on-the-job -- the training when you -- when you first come on board. So when it says joining staff initials and the date, that you acknowledge that

these documents exist, do you review them, or is it just more of an acknowledgement that these things exist?

A. It's meant to be, in my understanding, reviewed.

Q. And do you recall how long it took for you to go through this on-the-job training checklist before you took your first shift on duty?

MR. DRAHOS: Object to form.

THE WITNESS: It doesn't take long. It's done before the first shift.

BY MR. HOFFMAN:

Q. Okay. And when you went on the boat, do you recall if your first shift was the first day, the second day of the voyage?

A. As far as I remember, I think it was the second day of the voyage --

Q. Okay.

A. -- on the Splendor.

Q. Understood. What is the Fun Time policy and procedure?

A. Fun Time policy is the clocking in, clocking out so they can determine our working and resting hours.

Q. Understood. When -- the emergency equipment location on the ship -- ship map provided, did you go through and -- and locate these, or was it just you

received the map and it was just acknowledged that you have the map of where these items are located?

A. Which ship are you referring to, sir?

Q. Oh, I'm sorry. The -- I'm referring to the Carnival Splendor, your first boat.

A. Yeah. We're usually taken on a walking tour to see where it's located.

Q. Okay. And did you do that on the Pride, the walking tour?

A. Yeah, I would assume we did that. That's part of the procedure.

Q. Okay. Thank you. I'm -- I'm looking at your -- the performance evaluation, the -- from your first voyage on the Splendor, and the senior doctor noted that she wants you to read HESS on a daily basis and learn the CCL policies and procedures. And my question was: Did Carnival give you protected time to do that, or was that on top of your clinical duties?

A. There was no designated time to read HESS procedures.

Q. Okay. And then in June 2024, the senior doctor wrote you were still in the process of learning CCL guidelines and HESS procedures. Do you recall that?

A. Yeah.

Q. Have you read every medical HESS procedure?

A. I have read every medical HESS procedure.
Q. Do you recall how many there are?
A. No, I do not.
Q. Could you tell me about any Carnival document you had on October 18th, 2024, that told you how to recognize a stroke?
MR. DRAHOS: Object to the form.
THE WITNESS: Can you please elaborate on which -- what do you mean by "Carnival document"?
BY MR. HOFFMAN:
Q. Like a HESS procedure or any --
A. As far as I'm aware, there's no HESS procedure about clinically recognizing a stroke.
Q. Okay. Are you familiar with any written stroke protocol that Carnival has?
A. Carnival specifically? I don't think I'm familiar with any.
Q. Okay. The reason I ask is Nurse Dube had testified that there was a -- a written stroke protocol. She was just unsure if it included a -- a checklist. Does that sound familiar?
MR. DRAHOS: Object to the form. He's not read her deposition.
BY MR. HOFFMAN:
Q. I -- I'm sorry. Does it -- it ring a bell if

Ex. D
53:5-18

there was a written stroke protocol with a checklist?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't recall.
BY MR. HOFFMAN:
Q. Did SeaCare have a stroke assessment screen on October 18th, 2024?
A. Do you mean -- can you please elaborate on that question?
Q. Yeah. So you would use SeaCare in the -- in the clinic, correct?
A. That's correct, yes.
Q. And did SeaCare have different assessments available online?
A. Yes, they did.
Q. Was there a stroke assessment?
MR. DRAHOS: Object to the form.
THE WITNESS: I'm sure there was, but even if there wasn't, we can add our own assessments in.
BY MR. HOFFMAN:
Q. Okay. Did you ever add any of your own assessments?
A. Yeah.
MR. DRAHOS: Object to form.
BY MR. HOFFMAN:
Q. What did you add?

A. If it wasn't on SeaCare and I used it frequently, I would add it for each specific patient.
Q. Okay. Do you recall any specific assessments that you add -- added to SeaCare?
MR. DRAHOS: Object to the form.
THE WITNESS: It's not added to SeaCare. It's added to a specific patient.
BY MR. HOFFMAN:
Q. So are you saying that you would be able to do an assessment that's not within SeaCare?
A. Yeah.
Q. Okay. Were you familiar with BE FAST, the acronym BE FAST, on October 18th, 2024?
A. Yeah.
Q. Okay. Could you tell me what BE -- BE FAST stands for?
A. It's basically a stroke assessment tool, pre-hospital, recognizing symptoms of a stroke prior to them getting to the hospital and then indicating that 911 should be called or getting them to an emergency facility if any of these occur.
Q. Okay. And what does the B stand for?
A. I do not recall what the -- what they all stand for, but it's facial asymmetry on drift, slurring of the speech, and then the accompanying signs are

dizziness, headaches. Yeah.

Q. Is balance -- does B stand for balance being an issue?

MR. DRAHOS: Object to form.

THE WITNESS: Are -- are you asking me or telling me?

BY MR. HOFFMAN:

Q. Yeah. I'm asking if B -- does that ring a bell? Does that recall -- refresh your recollection that --

A. Yeah.

Q. -- the B stands for balance?

A. It stands for balance. Yeah.

Q. And -- and what -- what does that mean, balance in that -- in the terms of that assessment? What are you looking for?

A. We are looking as if a patient can maintain equilibrium when they stand, for example, and if it's normal or abnormal for them.

Q. So if a person is able to stand, they're not -- it -- it's a -- an indication that they're not having a stroke, right? If they're able to balance, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: No, that's not true.

BY MR. HOFFMAN:

Q. In order for a -- a stroke to be identified under BE FAST, do all of those issues need to be present? And when I say all of them, I mean, the -- the balance issue, the facial drooping, the slurring of speech, the imbalance. Are all those things required in order to identify as to whether or not a -- a person has been assessed for a stroke properly, and has been identified as having a stroke?

A. You do not need all of them to have a stroke.

Q. Okay. Thank you.

A. Sure.

Q. What -- what do you look for in a person's eyes when you're doing the BE FAST assessment?

MR. DRAHOS: Object to the form.

THE WITNESS: You want to look -- you want to look for pupil symmetry, that the pupils constrict and dilate equally, and there's no differentiating factors. You want to look for pupillary movements. You want to look for abnormal gaze.

BY MR. HOFFMAN:

Ex. D 56:21-25

Q. Okay. Did Carnival ever train you on BE FAST on the ship?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't recall Carnival training on BE FAST.

BY MR. HOFFMAN:
Q. Okay. Do you recall -- what drills do you recall having performed while on the Carnival Pride?
A. I do not recall specifically which drills.
Q. Okay. Do you know if you've ever performed a drill for a cardiac -- a -- a cardiac event?
A. Yeah, I'm sure -- I'm sure we did.
Ex. D 57:8-10
Q. Do you ever recall if you did a drill for a stroke?
A. Yeah, I'm sure we did that as well.
Q. Okay. Do you recall with whom?
A. I do not recall that.
Q. Okay. When you do a drill, is there any sort of documentation stating that you participated?
A. Yes, there is.
Q. Is there a sign-in sheet?
A. Yes.
Q. And when those drills are conducted, is that something that is selected by the ship doctor or is that a directive from Carnival?
A. So there's two parts to this. Carnival has, unless they change the protocols, but as far as I'm aware, drills which are usually performed every month, which is sent by -- from a representative in the HOC. And then it's at the discretion of the doctor or the

senior doctor for whatever further drills they want to do. If they want to do daily drills, if they want to do weekly drills, they -- you're more than welcome. Training is always welcome.

Q. Understood. And do you recall if Dr. Rotlaru ever gave a session on dizziness?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't recall that.

BY MR. HOFFMAN:

Q. Do you recall if Dr. Rotlaru ever gave a session on motion sickness?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't recall that.

BY MR. HOFFMAN:

Q. Do you recall if Dr. Rotlaru ever gave a session on a cardiac event?

A. No, I don't recall that.

Q. What -- do you recall if Dr. Rotlaru ever gave a session on stroke?

A. I'm not sure. I don't recall that.

Q. Okay. What -- do you recall any sessions that Dr. Rotlaru did while you were on board the Carnival Pride?

A. Not the specific sessions.

Q. Okay. How long were those sessions?

MR. DRAHOS: Object to the form.
THE WITNESS: Which ones are you referring to?
BY MR. HOFFMAN:
Q. The -- the monthly drills.
A. Monthly drills, it could range. We could have a long-ended discussion with a practical, or we could have a tabletop discussion, depending on the scenario.
Q. Okay. Do the nurses participate in those sessions as well?
A. Yes. It's a whole team.
Q. Okay. I -- I want to confirm: There's no -- there's no CT scanner on the Carnival Pride, correct?
A. That's correct.
Q. Is there anything on --
A. As far as I'm aware.
Q. Okay. Thank you. Is there anything on that ship that can rule a stroke in or out?
MR. DRAHOS: Object to the form.
THE WITNESS: You can only rule it out with the CT scanner.
BY MR. HOFFMAN:
Q. Okay. So is the only measure -- what measures are -- can be taken on the boat to determine whether or not a -- a stroke is occurring?
A. So there's a difference between measures and

ruling out. Everything has to be interpreted in clinical context.

Q. Okay. So how would you -- so you -- you stated ruling out versus identifying? Is that what you just -- that two different things you had stated?

A. Yeah. You can't rule out a CT scan on a ship. Sorry. You can't rule out a stroke on a ship.

Q. What must be done -- out a stroke?

A. -- on a ship.

MR. DRAHOS: Sorry. You two were talking at the same time.

Mr. Hoffman, would you repeat your question, please?

MR. HOFFMAN: Thank you.

BY MR. HOFFMAN:

Q. What must be done in order to rule out a stroke?

A. You need to have a CT scan.

Q. Okay. So the only way to really answer the question is to get the patient to a hospital?

A. A facility with a CT scanner, correct, yes.

Q. Carnival tells its passengers that guests presenting with symptoms of a stroke may require shore -- shoreside specialized imaging in a specialist review. Did Carnival ever tell you how to get that for a guest

that was in the middle of a sea day?
MR. DRAHOS: Object to the form.
THE WITNESS: I'm not understanding the question. Do you mean if someone spoke to me about it?
BY MR. HOFFMAN:
Q. Yes.
MR. DRAHOS: Object to the form.
THE WITNESS: Someone from Carnival?
BY MR. HOFFMAN:
Q. Yes.
A. I don't recall anyone from Carnival speaking to me about that.
Q. Okay. Did Carnival give you access to a neurologist by phone or video?
A. Yeah, we had telemedicine neurologist.
Q. Okay. Did you ever use it?
A. Yeah.
Q. And how often would you say that you used that telemedicine service?
MR. DRAHOS: Object to the form.
THE WITNESS: Are you talking about neurology specifically?
BY MR. HOFFMAN:
Q. Yes.

A. I honestly can't recall.
Q. Are you able to initiate that communication without the senior doctor?
A. Am I able to initiate that communication with the senior doctor -- without the senior doctor?
Q. Correct.
A. Yes.
Q. And when you --
A. It's just as per a HESS procedure that if it's an emergent telemedicine, be it a crew or a guest, that the senior doctor be contacted. If it's an elective or non-emergent, then you can do it yourself.
Q. Understood. What is the Health Operation Center?
A. So the HOC is our central coordinating center, which mostly deals with admin and logistics --
Q. Okay.
A. -- obviously related to medicine on -- in the -- the corporation.
Q. Do you know where it's located?
MR. DRAHOS: Object to the form.
THE WITNESS: The headquarters? You mean the building?
BY MR. HOFFMAN:
Q. Yes.

A. I think it's in Miami.
Q. Okay. And do you know who answers the phone there? Is it a physician?
A. I'm not sure who answers the phone.
Q. Okay. As a -- a shift physician, not the senior doctor, were you allowed to call the HOC yourself if it was --
A. We were allowed to.
Q. -- if it was not a medical emergency situation?
A. Yeah, we were allowed to.
Q. Okay. Before October 18th, 2024, can you recall how many times you personally contacted the HOC about a patient?
MR. DRAHOS: Object to the form.
THE WITNESS: I cannot recall how many times.
BY MR. HOFFMAN:
Q. Would it be registered in a person's -- in a patient's chart if you had contacted HOC or telemedicine?
A. It's usually written in notes.
Q. Okay. Can you tell me how many times you've personally recommended a medical evacuation?
MR. DRAHOS: Object to the form.
THE WITNESS: I cannot tell you how many times

specifically.

BY MR. HOFFMAN:

Q. Okay. Can you give me an estimate?

MR. DRAHOS: Object to the form.

THE WITNESS: I honestly cannot give you an estimate.

BY MR. HOFFMAN:

Q. Do you recall doing any on the Carnival Pride?

A. Yes.

Q. Okay. Do you recall doing any medical evacuations on the Carnival Splendor?

A. Yes.

Q. Okay. Do you recall doing -- do you recall any of the circumstances of those medical evacuations?

MR. DRAHOS: Object to the form.

THE WITNESS: Do you need specific diagnoses?

BY MR. HOFFMAN:

Q. I'm trying to first figure out about how many times you -- you may have performed the -- or, you know, recommended the medical evacuation specifically on the Carnival Pride.

MR. DRAHOS: Object to the form. It was -- it was mostly --

BY MR. HOFFMAN:

Q. So if it would help to under -- for your count

to go through what it was that they were, you know, I don't need to know it, but if it would help for that basic information as to number, please share it.

A. I'm not sure what the numbers were.

MR. DRAHOS: Hold -- hold on. Hold on.

THE WITNESS: Yeah.

MR. DRAHOS: Let -- let's ask for a clear question first.

What's the question, Mr. Hoffman?

BY MR. HOFFMAN:

Q. Could you recall how many events you had -- how many times you had made a recommendation for a medical evacuation while on the Carnival Pride? And if you need to take a moment to think of it, please take your time, but that is the question.

MR. DRAHOS: Object to the form. It's been asked and answered.

THE WITNESS: Yeah, I'll repeat, I cannot -- I cannot recall.

BY MR. HOFFMAN:

Q. Okay. Do you recall ever recommending a medical evacuation for a person suffering a stroke?

A. Are you talking about the Carnival Pride specifically?

Q. Yes, we can start with the Carnival Pride.

A. I'm not sure if it -- if it was specifically on the Pride.

Q. Okay. Do you recall doing a medical evacuation recommendation for a stroke on the Carnival Splendor?

A. I'm not sure if it was a specific ship or which specific ship, but I do recall it for one of the ships. I'm just not sure which specific one.

Q. What other ships did you -- were you on besides the Splendor and the Pride?

A. So I worked on four ships.

Q. Okay.

A. Splendor was first, Pride was second, Sunshine was third, and then back to Splendor. So ended off at Splendor, the fourth.

Q. Understood. So before October 18, 2024, had you ever recommended a medical evacuation for a person suffering from a neurological issue?

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah. Again, I can't remember which ship it was on.

BY MR. HOFFMAN:

Q. Okay. And you can't recall if it was before Mr. Smith or after Mr. Smith?

A. Yes, I can't recall that.

Q. Okay. Have you ever seen the medico/medevac check sheet before October 18, 2024?

A. Can you pull up the exact sheet so I can take a look at it?

Q. Absolutely. One sec.

A. Also, if you don't mind me just interjecting, just a side note. Is it okay if we take a quick toilet break soon?

MR. HOFFMAN: I think it is a good time to take a break. I will find that document. We can take a five-minute break if that's okay.

THE WITNESS: Yeah, it's perfect.

MR. HOFFMAN: All right. Come back at 38 after the hour.

THE WITNESS: Perfect.

MR. HOFFMAN: All right. Thank you.

MR. DRAHOS: Thank you, Doctor.

THE VIDEOGRAPHER: Okay. The time is now 10:32. We are going off record.

(A recess was taken.)

THE VIDEOGRAPHER: Okay. The time is 10:39. We are back on record.

MR. HOFFMAN: All right, Dr. Maharaj. So before we took a break, we were talking about the medico/medevac check sheet. I'd like to have this

marked as Exhibit 8.

(Exhibit 8 was marked for identification.)

BY MR. HOFFMAN:

Q. Are you able to see my screen okay?

A. Yeah, I can see it good.

Q. Okay. Are you familiar with this document?

A. Yeah.

Q. Okay. And do you recall if one of these was ever completed for Mr. Smith?

A. No, it was not.

Q. Okay. But a medical disembarkment was discussed for him, correct?

A. Correct.

Q. Okay. Would one of these forms need to be filled out for that evaluation to take place?

A. No.

Q. Okay. So is this an optional check sheet?

A. No. This is specifically for medevacs. So the common term is a helicopter evacuation.

Q. Okay. So is this for when it's been determined that somebody is going to be evacuated?

A. It usually depends on the method of evacuation. It's not for everyone that's being evacuated or disembarked, rather.

Q. Got it. And the type of disembarkation that

Mr. Smith was registered for would not require one of these documents to be completed?

A. As far as I'm aware, correct.

Q. Thank you. Who would normally complete that, the -- you or the senior doctor?

A. It's usually the treating doctor.

Q. Okay. Does the senior doctor also have shifts in the infirmary?

A. Yeah, definitely.

MR. HOFFMAN: Okay. I want to bring up next the Roles and Responsibilities for Doctors, and I'm going to mark this as Exhibit 9. And this is Bates stamp 681 and 682.

(Exhibit 9 was marked for identification.)

BY MR. HOFFMAN:

Q. Are you able to see my screen okay?

A. Yes, I can see it now.

Q. Okay. And were you provided with this document?

A. Yes, I was.

Q. Okay. Were you expected to follow the roles and responsibilities?

A. We are. It's -- it's a guide for us. Yes, that's correct.

Q. Okay. On Page 2 of the document, it says,

"Medical center administration, review patient bills in compliance with company procedures." Was that part of your job?

A. Are you talking about with regards to payment?

Q. Yes.

A. Yeah.

Q. Okay. And how were you involved with that part of the process?

A. So it starts from addressing any questions that our patients might have with regards to payment.

Q. Okay. Was that just in the infirmary in the moment?

A. It's obviously specific on the moment, but it is in the infirmary usually.

Q. Okay. And next says, "Suggest cost-saving and revenue-enhancing initiatives to the senior doctor." Did you ever suggest any revenue-enhancing initiatives?

A. Can't recall any specific ones that I did.

Q. Okay. Do you know what that means, revenue-enhancing initiatives?

A. Yeah. Pretty much to increase the intake of money into the medical center.

Q. Okay. Do you know if the medical center is a profit center for Carnival?

A. I don't think it is up there in making a

profit.

Q. Okay. Is it ever discussed whether or not the medical department is losing money?

A. It's never discussed, as to my knowledge.

Q. Okay. And then it says, "Consistently integrates responsible financial practices into medical decision-making and demonstrates fiscal compliance." What does that require?

A. Can you please explain the question?

Q. Yeah. So consistently integrating responsible financial practices into medical decision-making. So how do you incorporate that into your practice of medicine that you're focused on financial practices?

A. I don't think it means focusing on financial practices. I think it means that patient care comes first and finances take precedence -- sorry, patient care takes precedence over finances.

Q. Okay. Thank you. Is there anywhere in the Roles, Responsibilities for Doctors where it says that patient safety comes before costs?

A. I'm not -- I don't recall if it's those specific words.

Q. Okay. What words would they be, if not those?

A. I think you're asking me if it's in the Role and Responsibilities. I'm not sure if that wording is

mentioned there.

Q. Okay. Thank you. I want to go back to the evaluation from April 2024. It says on Bates stamp 911 -- let me share the screen, the first page. It says -- so this is April 24, 2024, after about 54 days at sea. Your senior doctor rates your clinical effectiveness as exceptional. And on the same page, she marks three things that need -- need improvement, and that's budgeting and billing, financial planning and referral, and CCL compliance. What does financial planning and referral mean?

A. So what it means to me is having a discussion with patients on what the prospective billings might be when they are referred, because those are all third party and we have no jurisdiction over what payments are when patients are referred.

Q. Okay. And were you told specifically what you were doing wrong or what you needed to improve?

A. I don't recall specifically, no.

Q. Okay. And then when it refers to referral, does that mean sending patients ashore -- ashore?

A. Yeah, that's a referral.

Q. Okay. So how does financial planning and referral -- how are those two interlinked?

A. So it's good practice for the treating doctor

to inform the patients and the patient's family, whoever they give consent with us to share, of the prospective costs that they might encounter when they are referred and they agree to be referred.

Q. Okay.

A. Because as I mentioned, it's third party and we have no involvement with payment or anything like that.

Q. Understood. I'll go to your evaluation from June 2024, and here again, it states, "Clinical effectiveness, exceptional. Assessment diagnosis and treatment planning, exceptional, but again, needs improvement in budgeting and billing, CCL compliance, and now in procedures and operations." And do you recall why those -- what the -- what the needs for improvement were in procedures and operations?

