Smith v. Carnival Corp., et al., No. 1:25-cv-24611-GAYLES/SHAW-WILDER (S.D. Fla.)

# EXHIBIT B

Deposition of Debra Dube, R.N. (Aug. 5, 2026)

*Plaintiff?s Motion for Leave to Take the Deposition of Defendant Letlhogile Rantleru, M.D., After the Discovery Cutoff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-CV-24611-DPG

MICHAEL SMITH,

Plaintiff,

-vs-

CARNIVAL CORPORATION AND NIKHIL MAHARAJ, MD,

Defendants.
_______________________________________/

Via Zoom videoconference

Wednesday, August 5, 2026
1:57 P.M. to 5:19 P.M.

VIDEOTAPED DEPOSITION OF

DEBRA DUBE

Taken before Julie Desmond, Court Reporter, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above-styled cause.

APPEARANCES:

On Behalf of the Plaintiff:

DAVID W. SINGER & ASSOCIATES PA
1011 South Federal Highway
Hollywood, Florida 33020
954-920-1571
mahoffman@1800askfree.com
BY: MICHAEL A. HOFFMAN, ESQ.

On Behalf of the Defendants:

GRAY ROBINSON, P.A.
151 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
561-268-5727
ashley.genoese@gray-robinson.com
BY: ASHLEY N. GENOESE, ESQ.

Also Present:

Benito Portas, Videographer

INDEX


| TESTIMONY OF DEBRA DUBE | PAGE |
|---|---|
| Direct Examination by Mr. Hoffman | 4 |
| Cross-Examination by Ms. Genoese | 101 |
| Redirect Examination by Mr. Hoffman | 102 |
| Certificate of Oath | 105 |
| Certificate of Reporter | 106 |
| Certificate of Reporter | 107 |


INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS MARKED


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | Medical Team On-The-Job Training Form | 15 |
| Exhibit 3 | First Response and Triage HESS Procedure | 20 |
| Exhibit 6 | Medico Medevac Check Sheet | 44 |
| Exhibit 4 | First Response Treatment Protocol | 52 |
| Exhibit 1 | SeaCare Medical Center Case File | 55 |
| Exhibit 2 | Against Medical Advice Document | 92 |


(Exhibits were retained by Mr. Hoffman.)

THEREUPON:

THE VIDEOGRAPHER: -- p.m. on August 5th, 2026, in the matter of Michael Smith v. Carnival Corporation and Nikhil Maharaj. Today we're taking the deposition of Debra Dube.

My name is Benito Portas. I'm the videographer. Julie Desmond is the court reporter, which will swear in the witness.

THE REPORTER: Thank you so much. I have previously checked the witness's identification.

Ma'am, can you please raise your right hand?

THE VIDEOGRAPHER: There's some feedback. Thanks. Go ahead.

DEBRA DUBE,

having first been duly sworn, testified as follows:

THE REPORTER: Thank you so much.

We may now proceed.

MR. HOFFMAN: Okay.

DIRECT EXAMINATION

BY MR. HOFFMAN:

Q. Good afternoon. My name is Michael Hoffman. I am here on behalf of Michael Smith. And Ms. -- I -- I don't want to mispronounce your name. How do you pronounce your last name?

A. Dube.

Q. Dube. Thank you.

A. Yes.

Q. So Ms. Dube, have you ever sat for a deposition before?

A. No.

Q. Okay. So it's a question-answer session. It's under oath. I -- I ask that all of your answers be audible. A lot of times people will shake their heads or nod their heads. We have a court reporter here for the purpose of taking down everything you say, so I do ask that you give audible answers, verbal answers. If I am the -- a lot of times when people go through this, they anticipate what a question will be and they begin to answer before it's fully asked. I just ask that you allow me to finish my questions.

I don't want you to guess. If you don't know, please say you don't know. If you need a break, let me know. We -- I ask that if a question is pending, that we answer that question or that group of questions before allowing a break. And are you on any medications or do you have any conditions that would affect your testimony today?

A. No.

Q. Okay. Ms. Dube, so I'm here on behalf of Michael Smith. And I want to ask you that -- - so Mr.

Smith was a -- a patient at the infirmary. And I want to ask that if -- everything that you would've done for Mr. Smith, would that be in the SeaCare record?

A. Yes.

Q. Okay. So everything that you've done is written down in that record, correct?

A. Yes.

Q. Okay. Could you tell me what you did to prepare for today?

A. I went through the patient's note.

Q. I'm sorry, you went through what?

A. The patient's information, the notes.

Q. Okay. And how many pages was that?

A. Forty-two.

Q. Okay. And did you speak with anyone to prepare for today?

A. No.

Q. Okay. Did you meet with Carnival's lawyers prior to today's deposition?

A. Come again?

Q. Did you meet with Carnival's lawyers before today's deposition?

A. Yes.

Q. Okay. How many times did you meet with them?

A. Two times.

Q. Okay. And how long was each time that you met?
A. Thirty to 45 minutes.
Q. Okay. Thank you. And I see that the name on your screen says Panorama Senior Doctor. That's not your title, is it?
A. No.
Q. Okay. Could you tell me your title, Ms. Dube?
A. I'm a registered general nurse.
Q. I'm sorry?
A. I'm a registered general nurse.
Q. You're a general -- you're a nurse, right?
A. Yes. Yes, correct.
Q. Okay. And was there a special -- are you the lead nurse?
A. No.
Q. What's your -- what was your full title?
A. Registered general nurse.
Q. Could you spell the first one? I'm -- is it generalist nurse?
A. Registered, R-E-G-I-S-T-E-R-E-D.
Q. Okay. Could you tell me who the senior doctor is on the Panorama right now?
A. Her name is Dr. Dayan Campino (phonetic).
Q. Okay. And are you on the Panorama now?

A. Yes.
Q. Okay. Ms. Dube, could you give me your full name and your age?
A. My name is Debra Dube. I'm 50 years old.
Q. Okay. And could you tell me your country of citizenship?
A. Zimbabwe.
Q. Okay. And is that your current residence as well?
A. Yes.
Q. And I wanted to ask about your nursing education. Could you tell me, beginning with your nursing education, when you started and what school?
A. I started in 2005 in Masvingo Provincial Hospital in Zimbabwe up to 2008.
Q. Okay. Do you have any specialized training?
A. No.
Q. Okay. And where is your -- is your nursing license currently out of Zimbabwe?
A. Can you rephrase?
Q. You -- do you have a license to be a nurse?
A. Yes.
Q. Okay. What country issued that license?
A. Zimbabwe.
Q. Okay. And have you ever had any discipline

underneath the Zimbabwe Nursing Board or whatever is equivalent?

A. No.

Q. Okay. Are you licensed in United States in any state?

A. No.

Q. Okay. So it sounds like, in 2008, you finished school, correct?

A. Yes.

Q. Okay. Could you tell me your employment history since 2008?

A. I started working 2008 in Bulawayo, Zimbabwe. My first occupation was in a medical ward from 2008 up to 2010. From 2010 up to 2023, I was working in intensive care unit.

Q. Intensive care unit?

A. Intensive care unit.

Q. And what hospital was that at?

A. United Bulawayo Hospitals in Zimbabwe, Bulawayo.

THE REPORTER: Could you spell that word, please?

THE WITNESS: United Bulawayo Hospitals, U-I -- U-N-I-T-E-D B-U-L-A-W-A-Y-O Hospitals.

BY MR. HOFFMAN:

Q. Thank you. And after 2023, could you tell me where you were employed?
A. I was employed with Carnival.
Q. Okay. And when did you first start working with Carnival?
A. November 2023.
Q. Okay. And how were you recruited to -- how were you recruited to Carnival? Did you apply directly or was there a placement agency?
A. I applied directly.
Q. Okay. And Carnival pays your salary?
A. Yes.
Q. Okay. Before Carnival, how many stroke patients had you personally cared for?
A. Fifteen to 20.
Q. Okay. And where was that experience?
A. United Bulawayo Hospitals.
Q. Okay. Do you have any experience interacting with stroke patients while working for Carnival?
MS. GENOESE: Form.
THE WITNESS: Can you rephrase?
BY MR. HOFFMAN:
Q. Yes. So I had asked before how many stroke patients you had personally cared for. And you said, 15 to 20, and you identified that they were at your

hospital. And the follow-up question was: Had you cared for any stroke patients while working for Carnival?

A. Not yet.

Q. Okay. Could you tell me who your first -- what boat were you first on when you were -- when you started work in November 2023?

A. I didn't get the question.

Q. What boat were you first put on when you first started working for Carnival in November 2023?

A. Carnival Vista.

Q. Vista. Okay. And how long were you on the Vista?

A. Eight and a half months.

Q. And then did you have your contract renewed?

A. Yes.

Q. Okay. And when was your next -- when did your next contract begin?

A. In June 2024.

Q. Okay. And what boat was that on?

A. Carnival Pride.

Q. On Carnival Vista, do you recall the names of the doctors that you worked for?

A. I only recall one name.

Q. Okay. Who was that person?

A. Dr. Tapiwa Mawere.

Q. Okay. And do you recall the doctor's --

THE REPORTER: I'm sorry. Sorry. I'm going to need a spelling.

MR. HOFFMAN: Okay. Yes.

THE REPORTER: Can you spell the doctor's name, please?

THE WITNESS: Okay. Tapiwa is T-A-P-I-W-A. Mawere is M-A-W-E-R-E.

THE REPORTER: Thank you. If we get -- so I don't have to interrupt, maybe if you could just say the name and then spell it, and then I won't have to interrupt. Thank you.

BY MR. HOFFMAN:

Q. And do you recall the name of the doctors on the Carnival Pride?

A. Yes.

Q. Could you tell me the position, the title, and who they were?

A. Dr. Rantleriu, he was the senior physician. Rantleriu is R-A-N-T-L-E-R-I-U. And Dr. Nikhil Maharaj, he was the junior physician. Nikhil is N-I-K-H-I-L-I (sic).

Q. Okay. Thank you. And on the Carnival Pride, do you recall the names of the other nurses that you worked with?

A. Yes.
Q. Could you tell me who they were?
A. Madonda Mduduzi, M-A-D-O-N-D-A, Mduduzi, M-D-U-D-U-Z-I. And Allan Acebu. Allan Acebu is A-N -- A-L-L-A-N C-E-U (sic).
Q. And what was that nurse's full name?
A. Mduduzi, Madonda.
Q. Allan?
A. And Allan Acebu.
Q. How do you spell the last name?
A. A-C-E-B-U.
Q. I see. Acebu. Thank you. Have you worked with them on any other vessels after the Carnival Pride?
A. No.
Q. Okay. Could you describe Carnival's onboarding when you first joined? Where -- where it was? What was covered?
A. We were at Port Canaveral with Vista. That was my first shift. The itinerary included Nassau, Curacao, Grand Turk.
Q. Right. But I'm asking when you were first hired. And usually there's, like, an orientation and a training period. Did you have a training period?
A. Yes.
MS. GENOESE: Form.

