# EXHIBIT C

Deposition of Julio Cesar Gonzalez-Noda, M.D. (Oct. 12, 2026), Boyle v. Carnival Corp., No. 1:25-cv-24465-BB (S.D. Fla.)

*Plaintiff?s Motion for Leave to Take the Deposition of Defendant Letlhogile Rantleru, M.D., After the Discovery Cutoff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 25-cv-24465-Bloom

DANIEL BOYLE,

Plaintiff,

-vs-

CARNIVAL CORPORATION,

Defendant.
_______________________________________/

Via Zoom videoconference

Monday, October 12, 2026
11:04 a.m. to 1:47 p.m.

VIDEOTAPED DEPOSITION OF

JULIO CESAR GONZALEZ-NODA, M.D.

Taken before Chantell K. Clairmont-Folkes, Court Reporter, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition Duces Tecum filed in the above-styled cause.

APPEARANCES:

On Behalf of the Plaintiff:
DAVID W. SINGER & ASSOCIATES, P.A.
1011 South Federal Highway
Hollywood, Florida 33020
954-920-1571
mahoffman@1800askfree.com
BY: MICHAEL AARON HOFFMAN, ESQ.

On Behalf of the Defendant:
JONES WALKER LLP
Citi Center
201 South Biscayne Boulevard
Suite 3000
Miami, Florida 33131
305-679-5700
lrose@joneswalker.com
BY: LAUREN SARAH ROSE, ESQ.

Also Present:
Cassandra Pierre, Videographer

INDEX

TESTIMONY OF JULIO CESAR GONZALEZ-NODA, M.D.


| | PAGE |
|---|---|
| Direct Examination by Mr. Hoffman | 6 |
| Cross-Examination by Ms. Rose | 86 |
| Certificate of Oath | 104 |
| Certificate of Reporter | 105 |


INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS MARKED


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Payment Agreement, Medical Record Consent, and the Guest Consultation Form | 29 |
| Exhibit 2 | Medical Center SeaCare Records | 29 |
| Exhibit 3 | SeaCare Medical Center Encounter Summary | 33 |
| Exhibit 4 | X-ray Report | 76 |
| Exhibit 5 | Three X-rays | 77 |
| Exhibit 7 | Patient Agreement and Medical Records Consent on Board | 78 |
| Exhibit 8 | Patient Paper Multichart | 83 |

INDEX OF EXHIBITS (CONT.)

PLAINTIFF'S EXHIBITS MARKED


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Payment Agreement and Medical Records Consent Form | 83 |
| Exhibit 10 | Gastrointestinal Illness Surveillance System Questionnaire | 84 |


(Exhibits were retained by the reporter.)

THEREUPON:

THE VIDEOGRAPHER: We are on the record for the video deposition of Dr. Julio Cesar Gonzalez-Noda, taken in the matter of Boyle v. Carnival Corporation. Today is October 12th, and the time is 11:04 a.m. This deposition is being conducted by Zoom. The court reporter is Chantell Clairmont-Folkes and the videographer is Cassandra Pierre.

Will counsel please introduce themselves? Afterwards, the court reporter will swear in the witness.

MR. HOFFMAN: Good morning. Michael Hoffman on behalf of the plaintiff, Daniel Boyle, from the law firm of David Singer.

MS. ROSE: Good morning, everyone. Lauren Rose of the law firm Jones Walker, on behalf of the defendant, Carnival.

THE REPORTER: Good morning, everyone.

Dr. Gonzalez-Noda, can you please raise your right hand for me? Thank you.

JULIO CESAR GONZALEZ-NODA, M.D.,

having first been duly sworn, testified as follows:

THE REPORTER: Thank you so much. You may lower your right hand.

And you may begin your deposition.

MR. HOFFMAN: All right.

DIRECT EXAMINATION

BY MR. HOFFMAN:

Q. Good morning, sir. My name is Michael Hoffman. I am taking your deposition today in the case of Daniel Boyle v. Carnival Cruise, for an incident that occurred, apparently, two years to the day, October 12th, 2024, it looks like. Could you -- have you ever been deposed before?

A. Yes, sir.

Q. Okay. How many times?

A. I think, like, twice --

Q. Okay. And was it for cruise ship litigation?

A. That's correct.

Q. Okay. So just the basics. If you have -- if you don't understand my question, let me know. I'll rephrase it. If -- if you need to take a break, let me know. We'll take a break. I ask that if you -- to take a second, if your client -- if your attorney objects, to allow them the opportunity to get their objection on the record before you answer. And -- and please keep all your answers verbal. A lot of times, often we'll shake our head or nod our head or -- but the court reporter has to take down your words for purpose of the court transcript today, okay?

A. --
Q. Is -- is that okay?
A. Yes. Okay, sir.
Q. Okay. Very good. Totally human nature that we shake our head. But yes. Thank you. So could you please state your full name for the record?
A. My full name is Julio Cesar Gonzalez-Noda.
Q. And have you ever practiced medicine under any other name?
A. No.
Q. Okay. And you stated earlier that you're in Miami. Are you on a boat?
A. Yes. We are currently docked in Miami on the ship.
Q. Which ship are you on?
A. Carnival Sunrise.
Q. Okay. How long have you been on that contract on -- on the Sunrise?
A. I commenced on August the 22nd --
Q. Okay.
A. -- 2026.
Q. And how much longer do you have left?
A. I'm supposed to be here, according to the schedule, until February 6th --
Q. Got you.

A. -- 2027.

Q. Okay. Is there anyone in the room with you?

A. No. Nobody.

Q. Okay. And do you have any documents or devices open in front of you?

A. No. Nothing is open.

Q. Okay. Could you tell me where you attended medical school?

A. I attended medical school in Cuba, Havana.

Q. Okay. And what year did you graduate?

A. I graduated in 1990, almost -- I think it was July -- I don't remember exactly, but it was August the 2nd when I received my qualification.

Q. Okay. And did you have any specialty training?

A. Yes, sir. I have family medicine.

Q. Okay. Have you ever completed a residency, or I don't know if there is an equivalent in -- in your program, regarding orthopedic surgery?

A. No, sir.

Q. Okay. In which countries are you licensed to practice medicine?

A. Cuba and South Africa.

Q. Okay. And what clinical work did you do before you joined Carnival?

A. I work in the emergency department, medicine, internal medicine. Also have some work in anesthesia and some ICU training.

Q. Could you tell me about the time period that you were in the emergency department and where and when that was?

A. Yes. It was in South Africa. It was from 2004 until 2010.

Q. Okay. And what was your role in the emergency department?

A. I was the doctor overseeing the -- the role of internal -- of community services and new internship office.

Q. Okay. So was that a clinical experience or --

A. Yes, sir. I was directly in -- in working with -- with patients.

THE REPORTER: Can you repeat that, please? I didn't -- I didn't hear that.

THE WITNESS: I was working with patients -- directly with patient care from that time experiencing in emergency department.

BY MR. HOFFMAN:

Ex. F 9:23-10:1

Q. Sorry. When did you first work aboard a Carnival ship?

A. I started working with Carnival ships on

Ex. F 9:23-10:1

January the 7th, 2011.

Q. And have you worked for any other cruise lines since or before then?

A. No, sir.

Q. Have you worked for any other cruise lines since you began working in January 2011 for Carnival?

A. No, sir.

Q. Okay. Have you had any other employment besides working at Carnival since January 2011?

A. Yes. I graduated in Cuba in 1990, August the 2nd, and I worked at the emergency department and the polyclinic area, Guanabo. And then I also work as a doctor in South Africa from 1996, August the 20th, until January the 7th, 2011, when I joined Carnival.

Q. And since you've joined Carnival, have you had any other employment besides working for Carnival?

A. No, sir.

Q. Okay. So would you say every year you're on a contract or two -- I don't know --

A. That's correct, sir.

Q. How many Carnival ships have you served on?

A. Well, I served quite a lot. I don't have exactly the number. But yes. I -- I serve, I think, more than around ten, if my memory doesn't betray me.

Q. Okay. October 12th, 2024, is why we're here

today. Could you tell me what your title was on the -- you were on the Carnival Panorama at that time, correct?
A. Panorama. That's correct, sir.
Q. Could you tell me what your title was?
A. Senior physician Carnival Sunrise.
Q. What does --
A. I mean, Carnival Panorama. Sorry. I mean Carnival Panorama.
Q. I'm sorry. What did you say?

Ex. F 11:10-21

A. I was the senior physician of the Carnival Panorama on the time in question.
Q. Got you. Thank you. And you had said that you were the senior physician on the Panorama?
A. That's correct, sir.
Q. What does the title senior physician mean on a Carnival ship?
A. The senior physician means the person in -- overseeing the work in -- of the medical department and have the -- on the -- under his supervision, the nurses, the lead nurse, and the -- my colleague, the other doctor who was working with me.
Q. Do you supervise the clinical care that's performed by the doctor?
A. I do supervise. However, we are on the clinical aspect on the same level. But one of the

doctor is a senior and the other one will be considered the junior doctor.
Q. Okay. And do you also oversee the nursing department -- the nurses?
A. The -- the nurses' work is overseen by the lead nurse. However, they all report on -- under the senior doctor.
Q. Okay. And I'm sorry. You said earlier, but what ship are you assigned to today?
A. I am on the Carnival Sunrise at the moment, sir.
Q. The Sunrise. Thank you. How many people are on the Sunrise? How many passengers can be on the Sunrise?
A. Well, now it is back, we were around three thousand -- hundred-something guests and 1,119 around the crew member. I don't know exactly by -- by memory.
Q. Approximate. I hear you. And the Panorama, was that also about the same size?
A. The Panorama was bigger than this ship.
Q. Okay. How big was that? How many --
A. Not exactly in tons. I'm not sure. But it carry around 4,000-something guests and crew members would be over 1,800 for crew --
Q. Understood. Okay.

A. -- approximately. Not -- I don't know exactly the -- the -- the numbers by -- by -- by heart.

Q. Does the lead nurse report to you as the senior doctor or is it different?

A. The -- the lead nurse -- the lead nurse have a specific role. However, everybody on the medical team reports to the senior doctor.

Q. What's the specific role for the lead nurse? I guess, how would you --

A. The lead nurse's specific role is going to be controlling drugs, controlling the -- the admission of insumes like medication, control drugs, equipment, also the schedule of the -- of the -- of the nurses, also overseeing the -- the part that is control of what is the hygiene and control of the admittable disease control measures. And overall is the person in charge of the nurses and the medical center.

Q. Okay. Thank you. You had stated that you've testified twice before. Was that in the -- in the recent future -- in the recent past like in the last two years?

A. No --

Q. It was over -- okay. And has anyone ever complained about or sued you about your care on the patient aboard the ship?

MS. ROSE: Form.

THE WITNESS: Not -- not that I have knowledge of, sir.

BY MR. HOFFMAN:

Q. Okay. Thank you. Could you tell me what you did to prepare for today?

A. I -- I have the notes supplied to me and offered to me from the case in question that I was in -- treating, in this case, Daniel Boyle.

Q. Okay. And what documents, specifically, did you review? How many pages?

A. So I have here the case consult form, also, consultation form. I have the Payment Agreement and Medical Records Consent signed by the --. I have also a page with the blood tests done. I have also -- gastrointestinal illness surveillance system questionnaire provided to the patient, as well as the CDC form to complete by the patient. I have also the Payment Agreement and Medical Records Consent. I have the X-ray report provided by the shoreside radiologist. And I have also the passenger injury statement as well as the medical notes of the -- medical records of the patient.

Q. Okay. Thank you. I'm going to share some exhibits too, but it sounds like you have them in front

of you. So if you don't -- so when we go there, if you have them in front of you -- you're welcome to review what you have or to look at what's on the screen.

