**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:25-cv-24611-GAYLES/SHAW-WILDER**

MICHAEL SMITH,

Plaintiff,

v.

CARNIVAL CORPORATION,
NIKHIL MAHARAJ, M.D., and
LETLHOGILE RANTLERU, M.D.,

Defendants.
_________________________________/

**PLAINTIFF'S REPLY IN SUPPORT OF HIS DAUBERT MOTION TO LIMIT THE OPINIONS OF CARNIVAL'S MEDICAL CAUSATION EXPERTS ALEXANDER MERKLER, M.D., VICTOR H. BARREDO, M.D., AND JOSEPH I. FERNANDEZ, M.D. [ECF NO. 119]**

Plaintiff, Michael Smith, replies in support of his *Daubert* Motion, ECF No. 119 (the "Motion"), and in response to Carnival's opposition, ECF No. 140 (the "Response"). Record citations are to the exhibits filed with the Motion: the Merkler Report (ECF No. 119-1), Barredo Report (ECF No. 119-2), and Fernandez Report (ECF No. 119-3), cited by ECF page; and the Merkler (ECF No. 119-4), Barredo (ECF No. 119-5), and Fernandez (ECF No. 119-7) depositions, cited by transcript page and line (the ECF page is the transcript page plus one).

## INTRODUCTION

The Response confirms the Motion's premise. It states that Dr. Merkler's Opinion 2 "relies upon and is an extension of Opinion 1." ECF No. 140 at 2. Opinion 1 is that Mr. Smith was not a candidate for reperfusion therapy when he presented. Plaintiff does not challenge it. The question is whether Opinion 2 may extend past it, to the proposition that forty hours without stroke-unit monitoring, imaging, or secondary prevention made no difference, and on that question the

Response offers Dr. Merkler's curriculum vitae in place of a method. On Dr. Barredo, the Response concedes the fact the Motion relied on: the stroke "later converted into a hemorrhagic stroke while he was in the hospital." *Id.* at 6. On Dr. Fernandez, the Response reads his two causation sentences in a way that makes the second one meaningless. And on every point, the Response's fallback is that the defect goes to weight, citing cases that predate the 2023 amendment to Rule 702. The Committee adopted that amendment because "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," and "[t]hese rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The Response does not mention it.

## I. Dr. Merkler should be limited to reperfusion eligibility.

A curriculum vitae is not a methodology. The Response's principal argument is that Dr. Merkler's "143 Peer-Reviewed Research Articles," listed in the CV attached to the Response, supply the methodology for Opinion 2, and that he "cites the multitude of peer-reviewed literature that supports his opinions." ECF No. 140 at 4–5. His report cites no literature. Its list of materials reviewed consists of medical records, imaging, and two depositions. ECF No. 119-1 at 3–4. The CV, ECF No. 140-1, is a list of what Dr. Merkler has written; it does not identify which article, if any, supports the proposition that a cerebellar-stroke patient with fourth-ventricle compression who goes forty hours without monitoring will have the same outcome as one admitted to a stroke unit. The Response cites Merkler Dep. 75:6–9 as testimony that "the support for his opinion are contained in these cited peer-reviewed publications." ECF No. 140 at 5. The passage continues. The publications, he said, "are, sort of, studies that are investigative. They're based on administrative claims databases. They're not physical patients that I've been taking care of, so they

have to be taken as intrigue . . . . They're not definitive." Merkler Dep. 75:6–15. The cases the Response describes, *Burgess* and *Allison*, involved experts who itemized the literature on which they relied. ECF No. 140 at 4–5. Dr. Merkler itemized none.

Experience must be explained. The Response says the Motion "concedes" that Dr. Merkler's opinions rest on experience and publications, and that his experience and publications "are in itself reliable methodology." ECF No. 140 at 2–3. The Motion said the opposite: that experience must be explained. "[T]he unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express," and a witness relying on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

The Response says Plaintiff "fail[ed] to ever actually ask this question." ECF No. 140 at 3.

Plaintiff asked for "a guideline or a study that supports the proposition that a 36-hour delay in diagnosis and stroke unit admission does not affect outcome in cerebellar infarction." Merkler Dep. 74:1–4. The answer was "the totality of medical research on stroke." *Id.* at 74:6–12.

Plaintiff asked whether he could say that the same hospital care thirty-five hours sooner would have changed nothing, and he answered that even if Mr. Smith had been "teleported to the hospital instantaneously, there was no therapy that could have been provided that was going to change his outcome." *Id.* at 67:16–68:7. Asked whether the outcome "could have been worse . . . but it wasn't," he answered: "His outcome was not going to be worse because it wasn't worse. The proof is in the pudding." *Id.* at 68:12–17. That is reasoning from the result.