A. As much as I can recall, it was due to familiarizing oneself with the maritime procedures. It was explained to me, as much as I can recall, that no matter how exceptional someone is prior to entering the ship, the -- or maritime medicine, maritime medicine is a completely different sphere of medicine, so it takes time to adjust. And as it was explained, it's completely expected of everyone, even when I'm evaluating people, to adjust to the ship, and it just

takes time in order for them to be familiar with maritime procedures.

Q. So in those improvements of learning more information about maritime medicine, was there any reference to seasickness and how it can mask other conditions?

A. I don't think that's related at all to the procedures.

Q. What would that be related to?

A. That's more clinically based.

Q. Okay. Do you recall any clinically -- clinical training that Carnival provided regarding when seasickness can mask other conditions?

A. I don't recall specific clinical training.

Q. Do you think that type of training would've been helpful given that you were new to maritime medicine?

A. I guess it potentially would be helpful.

Q. Okay. Would it have been helpful in the circumstances that Mr. Smith found himself in?

A. Not necessarily. It's helpful to people who aren't aware to -- of how to differentiate between the two.

Q. Would it have been helpful to you in Mr. Smith's situation to diagnosing the medical condition in

which he presented on October 18th, 2024?
A. I don't believe so.
Q. Why not?
A. Well, can you -- can you elaborate on what you mean by helpful?
Q. Well, Mr. Smith was identified as having seasickness, and he was also -- he was suffering from a stroke, but you had diagnosed him for seasickness. And my question was, if you had received any training in seeing if that seasickness was masking any other condition, if it would've been helpful with the situation Mr. Smith found himself in?
A. When did I diagnose him with seasickness?
Q. Well, we'll get to the medical records, but -- okay. Is -- you're right. We can -- we'll go through the records. I'll keep moving. Thank you.
A. Sure.
Q. But in your first contract, Carnival never once told you that your medicine needed improvement, correct?
A. I don't recall -- I don't recall ever being told that.
Q. Okay. And it seems that they marked your clinical effectiveness and your ability to diagnose and treatment as exceptional, and that the only things that

you were told to improve were billing, financial planning, and referral compliance and procedures, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: As far as I can see, yes.

MR. DRAHOS: We've been down this now several times, Mr. Hoffman, so at some point, it becomes harassing. Let's just move along, please.

MR. HOFFMAN: I don't see how that's a harassing question, but --

MR. DRAHOS: It's -- it's not the first time you've asked it. So I -- I don't know how many times you want to ask him about performance evaluations in the first month of his tenure, but, you know --

MR. HOFFMAN: Well, I was just marking that he was -- skills are exceptional for clinical effectiveness.

MR. DRAHOS: I would agree.

MR. HOFFMAN: Very good.

BY MR. HOFFMAN:

Q. Has any Carnival evaluation ever graded you on stroke recognition?

A. I don't believe that specific aspect is part of the evaluation.

Q. Have they ever graded you on patient outcomes?
A. I don't think that's part of the stroke -- sorry, part of the evaluation.
Q. Okay. Who decides what a guest is charged in the medical center?
A. We have to go according to the procedure and what the billing rates are.
Q. Okay.
MR. HOFFMAN: I'd like to mark this -- I'm going to pull up another exhibit. We'll mark this as Exhibit 10.
(Exhibit 10 was marked for identification.)
BY MR. HOFFMAN:
Q. This is an itemized bill from October 20, 2024. Okay. All right. Are you able to see my screen okay?
A. Yes, I can see it well, thank you.
Q. All right. Mr. -- Mr. Smith's bill codes, your consultation, "DR cons out HRS. LV2, low to mod." Could you tell me what that means?
A. So it's a doctor's consultation that's out of hours, and then it's graded as being severity low to moderate.
Q. Okay. And then it says -- so that was Bates stamp 656. We'll go to the second page, to 657. It

says, "26 units, inpatient standard care per hour." So Carnival bills admitted guests by the hour?

A. We bill certain observations per the hour.

Q. What observations are you referring to?

A. The one that you just mentioned, the standard nursing care.

Q. Okay. And then on the third page, which is Bates stamp 658, the total was 5,594.78, posted October 20th, 2024 at 9:57 a.m.; is that correct?

A. I don't see exactly when it's posted or the time, but I can see the correct amount.

Q. Okay. Thank you. Sorry, the date and time is on the first --

A. Sure.

Q. Okay. Thank you. When you advise a guest to be admitted, do you tell them that they're going to be billed by the hour?

MR. DRAHOS: Object to the form.

THE WITNESS: That's not a priority of my conversation.

BY MR. HOFFMAN:

Q. Okay. Do you recall having that conversation with Mr. Smith or his family members?

A. Are you referring to if I specifically mentioned those words, that they will be billed per --

per the hour?

Q. Yes. If that was referenced, the cost, and then the --

A. I don't recall telling them that they would be billed per the hour.

Q. Okay. Do you recall them -- do you recall having any conversation with them about billing?

A. I usually have a conversation about billing to the patient or their family once they're stable in the medical center.

Q. Okay. How long did it take to stabilize Mr. Smith once he entered the infirmary?

A. I honestly can't remember.

Q. Okay. We'll go through that, the medical records. Has anyone at Carnival ever told you what a diversion or a helicopter evacuation costs the company?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't recall if anyone at Carnival has told me that.

BY MR. HOFFMAN:

Q. Are you aware of what a diversion or helicopter evacuation costs would be for the company?

MR. DRAHOS: Object to the form.

THE WITNESS: It's not a fixed cost. It's variable.

BY MR. HOFFMAN:

Q. Would it -- how -- how does it -- how is the cost determined?

MR. DRAHOS: Object to the form.

THE WITNESS: As far as I'm aware, it depends on our position. It depends on the operational disruption. There's a lot of factors that go into it.

BY MR. HOFFMAN:

Q. Okay. Has anyone from Carnival discussed with you what a diversion or a -- or has anyone -- sorry. Scratch that.

Has anyone at Carnival ever told you what a -- a missed or late port call costs?

A. I don't recall that being discussed.

Q. Okay. I want to -- I'm going to show you what's been provided to us by Carnival. It's Med 3104A2. It's a policy.

MR. HOFFMAN: I'm going to refer to that as Exhibit 11.

(Exhibit 11 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is Bates stamp 922 and 923. I'll share my screen. Are you able to read the document okay?

A. I can read it well, thank you.

Q. So this is Carnival's disembarkation table, and it has a -- a separate category for a disembarkation involving operational disruption and a separate workflow for it. Were you taught that those cases are handled differently?

A. How is it handled differently?

Q. As far as the considerations that go into making the determination of that disembarkation?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't understand the question.

BY MR. HOFFMAN:

Q. Understood. Let me show you another document that might help.

MR. HOFFMAN: And this will be Exhibit 12.

(Exhibit 12 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is Med 3104A5, Bates stamp 928. So this is what I'm referring to as far as the special considerations. Are you able to see the policy on the screen?

A. Yes, I can see it well.

Q. Workflow for disembarkations with potential operation disruptions. Are you familiar with this workflow?

A. Yes, I am.
Q. Okay. So were you ever instructed on how disembarkations with potential operation disruptions are handled?
MR. DRAHOS: Object to the form.
THE WITNESS: What does the word "instructed" mean? Like, do you mean, was it taught?
BY MR. HOFFMAN:
Q. Yes. Thank you.
A. It was part of the orientation. We discussed this.
Q. Okay. Who conducted the orientation?
MR. DRAHOS: Object to the form.
THE WITNESS: It was the handover doctor at the time, as well as the senior doctor. Some parts were the lead nurse responsibility as well on my first contract.
BY MR. HOFFMAN:
Q. Okay. And on the -- the second contract on the Pride, do you recall who went through your orientation with you?
A. I would assume it was my senior doctor and lead nurse at the time. There was no in-person doctor, doctor handover.
Q. Okay. How long until a -- a senior doctor

came on board the Pride?
A. Which senior doctor are you referring to?
Q. So was there a different senior doctor on the Pride when you first came on board?
A. Different to?
Q. Different -- Rotlaru, I'm sorry.
A. Yes. Yes, there was. There was another doctor, and then Dr. Rotlaru replaced him.
Q. Okay. Do you recall the doctor prior to Dr. Rotlaru?
A. Yes, I do.
Q. What was her name?
A. It was a man. His name is Dr. Chavez.
Q. Okay. And do you know why Dr. Chavez lost -- left the boat?
A. Yeah. It was the end of his time. He rotated.
Q. Okay. Did he conduct your orientation?
A. That's correct.
Q. Okay. Thank you. On October 18th, 2024, did the cost of any of the disembarkation options play any part in your thinking?
A. The cost will never play any part in my thinking.
Q. Okay. Your decision is made based on your

clinical judgment alone?
A. That's correct.
Q. Thank you. So was -- I -- I appreciate you -- you clarifying as to when Dr. Rotlaru had joined you on the Pride. And it looks like you joined the Pride on August 18th, 2024, and would it -- would it be correct if I were to tell you that Dr. Rotlaru joined on September 8th, 2024, about two and a half --
A. I'm not sure the exact date that he joined.
Q. I'm sorry. I spoke over you.
A. No worries. I just said I don't know the exact date that he joined.
Q. Okay. But it was not too long after you had joined the Pride on August 18th, correct?
A. Oh, again, I'm not sure when he joined.
Q. No worries. Let me pull that up real quick. Yeah. I don't see an exhibit, but based on my calculation, it appears that on October 18th, 2024, you had worked for Dr. Rotlaru for about six weeks prior to the Michael Smith incident. Does that sound correct?
MR. DRAHOS: Object to the form. Mischaracterizes the relationship.
THE WITNESS: Yeah. I didn't work for him.
BY MR. HOFFMAN:
Q. You worked under him?

MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MR. HOFFMAN:
Q. Well, he was a senior ship doctor, correct?
A. That's correct, but not in terms of clinical designation.
Q. Only in terms of clinical designation, you said?
A. Not in terms of clinical designation.
Q. Understood.
A. Clinically, we had equal decision making.
Q. Okay. That aside, you did report to him, correct?
MR. DRAHOS: Object to the form.
THE WITNESS: That is --
BY MR. HOFFMAN:
Q. Yes?
A. That is correct. The ship's doctor reports to the senior doctor.
Q. All right. Thank you. Do you know if Dr. Rotlaru is a specialist in emergency medicine?
A. I'm not sure of his qualifications exactly.
Q. Okay. When we were looking at the roles and responsibilities, it stated that, "Notifies" -- for -- for your role, "Notifies a senior doctor in a timely

manner of any significant clinical cases, cases that may affect the operation of the ship." You understood that as a requirement, correct?

A. That's correct.

Q. And that you're to recognize limits of your own abilities and knowledge, ask for help, and escalate as needed, correct?

A. That's correct.

Q. And you take charge of a medical emergency only in the absence of the senior doctor, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: No, that's not correct.

BY MR. HOFFMAN:

Q. Let me pull up the document real quick. So the third bullet point under professional responsibility states, "Recognizes limits of own abilities and knowledge, asks for help, and escalates as needed." Do you see that?

A. Yes, I do.

Q. Did you ever, while on the Carnival Pride, find that there was an issue where your abilities and knowledge required you to ask for assistance?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't recall.

BY MR. HOFFMAN:

Q. Okay. If you did recognize your own abilities and knowledge were limited, who would you ask for help from?

MR. DRAHOS: Object to the form --

THE WITNESS: It depends on what -- it depends on what the instance for help means. Is it clinical? Is it logistical? Is it coordination-based? It's very specific according to that.

BY MR. HOFFMAN:

Q. Clinical. I'm sorry.

MR. DRAHOS: Same objection.

THE WITNESS: So if it's clinical-based and maybe I needed a second pair of eyes to give me their medical opinion, the senior doctor is there for that. If it requires a specific specialty, that's what telemedicine is for.

BY MR. HOFFMAN:

Q. Okay. And then let's see. Under patient care responsibilities, the -- the seventh bullet point says, "Assumes responsibility for effective medical response to medical emergencies, mass casualty incidents, and other medical related calls in the absence of the senior doctor." Do you see that?

A. Yeah, I can see that.

Q. Okay. So were there any medical emergencies

where the senior doctor was absent and you were required to fulfill that need?

MR. DRAHOS: Object to the form.

THE WITNESS: Are you -- you talking about on the Pride?

BY MR. HOFFMAN:

Q. Yes, sir.

A. I can't recall exactly, but maybe if he was on shore and I was on board, then yes.

Q. Okay. If he was on board, would that be a situation where you would be able to reach out to him and he would not be considered absent?

A. If he was on board, then he is not absent from the vessel.

Q. Okay. On October 18th, 2024, was Dr. Rotlaru ever absent from the vessel?

A. I'm not sure. What specific day was it?

Q. What was the specific day? I believe it was --

A. Oh, like, what -- do I mean, were we at port or were we at sea?

Q. At sea, I believe.

A. Then he would've been on board the entire time.

Q. Okay. Thank you.

MR. HOFFMAN: I'd like to have marked as Exhibit 13 the Role and Responsibilities for Senior Doctors.

(Exhibit 13 was marked for identification.)

BY MR. HOFFMAN:

Q. And it states here that, "He maintains overall responsibility for effective medical response to medical emergencies," correct?

A. I can read that. Yes, that's correct.

Q. And "he is the one to notify the shipboard senior management and shoreside health operations," correct?

A. Are you asking me if it's there? Yeah, that's correct. Yeah.

Q. Okay. So under this document, the call to shoreside and the call to the captain run through the senior doctor, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Where does it say that in the document?

BY MR. HOFFMAN:

Q. Well, if the senior doctor is the one to notify the shipboard senior management and shoreside health operation center -- sorry, I can go back to 3104A5 that actually has the specific reference.

A. That's okay. I can see it there under professional responsibilities.

Q. Okay. So just to confirm, it would be the senior doctor's role to call shoreside and the captain, correct?

MR. DRAHOS: Object to form.

THE WITNESS: Yes, that's correct.

BY MR. HOFFMAN:

Q. Do you know where Dr. Rotlaru was the evening of October 18th, 2024?

A. He was on board.

Q. Okay. Were you -- do you know who the doctor was on call that evening?

A. If I saw the patient, then I was on call.

Q. Okay. Do you -- did you speak to Dr. Rotlaru about Mr. Smith at any time on October 18th?

A. I don't recall speaking to him on October 18th.

Q. When do you recall first speaking to Dr. Rotlaru about Mr. Smith?

A. I'm not sure exactly when I did. It could have been October 18th or it could have been the day afterwards.

Q. Okay. And by what means would you have contacted him?

MR. DRAHOS: Object to form.

THE WITNESS: If I saw him in clinic, then it would've been face-to-face. And if it wasn't at clinic, then I would've called him on a Cisco phone.

BY MR. HOFFMAN:

Q. And if he had come to the clinic on October 18th, would he have seen Mr. Smith?

A. I'm not sure what he would've done.

Q. Did Dr. Rotlaru ever come to the medical center to see Mr. Smith on October 18th?

A. I'm not sure.

Q. Do you know if Dr. Rotlaru came to the medical center to see Mr. Smith on October 19th?

A. If it was during working hours and Mr. Smith was there, then he would've seen Mr. Smith.

Q. Okay. If -- did -- if Dr. Rotlaru ever saw Mr. Smith, would it be indicated in his chart?

A. Can you please repeat that?

Q. If Dr. Rotlaru did examine Mr. Smith, would it be documented in his chart?

A. If he documented the examination, then it'll be in his chart.

Q. Okay. Do you recall if you ever told Dr. Rotlaru that Mr. Smith was unable to walk?

MR. DRAHOS: Object to the form.
THE WITNESS: I don't recall.
BY MR. HOFFMAN:
Q. Do you recall if you told Dr. Rotlaru before you let Mr. Smith go back to his cabin at 11:30 on October 18th?
A. I don't recall.
Q. I want to ask you about the Against Medical Advice forms. I will bring those up.
MR. HOFFMAN: I have that marked as Exhibit 14.
(Exhibit 14 was marked for identification.)
BY MR. HOFFMAN:
Q. Okay. So this is Bates stamp 627 through 630. So on the first document, 627, is the Against Medical Advice that was signed at October -- October 18th, 2024 at 20:42, and then the next two documents at 629 -- bates 629 and 630 are Against Medical Advice documents that are signed at 20:41. Are you able to see those documents, sir?
A. Yes, sir. I can.
Q. Okay. And where it says on 628 and 630, were -- was that your signature?
A. That is my signature.
Q. And you signed it as the senior doctor; is

that correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. That's autopopulated by the system. It's a template. It can't be changed.

BY MR. HOFFMAN:

Q. Okay.

A. Which is why I put my name and crew ID under it.

Q. Is the senior doctor required to sign off when someone is going to not take medical advice, but yet there's a risk of their morbidity?

A. Not necessarily.

Q. What do you mean, not necessarily?

A. Are -- are you asking -- what exactly are you asking again, sir?

Q. Yes. So when a patient is signing against medical advice and wants to leave the infirmary and that person is at risk of dying, is it for the senior doctor to sign off on that Against Medical Advice form?

MR. DRAHOS: Object to form. Improper hypothetical.

THE WITNESS: Yeah. It's obviously very patient-specific as to what that means. "At risk of dying" is a very vague term.

BY MR. HOFFMAN:

Q. Okay. Well, it says here "possible risks," and I'm reading Bates stamp 627, the first -- or actually, it's the second of the Against Medical Advice, one at 42 after the hour and 41 after the hour, but this is the one that's 42 after the hour. And it says, "Possible risks and complications of refusing the medical advice given. Worsening of condition, poor response to treatment, progressive infection, no monitoring in cabin, further morbidity/mortality." What does further morbidity/mortality mean, sir?

A. So further morbidity means progression of the illness. Mortality means death.

Q. Okay. So would it be fair to say that on this Against Medical Advice document, that it states that Mr. Smith was at risk of death?

MR. DRAHOS: Object to the form.

THE WITNESS: On this specific one, it's fair to say that.

BY MR. HOFFMAN:

Q. Okay. And on the second one, which is the one that's 41 after, Bates stamp 629, it says, "Possible risks and complications of refusing the medical advice given. Again, worsening of condition, poor response to treatment, progression of infection, further morbidity mortality." So it appears that on both against medical

advices, it seems to indicate that Mr. Smith could be at risk of dying if he goes back to his cabin, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Risk is a relative term.

BY MR. HOFFMAN:

Q. Okay.

A. You have to differentiate between high, moderate, or low risk.

Q. Okay. Right. So that actually takes me to the language where it says, "Completed by ship's doctor." Above, it says, "I provided information to the patient regarding his or her condition, the treatment required, and potential alternative treatments, and the risk and benefits of treatment, as well as lack of treatment. I explored the alternatives with the patient. The patient has the decisional capacity to use this information to come to a reasoned decision." And then it says, "The patient's refusal presents a minimal, substantial, extremely high threat to his/her health."

So my question, sir, is are you supposed to indicate as to whether or not the threat is minimal, substantial, or extremely high?

A. You mean are you supposed to, like, circle or choose which one it is?

Q. Yes, sir.

A. So there are certain instances that we should do that, and there are certain instances where it's not really necessary.

Q. Is it not necessary to circle what level of threat it is, given that Mr. Smith was at risk of morbidity or mortality?

MR. DRAHOS: Object to the form.

THE WITNESS: It obviously depends on the patient's specific reason.

BY MR. HOFFMAN:

Q. So when a guest declines admission and declines a hospital referral, are you supposed to contact the senior doctor?

A. It's depending on the instance at which it happens.

Q. Well, in Mr. Smith's instance, and you've marked -- this looks like it's within the first hour of his being admitted into the infirmary, that he was at risk of morbidity and mortality. Would that be -- and he was declining admission and you were recommending go to a hospital. Would that require you to contact the senior doctor per the roles and responsibilities that we just went over?

MR. DRAHOS: Object to the form.

THE WITNESS: A referral to a Baltimore

hospital is relative and it doesn't necessarily indicate the urgency. If -- I don't want to hypothesize anything, but what's the exact question that you're asking? Should I have contacted or --

BY MR. HOFFMAN:

Q. Yes.

A. -- not exactly sure?

Q. Yes. Should you have contacted the senior doctor?

A. I'm not sure if I contacted him.

Q. Should you have contacted him?

MR. DRAHOS: Object to the form.

THE WITNESS: It depends on the situation that the patient was in.

BY MR. HOFFMAN:

Q. The situation is the -- the situation of Mr. Smith that we're talking about today.

A. I don't recall his exact clinical condition.

Q. But given your notes that he was at risk of death looking back, is that something that you should have referred -- contacted Dr. Rotlaru for?

MR. DRAHOS: Object to the form. Mischaracterizes the document.

THE WITNESS: Not necessarily.

BY MR. HOFFMAN:

Q. When would you be required to contact Dr. Rotlaru if somebody didn't want to sign the -- or someone was signing the Against Medical Advice form and returning to the room, what would necessarily require you to contact Dr. Rotlaru as a senior doctor?