BY MR. HOFFMAN:
Q. Okay. Could you tell me where that training took place?
A. In Carnival Vista on the ship.
Q. Okay. And do you recall who provided you that training?
A. Yes.
Q. Okay. Who provided you --
A. It's the Tapiwa -- Dr. Tapiwa Mawere, and the lead nurse, Deepak (phonetic), from India.
Q. And that was on the Vista?
A. Correct.
Q. Okay. And do you recall what topics were covered?
A. Yes. Duties and roles of the nurse.
Q. Okay. And what do you recall, from your training, of the duties and roles of the nurse to be?
A. How to care for the patients.
Q. Okay. I wanted to ask you: When it comes to caring for a patient, what -- what happens when a person is brought into the medical facility? How are they -- could you walk me through what -- what first happens when somebody comes to the medical facility needing help?
A. The nurses, they talk to the patient. And

then after talking to the patient, they get the vital signs. Then they refer the -- the patient to the physician.

Q. Okay. And what are those vital signs that you just mentioned that you take?

A. The blood pressure, the temperature, the heart rate, the oxygen level, the saturation levels, the respirations, the blood glucose.

Q. Okay. I wanted to ask -- I'm going to show you a document. It was provided by Carnival. It's the medical team on-the-job training form.

A. Okay.

Q. I'm going to share my screen with you just one moment. And I'd like to go over a document.

MR. HOFFMAN: I'll have this marked as Exhibit 8.

(Exhibit 8 was marked for identification.)

BY MR. HOFFMAN:

Q. And I wanted to ask, are you -- have you seen this form before?

A. Yes.

Q. Okay. Where do you recall seeing this form?

A. At the medical center.

Q. Okay. And did you complete one when you -- when you started on the Vista?

A. Yes.
Q. Did you complete one when you started on the Pride?
A. Yes.
Q. Okay. And I just want to walk through the checklist of the items that you signed off on. And so it says the first one here is "HESS Procedures"; is that correct?
A. Yes.
Q. And the second, "EMR: Emergency Response Procedures for Medical." You see that as number 2?
A. Yes.
Q. Okay. And is there a manual or a policy that goes along with those -- with those subjects, those topics?
A. I'm not sure.
Q. Okay. Well, when you first go onto the boat and you receive this checklist, do you receive other information related to the items listed here?
A. Both.
Q. Okay. Could you describe what other items that you receive in your training when you get onto the boat?
A. The other training that we received is the sexual assault training, the X-ray training, the

breathalyzer training.

Q. What was the last thing that you had said, ma'am?

A. Breathalyzer. Alcohol breathalyzer training.

Q. Ah. The breathalyzer?

A. --

Q. Thank you. And I just want to go through the last remaining topics. So I want to confirm that you received training on the emergency equipment locations on the ship, correct?

A. Correct.

Q. And you received training on oxygen storage, X-ray equipment, personal protective equipment, correct?

A. Correct.

Q. Okay. And then it looks like MSDS sheets. Could you tell me what MSDS stands for?

A. I'm not sure.

Q. Okay.

A. I can't remember.

Q. Okay. Well, it says, "Computer location." Do you know what that would mean?

A. Yes.

Q. What does it -- what does it mean when it says, "Computer location"?

A. Where the computers are located at the medical

center.

Q. Okay. But you don't know -- you don't recall what those documents are for?

A. The abbreviation, yes.

Q. I'm sorry?

A. I don't recall the abbreviation MSDS.

Q. Okay. But do you know what topics they cover or what they would be used for?

A. I'm not sure.

Q. Okay. And then it says, "Equipment not working." And then the final, "Review of equipment in the medical center." And then at the bottom, it looks like you would sign off on this document; is that correct?

A. Correct.

Q. Okay. And when you sign that document, you're representing that you're -- you're trained on all these issues?

A. --

Q. I'm sorry, did you answer or did you -- do you need me to zoom in on the document or --

A. I answered the last -- I answered the last question.

Q. Oh, okay. I asked -- I'm sorry, I didn't hear.

MR. HOFFMAN: Madam Court Reporter, did you hear what she had said?
THE REPORTER: I did not.
BY MR. HOFFMAN:
Q. The last question was: When you signed this document, are you representing that you're -- you've been trained on these matters listed on the on-the-job training form?
MS. GENOESE: Form.
THE WITNESS: Correct.
BY MR. HOFFMAN:
Q. Okay. I see here it says, "Blood chemistry analyzer, full blood count analyzer, and CoaguChek." Could you tell me what CoaguChek is?
A. CoaguChek is when we check for the clotting, blood clotting.
Q. Okay. And what is central monitoring system?
A. These monitors that are stationed in each room whereby we connect the patient to the monitor. And then the -- the vital signs or the observations will be displayed on the monitor and then at the nurse's station as well.
Q. Okay. And it says, "Intraosseous devices." Could you tell me what that means?
A. Intraosseous devices, these are devices that

we -- we use to access the -- the -- the intravenous line.

Q. Understood. Okay. Thank you. I'm going to stop sharing that document. I next want to ask you about shipboard medical staff training and competency. And I have another exhibit to go along with this.

MR. HOFFMAN: I'd like to have this marked as Exhibit 3.

(Exhibit 3 was marked for identification.)

BY MR. HOFFMAN:

Q. And -- one sec. Okay. Are you able to see my screen okay?

A. Yes.

Q. Okay. Are you -- oh, hold on one sec. Sorry. That's the wrong document. One second. Okay. Sorry. Misspoke. I want to ask: What competencies must you as a nurse demonstrate in your role?

MS. GENOESE: Form.

THE WITNESS: Professionalism, confidentiality, and general nursing care. Yes.

BY MR. HOFFMAN:

Q. Is that all? And it's not a trick question. If you don't know any more, it's okay.

A. Yes.

Q. Okay. Do you do emergency drills on board in

the infirmary?
A. Yes.
Q. What type of drills -- emergencies do you drill for?
A. Full abandon ship drill and partial.
Q. And do you do any drills regarding medical emergencies?
A. We do.
Q. Okay. Could you tell me what type of drills you do?
A. Okay. State room evacuation of patients.
Q. Okay. But, like, is -- is a -- would a heart attack be a medical emergency?
MS. GENOESE: Form.
THE WITNESS: Come again?
BY MR. HOFFMAN:
Q. Are you -- are you familiar with different -- so my -- my question was, and maybe it -- it wasn't clear, when you're on the ship and you're with your -- your team, do you do drills to prepare for a medical emergency?
A. Yes.
Q. Okay. What type of medical emergencies do you do drills for?
A. For the unconscious patients and then for the

-- the trauma patients.
Q. Okay. And how frequently do you do those drills?
A. Once after every two weeks.
Q. Okay. And who would run them?
A. The safety officer --
Q. Okay.
A. -- and the bridge.
Q. And the bridge?
A. The bridge, yeah.
Q. Okay. Who on the bridge?
A. The master control.
Q. Okay. And do you recall the name of the master on the Carnival Vista?
A. At the moment, no.
Q. Okay. And you had said earlier that you do drills for unconscious patients and trauma patients. What -- how is unconscious defined?
A. If the patient is not responding to physical stimuli. If the patient is not -- sometimes not --
Q. And is that the only consideration?
A. Mostly, yes.
Q. I'm sorry?
A. Yes.
Q. Okay. So the two drills that you mentioned

was for an unconscious patient -- patient and a trauma patient, correct?
A. Correct.
Q. And what would qualify as a trauma patient?
A. Can you rephrase your question?
Q. What type of condition would qualify as a trauma that would be drilled for?
A. Major falls from a staircase.
Q. I'm sorry?
A. Falls.
Q. From falls?
A. Falls, yes, from a staircase.
Q. And I'm sorry, the last thing you said? I couldn't understand.
A. A fall from the stairs.
Q. Oh.
A. If a patient falls down from the stairs.
Q. Understood. Okay. Thank you. And are these drills where you have to leave the infirmary and go to the patient?
A. Yes.
Q. Okay. And are there any drills that you perform if a patient were to be brought to the infirmary?
A. I'm not getting the question.

Q. Yes. So we just talked about the drills that you do are for patients that you have to go to on the ship, correct?
A. Correct.
Q. So the -- the next question was: Are there any drills that you do for any medical conditions for passengers who are brought to the infirmary?
A. Yes, we do.
Q. Okay. Could you tell me what those drills are?
A. Mass casualty drill.
Q. Okay. Is there any other?
A. A fire drill.
Q. Okay. Is that all?
A. Yeah. Yes.

Ex. E 24:16-18

Q. Thank you. Do you ever do a drill for a stroke?
A. No.
Q. Okay. Could you tell me what training, anywhere in the course of your training, that you have received specifically on recognizing stroke?
A. I -- I'm not getting your question. Can you rephrase?
Q. Yes. In your -- your training since, I guess, 2005, have you ever received specific training on

recognizing a stroke?
A. Yes.
Q. Okay. Could you tell me when and by who did you receive that training?
A. During my training from 2005 to 2008 at school.
Q. And is that the last time that you received training on recognizing a stroke?
A. In -- after every two years when we renew the ACLS, we do the training on the caring of the stroke patients as well.
Q. Okay. And in that training, do you specifically learn on -- learn recognizing when a person is having a stroke?
A. Yes.
Q. Okay. What do you recall from that training?
A. The signs and symptoms.
Q. Okay. Can you tell --
A. Of a patient having a stroke.
Q. Could you tell me what those signs and symptoms are that you recall?
A. Slurred speech, the facial paralysis, sometimes elevated blood pressure.
Q. Are there any other that you recall?
A. Yes.

Q. Okay.
A. Okay. The patient will not be able to use the -- the limbs or to move.
Q. Is that all?
A. Yes.
Q. Okay. And once the stroke is recognized, what's the next step?
MS. GENOESE: Form.
BY MR. HOFFMAN:
Q. In that person's care?
MS. GENOESE: Form.
BY MR. HOFFMAN:
Q. You can answer.
A. Okay. So once the stroke is recognized, the patient -- patient is brought to the medical center for medical assistance.
Q. Okay. And what type of assistance is provided to a stroke victim as per your training?
A. The general nursing care of the patient, for example, making sure the airway is patent, the patient is breathing, the vital signs, the circulation is good, and the level of consciousness of the patient. Then just to make sure the blood glucose levels are normal.
Q. Okay. And what do you mean by "level of consciousness"?

A. If the patient is awake, oriented to time, environment.

Q. And when a person is suffering a stroke, do they usually meet those standards of a level of consciousness?

A. Some do. Some, they don't.

Q. Okay. And how do you determine that?

MS. GENOESE: Form.

THE WITNESS: By interacting --

BY MR. HOFFMAN:

Q. You can answer.

MS. GENOESE: You can answer the question.

THE WITNESS: By interacting and talking to the patient and observing the patient.

BY MR. HOFFMAN:

Q. Okay. And do you also speak with anyone else that's with the patient?

MS. GENOESE: Form.

THE WITNESS: Yes, we do.