Have you spoken with any of the nurses that you had worked with during that time period about Dr. Boyle?

A. Dr. -- sorry. I didn't hear.

Q. Have you spoken with any of the nurses that were working with you on board at the time of Dr. Boyle's injury --

A. No.

Q. -- about Dr. Boyle?

A. No. No.

Q. Okay.

A. They were -- nobody was -- was -- was working with me here at the time on the Carnival Panorama.

Q. Got it. And you -- you would not have spoken to them outside of when you were on the ship. Is that what you're saying?

MS. ROSE: Form.

THE WITNESS: No.

BY MR. HOFFMAN:

Q. Have you spoken with anyone in security about Dr. Boyle?

A. No.

Q. Okay. Who is your employer of record, Carnival Corporation or Carnival Cruise Line?
A. Carnival Cruise Line.
Q. Okay. And you were working under contract as an independent contractor in October 2024?
A. Yes, sir.
Q. Okay. Do you know who has the ability to end your contract at Carnival?
MS. ROSE: Form.
THE WITNESS: Didn't get your question quite, sir?
BY MR. HOFFMAN:
Q. Do you know who the individual is at Carnival that has authority to end your contract?
MS. ROSE: Form.
THE WITNESS: Not -- not exactly, but should be the medical department. At one point, the -- one of the directors.
BY MR. HOFFMAN:
Q. Is there a title that you can think of, or?
A. Sorry, sir?
Q. Is there a title of a role, like a fleet director?
A. Not exactly my knowledge. It should be the medical director.

Q. Okay. Thank you. Do you have any memory of Dr. Boyle that is independent of the chart?
A. Memory? No much memory of him as a person. I cannot remember his face.
Q. Okay. But are you saying you somewhat recall the incident, the injury, or?
A. I recall seeing the patient, and now with the -- with the medical notes.
Q. Okay. The medical notes have helped you refresh your recollection?
A. That's correct, sir.
Q. Okay. Very good. And did you know at the time that you were treating Dr. Boyle that he was a veterinarian? Just curious.
A. That he was?
Q. He was a veterinarian?
A. No, I don't -- I don't recall that after, sir.
Q. Okay. I want to ask you a little bit about your time at Carnival. You've been there for 11 -- or since 2011, correct?
A. That's correct, sir.
Q. Is that when you had your first and only orientation for your assignments on board?
MS. ROSE: Form.
THE WITNESS: 2011, January 7th, I started my

-- my contract with Carnival.
BY MR. HOFFMAN:
Q. And when you go on a new assignment, do you have an orientation?
MS. ROSE: Form.
THE WITNESS: Yeah. We have an orientation every time we come on board about the ship. It is, like, the regulation.
BY MR. HOFFMAN:
Q. Okay. And when you have that orientation, is that from the other senior doctor who's leaving?
MS. ROSE: Form.
THE WITNESS: We have actually a handover from senior doctor to senior doctor, according to our schedules and according our -- to our procedure, just to hand over about the medical center and about -- yeah, mainly about the work at medical center.
BY MR. HOFFMAN:
Q. What else is given over in that handover? Is there -- so sorry. In that handover, during the transition, is there -- are the nurses that are on board at that time continuing with the boat, or do they leave at the same time as the doctor?
A. No. We have different sign-on and sign-off

date.

Q. Okay.

A. For instance, my colleague, they continue working. And when I sign off, my colleague continues working, and I sign off.

Q. Can you tell me what else is -- goes on in that list when you do the handover?

A. Well, in the handover, it's a long checklist. It's -- it's -- it's a handover about the -- the -- the working condition of the -- of the -- of the equipment, the -- the general public health condition of the ship.

We also have in the handover if everybody has been with a certification current on board. We also hand over about any relevant critical condition concerning infectious diseases. And mainly that. I don't recall exactly all the details, but it's a -- quite a long list of aspect to consider when you give the handover.

Q. How responsible is the senior doctor for the training that goes on?

A. I -- I do not -- I do not get your question properly, sir.

Q. Sorry. How -- what is the responsibility of the senior doctor in relation to the training that goes on for the medical team?

Ex. F
20:1-21:4

A. Well, the -- the responsibility is that every month, we have some training according to what the specific topic for that month will be given by the company. We go from many kind of condition, and we do the training. Everybody have to maintain the curriculum and the proper amount of medical reviews on the -- on the -- on the site to maintain certain amount with the registered bodies at home. And this is mainly the -- about the training.

Also, the senior doctors, if there is any kind of lacking in procedures, it addresses through the lead nurse in order to -- to check about the training and -- and proficiency on different aspect of the nurses. And of course, the -- my colleague, the so-called junior doctor, also falls under the senior doctor's responsibility.

Q. Is the information related to training part of the handover information?

A. Yes, sir, it's also part.

Q. Okay. When you become the senior doctor on the boat, are you -- do you have the ability to prioritize specific training that you want for your nurses?

MS. ROSE: Form.

THE WITNESS: The -- the trainings are

Ex. F 20:1-21:4

actually sent every month from the -- from the -- from the company, discuss Carnival -- Carnival Cruise Line. And then we -- we follow the -- the schedule of the training for that month. However, if there is any specific training, which all our nurses and doctors are certified and verified before employment, then we pay attention to that specific needs of the individual.

BY MR. HOFFMAN:

Q. Understood. Thank you. As the doctor, did Carnival train you on responding to 911 calls, or is that a role for the -- a job for the nurse?

A. When there is a -- sorry, repeat the question again?

Q. Yes. Did Carnival train you on responding to 911 calls on the ship?

A. Yes. Yes. They -- they -- they have a specific procedure for the 911 calls depending on the condition and depending on the -- the emergency in question. So we -- depending on the -- on the complaint or the condition, then the response is going to be based on.

Ex. F 21:23-22:10

Q. How does the medical department learn of a 911 call that they have to respond to?

A. So we have a procedure called medical response

Ex. F
21:23-22:10

team when the patient is unconscious, not breathing, or having any other medical condition that is life-threatening. So --

Q. What other conditions are those?

A. Those are, for instance, patient unconscious, not breathing, patient with symptom of a stroke, profuse bleeding. Those are the -- the most dangerous cases that we -- we could see, and those are the -- the most -- how can I say? The most -- the most acute kind of condition that we have response for on board.

Q. Understood. And when you say "acute," does that mean, like, critical and important?

A. Critical, important. All the patients are important. However, some -- some -- some conditions required a more aggressive response than others.

Q. And that decision is first made by the medical response team?

A. This decision is made by the condition and by the -- the -- the complaint or the information received on the 911 call.

Q. Okay. Thank you. So for a knee injury, like what Dr. Boyle suffered, would -- how would that 911 call have been handled?

MS. ROSE: Form. Just to clarify, are you asking how it actually would -- was handled?

MR. HOFFMAN: I -- yes.
BY MR. HOFFMAN:
Q. Do you --
MR. HOFFMAN: I guess I should ask if he has knowledge as to how it was handled. Thank you.
BY MR. HOFFMAN:
Q. Dr. Gonzalez, know that if -- as it was pointed out, I haven't established that you're aware of the 911 call for Dr. Boyle. My -- my question is: Are you aware of the incident that happened to Dr. Boyle when that happened?
A. I -- I was aware when the nurse post contacted me that she had responded to a patient with an injury on the knee.
Q. Okay. An injury of the neck?
A. Knee.
Q. The knee. Okay. Thank you. And who contacted you?
A. The -- the nurse. The nurse actually came down to the medical center with the patient on a wheelchair.
Q. How does the medical team communicate with each other on the boat?
A. The -- we communicate through the radio and through the telephone.

Q. Okay.
A. So yes, this is the way we communicate.
Q. And do they communicate through WhatsApp also?
A. Through WhatsApp, we do not communicate medical issues. Those are emergency -- emergency conditions are talk on the radio because radio is more reliable in this case because sometimes we do not have -- you know, the shipboard, most of the time we have more -- there are instances where we are in areas that there is no proper reception, but we do have a very reliable telephone system. We do not communicate on WhatsApp patients' condition or patients' problem.
Q. What is the WhatsApp for?
MS. ROSE: Form.
THE WITNESS: The -- the WhatsApp is mainly about schedules and about meetings and about other issues, but not about medical conditions of the patient and diagnosis and -- these kind of things, we do not discuss on the WhatsApp. What we have is a medical -- medical system that we used to call SeaCare. Now on this -- in these cases is where we communicate, we write our notes, and then the medical team has access to these medical cases on board.
BY MR. HOFFMAN:

Q. Understood. SeaCare is where the case -- the medical summary is of Dr. Boyle; is --
A. That's correct, sir.
Q. Okay. And SeaCare is -- it -- it includes all notes that are taken for the medical record, correct?
A. Sorry, sir, what's the question?
Q. SeaCare encompasses all communications regarding --
A. That's correct. This is where we write our medical notes. By the way, I need to let you know that now it's not called SeaCare. Now it's called Maritime Health.
Q. What's it called?
A. Maritime Health.
Q. Maritime Health. Is it a different provider?
A. Not sure if it's a different provider, but the name is different now. Before, we used SeaCare. Now it's Maritime Health.
Q. Has the format changed? Content?
A. Sorry, I didn't -- didn't understand.
Q. Has the format or content of it changed as it's changed over to Maritime Health?
A. No, no. It's the same format. Same format. We have, for instance, upgrade from time to time, but it's the same format, sir.

Q. Got it. Thank you. Who trains the nurses on fall response and triage?

A. Fall response and triage, we -- well, all nurses are verified and qualified from the bodies, and then -- at -- on their own home, and they are interviewed by the hiring personnel on the company.

And then we do have training on board about medical response team. This medical response team have been upgrading since I came on Carnival, and they have changed name. And they -- now lately it's called medical response team. Before, it used to be called Bright Star (phonetic), but how we know that it's an emergency? At this time now, we call it medical response team.

And the lead nurse and the doctors, we meet and we discuss about the -- how to respond to medical response -- the medical response team, sorry, about different conditions. It's -- we have frequent meetings about how to respond.

Ex. F
26:20-28:17

Q. Do you have meetings after an issue occurs to reflect back on how it was handled, or?

MS. ROSE: Form.

THE WITNESS: Yes. It is -- we have, depending on the case, if it is resuscitation, after resuscitation, we have a debriefing. And we

Ex. F
26:20-28:17

have a kind of debriefing after -- after resuscitation where it has involved chest compressions, intubation, this kind of a meeting after.

BY MR. HOFFMAN:

Q. Do -- do those involve any land shore employees?

A. Sorry, what did you say?

Q. Do those -- does -- do those debriefings involve any landside employees of Carnival?

A. No. No.

Q. They're -- are they strictly internal?

MS. ROSE: Form.

THE WITNESS: Not exactly. If there is any -- if there is, say, for instance, any kind of adverse event, like a death on board, we just communicate to the -- to the office with a specific. And also the office have access to the Maritime Health, and they can access the record -- side.

BY MR. HOFFMAN:

Q. Would -- so any kind of adverse event, you said like a -- the death of a -- a patient on board. Would other events qualify for a debriefing?

MS. ROSE: Form.

THE WITNESS: Mainly -- mainly the debriefing

Ex. F
26:20-28:17

are made for -- for this kind of critical and acute events. However, we talk in the -- in the weekly basis, we have a meeting where we sit and we kind of discuss the best practices and how to -- discuss the protocols and all the kind of procedures that we're supposed to follow on board.

BY MR. HOFFMAN:

Q. So you said a lot of it, and I may be generalizing, but if it's correct, you said an adverse event and you reflected back to if it relates to acute care -- or an acute case. And if -- if that is correct, that would mean that debriefings are also meant to also talk about the level of standard of care provided by the nurses?