Dr. Merkler himself explained why stroke patients outside the reperfusion window are admitted to stroke units: "sometimes patients who have an acute ischemic stroke, they potentially could get worse over time. . . . [I]t can cause hydrocephalus. It can lead to secondary injury. And so we monitor the patients." *Id.* at 30:10–15. He agreed that if the onset was October 16 "or well before October 18th," then October 19 and 20, when Mr. Smith was still aboard, were "days 3 and 4" and fell "within the window of edema." *Id.* at 50:10–18. An opinion that the absence of that monitoring made no difference because the patient happened not to deteriorate is "connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The testimony that he has treated "thousands of patients with stroke just like him," Merkler Dep. 24:8–10, on which the Response relies, ECF No. 140 at 3–4, does not explain how that experience leads to the conclusion for this patient. *Frazier*, 387 F.3d at 1261.

The scope limits are unopposed. The Motion asked the Court to bar Dr. Merkler from opining on the standard of care, the feasibility or necessity of diversion or evacuation, the disembarkation category, and the AMA forms, because he disclaimed each and Carnival's counsel stated on the record that he was not produced "to speak on the standard of care of maritime medicine." ECF No. 119, § I. The Response does not address that request. It should be granted.

## II. Dr. Barredo's hemorrhage, apportionment, and history opinions should be excluded.

Hemorrhage. The Response states that "Mr. Smith had an ischemic stroke which later converted into a hemorrhagic stroke while he was in the hospital," and that Dr. Barredo's point is that thrombolytic medication "at that time" would have worsened the outcome. ECF No. 140 at 6. The testimony it cites, Barredo Dep. 95:2–96:2, is Dr. Barredo's explanation that thrombolytics given "after four and a half hours" carry "the high risk of converting it into a hemorrhagic stroke

from a bland stroke." *Id.* at 95:15–19. That is the thrombolysis-window opinion, which Plaintiff does not challenge. ECF No. 119, § II. The report says something different: among the reasons "there was really nothing much that they could do for him even if he had come in earlier" is that "his stroke was hemorrhagic, which if he had been treated with an antithrombotic 'clot busting' agent, would have increased bleeding." ECF No. 119-2 at 11. Read as written, the sentence tells the jury that Mr. Smith's stroke was hemorrhagic when he presented.

Dr. Barredo testified that it "was not a primary hemorrhage, for sure," that he "can't even tell for sure that there was any blood when he got to the emergency room on October 20th," and that "there was certainly no acute blood when he got to the emergency room." Barredo Dep. 59:10–60:17. A conversion that, on Carnival's own account, occurred days later in the hospital cannot have been a reason the shipboard team could do nothing on October 18. The sentence is not "based on sufficient facts or data," Fed. R. Evid. 702(b), and the window opinion stands without it.

Apportionment. The Response says the Motion cites no authority "that an expert cannot provide an opinion that a patient's outcome would be the same without specifically apportioning pre-existing comorbidities." ECF No. 140 at 7. The Motion makes no such argument. Its point is that Dr. Barredo did not purport to apportion; he testified that he cannot. Asked whether, given his report's statement that a cerebellar component "would be impossible . . . to dissect out or apportion," he could tell the jury the stroke contributes nothing to Mr. Smith's gait, he answered, "Correct." Barredo Dep. 81:2–8. He agreed that the only thing that changed in October 2024 was the stroke: "Oh, definitely. Those were all due to the stroke." *Id.* at 81:10–18. Asked whether he could give a year or cite a study for the prediction that Mr. Smith "was going to be in this current state" anyway, he answered, "I don't think there's any study that ever looked at a group of people with all those things." *Id.* at 81:20–82:7. The testimony the Response cites, Barredo Dep. 103:3–

107:17, explains how diabetic neuropathy affects balance; it supplies no basis for the prediction, and he went on to acknowledge that he "can't rule out some small component" from the stroke. *Id.* at 109:9–12. The Response's cases, as it describes them, hold that an expert need not rule out every alternative cause. ECF No. 140 at 7–8. Plaintiff agrees. The problem is the opposite one: an expert who admits he cannot separate the causes has no basis to tell the jury that the pre-existing ones would have produced the same result "sooner than later." That is the "analytical gap" *Joiner* describes. 522 U.S. at 146.

History and credibility. The Response relies on *Bahr* for the proposition that "test results that show material discrepancies" are admissible because they are not credibility determinations. ECF No. 140 at 8. The report's finding of "inconsistencies between the history given by Mr. Smith and the documented infirmary records," ECF No. 119-2 at 9, is not a test result. It is a comparison of a patient's account to a chart, made without reading the sworn accounts of Mr. Smith, Mr. Grimm, or Nurse Dube. Barredo Dep. 16:23–17:3, 43:18–25, 97:9–15. Asked about his report's statement that Mr. Smith's arm complaint was "not documented," he testified: "I definitely have not read his deposition and I -- I didn't *see* it anywhere in the records that I reviewed." *Id.* at 43:23–25. Whether the chart or the patient is accurate is for the jury.

## III. Dr. Fernandez's mobility-causation, pre-incident-walker, and credibility opinions should be excluded.

The two sentences cannot be harmonized. The Response reads the two causation sentences as consistent because the first attributes Mr. Smith's mobility loss to the stroke "rather than any new traumatic orthopedic pathology involving the knees," and the second attributes it to osteoarthritis "rather than any acute injury allegedly occurring on 10/18/2024." ECF No. 140 at 9;

ECF No. 119-3 at 8. That reading works only if the "acute injury allegedly occurring on 10/18/2024" is something other than the stroke. It is not.