A. There's many instances. If the patient is at imminent risk of death, if the patient doesn't have the instance to make an informed decision or lacks the mental capacity to make an informed decision, if the patient has -- is traveling alone. Quite -- there's quite a few reasons to escalate the situation.

Q. What is hyperglycemia?

A. That's an increased blood glucose.

Q. And can it cause death?

A. It can potentially cause death.

Q. Okay. And if someone is suffering from hyperglycemia, are they able to make decisions?

MR. DRAHOS: Object to the form. Improper hypothetical.

THE WITNESS: Yeah. That's a very hypothetical scenario. It depends on the severity.

BY MR. HOFFMAN:

Q. Okay. If somebody is suffering from hyperglycemia and you have identified them as possibly at risk of death if they return to their cabin, would

you say that that hyperglycemia is an extreme situation?

MR. DRAHOS: Object to the form. Improper hypothetical. Are you speaking of Mr. Smith or some fictional character?

MR. HOFFMAN: We're only talking about one thing here. And yes, Mr. Smith, the difference --

MR. DRAHOS: Well, that's not the way you phrased the question. So that's the basis of the objection. If you want to ask him about Mr. Smith specifically, please make that clear so that it's not confusing to the witness.

BY MR. HOFFMAN:

Q. Okay. We are talking about Mr. Smith here, Doctor, in the context of this -- this conversation. And my question is, is given -- you've read his SeaCare notes, correct?

A. That's correct. Yes.

Q. And you read his blood glucose levels?

A. I can swipe through it quickly. Which one are you referring to?

Q. Let me turn to it as well. Before we go there, Doctor, could you tell me what a normal glucose level is for a diabetic that hasn't eaten in over 12 hours?

MR. DRAHOS: Object to the form.

THE WITNESS: A fasting glucose level, ideally?

BY MR. HOFFMAN:

Q. Yes.

A. It's usually between 4 and 7 millimoles per liter.

Q. All right. And what would be considered high?

MR. DRAHOS: Object to the form.

THE WITNESS: For who?

BY MR. HOFFMAN:

Q. For a diabetic, the blood sugar level.

MR. DRAHOS: Object to the form.

THE WITNESS: Do you mean a -- are you referring to a fasting glucose level?

BY MR. HOFFMAN:

Q. Yes.

A. Anything above that range will be considered above the normal.

Q. Okay. And when someone has the high glucose level, does it affect their decision making?

A. It depends on the severity --

MR. DRAHOS: Form.

THE WITNESS: -- of the glucose level. It's very clinically dependent.

BY MR. HOFFMAN:

Q. Okay. So if it -- if it's high, is it possible that a person could not have the capacity to make a decision?

MR. DRAHOS: Again, Mr. Hoffman, I'm stepping in because you had qualified these questions a moment ago as we're talking about Mr. Smith --

MR. HOFFMAN: Yes.

MR. DRAHOS: -- and then labeled the following questions as someone. That's extremely vague and unfair to the witness. So please --

MR. HOFFMAN: Mr. Smith.

MR. DRAHOS: -- what you're speaking of.

MR. HOFFMAN: That someone is always Mr. Smith, sir. So I --

MR. DRAHOS: Well, I don't agree that -- with that wording at all. That's -- that's not going to come out clearly. That may come out that way in your brain, but not to me and not to Mr. -- or to Dr. Maharaj. So please make it clear in every question you're going to ask who you're speaking of.

MR. HOFFMAN: Okay.

BY MR. HOFFMAN:

Q. So Dr. Maharaj, again, we're talking about Mr. Smith in this instance. And when he first presented to

the infirmary, what do you recall of his condition?

MR. DRAHOS: Object to the form.

BY MR. HOFFMAN:

Q. And I can pull the record.

A. Generally speaking, he looked like --

Q. I'm sorry. You broke up and I could not -- I couldn't hear.

A. I have a --

MR. DRAHOS: Hold on a second, Dr. Maharaj. We're losing you.

MR. HOFFMAN: Go off record for a moment.

THE VIDEOGRAPHER: The time is 10 --

(A recess was taken.)

THE VIDEOGRAPHER: The time is 11:31. We are back on record.

(The requested question was read back.)

THE REPORTER: I'm sorry.

MR. HOFFMAN: Go ahead.

THE REPORTER: You were saying something?

MR. HOFFMAN: No. Please go ahead.

THE REPORTER: Okay. Give me one second. I have to go back to it.

(The requested question was read back.)

THE WITNESS: So I can recall a generally unwell male individual, chronically ill, very

poorly managed blood glucose, in the obese weight category. I recall him having a fungal or some sort of superficial infection in his foot. Yeah. That's -- I can go more in depth if you'd like me to read my notes?

BY MR. HOFFMAN:

Q. Yes. I -- I'd like to know more about what you identified regarding his hyperglycemia and his blood sugar.

A. Yeah. Of course. So I can see that his initial blood glucose on triage in the medical center, October 18th at 19:16, was 369 milligrams per deciliter, so 20.5 millimoles per liter. And I noticed that -- sorry, noted on my HPI history that -- this is all subjective as to what he has told me. He has a very high RBS all the time, ranging between 320 and 380, hence that reading that we did was normal for him.

Q. So if it was normal and -- if -- if that blood sugar level was normal for him, wouldn't it have made sense that he was not suffering from a diabetic episode, given that that's his normal blood sugar?

MR. DRAHOS: Object to the form.

THE WITNESS: No. That's not true.

BY MR. HOFFMAN:

Q. Well, you just stated that he had told you

that this was normal for him, his blood sugar, correct?
A. That's correct.
Q. So that's just -- that's not normal for anyone, right, coming in at 369, right?
A. Correct.
Q. But you're saying that in -- in this moment, he is telling you that that is -- that is his normal, and if --
A. That's what he told me. Correct.
Q. Right. So if the patient is telling you that that is his normal, as a medical doctor, wouldn't you examine or look further to see as to whether or not there were other issues presenting besides hyperglycemia?
A. Correct.
Q. Okay. So the question to you is, why didn't you?
MR. DRAHOS: Object to the form.
THE WITNESS: Can you elaborate? Why didn't I what?
BY MR. HOFFMAN:
Q. Why didn't you look further beyond hyperglycemia if the -- if Mr. Smith had just told you what he was experiencing was normal in -- as far as his blood sugar, and he's suffering in the way that he was

when he presented, that he couldn't -- he reported not being able to stand, that he was slurring his speech. My question is --

A. Where did he report that?

Q. What's that?

A. Where did he report that?

Q. Where did he report what?

A. That he was unable to stand and slur his speech.

Q. Well -- well, I -- I -- I -- I -- I -- I don't know. If he did report that, it would be in your medical records, right?

MR. DRAHOS: Object to the form.

THE WITNESS: That's correct.

BY MR. HOFFMAN:

Q. Okay. So -- all right. So if a patient is presenting with normal blood sugar for him, but is suffering symptoms that required him to contact Carnival for a wheelchair to be brought to the infirmary. My question is -- is why didn't you look further than the blood sugar issue, given that Mr. Smith was now not able to walk, needing a wheelchair to get there, and having vomited several times throughout the day? Wouldn't this require a deeper investigation from a clinical standpoint?

MR. DRAHOS: Object to the form.

THE WITNESS: I have two questions to that. By someone, do you mean Mr. Smith?

BY MR. HOFFMAN:

Q. Yes. Mr. Smith. Yes, sir.

A. Okay. And what do you mean by look deeper?

Q. Well, the patient has just presented themselves to you saying that -- well, your -- you -- your impression was that he had hyperglycemia, correct? Which would be an indication that you felt that his blood sugar was off, but he is telling you that his blood sugar is normal for him, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: That -- that's what he told me.

BY MR. HOFFMAN:

Q. So --

A. It's normal for him.

Q. So first off, is that comment, that the blood sugar level was normal for him, is that something that you would record in your notes?

A. I did record that in my notes.

Q. That he indicated that his blood sugar, at the level that he was at, was normal? I'd like to actually pull up the medical summary right now.

MR. HOFFMAN: And I'd like to have this marked

as Exhibit 15.
(Exhibit 15 was marked for identification.)
BY MR. HOFFMAN:
Q. And this is the SeaCare case file that we had discussed earlier. You'd said you had reviewed this 42-page document, correct, prior to today?
A. Yes, sir. That's correct.
Q. So I'm going to share my screen here. And I'd like for you to tell me where in the notes does it indicate that Mr. Smith has identified his blood sugar, upon entry to the infirmary, as being normal for him?
MR. DRAHOS: Object to the form.
It's not limited to that page, Doctor. You can look through the whole chart.
BY MR. HOFFMAN:
Q. Yes. I can obviously scroll if it's on a different page.
A. Yeah. So if you don't mind scrolling down to Page 15 under HPI.
Q. Okay.
A. And then just look at the -- one of the last lines there. "Has a very high RBS all the time, ranging between 320 to 380."
Q. Okay. So if that's the -- the case, he always has that high RBS, then what was your medical conclusion

as to why he was suffering as he was?
A. Are you saying that his high RBS is not related to what he was having?
Q. He's saying that it's normal for him and that what he was experiencing was not normal for him.
MR. DRAHOS: Object to the form.
Doctor, make sure you understand what he's asking before you answer.
THE WITNESS: Yeah. I'm not understanding.
BY MR. HOFFMAN:
Q. No worries. All right. Given that Mr. Smith came to you, couldn't walk, needed a wheelchair to get there, okay? And he's reported that the issue is not his blood sugar because it always runs high, right?
A. He didn't say the issue was --
MR. DRAHOS: Objection. Form.
Wait, wait. Doctor, let me step in. His manner of speech, I'm not sure when he's finished with the questions. So sometimes I -- I -- no. There's a little bit of a lapse, but I want to object to the form of that question.
Go ahead and continue, Mr. Hoffman, if there's some question following. I don't know.
BY MR. HOFFMAN:
Q. So you indicated in your notes that his blood

sugar, when he comes into the infirmary, is normal for him, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I didn't say it's normal for him.

BY MR. HOFFMAN:

Q. I'm sorry?

A. I didn't say it's normal for him. I said it has a very high all the time.

Q. Okay. So if he has a high RBS all the time, like this time that he presented to you in the infirmary, and he's experiencing symptoms that he's not experienced before, why would you think that the issue is related to his glucose?

MR. DRAHOS: Object to the form.

THE WITNESS: Because is he clinically skilled to tell me that it's not.

BY MR. HOFFMAN:

Q. But he knows his own medical history, right, Doctor?

A. 100 percent.

Q. And --

A. But how accurate is him telling me that his ranging between 320 and 380? Am I just supposed to take that at face value and not do anything about that?

Q. Well, if he is experiencing symptoms that he's never experienced before, like not being able to walk, what --

A. Did he say he's not able to walk?

MR. DRAHOS: Object to the form. Again, I just want to make sure the transcript is clear. I -- I'm objecting to the form, but sometimes there's instances where the answer is coming in because the doctor is assuming Mr. Hoffman is done with his question.

So go ahead. Let's maybe try and pause a little bit, Doctor, so I can get these objections in.

Go ahead, Mr. Hoffman. Sorry.

MR. HOFFMAN: Okay. All right. We can come back to that. Actually, 11:43. Can we take a ten-minute break? I'm just getting a little hungry here. Is that okay with everyone?

MR. DRAHOS: Well, wait.

MR. HOFFMAN: Yes?

MR. DRAHOS: So look, I -- I'm always wanting to accommodate --

MR. HOFFMAN: Sure.

MR. DRAHOS: -- everybody, including, of course, the videographer and the court reporter.

But we are six hour -- we are six hours behind Dr. Maharaj. So unless somebody needs to eat or something, we can talk about that. But I would prefer not to take ten-minute breaks. I'd prefer to just break this up into five-minute intervals.

MR. HOFFMAN: Yes, sir. Absolutely. All right.

MR. DRAHOS: Okay.

MR. HOFFMAN: So back at 48 after?

MR. DRAHOS: Okay. Thank you.

MR. HOFFMAN: All right. You're welcome. Thank you.

THE VIDEOGRAPHER: Okay. The time is 11:43, and we're going off record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 11:53. We are back on record.

BY MR. HOFFMAN:

Q. Nurse Dube testified that a patient suffering a stroke is a condition that requires the senior doctor to attend the clinic. Was that your understanding also?

MR. DRAHOS: Object to the form.

THE WITNESS: If a patient is suffering a stroke, the senior doctor should be there. You can't confirm a stroke unless it's on CT. So I

think you mean suspecting to have a stroke.

BY MR. HOFFMAN:

Q. Yes, sir. Thank you.

A. Yes. That's correct.

Q. I'd like to -- when did you first tell Dr. Rotlaru that -- about Michael -- about Michael Smith?

MR. DRAHOS: Object to the form. Asked and answered.

THE WITNESS: I'll -- I'll repeat it. I can't remember exactly.

BY MR. HOFFMAN:

Ex. D 112:12-19

Q. And that WhatsApp group that you joined when you joined the Pride, was it already -- is that WhatsApp group already in place when you get there?

A. I would assume so, yeah. And then you'd be added to it.

Q. Okay. And then when you leave, you're removed, but that group continues on?

A. Yeah.

Q. Thank you.

MR. HOFFMAN: I'm going to pull up what I'd like to have marked as Exhibit 16.

(Exhibit 16 was marked for identification.)

BY MR. HOFFMAN:

Q. And I'll refer to this as the Guest Disembark

email. It's October 19th, 10:22 a.m. So your disembark notice was -- looks like this was sent at 10:22 a.m. on Saturday, October 19th. Would you have spoken to Dr. Rotlaru prior to sending an email like this?

A. Would I have -- most likely, yes.

Q. Okay. And it says, "Good day. The following guest has medically" -- "been medically disembarked." Do you know why it stated that he had been medically disembarked when he hadn't?

A. Yeah. That's -- sorry for disturbing. That's a nomenclature issue. It's a wording problem. He was still on the ship at this time.

Q. Okay. Then let's go to the next document, which is -- I'm sorry for the format here. It's the iCare comment log.

MR. HOFFMAN: I'd like to have this marked as Exhibit 17.

(Exhibit 17 was marked for identification.)

BY MR. HOFFMAN:

Q. And it's like this in the form because we don't have the emails, but we have this. And we have here, from Pride Doctor, that message that you had just sent at 10:23, where it states that medical disembarkation information. And then it looks like there was a response at -- there was a response October

19th at 4:00 p.m. from Arlene Rocha (phonetic). Do you know who Arlene Rocha is?

A. Not personally.

Q. Okay. It looks like her email says, "Hello, team. Was this guest medically disembarked to a local facility or did he fly home for further care?"

To which Dr. Rotlaru replies, "The guest is still on board, admitted to the medical center, envisaged disembarkation is tomorrow morning on arrival back to Homeport Baltimore."

Did he talk to you before he sent his message regarding Mr. Smith?

A. I don't recall if he did.

Q. Do you know if he ever went and saw Mr. Smith on October 19th?

MR. DRAHOS: Object to the form.

Go ahead.

THE WITNESS: I'm not sure if he did.

BY MR. HOFFMAN:

Q. Okay. Did anyone in Miami ever ask a single clinical question about Mr. Smith after this disembarkation letter?

A. Can you please clarify what "anyone in Miami" means?

Q. Oh, sorry. Anyone from Carnival. Anyone from

Carnival headquarters or HOC ever ask a single question concerning Mr. Smith's clinical condition?

A. I don't recall.

Q. Carnival's position in the case is Dr. Rotlaru provided no medical care and treatment to Plaintiff while onboard the subject vessel. Is that true as far as you know?

A. I don't recall if he did.

Q. Okay. But if he did, it would be in your -- in the medical records, you stated?

A. If he provided care or examined or prescribed something, it would be in the medical records if he documented it.

Q. Okay. Could you describe your working relationship with Dr. Rotlaru?

A. It's a professional working relationship. We got on well professionally.

Q. Okay. Was there ever a time on the Pride when you wanted to do something for a patient and Dr. Rotlaru directed otherwise?

MR. DRAHOS: Object to form.

THE WITNESS: He won't direct otherwise because, clinically, we have equal clinical decision-making capabilities.

BY MR. HOFFMAN:

Q. Okay. Unless you came to him and asked for advice, correct?
A. Correct. But that's not a -- doing otherwise.
Q. Understood. Did you feel free to disagree with Dr. Rotlaru?
A. Yeah. I feel free to disagree with anyone.
Q. Okay. Did you feel free to call him at night if you needed to?
A. Yes.
Q. Okay. Did Dr. Rotlaru write your performance evaluation?
A. Was it on the -- do you mean at the end of my contract on Pride?
Q. Yes.
A. Yes. He would've done it.
Q. Okay. And would his evaluation have decided whether you would be recommended for promotion?
A. Not his alone. It would've been a whole host of evaluations would've gone into that.
Q. But that's part of his role, though, to identify top performers for career advancement?
A. Yes, that is correct.
Q. Nurse Dube testified that she would be concerned for her job security if she told a ship's doctor that his diagnosis was incorrect. Were you aware

nurses on the Carnival Pride felt that way?

MR. DRAHOS: Object to the form. Again, mischaracterization.

THE WITNESS: I mean, that's a very personal thing. It's up to the individual, I guess, if they feel or don't feel that way. But there should be free speech and autonomy.

BY MR. HOFFMAN:

Q. Okay. But if Ms. Dube's perspective on the Carnival Pride was that she would be concerned for her job security, safe to say that you were not aware of her -- of her feelings?

MR. DRAHOS: Object to the form.

THE WITNESS: That's -- yeah.

BY MR. HOFFMAN:

Q. When you were working at Mr. Smith, did you ask the nurse who had been to the cabin what she had seen before bringing Mr. Smith to the infirmary?

A. I can't remember if those were the exact words used, but I would've liked to know the entire pre-hospital situation.

Q. Okay. Stop sharing my screen here. The lawyers defending you today are from GrayRobinson, and they also represent Carnival. Did you choose them?

A. Do you mean me personally?

Q. Yes, sir.
A. No, sir, I did not.
Q. Do you have any lawyer in this case that does not also represent Carnival?
A. Do you mean I have -- do I have another lawyer except for Mr. Michael?
Q. Yes, sir.
A. No.
Q. Thank you. I'd like to turn next to your -- your contractor agreement. Let me pull it up.
MR. HOFFMAN: All right. So I have up on the screen your independent contractor agreement, and this is -- looks like an eight-page document, Bates stamped 49 to 496.
(Exhibit 18 was marked for identification.)
BY MR. HOFFMAN:
Q. And your agreement says that you're an independent contractor, correct?
A. That's correct, sir.
Q. Okay. Did you receive any benefits while -- for Carnival?
A. What -- what does that mean?
Q. Like, employee benefits, like health insurance or anything along those lines?
MR. DRAHOS: Object to the form.

THE WITNESS: I -- I didn't receive health insurance.

BY MR. HOFFMAN:

Q. Okay. And your -- let's see. Number 19, it says, "Contractor agrees to practice according to the appropriate standard of care, to practice within his or her scope of medical expertise and in the best interest of his or her patient." That was your duty to Mr. Smith on October 18th, correct?

A. That's correct. To every patient.

Q. Did Mr. Smith come to you because his blood sugar was high?

MR. DRAHOS: Object to the form.

THE WITNESS: What do you mean by that?

BY MR. HOFFMAN:

Q. What's his complaint to you about his blood sugar when he presented to the infirmary?

A. No. I'll read my notes. His main complaints were vomiting, diarrhea, and lethargy.

Q. And that is what -- is that what prompted you to focus on his hyperglycemia?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't think I focused on his hypoglycemia.

BY MR. HOFFMAN:

Q. Well, you said that he came in with the -- the high blood sugar, and you -- you know, you said -- stated earlier that you felt a duty to take care of it, correct?

A. Correct.

Q. But he didn't come to see you due to his blood sugar. He came to you because of his symptoms, correct?

A. Yes. His -- him having high blood sugar was not a presenting complaint.

Q. Okay. So when he -- when you tested his blood sugar and he said that that was normal for him, but these symptoms were not, what was your next clinical step to evaluate what was going on with him?

A. He didn't say it was normal for him. He says that he has high-risk RBSs all the time.

Q. And why would you feel that it was your duty then, at that moment, to focus on reducing the RBS?

MR. DRAHOS: Object to the form.

THE WITNESS: Because the first line of the Hippocratic oath says, do no harm, and a high RBS to that extent will do harm.

BY MR. HOFFMAN:

Q. Could it affect his decisional -- his capacity to make decisions?

MR. DRAHOS: Object to the form.

THE WITNESS: His capacity to make decisions was not effective.

BY MR. HOFFMAN:

Q. Okay. I'd like to -- you just take a look at what I have up on the screen, which is Annex A to your independent contractor agreement, Bates stamped 496. It says here, "Carnival will provide your -- your defense, but the indemnity is limited to the sum of a stated amount." Do you know what that amount is?

A. No.

Q. Has anyone told you who pays if a judgment is larger than that amount?

MR. DRAHOS: Object to form.