BY MR. HOFFMAN:

Q. What's the purpose of talking to other people that are with the patient when they're presenting signs of a stroke?

A. To get the history and the onset of the -- the stroke. And if there are any medications that they are

Ex. E
28:2-25

taking.
Q. Okay. And does Carnival train -- or are you familiar with the -- the acronym FAST, F-A-S-T, or BEFAST, B-E-F-A-S-T, as it relates to stroke care?
A. Yes.
Q. Okay. Does Carnival train FAST or BEFAST?
A. Yes.
Q. Is there a place in the SeaCare to record a FAST analysis or a stroke screen?
A. Yes.
Q. How would you access -- how would that be recorded within SeaCare?
A. Through the assessment. On our SeaCare, we have the assessment. If you go to the assessment, you can access.
Q. And is there a specific assessment for strokes?
A. Yes.
Q. And if you conduct that assessment, and even if they do not meet all those conditions, would you still record if that assessment was taken?
A. Yes.
Q. Is there any reason why that assessment would not be recorded?
A. No.

Q. Could you tell me what training you've received on the Glasgow Coma Scale?
A. This is whereby we determine the level of consciousness -- of consciousness of a patient.
Q. Okay.
A. Whereby we assess the verbal response, the motor response of the patient, and the eye opening.
Q. Okay. Anything else? The motor response, eye opening?
MS. GENOESE: Form.
THE WITNESS: Verbal response.
BY MR. HOFFMAN:
Q. Which one?
A. Eye opening, verbal response, and motor response.
Q. Okay. And how is that -- do you know, is that scale 1 through 15?
A. Yes.
Q. Okay. And if someone scores a 15, what does that mean?
A. Fully conscious and alert.
Q. Okay. Are you familiar with the acronym AVPU?
A. Yes.
Q. Could you tell me what that stands for?
A. A, alert. V, verbal. P, pain. U, unresponsive.

Q. Okay. And is that also a screen that Carnival does within --

A. Yes.

Q. -- the infirmary? Yes?

A. Yes.

Q. Does Carnival provide continuing education?

A. Yes.

Q. When is that continuing education provided?

A. At the medical center by the senior doctor twice a month.

Q. Okay. And does any of that continuing education include stroke? Recognizing the signs of a stroke?

A. Yes.

Q. Do you recall when that training was given?

A. Last month.

Q. Okay. On board your current ship?

A. Correct.

Q. And do you recall -- this was -- this is given -- this training is being provided by the senior ship physician? Yes?

A. Yes.

Q. Do you recall Dr. Rantleriu conducting a continuing education regarding identifying the signs of a stroke?

A. I don't recall exactly the stroke.
Q. What -- I'm sorry?
A. I don't recall anything about the stroke. But yes, we used to do the trainings every month. I don't recall if they were about the stroke.
Q. Understood.
A. Or other topics.
Q. Would the junior doctor also attend the trainings?
A. Yes.
Q. Okay. Thank you. I wanted to ask about the reporting structure within the medical center. Could you tell me how it works with the senior doctor, the junior doctor, the lead nurse?
MS. GENOESE: Form.
THE WITNESS: I'm not getting your question exactly what you want to know.
BY MR. HOFFMAN:
Q. Yes. I understand. Sorry. Let me rephrase. I'm trying to understand who reports to who within the medical organization on the boat. And my understanding is there's the senior doctor, a junior doctor, and then -- so Senior Doctor Rantleriu, Junior Doctor Maharaj, Lead Nurse Acebu, you, Nurse Madonda. And then I also have HCA Njikelana, and that's spelled N-J-I-K-E-L-A-N-

A. Could you tell me what HCA stands for?
MS. GENOESE: Form.
THE WITNESS: Health care assistant.
BY MR. HOFFMAN:
Q. Okay. So among those -- of those people, could you tell me who reports to whom?
A. The health care assistant reports to the nurses and the lead nurse. The nurses, they report to the lead nurse, to the junior doctor as well, and to the senior physician.
Q. Was that the -- the lead nurse reports to the junior doctor and the senior doctor?
A. Yes.
Q. And are you able to report to the junior doctor or senior doctor?
A. Yes.
Q. Do you report to the junior doctor and senior doctor?
A. Yes.
Q. What is the senior doctor's role? Or what was Dr. Rantleriu's role on board the Vista?
MS. GENOESE: Form.
THE WITNESS: I don't have much information about his roles.
BY MR. HOFFMAN:

Q. Okay. Did you ever see him in the infirmary?

A. Yes.

Q. On what occasion would he come to the infirmary?

A. During clinic hours or if there's an emergency.

Q. What would qualify as an emergency that Dr. Rantleriu would attend?

MS. GENOESE: Form.

THE WITNESS: Rephrase your question.

BY MR. HOFFMAN:

Q. What type of emergency would there be that would trigger for Dr. Rantleriu, the senior doctor, to come to the clinic?

MS. GENOESE: Form.

THE WITNESS: If the patient's condition is deteriorating or needs further management and evaluation.

BY MR. HOFFMAN:

Q. And if a person is suffering a stroke, is that a condition that would require the senior doctor to attend the clinic?

MS. GENOESE: Form.

THE WITNESS: Yes.

BY MR. HOFFMAN:

Q. While a nurse on -- on Carnival, have you ever -- scratch that.
We're here today because of an incident that occurred in October 18th, 2024. And I want to ask, during that voyage, who set the nursing schedule?
A. The lead nurse.
Q. Okay. Does the lead nurse assign -- would the -- the -- would the lead nurse assign you to Mr. Smith on October 18th?
MS. GENOESE: Form.
THE WITNESS: Yes.
BY MR. HOFFMAN:
Q. And do you have any personal recollection of Mr. Smith?
A. I don't have an independent recollection of this patient.
Q. Okay. Could you tell me how long you had worked with Dr. Maharaj before this voyage where Mr. Smith was on board?
A. Two to three months.
Q. Okay. And could you describe your working relationship with him?
A. Professional.
Q. Okay. And what do you mean by "professional"?
A. We -- we only interact with each other when we

need to assess or evaluate a patient or when we refer a patient to him.

Q. Okay. And when you are working with -- when you were working with Dr. Maharaj, did he ask you for your input regarding the patient?

A. No.

Q. Were you -- did you feel comfortable to volunteer to the doctor information that you have observed regarding the patient?

A. Yes.

Q. Okay. So if you saw something that Dr. Maharaj was neglecting, you would speak up?

A. Yes.

Q. Okay. Could you describe the -- would that also include a misdiagnosis?

A. No.

Q. So if the doctor had missed a diagnosis, you would not speak up?

A. No. That is out of my scope of practice.

Q. Okay. So in terms of your professional relationship, you would not be -- you would not feel comfortable -- or it would be inappropriate if you were to ask about a possible diagnosis that was missed by the junior doctor, correct?

MS. GENOESE: These are a lot of hypothetical

questions for a fact witness.
But you can answer if you know the answer, Nurse.
BY MR. HOFFMAN:
Q. I -- it's okay. I think you already answered the question.
So just to confirm, you would not feel comfortable telling Dr. Maharaj that he missed a diagnosis, correct?
MS. GENOESE: Form.
THE WITNESS: Correct.
BY MR. HOFFMAN:
Q. And could you tell me your working relationship with Dr. Rantleriu?
A. Professional as well. We only interact when we have to evaluate the patient or examine the patient.
Q. Okay. And if you had noticed that Dr. Maharaj had missed a diagnosis, would you feel -- would it be your place to bring that to Dr. Rantleriu's attention?
MS. GENOESE: Form.
THE WITNESS: No.
BY MR. HOFFMAN:
Q. Why not?
A. As I -- I say it earlier, on my scope of practice, I'm limited with regarding the patient's

diagnosis and treatment.

Q. So if you recognized that a patient was exhibiting signs of suffering a stroke and that was not diagnosed by either the junior or senior doctor, you would not feel it would be in your place to bring that to their attention?

MS. GENOESE: Form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. Okay. Is there any sort of reporting hotline that Carnival offers you to let them know about any concerns that you have regarding the medical care of the patients?

A. I'm not sure.

Q. Let me ask it a different way. As a nurse who reports to the doctors, and you had stated that you couldn't always speak to them about issues because they may be outside of the scope of your roles and responsibilities, correct?

MS. GENOESE: Mischaracterizes testimony.

You may answer.

THE WITNESS: Yes.

BY MR. HOFFMAN:

Q. Okay. If that were to happen, is there a way for you to let Carnival know that you had a concern

about the medical care on board?

MS. GENOESE: Form.

THE WITNESS: I am not sure.

BY MR. HOFFMAN:

Q. You're not sure if there's a hotline for you, as a nurse, to report issues of concern?

MS. GENOESE: Form. Asked and answered.

BY MR. HOFFMAN:

Q. If it's the same answer, ma'am, that's okay. I just wanted to make sure I was clear on my question.

MS. GENOESE: You can answer if you know, Nurse.

THE WITNESS: I'm not sure.

BY MR. HOFFMAN:

Q. Okay. What is your training from 2005 to 2008? What were you trained to do if you disagreed with a doctor's assessment?

A. There was no specific training regarding the disagreements between the doctor and the nurse.

Q. Does your training require you to put the care of the patient as the primary interest, as a nurse?

MS. GENOESE: Form.

THE WITNESS: Yes. Yes.

BY MR. HOFFMAN:

Q. So if you disagreed with the doctor's

assessment, what would you do to make sure that that person -- that patient was receiving what you thought was a better course of care?

A. I'm not sure.

Q. Okay. Have you ever told a ship's doctor that you thought their diagnosis was incorrect?

A. No.

Q. What would happen if you did tell a ship's doctor that their diagnosis was incorrect?

MS. GENOESE: Improper hypotheticals, again, of a fact witness.

You can answer if you know the answer.

THE WITNESS: I'm not sure.

BY MR. HOFFMAN:

Q. Okay. Would you be concerned for your job security?

MS. GENOESE: Form.

THE WITNESS: Yes.

BY MR. HOFFMAN:

Q. Okay. Thank you. Regarding Mr. Smith, and I -- if you recall or you don't recall, please let me know. Did you ever disagree with anything Dr. Maharaj did or did not do for Michael Smith?

A. I don't remember.

Q. Do you ever remember a situation with Dr.

Maharaj where you did disagree with him, but you did not say anything?

A. No.

Q. Okay. Would you say something to the lead nurse if you thought that the doctor had missed a diagnosis?

A. No.

Q. Why not?

MS. GENOESE: Form.