MS. ROSE: Form.

THE WITNESS: Yes. We also -- we also approach that as well, sir.

BY MR. HOFFMAN:

Q. Okay. Thank you. I want to pull up the medical document for Mr. -- Dr. Boyle. Share my screen. All right. Can you see my screen okay?

A. Yes, sir.

Q. Okay. So what I have up now is the Carnival Panorama Medical Department Guest Consultation Form. Do you recognize this document?

A. Yes, sir.
Q. I'm sorry?
A. Yes, I do recognize that document.
Q. Okay. So I'm going to scroll through here. We also have the Payment Agreement and Medical Records Consent with, it looks like Melissa Boyle, the wife of Dr. Boyle. And then we have the Medical Case Summary.
MR. HOFFMAN: So I'd like to have marked as Exhibit 1 the Payment Agreement, Medical Record Consent, and the Guest Consultation Form.
(Exhibit 1 was marked for identification.)
BY MR. HOFFMAN:
Q. And then I -- I want to go through just real quick to make sure we're on -- we have the same amount of pages for the medical center records. SeaCare, it looks like I have 26 pages.
Is that what you have as well, it says in the bottom right, "1 of 26"?
A. Yes. And I have here 26 pages.
MR. HOFFMAN: Okay. All right. So we have the same documents in front of us. So I'd like to have marked the -- as Exhibit 2, the Medical Center SeaCare Records.
(Exhibit 2 was marked for identification.)
BY MR. HOFFMAN:

Q. So this is the entire medical center chart for Daniel Boyle, correct?
A. That's correct, sir.
Q. Okay. And does each entry show the date, the time, and the person who made it?
A. Yes. The person who made it at this time, it was on the 12th -- 12.
Q. Okay. It starts with communicable diseases, acute gastroenteritis, and it says the symptoms start October 20th. Why is that the first thing?
A. I -- I really don't know why --
Q. Okay.
A. -- this one came first, but the first encounter was on the 12th --
Q. Right.
A. -- because of the left knee swelling and pain.
Q. So I guess I want to ask that -- about that, the communicable disease of gastroenteritis. And what is that -- is the -- it says there diarrhea, number of episodes, six. And I'm asking why was that even flagged as, like, a --
A. It is -- it is --
Q. -- specific category?
A. Yes, sir. That was a different entry because Dr. Boyle presented with some gastrointestinal disease.

He had this amount of diarrhea that he reported that is normal for him when he takes antibiotics.

However, given the fact that we were on the ship, we need to document that we need to make this entry as we are in a very enclosed area and we need to make sure we do not oversee or overlook any aspect concerning public health.

Q. So how many episodes of diarrhea would trigger the flag, I guess, or if that's correct terminology?

A. It -- it depends. It depends what is normal for a patient, depending the condition. In this case, he said that he had six episodes of diarrhea and he reported to us and he said that it's because every time he takes antibiotics, he have diarrhea.

So he said that those were normal for him in the -- provided that he has been taking antibiotics and this trigger in the past the same kind of symptoms.

Q. I understand.

A. So for him -- for him, that was kind of normal when he takes antibiotics.

Q. Understand. And is -- if it wasn't from antibiotics, is this the type of thing that would be -- if it was a doctor who found this, would they be obligated to report it to the senior doctor? Is it that much of a concern as a communicable disease?

A. Depends from -- from patient to patient and the clinical condition. The -- this kind of -- of a gastrointestinal disease are mainly handled by the nurses. But in this case, why it was brought up is because it's a patient that was already seen on board.
And then at this time, actually, he came for a follow-up. And by the way, he reported that he had six diarrhea. If you can see here, the first symptoms was on October the 20th, and he presented only and reported the symptoms on October the 22nd when he came for follow-up of his knee.
Q. Okay. Thank you. And this is a -- a question I ask everyone. Just if your name is listed, does that indicate that you're the one that made that entry?
A. Not exactly, sir.
Q. Okay.
A. However, the -- the -- the doctor's name have to be there because the doctor is the one who put the diagnosis, even though the case was seen by the nurse.
Q. Got it. Okay. Yeah, I was just looking at Page 2. And that looks like that's closing out the antibiotic related diarrhea. Okay. On Exhibit 2, let's see, Page 17. It -- it -- actually, I want to -- I'm trying to show you what it does not show. So on Exhibit 3, which I'll present -- one sec. This is a ten-page

Encounter Summary. Have you seen this document?
A. Which page?
MR. HOFFMAN: This is -- this is a ten-page document. It's a separate document, sir. I apologize. I'd like to have it marked as Exhibit 3.
(Exhibit 3 was marked for identification.)
BY MR. HOFFMAN:
Q. It's a SeaCare Medical Center Encounter Summary.
A. In which -- in which page do you have this one?
Q. The first page. I have it on the screen, if you can see the screen. And I can make it bigger if you need.
A. Okay. Let me see. This is a communicable disease page.
Q. Right. So this is a ten-page document. I'm going to scroll through it real quick, because this is a different document than the -- the Exhibit 2. And I want -- I'm just going very -- something very specific here. Where it says loperamide 2 milligram capsule, what is loperamide?
A. Loperamide is a medication that is used to try to reduce the beat, the movement, the motion of the

intestine in order to reduce the -- the symptom of diarrhea.
Q. And what is -- why does it say counter checked with RN Moripe -- Moripe?
A. Sorry?
Q. On the -- in the notes here, it says, "Counter checked with RN Moripe"?
A. Oh, yes. Okay, sir. This is done because we always follow the nine rights of medicine administration, that is the right person, the right medication for the right condition, and that the patient is not having allergies. And that we give the right medication to the patient. So that's why it saying counter check.
Q. Got it. All right. Thank you. The reason I was asking is because, in the other document around that same medical administration, it doesn't have that note that -- about the counter check.
A. Right.
Q. Do you know why that would be or --
A. Actually, I'm not sure why it doesn't appear. But this is the standard procedure that we do. We always counter check all medication.
Q. I got it.
A. This is what we did. Like we do, like, by

reflex. By reflex, we always check all medication we give to the patient and we counter check.

Q. Just above it, I'm on Page 17 of 26 in the Medical Case Summary, and it says, "tramadol 50 milligram." And it says, "one tablet starting October 12th, 1907." And I guess my -- I wanted to ask: Do you guys disperse the medication?

MS. ROSE: Form.

THE WITNESS: We dispense the medication, sir.

BY MR. HOFFMAN:

Q. Okay. And is that when the medicine is dispersed or is that when the prescription is put into the record?

A. We printed it. We -- we order the medication and then we dispense the medication. And then in this case, the medication have to be signed by two medical professionals as if it's a controlled medication. It's tramadol.

Q. Okay. And then I guess this one's a little bit more -- is a little different. This one's an IV, ceftriaxone, 1 gram powder for injection IV. And it says completed, has your name, October 17th, 2024, 11:27. Does that mean that's when it's administered?

A. It was administered, yes. It was administered 1 gram stat on October 17 at 11:27. That was the time

that was prescribed, and then it could be a few minutes after about administration. But this is the time that was entered. And then yes, 1 gram was given IV stat.

Q. And then is there a sign-off log for that medication that it was needed for the injection?

MS. ROSE: Form.

THE WITNESS: This -- this medication was administered by the nurse, and then they do -- do cross-checking about the medication. And then they note in the -- they make a note in the notes that the medication was given and what is the -- if the patient have any adverse reaction. And, yes.

BY MR. HOFFMAN:

Q. Okay. So are all interactions with Dr. Boyle logged in the Medical Case Summary, the 26 pages?

A. Yes. Every interaction done logged here. However, maybe some words that we did not record, as we do not record every -- every single word we speak to the patient. But yes, mostly this is the -- the rough documentation and the most accurate documentation of the interaction with Dr. Boyle -- which makes Dr. Boyle.

Q. Okay. And I -- I'm just scrolling through and it goes back to October 12th. And is there, like, a -- a section where you update the record from before or --

MS. ROSE: Form.

THE WITNESS: October 12. Don't understand the question well, sir.

BY MR. HOFFMAN:

Q. Yeah. No. Sorry. Actually, I just scrolled through. I think I answered my own question. I wanted to ask about the -- the diagnosis on Page 18 of 26. It says, "Final: Internal derangement of knee." And then the -- it says down here, "Differential." What is differential, and how does it differ from final?

A. Differential is what I suspect it could be. However, the final would be the verified diagnosis. In this case, on Page 18, when you saw that I was writing here "Final: Internal derangement of the knee. Differential disorder of ligament" -- why is? Because I -- I know that he have an injury on the knee. However, for me to know that there is a disorder of the ligament, I need a -- a different kind of studies or examination to make it as final.

Q. Okay. Understood. Thank you. The -- I just want to show you real quick the document just to confirm. This is the guest consultation form that I've marked as Exhibit 1. And is this a document that every guest gets when they go to the medical center?

A. Yes, sir. This is the standard guest consultation form we have on board for every guest that

come requesting assistance or medical consultation.
Q. Okay. And then the Payment Agreement and Medical Records, that -- is that signed at the same time?
A. It may be signed with difference of a few minutes, sometime with an hour, but it's signed by the guest when they decide and they agree to be seen.
Q. Is there, like, an onboard charge when somebody goes to the medical center?
A. Yes, sir. There are charges to -- to be seen and to be treated at the medical center.
Q. What's the standard on-board charge for someone needing to go to the doctor?
A. It --
MS. ROSE: Form.
THE WITNESS: -- vary. It vary depending on the time of consultation. As he said, depending on the -- on the time of consultation -- the computer prompt depending on the time of the consultation. The -- the charges are mainly made by -- the nurses are the one who handle, most of the time, the charges. But at this current time, don't remember in 2024, it vary between 165 or 225, depending on the hour, if you come after hours to be seen by the doctor. And that doesn't exclude -- that doesn't

include -- sorry, doesn't include X-rays or any
kind of other intervention or the medication given,
the procedure.
BY MR. HOFFMAN:
Q. So is that payment made before the person is admitted?
A. No. This payment is made before the patient disembark the ship. This --
Q. Okay.
A. This is explained to the guest, as they have the right to know about the -- the charges they are going to incur.
Q. So there's nothing upfront that a person has to pay when they go to the medical center?
A. No. We do not uphold medical treatment unless the patient says, I refuse consultation. I do not want to be treated.
Q. And then you -- that's the only time you withhold treatment is what you're saying? Not because of money. Only if they say, I don't want to be --
A. Yes, that's correct.
Q. Okay. So are you referring to the Against Medical Advice form?
MS. ROSE: Form.
THE WITNESS: There are different form that

would be refusal to consult, or there could be another form that said, Against Medical Advice, like, let's say, the patient want to -- do not want to be seen by the doctor, or the patient doesn't want to be treated now. And yeah.

BY MR. HOFFMAN:

Q. So there's two different -- there's a Refusal to Consent and another form?

A. Against Medical Advice. Yeah. Those are two different forms.

Q. What's the refusal to consult?

A. Refusal to consult -- let's say that the patient need to be examined now and -- and I need to examine the patient. And the patient says, no, I don't want to be touched.

I say, okay, if I do not examine you at this time, I may miss any kind of important information to treat you.

No, but I don't want to be touched.

Okay. In this case, I would like to ask you politely to sign Against Medical Advice because we advised that this is the best and more indicated procedure or examination at this time.

Whether another one, even though it's very similar, is no, I don't want to be seen at all by the

doctor, and then they refuse to consult.

MR. HOFFMAN: Okay. We've been going for almost an hour. Now is a little break time, if we would. Can we take five minutes?