Dr. Fernandez testified that he had seen no allegation of a knee injury and did not disagree that the injury alleged "is a stroke that was not diagnosed and the aggravation of its effects." Fernandez Dep. 29:5–16. So the second sentence attributes Mr. Smith's weakness, gait instability, and decreased mobility to osteoarthritis rather than the stroke, and the first attributes the same complaints to the stroke rather than the knees. His deposition repeats the contradiction: "none of the restrictions he has are related to the -- to his trip on the -- and the stroke," *id.* at 26:4–6, and then, "Neurologic and his pre-existing arthritic condition," *id.* at 27:2–3. The Response says an expert "need not rule out all possible alternative causes." ECF No. 140 at 9. He must at least choose one. Dr. Fernandez has no basis to choose: he is "not a neurologist," Fernandez Dep. 8:1, and he has no opinion on whether the right-arm incoordination, right-sided weakness, or balance problem is permanent, or on the extent of the cerebellar deficits, *id.* at 27:5–24. An orthopedist who cannot measure the neurological contribution cannot assign the loss to the knees, and Carnival cannot choose at trial which of the two sentences to present.

The walker statement still has no source. The Response says that "[e]xpert disclosure is not a memory contest," that the record supporting the statement that Mr. Smith required a rolling walker before the cruise is somewhere in the file Carnival produced, and that Dr. Fernandez "could not specifically recall" it at deposition. ECF No. 140 at 10. Fourteen days after the Motion identified the problem, the Response still does not identify the record. Carnival's examining neurologist agreed that he has "no record of him using a walker before October 2024." Barredo Dep. 80:20–22. Dr. Fernandez's own history records that "[p]rior to the CVA, he was able to ambulate long distances independently without significant pain or limitation," and that only

"[s]ince the event" has he required a wheeled walker. ECF No. 119-3 at 5. A diagnosis that contradicts the history the expert himself recorded, and that no identified record supports, is not "based on sufficient facts or data." Fed. R. Evid. 702(b).

The question is not what Dr. Fernandez remembered; it is what the report was required to disclose: "the facts or data considered by the witness in forming" his opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii).

The credibility opinion is a credibility opinion. The Response says Dr. Fernandez's opinions are not "personal opinions . . . regarding Mr. Smith or his credibility" but "objective findings." ECF No. 140 at 11. The testimony at issue is: "Not at all. I doubt that seriously," and "his testimony that he was able to do all those things that he said he could is just completely inconsistent with his X-rays and with the pathology in his knee." Fernandez Dep. 54:9–13, 55:5–9. Dr. Fernandez may testify to what the films show about Mr. Smith's knees. X-rays taken nineteen months after the stroke do not show how far Mr. Smith walked in October 2024, and an expert's statement that he "doubt[s]" the plaintiff's account is not a finding. The Response's closing argument, that Plaintiff "has demonstrated a pattern of claiming various medical personnel improperly documented findings," ECF No. 140 at 11, confirms the point: that is a credibility argument, and it belongs to the jury, not to a retained orthopedist.

## IV. The cumulative objection is preserved.

Carnival argues that the cumulative objection is premature. ECF No. 140 at 12–13. Plaintiff does not object to deferring it to trial, provided that the Court's rulings on Dr. Parejo, ECF No. 117, are taken into account when Carnival decides which of its experts will testify that Mr. Smith was outside the reperfusion window.

**CONCLUSION**

Plaintiff respectfully requests that the Court grant the Motion and enter an order

(1) limiting Dr. Merkler to Opinion 1 and excluding Opinion 2, its "teleported" formulation, and the unopposed scope limits identified in the Motion;

(2) excluding Dr. Barredo's statement that Mr. Smith's stroke "was hemorrhagic" and the "nothing much that they could do" conclusion to the extent it rests on hemorrhage, his apportionment and "sooner than later" opinions, and his opinion on inconsistencies in Mr. Smith's history; and

(3) excluding Dr. Fernandez's opinion attributing Mr. Smith's mobility loss to pre-existing disease, his statement that Mr. Smith required a rolling walker before the cruise, and any testimony that Mr. Smith's account of his pre-incident mobility is not credible.

**REQUEST FOR HEARING**

Plaintiff requests a hearing on this Motion, to be held together with the parties' other expert motions, ECF Nos. 111, 112, 114, 117, and 118, as Plaintiff requested in ECF No. 148. A hearing would assist the Court because, as Plaintiff explained in ECF No. 148, those motions address the same timeline, and the ruling on each bears on the scope of the others. Plaintiff estimates thirty minutes for argument.

Respectfully submitted,

/s/ Michael A. Hoffman
Michael A. Hoffman (Florida Bar No. 89549)
mahoffman@1800askfree.com
litigation@1800askfree.com
marinab@1800askfree.com
David W. Singer & Associates, P.A.
1011 South Federal Highway
Hollywood, FL 33020
Telephone: (954) 920-1571
*Attorneys for Plaintiff Michael Smith*