So I'm going to instruct you not to answer the question, Dr. Maharaj, if your answer is dependent upon what you and I have talked about. If you have an understanding of this agreement beyond what I've told you, then you're free to -- to answer.

MR. HOFFMAN: Thank you, Michael.

MR. DRAHOS: Do you understand the instruction? Okay.

THE WITNESS: Yeah. I don't have an understanding more than what we've talked about.

MR. DRAHOS: All right. Then I'm going to instruct you not to answer.

MR. HOFFMAN: All right.

BY MR. HOFFMAN:

Q. It says, Paragraph 2, "You will not accept at your own cost, settle any claims, or admit any liability without our written authority." And you understood that when you signed the document, correct?

A. Yeah.

Q. Then it says, Paragraph 3, "Carnival shall be entitled to take absolute and complete control of the defense of all proceedings against you." Your -- you understood that when you signed the document, correct?

A. Yeah. Whatever is in the document, I understood.

Q. Okay. Paragraph 4 says, "You will not make any additional notes, records, or reports unless specifically requested by Carnival or its agents." And the question is, after October 20th, 2024, did Carnival ask you to write anything about Mr. Smith?

A. Not that I can recall.

Q. Okay. Then Paragraph 5, "You'll fully cooperate with our adjusters and our attorneys appointed to defend the claim." And you understand that your defense depends on that cooperation, correct?

A. Yes, sir.

Q. Okay. The first paragraph says, "The defense

shall not apply in the event" -- well, never mind. Scratch that.

Did you ever read any of the pleadings, any of the legal documents, the complaint, or the answer that has been filed in court in this case?

A. Which document are you referring to?

Q. Most specifically, the answer from Carnival to the lawsuit.

A. If you pull it up, I can tell you if I have read it or not.

Q. Understood. One sec. All right.

MR. HOFFMAN: I'm going to share with you the Answer and Affirmative Defenses to Plaintiff's Amended Complaint. And this is an 11-page document. I'd like to have this marked as, I think, Exhibit 19.

(Exhibit 19 was marked for identification.)

BY MR. HOFFMAN:

Q. Have you seen this document?

A. I can't recall if I did. Let me scroll through real quick.

Q. This is not looking familiar to you?

A. I'm not sure if I read it or not, sir.

Q. Okay. Thank you. It says in the affirmative defenses that you were operating as an independent

contractor at all times, and you're aware of this position by Carnival, correct?

A. That's correct.

MR. DRAHOS: Object to form.

BY MR. HOFFMAN:

Q. And that you were paid as an independent contractor and not as an employee, correct?

A. That's correct.

Q. And that you exercised medical judgment?

A. Correct.

Q. And that your nurses were borrowed servants. Is that your understanding?

MR. DRAHOS: Object to the form.

THE WITNESS: No. I don't know what that means.

BY MR. HOFFMAN:

Q. Was it your understanding that the nurses were employees of Carnival?

MR. DRAHOS: Object to the form.

THE WITNESS: Oh, I think -- if that's what you're referring to, yes. I think that nurses were employees of Carnival.

BY MR. HOFFMAN:

Q. Okay. Thank you. Yes. It says at the bottom with -- on -- of G, "With respect to the care plaintiff,

the ship's nurses were at all times acting under the control of the subject ship physician and -- or does his/her borrowed servants." Thank you. It says under letter E, affirmative defense, that Plaintiff was provided access to a licensed physician aboard the vessel who rendered reasonable medical care and appropriately counseled Plaintiff on available treatment options. What risks was Mr. Smith -- actually, sorry. Scratch that question.

Are you under contract with Carnival today?

A. I'm not on board a ship, no.

Q. And when did your last assignment end? I'm not asking why. I'm just asking the date.

A. It ended in -- I think it was towards the middle of January this year.

Q. And do you anticipate going back out on a boat as a doctor?

A. I'm not too sure.

Q. Okay.

A. Not immediately.

Q. Okay. And -- all right. I want to go through the medical records, the SeaCare, a bit more thoroughly. And that's Bates stamp 5 through 46. It's Exhibit 15. Go to it. Okay. I'm going to start with Page 1, Bates stamp 5. Okay. Let me know if you need me to zoom in.

Are you able to see okay, the screen?
A. Yeah. I can see it well. Thank you.
Q. So Nurse Dube triaged Mr. Smith as urgent, correct?
A. Wait, does it say urgent? Oh, priority urgent. Correct. Yes.
Q. And then it says in her note, "Guest services reported a guest to be vomiting in his cabin and unable to walk." You see that?
A. I can see that, yes.
Q. He was brought to the medical center on a wheelchair, correct?
A. That's correct.
Q. Did you read the triage note before you examined Mr. Smith?
A. Yes. I usually read all triage notes before I see patients.
Q. Did you ask Nurse Dube what she meant by unable to walk?
A. As far as I understand, she didn't mention -- she didn't mean that. She was reporting what Guest Services told her.
Q. Okay. So the last updated date here was October 19, 2024 at 10:13. You see that?
A. Yeah, I can see that.

Q. And go to Bates stamp 44. Now -- sorry, here, 42. Sorry. So Bates stamp 42. At the same time that she was changing her notes, it also -- you were putting in a note that stated, "Guest is sleeping peacefully in ICU. Stable vital signs for hourly glucose monitoring as per sliding scale for referral to Baltimore Hospital mane. Guest explains he is a first-time cruiser and this may be attributed to motion sickness. However, his foot as being a potential source of infection with uncontrollable RBS needs to be further investigated and optimized." Now, my question is -- is when you were putting that note in, that's the same exact time that Nurse Dube was changing her notes. Do you know why she was changing her notes?

MR. DRAHOS: Object to the form.

THE WITNESS: I have no idea. I can't speak on behalf of her.

BY MR. HOFFMAN:

Q. Fair enough. So that was his arrival that you were noting on the next morning, but then I want to go to Page -- a little bit earlier on October 18th. And this is Bates stamp 19, and it says you recorded onset two days ago. And my question is: What exactly began two days earlier, because it says vomiting, diarrhea, lethargy? So what was it that began two days earlier,

the vomiting, loose stools, or the inability to walk?

MR. DRAHOS: Let me object to the form. You -- you had a lot of commentary leading up to that question, some of which was inaccurate.

So Doctor, if you understand the question that he's asking, you can answer, but if you need him to clarify exactly what he's asking you, please do so.

THE WITNESS: Yes, please. So if you don't mind just clarifying it again.

BY MR. HOFFMAN:

Q. Absolutely. So you recorded onset two days ago. What are you referring to from -- that began two days earlier?

A. So I'm specifically referring to those three presenting complaints: vomiting, diarrhea, and lethargy.

Q. Okay. Did you ask Mr. Smith when he was last able to walk normally?

A. He was walking.

Q. Okay. You next typed, a couple lines down, "No history or DKA HS -- HHSMI stroke." So the word stroke was in your mind as a part of his past history, but was it in your mind as a present possibility on October 18th?

A. Are you asking if what he presented with seemed like a stroke?

Q. I'm asking if it ever presented as a possibility in your mind?

A. Specifically to Mr. Smith?

Q. Yes, sir.

A. His symptoms, his presenting complaint, his examination, his investigations did not suggest a stroke.

Q. Okay. And then your review of systems at 19:23 says he denies dizziness and weakness, but the triage notes that were taken a few minutes earlier complained about general body weakness, and then your note at 20:34 states that he complains of dizziness. So which note is correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I would assume the most updated note is exactly what he's presenting with at that point in time. So I can only that, at the point I was recording the review of symptoms, he was not dizzy and he didn't have a headache or weakness, as you explained, and I didn't note any of these in my HVI. It's also very important to note what weakness means. These are very subjective terms, and it's also subjective in the clinical context. The way I understand weakness is weakness that a specific part does not move, more like a

hemiparesis, when that wasn't the case. Weakness in terms of being tired is called lethargy, which is what I noted. And then on the updated instance, I think you said I made a note at 20:34, then I mentioned that he was dizzy at that time.

BY MR. HOFFMAN:

Q. Okay. When you -- sorry, scratch that.

Does SeaCare have a pick list with defaults when you're using it to create a record?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not understanding what that means. What is a pick list?

BY MR. HOFFMAN:

Q. So like when you click on a button and it comes up with a bunch of different choices.

A. Do you mean like dropdown menus?

Q. Yes, a dropdown menu. Thank you.

A. I guess it -- may be SeaCare has dropdown menus. I'm not exactly sure.

Q. Okay. And do you know if it selects, denies by default, or do you have to specifically select something?

A. No, you have to specifically select something.

Q. Okay. Mr. Smith, in his testimony, stated that he told the doctor something was wrong with his arm

and that he could not feel his legs. Did he tell you anything about his arms or legs?

A. No. Whatever he told me is a subjective note that I would've written in HPI, if it's not there.

Q. I'd like to go to Bates stamp 22. This is -- let's see. So sorry, Bates stamp 21, which is Page 17 of the 42-page document. And it says, "Appearance distress: no distress; weight: obese, morbid; mental status: awake and alert, orientated, cooperative." And then general is dehydration, moderate. So if -- how did you measure his dehydration level?

MR. DRAHOS: Object to the form. Are you talking about on the 19th, Mr. Hoffman, or the 18th?

MR. HOFFMAN: The 18th. The one that's up on the screen, the 19:24.

MR. DRAHOS: You -- you -- well, I'm sorry, but you just read the 19th.

MR. HOFFMAN: Sorry, I'm looking at Page 17. Are you able to see my screen okay?

THE WITNESS: I can see it, yes.

MR. HOFFMAN: So I'm referring to this entry here, October 18th at 19:24.

MR. DRAHOS: Thank you.

MR. HOFFMAN: Yeah. So --

MR. DRAHOS: So --

BY MR. HOFFMAN:

Q. Yeah. How did you measure his level of dehydration?

A. So dehydration is measured clinically, usually by a variety of sources, the first one being skin turgor. Then you look at the eye appearance, you look at the mucus membranes, and you also look at the level of thirst, and then you grade it from mild, moderate, to severe from there.

Q. Okay. And then your exam states that he had a -- second page here of that entry from the 18th, 19:24 -- that he had a steady gait and negative Romberg test. You wrote that?

A. Well, I typed it. Yes.

Q. Okay. So he arrived nine minutes earlier in a wheelchair; reported as unable to walk. So my question is: Did you watch him walk, first?

A. Yes, I did watch him walk.

Q. How far did he walk?

A. Can't remember the exact distance if I had to quantify it --

Q. Okay.

A. -- but I remember that he walked to the bathroom because he had to urinate.

Q. Was anyone holding him up?
A. Okay. Yeah.
Q. You can't remember, you said?
A. I can't remember, sir.
Q. All right. Thank you. So next, a Romberg test. My understanding is, and correct me if I'm wrong, that has the patient stand feet together with eyes closed. And so did Mr. Smith stand unsupported with his eyes closed?
A. I don't know if it was unsupported, but I would assume someone would be there holding him, or at least supporting him if he falls.
Q. Okay. Who else would be in the room for then examination?
A. It's usually a chaperone. I'm not sure who the chaperone was.
Q. Like, a family member chaperone?
A. I usually prefer medical chaperones.
Q. Okay. Who would qualify as a medical chaperone? I'm sorry.
A. Any member of the medical team is a member -- is a medical chaperone.
Q. Understood. And now I want to ask about how SeaCare works. So that neurological paragraph, "Oriented to person, place, and date. CN II to XII

intact. Strength and -- strength and sensation symmetric, and intact throughout." Is that a normal examination template that the system inserts?

A. The system doesn't insert anything. It might be a template, but we have to insert it and edit it.

Q. Okay. Now, that same paragraph, word for word -- and -- and I can turn to it, but on October 19th at 9:36, that same language. October 19th at 17:26, that same language. And October 20th at 8:04, that same language. And my question is -- is, did you perform a full cranial nerve, strength, sensation, gait, and Romberg examination four separate times on Mr. Smith?

A. That would be unreasonable to assume. And this is not a full neurological exam. If done in context of the patient, if a patient is completely uncomfortable, I'm not going to subject them to a long exam multiple times. If they walk to the bathroom, I'm going to consider that as testing their gait. If they're standing, I'm going to consider that as part of the exam.

If they're able to lift themselves up, I'm going to consider that as part of strength testing. It's not very reasonable as a clinician to go and make the patient more uncomfortable when they're already in distress. So there's certain parts of everyday activity

that we use as part of our exams.
Q. Okay. Did you ever do a finger-to-nose test?
A. I don't recall. If -- if it's documented there, then I did. If it's not documented, then I don't recall if I did it.
Q. Do you ever recall doing a heel-to-shin test?
A. Again, the same answer. If it's documented, then I did. If it's not documented, I don't recall doing it.
Q. Okay. I -- well, you reviewed the document before, and did you see anywhere in the document, the medical record, where you performed that test, either of them?
A. So -- so that will be in the neurological note. Let me look through all the neurological notes.
Q. Okay.
A. It's not that -- it's not in that one. It's not in that one. No, they're not in the neurological note, so I can't say if I've done them.
Q. What is nystagmus, N-Y-S-T-A-G-M-U -- J-M-U-S (sic)?
A. It's usually called the beating pulsation of an eye in response to a specific stimuli or in response to a specific gaze.
Q. Okay. Did you perform that test on Mr. Smith?

A. It's not really a test. It's a sign.
Q. Okay. Did you look for it? I'm sorry.
A. Again, if I -- if it was documented, it was there, but I don't see it documented.
Q. Okay. And you -- you charted reflexes, "2+ bilaterally at the knee and arm." I know you said you didn't do it all four times, but the times that you did do it, did you use a reflex hammer?
A. Yeah. I never said that I didn't do it all four times.
Q. Oh, okay. Did you use a reflex hammer on him -- on Mr. Smith to test his reflexes?
A. Yeah, we have those quite easily available.
Q. Okay. And did you test it when you did the neurological examination?
MR. DRAHOS: Object to the form.
THE WITNESS: Yeah. There -- there's no such thing as a dedicated neurological examination. Everything is done pretty much holistically in one. It's not that I'm now doing a cardiovascular -- or a neurological, as if it's separate occasions. We examine the patient holistically.
BY MR. HOFFMAN:
Q. Okay.
A. But if you're asking if I used the reflex

hammer, I most likely did, yes.

Q. Okay. Would you -- would that be documented as well?

A. The reflexes are documented.

Q. Okay. So when it states that you did the reflexes, 2+ bilaterally, that's an indication that in that moment you -- for those four indications in the record, you did test the reflexes?

A. Yes, sir.

Q. All right. So Carnival stroke neurologists agreed that for a steady gait to be evaluated, a person would have to walk, and that -- my question is -- is, as to the steady gait that's indicated in the records, is it possible those are not correct?

MR. DRAHOS: Object to the form. Again, you're quoting Dr. Merkler, I believe, possibly, and not even accurately. Well, you know what? Let me just object to the form. Sorry.

THE WITNESS: So you're asking, is it possible that it's not correct?

BY MR. HOFFMAN:

Q. Yes, sir.

A. But to what standard does that mean? Is it not correct to you, is it not correct to another doctor, or -- what does that mean?

Q. So what it would mean is that it's possible that he didn't have a steady gait in that moment?

MR. DRAHOS: Object to the form.

THE WITNESS: A steady gait is patient-specific. Maybe if you want to delve on the terms of the English, it could rather be used as a normal-for-him gait or a stable gait, instead of steady. As I said, it's a template that we edit, and maybe I just didn't edit that word. But if, for example, someone doesn't have a few toes, they're not going to walk "steady," but it's normal for them. That's the way they've been walking.

So as per what I understood, there's no neurologically abnormal gait as documented in the -- sorry, neurological exam. For example, a circumductive and antalgic, hemiplegic gait. But again, if someone is lethargic, like what I mentioned in the HPI, they're not going to walk like how you and I walk.

BY MR. HOFFMAN:

Q. Okay. The toe problem that Mr. Smith had, that was on his left foot, correct?

A. I can't remember the exact foot that he had. I can see that the X-ray is ordered for the left foot. I would assume that it's on his left foot.

Q. Okay. All right. Yes. So -- and then you diagnosed on October 18th, "Hyperglycemia, unspecified tinea pedis." What is tinea pedis?

A. It's a fungal infection, but --

Q. Go ahead. It's a fungal infection, you had stated?

A. That's correct, sir. Yeah. Tinea is a fungus.

Q. And tinea unguium?

A. It's more of the nail bed.

Q. Okay. And gastroenteritis, correct, on October 18th?

A. Are you asking for the differentials? Okay. I can't really see it there --

Q. All right --

A. -- but if I wrote it down --

MR. DRAHOS: Doctor, if you need to review the chart to be able to answer his questions, you're entitled to that. So if he is not putting it up on the screen, let him know that, so that you'll have the opportunity to review and answer the question.

BY MR. HOFFMAN:

Q. All right. So here we are. I'm sure. Page 32 of 42, Bates stamp 36, and it states your -- your diagnoses.

A. Sure.
MR. DRAHOS: Well, again, that's not the entirety of it, Mr. Hoffman, so --
MR. HOFFMAN: Right. I'm going to --
BY MR. HOFFMAN:
Q. So we're looking at Bates stamp 36, Page 32, and then I'm going to go to the next page. Now we're at Page 33 of 42, Bates stamp 37. So that's on October 18th, correct?
A. That's correct.
Q. And then on October 19th, you added, "Other: specified diabetes mellitus and motion sickness." Is there any neurological diagnosis on your list?
A. From all that you've shown me, there's not an isolated neurological diagnosis.
Q. All right. Thank you. Has high blood sugar ever, in your experience, made a patient unable to walk?
MR. DRAHOS: Object to the form.
THE WITNESS: What does unable to walk mean? Like lost power in their legs, or too tired to walk, or put them in a coma? Like, what does that mean?
BY MR. HOFFMAN:
Q. I guess any of those conditions.
A. It's different.

Q. So in your experience as a medical doctor, when somebody has had high blood sugar, have you ever found that it's made them unable to walk?

MR. DRAHOS: Object to the form.

THE WITNESS: So have I ever found that someone is unable to walk with high blood sugar?

BY MR. HOFFMAN:

Q. No. My question, has high blood sugar ever made a patient unable to walk in your experience?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, it's -- I don't understand what unable to walk means, but if I can elaborate on that, when there's diabetic emergencies such as DKAs or HHSs, not a specific patient, obviously, but any patient in general, like you're asking, they're too lethargic to walk. They maybe not be in the -- a GCS might be low for them to walk. So if that's what you're referring to, then yes, they might not be able to walk if their blood sugar is high enough, if I understand the question correctly.

BY MR. HOFFMAN:

Q. What's DKA stand for?

A. Diabetic ketoacidosis.

Q. And what does HHS stand for?

A. Hyperosmolar -- it's basically another diabetic emergency. It's a hyperosmolar, hyperosmotic state.

Q. Did Mr. Smith present with either of those?

A. No, sir.

Q. Okay. And has athlete's foot, in your experience, ever made a patient unable to walk?

MR. DRAHOS: Object to the form.

THE WITNESS: In my experience, has athlete's foot -- maybe if they're in severe pain. I can't recall an exact patient that hasn't been able to walk with athlete's foot, but if the pain is too severe or the infection is too severe, then they might not be able to walk.

BY MR. HOFFMAN:

Q. Has -- would any of the diagnoses on your list explain why Mr. Smith was stating he could not walk?

MR. DRAHOS: Object to the form.

THE WITNESS: When did he state he could not walk?

BY MR. HOFFMAN:

Q. His deposition.

MR. DRAHOS: Well -- object to the form.

THE WITNESS: I don't recall anywhere in the notes that he states he cannot walk.

BY MR. HOFFMAN:

Q. When he called Guest Services and needed a wheelchair to get to the infirmary, he stated he could not walk, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I can't deem that as correct because that's what Guest Services supposedly told the nurse that she supposedly written down, so I can't speak on behalf of anyone else. But if you're asking specifically, did he tell me he could not walk? He did not say that.

BY MR. HOFFMAN:

Q. Okay. Did he complain to you about motion sickness?

A. Do you mean the specific word "motion sickness"?

Q. Yeah.

MR. DRAHOS: Object to the form. Time frame.

BY MR. HOFFMAN:

Q. October 18th, did Mr. Smith complain of motion sickness?

A. I recall that I wrote in my notes the instances where he has told me that he is a first-time cruiser and it might be motion sickness, as per him.

Q. So he --

A. So those -- pardon?
Q. You're saying that he told you that it could have been motion sickness?
A. Yeah, that's -- yes, sir. That's what I'm saying. I can tell you the exact time because it's in my notes where he stated -- I remember reading that he is a first-time cruiser --
Q. Okay.
A. -- and it could potentially be motion sickness that is made worse by the motion of the ship.
Q. Okay.
A. "19th, 10:13 a.m. Guest explains he is a first-time cruiser, and this may be attributed to motion sickness." That's what I wrote.
Q. Okay. What happens when somebody signs in Against Medical Advice? Do you -- do they go back to their rooms?
MR. DRAHOS: Object to the form. Improper hypothetical.
THE WITNESS: No. Are you asking specifically to Mr. Smith, or are you asking -- what are you asking?
BY MR. HOFFMAN:
Q. Well -- well, I'm asking the policy and procedure, you know? So someone comes in the infirmary,

and they decide that they're not going to follow your advice, and they want to go back to their cabin. So they sign the Against Medical Advice. What happens next?