BY MR. HOFFMAN:

Q. If you don't know, you don't know, but could you tell me why you would --

A. Yes. I -- I don't know.

Q. Okay. Would you be concerned for your job security?

A. Yes.

Q. Okay. Do you know if doctors give input on nurses' performance for their evaluations?

A. Yes.

Q. So to confirm, the -- the doctors do give input on your performance evaluation, correct?

A. Yes.

Q. Do you know if it's both doctors give input or just the senior doctor?

A. The senior doctor.

Q. Okay. The junior doctor does not give input --
A. No.
Q. -- to the best of your knowledge? Do nurses give input on doctors' performance evaluations?
A. The lead nurse.
Q. The lead nurse does contribute to the performance evaluation of the doctor?
A. Yes.
Q. Do you know how long Nurse Acebu and Dr. Maharaj had worked together?
A. No.
Q. Do you know if they had worked together on a different ship?
MS. GENOESE: Form. She just answered that question. She doesn't know.
BY MR. HOFFMAN:
Q. Okay. Do you know anything -- do you know if Dr. Rantleriu had worked with Nurse Acebu before the Carnival Vista voyage that we're referring to?
A. I'm not sure.
Q. Did Nurse Acebu begin her contract on the boat at the same time as you?
A. No.
Q. Okay. Do you know how long she had been on

the boat when you had joined?
A. She came after me. A few weeks after -- after I joined.
Q. Understood. Okay. Thank you. Do you know if she was on another shift beforehand?
MS. GENOESE: Form.
THE WITNESS: I'm not sure.
BY MR. HOFFMAN:
Q. Okay. Since October 20th, 2024, have you had any conversations about Mr. Smith with either Dr. Maharaj or Dr. Rantleriu?
A. No.
Q. Have you had any conversations about Michael Smith with Nurse Acebu since October 20th?
A. No.
Q. Have you had any conversations about Michael Smith with Nurse Madonda since October 20th?
A. No.
Q. Are you familiar with the Health Operation Center?
A. Yes.
Q. Could you tell me what the Health Operation Center does?
A. It gives us guidelines on how to -- to take care of the patients on the ship.

Q. And how does one receive those guidelines? Is it per incident?
A. Yes, per incident.
Q. Okay. And could you tell me how that works? How -- how does a Health Operation Center get involved?
A. When we have a particular case that is complicated or if the condition is worsening, the senior doctor liaise with the HOC, informs the HOC.
Q. Okay. And do you know who staffs the HOC?
A. I'm not sure.
Q. Okay. You don't know if they are physicians?
MS. GENOESE: Form.
BY MR. HOFFMAN:
Q. You can answer if you can.
A. Yes. I know there's a physician.
Q. Okay. They are physicians?
A. Yeah.
Q. Thank you.
A. Yes. I know.
Q. Do you know if these physicians worked for Carnival?
A. Yes.
Q. Okay. They do work for Carnival, correct?
A. Yes.
Q. Okay.

MS. GENOESE: Repeating the same question twice. I'm not sure why that's necessary.
MR. HOFFMAN: Just clarity.
BY MR. HOFFMAN:
Q. Could you tell me what is a -- a medico, M-E-D-I-C-O?
A. Can you rephrase your question?
Q. Yeah. I'm going to --
A. --
MR. HOFFMAN: Yeah. No worries. I'm going to share a document. I'm going to have this labeled as Exhibit 6.
(Exhibit 6 was marked for identification.)
BY MR. HOFFMAN:
Q. Are you able to see my screen okay?
A. Yes.
Q. Okay. So my question was, what does this word medico, M-E-D-I-C-O, mean?
A. To my knowledge, this is -- this is regarding the injury of a patient.
Q. Okay. But are you familiar with this word medico, M-E-D-I-C-O?
MS. GENOESE: Form.
THE WITNESS: I'm not.
BY MR. HOFFMAN:

Q. You're not? Okay.

A. Yes.

Q. Are you familiar with the -- when this form is used?

A. No.

Q. And we're looking at the -- the Medico Medevac Check Sheet.

A. No.

Q. Okay. Have you ever seen this form before?

A. No.

Q. Thank you. I'm going to stop sharing there.

MS. GENOESE: Michael, if now is a good time to take a break, we've been sitting for about two hours.

MR. HOFFMAN: Absolutely. Yes. Let's take a five-minute break; is that okay? Okay. All right. Everyone come back at --

THE VIDEOGRAPHER: We're going -- yeah.

MR. HOFFMAN: -- 3:00?

THE VIDEOGRAPHER: We're going off the record at --

(A recess was taken.)

THE VIDEOGRAPHER: We're back on the record at 3:12 p.m.

BY MR. HOFFMAN:

Q. Okay. Nurse Dube, I want to bring you back to the form we were just looking at, and I want to know -- I want to show you both pages. One is Bates stamped, at the very bottom, 924, and it says, "Patient vital signs." Do you see here where it says, "Conscious, convulsions, vomiting, tingling limbs." Why would those things be important when considering whether a person should be medically evacuated?

A. It helps us to -- to determine the condition, the general condition of the patient.

Q. Are these neurological questions?

MS. GENOESE: Form.

THE WITNESS: Yes.

BY MR. HOFFMAN:

Q. Okay. It also has here, "Paralysis and pupils dilated, reactive or equal." Are those also neurological conditions that are screened?

A. Come again with the question.

Q. It says also, "Eyes dilated, reactive or equal," as well as, "Paralysis," and my question was, are those also neurological issues?

A. Yes.

Q. Okay. Thank you. I wanted to show on the second page here, it's titled Diving Accident, and then on the very bottom, it says -- it has a section that

says, "Miscellaneous information." And it has seven questions that shall be asked, and I wanted to know if you're familiar with this list of seven and what --

The first one is, "What does the victim have?" Second is, "What does the victim need? 3, "Where can they get it?" 4, "How soon does the victim need it?" 5, "What care can be rendered now?" 6, "What care can be rendered during transit?" And then 7, "Can we meet the window of opportunity?" Are you familiar with those questions?

A. No.

Q. No? Okay. Can a nurse initiate contact with HOC?

A. No.

Q. Have you ever participated in a call with HOC or shore side medical support?

A. Yes.

Q. Could you describe each time?

A. When we are doing a debriefing about a certain case, that's when we interact with the -- the doctor from the shore side.

Q. Okay. And what type of case would you be debriefed by shore side?

A. The emergent cases, for example, if the patient was taken, evacuated out of the ship, those are

the cases that we usually do the debriefing with the doctor.

Q. Are there any other instances where you would be receiving a debriefing by shore side?

A. The major injuries. If the patient falls and becomes unconscious. If the patient is having seizures. If the patient is having cardiac problems or cardiac issues.

Q. Those are instances that you have participated in a debriefing with shore side?

MS. GENOESE: Form.

THE WITNESS: Yes.

BY MR. HOFFMAN:

Q. Okay. When a patient is taken off the boat when it arrives at its final port, is that considered a medical evacuation?

A. Come again?

Q. If a patient were to be taken off by the paramedics when it arrives at its final port of call, would that also -- would that be considered a medical evacuation?

A. No.

Q. Okay. What is considered a medical evacuation that would require a debriefing?

MS. GENOESE: Form.

THE WITNESS: When we have to call for the helivac in the middle of the sea, and then we evacuate the patient.

BY MR. HOFFMAN:

Q. Have you been involved in medical evacuations?

A. Yes.

Q. How often? How many?

A. Less than five.

Q. Could you tell me the circumstances of those five?

A. The patients needed -- needed immediate medical attention, so we had to do the helivac to take them to the nearest hospital for further management.

Q. Do you recall what any of those medical conditions were that required evacuation from the Vista?

A. From the Vista, I don't recall.

Q. Okay. Would Dr. Rantleriu have been the one to organize that evacuation?

MS. GENOESE: Form.

THE WITNESS: Yes.

BY MR. HOFFMAN:

Q. Have you ever seen or been with Dr. Maharaj when he recommended or opposed a medical evacuation?

A. No.

Q. So you've never seen Dr. Maharaj recommend a

patient be medically evacuated?

A. No.

Q. In the instances that Dr. Rantleriu had ordered those medical evacuations, did he come to the infirmary before making that determination?

MS. GENOESE: Form.

THE WITNESS: I -- I'm not sure.

BY MR. HOFFMAN:

Q. Okay. Okay. Do you know if any shore side physician was contacted regarding Mr. Smith regarding his clinical care?

A. I'm not sure.

Q. Okay. Do you know if a medico or medevac check sheet was ever completed for Mr. Smith?

A. I'm not sure.

Q. Who would be the person to complete that form?

MS. GENOESE: Form.

BY MR. HOFFMAN:

Q. If you know.

A. The attending physician.

Q. Okay. Could you tell me the signs and symptoms of a heart attack?

MS. GENOESE: Form.

THE WITNESS: Shortness of breath, chest pain. The patient becomes diaphoretic and clammy.

BY MR. HOFFMAN:
Q. And what about folks that are diabetics? Does it present the same?
A. Some of the symptoms. For example, they become diaphoretic.
Q. Anything else?
A. The general symptoms of a patient with diabetes, they become fatigued. They become weak and tired. They become diaphoretic. They become restless, and sometimes they become confused.
Q. So does that affect the diagnosis of the heart attack?
MS. GENOESE: Form.
THE WITNESS: Come again. Sorry. Come again.
BY MR. HOFFMAN:
Q. Could that affect the diagnosis of a heart attack?
A. I'm not sure.
Q. As a nurse, isn't it your role to be able to identify if a person is having a heart attack, even if they are diabetic?
A. I am not sure.
Q. Okay. Why are you -- you -- why are you not sure?
MS. GENOESE: Form.

THE WITNESS: Because there are some other things that are done in order for us to -- for -- for the doctor to identify if this is a heart attack or not.
BY MR. HOFFMAN:
Q. Okay. So actually, I want to show you what I'm going to have labeled as Exhibit 6, which is the -- it's Bates stamped 929. It says, "Shipboard First Response." Are you able to see this okay?
A. Yes.
Q. Okay. And it looks like this is a policy. It says up top here, "CCL Med 300383. First Response Treatment Protocol." Do you see that?
A. Yes.
Q. Okay. And --
THE REPORTER: Excuse me one moment.
MR. HOFFMAN: Yes.
THE REPORTER: I think that you said that the medico was Exhibit 6. That's what I had written down.
MR. HOFFMAN: Oh, sorry. I have this as Exhibit 4. I apologize.
(Exhibit 4 was marked for identification.)
THE REPORTER: Okay. Thank you.
MR. HOFFMAN: I misspoke. Thank you.

BY MR. HOFFMAN:
Q. And it says here in the red box at the top, "Triage -- triage all call. At all stages, assess need for additional responders or immediate MRT activation." What does MRT stand for?
A. Okay. MRT stands for Medical Response Team.
Q. Okay. And it has here, it looks like seven different categories. The first one, "Any pediatric or adult life-threatening emergency." What would that consist of as far as a life-threatening emergency?
MS. GENOESE: Form.
THE WITNESS: Can you rephrase your question?
BY MR. HOFFMAN:
Q. What would be considered a life-threatening emergency?
MS. GENOESE: Form.
THE WITNESS: If the patient is not breathing and if the patient is unconscious, if the patient is having seizures, those are some of the life-threatening emergencies.
BY MR. HOFFMAN:
Q. Okay. And then it says, "Any patient requiring BLS, ACLS, APLS, or ATLS." Could you tell me what those acronyms mean?
A. Basic Life Support, that is BLS.

Q. Uh-huh?

A. BLS, Basic Life Support. ACLS, Advanced Cardiac Life Support. Advanced Pediatric Life Support and Advanced Trauma Life Support.

Q. Okay. And what was APLS? I'm sorry.

A. Advanced Pediatric Life Support.

Q. Thank you. And then it says on the third one, "Acutely deteriorating GCS/AVPU," and it says, "Equals P or less." Could you tell me what that means?