THE WITNESS: Okay.

MR. HOFFMAN: All right. Everyone --

MS. ROSE: Doctor, you can turn your camera and -- and mute yourself during the break.

MR. HOFFMAN: All right. Thank you.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: The time is 11:55 a.m. We're going off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 12:01 p.m., and we're back on the record.

MR. HOFFMAN: All right. I want to open up on Page -- I guess it's Page 2 of the medical records, the case summary. I can share it or -- it looks like you all have it on -- in paper, right, so I don't need to share it? Okay. So --

MS. ROSE: Can you just clarify -- sorry, Michael. When you say Page 2, the one that's the 26 pages?

MR. HOFFMAN: Correct. 2 of 26, the -- Exhibit 2, the Medical Case Summary.

BY MR. HOFFMAN:
Q. So I want to ask, what does triage mean in your medical center?
A. Triage means the nurse will check the patient and will check the vital signs, who's going to see the patient -- first of all, the general condition of the patient. It is dedicated in order to -- to see if the patient is having any medical condition to attend for. It's going to -- it's going to be like the presentation of the patient to the medical center or to the medical staff in order to dedicate attention to what is affecting the patient. So that is what the triage is about. And also, more importantly, to know if the patient is an emergent, urgent, or a patient that is ambulating and able to -- to wait. So this triage will give you the priority of the treatment on the patient in question.
Q. Okay. What is -- you said there are three categories: emergent, urgent, and non-urgent?
A. Yes. For instance, there could be a patient that is coming no breathing, unconscious. That's going to be emergent. That's going to be Priority 1. The rest of the patient will have to wait for this patient to be seen first. That is what the triage mean, to actually diagnose or spot which patient need to be seen

first and what is the attention in this case that the patient requires.

Q. Okay. And that was for emergent versus urgent, correct?

A. Emergent, urgent, or a regular, kind of non-urgent patient.

Q. Okay. Is -- who performs triage?

A. The triage is mainly performed by the -- by the nurse in the medical center or the healthcare assistant when -- if the shift has one. So it's the -- the first contact with the patient.

Q. So can it sometimes be done at the scene?

A. That's correct. On the scene as well, in case there is a call. And then the patient can be seen on the scene. The triage is -- is made. And based on the condition and the need of the patient, then one action will lead to the next one, depending on the need for every specific patient.

Q. Is there a procedure for someone to call in a triage at the scene?

A. The triage is -- is done automatically by the -- the healthcare provider when interacting with the patient. So you immediately see what the requirement of the patients are, and depending on the needs, then you call for assistance of other -- of other colleagues, in

this case, tailoring the -- the answer to our patient in question. So then depending on the condition of the patient, then we will act upon.

Q. How is a call made for assistance?

A. You call for assistance when, for instance, the patient is in critical condition, the patient is not breathing, the patient is unconscious, where you need all the colleagues to treat that patient. That is when you call for assistance, when you cannot treat the patient alone, when you cannot -- when they -- actually, when the condition of the patient exceeds your -- capabilities of only one individual.

Q. Understood. What makes a patient fall as urgent?

A. The patient is -- is -- is fall as urgent -- the patient who is not breathing, unconscious, respiratory difficulties.

Q. I --

A. Those are -- those are urgent. Emergency, it just -- a patient can -- can -- can actually change condition, a priority from urgent to emergent in a couple of minutes, or the patient can change from urgent according to what you hear on the phone -- and when you arrive, you see that the patient is standing, walking, breathing, talking to you. Then now it's not an urgent

condition anymore. It's a patient that can be wheeled or we can be taking now for further examination. So it depends on the condition of the patient, on the ability of the patient to preserve his vitals and the breathing capabilities. So there are too many aspects that you have to consider. It won't be a mathematical formula, like 2 plus 2 is 4. It varies from patient to patient.

Q. Okay. Thank you. Who was the nurse that went to Dr. Boyle when he was -- when he had fallen?

MS. ROSE: Form.

THE WITNESS: According to the medical records, the nurse who saw Dr. Boyle, let me see here, is -- let me check. It's Moripe Maletshabisa Lydia. Lydia Moripe.

BY MR. HOFFMAN:

Q. Okay.

THE REPORTER: Can you repeat that? The -- it -- it was a little confusing.

MR. HOFFMAN: The last name is M-O-R-I-P-E, and we can do a full name at the end of the depo if needed.

THE WITNESS: The -- the surname is Moripe.

MR. HOFFMAN: Moripe, Lydia. Okay. Thank you.

BY MR. HOFFMAN:

Q. Is -- what -- so she would be the responding nurse to the scene. So what is she trained to do once she arrives upon the scene?

A. The nurse is trained to stabilize the patient's condition, give first response. Let's say the patient is not breathing. She will be able to give assisted bag respiration to the patient. She can put an IV line. She can stabilize the patient if the patient have a deformed limb. And she can be the first responder. She can be the person who stabilize or try to stabilize the patient until the patient go for a second assessment or for further assessment and treatment. The nurses on board are qualified to respond on a stabilized patient with critical condition.

Q. The -- the notification that the -- of the acute gastroenteritis, would severe diarrhea or -- or nausea be a -- a cause of concern that a nurse would radio it in?

MS. ROSE: Form.

THE WITNESS: The -- the six diarrheas -- six diarrheas in two days, they are not severe. And then in this case, the -- the diarrhea was because of the patient said it's normal for him. However, we cannot just take for granted that it's because of the -- of the medication. I think we needed to

do more investigation and more talking with the patient to make sure that there is not a virus on board. But yes, the -- the nurse -- answering your question, the nurses will be able to -- to put IV on, to give fluids if the patient require it. But in this case was not the example of the question you are asking. The patient was not in severe diarrhea.

BY MR. HOFFMAN:

Q. Okay. Thank you. I'm looking -- sorry, one sec. Before the doctor meets with the patient, do they review the nurse's triage?

A. When they -- when -- before the doctors see the patient, we get the information from the nurse. The nurse is going to come with the patient and he's going to tell this is a patient of so many years old. It's Mr. Boyle in this case. I think he have this incident and then he's complaining about this and this. And then if the patient is allergic to any medication. And then we proceed with more questioning, verifying about all the information given, and we proceed to the -- to the -- to questioning and examining the patient. And then at the -- at the time of presentation, so most of the time there is no time to come and sit to write notes. So we need to first see the patient, assess the patient. And

then later on, you would go and write the notes because, I mean, it's -- we cannot, at this time, sit and write the note and then it's going to be time-consuming to see the patient. But it depend on case to case and depending -- depending on the condition versus another conditions.

Q. Got it. Thank you. I wanted to ask a little bit more about the intake form. It looks like the form was created by Dr. Boyle's wife, Melissa, right? She filled it out? I can share it with you.

A. Uh-huh. She -- yes. Yes, sir.

Q. Okay.

A. You mean this -- this form? Yeah.

Q. Okay. You have it?

A. Yeah.

MS. ROSE: Sorry, just to interject. It looks like Dr. Noda was showing the passenger injury statement. So let's just clarify which form we're talking about.

MR. HOFFMAN: Yes. The guest consultation form.

MS. ROSE: Thank you.

BY MR. HOFFMAN:

Q. So it looks like the form is dated October 12th at 6:00 p.m. So does that -- that -- what does

that mean, the time?

A. The time means this is the time that she -- she arrived to the medic at 7:00 -- at 6:10 p.m. This is the time she was completing the form.

Q. Okay. Sorry. It stated it's Mrs. Boyle -- it looks like Ms. Boyle signed. Was that --

A. Yes. It looks like the -- I feel -- I feel like the name of Melissa Boyle.

Q. Right. So on the Patient Agreement and Medical Records Consent, is that filled out at the same time as the guest consultation form?

A. No. The guest consultation form is filled first and the injury report is -- it was filled at -- at later stage. We call security who is involved in a -- in providing assistance with doing daily report and going back to the scene of the injury to check the area. Yeah. So this one was done -- the consultation -- the guest consultation form was filled first, then the passenger injury statement report.

Q. Got it. It says on the onboard charges, underneath it, "If patient unable to sign due to incapacity." And I guess my question is: Why would Dr. Boyle not be able to sign around the time?

A. Could -- could be -- could be --

MS. ROSE: Form.

THE WITNESS: -- because -- could be because he asked his wife to take care or didn't want to sign because his injury was not in the arms or in the hand. The wife was actively with him and with full consent as a family taking care of the paperwork.
BY MR. HOFFMAN:
Q. Okay. Are you aware of what Dr. Boyle was ultimately diagnosed, Doctor?
MS. ROSE: Form.
THE WITNESS: We have no -- we have no idea. We never received any information.
BY MR. HOFFMAN:
Q. Okay. Would it surprise you to -- to learn that he had a complete quadriceps tendon rupture?
MS. ROSE: Form.
THE WITNESS: Was actually -- actually was one on the -- of the differential diagnosis of the described was the ligament injuries.
BY MR. HOFFMAN:
Q. And how do you determine that?
A. Sorry?
Q. How -- how are you able to determine that bedside?
A. No, that was a differential. That was a

suspicion that could be an injury --

Q. Okay.

A. -- because when we did the X-ray, there was no fracture, no dislocation. So because ligaments and muscles are not seen on the X-ray, that could be one of the differential diagnosis -- diagnosis to be ruled out. So that's why we put it on the -- on the differential diagnosis. Yeah.

Q. Okay. On Page 15, there was a -- a neurological exam. I want to show it to you real quick. And it looks like this was completed on October 12th, 19:01. And it says -- oh, doh. Give me one sec. It says, "Neurological, oriented to a person, place, and date." Can you see that, Doctor?

A. Yes.

Q. It states here that he had steady gait, negative Romberg test. Did you see Dr. Boyle walk when he first came into the --

A. No. When he arrived, he arrived in the -- in the -- in the -- in the wheelchair.

Q. Okay.

A. However, I wrote there that the patient had pain of the knee and then have -- in this case, the -- the -- the -- I think this was an overlook on my part, but because the patient was completely oriented -- he

didn't have any kind of cerebrovascular involvement. However, in other documentation, it appear on musculoskeletal on top that flexion-extension, abnormal. Passive rate of movement, abnormal. -- abnormal. And comments hematoma of the left knee. So on top of this one, on the same musculoskeletal, it is actually explained that he have actually an abnormal examination of the knee.

Q. What does nonatalgic (sic) gait without ataxia mean?

A. Meaning -- meaning that the patient doesn't have any kind of cerebrovascular, like a stroke. So there was no discoordination. There was no kind of delay on the -- on the information sent by the brain to the -- to the members. Even though our patient was injured and was -- came in the wheelchair, he was still able to move -- move his legs and his -- his foot properly. And the neurovascular examination was intact as well.

Q. The nonatalic (sic) gait without ataxia, that's, you said, in reference to a stroke, you said; is that correct?

A. That's correct.

Q. Why wouldn't that be under neurological?

MS. ROSE: Form.

THE WITNESS: Neurological is the one that covered all this part. So we did all the examination of the patient as well. The patient fell, so we need to make sure that the patient does not have any weakness in all the other limbs. I mean, beside the injured knee that he had, of course, because of the fall, we need to make sure that this patient is not -- is breathing properly, is well oriented, is conscious. So we need to just check the patient completely as an individual and as a person, not only dedicate the only examination of the knee.

BY MR. HOFFMAN:

Q. When you are hired by Carnival as an independent contractor, these categories, are they something that you've been taught or is it -- are they templates?

MS. ROSE: Form.