MR. DRAHOS: Object to the form. Improper hypothetical.

THE WITNESS: So you're talking about someone, not Mr. Smith?

BY MR. HOFFMAN:

Q. Yes. I'm talking about the policy and procedure as to how things are supposed to work in the infirmary, as the medical doctor who's running it. When someone signs an --

A. Sure --

Q. -- against Medical Advice form, what's the next step after that?

MR. DRAHOS: Object to the form. Improper hypothetical.

THE WITNESS: Sure. It's patient-specific. It depends on the severity. It depends on what they sign on the compos mentis state. There's a lot of factors that go into it.

BY MR. HOFFMAN:

Q. Would you continue to treat them if they had signed an Against Medical Advice and didn't want to be

there?

MR. DRAHOS: Object to the form.

THE WITNESS: If they're in their right state of mind and deny treatment, we can't continue to treat them.

BY MR. HOFFMAN:

Q. Okay. So in Mr. Smith's case, apparently he signed this Against Medical Advice, but then he stayed in the infirmary for another three hours until you discharged him. So my question is -- is when he stayed in the infirmary, was he following your medical advice?

MR. DRAHOS: Object to the form.

THE WITNESS: When -- when did I discharge him?

BY MR. HOFFMAN:

Q. About around 11:30 that evening.

A. I don't think he was discharged.

Q. Let's go to the --

A. Discharge is obsolete from medical care.

Q. So -- okay.

MR. DRAHOS: Mr. Hoffman, when you have another breaking point --

MR. HOFFMAN: Yes.

MR. DRAHOS: -- about an hour -- it doesn't necessarily need to be right now, but --

MR. HOFFMAN: Okay. Actually, now would probably be a good time. Five minutes?

MR. DRAHOS: That would be great. Thank you.

MR. HOFFMAN: All right. Come back at 53 after. Thank you.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Okay. The time is now 12:48. We're going off record.

(A recess was taken.)

BY MR. HOFFMAN:

Q. On October 18th, when you had made the decision that he needed a hospital, why did you not call the senior doctor then?

A. What was the reason I should have called him for?

Q. That Mr. Smith needed a hospital and he wanted to go back to his cabin and he was at risk of death.

A. I explained this before, that it's patient specific and he wasn't at imminent risk of death.

Q. The -- against Medical Advice forms that we saw before, one was -- the first one was timestamped 20:41, and the second one was 20:42. Which one was prepared first?

A. I would assume that 20:41 would come before 20:42.

Q. Okay. Why two forms?
A. Because they're for two different indications. One is for disembarkation, one is for admission in the medical center.
Q. I see. And the risks that you explained to him were due to the risks of his high blood sugar, correct?
A. Can you please clarify, sir, about what you mean by that? The risks of?
Q. Yeah. The risks that you explained to him as to why he shouldn't go back to his cabin and needed to go to a hospital, it was due to his high blood sugar, correct?
A. It's not in isolation. If you want, I can elaborate on what I mean by that. He's --
Q. Okay.
A. -- an unwell individual that's very poorly controlled, has an infection that needs to be chronically managed, has severely high blood sugars that needs to be optimized. So it's -- holistically, we can't treat the patient in isolation of one symptom.
Q. But you only identified hyperglycemia?
A. What do you mean by identified?
Q. The diagnosis, again, with Against Medical Advice, you only were referring to hyperglycemia. So my

question is -- is did you explain the risks to him were related to his high blood sugar?

A. If hypoglycemia is on the form, yeah, I would assume so. The dangers of the high blood sugar.

Q. Even though he had told you that the blood sugar that he had was his normal baseline?

A. I'll say it again. He never said it was his normal.

Q. Did you ever tell him that he might be having a stroke?

A. I never told him that.

Q. The form says the patient has decisional capacity to use this information to come to a reasoned decision. What did you do to assess his capacity?

A. There's various factors. One of which I documented was a Glasgow Coma Scale.

Q. Okay. SeaCare shows promethazine 25 milligram IM administered by you at 20:33. What is promethazine?

A. So I don't think I administered it. I think I prescribed it, but promethazine was used as an antiemetic in this case.

Q. Okay. So once you prescribe it, when is it administered?

A. It's usually administered by the nurse, but again, I'm not sure who administered it. I'm not saying

that it wasn't me, but it could have been me, but usually, it's a prescriber and -- and administer. I don't know if -- what difference it makes, but I guess it's just semantics.

Q. Would it be administered contemporaneously with -- would it be given -- and then would it be administered when it is prescribed by you around the same time?

A. Yeah. Safe to say around the same time.

Q. Okay. So what's the effect of promethazine that -- what effect does it have on a person?

A. Multiple effects. It can cause sedation. It causes antiemetic. It's a very strong anti-nausea medication. Those are the main indications as to why we give it.

Q. Okay. So based on the timestamp of the Against Medical Advice, he signed that document eight minutes after he was injected with promethazine. Did you consider that when you determined that his alertness was not affected when he signed?

A. His alertness was definitely not affected when he signed.

Q. Okay. And --

A. In this not compos mentis state.

Q. I'm sorry?

A. So basically, what I mentioned is that promethazine by itself has a potential to cause drowsiness or sleepiness. It doesn't affect your mental state. So just because someone is sleepy, it doesn't mean that they have an altered mental state.

Ex. D 151:6-12

Q. And Carnival's lawyers told the Court that these were signed on a tablet, and the scans seem to show an ink signature with handwritten names. So I'm trying to understand, was this printed out, or was this done on a tablet?

A. It was definitely not done on a tablet. We don't, at that point, have at our medical center.

Q. Okay. So who would've printed out the Against Medical Advice forms that were signed?

A. It's the responsibility of the treating doctor, so I guess I would've printed it out and then explained it to him and had it signed.

Q. Okay. And the medical staff witness line read as M. Medanda (phonetic). And was the -- was Nurse Medanda in the room?

A. Yeah. He would've had to be there as a witness.

Q. The -- the companion who signed was Austin Patterson. Do you know who he is in relation to Mr. Smith?

A. No, sir.
Q. Do you know who asked him to sign it?
A. Sorry. Do I know who asked who to sign it?
Q. Who asked Mr. Patterson to sign the Against Medical Advice?
A. Not exactly sure.
Q. Is it Carnival's policy to -- scratch that.
Did anyone in the family object to his wanting to leave the infirmary?
MR. DRAHOS: Object to the form. Time frame?
MR. HOFFMAN: On October 18th.
THE WITNESS: Are you asking me if anyone from his family objected for him to leave? I'm not sure if anyone was there at the time, apart from maybe the witnessee that was with him. I don't recall.
BY MR. HOFFMAN:
Q. Okay.
A. If they were objecting for him to leave, he -- they wouldn't have witnessed it, in just my opinion.
Q. Okay. Do you know if security was ever called or mentioned at any point on the evening of the -- of October 18th?
A. Security in terms of what? The security on the ship?
Q. Yes.

A. No. I'm not understanding. Security for what?
Q. In relation to the evening of October 18th, was in -- security ever contacted?
MR. DRAHOS: Object to the form.
THE WITNESS: I'm sure multiple times. I don't understand the question.
BY MR. HOFFMAN:
Q. Yeah. So was security ever called to the infirmary on the evening of the -- of October 18th?
A. For what reason? Why would security --
Q. I don't know. I -- I --
A. -- come to the --
Q. I don't -- I don't know. It's -- I'm asking just clearly, was -- if you don't know, you don't know. But was -- was security called --
A. Yeah.
Q. -- at any point the evening of October 18th?
A. I'm not sure, sir.
Q. Have you ever had to call security while tending to a patient in the infirmary?
A. To Mr. Smith or to any patient?
Q. Any patient.
A. Yeah, I have.
Q. How do you -- how does security get summoned?

A. There's usually an emergency security number where you call the chief security or assistant chief security who's on call, essentially, and then they come to the medical center with either a team or whoever is appointed.

Q. Okay. And do you ever recall, not if security was called, but if it was even mentioned to Mr. Smith's family and companions that security was going to be called?

A. No. I'm not sure.

Q. Okay. Did Mr. Smith read the Against Medical Advice forms?

A. I can't speak on behalf of him.

Q. Did anyone read the Against Medical Advice forms then?

A. Yeah.

Q. Okay. Who?

A. Most likely me, if I'm the treating doctor.

Q. Okay. Did Mr. Smith tell you why he wanted to go back to his cabin?

A. I can't remember offhand, but let me read my notes if I documented why.

Q. Okay.

A. All I noted from what he told me is I advised admission for monitoring. However, he would prefer to

go back to his cabin.

Q. But after he signed those forms, he did not go back to his cabin, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not the exact -- I'm not exactly sure what you're mentioning because, eventually, he did go back to his cabin.

BY MR. HOFFMAN:

Q. Right. But not until hours later, correct? I mean, we can look at the records.

A. Maybe he went after a few hours.

Q. Okay. Now, we discussed earlier if it was normal procedure for somebody to stay in the infirmary if they weren't going to take your advice, correct?

A. Right. Yeah. But --

Q. As said earlier?

A. Yeah. As in clinical context, if there's a sick individual that's poorly managed, we definitely shouldn't be rushing to get him out of the medical center. We want to actually keep him there as long as possible, and I would assume that's exactly what he did. We want to try and manage him as best as possible before eventually he refuses to stay any longer and then go up.

Q. Are you --

A. We would never -- not keep them for longer in

the medical center.

MR. DRAHOS: Your -- your answer got cut off there, Doctor. Can you say that again, please?

THE WITNESS: Oh, sorry, guys.

What I stated was that just because someone has signed an Against Medical Advice, it's completely wrong of us as treating clinicians to not want -- still want the best for them. So if there's a severely ill individual such as Mr. Smith that looks chronically ill, poorly managed, I would want to keep him there as long as possible until he refuses any further treatment and ultimately doesn't want any more and has to go up.

BY MR. HOFFMAN:

Q. So it's your position that when a patient signs an against medical advice that they want to go to their room and stop treatment, it's in your discretion as to whether to allow that person to leave immediately?

MR. DRAHOS: Object to the form.

THE WITNESS: That's not my discretion.

BY MR. HOFFMAN:

Q. I'm sorry?

A. That's not my discretion.

Q. Whose discretion is it?

A. It's the patient's discretion.

Q. Was it still your recommendation that Mr. Smith need to stay in the medical infirmary when he was discharged at -- or when, I guess, his last vital sign was performed by you at 11:30 the evening of October 18th?

A. I would've still liked him to stay, correct.

Q. Is that noted in your records?

A. I mean, that's the whole purpose of it against medical advice. I would advise him to stay, and he didn't want to stay.

Q. And in that three-hour window, did you ever think to contact Rotlaru for assistance?

A. I think you've asked this multiple times, and I kept asking you why.

Q. I know, but I'm not just asking for an answer. It's not your place to ask me questions. I'm sorry. Just a yes or a no, please.

MR. DRAHOS: Well, it's not your place to ask him questions repetitively. So I -- I don't blame him for being tired of having to answer the same question over and over again, Mr. Hoffman.

MR. HOFFMAN: He just responded that his response to me was, why? And I agree with that. I have not been able to get a straight answer.

BY MR. HOFFMAN:

Q. So my question is very specific. In the hours that were between Mr. Smith signing against medical advice around 8:30 and him being your last check on him at 11:30 to read his vital signs, my question was, did you ever contact Dr. Rotlaru during that time for assistance?

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah. So I -- I did answer this. I told you I'm not sure if I did that night or the morning after.

BY MR. HOFFMAN:

Q. So your answer is you're not sure if you did?

A. Yeah.

Q. So it's possible --

A. I'm not sure exactly when contacted on the patient.

Q. If you -- well, knowing your relationship with Dr. Rotlaru, if you -- you did contact him for a situation like this, is he attentive enough to come to the clinic or would he just handle it by phone?

MR. DRAHOS: Object to the form.

THE WITNESS: -- situation, if I wanted him in the medical center for a patient, he'd be in the medical center for a patient.

BY MR. HOFFMAN:

Q. Would you say that Mr. Smith was undergoing a medical emergency?

A. At which point in time, sir?

Q. At the point in time that you wanted him to stay in the infirmary on October 18th?

A. He did not have an immediate threat to life or limb in my clinical opinion, so he was not undergoing an emergency at that time.

Q. So why would you want him to stay in the infirmary?

A. Why does someone have to be in an emergent state to be in a hospital?

Q. I am asking you the question, sir. My --

A. So my --

Q. Yeah.

A. -- clinical reasoning, optimizing his condition and monitoring --

THE REPORTER: I'm sorry. It's cutting out so much. Can you repeat that?

THE WITNESS: Sorry, ma'am. I said that my clinical reason was to optimize his condition and for further monitoring. It's -- if a sick individual comes that's very poorly managed, obviously at risk of various things, we don't just want to quick-fix him and send him off. Monitoring

becomes a crucial part, and obviously monitoring by a medical individual becomes a crucial part of the care of him.

BY MR. HOFFMAN:

Q. Okay. Bates Stamp 45, Page 41 of the SeaCare documents. I'm going to share my screen real quick. We discussed earlier the categories for disembarkment, and it says, "October 18th, 21-18, Category 1, medical disembarkation, direct without escort." When did you select Category 1? Was it -- Cat 1, was it October 18th or October 19th?

A. I honestly can't remember when I selected it.

Q. Okay. Because it's -- the reason I ask is it says, "Last updated October 19th, 2024, 10:19." So do you know what was updated?

A. Honestly, not sure.

Q. Okay. And Carnival's table that we looked at earlier said, "Category 1, Patient does not need immediate admission and can travel." And my question is, was Mr. Smith in any capacity to travel?

MR. DRAHOS: Object to the form.

THE WITNESS: He was on a ship, so he was traveling.

BY MR. HOFFMAN:

Q. Right. But that's not what Carnival means

when they come up with those categorizations, correct?

A. So I -- I don't know what the -- maybe I'm not understanding the question correctly.

Q. Yeah. Well, I can go back to the form if -- if need be, but Category 1, it specifically states, "Patient does not need immediate attention and can travel." And actually, let me pull it up. One sec.

All right. So it says here, "Category 1, medical disembarkation direct without escort. Patient does not need immediate admission and can travel. For example, they're known to have renal calculi, which need treatment, but are not accusing -- causing an acute problem." But you had stated that you wanted Mr. Smith to stay in the infirmary.

A. Uh-huh. That's correct.

Q. So my question is, if he still fits under that -- if you still want him in the infirmary, does he fit underneath Category 1 where he does not need immediate admission?

MR. DRAHOS: Object to the form.

THE WITNESS: So that's a --

MR. DRAHOS: Go ahead, Doctor.

THE WITNESS: Sorry. That -- that's a wording issue. I would -- when someone is in -- in home port, and they're U.S. -- in a U.S. port, there's

no difference between Cat 1 and Cat 3 in terms of management and in terms of notifications. They both get exactly the same. So whether Cat 3 or Cat 1 was used, maybe appropriate wording, if that's what you're assuming. There's no difference in terms of care notifications.

BY MR. HOFFMAN:

Q. Well, for Category 2 or Category 3, it doesn't say anything about whether or not people can travel, but it does talk about them being medically disembarked with an escort. And I guess my question is, did Mr. Smith get off the boat on his own, or did an ambulance take him?

A. Sure. No, let me clarify that. So what Carnival means with an escort is if it's a Carnival escort that's specifically medical. It has -- it has nothing to do with family or external medical escorts coming. So if he travels with family, it's not a Carnival escort. Or if he travels with an ambulance or an air ambulance or anyone else, it's still not an escort from Carnival's point of view. So that's what escort refers to.

Q. And then --

A. So in --

Q. Go ahead.

A. -- medical, that's why he went without an escort, but he did go with an ambulance, correct.
Q. So your understanding of "can travel under Category 1" is just being on the boat?
MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MR. HOFFMAN:
Q. What's your understanding of immediate -- or what's your understanding of when it says that a passenger can travel under Category 1?
A. Yeah. So this patient specifically, I would assume you're referring to Mr. Smith?
Q. Yes.
A. He went to a hospital at the port. So again, if you want to talk about wordings and semantics, we could have said that it's a Category 3A. But what I'm trying to say is, from a management, a clinical, a referral, a documentation, and notification point of view, there is no difference in a Category 3A and a Category 1.
Q. So why wasn't he categorized as a Category 3A?
MR. DRAHOS: Object to the form.
THE WITNESS: I guess it's just semantics. He could have. I'm not saying that he couldn't have, but when someone is in a home port, most of the

time it's just a 1A for country of residence. It's not to say that if you put him in a 3A it would've been wrong, because he met the criteria and he went to a hospital. But it's not to say that because he's in a 1A, he was wrong. But what I'm trying to emphasize is the end result is there's absolutely no difference in the home port.

BY MR. HOFFMAN:

Q. When HOC sees that there's a Category 1 disembarkation, does that mean that there does not need to be an ambulance that needs to be arranged?

MR. DRAHOS: Object to the form.

THE WITNESS: That's what I'm trying to say. There's no difference from what the HOC sees, and they don't arrange the ambulance. We do.

BY MR. HOFFMAN:

Q. Okay. Go back. Does a category selected for disembarkation have implication as to who at Carnival is notified?

A. No, sir. I just mentioned that there's no -- there's no change between a Category 1 and a Category 3. For other categories, yes.

Q. Okay. Your discharge advice on, looks like October 18th, 21-18, updated October 19th, 10-19, says to call 911 for an emergency. Is that the number that's

called from the cabin?
A. Yeah, that's correct.
MR. HOFFMAN: I want to go to -- this will be Exhibit 20, Policy 3102, Bates stamp 935.
(Exhibit 20 was marked for identification.)
BY MR. HOFFMAN:
Q. And it says here "Section 2." I'm going to share my screen. All right. So this document is titled "Med 3102, Patient Admission and Discharge from the Medical Center." And I'm going to go to Number 2 on the second page, Bates stamp 935, where it says, "Process: Patients anticipate to require more than two hours of active medical management should be formally admitted to the medical center." Is that true? Is that correct?
A. That's correct.
Q. Okay. So he was there from 7:15 to 11:30 p.m., so it's safe to say he was admitted during that time period?
A. Yeah. That's safe to say.
Q. And then looks like when he -- 23:30, when he left -- I'm sorry. When he left on October 18th at 23:30, it states that his heart rate was 102, capillary refill, three seconds, and then that he left on a wheelchair. And to your recollection, how many times did he stand or walk in the four hours that he was in

the infirmary? If you don't recall -- I'm sorry. I spoke over you. What did you say, Doctor?

A. Sorry. I said that I can't give you an exact number. I don't recall exactly.

Q. Thank you. It looks like in a continuation of that policy that we're looking at before, I don't know if it -- the discharge procedure, it says, "The patient and travel companion should be involved in discharge planning. Patient should only be discharged from the medical center when support and/or assistant needs that have been identified have been put into place." And my question is, who took him to the cabin and what was put in place to assist and support Mr. Smith?

A. So you mentioned discharged. I'll say again, he wasn't discharged from the medical center. Who took him? You mentioned that he went in a wheelchair. I'm not sure exactly who took him. I -- I can't attest to that. And what factors were -- were put in place? Again, I can't -- I can't recall that.

Q. Okay. And did you document, again, any other time besides the Against Medical Advice where Mr. Smith had said that he wanted to return to his cabin?

A. Yes, sir. It's in my notes.

Q. Okay. I would like -- where in your notes does it state that he again made the request to go back

to his cabin after the Against Medical Advice was signed?

A. Oh, I'm not sure if it was after the Against Medical Advice, but let me try and find it for you.

Q. Thank you.

A. So after the Against Medical Advice, it was Page 39 of 42, October 18, 2024, 21:40, "Guest wants to rest in cabin."

Q. At 21:40?

A. That's correct. Yes.

Q. Okay.

A. Again, at -- yeah. I -- I documented it again.

Q. Okay. But that's --

A. At 2:42, October 18th, "Guest explained that he is feeling much better. He is no longer dizzy and is not nauseous. He is clinically well -- and he is tolerating oral intake of water."

Q. Is it possible that Mr. Smith had his stroke on October 19th?

MR. DRAHOS: Object to the form.

THE WITNESS: Is it possible that he had a stroke on October 19th? I guess it is possible.

BY MR. HOFFMAN:

Q. Okay. And, you know, I -- does -- would the

medical record state who had taken Mr. Smith back to his cabin the evening of October 18th?

A. We can take a look at it, but I don't see anything documented here. All I can see is that he has left on a wheelchair.