A. This means that if the patient is responsive or -- or not.

Q. Okay. If someone were suffering a stroke, would that -- would they qualify under that third category?

A. Yes.

Q. Okay. Thank you. And then it says a little bit below it, what -- what the ship can -- what can the doctor do for, say, a heart attack, right? And it gives medical -- different medical options, medicines, correct?

A. Yes.

Q. So the doctor on board, when they're worried about the heart, they have the tools to test for it, also, in the infirmary, correct?

MS. GENOESE: Form.

THE WITNESS: Yes. But limited.

BY MR. HOFFMAN:

Q. Well, how is it limited?

A. For example, if we need a -- a CT scan or an MRI scan, we cannot provide that.

Q. Okay. And so there's no CT scan or MRI on board, correct?

A. Yes.

Q. Okay. Thank you. Give me one second, please.

MR. HOFFMAN: I want to share another document. This is Exhibit 1, and this is the SeaCare Medical Center case file, and it's Bates stamped 05 to 046.

(Exhibit 1 was marked for identification.)

BY MR. HOFFMAN:

Q. And I want to bring you to Bates stamp 23 where it has here that Dr. Maharaj ordered a troponin and a 12-lead EKG on Mr. Smith; is that correct?

A. According to the document, yeah.

Q. And do you know what symptoms would've prompted a -- a cardiac workup? And it looks like this took place on October 19th at about 6:26 in the evening.

MS. GENOESE: Form.

THE WITNESS: I'm not sure.

BY MR. HOFFMAN:

Q. Okay. I want to bring your attention to Page 26 of the 42-page document. It's Bates stamp 30, and it says here, regarding the 12-lead EKG that was performed, findings, it says, "NSR LAD, normal intervals." And then it has, question mark, "RBBB." Do you know what RBBB stands for?
MS. GENOESE: Form.
THE WITNESS: Right bundle branch block.
BY MR. HOFFMAN:
Q. And what does that mean?
A. It means a -- a blockage on the right bundle branch.
Q. What does it mean?
A. A blockage on the right bundle branch on the heart.
Q. Okay. And what would that be a sign of?
MS. GENOESE: Form.
THE WITNESS: Heart problems.
BY MR. HOFFMAN:
Q. What medical condition could that be a sign of?
MS. GENOESE: Form.
THE WITNESS: Problems.
BY MR. HOFFMAN:
Q. I'm sorry?

A. Heart issues.
Q. I didn't understand your answer.
A. I think heart problems.
Q. Heart problems, you said?
A. Yes.
Q. But you just said it was in the -- the brain, that issue, RBBB?
MS. GENOESE: Form. Mischaracterization of testimony. And you're reading from a doctor's note.
MR. HOFFMAN: I'm trying to understand what her --
MS. GENOESE: She's trying to answer the best she can, but you're mischaracterizing her testimony quite frequently.
MR. HOFFMAN: I'm having a hard time understanding, that's why I'm asking it --
MS. GENOESE: And you can ask her to repeat. Don't put words in her mouth.
BY MR. HOFFMAN:
Q. So could you explain again? I'm sorry. What does -- what part of the body does RBBB relate to?
MS. GENOESE: Form.
THE WITNESS: Heart.
BY MR. HOFFMAN:

Q. The head?
A. Heart.
Q. Is it the brain specifically?
MS. GENOESE: She's saying heart, if I'm hearing her correctly.
MR. HOFFMAN: Oh. Thank you. I -- I appreciate that.
BY MR. HOFFMAN:
Q. And then it says, "No acute ischemic changes." Could you tell me what that means?
MS. GENOESE: Form.
THE WITNESS: This is the doctor's description in a decision. I cannot explain that one, this one.
BY MR. HOFFMAN:
Q. Okay. What bedside tests does the ship have to rule a stroke in or out?
MS. GENOESE: Form.
THE WITNESS: We check the -- we check the vitals. We check the patient's condition. We can run some blood tests.
BY MR. HOFFMAN:
Q. Is there any way to diagnose a stroke on the ship?
A. I am not sure.

Q. Is there a CT scanner on board that could diagnose a stroke?
A. No.
Q. And we established earlier there is no MRI on board to diagnose a stroke. So are there any ways to diagnose a stroke patient without those tools?
A. I'm not sure.
Q. Could you tell me what a stroke is, ma'am?
MS. GENOESE: Form.
THE WITNESS: A -- a stroke is whereby a patient suffers from the -- the blockage in the brain.
BY MR. HOFFMAN:
Q. Okay. And based on your training, is there any way to determine that without an MRI or a CT scanner?
MS. GENOESE: Form.
THE WITNESS: We -- we can determine by the presenting complaint and symptoms.
BY MR. HOFFMAN:
Q. And if the symptoms point to a stroke, does an -- isn't an official diagnosis needed?
A. It is the doctor's discretion to -- to make.
Q. It's the doctor's discretion, you said?
A. It is the doctor's decision is to make.

Q. Okay. Can you describe what a seizure looks like?
MS. GENOESE: Form.
THE WITNESS: The patient will be convulsing, shaking, unconscious, and most of the times, lying on the ground.
BY MR. HOFFMAN:
Q. Can a seizure present without convulsions?
A. Yes.
Q. Okay. So lying on the ground and having those convulsions is not always how you can tell if a person is presenting with a stroke, correct?
A. Yes.
Q. Okay. Is confusion a possible sign that someone is suffering from a -- a seizure?
A. I am not sure.
Q. All right. So I'm going to ask about four symptoms. So can a seizure present without convulsions as confusion, staring, vomiting, or sudden weakness?
A. I'm not really sure.
Q. Okay. Could you tell me what is a postictal state?
A. When -- when the patient has just recovered from a -- a seizure, it is what.
Q. And can you tell me how long it lasts and what

the patient looks like?
A. The patient will be staring blankly on the space.
Q. And how long does that --
A. And I --
Q. I'm sorry.
A. I'm not really sure how long it lasts.
Q. Okay. What was your training when there is seizure activity?
A. Can you rephrase the question?
Q. Yes. What were you trained to do upon seeing seizure activity?
A. Here on the ship, we activate the -- the Medical Response Team, and the first responder nurse has to attend to the patient. And then when the rest of the medical team is present, the patient will be taken down to the medical center for further management.
Q. Okay. And -- go ahead.
A. As a -- as the responder nurse, when you arrive at the scene, you make sure of the safety. You make -- take care of the airway, the breathing, the circulation, and then, as I mentioned earlier on, you also call for help.
Q. Okay. And what can cause a seizure -- a seizure?

A. I'm not sure.
Q. Could a stroke cause a seizure?
A. I'm not sure.
MS. GENOESE: Form. Asked and answered.
BY MR. HOFFMAN:
Q. Did anyone assess Mr. Smith for seizure activity at any point?
A. I'm not sure.
Q. Would it be charted if he was evaluated for seizure activity?
A. Yes.
Q. Who would've performed that evaluation?
A. The physician -- attending physician.
Q. We discussed the AVPU earlier, and I want to ask, can a patient be, A) on the AVPU awake and still be having a catastrophic neurological event?
A. I'm not really sure.
Q. Okay. Would a -- a stroke patient be able to talk to you?
A. No.
Q. Why not? How would it sound?
MS. GENOESE: Form.
THE WITNESS: Slurred speech.
BY MR. HOFFMAN:
Q. I'm sorry?

A. Slurred speech.
Q. I'm sorry. I couldn't understand.
A. Because of the slurred speech.
Q. Slurred speech. Thank you.
A. Yes.
Q. Thank you. What word would you use for a patient who is awake but too lethargic to stand?
A. I -- I didn't get -- I didn't get the question.
Q. Yeah. What word would you use for a patient who is awake but too lethargic to stand?
A. Conscious and fatigue -- fatigue.
Q. Is lethargy -- lethargy a change in level of consciousness?
A. No.
Q. No? Is that considered in determining a GCS score?
A. No.
Q. Would it be relevant if a person was too lethargic to stand when --
A. No.
Q. I'm sorry. Let me finish the question.
A. Sorry.
Q. It's okay. It's okay. We're doing great on that front. On the GCS scale, I just wanted to confirm

that if a person is too lethargic to stand, it would not influence the GCS score?

A. Yes.

Q. So correct, it would not address -- it would not change or address reflecting the GCS score, yes?

A. Yes.

Q. Thank you. If a patient's level of consciousness is trending down over hours, what were you trained to do and who were you trained to tell?

MS. GENOESE: Form. Hold on. If this is going to -- this line of questioning is going to continue to do improper hypotheticals of a fact witness, that's what they're here to be deposed as, not an expert, then I'm going to ask that this line of questioning be stopped.

BY MR. HOFFMAN:

Q. It's like --

(Proceedings interrupted due to technical difficulties; a portion of the proceeding was not recorded.)

THE WITNESS: -- the Medical Response Team.

BY MR. HOFFMAN:

Q. Okay.

THE REPORTER: I apologize. I apologize. I got kicked out there for a moment, so I might have

missed one question.
MR. HOFFMAN: The answer -- I had asked about if a patient's level of consciousness was trending down over hours --
THE REPORTER: Okay.
MR. HOFFMAN: -- what were you trained to do and who were you trained to tell?
THE REPORTER: I know. I got that, but then I had Ms. Genoese objecting. Did I miss anything after that?
MR. HOFFMAN: She had answered the question that she would let the MRT know.
Is that correct, Ashley? I don't want to --
MS. GENOESE: Why don't you just re-ask the question and she can answer again?
MR. HOFFMAN: Okay.
THE REPORTER: Thank you.
BY MR. HOFFMAN:
Q. So you -- Ms. Dube, you heard the question. Could you answer the question again?
A. If the patient's level of consciousness is deteriorating, I call for help or inform the -- the doctor.
Q. Okay. Is vomiting plus lethargy plus an inability to stand a combination you are trained to

worry about?
A. Yes.
Q. Could you tell me what conditions could be caused -- what conditions could cause that triad?
A. For example, if the blood sugar levels are elevated, if the patient is dehydrated, if the patient is experiencing sea sickness.
Q. What about anything happening inside the skull that could cause that?
A. Can you rephrase your question?
Q. Is there anything inside the skull, as far as a condition, that could be the cause of vomiting plus lethargy plus inability to stand?
A. I am not sure.
Q. You don't know is -- is your answer? Because I'm trying --
MS. GENOESE: Form.
THE WITNESS: I'm not sure.
BY MR. HOFFMAN:
Q. We were talking earlier about the GCS, and my understanding -- and I just want to walk through the three components in the scoring, and that's eye movement is 1 to 4, verbal is 1 to 5, and motor is 1 to 6; is that correct?
A. Yes.

Q. Okay. And what do you do exactly -- what exactly do you do at the bedside to score each?

A. We assess the patient.

Q. Okay. And so to score a verbal 5, what questions must the person -- what questions must the patient answer?

A. Is the patient having inappropriate words? Is the patient oriented? Is the patient disoriented?

Q. Right. But I mean, you're not specifically asking the question if they're disoriented, correct?

A. Yes. It is through your assessment -- through my assessment.

Q. Okay. So you are trained on how to give this assessment, correct?

A. Yes.

Q. Okay. And does this assessment require the patient to answer questions?

A. If they can.

Q. Okay. So if a person can't answer the questions, what would their score be?

A. That determines their level of consciousness. So it -- it's either a 0 or a 1.

Q. Okay. Thank you. To score on the motor a 6, are there specific commands that the patient must be able to obey, like squeezing a hand, or is there more?