THE WITNESS: I don't understand your question with --

BY MR. HOFFMAN:

Q. Yeah. So -- so when you've completed an examination on behalf of Carnival, you cover these areas, general, skin, hair, nail, eyes, head and neck, cardiovascular, respiratory, musculoskeletal,

neurological, and psychiatric, right? Those are the categories?

A. Yes. We -- we have these in every patient that comes. It's established. It's on our medical record form. And also, in the hospital, we check the patient in all the different aspects. In all the systems, we check the head, we check the cardiovascular system. We check the respiratory. We see how is the blood pressure. We take the vitals.

Q. Now, I know as a physician, you're -- you have your own training to rely upon. Does Carnival give you training though for what they expect regarding this general examination?

MS. ROSE: Form. Asked and answered.

THE WITNESS: Yes. We -- we -- Carnival give us training and we also go for training that we need to have every two year. We have to have a certification for ACLS, PALS, BLS, also international trauma life support. And then yeah, Carnival -- Carnival makes sure that we are trained.

BY MR. HOFFMAN:

Q. Okay. So when it says a neurological steady gait, negative Romberg test, is it fair to say that that's inaccurate?

MS. ROSE: Form.

THE WITNESS: That was an -- that was an overlook on my side on that part. However -- however, I need to check that the patient doesn't have any deficit in the -- any of the four limbs, and that I did not make a -- specifically said there that the patient is not, at this time, walking. But my aim was to make sure that it's documented that the patient does not have any fallout on the neurological part and all his four limbs were moved -- able to move all four limbs.

Of course, this patient have an injury on the knee and was still able to move his foot, his leg. He actually was -- his -- he -- he did not have a severe pain. The -- the second time we followed him, we follow up him with the medication. He was comfortable. So we needed to make sure that this patient doesn't -- didn't have any other reason, besides the injury on the knee of the trauma, besides that injury.

BY MR. HOFFMAN:

Q. And you mentioned moving all four limbs?

A. I did not move -- it's wrote there, "Moving of all limbs," but he was not written anywhere that the patient was having a deficit, as it is not -- was -- how

can I put it across? It was not specific for this patient. This patient did not have any weakness of moving any of the four limbs. Therefore, there was not a neurological impairment or focalization, like we said, in this case.

Q. Got it. On October 14th at 9:20, Page 13.

A. Page 13?

Q. Yeah.

A. Yes, sir.

Q. Okay. So it looks like this is a couple days later, and it has in musculoskeletal, knees -- sorry. Underneath. It says, "Passive range of movement," and then it has comments. And it says, "Swelling of the left knee," again, "Unable to walk to" -- or, "Swelling of the left knee, unable to walk due to pain." And in the neurological section, it again says, "Steady gait, negative Romberg test." And I wanted to ask, which one was correct?

A. Yeah. The -- I went to the musculoskeletal -- the thing is the neurological is coming with all these default, and they have been not specified there, but I made sure that I specify on the -- on the musculoskeletal with this involvement and with the -- the -- the reason why the patient console -- that the patient was unable to move the knee and swelling and

pain. So I described the specific condition and problem on this patient.

Q. Okay. And safe to say the patellar reflexes, two plus bilaterally, that also was controlled by the -- the injury on the -- the leg that he was suffering pain. Did you --

A. I do not -- I do not understand the question. Could you --

Q. Sorry. Did you strike his left patellar tendon with the reflex hammer that night?

A. The thing is -- the thing is the patient came with -- with pain and unable to -- to -- to move, but I -- I couldn't, at this time, on top of the pain, strike on top of the -- of the injury. However, there were other -- other examinations that we made. We palpate. We check his motor response and the sensitivity of the -- and the most neurovascular involvement, and all was concerned.

So he did not have any sensation deficit. He did not have any pulse abnormalities on the -- on the foot. And then I -- as -- here, on the musculoskeletal, when I wrote this comment, "Swelling and pain over the left knee, unable to -- to -- to move the knee due to swelling and pain," that -- Daniel was -- has been with the knee immobilizer applied since arrived on October

12th. There were no lumps, swelling of pain, of palpation of the left -- area, neurovascular intact.

I also checked at the back of the knee if there were any lump, any other -- any other swelling. So that is what I described there. I went again specifically to check the left knee because that was the area of concern.

Q. Thank you. On Page 19, on October 12th, your initial diagnosis, it was hemarthrosis of the left knee following the fall, initial encounter. What is hemarthrosis?

A. Hemarthrosis mean that there is collection of -- of blood, of fluid. In this case hema is blood due to the fall. So that means, when he fell, he have a swelling described on the first X-ray. And then the patient was set, like, a -- a -- a little bit of swelling -- the mild swelling on the left knee on the X-ray. And then I put here as a hemarthrosis because there was collection of fluid. But after a while, it was reabsorbing.

Q. Okay.

A. And on the differential, I wrote, "Left knee ligament injury," and then -- because this is something to consider as well, but we didn't have the means to -- to diagnose at the time.

Q. I understand. And I know that you offered the option for him to see an orthopedic at Vietnam, Philippines, Guam, Hawaii, but he waited until he got back to Long Beach, California, correct?

A. Correct, sir.

Q. Okay. And you continued to monitor him throughout your -- his stay, right?

A. Yes. We actually explained to him to call us if he needs anything, if anything -- if he deteriorates, if he change his condition, if the pain worsen. And then he -- he was pretty much stable at the time. And then we continuous offering him options to go and see with the orthopedic in all those ports. And, like you already explained, he -- he decided -- was his will to wait until he's been seen in Long Beach on November 5, when he arrived to California.

Q. If he were to have gotten off at one of those other ports, would he be a medical disembarkation or would he be able to go back on the boat?

A. It is hard for me now to say because that would be the decision of a specialist. However, if he would go to -- to -- to one of these boats, he's going to be able to rule out time -- in a timely manner what was the final diagnosis that we couldn't -- because of the capabilities -- although we don't have MRI CT scan,

we'd be able to do it earlier on and we'd be seen at that time by a specialist.

Q. I understand. And I want to take a look at the notes on the 17th. It looks like that's five days later. That's when you gave him the first dose of antibiotics due to your concern about the left -- the left knee and the temperature and skin change; is that correct?

A. Which page is this one?

Q. Sorry. On Page 8 of 26.

A. 8?

Q. 8 of 26. The -- on Page 7 --

A. 8 of 26. I got it. I got it.

Q. And -- and on Page 7 of 26, it has the date and time of the entry.

A. 7. Okay. On the 7th at the time -- okay. October 20 -- 17 at 12:21. Okay. So "Swelling of the left knee and pain follow-up. Daniel arrived to the medical center assisted by room service and accompanied by his wife due to pain and swelling of his left knee. He had the fall October 12th, which was five days ago. Today, Daniel, left knee, warm on touch, and shows some changes to skin coloration or anterior aspect."

This is five days after, on the 17th. So there are some changes of the coloration due to the

reabsorption of the swelling and to the -- because of the fall. However, also can be warm because of the collection of the swelling, known as the hemarthrosis or the swelling.

However, because it have some scratch on the lower part of the -- of the knee -- and then I wrote here, "This clinical presentation could be due to a hematoma or hemarthrosis in the left knee and the reabsorption of the swelling. Additionally, there is a very superficial skin excoriation below the knee."

Because there was a skin excoriation, I didn't want to take a chance. And that's the reason why I prescribed an antibiotic. And then later on, he presented saying that he had six episodes of diarrhea in two days, because it's normal for him to have diarrhea when he had -- however, even though the blood test was on a normal range, I wanted to be sure that Daniel did not have any kind of infection affecting to his knee that could complicate the already-injured left knee.

Q. Did you utilize any off-boat resources, like HOC?

MS. ROSE: Form.

THE WITNESS: The HOC -- the resources that we have in every country are pretty much standardized, where we have hospitals with a specialist to be

seen by the -- by the specialist. However, we were in a crossing on the transit from Asia to Long Beach, basically in the middle of the ocean. So it was advised, before we do the crossing, that he could seek a specialist and hospital second opinion and investigation.

BY MR. HOFFMAN:

Q. Understood. Okay. And he was on blood thinners. Was that a concern about -- related to his knee?

A. Yes. The thing is we -- we -- we noticed that he have Eliquis, which is a medication that is to keep his blood thinner, because our patient have previous medical condition of heart surgery and knee surgery. And this specific knee, he had a previous surgery, in which the X-ray showed some clips at the medial posterior aspect. And the Eliquis is going to make his knee -- I mean, his blood thinner. And it -- it could -- it -- it may contribute to the -- to -- to the swelling and to some kind of capillary, I would say, viability of, you know -- of leaking of the capillary.

Q. Was there --

A. -- vessels.

Q. Thank you. Was there a fit-to-sail determination for Dr. Boyle?

A. Sorry, sir?

Q. Was there a fit-to-sail determination for Dr. Boyle?

A. The -- he -- he was fit to sail. However, that didn't mean that he didn't need to go for definite treatment and evaluation. At this time, he was stable. He had a good pulse on his foot. However, the sooner we could send the patient to the specialist, the better. And that's why we offer him, in all the port, to go to be seen by the -- by the specialist. And we gave him options of all the ports. But was his decision to be seen by the medical doctor, and we had to respect his decision, as an independent patient and individual.

Q. Did he sign any Against Medical Advice form?

A. I don't recall if he signed any Against Medical Advice. However, it's documented that we offer him and then it was his wish to wait until he is seen by the -- by the medical doctor. And we discussed with him that the sooner he's seen by the specialist, as we do not have MRI and CT scan on board to rule out any ligament injury and meniscus or cartilage, the -- the best is to go to the hospital sooner.

Q. Thank you. So there was no Against Medical Advice form, and there was -- there was --

A. Not that I have recall, and not that I have

with me in my hand.
Q. Okay. Was there -- and there would be no refusal to consult, because he did consult with you about his options, correct?
A. He -- he -- he consulted us.
Q. Okay.
A. He -- he wanted to be seen by the specialist, but not on the places we offer him. He wanted to wait until he is seen in Long Beach by a medical physician, and he signed of his position on this -- on this advice.
Q. Understood. Was he of such that he would be on a special assistance list?
MS. ROSE: Form.
THE WITNESS: Sorry, sir. I didn't hear your question properly.
BY MR. HOFFMAN:
Q. Would he be on a special assistance list, given that he had injured his leg and was in a wheelchair?
MS. ROSE: Form.
THE WITNESS: He -- he was provided from day one the wheelchair. He was provided assistance. However, he -- he wanted to continue on the -- on the -- going to the restaurant with the wife, and the wife actually took control, because we -- we

have a system where we call room service to bring the patient and assist, but the wife was very comfortable going with him places everywhere to -- to continue with the cruise, with the daily activity of the cruise.

BY MR. HOFFMAN:

Q. Understood. And was he marked for a category for disembarkation?

A. If he was -- I don't understand.

Q. Was -- was he marked for a category for disembarkation?

MS. ROSE: Form.

THE WITNESS: Marked? I don't understand. Explain the question, if he was marked.

BY MR. HOFFMAN:

Q. Yeah. Was he categorized as any particular level of disembarkation as a result of his medical condition?

MS. ROSE: Form.

THE WITNESS: He -- he -- he actually agreed at -- when we arrived to Hawaii -- I mean, when we -- sorry. When we arrived to -- excuse me. When we arrived to Hawaii, he agreed then to go to the hospital, but they never returned back to -- to the medical center. So this is where we lost all

contact with him. So we didn't know what they said about him to him in the hospital. And he just -- I think he left the -- the ship from -- from -- from Hawaii because we never really saw him again. He never came back to us.