Q. Okay.

A. There's no one -- yeah, "Left out of medical center assisted on a wheelchair." No one says specifically who pushed him.

Q. Okay. Was there any check-ins on Mr. Smith between 11:30 p.m. on October 18th and October 19th at 9:30 a.m.?

A. Nothing that I can recall, but it's been documented quite extensively that he needs to call 911 for any issues that he has, because that's a 24/7 manned line.

Q. So on October 19th, I'm on Bates stamp 42, Page 38 of the SeaCare documents, it states, "Guest presented to MC in wheelchair for follow-up." So he was still not walking, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: He didn't walk to the medical center.

BY MR. HOFFMAN:

Q. What's that?

A. He didn't walk to the medical center, so he came in a wheelchair.

Q. Okay. And then you noted, "Multiple episodes of vomiting from 3:00 a.m. He now feels nauseous and dizzy, made worse by motion of ship." Is that what he reported or --

A. Yeah. This is all he's reporting.

Q. Okay. And then at 9:36, next morning, you again charted, "Steady gait, negative Romberg test," right?

A. If that's in the exam? Yes.

Q. So that means he walked again for you that morning?

A. He didn't really walk for me, but if he walked, then I noted it as part of the exam.

Q. Okay. Bates stamp 36, Page 32, I'm looking at the assessment dated October 19th at 10:08, performed by Nurse Sebu (phonetic), and it states there, "Gait steady, mobility full." And then in the same entry, "The patient thinks that he is quite likely to fall." And my question is, how do those two -- how do those things equate? If -- if -- if his mobility is full and his gait is steady, why does the patient thinks he's quite likely to fall?

MR. DRAHOS: Object to the form.

THE WITNESS: I didn't do this assessment, sir. I can't speak on behalf of anyone else.

BY MR. HOFFMAN:

Q. Okay. Were there any performance problems that you ever found with your -- with the nurses on the Carnival Pride?

A. Not -- nothing that comes to mind.

Q. Okay. Is there any reason that you would doubt the record keeping here in the risk assessment portion on this day?

A. No.

Q. Okay.

A. Not present.

Q. All right. And then October 19th, Bates stamp 42, Page 38, it says -- you -- you wrote, "Chem-8/VBG within normal ranges." What does that mean?

A. So his Chem-8 essentially looks at his renal function and electrolytes. VBG when you look at his acid gas -- sorry, acid-based balance in regard to his high glucose, because that can be altered, and everything was within the normal ranges of those two tests.

Q. Okay. So the vomiting, the dizziness, and the inability to walk though, those all remained, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: It -- it doesn't mention anything there about those three things, so I can't comment if at that specific point in time it was there or it wasn't there.

BY MR. HOFFMAN:

Q. Well, if it was there, wouldn't you list his conditions?

A. What I can read after Chem-8 and VBG is that, "Guest is sleeping peacefully in the ICU," and sleeping peacefully means that he's not vomiting, he's not dizzy.

Q. Well, it says -- sorry, but October 19th starts at 9:35. "Patient came for a follow-up as advised. Keep in bed on semi-Fowler's position with side rails up and wheels locked." What does semi-Fowler's position mean?

A. It's just upright.

Q. Okay. And then it says, "Vital signs checked and recorded. Patient stated of still having -- of still has vomiting episode." Okay. And then we go to 9:36, receives saline, promethazine, ondansetron, which I believe is Zofran. And that's at 9:36.

9:42, 10 units of insulin. And then 9:48, it says, "Slept well upon discharge from MC, but then started vomiting at 0300 this morning. Multiple -- multiple episodes. MC was not made aware. No further

episodes of loose stools. He now feels nauseous and dizzy, made worse by motion of ship. Raised blood pressure and RBS for hydration and repeat Chem-8 and gas."

And then at 10:13, it says, "Normal range." Now you're saying that he's sleeping peacefully, but about a half hour earlier he just received that sedation medicine that you had given him, right?

MR. DRAHOS: Object to the form.

So long as -- question, go ahead.

THE WITNESS: So did he just receive that sedation medicine? Are you talking about promethazine about 30 minutes ago?

BY MR. HOFFMAN:

Q. Yeah.

A. Yeah. It's not a sedation medicine. It makes you drowsy. It's not like an anesthetic that'll knock you out, but that's correct. He did receive it.

Q. Okay. Would it help somebody sleep if they've been up vomiting since 3:00?

A. Yeah. It's a -- it's a good antiemetic.

Q. Okay. So we've just established though in the record before he fell asleep that he still had vomiting, dizzy, and he was not able to walk to the infirmary, and his blood sugar seemed to be in check. So my question

is, did his condition --
A. His blood check what?
Q. -- make you reconsider whether the blood sugar was the reason why he was ill?
MR. DRAHOS: Object to the form. Mr. Hoffman, it would help if you eliminated the commentary and what you personally believe, especially when it's medically wrong.
Go ahead, Doctor.
THE WITNESS: Yeah. So you mentioned that his blood sugar was in check. It wasn't in check. I clearly noted that raised blood pressure and raised blood sugar. So yeah, it's not that his blood sugar was now an independent factor. It was definitely contributing to whatever he was having clinically.
BY MR. HOFFMAN:
Q. Oh, I'm sorry. I thought "Chem-8/VBG within normal ranges" was an indication that things were stable. Did I misread that?
A. Yeah. It means that things were stable, but it doesn't mean his blood pressure is normal or his blood glucose is normal.
Q. Okay. At 10:13, you wrote there that this -- "Guest explains he's a first-time cruiser and this may

be attributed to motion sickness." Was that your explanation or his?

A. That's -- so he explained, so he reported that.

Q. Okay. When the email went out that Mr. Smith was a disembarkation Category 1, did anyone on the bridge ask anything about him?

A. I don't recall anyone asking anything about him.

Q. Okay. Go to Bates stamp 40 at -- sorry, the time. Okay. So bottom of Page 36, October 19th, 14:15, performed by Nurse Dube. It says, "He vomited about 500 mLs of greenish gastric contents." And this means that he's still vomiting 19 hours after his treatment began, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah. Yeah.

BY MR. HOFFMAN:

Q. Okay. And by then he's received, at 10:16 and at 15:12, more, followed by 8:13 that night with ondansetron, which is anti-nausea, correct?

A. That's correct.

Q. So what did persistent vomiting through all of that tell you?

MR. DRAHOS: Object to the form.

THE WITNESS: It means that he's still vomiting.

BY MR. HOFFMAN:

Q. But 19 hours after his treatment began, wasn't that a concern?

A. Yeah. Which is why he was in the medical center.

Q. Did you know why he was still vomiting?

A. Are you asking for if I knew the --

Q. Yeah.

A. -- the specific diagnosis as to what's causing the vomiting?

Q. Yeah.

A. Can't -- I knew exactly why he was still vomiting.

Q. You did not, or you did? I'm sorry, you broke up.

A. I can't recall if I pinpointed exactly what caused the vomiting at that point in time.

Q. Okay. If someone has motion sickness, wouldn't all that medication resolve the vomiting?

A. Not necessarily. I've had multiple instances where vomiting occurs throughout the entire cruise.

Q. Do you recall the -- the boat being unstable during the -- October 18th or October 19th?

MR. DRAHOS: Object to the form.
THE WITNESS: What do you mean, unstable? Do you mean rocking?
BY MR. HOFFMAN:
Q. Yeah.
A. Yeah. I -- as far as I remember, I think it was a little rocky. I can't remember exactly.
Q. But was it excessive rocky, or was it just normal?
MR. DRAHOS: Object to the form.
THE WITNESS: -- it's subjective.
BY MR. HOFFMAN:
Q. All right. So it looks like on October 19th, Bates stamp 39, bump 35, this is an entry in -- by you. It says, "Notes: guest says he's feeling tired and dizzy as the ship rocks due to bad weather. He's sleeping peacefully in ICU bed. He has no further episodes of vomiting. He is not nauseous now. His vital signs have been stable, and his RBS is less than 250 for more than four hours. He's tolerating sips of water. He is clinically well hydrated. I've explained to guest that, due to his stable vital signs, being well hydrated, and having controlled RBS for more than four hours, he's potentially stable to be in his cabin for return for follow-up. He understands and agrees with the plan."

So was your plan to send him back to his cabin a second time on October 19th?

A. I didn't plan to send him back to his cabin the first time. So this is a plan to send him back to his cabin the first time.

Q. Ah, okay. Thank you. And on October 18th at 11:30, you're stating that he again asked to be released from the infirmary, and that's when he was sent back to his cabin?

A. Yes, sir. It wasn't that we wanted him to go. He urged to go.

Q. Okay. So at 17:16, sounds like you're saying that he's good to go back to his cabin, if you'd like. And then on -- it looks like on -- a little bit later, literally less than an hour, it says, "Guest, however, is too lethargic to stand." What was your reason as -- what was your diagnosis as to why you think he was still too lethargic to stand?

A. There's no diagnosis for lethargy. Can be due to a plethora of things, specifically with what's going on with him. He has a whole host of factors: raised blood sugar, dehydration, electrolyte abnormalities. Could have been a whole host of factors.

Q. But 40 minutes earlier, you had charted that he had a steady gait and negative Romberg test. So

that's only 44 minutes prior to saying that he is too lethargic to stand. Are both of those entries correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Yeah. If I -- it's correct. It doesn't take 44 minutes for patients to change. They can change in four seconds. So I don't think that time period means anything.

BY MR. HOFFMAN:

Q. Okay. Can lethargy be a sign of hydrocephalus?

MR. DRAHOS: Object to the form.

THE WITNESS: Can lethargy be a sign for -- so lethargy is a symptom. Potentially, it could be, along with a thousand other things. Yeah.

BY MR. HOFFMAN:

Q. Did it occur to you that that could possibly be what he was experiencing due to a stroke?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't think I was thinking that at that stage based on his clinical situation.

BY MR. HOFFMAN:

Q. Okay. On October 19th at 18:26, it says, "Cardiac enzyme troponin quantitative." What were you concerned about?

A. So with us being on the ship, we obviously

limited in terms of the resources for biomarkers that we have. Someone presenting with now non-specific things, obviously, I'm sure you mentioned it before, caused us to think of something else. Specifically in diabetes, diabetics have something called an autonomic neuropathy, where they don't feel chest pain or any symptoms which is related to the heart when they're having heart problems.

And based on his clinical picture, chronically unwell, morbidly obese, all the risk factors you can imagine, maybe he could have had something going on with his heart, which posed us to further investigate him.

Q. Understood. And then it looks like the same time, you did a 12-lead EKG. Is that also related to his heart?

A. Yes, sir. So they go hand in hand: 12-lead EKG and the cardiac marker.

Q. So at 6:26 on October 19th, you investigated his heart because you were still trying to diagnose him, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know if it counts as trying to diagnose him. I think it counts as looking for a directed alternate source.

BY MR. HOFFMAN:

Q. Did you reexamine his nervous system?
A. As the examination has documented, yes, I did.
Q. Okay. Can you show me where?
A. Are you talking about after the 18th?
Q. Around the same time. Yeah. On October 19th in the evening when you're -- you -- you're investigating the heart --
A. Uh-huh.
Q. -- my question is, around the same time, did you also investigate the nervous system?
A. If it was clinically appropriate, then I would have. If it wasn't clinically appropriate, I wouldn't have gone to the nervous system, so no, I didn't.
Q. Okay. Did your investigation into the heart rule -- rule -- answer your questions as to what was going on with him?
A. Yeah. It gave us clarity that his heart was nothing acutely wrong.
Q. Okay. Carnival's triage procedure says, "A category should be amended if clinically indicated." And I'm going to pull up the policy here. So we're back to -- so this is Bates Stamp 930 to 933.
MR. HOFFMAN: I believe this will be Exhibit 21.
(Exhibit 21 was marked for identification.)

BY MR. HOFFMAN:

Q. So a question here. Hold on a sec. Sorry. I'm looking for the language. All right. Scratch that question.

All right. So I'm going to move on to October 20th. Go to Bates stamp 20. All right. So we're back to the SeaCare document. It's medical records. Go ahead and share my screen. Now, let's see. On October 20th at 8:04 in the morning -- oh, first, did Mr. Smith spend the night in the infirmary between the October 19th and 20th?

A. I think he did. Yes, sir. I think he did spend the night.

Q. Okay. And then it says again, "Neurological, oriented to person, place, and date. CN II to XII intact. Strength and sensation symmetric and intact throughout patellar, brachial, and brachioradialis. Reflexes, 2+ bilaterally. Steady gait. Negative Romberg test." So did you again see Mr. Smith walk that morning?

A. I would assume, yeah, if it's here that I saw him walk.

Q. Okay. And then it states -- oh. I'm going to Bates stamp 37, very bottom, October 22, 2024, 8:07, performed by Dr. Maharaj. It says at the end, "He has

no complaints and is feeling much better." Do you recall that?

A. I don't recall that, but that's what he reported to me.

Q. Okay. And then two and a half hours later, he was taken off in a stretcher, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not sure -- stretcher.

BY MR. HOFFMAN:

Q. Let's see here. I have a security log here.

MR. HOFFMAN: I'm going to mark this as Exhibit 22.

(Exhibit 22 was marked for identification.)

BY MR. HOFFMAN:

Q. The security incident log indicates that he had been -- paramedics boarded with an ambulance gurney. Would that be a stretcher?

A. Yeah. Equivalent. Yeah.

Q. Okay. So if the security log says paramedics boarded with an ambulance gurney, would that mean that the paramedics came on board to remove Mr. Smith on a stretcher?

A. Yeah. You can consider it interchangeable. Yeah.

Q. What did you tell the paramedics was wrong

with him?

A. I don't remember the exact handover, word for word.

Q. Okay. Did you write a referral letter?

A. I don't remember if it was a referral. Usually, for complex inpatient cases, a referral is not good enough to tell them everything that we did. So we usually just print the entire notes.

Q. I would like to share with you an affidavit that was submitted by your attorney. One sec. Finding it.

MR. HOFFMAN: Okay. Have this marked as Exhibit 22, please. Let me share my --

THE REPORTER: I'm sorry. You said 23?

MR. HOFFMAN: I believe it's 22.

THE REPORTER: 22 was the security log.

MR. HOFFMAN: Thank you. Oh, I did not show the security log, but yes, I would like for 22 to be the security log.

THE REPORTER: Thank you.

MR. HOFFMAN: 23 is the affidavit.

(Exhibit 23 was marked for identification.)

BY MR. HOFFMAN:

Q. I'm going to share my screen, Doctor. Okay. Do you -- have you seen this document?

A. I think I have. Yeah.

Q. Scroll through. It's two pages?

A. Yeah.

Q. Okay. It says Page 2 of three, but the affidavit begins on Page 2 of three. In Paragraph 8, it says, "My involvement in the care and treatment of Michael Smith came on October 18th and 19th, 2024, while the ship was at sea." You examined and wrote in his chart on October 20th, correct?

A. Correct.

Q. Where was the ship on October 20th at 8:04 in the morning when you had made that note?

A. Baltimore.

Q. Okay. Was it in the Chesapeake Bay?

A. Oh, I have no idea, but most likely at Baltimore. We usually talk quite early.

Q. Okay. And Paragraph 3 says you reviewed the complaint. Do you recall if it was the first complaint or the amended complaint?

A. I can't recall that.

Q. Okay. Or the second amended complaint? You can't recall?

A. Can't recall that.

Q. Thank you. All right. Doctor, are you doing okay? I know it's late there. I think I'm in the home

stretch. You need a break, or are you okay?
A. No. Let's push through the stretch.
Q. All right.
A. -- break.
Q. What was that?
A. Unless anyone else would like a break?
MR. DRAHOS: How much more do you think you have, Mr. Hoffman?
MR. HOFFMAN: Hopefully not more than 45 minutes.
MR. DRAHOS: Let's take a break.
MR. HOFFMAN: Okay. All right. It's 1:58. Come back at five after, 2:05? Okay. We'll go off record.
(A recess was taken.)
THE VIDEOGRAPHER: Okay. The time is 2:07. We are back on record.
BY MR. HOFFMAN:
Q. Dr. Parejo, an expert of Carnival, in his report on Page 5 says, "If the same circumstances had happened while being in a land-based location, the persistent vertigo would've triggered certain alarms among medical professionals, and they may suspect a cerebellar stroke." Would you agree with that?
MR. DRAHOS: Object to the form.

THE WITNESS: Are you talking about specifically to Mr. Smith or just a statement in general?

BY MR. HOFFMAN:

Q. A statement in general.

A. So someone with persistent vertigo, would it trigger -- stroke? It has -- it has to be interpreted in clinical context. Vertigo doesn't -- point to a stroke.

Q. So it would not -- so you disagree with the statement?

MR. DRAHOS: Object to the form. You're using half the statement. It's completely unfair.

MR. HOFFMAN: I'm -- I'm giving the full sentence. I mean, it -- we --

MR. DRAHOS: Of a 30-page report, Mr. Hoffman?

MR. HOFFMAN: It's a very specific statement.

MR. DRAHOS: Well, if you want to just ask him the concept, you can. If you want to try and misquote Dr. Parejo, that's another circumstance. So I -- I would appreciate you asking fair questions and not trying to trick the witness.

MR. HOFFMAN: It's not trying to trick. I'm using the exact words, but it's -- I'll ask the question --

MR. DRAHOS: -- in a courtroom --

BY MR. HOFFMAN:

Q. I'll ask the question. You could let me know if you agree with it, okay? Would persistent vertigo have triggered certain alarms among medical professionals that they may suspect a cerebellar stroke?

MR. DRAHOS: Object to the form.

THE WITNESS: Would persistent vertigo -- again, my question to that: Is it just a general statement that you're saying that?

BY MR. HOFFMAN:

Q. Yes.

MR. DRAHOS: Object to the form.

THE WITNESS: Okay. But -- sorry. The -- the question was nothing to do with --

BY MR. HOFFMAN:

Q. Do you agree or disagree with that statement?

MR. DRAHOS: Object to the form.

THE WITNESS: It's not an agree or disagreeable thing. It has to be interpreted in clinical context.

BY MR. HOFFMAN:

Q. Okay. Is it possible to differentiate motion sickness from a cerebellar stroke?

MR. DRAHOS: Object to the form.

THE WITNESS: Is it possible in what form? By examination, by history, by a scan? What does possible mean?

BY MR. HOFFMAN:

Q. Examination.

A. If you have a scan, then definitely it's possible.

Q. Okay. And by examination?

A. By examination, it depends on the clinical context as to the extent of the motion sickness and the extent of the stroke and what symptoms they're presenting with, because you can only pick up symptoms and signs on that examination.

Q. Did Carnival ever train you on differentiating motion sickness from other -- other possible medical conditions?

MR. DRAHOS: Object to the form. It's been asked and answered.

THE WITNESS: Yeah. This is a repeated question, so I already told you I can't recall any specific training.

BY MR. HOFFMAN:

Q. Okay. So I'm going to pull up what's been given to me by Defense Counsel. This is Bates stamp 929. It's a Shipboard First Response Policy CCL Med

3003-A3. Are you able to see my screen okay?

A. I can see it well. Yeah.

Q. So Carnival's first response protocol tells responders to assess AVPU, pupils, seizure, focal signs. Is there a Carnival document that tells the doctor what to do next when the focal sign is that the patient cannot walk?

MR. DRAHOS: Object to the form.

THE WITNESS: What does "patient cannot walk" mean? That's not really a sign.

BY MR. HOFFMAN:

Q. Okay.

A. That's a statement.

Q. I'm sorry?

A. Patient cannot walk is a subjective statement.

Q. Well, it -- for a first responder who's looking for the focal signs and has established that the patient cannot walk, my question would be, is there a Carnival document that tells the doctor what to do next?

A. Yeah. But that's what I'm trying to make you understand. A first responder is a medical -- medically trained, and they would know that cannot walk is not an appropriate handover or sign.

Q. So how would you describe a person who can't use their legs to move about?

MR. DRAHOS: Object to the form. Improper hypothetical.

BY MR. HOFFMAN:

Q. What does -- we're having a difficult time understanding cannot walk. So I'm trying to understand what your definition of walking is.

MR. DRAHOS: Object to the form. You're having a hard time, Mr. Hoffman, not the doctor.

THE WITNESS: Yeah. I'm quite familiar with regards to what walking in the clinical sense means. I just want to know from what you mean by that.

BY MR. HOFFMAN:

Q. I'm just -- plain speak for the jury. Patient cannot walk. You get that from the first responder. I'm bringing a patient to you. He cannot walk. Is that sufficient? Is that sufficient?

MR. DRAHOS: Object to the form.

THE WITNESS: Means?

BY MR. HOFFMAN:

Q. Hmm?

A. Thank you for the hand -- for that first responder. Can you medically explain what "cannot walk" means?

Q. Okay. So your response, Doctor, is that "a

patient cannot walk" is not specific enough for you, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Yes. That -- that's correct. I would like to get more information.