A. If the patient is withdrawing to pain, flexing to pain, so those are some of the assessment protocols that we use.

Q. To assess motor?

A. Yes. If he's withdrawing to pain, if he's reflexing to pain, those are some of the things.

Q. Okay. Do they need to physically perform a task in order to demonstrate their motor?

MS. GENOESE: Form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. Does the GCS test whether a patient can walk?

A. No.

Q. Does the GCS test whether a patient can balance?

MS. GENOESE: Form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. And lastly, would the GCS test whether a patient can stand?

A. No.

Q. Does the GCS test arm or leg strength on one side versus the other?

MS. GENOESE: Form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. It doesn't test for limb -- limb drift?

A. No.

Q. Does it test coordination?

MS. GENOESE: Form.

THE WITNESS: I didn't get the question.

BY MR. HOFFMAN:

Q. Yes. Does the GCS test coordination?

MS. GENOESE: Form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. Does it test speech articulation, like slurring?

MS. GENOESE: Form. These are all leading.

You may answer if you know.

THE WITNESS: Can you rephrase your question?

BY MR. HOFFMAN:

Q. Yes. Does the GCS test for a person's ability to articulate, such as whether or not they're slurring?

A. No.

Q. Do you know if it tests facial symmetry?

A. No.

Q. So a patient can score a perfect 15 and still be unable to stand, agree?

A. Yes.

Q. Okay. And a patient can score 15 and still have each of the deficits that we just listed, agreed?

MS. GENOESE: Form.

THE WITNESS: Yes.

MS. GENOESE: These are all leading. Is this going to continue, Mr. Hoffman?

MR. HOFFMAN: No.

MS. GENOESE: I'm going to ask it to stop if it does.

MR. HOFFMAN: Okay.

MS. GENOESE: I've asked you multiple times about improper hypotheticals and leading questions now.

MR. HOFFMAN: Well, all right.

BY MR. HOFFMAN:

Q. I wanted to bring you to -- let's see. I'm going to share my screen back to Exhibit 1. And let's see. And okay. So I'd like to take you to what's Page 5 of 42, which is Bates stamp 009. And it says you -- you -- you -- you, I believe, personally charted Mr. Smith's GCS on October 19th at 18:07, and you scored E4, V5, M6 equaling 15.

Could you tell me exactly what you did and asked to get those numbers from Mr. Smith?

A. I don't recall exactly what I asked on him.

Generally, if we are asking the -- the level of consciousness -- if you are assessing the level of the consciousness on a patient, we look for the eye response, the verbal response, and the motor response. What exactly I asked on him, I don't recall.

Q. Are there typical questions that you would ask?

A. No.

Q. Okay. So this was at looks like October 19th at 18:07. I want to -- well, actually, I want to make sure I'm reading this correctly. It says here that the GCS score was performed by Nurse Acebu; is that correct?

A. Yes.

Q. Okay. Thank you. My mistake. On October 19th at 8:10 p.m. on Page 35 of 42, it was noticed -- it was commented that by -- in the notes by Dr. Maharaj, "Guest still remains with stable vital signs. RBS controlled on sliding scale. Guest is, however, too lethargic to stand."

And my question is -- is could the GCS score of 15 and Dr. Maharaj's comment that he was too lethargic to stand be both true at -- at once?

A. Yes.

Q. Okay. And between October 18th and disembarkation, every GCS in this chart is a 15, and yet

he left on a stretcher to an ambulance. And my question is -- is -- does a string of 15s tell us that he was neurologically fine?

A. Yes.

Q. A string of 15s tells us that Mr. Smith was neurologically fine? Is that what you were saying?

A. Yes.

MS. GENOESE: Form. Asked and answered.

BY MR. HOFFMAN:

Q. Okay. If he was neurologically fine, do you know why he would need to be taken off on a stretcher?

A. For safety reasons and to prevent falls.

Q. It wouldn't be because he was too lethargic to stand?

MS. GENOESE: Form. Asked and answered.

MR. HOFFMAN: I didn't ask that specific question.

BY MR. HOFFMAN:

Q. Could you answer, please?

A. Can you come again with your question?

Q. Yeah. It was -- it was noted that he was -- Mr. Smith was too lethargic to stand. And my question was -- was -- could that be a reason as to why he was taken off the boat on a stretcher to an ambulance?

A. Yes.

Q. Thank you. And I asked you vaguely about whether or not there was a -- a hotline. And I want to ask specifically, do you know if Carnival has an ethics hotline?

A. I'm not sure.

Q. Okay. Do you know how you would go about finding out if they had an ethics hotline?

MS. GENOESE: Form.

THE WITNESS: I'm not sure.

BY MR. HOFFMAN:

Q. Okay. Does Carnival train you to do anything if a nurse believes a doctor is missing a life-threatening diagnosis?

MS. GENOESE: Form. Asked and answered.

You can answer if you know.

THE WITNESS: I'm not sure.

BY MR. HOFFMAN:

Q. Okay. Do you know when a sea event or incident report must be filed for a medical case?

A. Can you rephrase your question? I heard to incident report and the other one.

Q. A sea event. Whether a sea event or incident report is to be filed for a medical case?

A. I'm not sure about the sea event.

Q. Okay. But an incident report?

A. An incident report is filed when there is an incident that happened.
Q. Is the incident -- incident that Mr. Smith had grounds for an incident report to be created?
A. I'm not sure.

Ex. E
74:6-75:5

Q. Okay. After the cruise, were you ever interviewed by anyone regarding whether Mr. Smith had a stroke?
A. No.
Q. Do you know if there was any internal review conducted?
A. No.
Q. Does Carnival have a written stroke protocol?
A. Yes.
Q. Do you know what that stroke protocol says?
A. I cannot recall offhand.
Q. Do you have access to it?
A. Yes.
Q. Could you pull it up?
MS. GENOESE: I'm not going to allow the witness to be using the computer during the deposition.
MR. HOFFMAN: Okay.
BY MR. HOFFMAN:
Q. Do you know if there is a stroke checklist as

Ex. E
74:6-75:5

part of that protocol?
A. Yes.
Q. Okay. Do you know what's listed on that checklist?
A. I cannot remember all the details.
Q. Okay. I'm going to bring you back to Exhibit 4, which is the Shipboard First Response, and I want to ask a question about where it says "disability." Do you see that here where my hand -- the mouse is under 3?
A. Yes. Yes.
Q. And it says, "Assess AVPU, pupils, seizure, and focal signs." And could you tell me what a focal sign is?
A. Okay. Focal signs are whereby the -- the patient is assessed for responsiveness.
Q. Can you give an example?
A. And if -- for example, in cases of a stroke patient, if the patient is able to -- to answer -- to talk -- to -- to answer the questions and to talk properly.
Q. Okay. And you had stated earlier that you had reviewed Mr. Smith's chart, and my question is -- is, did you see any vocal sign assessment documented in Mr. Smith's chart?
A. Can you come again? Which sign, sir?

Q. The -- the question was, is you -- you had -- you had stated earlier that you had reviewed Mr. Smith's chart.
A. Yes.
Q. And my question was -- is whether there was any focal sign assessment documented in his chart?
A. I didn't see.
Q. Okay. Thank you.
THE REPORTER: I'm going to have to get another reporter on to cover me. I'm so sorry.
MR. HOFFMAN: Understood.
THE REPORTER: Can we take a five-minute break while they hop on?
MR. HOFFMAN: Yep.
THE REPORTER: Okay. Thank you so much.
THE VIDEOGRAPHER: All right. We're going off the record at 4:04 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: And we're back on the record at 4:22 p.m.
THE REPORTER: All right. Thank you. I'm going to go ahead and swear in our witness one more time, since I am taking over for a reporter, and I verified her ID. Do you -- madam, is your name Debra Dube?

THE WITNESS: Yes.

THE REPORTER: Okay. Ms. Dube, if you could please raise your right hand once again? Can you hear me?

MR. HOFFMAN: We can hear you, Court Reporter.

THE REPORTER: You can hear me.

Ms. Dube, can you please raise your right hand? Do you swear or affirm that the testimony you're about to give -- or continue giving, will be the truth, the whole truth, and nothing but the -- do you swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: Thank you so much.

Counsel, you may proceed.

MR. HOFFMAN: Okay. All right. Thank you as well. Are we on the record?

THE REPORTER: Yes.

MR. HOFFMAN: Okay.

BY MR. HOFFMAN:

Q. Ms. Dube, I wanted to share with you what was provided by Carnival. It -- it is a --

MS. GENOESE: Did we just lose Mr. Hoffman?

THE REPORTER: It seems so --

THE VIDEOGRAPHER: I -- I -- I think we did. All right. We're going off the record at 4:23 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: And we're back on the record at 4:24 p.m.

BY MR. HOFFMAN:

Q. Okay. So Ms. Dube, are you able to see my screen where it says Exhibit 3, madam, 3002, First Response and Triage?

A. Yes.

Q. Okay. So I'm showing you what's labeled as Bates stamp 930. And this is the HESS Procedure. Are you familiar with this document?

A. Yes.

Q. Okay. I want to bring you to Bates stamp number 931, where it talks about -- looks like the -- what -- underneath 2.2 in the second bullet, it says, "Based on the medical first responders call triage assessment, calls must be classified as follows: emergent." And it's defined as, "Conditions that are threats to life and limb, requiring time-critical and aggressive intervention." And I'd like for you -- could you define urgent?

MS. GENOESE: Form.

THE WITNESS: I didn't get the question.

BY MR. HOFFMAN:

Q. Yeah. I -- so -- sorry. Emergent is defined as, "Conditions that are threats to life and limb, requiring time-critical and aggressive intervention." And then urgent is defined as, "Conditions that have the potential to become threats to life and limb or that could progress towards a serious condition requiring time-critical medical intervention." And my question is, is a suspected stroke emergent or urgent?

MS. GENOESE: Form.

THE WITNESS: Emergent.

BY MR. HOFFMAN:

Q. Okay. And it says that, "Urgent patients should be reassessed at least every 30 minutes, and the triage category should be amended if clinically indicated." Whose job would it be to amend the triage category?

A. The nurse.

Q. Okay. Was Mr. Smith's category ever amended in the 39 hours in the records?

A. Yes.

Q. It was amended?

A. Yes.

Q. Could you tell me what page it was amended on?

A. The first page, the triage.

Q. The first page?
A. The first page, Page number 1.
Q. Okay.
A. The triage --
Q. So he's listed as urgent, correct?
A. Yes.
Q. Okay. Is that ever changed to emergent?
A. No.
Q. Okay. When you did your training about stroke treatment -- or what did your training teach about stroke treatment, and specifically clot-busting drugs and the time windows for them?
A. Stroke is a life-threatening condition. Therefore, it -- it needs to be treated as early as possible. It --
Q. Are you familiar with the term, time is brain?
MS. GENOESE: Form.
THE WITNESS: Yes.
BY MR. HOFFMAN:
Q. What does time is brain mean?
A. And pardon? Come again?
Q. What does that mean, time is brain?
MS. GENOESE: Form.
THE WITNESS: Time is brain, it means that the -- the time is life in general. The sooner we get

the patient treated, the better, or the less
complications we get.