BY MR. HOFFMAN:

Q. Understood. Did you contact anyone at Carnival ashore about disembarking him?

A. Not at the time, because the disembarkation was done, actually, based on his request to fly from, I think, Honolulu. I don't remember exactly, because we were on -- we were on -- we arrived to Honolulu on the 29 of October, and we left next day on the 30th. So he was already on American territory. Yeah. And he -- he was fit to -- to travel by sea and by air. Most important is that he needed the -- the orthopedic evaluation and the -- the investigation, he needed. But it was not categorized, because we sent him for an evaluation and for the -- for a consult, but never came back with any result, with any medical report or anything.

Q. Understood. When Dr. Boyle went to the Honolulu provider, did you send your X-rays with them, or what's the procedure?

A. Actually, the -- the X-ray found -- I mean,

finding were discussed with -- with the patient, and then we provided him with a CD, CD with a copy. And also, on our patient's request and with his permission, we forward this X-ray to his email, personal email address.

Q. Okay.

A. At his request.

Q. Understood.

A. And that was before we reached Honolulu, before he accepted and -- and agreed to go for evaluation in -- in Hawaii.

Q. When Dr. Boyle's incident occurred, you were the senior doctor on the boat. Would -- does that mean that there was another doctor as well?

A. That's correct, sir. There was another doctor.

Q. Okay. Did the other doctor see Dr. Boyle as well or is only --

A. I don't recall. I mean, it doesn't appear that she saw this patient. If she saw him, there are no records on the -- his medical records.

Q. Okay. And is there ever a situation where someone would be elevated from the care of the doctor to the senior doctor?

A. If -- if -- if it -- I didn't understand the

question.
Q. Would there be an occasion where the care of a patient would be elevated from a doctor to a senior doctor?
A. Could be. Yes. There could be cases.
Q. And what are some of those instances?
MS. ROSE: Form.
THE WITNESS: It depends. It depends on the -- for instance, let's say that the -- mainly, it's going to be kind of -- let's -- let me give you an example. For instance, my colleague could be now working the whole night, and then next day the patient is coming, and then my colleague would be resting, resting hours, and then I will take care of the patient or continue the care of the patient. However, all the -- all the doctors employed by Carnival are well-trained, have a good credential, and they are all registered with the body of license in the country.
So they -- there -- there are not exactly any case that I remember or I can recall where the -- the other doctor was incapable of treating or managing a case as a doctor.
BY MR. HOFFMAN:
Q. Understood. Are there incidences where it's -

- scratch that.
Is diarrhea -- and I know it was determined that Dr. Boyle's was due to the antibiotics, but when diarrhea, something like that is reported, is that something that would be elevated to the senior doctor?
A. No. No. Not necessarily. Actually, the diarrhea is treated mainly by the nurses, unless there are dehydration, electrolyte imbalances, and -- yeah. But all the -- the other doctor is capable or are capable to see the patient as well. So the answer is no. No. Not necessarily.
Q. What if the symptoms don't subside, but all the differential diagnoses have been ruled out?
A. Which symptoms are you referring, sir?
Q. Diarrhea.
A. Well, if the -- if the -- if the symptom doesn't get better, we -- the first thing was to stop the antibiotics that he says that is normal for him. If the symptoms don't stop, then we have the option of IV fluid. We can do, also, admit the patient after the patient is already subside the symptoms. But in this case, he only has six diarrheas, and he never complained about diarrhea again.
Q. But is diarrhea something that would trigger a cause for the senior doctor to be involved?

MS. ROSE: Form.
THE WITNESS: No.
BY MR. HOFFMAN:
Q. Okay. No, because of -- because it became -- it was understood where the -- the origin?
A. Actually, the patient made it clear. I didn't know that he was a doctor, but since now I have the knowledge, it made sense. And then he says that every time he have antibiotics, it triggers for him diarrhea, and he saw it as a normal. As a patient, he said that was normal for him, and he has six episodes of diarrhea in two days.
Q. Got it. Did you notify the bridge on October 20th -- on October 12th when Dr. Boyle presented to you?
A. The patient -- the patient -- I don't recall making that notification. The patient injury was managed in the medical center according to the resources, and we were already departing Singapore. So the patient was evaluated, examined, X-ray was done, and then with the consent and with the permission of the patient. But I do not remember calling the -- the bridge for the knee injury.
Q. Did you ever contact the bridge about Dr. Boyle?
A. I don't recall.

Q. Okay. Do you know if you notified the hotel doctor -- director about Dr. Boyle?

A. Actually, the notification was about security, and then the -- the mechanism we have on board is to notify the -- the guest services. The hotel director should be in copy, also, of the injury, but mainly the staff captain is the one that is involved in these notifications. And because Dr. Boyle is -- is an American and was injured on board, we also have the report, this as a U.S. Coast Guard report. So we do a reporting of the injuries on board.

Q. Understood. Did you participate in creating that report?

A. Yes, sir.

Q. Okay. Do you have a clinical supervisor ashore?

A. Yes, we do have clinical supervisors, and we have -- recently, we have now a Health Operations Center where we communicate and like that if the patient need to disembark, depending on the area where we are, to assist with the logistics mainly.

Q. Is a clinical supervisor a doctor?

A. We do have the Health Operations Center.

Q. And what -- what happens at the Health Operations Center?

Ex. F
72:8-73:19

A. The Health Operations Center is there to assist us with -- especially with -- with advice in -- in order to logistics, the position where we are. And also, it's managed by doctors, and the person in charge is the medical director as well, so he oversees the evacuation of the patient when need evacuation and -- and also, the treatments. Yes.

Q. Does the Health Operations Center oversee the training that is performed on the --

A. Yes. The Health Operations Center has offered training of the medical response team, especially for all those cases who need immediate response by the whole team.

Q. Which are those? Which are those immediate response?

A. The medical response team, patients who are critically ill, patients that need to be resused -- after the resuscitation, like patients with a stroke, patients with -- patients that are unconscious and not breathing, patients with -- epileptic and with seizures. So yes, we do have a system where we train the team and we do frequent training on medical response team and different cases that are -- for study purposes to all the teams on board.

Q. Is there someone at the Health Operations

Ex. F
72:8-73:19

Center who's responsible for that effort?

A. The Health Operations Center in -- in -- in charge of these trainings is -- I think it's Dr. Monika Pisonic, and the person in charge is Dr. Scott, Joseph Scott.

Q. Is Dr. Scott responsible for overseeing this -- the -- the medical doctors that are contracted with Carnival?

MS. ROSE: Form.

THE WITNESS: Dr. Scott is the medical director.

BY MR. HOFFMAN:

Q. Okay. And in that role, does he oversee the doctors?

A. Correct.

Q. Okay. Is he your direct supervisor?

A. He's my -- yes, he's my supervisor.

Q. Is he all doctors' supervisor?

A. That's correct.

Q. And is Monika responsible for training the nurses and the doctors?

A. Monika is at the HOC, Health Operations Center, and then they assist with the support to the doctors and mainly as well as the logistic of -- to assist when disembarkment is required.

Q. Have you ever been involved in the -- in -- in interviewing other doctors that are being considered to be a senior doctor?

MS. ROSE: Form.

THE WITNESS: Sorry, I didn't -- I didn't understand the question, sir.

BY MR. HOFFMAN:

Q. Yes. In -- in your role as a senior doctor who's been with Carnival since 2011, have you participated in the -- I guess, the supervising and the promoting of other doctors to senior doctor position?

A. Yes, yes. I have all the -- all the -- all the -- especially new -- new at sea -- I've been able to supervise few doctors, yes.

Q. Okay. All right. Before October 12th, 2024, had you ever treated any guest who fell at those two steps near the Horizon Restaurant entrance on Deck three where Dr. Boyle fell?

MS. ROSE: Form.

THE WITNESS: Don't recall, sir. Don't recall.

BY MR. HOFFMAN:

Q. Have you treated anyone who fell there since?

MS. ROSE: Form.

THE WITNESS: Yeah -- no. I don't recall if

they are on that ship, sir.
BY MR. HOFFMAN:
Q. Have you treated falls at the atrium stairs on the Carnival Vista?
MS. ROSE: Form.
THE WITNESS: I never worked on the Carnival Vista, sir.
BY MR. HOFFMAN:
Q. I'm sorry. Have you worked on the Carnival Horizon?
A. Horizon? Don't recall working on Carnival Horizon either.
Q. Okay. How about the Firenze or the Venezia?
A. No, sir. Never been on those ships.
Q. Okay. Thank you. So I believe those were the sister ships. Carnival says it added a handrail to the Panorama's atrium stairs on November 16th, 2025. And I asked, did anyone ever ask you about the injuries that Dr. Boyle suffered at those steps before it was done?
MS. ROSE: Form.
THE WITNESS: Sorry, sir. What is -- what is the question?
BY MR. HOFFMAN:
Q. Yes. There was a -- a handrail added to the stairs where Dr. Boyle had air stepped. And my question

was -- is: Did anyone ever ask you about his injuries at those steps before they installed that handrail?

MS. ROSE: Form.

THE WITNESS: No. I don't recall, sir.

MR. HOFFMAN: Okay. I think I'm done. If I could just get five minutes to review my notes?

MS. ROSE: Yeah. And I'll have a few minutes of questioning after as well.

MR. HOFFMAN: Okay. Thank you.

MS. ROSE: Okay. So we'll take another quick break.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 1:06 p.m. We're back on the record.

BY MR. HOFFMAN:

Q. Doctor, thank you for your time. I want to go just through the remainder of the documents. Give me one sec. Okay.

MR. HOFFMAN: So I'd like to have this marked as Exhibit 4.

(Exhibit 4 was marked for identification.)

BY MR. HOFFMAN:

Q. And I have on the screen the X-ray report. It has here that this was electronically signed by Dr. Hashmi (phonetic). Who's Dr. Hashmi?

A. Let me put it here. Okay. Yes. This was signed by me, acknowledged by me on the report of the shoreside radiologist.

Q. Okay. She's the shoreside radiologist?

A. That's correct, sir.

Q. Okay. So did you communicate with shoreside regarding Dr. Boyle?

A. I just sent the -- the X-ray report to the shoreside radiologist for second opinion and for a written report that was actually communicated and given to Dr. Boyle.

Q. Got it. Thank you.

MR. HOFFMAN: I have next the -- looks like these are the X-rays and -- three of the X-rays, so Plaintiff Exhibit 5.

(Exhibit 5 was marked for identification.)

BY MR. HOFFMAN:

Q. These are the X-rays that you referenced in your report, correct?

A. That's correct, sir.

Q. Okay. That, you've never seen.

MR. HOFFMAN: I'd like to have this marked as Plaintiff Exhibit 7. I know -- I'm skipping 6 because I'm not using that document, but for the sake of consistency with the documents as they're

stamped.

(Exhibit 7 was marked for identification.)

BY MR. HOFFMAN:

Q. Doctor, this is the Patient Agreement and Medical Records Consent on Board. And it looks like this was on October 12th, 2024, and there's a timestamp of 1810. Could you tell me what this document is?

A. This document is the form together with a request for consultation, guest consultation, that I've provided or I've given to all the guests who are coming on to the medical center. It's called Payment Agreement and Medical Records Consent.