BY MR. HOFFMAN:

Q. Understood. So is there a protocol that Carnival has that a doctor can follow when the doctor has established that a patient cannot walk?

MR. DRAHOS: Object to the form.

THE WITNESS: Okay. There's various emergent protocols in place.

BY MR. HOFFMAN:

Q. Okay. Do you know what the name of that document is?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know the name, specifically.

BY MR. HOFFMAN:

Q. Okay. But Carnival does have a protocol?

MR. DRAHOS: Object to the form.

THE WITNESS: If someone -- I'm not familiar if they have a protocol if someone cannot walk.

BY MR. HOFFMAN:

Q. Okay. And if Carnival had a one-page stroke

chest -- checklist that stated new dizziness, vomiting, cannot walk, treat as a possible stroke, call the senior doc, call the HOC, would you have followed it on October 18th?

MR. DRAHOS: Object to the form.

THE WITNESS: If Carnival has protocols, we follow them all the time.

BY MR. HOFFMAN:

Q. And if Carnival had given you a one-page stroke checklist which identifies new dizziness, vomiting, cannot walk, treat as a possible stroke, call the senior doc, call the HOC, would you have followed it on October 18th, yes or no?

MR. DRAHOS: Object to the form. It's not a yes or no, Mr. Hoffman.

THE WITNESS: I repeat the same answer. If Carnival has a protocol, I will follow the protocol.

BY MR. HOFFMAN:

Q. Okay. Do you know of any stroke protocol that Carnival has?

MR. DRAHOS: Object to the form. Asked and answered.

BY MR. HOFFMAN:

Q. You can still answer, sir.

A. Any stroke protocol that Carnival has specifically to strokes -- it forms stroke forms under emergent care. So Carnival does have emergent care protocols.

Q. Okay. Is that what you followed when Mr. Smith was in the infirmary?

MR. DRAHOS: Object to the form.

THE WITNESS: Why would I follow an emergent care protocol?

BY MR. HOFFMAN:

Q. I believe Nurse Dube had categorized him as emergent. Let me look.

A. No, it was urgent. It's right there on the --

Q. -- what's the difference between urgent and emergent?

A. Emergent is an immediate threat to life or limb. Urgent is a potential change that a patient might occur which might make them have a threat to a life or a limb.

Q. So if you felt that his life was at risk, wouldn't the category should've properly been emergent?

MR. DRAHOS: Object to the form. This is argumentative at this point. And asked and answered.

MR. HOFFMAN: I don't think I've talked about

urgent and emergent yet.

MR. DRAHOS: You talked about this, quote, "threat of life" --

MR. HOFFMAN: I'm asking about urgent and emergent.

MR. DRAHOS: And you're interpreting it the wrong way, Mr. Hoffman. And we've been at this now for five hours and the Doctor has repeatedly explained it. But we'll do it one more time.

THE WITNESS: So what is the question, Mr. -- Mr. Hoffman?

BY MR. HOFFMAN:

Q. Yeah. What's the -- what's the difference between urgent and emergent? And why, if Mr. Smith was listed -- if the risk was listed that death was a possibility, why would his -- it not have been changed from urgent to emergent?

A. Okay. So I answered both questions multiple times, actually, with the most recent one being about two minutes ago. Urgent -- or emergent is an immediate threat to life or limb. Urgent is the potential for the disease or potential injury to convert to a threat to a life or limb, but it's not currently there. Mr. Smith was characterized as urgent by a nurse, so I cannot speak on behalf of her.

Q. But didn't you determine that he was emergent?
A. No, I did not. When did I determine that?
Q. Okay. Had you suspected a stroke at 7:45 p.m. on October 18th with Mr. Smith, whom would you have called first?
MR. DRAHOS: Object to the form. Improper hypothetical.
THE WITNESS: It all depends on the clinical context.
BY MR. HOFFMAN:
Q. You wouldn't call Dr. Rotlaru?
A. I would call him. It depends on context.
Q. Is a stroke considered a medical emergency?
A. Is a confirmed stroke considered a medical emergency? Yes, it is.
Q. Is a -- well, you had said earlier that you can only confirm a stroke with a CT scan, right?
A. That's correct, sir.
Q. So if you do your assessment, you suspect a stroke, would you consider that a medical emergency?
MR. DRAHOS: Object to the form. Improper hypothetical.
THE WITNESS: Correct.
BY MR. HOFFMAN:
Q. Correct, you would?

A. A suspected stroke is a medical emergency.

Q. Thank you.

A. I'd actually just like to correct what I just said. A suspected acute stroke is a medical emergency. If someone had -- and they're now presenting with the one-month symptoms of not being able to use their arm, that's not a medical emergency. So again, everything is in clinical context, sir.

Q. What's the difference in the strokes? I'm sorry. You said an acute stroke?

A. Yeah. So a suspected acute stroke is a medical emergency. And I gave you the example of if someone had a stroke a month ago and they're now presenting with symptoms of still not being able to use their arm for a month without any change, that's not a medical emergency, hence why everything depends on clinical context.

Q. Okay. On the afternoon that Mr. Smith left the ship, his sister wrote to Carnival that he had a stroke on Friday, October 18th, and that the doctor misdiagnosed him. Did anyone at Carnival ever show you that?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't recall seeing that, sir.

BY MR. HOFFMAN:

Q. Okay. I'm going to show it to you real quick.

MR. HOFFMAN: Mark this as Exhibit 24.

(Exhibit 24 was marked for identification.)

BY MR. HOFFMAN:

Q. And please let me know if this refreshes your recollection. Have you ever seen this document?

A. I don't recall seeing this, sir.

Q. And then Carnival replied -- oh, sorry. So guest care, loss prevention, security replied on October 22nd. Did loss prevention ever contact you before responding?

MR. DRAHOS: Object to the form.

THE WITNESS: No, I don't recall that, sir.

BY MR. HOFFMAN:

Q. Okay.

MR. HOFFMAN: And that reply I'd like to have marked as Exhibit 25.

(Exhibit 25 was marked for identification.)

BY MR. HOFFMAN:

Q. And then going back to the iCare comment log, there's an email, looks like from October 28th. It says -- sorry. On October 28th, you were still on the Carnival Pride, correct?

A. Yes, that's correct.

Q. Okay. Do you recall receiving an email on

October 28th from Carnival's care team regarding Mr. Smith?

A. I don't recall this, sir. Yeah. No, I don't recall this.

Q. Okay. It states, "Hello, team. We attempted to contact Michael and Eric without a response. Additionally, we contacted Harbor Hospital and were -- were informed that they do not have a patient under our guest's name. Later, I received a call from Eric. While initially upset, he remained calm and shared that Michael is learning -- now learning to walk and is not suffering from seasickness, contrary to what he was allegedly previously informed. We'll email our guest care department to follow up with Eric regarding his experience. He has our contact information should they have any questions. Since our guest has been discharged, we'll now close this case." Did you ever inquire as to what he was suffering for -- from?

MR. DRAHOS: Object to the form.

BY MR. HOFFMAN:

Q. Sorry?

A. No, I don't recall that.

Q. Okay. Did Carnival ever do any root cause review of -- after an incident occurred?

MR. DRAHOS: Object to the form.

THE WITNESS: What incident?
BY MR. HOFFMAN:
Q. Evacuation, major injury, seizure, cardiac case, you know, anything.
MR. DRAHOS: I'm going to object to the form.
THE WITNESS: Do -- do you mean that, do they do case discussions after -- after certain instances?
BY MR. HOFFMAN:
Q. Yeah.
A. Yeah, sometimes. Debriefs --
Q. Was one held for Mr. Smith -- concerning Mr. Smith?
A. I don't recall.
Q. Okay. Whose discretion would that be as to whether or not that root cause review took place?
A. It could be anyone's. There's no one that's responsible for saying that it has to happen or it doesn't have to happen.
Q. Okay. I want to pull up -- so I have here your performance evaluation from Dr. Rotlaru. You signed on -- on August 18th, 2024, and the sign-off is December 15th, 2024. I'm going to share the screen. And this is for the same period that included Mr. Smith in October 2024, correct?

A. That's correct.
Q. And you see here where it says, "Assessment, diagnosis, and treatment planning," on Bates 907, "exceptional"?
A. Sure.
Q. Okay.
MR. HOFFMAN: And I'll have this marked as Exhibit 26, please.
(Exhibit 26 was marked for identification.)
BY MR. HOFFMAN:
Q. And then it goes on to say, "Clinical effectiveness, documentation, upward communication, all exceptional," correct?
A. That's correct.
Q. And he wrote, "You always speak up and provide high quality level of care with the available resources." And my question to you is, what resources were not available to you?
MR. DRAHOS: Object to the form.
THE WITNESS: That are not available?
BY MR. HOFFMAN:
Q. I can't hold you responsible for a level of care where you don't have the correct resources, correct?
MR. DRAHOS: Object to the form.

THE WITNESS: I mean, if you can't do a
specific thing and the resource is not there.
BY MR. HOFFMAN:
Q. Okay. So what resources are not available to you that you would have at, say, was it Helen Joseph?
MR. DRAHOS: Object to the form.
THE WITNESS: -- for hours if I talk about everything. We don't have. Is there anything specific you'd like me to mention?
BY MR. HOFFMAN:
Q. I guess diagnostically. Diagnostic equipment.
MR. DRAHOS: Object to the form.
THE WITNESS: Diagnostic. No complicated scanning equipment. There's no MRI. There's no CT scanner. We have an X-ray. We have an ultrasound. But diagnostically, the main two of the MRI and the CT scanner, we don't have on board.
BY MR. HOFFMAN:
Q. Got it. Thank you. And then -- let's see. We have the lead nurse's comments here, Alan Asibu (phonetic). It says, "Excellent both clinical and decision making skills. He should be promoted to higher leadership role." Did you know that he had written that about you?
A. Yes, sir, I did.

Q. And then there's another approver. Who's Crystal Long (phonetic)?
A. She's in shoreside.
Q. Okay. What's her role at shoreside?
A. I'm assuming she's in charge of performance reviews.
Q. Okay. So it says, "Kudos on a strong contract, Dr. Maharaj. It is wonderful to see all the -- the positive attributes you bring to the team. Enjoy the rest of your contract and have a great vacation." Was she involved with your -- sorry. When this evaluation was given to you, did Dr. -- or did Mr. Smith's case come up at all when you and Dr. Rotlaru discussed the time period of the contract?
A. No, sir.
Q. When Carnival graded your diagnosis exceptional on November 10th, had anyone at Carnival told you the patient you diagnosed with hyperglycemia on October 18th actually had a stroke?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't recall those words being mentioned.
BY MR. HOFFMAN:
Q. Okay. When did you become a senior physician -- or I'm sorry. After the Carnival Pride, could you

tell me when you -- what was your next role at Carnival and when was that contract?

A. My next role was a senior physician, and that was in -- about two months after this contract.

Q. Okay. And as a senior physician, you're responsible for coordinating with shoreside medical support, correct?

A. Yes, sir.

Q. And compliance with company-specific protocols, correct?

A. Correct.

Q. When you became a senior physician, did Carnival have a stroke protocol to implement?

MR. DRAHOS: Object to the form. Asked and answered.

THE WITNESS: I don't recall a specific stroke protocol, sir.

BY MR. HOFFMAN:

Q. Okay. As senior physician, did you teach your team stroke recognition?

A. I'm sure we had a case review now and then about strokes.

Q. Okay. Can you specifically tell me as to whether or not you taught your team about stroke recognition?

A. I'm sure we've had a conversation now and then about strokes.

Q. Would you document that?

A. If it was a monthly training, it would've been documented. If not, unlikely to have been documented.

Q. Okay. Well, as a senior physician, did you have discretion as to whether or not you wanted to teach your -- what you could teach your team?

A. Did we have discretion? Yeah, of course we did.

Q. Okay. But you don't recall if you taught stroke recognition, correct?

A. I just said I don't.

Q. To your knowledge, did Carnival change anything after Mr. Smith, like a protocol or a checklist or a training module?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't recall that.

BY MR. HOFFMAN:

Q. Do you know if SeaCare has been modified to address stroke?

A. SeaCare has been modified to address stroke? I don't think -- as far as I'm aware, I don't recall.

Q. Okay. Knowing what you know now, is there anything that you would've done differently for Mr.

Smith?

A. No.

Q. Is there anything you believe Carnival should have done differently for you?

A. No, sir.

Q. Okay. Every contract you had with -- with Carnival, to the best of your knowledge, came from their headquarters in Miami, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't understand what that means.

BY MR. HOFFMAN:

Q. Your contract that we were looking at before, the offer of employment, that came from Miami, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I'm not sure where it came from.

BY MR. HOFFMAN:

Q. Okay. Let me show you. All right. So pulling back up the Conditional Offer of Employment dated December 6th, 2023. If you could -- so now that you see the Conditional Offer of Employment, could you tell me whether this originated from Miami?

MR. DRAHOS: Object to the form.

THE WITNESS: How am I supposed to know that, sir? I got it via email.

BY MR. HOFFMAN:
Q. Okay. Is it your understanding that your offer came from Carnival Cruise Lines?
A. Yeah.
Q. Okay. Do you know where your onboarding coordinator was?
A. Sorry, sir? My onboarding coordinator? I'm -- I'm not sure.
Q. Right. Okay. Do you know where Crystal Long (phonetic) was based?
A. Not sure.
Q. Okay. Did you attend any orientation in the United States?
A. No orientation in the United States apart from on ship.
Q. Okay. Did you attend any medical exam in the United States?
MR. DRAHOS: Object to the form.
THE WITNESS: No.
BY MR. HOFFMAN:
Q. Okay. Did you attend any training in the United States?
MR. DRAHOS: Object to the form.
BY MR. HOFFMAN:
Q. I'm sorry? I didn't hear you.

A. No, I didn't attend any training.
Q. You held a C-1/D visa in order to qualify for this work, correct?
A. That's correct.
Q. That's a United States-issued visa, correct?
A. Yeah. Crewman's visa.
Q. And how and where were you paid?
A. I was paid into a bank account, so it's an electronic payment.
Q. Okay. In what currency?
A. U.S. Dollar.
Q. Have you ever had a bank account issued or a pay card issued in the United States?
MR. DRAHOS: Object to the form.
THE WITNESS: No. The States, no.
BY MR. HOFFMAN:
Q. Which Carnival ships have you served on and which U.S. ports did they sail from while you were on board?
A. So U.S. ports was Pride, it sailed from Baltimore, and Sunshine, which sailed from Norfolk, Virginia.
Q. Okay. So just those two boats?
A. In the U.S., yes.
Q. Where were the other two boats?

A. In Australia.
Q. When you received your offers of employment from there, did that offer come from Australia or from Miami?
MR. DRAHOS: Object to the form. Asked and answered.
THE WITNESS: I'm not sure.
BY MR. HOFFMAN:
Q. Okay. Would it be safe to say that you treated passengers and crew while the ship was alongside in Baltimore and in United States waters?
A. Did I treat patients on the ship? Yes.
Q. Okay. While alongside in Baltimore and in United States waters?
A. I'm sure, yeah.
Q. I'm going to go back to the -- the category 1 email, Exhibit 16. And your email signature gives a Miami, Florida, address; is that correct?
MR. DRAHOS: Object to the form.
THE WITNESS: The email signature, I think that is in Miami, yeah.
BY MR. HOFFMAN:
Q. And your -- your disembark notice from Mr. Smith, this went to Carnival's Health Operations Center in Miami, correct?

MR. DRAHOS: Object to the form.
THE WITNESS: The -- one of the people sent to, yes, was the HOC.
BY MR. HOFFMAN:
Q. Okay. Have you ever met Crystal Long in person?
A. No.
Q. Before you were promoted, did you have any further interviews?
A. For promotion?
Q. Yes.
A. I think I might have, yes.
Q. Do you recall who those interviews were with?
A. No, I don't.
Q. Okay. Do you recall if they discussed any of your -- any of your tenure during your prior contracts?
A. Discussed what?
Q. Any of the patients or any of the situations that you encountered.
MR. DRAHOS: Object to the form.
THE WITNESS: I don't recall --
BY MR. HOFFMAN:
Q. I'm sorry?
A. I don't recall that being discussed.
Q. Okay. What do you recall being discussed when

it would -- when you were being considered for a promotion?

A. Various things. I don't recall exactly. Expectations, administrative stuff, performance reviews, yeah.

Q. Okay. Well, that sounds more like what the job was about versus screening for the job; is that correct, or am I wrong?

A. I don't know. That's as much as I remember.

Q. Okay. So you don't really remember any sort of direct interview process regarding being promoted to senior ship captain, correct?

MR. DRAHOS: Object to the form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. I'm sorry. What was your answer, sir?

A. I don't recall specifics.

Q. Okay. Did anyone communicate with you about your testimony during any break today?

A. About my testimony? No.

Q. Is there any document about Mr. Smith that you know exists that I've not shown you?

A. No.

MR. DRAHOS: Object to the form.

BY MR. HOFFMAN:

Q. I'm sorry? I didn't hear.
A. No, sir.
Q. No? Okay. Thank you. When Guest Services reports a sick guest to the medical center, does it send anything in writing ahead to the medical -- medical center?
A. Only if an iCare is created --
Q. Okay.
A. -- retrospectively.
Q. Okay. And what does the iCare generally say for a patient that's calling for help?
MR. DRAHOS: Object to the form.
THE WITNESS: How am I supposed to answer that? Whatever the patient says.
BY MR. HOFFMAN:
Q. Is there certain information that's conveyed by Guest Services to the medical center or is it nothing specific? It's just --
A. It's whatever the patient says.
Q. Okay. Is that generally in an email? I'm sorry --
A. iCare.
Q. Okay. Sorry.
A. Under --
Q. How does iCare differentiate from email?

A. It's sent via email.
Q. Okay. iCare is email?
A. Yeah.
Q. Do you know -- scratch that.
Do you know the name Joseph Scott?
A. I do know of that name.
Q. Okay. Yeah. He's listed on this medical disembarkment email. Who is it?
A. As far as I'm aware, I think he's the medical director of Carnival.
Q. Okay. Have you ever communicated with Mr. Scott regarding anything separate from Mr. Smith?
MR. DRAHOS: Object to the form.
BY MR. HOFFMAN:
Q. I'm sorry?
A. Potentially, I might have.
Q. Okay. What do you recall of your -- of your communications with Mr. Scott?
MR. DRAHOS: Object to the form.
THE WITNESS: I don't recall exactly. I know he's one of the doctors that's on call for the HOC, so maybe I called him and he picked up at some stage.
BY MR. HOFFMAN:
Q. Okay. Would he be involved with a medical

disembarkation?

A. Yeah. If he's on call, then sometimes he might be involved.

Q. Okay. What would his involvement be?

MR. DRAHOS: Object to the form.

THE WITNESS: He -- then he assists with coordination.

BY MR. HOFFMAN:

Q. Okay. But in this instance, Mr. Smith was disembarked at the port and does -- would that require Mr. Scott's involvement?

MR. DRAHOS: Dr. Scott.

MR. HOFFMAN: Dr. Scott. Thank you.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. Okay. Where are the HESS procedures kept? What's the system called?

MR. DRAHOS: Objection. Form. It's been asked and answered.

THE WITNESS: It's online.

BY MR. HOFFMAN:

Q. Okay. Can it be searched by keyword?

A. What -- what does that mean?

Q. Like, if you type in a word, does -- will it come up with a -- a result? Can you search?

A. On HESS?
Q. Yes.
A. If you're on the HESS system and you type in a keyword, certain remarks from that policy will come up.
Q. Okay. Had you ever typed stroke into it?
A. I can't recall.
Q. Okay. On the -- on the job training checklist, it references emergency response procedures from medical. And my question is, were you handed a manual with that title?
A. I don't recall it being handed a physical manual.
Q. Okay. Is there a drill log that's kept in the medical center?
A. Do you mean physically kept in the medical center?
Q. Yes.
A. I don't think it's required by us to keep a physical log in the medical center of drills.
Q. Okay. Is it kept electronically?
A. Yeah. Usually, it's kept electronically.
Q. Thank you. Do you know if anyone contacted your references from Atlantic -- from AMR?
A. I'm not sure if they were contacted.
Q. Okay. I think I'm just about done, Doc. I'm

just going through my records. Thank you for your patience.

A. Okay.

Q. What are you doing now? What are you -- what are you doing for work now?

A. It's a bit personal, isn't it?

Q. You can answer the question.

A. I'd prefer not to.

Q. Are you practicing medicine?

A. Yeah.

Q. Okay. Are you in private practice?

MR. DRAHOS: Object to the form.

THE WITNESS: Irrelevant to the case.

BY MR. HOFFMAN:

Q. Are you refusing to answer?

A. Well, I'm not refusing to answer. I just -- it's personal information. I'd like to keep my private life private.

Q. Has your removal from the -- or has the end of your contract with Carnival -- has your career been able to continue on the same trajectory that you were on before?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know what that means.