BY MR. HOFFMAN:

Q. And what does that mean in specific to a -- a stroke and clot-busting drugs?

A. It means that the patient has to be evaluated and assessed and given the appropriate drugs as soon as possible.

Q. Okay. In your career with Carnival, how many times have you seen the Coast Guard called for a medical case?

A. Can you rephrase the question? I don't get the part of the Coast Guard.

Q. So Carnival's -- has a -- a rescue -- U.S. Coast Guard Rescue Coordination Center. And --

A. Yes.

Q. -- my question is, is how many times have you seen the Coast Guard called for a medical case while working for Carnival?

A. Three or four times.

Q. Okay. And do you remember the circumstances under which they were called?

A. I cannot recall each and every condition that was -- that we encountered during that time. I cannot recall.

Q. Okay. You can't recall if any were for a stroke?
A. No.
Q. Okay. Do you know how to -- who has the authority to make the call to the Coast Guard?
MS. GENOESE: Form. Object to form.
THE WITNESS: The doctor.
BY MR. HOFFMAN:
Q. Okay. Is it -- and is the junior doctor allowed to call the Coast Guard or is it only the senior Coast -- the senior doctor?
A. The junior doctor can call.
Q. Only the senior doctor can call? I'm sorry.
MS. GENOESE: Form. Mischaracterizes testimony.
MR. HOFFMAN: Yeah. I -- I didn't hear. I was trying to clarify.
BY MR. HOFFMAN:
Q. Could you repeat the answer?
A. The junior doctor can also call.
Q. Okay. So both -- either doctor could call the Coast Guard, correct?
A. Yes.
Q. Thank you. Were you called to Mr. Smith's cabin, 4136, on October 18th?

A. Yes.

Q. Why do -- you know if -- do you recall what you were told as to why you had to go to Mr. Smith?

A. I cannot independently recall, but based on my notes, the -- the presenting complaint was vomiting and unable to walk.

Q. Okay. Is a patient -- when does a patient -- required to make payment to the medical infirmary?

A. When the case is closed on our side.

Q. Is it ever the case that payment needs to be made prior to an assessment?

A. I'm not sure.

Q. It says here -- I -- I want to show you -- with you Exhibit 3 again, which is the First Response and Triage HESS Procedure, and it says on Bates stamp 932 -- sorry, I just lost my place. It says, "Discussion about medical charges should be deferred until after an assessment, and if required, after the delivery of emergency treatment." Why would it say that medical charges need to be deferred after the assessment when there's emergency treatment if the procedure that you had just stated was -- and please correct me if I'm mistaken, that -- was that payment is not arranged until after the medical infirmary team has completed their work; is that correct?

A. Yes.
Q. Is -- was there ever an instance where care had been delayed until payment to the medical infirmary had been made while you were on the Carnival Vista?
A. No.
Q. And do you recall if -- or how much must a passenger pay in order to be admitted into the infirmary --
MS. GENOESE: Form.
BY MR. HOFFMAN:
Q. -- or to see a doctor at the infirmary?
A. The payment differs according to the time and the patient's condition.
Q. Okay. In Mr. Smith's instance, there -- there's been testimony that payment was required before Mr. Smith was assessed. Do you recall this?
A. This has never been a case before, and I don't recall any such incident.
Q. Okay. Who typically discusses the charges with the guest and when?
A. The nurse discusses the charges with the guest.
Q. And when does that charge get discussed?
A. It depends on the patient's condition. If the condition is less critical, the nurse can then explain

the charges. If the condition is life-threatening, the charges will be explained after the -- the -- the treatment of the patient.

Q. Okay. I want to share with you the medical record again, Exhibit 1, on Page 1 of 42, Bates stamp 005, where it states, "Guest services reported a guest vomiting in his cabin and unable to walk." What did "unable to walk" mean to you when you took that call?

A. It -- it means that the patient was not able to mobilize on his own.

Q. Okay. Did any possible causes come to mind as to why he may not be able to walk?

A. Yeah. There may be different causes.

Q. Okay.

A. It varies. Some conditions -- for example, if the patient is lethargic due to diabetes, if the patient has this, the -- if the patient is having immobility problems.

Q. And if their limbs are -- are not functioning properly?

A. If the limbs are weak, yes.

Q. And that could be related to something other than diabetes, correct?

A. Yes.

Q. Okay. Could it be related to a neurological

condition?
A. Yes, it can.
Q. Okay. Your notes go on to say that you found him seated, fully conscious, alert, and communicating well. What did you do to -- to test "communicating well"?
A. As I was interacting with the patient, he was able to tell me how he feels. He was responding. He was alert and able to -- to communicate with me and tell me his symptoms.
Q. Did you check his speech for slurring?
A. Yes.
Q. Did you check his face for a droop?
A. Yes.
Q. Did you have him list -- lift both arms?
A. No.
Q. Did you ask him to try to stand or walk?
A. No.
Q. Okay. Was Mr. Smith able to get to the clinic on his own or did he need the wheelchair?
MS. GENOESE: Form.
THE WITNESS: He needed a wheelchair.
BY MR. HOFFMAN:
Q. Okay. You had triaged him as urgent, not emergent. And what would he have had to have shown to

you to be labeled as emergent?
MS. GENOESE: Form.
THE WITNESS: The symptoms that he told me. Vomiting, the diarrhea, and lethargic.
THE REPORTER: I'm sorry. Repeat that answer. You broke up a little bit.
THE WITNESS: Okay. The symptoms that he told me. He mentioned vomiting more than ten times, and the diarrhea, and also general body weakness.
BY MR. HOFFMAN:
Q. General body weakness?
A. Yes.
Q. He did not complain to you about his inability to use one side of his body over the other?
A. No.
Q. You didn't witness his face drooping?
MS. GENOESE: Asked and answered.
THE WITNESS: No.
BY MR. HOFFMAN:
Q. Okay. On the evening on -- of October 18th, Dr. Maharaj's note stated that he advised admission in the medical center for monitoring. However, he would prefer to go back to his cabin. And then separately, he advised referral to the hospital, but he would prefer to go to his own hospital back home. Were you present for

those conversations?
A. No.
Q. Okay. On the night of October 18th, was it ever noted that he took an unassisted step that night?
MS. GENOESE: Form.
THE WITNESS: I don't remember.
BY MR. HOFFMAN:
Q. Well, do the notes indicate that at any point that he was able to walk?
MS. GENOESE: Form.
THE WITNESS: Yes.
BY MR. HOFFMAN:
Q. Where does it indicate that he was able to walk?
A. Okay. And maybe I might have answered inappropriately. I thought the question meant, is the nurse able to document? So I was answering to that question, that -- to say, is the nurse able to document? Yes.
Q. Okay. So if he was able to walk, would the nurse have documented it?
A. Yes.
Q. Okay. Is there a system in place to check on a -- a discharged patient overnight?
A. Can you rephrase your question? Sorry.

Q. Yes. It -- it was advised that, per Dr. Maharaj, that he was to -- recommended to stay in the medical center, but yet he went back to his cabin. And the question was, is -- is there a system in place to check on a patient who had been discharged overnight?

MS. GENOESE: Form.

THE WITNESS: A phone call is usually placed by the doctor to check on the patient.

BY MR. HOFFMAN:

Q. Okay. Would that be noted in the record?

A. Yes.

Q. Okay. Do you see anywhere in the record where Dr. Maharaj checked on Mr. Smith overnight?

A. No.

Q. Okay. Mr. Smith came back the following morning at 9:35, again, in a wheelchair, and he still couldn't walk. Was there any discussion about whether he was suffering from a condition that may have been missed?

A. I'm not sure.

Q. There's a note at 10-13 that attributes his systems -- his symptoms to motion sickness, and it also indicates that there's a plan to refer him to a Baltimore hospital the next morning. And is motion sickness the basis for a referral to a hospital?

A. That is according to the doctor's decision. I cannot say anything about that.

Q. Okay. What is the -- it says here, "Diagnosis, hypoglycemia." Could you tell me what that means?

A. Hyperglycemia, it means the elevated blood sugar levels in the system, in the body.

Q. Okay. And was Dr. Maharaj able to stabilize his blood sugar -- Mr. Smith's blood sugar?

A. I'm not really sure. However, the treatment was done regarding the elevated sugar level.

THE REPORTER: I'm sorry. I'm -- I'm sorry. I'm picking up voices. I'm not sure where that's coming from.

MR. HOFFMAN: I think it's quiet now, right?

THE REPORTER: Yes.

BY MR. HOFFMAN:

Q. There's a second diagnosis, tinea pedis. Could you tell me what that means?

A. That is the -- the infection of the skin.

Q. Okay. Could it be athlete's foot?

MS. GENOESE: Form.

THE WITNESS: I'm not sure.

BY MR. HOFFMAN:

Q. Okay. And tonea -- tinea unguium, do you know

what that is?
MS. GENOESE: Form.
THE WITNESS: Secondary infection.
BY MR. HOFFMAN:
Q. Okay. What is gastroenteritis?
MS. GENOESE: Form.
THE WITNESS: These are symptoms that involve the -- the -- the stomach.
BY MR. HOFFMAN:
Q. They involve the stomach?
A. The -- the lining of the stomach, yes.
Q. Okay. It looks like on -- it looks like on Page 5, Bates stamp 9, that -- sorry, that he's had an oxygen of -- reading of 90 percent and blood pressure of 107/68. What is a normal oxygen level there?
A. It's above 90 percent.
Q. Is 90 percent low?
A. -- borderline.
Q. Okay. Did you start oxygen at that point?
A. At that point, no.
Q. Now, is at -- looks like 6:18:07, overnight from October 19th to October 20th, the -- it indicated that Mr. Smith stayed overnight in the medical center. Whose responsibility would it have been to watch him during that time period?

MS. GENOESE: Form.

THE WITNESS: The nurse and the attending physician.

MR. HOFFMAN: Okay. Now, I want to show you what's labeled as Exhibit 2.

(Exhibit 2 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is Bates stamp 627, where it says, "Medical advice given, admission to the medical center for monitoring." And my question is: Is that advice that you recall hearing?

MS. GENOESE: Form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. Okay. And then -- and that was signed, it looks like, at -- on October 18th at 2042. And then I'm going to show you Bates stamp 629, which is a second against medical advice document where it says, "Medical advice given, referral to Baltimore Hospital." And it looks like that was signed at 2041, one minute before the other document.

And my question there is: Who -- who's responsible for having the against medical advice documents signed?

A. The attending physician.

Q. Okay. And what's the procedure for having that document created?

A. This is the decision of the attending physicians. I cannot have a say on this one.

Q. Okay. On Bates stamp 628, which is the document that was signed at 2042, it says, "Signature witness, senior doctor." But it looks like it has Dr. Maharaj listed.

And my question is: Do you know why Dr. Rantleriu was not consulted to sign this document?