Q. Okay. And it looks like this is a digital signature?

A. Yes.

Q. Could you tell me how this form is created and how it's filled out?

A. The form -- the form is -- is standard, and then the form is generated automatically from the medical records of the patient. In this case, it was entered the name of the patient and the particular -- like, you know, the name, surname, the stateroom number, date of birth, as the specific identification criteria, so particular for the patient. And once again it's signed by the wife, which is specified that it's a

spouse, by Melissa Boyle.
Q. Is this the similar format that the Against Medical Advice form takes?
MS. ROSE: Form.
THE WITNESS: No. This is -- this is not Against Medical Advice, no.
BY MR. HOFFMAN:
Q. But as far as the -- the documents as the way that they're created, this has a -- a digital timestamp, correct? And that's when the signature was applied to the document, right?
A. That's correct.
Q. So if there was an Against Medical Advice form, does that still have the same digital timestamp entry?
MS. ROSE: Form.
THE WITNESS: If the patient do not want to be seen by the -- by the doctor, then this -- this form won't be generated as there are not going to be complete medical records. So yeah, in my understanding, yes, this medical Patient Agreement and Medical Record Consent got nothing to do with Against Medical Advice.
BY MR. HOFFMAN:
Q. Right. I -- I was just asking about the

procedure because we had a paper document of one of these before, right?

MS. ROSE: Form.

BY MR. HOFFMAN:

Q. I can show you what I was referring to. This is Page 2 of Exhibit 1. Is this the same document?

A. Yes. The thing is he -- I think there were different entries. So every time you come to the medical center, if the case is closed or we open a new case, then we need to generate again this form. Not as -- not sure specifically why two of them, if they are the same, were generated.

Q. Understood. And I guess my question would be the Against Medical Advice, would it be more like this form where it has just a place for a signature, or would it be the digital form where the --

A. It's going to be -- it's going to be a -- a form, and the form is going to say Against Medical Advice, and then it's have a different narrative.

Q. It would have a different what?

A. It'd have a different -- it's not there. You would not -- I don't see any Against Medical Advice form there on -- on this.

Q. I know. I'm just asking about your knowledge --

MS. ROSE: Form.

BY MR. HOFFMAN:

Q. -- of what you're familiar with with that form. Because it -- it was not an -- it was not a consideration, a complete one, for Dr. Boyle, correct?

MS. ROSE: Form.

THE WITNESS: Dr. Boyle was -- was complied with our examination. He never declined to be seen by us. Actually, he -- he signs the -- the wife signed on his behalf the consult -- the guest consultation form and sign all the medical forms, like -- like the Payment Agreement and Medical Records Consent. The Medical Records Consent for some reason is together here with the Payment Agreement, but we need the Medical Records Consent in order for us to be able to -- to send, for instance, the -- the X-ray views to the radiologist for examination, and also to provide third parties requiring the medical notes as authorized by the guest. So this is -- this form is -- is required because of that.

BY MR. HOFFMAN:

Q. Okay. Thank you. So just to complete the record, we have -- looks like this is Dr. Boyle's patient lab results from October 17th. This is related

to the diarrhea, Doctor?
A. Yes, I did -- actually, I did -- no, this is not related to the diarrhea.
Q. No.
A. That was before the diarrhea started. That is the test that I did because Mr. Boyle show us that he had a small abrasion or excoriation on the skin, superficial, and a little bit of discoloration. So we wanted to know, specifically myself, I wanted to know if there is any infection at this time, and that's why this blood sample was taken and this test was performed.
Q. Understood.
A. --
Q. I -- I misspoke. This was the blood test that you relied upon to prescribe the antibiotics on October 17th?
A. Well, actually this -- this blood test result is normal. The reason why he got the antibiotics is because we wanted to make sure that given the excoriation that he showed us now, that appeared on the -- on the -- on the -- on the knee and clinically on test was warm, we didn't want just to assume that it was because of the inflammatory process, and we wanted to give some coverage of antibiotic to this patient, given the small abrasion or excoriation on the skin to avoid

further complication like infection on this patient.

MR. HOFFMAN: Understood. So I'd like to have that marked as Plaintiff Exhibit 8.

(Exhibit 8 was marked for identification.)

MR. HOFFMAN: That would be the document we just discussed at Med 310 -- 3101 A1 Patient Paper Multichart. And then again, this is a -- have this marked as Plaintiff Exhibit 9, another Payment Agreement and Medical Records Consent form on October 17th.

(Exhibit 9 was marked for identification.)

BY MR. HOFFMAN:

Q. And this is another one that's -- appears to be handwritten, correct, Doctor?

A. Yes.

Q. So I guess question goes, why would it be handwritten, not the digital timestamp one?

MS. ROSE: Form.

THE WITNESS: Because the person who filled this form --

BY MR. HOFFMAN:

Q. Not --

A. -- not write it digitally, and then it was given to the patient to write it manually. And then here also is signed by Daniel in this case.

Q. Understood. And then this appears to be the --

A. That was another form that was not completed.

Q. Right.

A. The only thing that appear is the vital signs.

Q. Right. Okay. So I have this as Page 2 of the Exhibit 9. I'm under the impression that the Payment Agreement Medical Record Consent was related to this document, even though there's no date, correct, Doctor?

A. No, no. This one was not completed at all. Somebody wrote the name, the -- the vital signs there, but it was not completed.

Q. Understood. So you don't know when this document is from?

A. No.

MR. HOFFMAN: Okay. Thank you. And then this is -- I'd like to have this marked as Exhibit 10.

(Exhibit 10 was marked for identification.)

BY MR. HOFFMAN:

Q. It's a two-page document. It says Gastrointestinal Illness Surveillance System Questionnaire. What is this document, Doctor?

A. This is the Gastrointestinal Illness Surveillance System Questionnaire. This is a questionnaire that we have on board and we give to all

the passengers that complain about increased bowel motion, in this case, diarrhea. And however, in this case of this patient, he made it -- he specified that every time he has antibiotics, he have some diarrhea, and that was normal for him. So this is the -- the standard form we give to all guests who come to the medical center complaining of diarrhea or gastrointestinal disease.

Q. What if someone is throwing up, would they also fill out this form?

MS. ROSE: Form.

THE WITNESS: Sorry, didn't understand properly the question. I didn't hear.

BY MR. HOFFMAN:

Q. Yeah. No, I -- so I would -- you would said about diarrhea that this is a form that they would fill out. My question is: If someone was vomiting, would they also fill out this form?

A. If the patient is having vomit and diarrhea, this is the -- the -- the form. If the patient is -- in this case, it was given to him because he was having diarrhea, but this patient was not vomiting at all.

Q. Okay. And then what's the second page?

A. The second page is a continuation of the form where the patient was asked what he ate, at what time he

ate, and the location on the ship where he ate.

Q. Okay. And then it says at the bottom, "last episode at 10:00 a.m." Do you know whose handwriting that is?

A. I don't recognize. I cannot say whose handwriting is this, but this form is actually filled by the patient. In this case, not sure it was Daniel or was the wife.

Q. And what qualifies for gastrointestinal illness for this questionnaire?

A. Questionnaire qualified for gastrointestinal illness, three or more abnormal kind of increased bowel movement. And then we say it's reportable if it's accompanied by fever, abdominal cramps, vomiting. Yeah. On this case, this patient did not have any of those.

MR. HOFFMAN: Dr. Gonzalez-Noda, thank you for your time and thank you for the good care that you provide, Dr. Boyle.

THE WITNESS: Thank you so much, sir.

CROSS-EXAMINATION

BY MS. ROSE:

Q. Okay. Dr. Gonzalez-Noda, I'm going to ask you a few questions myself, okay, sir?

A. Yes.

MS. ROSE: Michael, could you take down the --

this exhibit?
MR. HOFFMAN: Oh, I apologize. Thank you.
MS. ROSE: No worries.
BY MS. ROSE:
Q. Okay. First -- first of all, Doctor, confirm for me, you did not witness Dr. Boyle's incident on the ship itself, correct?
A. No, I did not.
Q. Okay. So we've looked a lot at the -- the ship medical records, and I'm just going to go through them and -- and ask you some questions myself, and I will put them up if we need to put them up, okay, Doctor?
A. Sorry?
Q. I said I'm going to ask you some questions about the ship medical records and I -- I can share my screen with you if -- if -- if we need to.
A. Okay.
Q. Okay. Actually, before I do that, I want to ask you about the cruise itself. From my understanding, this particular voyage on the Panorama was called a Journey's Transpacific Itinerary. Do you know what that means?
A. Yes, correct.
Q. Okay. Can you please explain what that means?

A. That means that it's coming from one continent across the ocean to the other.

Q. Okay. And in this particular case, do you recall from where to where, like, where did this voyage start and where did it end?

A. It started in -- this voyage, it started in Singapore on October the 12th, and then ended on Long Beach, November the 5th, 2024.

Q. Okay. And when you say Long Beach, that's California?

A. That's correct.

Q. Okay. Now, so it started October 12th and it ended November 5th. That's a period of approximately 25 days; is that correct?

A. Correct.

Q. Okay. And so you noted that the -- the voyage began on October 12th. That's the same day that -- the very same day the plaintiff had his incident; is that correct?

A. That's correct.

Q. Okay. So the plaintiff had his incident on the very first day of this 25-day voyage, correct?

A. That's correct.

Q. Okay. And from your knowledge, he did not seek medical care other than in the Ship Medical Center

until after the 25-day voyage ended?
A. That's correct. However -- no. Repeat that question again, because he seek medical assistance on the 12th, and then on the 29th, when we arrived to Honolulu, he went outside to see the doctor in the hospital.
Q. Okay. So in Honolulu on October 29th; is that right?
A. That's correct.
Q. And for which of his ailments did he seek medical treatment in Hawaii, either the -- the leg or the gastro issues we've been discussing?
A. He was referred -- he accepted after a repeated offer to go outside to be seen by the specialist, and then he went to the hospital on the 29th. However, we did not -- he never came to tell us what was the result, what was the -- the report, the findings, so we do not have any other knowledge about it.
Q. And you said the referral was for the specialist. Was that a specialist for his leg or for his gastro issues or something else?
A. It was for the knee.
Q. For the knee. Okay. And that was -- you never saw him again after that? That's what I

understand?
A. Not -- not as far as I recall, and nor as our medical records.
Q. Okay. So from October 12th, the day of the incident, until October 29th, the plaintiff did not seek outside medical care; is that correct?
A. No, he did not. As far as I know, and as far as our knowledge, and as far as our records.
Q. However, from my understanding of your testimony, it was your recommendation that he seek outside orthopedic care immediately, correct?
A. Yes. We advised him to go as soon as possible, as we were already departing, but we offered him to go the day after -- I mean, two days -- a day and a half after, because we left on the 12th, so we offer him to be seen in Vietnam on the 14th. We offer him to go on Malaysia on the 16th. We offer him to go in Manila, Philippines, on the 18th.
Q. And tell me why it was you recommended he go seek outside medical care for his knee?
A. The reason why we advise him to go and see medical care outside is because we do not have MRI or CT scan on board. Therefore, we won't be able to see if there is any injury on the ligament, meniscus, or cartilage as they are not seen on the X-ray. So for

that, he needed to be seen by the specialist. Also, this patient had previous surgery on the same knee, and then is documented also is seen on the X-ray that he has some previous -- from previous surgery. So -- so that were the reason why we advised the patient to go for evaluation, because we do not have MRI or CT scan on board. And -- yes.

Q. Why is that important for him to have sought an MRI or other treatment that you didn't have on board immediately after his incident?

A. It was important to have it just to rule out any ligament or soft tissue injury that we are not able for us to see on board, and we cannot -- we won't be able to do surgery of the knee on board. So that is the reason why we advise our patient to be seen by the orthopedist or specialist on the hospital setting.

Q. And is that because if an MRI or other diagnostic tests had revealed those issues, getting immediate or prompt treatment would've been necessary?

A. Correct.

Q. So even though the plaintiff did not sign an Against Medical Advice form, because he did get treated by you, I understand, he did in fact go against the advice that you were giving him in terms of seeking outside treatment, correct?

A. Well, he -- he did not want to go to be seen by the specialist on those other places. He wanted to follow my advice, but only when he arrived to United States.