Or rather, I don't understand the question.

BY MR. HOFFMAN:
Q. Okay. It's too personal to ask what you are doing for work these days?
MR. DRAHOS: Hold on a minute, Doctor. So Mr. Hoffman, it's almost 9:00 in --
MR. HOFFMAN: Yeah, it's my final question. It's just --
MR. DRAHOS: Well, he -- he -- he said that he doesn't want to give any more information. He's told you that he's in private practice, but if you think you're entitled to more, get a court order.
MR. HOFFMAN: If you don't want to instruct your client to answer, that's fine. No further questions.
MR. DRAHOS: Thank you.
MR. HOFFMAN: Thank you.

CROSS-EXAMINATION

BY MR. DRAHOS:
Q. So Doctor, I have a couple of very brief points of clarification because I do know it's late for time and none of us have eaten today yet, so I'll be brief.
A. Sure.
Q. Throughout the course of this deposition, you've used a particular phrase that I want to ask you

to explain. You've said on a number of instances that Mr. Smith was, quote, "very poorly managed." What -- what did you mean by that? Can you explain what that term means?

A. Yeah, sure. It means that he was chronically ill and he wasn't managing his condition very well, holistically. So I mean, his health was -- it -- he wasn't being managed well at all.

Q. Okay. So in other words, you're not saying that he was being very poorly managed on -- in the ship's medical center. You're saying he was poorly managing his own medical care prior to arrival to the ship?

A. Yes, sir. Yes, of course. Yeah. All prior to arrival of the ship.

Q. Okay. So you were asked some questions about whether or not Carnival trained you in recognizing seasicknesses versus other conditions, whether or not Carnival had trained you to recognize signs and symptoms of stroke. Do you recall that line of questioning?

A. Whether Carnival has trained us specifically to -- yeah, I recall the question. Yeah.

Q. Did you need Carnival to provide you with training in that regard, or did you already have that training before you started as a ship's physician?

A. Yeah, we don't get any clinical training by Carnival.

Q. Okay. In other words, did you learn in medical school how to recognize and diagnose a stroke?

A. Yes, sir. Medical schools, various emergency courses.

Q. Okay. And also during your residency, did you learn how to recognize and diagnose a stroke?

A. Yeah. It further elaborated the knowledge, correct.

Q. And -- and subsequently thereafter, in the years that you worked in emergency rooms in hospitals in South Africa, did you have experience recognizing and diagnosing strokes?

A. Yes, sir. I've seen and diagnosed many strokes.

Q. Did you need the senior doctor's guidance and input on how to render medical care aboard a cruise ship medical center?

A. No, we don't need his guidance. The ship's doctor is capable of making clinical decisions.

Q. And on October 18th, 2024, were you capable of making your own independent diagnoses and assessments of patients in the ship's medical center?

A. Yes, sir. That's correct.

Q. You were asked some questions about the Against Medical Advice forms that were executed in this case by Mr. Smith. Do you recall that line of questioning?

A. Yes, I do.

Q. And is the senior doctor required to sign Mr. Smith's Against Medical Advice forms in this case?

A. Not in this case, no.

Q. Why not?

A. It's the responsibility of the treating physician to have it signed, and then obviously the other necessary parties.

Q. So I want to ask you to explain, in your own words, please, the Against Medical Advice forms that were executed in the case. I'm waiting for them to pull up on my screen. I apologize for the delay. Okay. So can you see my screen, Doctor?

A. Yes, I can.

MR. DRAHOS: All right. And I've -- what I've put up is the Against Medical Advice Form which has been previously marked in the deposition by Plaintiff's counsel. And just for the sake of clarity, I'm going to mark it as Defense Exhibit 1.

THE REPORTER: I'm sorry. It would have to be alphabet.

MR. DRAHOS: Okay. Defense Exhibit A. Thank you.

(Exhibit A was marked for identification.)

THE REPORTER: Thank you.

BY MR. DRAHOS:

Q. And I'm going to scroll down to the bottom there and ask you, do you see the one that it's got a Bates stamp or a -- a timestamp of October the 18th, 2024, at 2041, Doctor?

A. Yes, sir. I can see it.

Q. And that contains your signature, correct?

A. That's correct.

Q. And in the box next to it there, whose signature is that?

A. That's the registered nurse, Medanda.

Q. And what is the purpose for Nurse Medanda to sign that?

A. He has to witness to state that he was there to -- obviously, that -- ensure that everything was explained properly.

Q. Okay. And the box just above that there, what is the purpose of that signature?

A. It's to state that another individual was there to witness the entire explanation happening and that patient understands what is happening.

Q. And the patient box next to that -- that states, Smith, Michael, whose signature is that?

A. As far as I'm aware, it's Michael Smith's.

Q. Did you witness Mr. Smith sign that box?

A. Yes, I did.

Q. Okay. And what was the reason for this Against Medical Advice Form being signed at 2041?

A. So is he -- he didn't want to be referred to a hospital.

Q. And what was the specific advice that you were giving in that regard? Can you explain what it was that he was acting against?

A. Yeah. So specifically, I don't want to use the word poorly managed anymore. He was just chronically ill and his condition required optimization as well as monitoring and follow-up. And that can only be done in a hospital setting, which is why I urged him to be referred to Baltimore Hospital.

Q. Okay. So were you saying, Mr. Smith, you need to be in the Baltimore hospital right now, on the evening of October the 18th, or, Mr. Smith, you need to go to the hospital at the conclusion of this cruise?

A. No, sir. It was at the end of the cruise, when we reach Baltimore.

Q. All right. And so when you say here, under

the possible risks -- well -- well, why don't you tell us what were the possible risks if Mr. Smith did not follow your advice?

A. If he didn't follow my advice at that point in time, just progression of his condition, continuing to be poorly managed. And ultimately, it can't -- it's not an immediate because it's not emergent, but it could just be further morbidity and eventual mortality down the line.

Q. All right. So you're not saying that on the night of October the 18th, when Mr. Smith was filling out this form, he was going to die if he didn't go to the hospital? You're not saying that, are you?

A. No, sir. I'm not saying that it wasn't an immediate threat to life.

MR. DRAHOS: Okay. And then same for what we'll mark as Defendant's Composite -- or I'm sorry, yeah, Defendant's Composite Exhibit B.

(Exhibit B was marked for identification.)

BY MR. DRAHOS:

Q. Do you recognize this form, sir?

A. Yes, I do.

Q. And is this also an Against Medical Advice form that's completed on the Carnival Pride?

A. Yes, that's correct.

Q. All right. And if we flip to the bottom -- second page there, is that your signature there under the senior doctor template?

A. That's my signature.

Q. All right. And as we explained before, why does it say senior doctor if you were not the senior doctor at that time?

A. It's an uneditable template, so it automatically autopopulates, once you print out the form, as senior doctor.

Q. Does that mean that only Dr. Rotlaru could have signed this form on October the 18th?

A. No, sir. That's why I put my name as well as crew ID next to it, to distinguish who I am.

Q. All right. So in other words, you had the authority to execute this document as well?

A. Yes, that's correct.

Q. All right. And similarly, is that Nurse Medanda's signature to the right?

A. Yes, that's correct.

Q. And also, is that Mr. Patterson's signature just above?

A. Yeah, I would assume so.

Q. And again, is that Mr. Smith's signature in the next box to the left-hand corner there?

A. Yeah, Mr. Michael Smith.
Q. And did you witness Mr. Smith sign that box on October the 18th, 2024, at 2042?
A. Yes, I did.
Q. And what was the medical advice that you gave at that time?
A. So this one was, we urged him to stay in the medical center so we can continue monitoring him.
Q. Okay. And do you explain -- did you explain to him why it was that you felt it was important for him to stay in the medical center?
A. Yes, we did. Briefly, he presented as someone who's chronically ill, was now in a severe condition. Although he felt better and he claimed that he felt better at the time, it's not really a quick fix that now someone can assume that they just better after the initial treatment that they've been received. They medically have to be monitored.
Q. Did he have any questions or was there any miscommunication between the two of you when you were giving him this advice?
A. I don't think that there was any miscommunication. I don't recall him having any questions.
Q. All right. And he did not appear to you to be

confused or unclear as to what you were suggesting to him?

A. No, he was not confused, and it was confirmed by his family member as well that they understood.

Q. All right. And so what risks did you tell him could potentially occur in the event he did not follow your advice and remain in the medical center?

A. So if he did go back to his cabin, there's a risk of his blood sugar just rising out of control again. There's a risk of it going to dangerous levels, like further morbidity, into the diabetic emergent levels that we discussed earlier. His -- and then that could eventually lead, down the line, to just further morbidity and mortality. But again, I'll emphasize no immediate threat to life with his current situation as to what he presented at that time.

Q. All right. So in other words, you're not saying that on October the 18th at 20:42, if Mr. Smith left the medical center, he was going to die. What you're saying is your condition could be such that it could worsen and it could ultimately lead to death if, worst-case scenario, it -- it worsened to that point?

A. 100 percent. That's correct, sir.

Q. All right. Now, it was asked of you as to whether or not this AMA was applicable because Mr. Smith

remained in the medical center for approximately three hours after this document was signed. Do you recall that line of questioning?

A. Yes, I do.

Q. All right. And so were you attempting to keep Mr. Smith in the medical center for as long as he was willing to stay?

A. Yeah. I mean, realistically, we want to monitor him for as long as possible, which is what we initially wanted. Again, if someone is in their right state of mind, GCS-15, compos mentis, we can't force them to do anything, but I would've liked him to stay for as long as possible just so that we can continue monitoring him for as long as possible.

Q. All right. And so ultimately, then, when he decided that he wanted to leave, that was against your medical advice, correct?

A. That's correct, sir.

MR. DRAHOS: So I'm sharing with you on the screen the medical chart that was previously marked as an exhibit by Plaintiff's Counsel. And just for the sake of clarity, we'll mark it as Defendant's Composite Exhibit C, specifically Page 39.

(Exhibit C was marked for identification.)

BY MR. DRAHOS:

Q. And I'd like to turn your attention to a note entry that was entered at 23:32. Do you see that there?

A. Yes, I can see that.

Q. Okay. And it says, "Glucose on downward trend. Stable vital signs on exit from medical center. He has left on a wheelchair to follow-up mane." Is that your note entry, Doctor?

A. Yes. That's my note entry.

Q. So was Mr. Smith discharged from -- from the medical center on October the 18th at 23:32, or was he allowed to go to his cabin with the understanding that he was going to come back?

A. Yes. No, he was never discharged from the medical center. A discharge means that we have completed care for that period. He was choosing to leave, and obviously we urged him to come back as soon as possible.

Q. All right. So when it says here to follow up mane, what -- I'm not familiar with the word "mane." What does that mean?

A. Yeah. Sorry. So it's mane. Mane is just Latin for what we said, first thing in the morning.

Q. Oh, I see. Okay. So it was asked of you as to when you ultimately decided upon this Category 1 medical disembark, and you were asked whether or not you

did that on October the 18th or October the 19th. Do you recall that line of questioning?
A. I do recall that.
Q. Okay. Now, when Mr. Smith returned to the medical center on October the 19th, did his blood sugar spike again?
A. I think it did.
Q. Okay. And was he still showing signs and symptoms of hyperglycemia?
A. Yes. Correct.
Q. And was he still showing signs and symptoms of a potential infection due to what it was that you all were examining there in his big toe?
A. Yes, that's correct.
Q. And did he still appear to you, at that point in time, to need medical care at the conclusion of the cruise when he reached Baltimore?
A. Yes, sir. That's correct.
Q. And was it for the same reasons that you had communicated to him on October the 18th?
A. Yes. It's the same.
Q. All right. Now, at this point in time, he remains in the medical center, correct?
A. Yeah. He stayed there.
Q. All right. And then now there's this note

entry that we have on the screen here on Page 38, which was entered by you at 10:13 a.m.  Do you see that there on the screen?

A.   I do, yes.

Q.   All right.  And it says, "For a referral to Baltimore Hospital mane."  Now that I know what that word is, I can say it correctly.  Do you see that there?

A.   Yeah.  Yes, I can see that.

Q.   Okay.  And it -- it also says that Mr. Smith was trying to rationalize his symptoms by saying that he's a first-time cruiser and it may be motion sickness. However, you're still -- his foot is still a potential source of infection.  He still has this elevated blood sugar, and you still believed he needed to be further investigated and optimized, correct?

A.   That's correct.

Q.   All right.  So now at this particular point in time, did Mr. Smith finally change his mind and agree, okay, I'm going to go ahead and -- and seek medical care at the conclusion of the cruise?

A.   Yes, he did.

Q.   And that was based upon your prompting and your continued encouragement, correct?

A.   Yeah.  He was quite reluctant, but obviously we have to be -- we -- we have to do what's best for the

patient, and ultimately, he did agree.

Q. Okay. And we discussed the -- the -- the semantics between Category 1 and Category 3, but ultimately, Mr. Smith was going to be medically disembarked to where this cruise originated, the home port in Baltimore, correct?

A. Yes, that's correct.

Q. And he was capable of being transferred from the ship to a hospital in Baltimore by a paramedic ground ambulance, correct?

A. Yes, that's correct.

Q. So is that why he did not need a Carnival medical escort, because there was a paramedic capable of doing so?

A. Yeah. He didn't require any escalation other than the paramedic for transfer.

Q. Okay. Now, I want to -- I want to ask about a -- a -- a brief exchange that happened between you and Plaintiff's Counsel and -- and make sure that your position on this is clear. You were asked a question from my colleague, "Was it possible that Mr. Smith had a stroke on October the 19th?" And you responded, "I -- I guess it's possible."

Do you recall that exchange between the two of you?

A. Yes, I do remember that.
Q. Okay. And I want to be clear. Are -- are you testifying here today that it's your opinion that Mr. Smith suffered a stroke on October the 19th?
A. No, I'm not stating that. I can't possibly know that.
Q. All right. As you sit here today, have you reviewed any of the records from the land-based hospital following his medical disembark from the ship?
A. Land-based? I don't think so, no.
Q. Okay. In -- in other words, did you see the CT films that were taken of his head following the cruise?
A. Sorry. I didn't see the CT films.
Q. Okay. Did you see any diagnostic films whatsoever taken of Mr. Smith's brain?
A. I don't recall any.
Q. Have you read any radiology reports?
A. I don't recall any.
Q. All right. So as you sit here today, do you have any opinion or understanding as to when, if at all, Mr. Smith ever suffered a posterior circulation stroke?
A. I cannot comment on that at all without a CT.
Q. Okay. Would you defer to the expert neurologist in that regard?

A. Yeah. They'll be much more equipped to answer that. Yeah, definitely.

Q. Okay. Did Mr. Smith ever have a catheter inserted during the time that he was in the ship's medical center?

A. No, not -- if he did have a catheter, I would've had to note it as a procedure. He didn't have one.

Q. One second here, Doctor. I've got just a few more.

A. No worries.

Q. Sorry. My computer is a little slow to pull this up.

A. No problem.

Q. So while this is pulling up, have you ever stepped foot on Florida soil?

A. On -- in Florida?

Q. Yeah. That's a dramatic way of saying, have you ever been to Florida?

A. When I was a kid, for about a week.

Q. When -- when was that, Doctor?

A. I think it was 2011.

Q. Okay. And what was the reason for being in Florida in 2011?

A. It was a family holiday. We went to Disney

World for about a week.
Q. All right. And so you have not been to Florida since?
A. No.
Q. And where are you a citizen?
A. South Africa.
Q. And do you maintain citizenship anywhere else?
A. No, not anywhere else.
Q. All right. Have you ever operated, conducted, engaged, or carried on or transacted any business at all in the state of Florida whatsoever?
A. No.
Q. Have you ever maintained an office, a place of business, a post office box, or a telephone listing in Florida?
A. No, sir.
Q. Do you have any real estate in Florida?
A. No.
Q. Do you have any bank accounts in Florida?
A. No.
Q. Have you ever held any interest or real estate with any properties in Florida?
A. No.
Q. Have you ever incurred any obligation to pay or -- or paid any taxes in Florida?

A. No.
Q. Have you ever filed a lawsuit in Florida?
A. No.
Q. Has any court in Florida ever invoked jurisdiction over you for any reason?
A. No, sir.
Q. Okay. And have you answered those questions under the penalty of perjury of the laws of the United States of America?
A. Yes.
Q. And what I'd like to do is put up on the screen an affidavit that was filed on your behalf on October the 2nd, 2026. Can you see that there, sir?
A. Yes, I can.
Q. All right. And I'm going to flip down to the last page and ask you, is that your signature?
A. That is.
Q. And did you sign this document on February the 10th, 2026, after having reviewed and confirmed the accuracy of the statements contained in the affidavit?
A. Yes. October the 2nd, 2026.
Q. Oh, October the 2nd. I'm sorry. Thank you.
A. Yeah.
MR. DRAHOS: Okay. Doctor, those are all the questions I have. Thank you very much for your

time and your patience today. I really appreciate it.

THE WITNESS: Thank you, sir. Thank you, sir.

MR. HOFFMAN: You have the right to read or waive the transcript.

MR. DRAHOS: The doctor will read the transcript.

THE WITNESS: Oh, very good.

MR. DRAHOS: Okay. Thank you all very much. Doctor --

THE VIDEOGRAPHER: Counselors -- Counselor, will there be any orders at this time for the video or the transcript?

MR. HOFFMAN: I'll order the transcript.

MR. DRAHOS: And this is Michael Drahos. I will not need the video right now, but I will order the transcript, please.

THE REPORTER: Would you like the transcript standard time for both of you, ten business days?

MR. HOFFMAN: Could you send me different pricings for different delivery times?

THE REPORTER: I'll put that as a note.

And what about you, Mr. -- I don't know how to say your last name. Michael?

MR. DRAHOS: Drahos. Yeah. Thank you. Kim,

I would just ask that we receive it at the same -- on the same date as Plaintiff's Counsel. So if they ask for it to be expedited, we would like to match that, please.

THE REPORTER: Okay. And for the read, would you like it to be emailed to you?

MR. DRAHOS: Yes, please. And I'll forward it on to the doctor. Thank you.

THE REPORTER: Okay. And then the exhibits, I have A and B. Would you like to retain that or give it to me, Mr. Drahos?

MR. DRAHOS: You know what? I think I had more than that. I had A, B, C, and D, I think.

THE REPORTER: I have A, B, and C, actually. What was D?

MR. DRAHOS: I believe D was the affidavit.

THE REPORTER: I'll mark that.

(Exhibit D was marked for identification.)

MR. DRAHOS: Okay. So I have the two AMA forms in the medical chart. I will email that to you. Would you mind -- do you have your email address in the chat?

THE REPORTER: I'll put it right now.

MR. DRAHOS: Doctor, you can go.

Unless you need any spellings from him, which

I probably can help with. No?

THE REPORTER: No.

MR. DRAHOS: All right. Doctor, please go get something to eat. I know you must be starving, so --

THE WITNESS: I'm good.

MR. DRAHOS: Thank you very much. You're free to go.

THE WITNESS: You guys take care.

MR. DRAHOS: Thank you.

THE VIDEOGRAPHER: Okay. Let -- let me take us off record. The time is now 3:14. This concludes the video deposition of Dr. Nikhil Maharaj in the matter of Smith v. Carnival Corporation, et al. Have a good day, everyone.

(Deposition concluded at 3:14 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, Kimberly Cherena, Court Reporter, Notary Public, State of Florida, certify that Nikhil Maharaj, M.D., personally appeared before me on the 8th day of October 2026, and was duly sworn.

Signed this 12th day of October 2026.

Kimberly Cherena
______________________________

Kimberly Cherena, Court Reporter
Notary Public, State of Florida
Commission No.: HH 489539
Commission Expires: February 25, 2028

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, Kimberly Cherena, Court Reporter, certify that I was authorized to and did report the Deposition of Nikhil Maharaj, M.D.; that a review of the transcript was reserved; and that the transcript is a true and correct record of my notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 12th day of October 2026.

Kimberly Cherena

Kimberly Cherena, Court Reporter

WITNESS NOTIFICATION LETTER

October 12th, 2026

NIKHIL MAHARAJ, M.D.

In Re: MICHAEL SMITH vs CARNIVAL CORPORATION AND NIKHIL MAHARAJ, MD

Deposition taken on October 8, 2026.

The transcript of the above proceeding is now available for your review.

Please call to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday.

Please complete your review within 30 days.

Sincerely,

Kimberly Cherena
Cogent Legal Services
2609 North Forest Ridge Boulevard
Suite 101
Hernando, Florida 34442
561-356-0831

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT

ENTER CHANGES ON THIS PAGE

IN RE: MICHAEL SMITH vs CARNIVAL CORPORATION AND NIKHIL MAHARAJ, MD

NIKHIL MAHARAJ, M.D.

October 8, 2026

| Page | Line | Change | Reason |
|---|---|---|---|
| | | | |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

____________________________________

NIKHIL MAHARAJ, M.D. Date