A. I'm not sure.

Q. Would Dr. Rantleriu normally be the person to sign this document?

A. I'm not sure.

Q. Okay. So at 11:28 on October 18th, the ship was about 37 hours from Baltimore. And the advice of a referral to a Baltimore hospital at that moment, was that something that Mr. Smith could have done at that moment?

A. I am not sure.

Q. Were you ever told on the evening of October 18th that Mr. Smith was referred to a hospital?

A. I don't remember.

Q. If a patient were to suffer a condition that would require referral to a hospital, would that be

grounds for a medical evacuation?

MS. GENOESE: Improper hypothetical. I'm not going to go allow my witness to answer this line of questioning if it keeps going down this route.

BY MR. HOFFMAN:

Q. So again, on the -- the against medical advice with the advice given of the admission to the medical center for monitoring, has a diagnosis of hyperglycemia, and then it says the possible risks and complications -- or sorry.

What are the possible risks and complications of hyperglycemia?

A. The patient can fall into an unconscious state.

Q. Was Mr. Smith at risk of further complication from hyperglycemia when he was -- when he left the medical center --

A. No.

Q. -- on October 18th?

A. No.

Q. So why would it say that there was a concern of morbidity, mortality if his hyperglycemia was under control when he left on October 18th?

A. This is based on the doctor's decision and assessment.

Q. Okay.
A. As a result, I cannot say --
Q. Okay. Thank you. And again, on Bates stamp 629, the one -- that document that was signed a minute before the first, this was signed a minute before the other against medical advice where he was referred to the Baltimore Hospital. Again, the diagnosis is hyperglycemia. And it -- it, again, references morbidity, mortality.
And that's, again, something that would be strictly for the doctor to decide, correct?
A. Yes.
Q. Would the junior doctor consult with the senior doctor before making such a determination?
A. I am not sure.
Q. Okay. Is there anything that you wish you had done differently for Mr. Smith?
A. At this point, nothing much.
Q. But looking back after reading through his medical records and knowing that he had suffered a stroke, is there anything with that -- with that context in mind, is there anything that you wish you had done differently for Mr. Smith?
A. Nothing much.
Q. Okay. And -- sorry. Just a few more

questions. Okay. So I'm going to show you the medical records. It's Page 16 of 42. And it's at -- noted at -- on October 20th at 8:04 a.m., by Dr. Maharaj. And it says, under neurological, "Oriented to person, place, and date. CN II-XII intact."

Do you -- do you know what CN II-XII means in that reference -- in that context?

A. I am not aware of this abbreviation.

Q. Okay. And then it goes on to say, "Strength and sensation symmetric and intact throughout. Patellar, brachial, and brachioradialis reflexes 2+ bilaterally." And then it says, "Steady gait." And this was on the final day just before Mr. Smith was taken off by a stretcher.

And my question is: Did anyone ever see Mr. Smith walk on October 20th?

A. I am not sure.

Q. Okay. Would it be required to see Mr. Smith walk in order for the note to be included that he had a steady gait?

MS. GENOESE: Form.

THE WITNESS: I'm not sure with that in that one.

BY MR. HOFFMAN:

Q. Well, when you are doing your triage, would

you put down that somebody has a steady gait if you had never seen them walk?

MS. GENOESE: Form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. Okay. When a guest declines medical advice, what is the Carnival's process?

MS. GENOESE: Form.

THE WITNESS: Can you rephrase your question?

BY MR. HOFFMAN:

Q. Yeah. When a guest declines medical advice, does Carnival have a process that they put in place?

MS. GENOESE: Form.

THE WITNESS: I am not sure.

BY MR. HOFFMAN:

Q. Okay. Is -- do you know if the senior doctor is supposed to be contacted?

MS. GENOESE: Form.

THE WITNESS: Yes.

BY MR. HOFFMAN:

Q. Do you know if the senior doctor was contacted in this instance?

A. I don't remember.

Q. Okay. How would contact be made with the senior doctor? Would it be via an electronic message or

a phone call?

A. A phone call.

Q. Okay. Who would make that call?

A. The attending junior doctor.

Q. Okay. And the attending doctor would contact the senior physician directly?

A. Yes.

Q. Okay. And then after the senior doctor would be consulted, is that -- is that when the against medical advice form is provided?

A. I'm not sure.

Q. Okay. Have you ever seen an against medical advice form being signed by a passenger or the Medical Response Team?

A. No.

Q. Do you know if these are paper documents or electronic documents?

A. They are electronic.

Q. Okay. So are the signatures completed on, like, an electronic pad that goes into the computer?

A. If the pad is accessible to the patient, yes.

Q. Okay.

A. If the pad is not accessible to the patient, then a printout will be made.

Q. Okay. And the signatures on the against

medical advice form, are they always on a second page?
A. I'm not sure.
Q. Have you ever seen the against medical advice document with the signatures on the same page as the information related to the against medical advice?
A. Yes.
Q. Have you ever seen, besides in Mr. Smith's instance, the against medical advice form with the signatures on a second page?
A. Yes.
Q. How many times have you seen that before Mr. Smith?
A. I cannot remember.
Q. More than once?
A. Yes.
Q. More than five times?
A. I think so, yes.
Q. Is deteriorating handwriting over a period of a few hours something that a nurse should notice?
A. Yes.
Q. What could it indicate clinically?
A. Can you rephrase your question?
Q. Yeah. What can that indicate clinically if a person's handwriting is deteriorating over a period of a few hours?

A. If I'm getting you correctly, you are asking what can -- what indications if the patient's --

Q. The deteriorate -- would a -- if a -- a patient's handwriting, their ability to sign --

A. Handwriting.

Q. Yeah. Handwriting. I'm sorry. Is -- deteriorates, what could that be an indication of clinically?

A. It -- it -- it means that the patient is having a -- a neurological deficit.

Q. Okay. Have I asked you about every conversation you have had regarding Mr. Smith's case?

A. Yes.

Q. Is there anything that you expected me to ask about that I did not?

A. No.

MR. HOFFMAN: Okay. I don't think I have any further questions. Could I get five minutes real quick to review? I'll probably be back soon. Thank you.

THE VIDEOGRAPHER: All right. We're going off the record at 5:10 p.m.

THE REPORTER: Off record.

(A recess was taken.)

THE VIDEOGRAPHER: And we're back on the

record at 5:15 p.m.

CROSS-EXAMINATION

BY MS. GENOESE:

Q. Good afternoon -- afternoon, Nurse Dube. Plaintiff's counsel had indicated that he does not have any more questions for you. I only have three or four follow-up questions, and I'll make it quick.

Do you remember earlier in your deposition where you were asked questions about the diagnoses of a passenger?

A. You mean just now?

Q. Yes. During this line of questioning, do you remember when Mr. Hoffman was asking you questions about the diagnosis of passengers, including Mr. Smith?

A. Yes.

Q. Do you have any involvement in the diagnoses of passengers?

A. No.

Q. Do you remember being asked questions about the against medical advice form?

A. Yes.

Q. Do you have any involvement with passengers signing the against medical advice form?

A. No.

Q. Do you have any involvement in the preparation

of the against medical advice forms?
A. No.
Q. Do you recall being questioned earlier about some of the charted notes on Mr. Smith's medical chart by other doctors and nurses?
A. Yes.
Q. Do you have any knowledge about their notes or why they had made their notes in the medical chart?
A. No.
MS. GENOESE: Okay. That is all the questions that I have for you today, Nurse Dube.

REDIRECT EXAMINATION

BY MR. HOFFMAN:
Q. I just have one follow-up question. In what capacity have you seen the against medical advice forms that we had discussed before, where some of them were one page and some of them were two pages?
A. When we are required to sign. Only when we are required to countersign.
Q. So are -- when you have -- when you have acted as a witness, you have seen those against medical advice forms. Is that what you're --
A. Yes, I've seen them.
MR. HOFFMAN: Okay. Okay. No further questions.

THE REPORTER: Okay. Read or waive?
MS. GENOESE: We'll read. Thank you.
THE REPORTER: Read. Perfect.
THE VIDEOGRAPHER: Okay. Before we conclude the deposition, any other parties would like to order the transcript and/or the video?
MR. HOFFMAN: I would like a copy of the transcripts, but not the video yet.
THE REPORTER: Okay. Is that going to be standard or rush?
MR. HOFFMAN: Standard, please.
THE REPORTER: Standard. Okay. Perfect. And then as for the three exhibits?
THE VIDEOGRAPHER: I -- I -- I think she asked Counsel Genoese.
MS. GENOESE: Oh, I'm sorry. I didn't hear you. Yes. We'll take a copy.
THE REPORTER: Okay. And that's also standard?
MS. GENOESE: Just standard.
THE REPORTER: Standard. Perfect. And then --
THE VIDEOGRAPHER: Okay.
THE REPORTER: -- as for the three exhibits, did you want to retain --

THE VIDEOGRAPHER: This concludes the deposition, and we're going off the record at 5:19 a.m. -- p.m. Sorry.

THE REPORTER: As for the exhibits --

THE VIDEOGRAPHER: All right. Thanks, everyone.

MR. HOFFMAN: Awesome.

THE REPORTER: I wasn't finished.

THE VIDEOGRAPHER: I think we have all the information on the notice.

Madam Court Reporter, do you have the notice?

THE REPORTER: Yes, I have the notice.

THE VIDEOGRAPHER: All right. Perfect. That's it.

THE REPORTER: Thank you. Have a good day.

(Deposition concluded at 5:19 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, Julie Desmond, Court Reporter, Notary Public, State of Florida, certify that Debra Dube, personally appeared before me on the 5th day of August 2026, and was duly sworn.

Signed this 13th day of August 2026.



Julie Desmond, Court Reporter
Notary Public, State of Florida
Commission No.: HH 190239
Commission Expires: October 24, 2029

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, Julie Desmond, Court Reporter, certify that I was authorized to and did report the Deposition of Debra Dube; that a review of the transcript was reserved; and that the transcript is a true and correct record of my notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 13th day of August 2026.

__________________________________________

Julie Desmond, Court Reporter

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, Lissette C. Escobar, Court Reporter, certify that I was authorized to and did report the Deposition of Debra Dube; that a review of the transcript was reserved; and that the transcript is a true and correct record of my notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 13th day of August 2026.



__________________________________________

Lissette C. Escobar, Court Reporter

WITNESS NOTIFICATION LETTER

August 13th, 2026

Debra Dube

In Re: MICHAEL SMITH vs CARNIVAL CORPORATION AND NIKHIL MAHARAJ, MD

Deposition taken on August 5, 2026.

The transcript of the above proceeding is now available for your review.

Please call to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday.

Please complete your review within 30 days.

Sincerely,

Julie Desmond
Cogent Legal Services
2609 North Forest Ridge Boulevard
Suite 101
Hernando, Florida 34442
561-356-0831

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT

ENTER CHANGES ON THIS PAGE

IN RE: MICHAEL SMITH vs CARNIVAL CORPORATION AND NIKHIL MAHARAJ, MD

DEBRA DUBE

August 5, 2026

Page Line Change Reason

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

______________________________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

____________________________________

DEBRA DUBE Date