Q. But again, your advice was to go immediately, as soon as possible, correct?

A. That's correct. As soon as possible. And we offer all this port of call for him to go as soon as was possible. Yeah.

Q. Okay. I'm going to share my screen with you, Doctor. Okay. We've talked at length about the ship medical records in this case. I don't know what number Counsel marked them as, but I'm going to direct your attention to -- let me get there first. This will be Page 10 of the 26-page medical summary that we've looked at already.

A. Okay.

Q. So you see here it says Page 10?

A. Yes.

Q. Okay. And this middle paragraph here, do you see where it starts, "Upon arrival at the medical center"?

A. Yes.

Q. Okay. I'm going to read the -- the last sentence of that paragraph. It says, "However, the

lateral view of the X-ray showed a hematoma and a blood -- and blood collection and arthritic changes were also observed in the X-ray views." Do you see where I read that?

A. That's correct.

Q. Okay. Can you explain to me what this means, the, "arthritic changes were also observed in the X-ray views"?

A. Yes. This is an extra grow of the bone. So that is most of the -- our population above certain age develop. And so he had some changes on the -- of a growth kind of or inflammation on the -- we call it inflammation, but it's kind of overgrow on the -- on the joint, and they are called arthritic changes. This is what means arthritic one.

Q. Okay. And is that something you -- that existed prior to his fall?

A. Yes. That's correct.

Q. Okay. Discussing the -- the gastro issues that we've talked about, can you just explain in general why Carnival and you as a ship doctor take those issues seriously? Is it because or in part because you want to ensure that to prevent the spread of any gastrological, like, communicable diseases on board the ship?

A. Yes. Actually, the CDC of United States have

some guidelines that they advise or they impose, I would say, to all the crews in the industry where we need to be very vigilant about gastrointestinal symptoms, like vomiting, diarrhea, if anyone vomit in the public place or anyone have diarrhea in the public place. Was not about this patient, but in general. And then also because of this, in this case, our guest, our patient, Dr. Boyle, reported that they have six episodes of diarrhea, even though he includes it as normal.

And then we have to complete this form and request where he had the meals, what he ate, and when was the first symptom, the last symptom. That's why this form is so in detail, like you -- you can see there, because we need to make sure that if there is any possibility of any infection disease, we do not have an outbreak on board, like has been in the past in other kind of cruise ship. Like, I don't know if you remember in the media as a lot of cases sometimes about cruise ships having outbreak of diarrheas. That's the reason why we need to hold this guy back.

Q. Thank you, Doctor. As you were speaking, I put back up on the screen that CDC form that Counsel showed you, and I believe that you were just referring to. Do you remember this form? You answered some questions about it during Mr. Hoffman's questioning?

A. Yes, I remember.
Q. Okay. I'm going to make it a little bigger. And again, I apologize. I don't know what number it was marked as previously, but it is already a marked exhibit. So --
MR. HOFFMAN: 10.
MS. ROSE: Sorry, Michael?
MR. HOFFMAN: It was Plaintiff Exhibit 10.
MS. ROSE: Okay. Thank you.
BY MS. ROSE:
Q. Okay. And then you -- you touched on this in your answer, but down at the bottom, I just want to ask you about these -- these two questions. Did you eat anything while you were ashore at any port of call, and did you drink anything, including drinks with ice, while ashore at any port of call? Can you tell me why those questions are important?
A. These questions are important because we want to know -- actually, we need to try to kind of single out or try to have a more comprehensive, how we say, approach of where could be a potential source of starting any kind of infectious disease. Did he eat any contaminated food outside? Is there anything that somebody ate outside that he's coming on board with? So that's why this question is -- is asked.

Q. And in this case, Dr. Boyle answered both of those questions as yes, he did eat ashore and he did drink ashore, correct?

A. That's correct.

Q. Okay. Now, he attributes the cause of his gastro issues to the antibiotics, correct?

A. That's correct.

Q. Okay. Is it possible or did you do anything on the ship to know with certainty whether his issues were in fact caused by the antibiotics or potentially caused by something he ate or drank off the ship?

A. No. I cannot point out, but we listen to the patient, we believe our patient, and we have the best interest at heart about our patient's concern and report.

Q. So it's not possible to rule out that his -- his gastro issues were caused by something he ate or drank off the ship?

A. That's correct, but I have to believe my patient's statement.

Q. Okay. And Dr. -- Dr. Gonzalez-Noda, do you -- as a doctor with your medical training experience, do you think that delaying the orthopedic care contributed to the plaintiff's -- or the degree of his injury?

A. The longer you wait to get this kind of

treatment, the more difficult it would be because it could be -- in this case, I didn't know the final -- the final -- when we started talking, the deposition, I didn't know about the final diagnosis, but if he had a section or a -- or a -- a rupture of the tendon, the longer we wait, the more this tendon retracts and the more get -- shrinks. So then when they are repair, they need to go and -- and try to pick and fetch, I would say, the tendon to where it retracts and pull it back to join again. So the longer you wait, the -- the more -- I would say the more prone to complications it would be.

Q. And the antibiotics that he was prescribed, I believe you testified that that was to prevent a possible infection; is that correct?

A. That's correct. I just explained to the -- to the guest, and then I asked for his preference, and I said, this -- this presentation that you have, it could be consistent with the inflammation process as you felt. However, since you are having wound on the knee, that you did not have as obvious on the first day of -- or first day of presentation, and there is a wound knee now compared to the first day, and because you have a scratch or an abrasion that is showing that was not obvious and noticed the first day, I would advise that we give you coverage with antibiotics to make sure that

you do not suffer any infection on top of already the injury that you have. And that was a rationale of the antibiotic. I think I went a little bit more preventative on this case.

Q. And, Doctor, could you explain, based on your experience as a doctor, what the plaintiff would -- could have been at risk for had you not given him those antibiotics?

A. If I have not given these antibiotics and he have an infection, he could have -- given the fact that he have already an injury and he have the swelling on the area and he have a possible bleeding inside, that could be a -- a ground for growth of bacteria, antibiotics, and could complicate the outcome of the patient condition and the joint. The knee is a very important joint. So that's the reason why I discussed with the patient. And after his agreement and consent, we started with antibiotics to prevent any kind of possible complication or infection.

Q. And finally, Doctor, did the plaintiff give you any indication at any point when you were treating him that he was not satisfied with the medical care he was receiving on the ship?

A. On the contrary. I even wrote on my -- on my notes that they were so pleased and so happy with the

care and treatment received onboard. However, he clearly specified he was disappointed in falling onboard.

MS. ROSE: Understood. Thank you, Doctor. I have nothing further.

MR. HOFFMAN: All right. Doctor, you have the opportunity to read the deposition transcript before the court reporter finalizes it, or you have the right to waive and just let it -- let it be going to the record as is. So I don't know if you want to take your advice of Counsel, but generally --

MS. ROSE: I'll just -- yeah, just further. The -- so reading means you can read it to make sure the court reporter took everything down correctly. It's not meant to -- to change your -- the substance of your testimony. So that's your -- that's your right to read it and say, no, that's not what I said. What I said was this. Or you can waive that right and say, I believe the court reporter took down what I was saying correctly. That's your choice. We can't tell you what to do, sir, Doctor.

THE WITNESS: I -- I -- I trust on the court report -- reporter. I don't think it's necessary

for me. I have a great trust for the -- the court reporter.

MS. ROSE: Thank you so much, Doctor. So unless -- unless Mr. Hoffman has anything further, I believe you're free to go.

MR. HOFFMAN: You're free to go. Thank you, Doctor. Appreciate your time.

THE WITNESS: Thank you.

MR. HOFFMAN: Safe travels.

THE REPORTER: Just -- just to clarify, you're going to read?

MS. ROSE: No. He's waiving.

THE REPORTER: Okay. Sorry about that.

MS. ROSE: And you can log off now, Doctor.

THE WITNESS: Okay. Thank you.

MS. ROSE: Bye.

THE WITNESS: Bye-bye.

THE VIDEOGRAPHER: Will anyone be ordering a copy of the video today?

MR. HOFFMAN: I'm not going to order a copy of the video, but I would like to order a copy of the transcript overnight.

THE REPORTER: Overnight?

MR. HOFFMAN: Yes.

THE REPORTER: Okay.

MS. ROSE: We'll take the transcript, but we just need -- regular is fine.

THE REPORTER: Okay. What was I going to ask? I need the email to be put in the chat or to tell me -- one moment. One moment.

MR. HOFFMAN: What's your email so I can get you the exhibits, please?

THE REPORTER: I just have to get the little orders that you guys were putting in on the record. One moment, please. Okay. I will put my email in the chat. One moment. Okay. My email is there.

Ms. Rose, can I please have your email address?

MS. ROSE: Sure.

THE REPORTER: Mr. Hoffman as well, too, because I think I have the previous person's email.

MR. HOFFMAN: No worries.

THE REPORTER: Thank you.

Okay. That will be lrose@joneswalker.com for the copy.

MS. ROSE: Can I also give you my assistant?

THE REPORTER: Yes.

MS. ROSE: Because she -- I mean, it's all on the notice, but --

THE REPORTER: It's actually not. I tried to

find it. And then mahoffman@1800askfree.com. Erivera@joneswalker.com. Okay. And this is for next day?

MS. ROSE: That's my legal assistant.

THE REPORTER: Yes.

And this order for Mr. Hoffman is for the next day.

And, Ms. Rose, you would like yours sent to both email addresses and in regular time?

MS. ROSE: That's fine.

THE REPORTER: Okay. I am not sure how that is done completely, if the original is done in regular time, how it works out for you, but I'll have them reach out to you to let you know if it can be changed like that or what have you, okay?

MS. ROSE: For me, you mean?

THE REPORTER: Yes.

MS. ROSE: Okay. I mean, just my point is that, like, we don't need to pay for next day.

MR. HOFFMAN: Yeah.

THE REPORTER: Right. I just -- I just want you to know that I don't know how that's done exactly --

MS. ROSE: Okay.

THE REPORTER: -- because it will be ready by

the next day. So I don't know how it works. I'll have them reach out to you.

MS. ROSE: Okay.

THE REPORTER: All right?

MR. HOFFMAN: You got it.

MS. ROSE: All right.

THE REPORTER: And there are ten exhibits. Would you be keeping the exhibits, Mr. Hoffman?

MR. HOFFMAN: No. I am emailing them to you right now.

THE REPORTER: Okay. And if you can put the exhibit numbers on there.

MR. HOFFMAN: They are numbered and there's also an index in the beginning.

THE REPORTER: Actually, you have nine exhibits. My apologies. 1 through --

MR. HOFFMAN: Correct. I do.

THE REPORTER: -- 10, but missing Number 6.

MR. HOFFMAN: Correct.

THE REPORTER: Okay. All righty. Would -- is everyone okay to come off the record?

MS. ROSE: Yeah.

THE REPORTER: All righty. We are now off the record. The time is 1:47 p.m.

(Deposition concluded at 1:47 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, Chantell K. Clairmont-Folkes, Court Reporter, Notary Public, State of Florida, certify that Julio Cesar Gonzalez-Noda, M.D., personally appeared before me on the 12th day of October 2026, and was duly sworn.

Signed this 13th day of October 2026.



Chantell K. Clairmont-Folkes, Court Reporter
Notary Public, State of Florida
Commission No.: HH 209372
Commission Expires: January 24, 2030

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, Chantell K. Clairmont-Folkes, Court Reporter, certify that I was authorized to and did report the Deposition of Julio Cesar Gonzalez-Noda, M.D.; that a review of the transcript was waived; and that the transcript is a true and correct record of my notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 13th day of October 2026.



_________________________________________

Chantell K. Clairmont-Folkes, Court Reporter